**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Case No. 21-cr-34 (CRC) |
| **THOMAS ROBERTSON,** | |
| Defendant. | |

**ORDER**

Defendant Thomas Robertson faces charges for his participation in the riot at the United States Capitol on January 6, 2021.  After his arrest, Mr. Robertson was granted pretrial release with several conditions, including that he must obey all federal, state, and local laws and that he must refrain from possessing firearms.  The government now submits that Robertson has violated these conditions by possessing several firearms and by ordering numerous others to be shipped to a nearby gun dealer and picked up later.  The government therefore moves to detain Robertson pending trial.

The Court will grant the motion.  As explained below, there is probable cause to believe that Robertson committed a felony—willfully shipping or transporting firearms and ammunition despite being under felony indictment—while on pretrial release.  Under the applicable statute, this finding gives rise to a rebuttable presumption that Robertson cannot be safely released into the community pending trial under any conditions.  Robertson has not rebutted this presumption.

## I.    Background

The following facts appear undisputed, except where otherwise noted.  On January 6, 2021, after a nearby rally in support of then-President Donald Trump's claim that the 2020 election had been stolen from him, a mob infiltrated the U.S. Capitol Building and disrupted the

certification of the election results.  One individual who entered the Capitol that day was Mr. Robertson, who at the time was a police officer in Rocky Mount, Virginia.  Def.'s Opp'n at 2, ECF No. 31; Hearing Tr. at 23-24 (July 21, 2021).  Shortly thereafter, Robertson made statements on social media praising the Capitol riot and appearing to endorse further political violence.  For example, on January 8, he posted: "Peace is done. Now is the time for all the braggart 'Patriots' to buckle armor or shut the fuck up.  Facebook warriors time is done.  The next revolution started 1/6/21 in case you 'Im ready' and 'standing by' guys missed it."  Mot. to Revoke Release Order at 2, ECF No. 30.

On January 13, Robertson was arrested in the Western District of Virginia and had an initial appearance before Magistrate Judge Robert S. Ballou in that district.  The next day, Judge Ballou issued a written order setting conditions for Robertson's release, including that Robertson "must not violate any federal, state, or local law while on release" and must "refrain from possessing a firearm, destructive device, or other dangerous weapons."  Order Setting Conditions of Release at 1-2, United States v. Robertson, No. 21-mj-5 (RSB) (W.D. Va. Jan. 14, 2021).  The order further directed Robertson to relocate all firearms in his home by January 15.  Id.

On January 19, Robertson appeared before Magistrate Judge G. Michael Harvey in this district.  Judge Harvey issued another order enumerating conditions of Robertson's pretrial release, including the requirements to comply with all federal, state, and local laws and to refrain from possessing a firearm, destructive device, or other weapon.  Order Setting Conditions of Release, ECF No. 12.

The same day as Robertson's appearance before Judge Harvey, law enforcement executed a search warrant at Robertson's home in Virginia.  In that search, officers found eight firearms and "large amounts of ammunition."  Mot. to Revoke Release Order at 3; see also

Hearing Tr. at 20-21 (acknowledgment by counsel that Robertson made a "mistake regarding the first order" setting conditions of release).

On January 29, Robertson was formally indicted on charges including obstruction of an official proceeding under 18 U.S.C. § 1512(c), a felony charge.  Robertson and a co-defendant, Jacob Fracker,[1] entered pleas of not guilty on February 2.

In mid-February, Robertson exchanged numerous emails about purchasing guns and ammunition.  At one point, Robertson used Venmo to pay $3,600 to a person with whom he had been corresponding about ammunition.  The note attached to the transaction read "Wedding Photos."  Mot. to Revoke Release at 6-7.

Robertson and Fracker appeared before the undersigned judge for the first time on February 25.  Both defendants orally moved to modify their conditions of release to permit them to possess firearms for personal protection.  The Court reserved ruling on these requests pending submission of written motions and reminded the defendants to adhere to their conditions of release.  Neither defendant followed up with a written motion.

During the next several months, Robertson made numerous purchases through Gunbroker.com, according to records the government later obtained from that website.  See Mot. to Revoke Release at 8-9.  On June 10, Robertson touted his pending charges on a Gunbroker.com forum, stating:

> I've said before.  They are trying to teach us a lesson.  They have.  But its definitely not the intended lesson. I have learned that if you peacefully protest than you will be arrested, fired, be put on a no fly list, have your name smeared and address released by the FBI so every loon in the US can send you hate mail.  **I have learned very well that if you dip your toe into the Rubicon. . . . cross it. Cross it hard and violent and play for all the marbles**.

