```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
 4                     Plaintiff,           1:21-cr-00034-CRC
                                            Wednesday, July 21, 2021
 5      vs.                                 1:33 p.m.

 6      THOMAS ROBERTSON,

 7                     Defendant.
        - - - - - - - - - - - - - - - x
 8
 9      _____

10                     TRANSCRIPT OF MOTION HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                     UNITED STATES DISTRICT JUDGE
        _____
12
        APPEARANCES:
13
        For the United States:      ELIZABETH ANN ALOI, ESQ.
14                                   UNITED STATES ATTORNEY'S OFFICE
                                     555 4th Street, NW
15                                   Washington, DC 20530
                                     (202) 252-6782
16
        For Defendant Robertson:     MARK M ROLLINS, ESQ.
17                                   ROLLINS & CHAN
                                     419 Seventh Street, NW
18                                   Washington, DC 20004
                                     (202) 455-5610
19
20      Court Reporter:              Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
21                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
22                                   Washington, DC  20001
                                     202-354-3187
23

24

25
```

I N D E X

WITNESS                                                          PAGE

**HUNTER RAYMOND ROBERTSON**
        (By Mr. Rollins)................................... 5

```
 1                     P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3     record for Criminal Case 21-34, Defendant 1, United States
 4     of America vs. Thomas Robertson.
 5              Counsel, please come to the lectern and identify
 6     yourselves for the record.
 7              MS. ALOI:  Good morning, Your Honor; Liz Aloi for
 8     the United States.
 9              THE COURT:  Good morning, Ms. Aloi.
10              MR. ROLLINS:  And good morning, Your Honor; Mark
11     Rollins for Thomas Robertson.
12              THE COURT:  Good morning, Mr. Rollins.
13              Good morning, Mr. Robertson.  How are you this
14     morning?
15              THE DEFENDANT:  I'm well, thank you.
16              THE COURT:  Okay.  So we're obviously here for the
17     continuation of the hearing on the government's motion to
18     revoke the defendant's release.  We had a couple of false
19     starts by video last week from the Central Virginia
20     detention facility where Mr. Robertson had been detained, so
21     the Court thought it prudent to continue the hearing and to
22     gather everyone together in person this morning.  I believe
23     that we have also connected the public access line given the
24     short notice for the in-person hearing.
25              So with that, Mr. Rollins, I think we were in your
```

1     presentation.  I forget exactly where we left off, but you

2     should feel free to proceed where you left off or to recover

3     any material that you would like to review for the Court's

4     consideration.

5             And I take it that you've had an opportunity to

6     consult with your client on the questions that he indicated

7     he had on the video proceeding before we were unable to

8     proceed last week?

9             MR. ROLLINS:  I did, Your Honor.

10            THE COURT:  Okay.

11            MR. ROLLINS:  And we'd like to -- I know that

12    initially when this hearing had started we had not -- we

13    said there --

14            THE COURT:  And, Mr. Rollins, you should feel free

15    to take your mask off.

16            MR. ROLLINS:  That's much better.

17            THE COURT:  I take it you've been vaccinated.

18            MR. ROLLINS:  Yes.

19            THE COURT:  Okay.

20            MR. ROLLINS:  So I think when we initially started

21    we said that there would be no witnesses because at the time

22    we didn't believe that witnesses were necessary, but the

23    defense actually does want to call a witness to the stand so

24    that the government will have the opportunity to cross-

25    examine that witness regarding the M4 rifle.

```
1              I can call that witness now or continue to lay out
2      my argument.
3              THE COURT:  Why don't you call the witness now
4      since we've already gone over that material.
5              MR. ROLLINS:  Yes.
6              THE COURT:  Okay.  Sir, step right up.
7              (Witness sworn)
8              THE COURT:  And I'll tell you what, if you have
9      been vaccinated, you should feel free to take off your mask
10     to testify.  If you have not been or you prefer not to say,
11     you can leave it on, okay?
12             THE WITNESS:  Yes, Your Honor.
13             THE COURT:  Mr. Rollins, why don't you call the
14     witness, and then the courtroom deputy will swear him in.
15             MR. ROLLINS:  Yes.  The defense calls Hunter
16     Robertson to the stand.
17             THE COURT:  I'm sorry, what's his first name?
18             MR. ROLLINS:  Hunter Robertson.
19             THE COURT:  All right.
20             (Witness sworn)
21             THE COURT:  All right.  Good morning, sir.
22                  HUNTER RAYMOND ROBERTSON, Sworn
23                       DIRECT EXAMINATION
24     BY MR. ROLLINS:
25     Q.  Good morning, Mr. Robertson.  Could you please state
```

1    your name for the record.

2    A.   Hunter Raymond Robertson.

3    Q.   Mr. Robertson, how old are you?

4    A.   I'm 21, sir.

5    Q.   And what do you do for a living?

6    A.   I was recently employed in the Army.  I just got out of

7    the Army a few weeks ago.