---

[1] The present motion does not involve Mr. Fracker.

Mot. to Revoke Release at 14-15 (emphasis added).

On June 29, the Federal Bureau of Investigation executed a second search warrant at Robertson's home. Agents found, among other items, a loaded M4 military-style assault rifle in Robertson's bedroom; ammunition; four silencers; and a device labelled "ALERRT kit, props, and boobytrap sims," which the government claims "appears to be a partially assembled pipe bomb." Id. at 10-11; Reply at 3, ECF No. 32.

Robertson was not home during the search, but his son Hunter Robertson was present. The parties agree that Hunter told FBI agents that there was a gun inside his truck, which was parked on the property. See Reply at 2-3; Hearing Tr. at 7. Hunter has testified that he was also the owner of the M4 rifle found in Robertson's bedroom. Hearing Tr. at 7. In his telling, he had brought the M4 into the bedroom to retrieve ammunition from a gun safe located there. Id. at 5. The Government alleges that during the search, law enforcement asked Hunter about the M4 and "he declined to provide any information about it." Reply at 3. Hunter, however, denies that the agents asked him about the M4. Hearing Tr. at 6.

 Also on June 29, the FBI conducted a voluntary interview with the owner of Tactical Operations, Inc., a Federal Firearms License holder in Roanoke, Virginia. The owner stated that Robertson had 34 guns waiting for him to pick up and that Robertson had recently visited the store to handle the guns without taking them off the premises. Mot. to Revoke Release at 11-12. Three more firearms arrived at the dealer for Robertson between June 29 and July 1. Reply at 7.

On June 30, the Government moved to revoke Robertson's pretrial release. The Court promptly issued a warrant for Robertson's arrest, which was executed on July 7. Robertson is currently in detention pending the outcome of the Government's motion to revoke his release.

The motion is fully briefed, and the Court conducted a hearing at which it heard argument from counsel as well as live testimony from Hunter Robertson.

## II.   Legal Standards

A person who has been granted pretrial release and violated a condition of release "is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). The Court "shall enter an order of revocation and detention if, after a hearing," the Court finds that (1) there is either "probable cause to believe that the person has committed a Federal, State, or local crime while on release" or "clear and convincing evidence that the person has violated any other condition of release," and (2) either "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community" or "the person is unlikely to abide by any condition or combination of conditions of release." Id. § 3148(b). To determine whether there are any conditions that would prevent the person from fleeing or endangering the community, the Court must consider the factors listed in 18 U.S.C. § 3142(g)—i.e., the nature and circumstances of the offense charged, the weight of the evidence, the defendant's history and characteristics, and the nature and seriousness of the danger release would pose. 18 U.S.C. §§ 3148(b)(2)(A), 3142(g). However, "[i]f there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3148(b).

## III.   Analysis

The Government argues that Robertson's pretrial release should be revoked because he both committed a federal felony—namely, 18 U.S.C. § 922(n)—and violated the condition of his

release requiring him not to possess a firearm, destructive device, or other weapon.  The Court agrees with the Government's argument under § 922(n) and therefore need not reach the question of whether Robertson's alleged possession of firearms in violation of his conditions of release independently warrants detention.

To begin, there is "probable cause to believe," 18 U.S.C. § 3148(b)(1)(A), that Robertson violated § 922(n) by ordering guns and ammunition from other states to be shipped to the gun store in Roanoke.  Section 922(n) makes it a crime "for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  There is no dispute that Robertson was under indictment for a crime punishable by imprisonment for more than one year when he ordered the firearms for interstate delivery to the gun store.  See 18 U.S.C. § 1512(c) (providing for imprisonment up to 20 years).  Robertson does, however, argue that he did not violate § 922(n) because he did not personally ship or transport firearms or ammunition while under felony indictment.  See Def.'s Opp'n at 4-5.[2]  The government responds that Robertson