8    Q.   Okay.  Do you recall the day of June 29th when the

9    police came to your father's home?

10   A.   Yes, sir.

11   Q.   Prior to them coming to the home, what was your

12   discussion with your father?

13   A.   The discussion I had with him before?  He discussed his

14   plans with me for the day.  He told me he was going to his

15   probation officer in Danville, and after he gets back from

16   Danville he's going to go to Christiansburg for the bank,

17   and then work on the house that I'm going to be going to or

18   renovating it.  So he told me that he'll be gone all day,

19   and he won't be back until late evening.

20         At that point I asked him, "Is it okay if I bring

21   my rifle on the property so I can shoot on the property

22   while you're not there?"

23   Q.   Is this something you engage in regularly?

24   A.   Yes, sir.

25   Q.   When you say "shoot on the property," can you describe

1    this property.

2    A.  So we have multiple places, you know, down the backyard,

3    down the front yard.  We have like little ranges set up that

4    we use to -- you know, for target practice and everything

5    like that.

6    Q.  And after you had that discussion with him, what did you

7    do?  I mean after he left.

8    A.  So after that point he told me, "As long as I'm not on

9    the property or anywhere near it, you are perfectly fine to

10   have your rifle here.  Just make sure that it is gone before

11   I get back."

12            And I said, "Okay, that's not a problem."

13            So in the morning, we both woke up.  He left for

14   Danville.  I went to go get my rifle from the house I have

15   my guns at, and then I brought it onto the -- into the

16   house, and I set it on the bed to get to his gun safe

17   because --

18   Q.  Explain why you set it on the bed.

19   A.  I set it on the bed because right next to the bed

20   there's a gun safe that has magazines in it with the ammo

21   for the rifle I was going to shoot, so I set it on the bed

22   to unlock the safe and get the ammunition that I needed.

23            THE COURT:  And who's bed did you set it on, sir?

24            THE WITNESS:  I set it on his bed.  The gun safe

25   is in --

1    Q.  When you say "his bed," who are you referring to?

2    A.  My father.

3    Q.  I'm sorry.  I didn't ask your relationship between you

4    and the defendant.

5            What is your relationship with --

6    A.  I'm his son.

7    Q.  Now, once the police arrived, what do you do then?

8    A.  So once I heard the dogs barking a lot, I went outside

9    to check what was all the commotion about, and at that point

10   about 15 to 20 FBI agents or task force all point guns at me

11   telling me to step out of the house.

12           I step out of the house.

13           They ask me if there's anybody else in the house.

14   I tell them no.

15           At that point they put me in handcuffs and send me

16   away from the house and --

17   Q.  How far --

18           THE COURT REPORTER:  Can you please let him

19   finish.

20           MR. ROLLINS:  I'm sorry.

21   A.  So at that point they set me down about 20, 30 feet

22   outside the house or outside the garage while they conduct

23   their search.

24   Q.  And did the police officers ask you about the gun inside

25   the house?

1    A.   About the gun inside the house?  They did not, sir.

2    Q.   Did they ask you about any other guns?

3    A.   Yes, they did.

4         So I have my truck obviously parked in the

5    driveway, and they asked -- because there was a Glock 19 in

6    the truck.  They asked if that was my truck and was that my

7    gun.  And I said yes, it was.  And they asked me to show

8    them proof that it was my gun, so I showed them my concealed

9    carry permit for that.

10   Q.   The M4 rifle that was on the bed when the police came,

11   does that rifle belong to you?

12   A.   Yes, sir.

13   Q.   Was Mr. Robertson ever in the house when that rifle was

14   present?

15   A.   No, sir.

16        MR. ROLLINS:  No further questions.

17        THE COURT:  Ms. Aloi.

18        MS. ALOI:  Your Honor, I'm going to have to ask

19   for a brief hiatus so -- I was given no notice that

20   Mr. Robertson's son would be here today, and as I proffered

21   to the Court during the detention hearing, he has now given

22   inconsistent statements to law enforcement, including

23   testifying today that he wasn't asked about the M4, which is

24   not my understanding of the recollection of the agents who

25   were on site that day, so I don't feel comfortable inquiring

1    of this witness without further consultation lest I put him

2    in a position that might implicate his Fifth Amendment

3    rights.

4              So if I could ask for a brief hiatus or a brief

5    continuance just for a few minutes so I can consult with a

6    supervisor, and I can come back.

7              It may be this particular issue is simply not

8    dispositive of the revocation motion.  I don't think it is.

9    There were certainly other firearms found at the house that

10   day, and so I don't want to do anything that might

11   jeopardize Mr. Robertson's rights.

12             THE COURT:  Very well.  We'll take a ten-minute

13   recess.