_____

[2] Robertson also argues that he did not receive firearms and ammunition within the meaning of § 922(n) because he did not—and legally could not—pick up his new firearms and ammunition from the gun dealer.  As Robertson's counsel noted at oral argument, a purchaser receiving firearms from a federally-licensed firearms dealer must fill out a form affirming, among other things, that the purchaser is not under felony indictment.  See Hearing Tr. at 16; Firearms Transaction Record, ATF Form 4473 (May 2020), available at https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.  There is insufficient evidence in the present record for the Court to determine whether it would be possible for Robertson to circumvent this legal impediment by, for example, designating a proxy to take delivery of the firearms on his behalf.  In any event, the point is immaterial.  As elaborated below, whether Robertson constructively possessed (and thus "received") the new firearms and ammunition has no bearing on whether he "shipped" or "transported" those items in violation of § 922(n).

violated the statute by causing the shipment and transportation of firearms and ammunition in interstate commerce, regardless of whether he did the shipping and transportation himself. Reply at 6-7.

The government has the better reading of § 922(n). In general, a person who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). Applying that principle, the Supreme Court has explained that 18 U.S.C. § 922(g), which expressly prohibits certain persons from shipping or transporting firearms in interstate commerce, also bars the same individuals from "*causing*" a firearm "to be shipped interstate." Barrett v. United States, 423 U.S. 212, 218 (1976) (emphasis added); see also United States v. Smith, 542 F.2d 711, 714-15 (7th Cir. 1976) (appellant caused interstate transportation of machine gun because he requested that the package be shipped and "set the entire delivery process in motion," although he "did not physically place the weapon in the possession of the carrier which ultimately transported it" across state lines). Indeed, as the Supreme Court noted in another firearm-control case, the ordinary meaning of the verb "ship" includes having an item shipped by a third party. See Muscarello v. United States, 524 U.S. 125, 135 (1998) ("If Smith, for example, calls a parcel delivery service, which sends a truck to Smith's house to pick up Smith's package and take it to Los Angeles, one might say that Smith has shipped the package[.]").

The same logic applies in the context of § 922(n). The case law applying § 922(n) to comparable facts, while sparse, supports this conclusion. See United States v. Call, 874 F. Supp. 2d 969, 974 (D. Nev. 2012) (person under felony indictment would violate § 922(n) by holding job that "involves him either directly or indirectly in the receipt, shipment or transportation of ammunition," even if he "personally" never "orders, touches, ships or sells ammunition"). So do

general principles of statutory interpretation.  "As the Supreme Court has instructed on countless occasions," courts must "presume 'identical words used in different parts of the same act are intended to have the same meaning.'"  Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176, 180 (D.C. Cir. 2008) (quoting Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 433 (1932)). The Court is also obligated to read § 922 in such a way as to "give effect, if possible, to every clause and word."  Duncan v. Walker, 533 U.S. 167, 174 (2001); see also Barrett, 423 U.S. at 218 (rejecting interpretation of a provision of § 922 that would "reduce that section to a near redundancy with" another provision of the same statute).  Insofar as Robertson contends that he did not ship firearms or ammunition because he did not physically or constructively receive the items, his argument would make § 922(n)'s shipping prohibition redundant of its separate ban on "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Robertson also suggests, with hardly any elaboration, that § 922(n) might violate the Second Amendment, either on its face or as applied to him.  Def.'s Opp'n at 5.  The Court disagrees.  As other courts have recognized, § 922(n) is subject to intermediate, rather than strict, scrutiny under the Second Amendment because it "applies only to a narrow class of persons, rather than to the public at large" and "only applies for the limited period between indictment and either acquittal or conviction."  United States v. Laurent, 861 F. Supp. 2d 71, 104 (E.D.N.Y. 2011); see also Call, 874 F. Supp. 2d at 978 ("The Laurent court's analysis of § 922(n) is persuasive and clearly consistent with the decisions by the federal courts of appeal upholding other provisions of 18 U.S.C. § 922."); State v. Jorgenson, 312 P.3d 960, 967 (Wash. 2013) (finding that "intermediate scrutiny is appropriate to evaluate" a state statute "comparable" to § 922(n) under the Second Amendment); State v. Philpotts, 132 N.E.3d 743, 752 (Ohio Ct. App.