14             MS. ALOI:  Thank you.

15             THE COURT:  You can step down, sir.  If you could

16   not discuss your testimony with anyone until the proceeding

17   continues, okay?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  But you can step down.

20             (Recess taken)

21             THE COURT:  Okay.  We're back on the record.

22             Ms. Aloi.

23             MS. ALOI:  Thank you, Your Honor.  At this point

24   in the proceedings the government is not going to make any

25   inquiry of Mr. Robertson and actually would suggest that the

1   Court initiate the process of having him have his own lawyer

2   appointed because we do think it is important that he speak

3   with counsel on these issues.

4           THE COURT:  I also thought -- go ahead.

5           MS. ALOI:  The government thinks this issue is

6   probably peripheral to the resolution of the motion, and so,

7   to the extent the Court wanted to continue today instead of

8   waiting for that to be resolved, we would just ask for the

9   opportunity to revisit our motion should it be declined and

10  should the testimony be dispositive in some way.

11          THE COURT:  Very well.

12          Mr. Robertson, would you approach the witness

13  stand, please.

14          Okay.  Have a seat.  You remain under oath.

15          As Ms. Aloi has indicated, the government believes

16  that your prior statements to the law enforcement officers

17  who conducted the search may be inconsistent with the

18  statements that you have made here in court under oath

19  today, and in an abundance of caution, when that issue

20  arises -- and I'm not saying that they are inconsistent or

21  they're not -- the prudent course is to advise a witness

22  that his testimony may incriminate him and, therefore, that

23  you may want to consult counsel before providing any further

24  sworn testimony in court.

25          We don't have to deal with this issue now.  You

1    can think about whether you want to do that or not.

2            If, for some reason, the government -- excuse me,

3    if I were to grant the government's motion and the defense

4    wanted to renew its objections to the Court's ruling, it

5    could recall Mr. Robertson at a later date.

6            Likewise, if the Court were to deny the

7    government's motion, the government could seek to renew its

8    motion at a later date.

9            So for now we're going to continue with the

10   hearing, and we're going to dismiss Mr. Robertson.

11           And you can step down.  Thank you very much for

12   your testimony, okay?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Anything else, Ms. Aloi, on that

15   issue?

16           MS. ALOI:  Not on that issue.

17           THE COURT:  Okay.

18           Mr. Rollins.

19           MR. ROLLINS:  Yes.

20           THE COURT:  Press on.

21           MR. ROLLINS:  So I'm going to kind of go through

22   the issues here.  The M4 rifle -- and I understand the

23   government's objection, and they can continue to investigate

24   that, but just think about this in the terms of a 20-year-

25   old kid being presented by law enforcement, and so I think

1    that goes into the -- some of the analysis on whether he's

2    saying the gun is his or not saying it's his in reference to

3    the M4 rifle.

4           I'm next going to turn to the suppressors --

5           THE COURT:  Well, on that, putting the rifle

6    aside, wouldn't the ammunition in the safe that he just

7    testified about also constitute a violation?  Why wouldn't

8    it?

9           MR. ROLLINS:  No, I don't believe the ammunition

10   because that wasn't part of the Court's order to -- I think

11   the Court's order was to destructive devices or possession

12   of firearms.  Those ammunitions have been on the property --

13   as well as the gun powder that was on the property has been

14   there since the inception of this case.

15          THE COURT:  Okay.

16          MR. ROLLINS:  I don't think the government's

17   actually ever -- that was never their position, regarding

18   the ammunition, because there was no court order at the time

19   against it.

20          And that kind of speaks to the next issue

21   regarding the suppressors because this, again, was something

22   that was on the property at the time that the government's

23   agents came through and confiscated property, and so there

24   was no reason to believe that any of the items that the FBI

25   agents left or did not have an issue with in the prior --

1    when the government raised this issue in the past.  This

2    wasn't something they raised in their initial proceeding

3    back when they said that he violated the first order, and

4    these easily could have been raised at that point since we

5    can tell that that stuff has been on the property since the

6    government's presented receipts to show that those

7    suppressors have been around for the last ten years.

8              So we know that --

9              THE COURT:  You say suppressors.  The silencers?

10             MR. ROLLINS:  Silencers, yes.

11             So the government was aware that those things have

12   been around for the last ten years.  Furthermore, they've

13   been investigating Mr. Robertson, it appears, for the last

14   four or five months, and that was never an issue.  I mean,

15   obviously if he had said something about get me those

16   silencers or something to that end, they'd be presenting

17   that today.

18             But that's not what the argument here is.

19   this may come down to, you know, just kind of a -- someone

20   from -- a mistake of law on Mr. Robertson's part, but I

21   think somebody who's suggesting that he was supposed to turn

22   the silencers -- the silencers in at some point and his

23   understanding of the law, which was that you could not --

24   only law enforcement can take the silencers or himself or

25   the manufacturer.  He could not even turn them into the FFL.