2019) (similar).  A restriction on access to firearms will survive intermediate scrutiny if it is "substantially related to an important governmental objective."  Heller v. D.C., 670 F.3d 1244, 1258 (D.C. Cir. 2011).  "'[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect[,]' and proper deference is accorded to Congress's predictive judgments."  Medina v. Sessions, 279 F. Supp. 3d 281, 291 (D.D.C. 2017) (Cooper, J.) (quoting Schrader v. Holder, 704 F.3d 980, 990 (D.C. Cir. 2013)), aff'd sub. nom. Medina v. Whitaker, 913 F.3d 152 (D.C. Cir. 2019).

Courts applying intermediate scrutiny have consistently upheld § 922(n) and similar state statutes.  See Laurent, 861 F. Supp. 2d at 80; Call, 874 F. Supp. 2d at 979; Jorgenson, 312 P.3d at 968; Philpotts, 132 N.E.3d at 758.  As the court in Laurent explained, Congress initially enacted a narrower restriction on "receipt of firearms by violent indictees," but "[a]fter three decades of experience, it saw the need to expand the prohibition to all [felony] indictees."  861 F. Supp. 2d at 105.  The resulting statute may be debatable from a policy standpoint, but it "is substantially and directly related to the important government interest in public safety" on its face.  Id.  The Court will not depart from this unbroken and well-reasoned line of authority, especially without the benefit of full briefing on the issue.

That said, the case law leaves the door open for arguments challenging the application of § 922(n) to specific defendants.  See Call, 874 F. Supp. 2d at 978-79; cf. also Miller v. Sessions, 356 F. Supp. 3d 472, 485 (E.D. Pa. 2019) (18 U.S.C. § 922(g)(1) unconstitutional as applied to person who was denied access to firearms based on misdemeanor violation of Pennsylvania Vehicle Code, which was not a "serious crime").  However, the facts of this case do not support an as-applied challenge to § 922(n).  While Robertson is not accused of personally committing any violent acts on January 6, the strong weight of the evidence shows that he participated in the

Capitol riot, which posed "a grave danger to our democracy" as well as our national security. United States v. Munchel, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  Since that incident, both before and after his indictment, Robertson has expressed pride in his role and enthusiasm for the prospect of future political violence.  Robertson thus falls within the category of felony indictees whom Congress reasonably deemed unfit to ship, transport, or receive firearms and ammunition while under indictment.

There is also probable cause to believe that Robertson's violation of § 922(n) was willful. "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose."  Bryan v. United States, 524 U.S. 184, 191-92 (1998) (some internal quotation marks omitted).  "In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  Id. (some internal quotation marks omitted).  Here, a reasonable person could draw the inference that Robertson acted with consciousness of guilt in ordering firearms and ammunition for delivery to the gun dealer.  It appears that Robertson may have attached the label "Wedding Photos" to a Venmo transaction that was actually for ammunition, suggesting an effort to avoid detection.  See Mot. to Revoke Release at 6-7.  This evidence suffices to create a "fair probability"—in other words, probable cause—that Robertson's alleged actions in violation of § 922(n) were willful.  United States v. Jackson, 415 F.3d 88, 91 (D.C. Cir. 2005) ("Probable cause is synonymous with fair probability" (internal quotation marks omitted)); see also United States v. Gotti, 794 F.2d 773, 777 (2d Cir. 1986) (probable cause standard in 18 U.S.C. § 3148(b)(1)(A) does not require court to find allegation "more likely true than false").

Accordingly, there is probable cause to believe that Robertson committed a felony while on pretrial release.  See 18 U.S.C. § 924(a)(1) (person who "willfully violates any other

provision of this chapter . . . shall be fined under this title, imprisoned not more than five years, or both"); 18 U.S.C. § 3156(a)(3) ("the term 'felony' means an offense punishable by a maximum term of imprisonment of more than one year").  This finding creates "a rebuttable presumption . . . that no condition or combination of conditions will assure that [Robertson] will not pose a danger to the safety of any other person or the community."  18 U.S.C. § 3148(b).