1    So it's kind of -- they were just kind of there, and they

2    remained on the property.

3        I'm going to move to the explosive devices.

4    Again, I think the government's argument initially was

5    disingenuous regarding the can in which that item was found

6    in.  We've explained that Mr. Robertson has been a police

7    officer for the last 28 years, and during that time he was

8    actively engaged in instructing other police officers and

9    other personnel.  In fact, one of the issues in his

10    incarceration is that they've had to move him to Central

11    Virginia because he knows almost all the officers in the

12    surrounding area, and I think it was more comfortable for

13    them to put him somewhere where he's not familiar with those

14    officers because he's familiar with all those officers in

15    that he taught the majority of them regarding explosive

16    devices as a Level 2 instructor of ALERRT.  I don't think it

17    was unreasonable for the -- those devices that were in his

18    house that were inert.  They obviously could not have been

19    used.

20        And the government is aware of that as there was a

21    hole in the top of that device and a hole in the bottom of

22    that pipe.  That would clearly suggest that that was a

23    training tool, and I think the statute allows for possession

24    of items like that when there is safety involved.  And I

25    think, as we stated in our motion, that he could possess

1    things like that when there's safety -- basically teaching

2    safety of using those devices.

3              THE COURT:  Well, is the question what purpose he

4    put the devices to, or is the question whether the devices

5    were operable or not?

6              MR. ROLLINS:  Right.

7              THE COURT:  I mean, you can't say that, well, you

8    know, he had a loaded assault weapon in his house because he

9    trained other people out to assemble and disassemble that

10   assault weapon, right?  If the assault weapon worked,

11   clearly that would have been a violation.

12             I mean, why isn't the same analysis true for the

13   so-called pipe bomb?

14             MR. ROLLINS:  Well, I think you can take any

15   device and turn it into a destructive device, especially

16   when, in fact, he has -- I mean, because he's been trained

17   in this.  He could take any device and turn it into a

18   destructive device.

19             But I think what the Court is saying is those

20   devices that were there -- and I'm speaking to that grenade,

21   what they classify as M225.  As I've learned more about

22   that, you could, in fact, put gun powder in it, and it would

23   make a pop because of the way it's designed.  It's not

24   designed as a destructive device.  It's more like a fire

25   cracker.  If you were -- you could not turn that device into

```
1    a destructive device even if you pound it with gun powder.

2    It would simply make a pop so --

3              THE COURT:  But is your argument that the devices

4    aren't covered by the statute because they weren't presently

5    operable and he would have to do something to make them

6    operable --

7              MR. ROLLINS:  That's part --

8              THE COURT:  -- or is your argument, you know, Your

9    Honor, maybe they fall within the statute, but, look, these

10   were training devices, and, you know, if they were really

11   dangerous, then they would have been fully operable?

12             MR. ROLLINS:  And I think the latter is my

13   argument.

14             THE COURT:  Okay.

15             MR. ROLLINS:  Is that these -- they're simply

16   training devices.

17             And just speaking to that, even the grenade

18   itself, as I learned, the color of that -- the handle or

19   what they -- I forgot what they called it, but that color of

20   blue tells you that that's not -- that that's a training

21   grenade as opposed to green.  If the green was on top of it,

22   it would tell people that that is a useable device.

23             I just want to go into a little bit regarding the

24   guns that were ordered because that is probably alarming to

25   most people and to this Court.
```

1      So those items, once they're ordered, he cannot

2  take possession of them.  So that's first and foremost.  The

3  government's argument --

4      THE COURT:  What evidence is there of that fact?

5      MR. ROLLINS:  So because that FFL dealer -- and I

6  don't think anybody is disputing that that's a registered

7  dealer.  In order for him to give him those guns, he

8  actually has to fill out this form.  And I can present

9  this up to the Court.  This form basically tells the person

10 that -- it's a firearm transaction record, and one of the

11 questions on the form is if you're under indictment in any

12 court for a felony.

13     So this form, before he could ever take possession

14 of it, would have to be filled out by the FFL and him, and

15 that check box would have been marked.  And at that point

16 he's put on notice that he's not allowed to take possession

17 or -- I mean, obviously he is on notice because the Court

18 told him he could not take possession of any firearms, so --

19 but just to be clear, those firearms were in the possession

20 of the FFL, and he could not have taken possession of them.

21     I mention the form --

22     THE COURT:  Who fills out the form?  The purchaser

23 or the FFL?

24     MR. ROLLINS:  They both do it so -- and I can pass

25 this up to the Court.  But they both have to fill out this

1       Department of Justice form that basically -- you know, put

2       their information in, check off the boxes that are

3       appropriate to you.  And as I said, one of the questions on

4       this is whether you're under indictment.