Applying the relevant factors under 18 U.S.C. § 3142(g) to the facts presented here, the Court finds that Robertson has not rebutted this presumption.  First, "the nature and circumstances of the offense charged," 18 U.S.C. § 3142(g)(1), do not weigh strongly either for or against detention.  The fact that Robertson is charged with committing nonviolent offenses during the Capitol riot would not be an independently sufficient ground to detain him, see Munchel, 991 F.3d at 1284, and the government did not seek to detain him based on the original charges.  Nevertheless, the allegations against Robertson are serious and include a felony charge under 18 U.S.C. § 1512(c).  The D.C. Circuit has recognized that defendants charged with similar conduct on January 6 may properly be detained, depending on other relevant circumstances.  See United States v. Hale-Cusanelli, No. 21-3029, 2021 WL 2816245, at *5 (D.C. Cir. July 7, 2021) ("January 6 defendants" should not "get the special treatment of an automatic exemption from detention if they did not commit violence on that particular day").

Second, "the weight of the evidence against" Robertson, 18 U.S.C. § 3142(g)(2), supports detention.  Robertson does not contest that he entered the Capitol on January 6, as captured on video which the Court has reviewed.

Third, Robertson's "history and characteristics," 18 U.S.C. § 3142(g)(3), do not reassure the Court that he can be safely released into the community pending trial.  To his credit, Robertson appears to have served honorably in the United States Army and as a police officer.

By all indications, he also has strong family ties, and the Court is not aware of any criminal history before this year.  Yet, the Court must also take into account Robertson's conduct since January 6.  Both in the immediate aftermath of the riot and more recently, Robertson has expressed remorselessness and endorsed future political violence.  See Mot. to Revoke Release Order at 2 (Robertson posted on social media that "[p]eace is done" and "[t]he next revolution started 1/6/21"); id. at 14-15 ("I have learned very well that if you dip your toe into the Rubicon. . . . cross it.  Cross it hard and violent and play for all the marbles.").  Even more concerningly, the events precipitating the instant motion are not Robertson's first violation of his conditions of release.  As Robertson admits, Hearing Tr. at 20-21, law enforcement found firearms at his home on January 19, after the deadline to relocate those firearms set by Judge Ballou.  Even after January, Robertson appears to have continued violating the prohibition against possessing firearms.  See Reply at 3 (noting that silencers were seized from Robertson's home on June 29); 18 U.S.C. § 921(a)(3) (defining "firearm" to include any "firearm silencer").  This recent history suggests that, if released under new conditions designed to protect the community, Robertson might violate those conditions.

Fourth, "the nature and seriousness of the danger to any person or the community that would be posed by [Robertson's] release," 18 U.S.C. § 3142(g)(4), also tend to support detention.  The undisputed facts demonstrate a concrete risk that Robertson might participate in or provide material support to acts of ideologically motivated violence if released at this time. His recent social media posts may contain elements of bravado and hyperbole, but they provide evidence that Robertson is sympathetic to calls for a violent "revolution," Mot. to Revoke Release Order at 2, and has been further radicalized by his pending prosecution, see id. at 14-15. Coincidentally or not, Robertson has also embarked on a remarkable shopping spree for high-

powered assault weapons.[3]  Robertson's procurement of these dangerous weapons under the

surrounding circumstances heightens the risk to public safety, despite the fact that he might have

to lie on a federal form in order to take physical possession of them.

      Having weighed the relevant factors, the Court finds that Robertson has failed to rebut

the presumption that no condition or combination of conditions will assure that he will not pose a

danger to the safety of any other person or the community.

### IV.   Conclusion

      For the foregoing reasons, it is hereby

      **ORDERED** that [30] the United States' Motion to Revoke Release Order IS GRANTED.

It is further

      **ORDERED**, pursuant to 18 U.S.C. § 3142(i), that Defendant Robertson shall be

committed to the custody of the Attorney General for confinement pending trial in a corrections

facility separate, to the extent practicable, from persons awaiting or serving sentences or being

held in custody pending appeal.  It is further

      **ORDERED** that Defendant Robertson shall be afforded reasonable opportunity for

private consultation with counsel.  It is further

---

[3] Robertson suggests that the 34 guns he ordered before June 29 are simply World War II collectables.  Def.'s Opp'n at 2 n.2.  The record shows otherwise.  For example, a government inventory of the guns shows that many of them are recent vintage military-style assault weapons. <u>See</u> Reply Exh. 1, ECF No. 32-1 (listing, among other firearms, three M4 shotguns, one M16A4 rifle and two PA-15 rifles).

**ORDERED** that on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant Robertson is confined shall deliver Defendant Robertson to a United States marshal for the purpose of an appearance in connection with a court proceeding.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  July 28, 2021

14