5               THE COURT:  So this was not in your brief,

6       correct?

7               MR. ROLLINS:  No, this was not.

8               THE COURT:  Okay.

9               MR. ROLLINS:  This is something that I literally

10      have learned over the weekend in talking to my client, that

11      this form would have to be filled out and -- in order for

12      the transfer of that firearm.

13              THE COURT:  Okay.  Please pass it up.

14              MR. ROLLINS:  Can I show it to the government real

15      quick?

16              MS. ALOI:  We were not provided with a copy of

17      this in advance.

18              THE COURT:  Very well.  Take your time.

19              (Pause)

20              THE COURT:  Okay.  Proceed.

21              MR. ROLLINS:  Yes.

22              So the next part of sort of the government's

23      allegations is regarding the social media, and I understand

24      and he understands exactly now --

25              THE COURT:  But let's go back to the 34 firearms.

1    This form goes to possession.  Your argument is that he

2    could not have constructively possessed the firearms that

3    were sitting at the dealership waiting for him because in

4    order to exert control over the guns he would have had to

5    fill out this form.  Had he filled out this form, he would

6    have truthfully checked the box that he was under

7    indictment, and the firearms dealer then could not legally

8    give him those guns.  Is that your argument?

9              MR. ROLLINS:  That is my argument.  And

10   furthermore, as you just explained, that after that form is

11   filled out the FFL calls the state police to make sure that

12   that information is true and correct.

13             THE COURT:  Okay.  That still does not go to

14   whether he violated 922(n) by causing the shipment or

15   transportation of those guns in interstate commerce.

16             MR. ROLLINS:  I understand that.

17             THE COURT:  Address that.

18             MR. ROLLINS:  So --

19             THE COURT:  If you'd like.

20             MR. ROLLINS:  As 922(n) is shipping or

21   transporting of firearms, and I tried to look at this word

22   "shipped" and whether that implies to ordering because

23   obviously he's not the one shipping them.  He simply orders

24   them on the Internet, and then they are shipped.

25             I suspect that that is an issue for a -- either a

1    judge to decide at trial or the jury to make a decision of,

2    in fact, he's shipping those firearms, especially in lieu of

3    that form that indicates that kind of puts that person on

4    notice that you are not to do this.  It kind of puts people

5    on notice regarding that, and I just suspect that the

6    shipping or transporting is going to come down to whether he

7    shipped, which I think is the word that could have been

8    placed into that statute, and it's not, that he shipped.

9         THE COURT:  So the government cites a number of

10   cases where courts have interpreted the term "shipped" or

11   "transport" in other parts of 922 to include causing to be

12   shipped by putting the delivery in motion.

13        MR. ROLLINS:  Yes, Your Honor.

14        THE COURT:  And your argument is that those cases

15   were inapt because they don't relate to 922(n) or that they

16   were wrongly decided?

17        MR. ROLLINS:  No, that they don't refer to 922(n).

18        THE COURT:  Okay.

19        MR. ROLLINS:  It's the same as the Second

20   Amendment issue that was raised; you know, that case that

21   goes to whether that statute is, in fact, constitutional

22   because it doesn't -- it doesn't allow for an analysis of

23   that person.  So when they're saying that someone is under

24   indictment, they basically make it a blanket statement

25   regarding everyone instead of looking at the individual to

1    say this person cannot ship or transport a firearm.

2              THE COURT:  Very well.

3              MR. ROLLINS:  And, again, I think that that goes

4    to a court of law at a future time to make a decision on

5    whether that -- whether there's a Second Amendment violation

6    or whether it's a constitutional violation at statute.

7              THE COURT:  Now, you cited a district court case

8    out of Pennsylvania that was about the facial

9    unconstitutionality of 922(g)(1).  You may have tripped

10   across my decision in *Medina* on that same issue in this

11   circuit, which was affirmed by the D.C. Circuit.  So in

12   D.C., I don't believe any court has taken the position that

13   922(g) facially violates the Constitution.

14             Again, that's not 922(n).  You may have a better

15   argument, but --

16             MR. ROLLINS:  And I just say that that is -- it

17   will be an argument regarding if the government decides to

18   charge, you know, whether his second -- or whether his

19   Second Amendment rights are violated by that statute.  And I

20   understand that.  I don't -- I've looked for it, and I could

21   not find any court dealing with a 922(n).

22             I'm just going to speak briefly about the previous

23   order.  He fully accepted the responsibility on that, and,

24   you know, we've talked, and he was like it's mea culpa.

25   That was me, and I made that mistake regarding the first

1    order.

2              And it's important only because of those other --

3    those devices that were there at the original order.  And

4    the fact is they didn't raise these issues even though these

5    devices were present at the time of the first order.  But he

6    does accept, and it was mea culpa regarding that first

7    order.

8              And then regarding the social media, it is the

9    same in that his statements, and specifically the ones that

10   he made right after January 6th regarding we did this or

11   something to that extent, and the best I can summarize why

12   that statement is made regarding, you know, the attack on

13   the Capitol, it's more like his team and not that he is

14   doing this, but the team, the Redskins, or whatever.  Our

15   team won.  We did this.  But not that he was, in fact, out

16   there on the field playing.

17             And --

18             THE COURT:  Well, there are photographs of him on

19   the field.

20             MR. ROLLINS:  And I'm going to show the Court this

21   right now because I think this goes to the nature and

22   circumstances of this offense.  I've shown it to the

23   government, and I know they had an objection initially.

24             But it's a four-minute video.  It is taken from

25   that entire episode of Mr. Robertson coming onto the

1    property and leaving the property because we can see him

2    coming in, and we can see him going out, and you'll be able

3    to observe that.

4          THE COURT:  Well, Counsel, you can play it, if

5    you'd like, but just full disclosure, if it were just the --

6    you know his conduct associated with the underlying offense,

7    I would have reached the same conclusion that every other

8    magistrate judge reached, that that would -- that factor

9    would not favor detention given his particular role.

10          I think it's the subsequent events that have

11    caused the government to file the motion and why we are here

12    today.

13          Feel free -- I'm happy to watch, but...

14          MR. ROLLINS:  I would ask that the Court watch

15    only because even though they -- even if they get past the

16    probable cause or the clear and convincing evidence, the

17    Court still has to look at the 3142(g) factors.

18          THE COURT:  Fair enough.

19          MR. ROLLINS:  So I will play this for the Court.

20          (Video playing)

21          MR. ROLLINS:  And I hope the Court can see that

22    that's Mr. Robertson with the blue book bag coming in with

23    the telephone.

24          And the observance of the time is 2:17.

25          (Video playing)

1          MR. ROLLINS:  This is the next shot inside the --

2     what's this called? -- the crypt room where you can see him

3     as well.  You have to look really clear.  He's standing next

4     to another gentleman there just kind of playing on his

5     phone, doing something on his phone.

6          (Video playing)

7          THE COURT:  I'm sorry, can you point out the

8     defendant in this one.

9          MR. ROLLINS:  So if you look in the back of the

10    line, he's at the back of the line right now.

11         THE COURT:  Yes, got it.

12         (Video playing)

13         MR. ROLLINS:  Okay.  That's the end of that video.

14    That has been provided to us by the government.

15         And I point this video out only, as I stated, that

16    the nature and circumstances of this offense is that you can

17    see that Mr. Robertson was there, and that's a decision for

18    the jury to decide whether, in fact, he -- you know, there's

19    no question he was there.  The question becomes whether he

20    was, as the government said, an insurrectionist based on --

21    especially after looking at that video.  And I know that

22    that's what one of their themes of their argument's been,

23    that he's an insurrectionist.

24         But if you look at that video, you see a gentleman

25    coming in peacefully, walking through the door, going down

1    the hallway, and coming right back.  I think it's somewhere

2    in the range of 20 minutes that he was actually in the

3    building, and then he left.

4          He did nothing more other than his presence was in

5    the building.  And that may or may not be a violation, but

6    clearly regarding the nature and the circumstances of the

7    events, there was no violence involved.

8          That also goes to the same as the weight of the

9    evidence against the defendant in the second factor looking

10   at 3142.

11         One of the big factors I'd ask this Court to look

12   at is the history and characteristics of my client, and that

13   is, again, he's been a police officer for 28 years with a

14   record of not once being charged or someone making a

15   complaint against him that he used excessive force or that

16   he was violent in some way.  None of that is -- any of his

17   police history goes back to show that he's ever done

18   anything like that.  And the fact is that he's been a police

19   officer's police officer in that he's trained other

20   officers.

21         So what we have here is yes, could the Court find

22   that mistakes were made during the pretrial phase?  Yes.

23         Is there a -- is there another release condition

24   that this Court could impose that would express

25   responsibility upon Mr. Robertson in complying?  We suggest

1    that this Court can, in fact, do that.  One is that the

2    Court -- he's been detained now for over a week.  He

3    understands and, you know, I think that the thrust of that

4    argument is contempt basically.  Contempt.  You've gotten

5    his attention.  He's been locked up.  He's been -- he's been

6    locked up for 23 hours a day because he's an officer.  He

7    cannot leave.  He's -- detention for him is a little bit

8    more extreme than most because of the isolation that he's

9    put into because of his background.

10              And so is he a danger to someone else in the

11   community?  He's never presented that at all.  Even in the

12   video, even coming onto the Capitol we show that he's never

13   been a danger to anyone in the community.

14              The mere fact that -- like I said, were there

15   mistakes made during the pretrial?  I think this Court

16   probably could find that mistakes were made on behalf of

17   Mr. Robertson.

18              But is that a reason to detain him between now and

19   his trial?  I would ask this Court not to make that extreme

20   measure.

21              If the Court wants to take additional measures, it

22   could, in fact.  He has been trained.  He's eligible for

23   high-intensity supervision, or this Court can simply place

24   him on house arrest.  All those other -- I think -- the

25   Court could use those in order -- and get his attention, and

1    I would ask the Court to deny the government's motion based

2    on all of that.

3                THE COURT:  Very well.

4                Ms. Aloi.

5                MS. ALOI:  So, Your Honor, where we left off last

6    week the defendant had conceded that there was probable

7    cause that violations had been committed while he was on

8    pretrial supervision, and, in fact, as you are aware, a

9    judge has found that in the Western District of Virginia.

10   And I just want to flag the standard for the revocation we

11   request today because, under 3148, once there is probable

12   cause there is a rebuttable presumption that no combination

13   or conditions -- or combination of conditions would assure

14   the safety of the community.

15               And the Court can find one of two things in

16   revoking the defendant's release.  Either that based on the

17   factors set forth in 3140(g), there's no condition or

18   combination of conditions of release that will assure that

19   the person will not flee or pose a danger to the community,

20   or --

21               THE COURT:  So ordinarily I would have to make

22   that finding by clear and convincing evidence, but the clear

23   and convincing standard is -- would not apply because

24   there's a rebuttable presumption?

25               MS. ALOI:  That's right.  And in addition, there's

1    an alternative finding you can make, which is simply that

2    the person is unlikely to abide by any condition or

3    combination of conditions of release.  And I think here the

4    evidence supports that finding.

5            I think the 3142(g) factors also do, and we

6    discussed some of that the last time we were here, and I'm

7    happy to answer any questions you may have on that.

8            But what we have here is a defendant who just

9    thinks he's above the law.  The excuses you have heard today

10   for his conduct don't actually offer any explanation for why

11   he completely disregarded the Court's orders in the first

12   instance and, again, in the second instance following the

13   search.

14           You heard a lot about how those items were there

15   before the search.  Well, as you are aware, at the time the

16   first search was conducted what they were searching for

17   related to the insurrection at the Capitol.

18           Last time we were here there were representations

19   made that an ATF representative at the search told

20   Mr. Robertson that he could have his stuff, and not only

21   were there no ATF representatives at the search, at that

22   first search, but probation was called -- the supervise --

23   the individuals supervising Mr. Robertson's release were

24   contacted during that search, and they confirmed that he

25   could not have any firearms.

1              Whether or not they were seized under the warrant

2       is immaterial.  You ordered him not to have any firearms,

3       and he kept firearms in the house.  That is a flagrant

4       disregard for the rule of law and this Court's orders that

5       perfectly illustrate that there's no combination of

6       conditions that would assure the safety of the community.

7              I would also add, these offenses he has committed

8       related to firearms could happen from the home, and so home

9       detention is not an answer here.  He can continue to ship

10      and transport firearms from his residence, and so that is

11      just a red herring to suggest that that would somehow ensure

12      the community's safety.

13             THE COURT:  Okay.  Address a couple of points.

14             MS. ALOI:  Yes, Your Honor.

15             THE COURT:  The first is the ammunition point that

16      the Court raised with the defense.  Is that a separate

17      stand-alone violation of his conditions, to possess

18      ammunition?  Is that construed as a firearm or a destructive

19      device under the statute?

20             MS. ALOI:  Your Honor, unfortunately the statute

21      is not -- it's not clear whether or not ammunition is

22      included in the definition of "firearms" for the purposes of

23      the release order.  There are definitions, my understanding

24      is, of firearms within the code that do refer back to

25      ammunition, but not all of them do.

1      THE COURT:  What about explosive devices?

2      MS. ALOI:  Explosive devices.

3      THE COURT:  Is an ammo round an explosive device?

4      MS. ALOI:  I do not know if an ammo round is an

5  explosive device.  What I can tell you is that there were

6  explosive devices found in Mr. Robertson's residence the day

7  of the second search, and those devices -- why he had them

8  is immaterial.  He was not permitted to have them, and

9  that's actually an issue irrespective of his status as a law

10  enforcement officer, former law enforcement, or somebody

11  under felony indictment.  They are very highly regulated.

12  You cannot just have them in your home.

13      THE COURT:  But I hear counsel to be making a no-

14  harm-no-foul argument; that, look, maybe they fall within

15  the statute, but they were clearly for training purposes

16  because of his former role as a law enforcement trainer,

17  which the government doesn't seem to dispute, and that they

18  weren't readily operable at the time.

19      MS. ALOI:  Your Honor, we do dispute that in his

20  role as a former law enforcement officer, that he would be

21  permitted to have these items.  And we also --

22      THE COURT:  But you don't dispute that he

23  conducted training in his former role.

24      MS. ALOI:  Your Honor, I am not prepared to opine

25  on whether or not he conducts training in his former role.

1        The firearms offenses, as you are aware, are under

2   investigation, and to the extent he may have been improperly

3   retaining them or have not necessarily had them for the

4   correct purpose is a ripe matter for that investigation.  I

5   don't think it matters.  They were in violation of this

6   Court's order.

7        And also, I don't think you could say no harm no

8   foul here.  I think it's important to look at this in the

9   context of the defendant's greater conduct.  So he has these

10  things at his home.  He is shipping and transporting an

11  arsenal of weapons, and he is advocating for violence, both

12  in the immediate aftermath of the insurrection on January

13  6th and as recently as June 10th.  His own words:  Being

14  nice, polite, writing letters, accepting email hasn't

15  worked.  All that's left is violence.  Peace is done.

16  Buckle armor.  The only voice these people will listen to is

17  violence.  Buckle armor or just stay home.  I've said before

18  they're trying to teach us a less on.  It's definitely not

19  the intended lesson.  I have learned that if you peacefully

20  protest then you'll be arrested, fired, put on the no-fly

21  list, have your name smeared and address released by the

22  FBI.  I have learned very well if you dip your toe into the

23  Rubicon, cross it.  Cross it hard and violent and play for

24  all the marbles.

25       That does not sound to me like someone who

1    intended no harm no foul with the 37 weapons, explosive

2    devices, you know, disassembled pipe bomb and ammunition at

3    his home.

4                THE COURT:  Okay.  Address the DOJ form that the

5    defense has called to the Court's attention in connection

6    with the possession or constructive possession of the 34

7    firearms.

8                MS. ALOI:  So the 34 firearms are evidence of his

9    violation of 922(n), which involves the shipping and

10   transport, and so certainly whether or not he possessed them

11   does not -- is not dispositive of whether or not he

12   committed that violation.

13               Moreover, he actually went to the FFL and did

14   possess them.  He asked to hold his guns, and he did.  And

15   so as we briefed in our motion, he took advantage of the

16   fact that he had the ability to possess them through the

17   FFL, to go in and exercise that right to visit his guns for

18   whatever reason.

19               And so now that is not the basis for our presence

20   here today, which is to say that he was ordered not to have

21   firearms at his house.  Whether or not he constructively

22   possessed them at FFL is a conversation for another day.  It

23   seems --

24               THE COURT:  But if there's no -- if we're not on

25   the rebuttable presumption prong, you have to show by clear

1    and convincing evidence that he violated a condition, if the

2    condition was possession of a weapon, a firearm.  And, you

3    know, he has submitted a form which appears to show that in

4    order for him to actually take true possession of the

5    firearms he would have to make a false certification and

6    somehow get them notwithstanding the fact that the dealer

7    would have to call for verification of his felony indictment

8    status.

9         So have you proven by clear and convincing

10   evidence that those 34 constituted a violation of a

11   condition?

12        MS. ALOI:  Your Honor, that form is actually

13   interesting because it's the same type of form that

14   accompanied the silencers that were at his house that states

15   that the silencers are firearms.  So we have proved by clear

16   and convincing evidence that he possessed the firearms that

17   were at his home registered to him on the day of the

18   searches, and so he has violated the conditions of release

19   as to those items irrespective of whether or not he

20   possessed the items that were stored at the FFL and shipped

21   and transported at his direction.

22        THE COURT:  Okay.

23        All right.  So I was prepared to rule from the

24   bench this morning, but you all have thrown me a couple of

25   curveballs with these forms and with the presentation of

1    younger Mr. Robertson's testimony, so what I would like to

2    do is to take this matter under advisement, and I will get

3    out something very soon in writing to incorporate all of the

4    issues that have been raised today.

5            Ms. Aloi, I don't read 1348 to require a written

6    detention order as 1342(f) does, but do you have a view on

7    whether a written order is required under 1348?

8            MS. ALOI:  Your Honor, I -- the Court's

9    indulgence.

10           THE COURT:  To detain or to release.

11           MS. ALOI:  I believe by revoking the current

12   conditions he would then -- he would then -- the warrant is

13   issued, he would then be detained, so I don't know that a

14   written order is necessary.

15           THE COURT:  Okay.  Very well.  We'll do one

16   anyway.

17           MS. ALOI:  Thank you.

18           THE COURT:  Anything else?

19           MS. ALOI:  Not from the government.

20           THE COURT:  Okay.  We are adjourned.  It's good to

21   see everybody in person for once.

22           MS. ALOI:  It's nice to be back in the courtroom.

23   Thank you.

24                   (Whereupon the hearing was

25                    concluded at 11:03 a.m.)

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                    I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 30th day of July, 2021.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
                                     Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25