```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2
     - - - - - - - - - - - - - - - x
3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4              Plaintiff,               1:21-cr-00034-CRC
                                        Monday, April 4, 2022
5    vs.                                9:34 a.m.

6    THOMAS ROBERTSON,                  *MORNING SESSION*

7
               Defendant.
8    - - - - - - - - - - - - - - - x

9    _____

10                  TRANSCRIPT OF JURY TRIAL
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
     _____
12
     APPEARANCES:
13
     For the United States:    ELIZABETH ANN ALOI, ESQ.
14                             RISA BERKOWER, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
15                             555 4th Street, NW
                               Washington, DC 20530
16                             (202) 252-6782

17
     For Defendant Robertson:   MARK M ROLLINS, ESQ.
18                             CAMILLE WAGNER, ESQ.
                               ROLLINS & CHAN
19                             419 Seventh Street, NW
                               Washington, DC 20004
20                             (202) 455-5610

21   Court Reporter:           Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
22                             U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
23                             Washington, DC  20001
                               202-354-3187
24

25
```

```
1                       P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Your Honor, we're on the

3    record for Criminal Case 21-34, United States of America vs.

4    Thomas Robertson.

5            Counsel, please identify yourselves for the

6    record.

7            MS. ALOI:  Good morning, Your Honor; Liz Aloi and

8    Risa Berkower for the United States.

9            THE COURT:  Good morning.  Can you all hear me?

10           MS. WAGNER:  Good morning, Your Honor; Camille

11   Wagner on behalf of Mr. Robertson, along with my co-counsel,

12   Mark Rollins.

13           THE COURT:  Okay.  Good morning, everyone.  Good

14   to see you.  Obviously this is jury selection.

15           Before we start, it occurred to me, Ms. Aloi, that

16   I'm not certain that Mr. Robertson has been arraigned on the

17   second superseding indictment; is that correct?

18           MS. ALOI:  Yes, Your Honor, I think that is

19   correct.

20           THE COURT:  Okay.  Mr. Robertson, have you been --

21   welcome, sir.  It's good to see you.

22           THE DEFENDANT:  Good morning.

23           THE COURT:  Have you been furnished with a copy of

24   the March 23rd superseding indictment in this case, which I

25   believe adds a sixth count?
```

```
 1                    THE DEFENDANT:  Yes, sir.
 2                    THE COURT:  Okay.  Ms. Wagner, Mr. Rollins, waive
 3        reading?
 4                    MR. ROLLINS:  Yes.
 5                    THE COURT:  And would you like to --
 6                    MR. ROLLINS:  We enter a plea of not guilty and
 7        assert all constitutional rights.
 8                    THE COURT:  Very well.
 9                    Okay.  I'm having a little trouble picking you
10        folks up.  This is obviously not my normal courtroom, so is
11        there a microphone?
12                    MR. ROLLINS:  My apologies.  On behalf of
13        Mr. Robertson, we waive formal reading of the charges, plead
14        not guilty, and assert all constitutional rights.
15                    THE COURT:  Okay.  Very well.  The not guilty plea
16        is entered.
17                    Before we bring the jury in, I know there were a
18        few preliminary evidentiary issues that were filed over the
19        weekend.  Let's deal with those at the end of the day.
20                    Anything else related to jury selection?
21                    MS. ALOI:  Yes, Your Honor.  Our case agent is
22        identified as one of the witnesses.  Since she's going to be
23        at counsel table, may we also introduce her when the counsel
24        and legal assistant are introduced to the jury to
25        distinguish between her sitting here and being a witness?
```

1          THE COURT:  Yes, that's fine.

2          MS. ALOI:  Thank you.

3          THE COURT:  And, Mr. Rollins, I know we have court

4     security here.  I generally just refer to them as court

5     staff.  Okay?

6          While we're at it, why don't you all come up and

7     pick the two alternate seat numbers.

8          THE COURT:  Ms. Aloi's choice is the first

9     alternate seat, and Ms. Wagner's choice is the second

10    alternate seat.

11          (Pause)

12          THE COURT:  Again, Counsel, we'll just be here for

13    the collective questioning.  We will bring each juror in for

14    individual voir dire in Courtroom 27, and I believe we'll be

15    able to do the strikes in Courtroom 27 as well; so the

16    actual order is not all that important now.

17          All right.  We're off the record.

18          (Discussion off the record)

19          THE COURT:  Mr. Rollins, Ms. Wagner, who will be

20    introducing counsel and the defendant?

21          Mr. Rollins, okay.

22          THE COURTROOM DEPUTY:  Your Honor, the jury panel.

23          (Venire enters courtroom)

24          THE COURT:  Okay.  Welcome, everyone.  Good

25    morning.

```
 1              VENIRE IN UNISON:  Good morning.
 2              THE COURT:  Welcome to the United States District
 3     Court for District of Columbia.  My name is Christopher
 4     Cooper, and I will be presiding over this trial.  Thank you
 5     from the outset for your service.
 6              Before we start the next phase of the jury
 7     selection process, let me just orient you a little bit to
 8     where we are.
 9              This is our ceremonial courtroom.  This is the
10     largest courtroom in the courthouse.  We normally hold
11     special ceremonies here like immigration and naturalization
12     ceremonies where we swear in new citizens, investiture
13     ceremonies for new judges, retirement ceremonies, and
14     portrait hangings and other special events.  But because of
15     the COVID pandemic, we have been conducting jury selections
16     here to enable folks to socially distance for jury
17     selection.  We will be conducting the first part of the
18     process here in this courtroom, and then once we ask you all
19     a series of collective questions, we will be questioning you
20     individually in my courtroom, which is on the same floor
21     down the hall.
22              All right.  You've already met Ms. Jenkins.  She's
23     the courtroom deputy.  She makes sure that all the trains
24     run reasonably on time and that I'm not screwing anything
25     up.
```

1          Ms. Moreira, to my left, is our court reporter.

2     She is taking down everything that takes place this morning.

3          To my right is one of my law clerks.  We also have

4     some members of the press who are covering this trial in the

5     jury box to my right as well as I believe a sketch artist.

6          Mr. Hennessy; is that right?  Good to see you,

7     sir.

8          All right.  Before we start, if everyone could

9     stand and raise their right hand, and we will swear -- the

10    courtroom deputy will swear you in.

11          (Venire sworn)

12          THE COURT:  All right.  Ladies and gentlemen, does

13    everyone have an index card and a pen or pencil?  The first

14    thing I would like for you to do is to write your juror

15    number -- not your name, but your juror number -- in the

16    upper right-hand corner of the index card.

17          And I'm going to ask you a series of questions.  I

18    think there are about 40 of them in total.  And each of the

19    questions that I will ask is a yes-or-no question.  If your

20    answer to any particular question is "yes," write down that

21    question number.  Don't write down "yes" or "no."  Just

22    write down that question number.  All right?

23          And before I start with the questions, let me give

24    you an overview of what this case is about.

25          This is a criminal case entitled *United States vs.*

1    *Thomas Robertson*.  It arises out of the defendant's conduct

2    at the U.S. Capitol on January 6, 2021.  At the time of the

3    conduct, the defendant was an off-duty police officer in

4    Rocky Mount, Virginia, which is near Roanoke.  The

5    government has charged Mr. Robertson with six crimes related

6    to Congress's meeting at the United States Capitol on

7    January 6, 2021, to certify the Electoral College vote for

8    president.

9         First, he is charged with obstructing an official

10   proceeding for allegedly interfering with Congress's

11   meeting.  Second, he is charged with interfering with law

12   enforcement officers during a civil disorder.  Third, he is

13   charged with being unlawfully present in the Capitol

14   Building and grounds while armed with a dangerous weapon,

15   specifically a large wooden stick.  Fourth, he is charged

16   with disorderly and disruptive conduct in the Capitol

17   Buildings and grounds while armed with that stick.  Fifth,

18   he is charged with engaging in disorderly and disruptive

19   conduct with the intent to impede, disrupt, and disturb

20   Congress.  And sixth, he is charged with obstructing an

21   official proceeding for allegedly interfering with the grand

22   jury investigation and the federal criminal prosecution with

23   respect to this case.

24        Mr. Robertson maintains his innocence and denies

25   that he committed any of these offenses.

1          Okay.  Question 1:  Based on my conversations with

2     the lawyers in the case, I expect this trial to last through

3     the end of this week and potentially into next week.  A

4     typical trial day lasts from about 9:30 to 5:00 p.m. with

5     15-minute breaks in the morning and in the afternoon, and an

6     hour to hour-and-15-minute lunch break.  Do any of you have

7     any difficulty with hearing, seeing, understanding the

8     English language, or is there anything else which could

9     impair your ability to sit as a juror and devote your full

10    attention to this trial given the schedule I've just

11    described?

12         So any hearing, language, or sight limitations

13    that would prevent you from sitting as a fair and impartial

14    juror for a trial that will last this week and potentially

15    into next week?  If the answer is yes, please write 1 on

16    your card.

17         Question 2:  Apart from your general knowledge of

18    the events of January 6th, do you know or have you read

19    anything, or have you watched any videos, or read any press

20    about Mr. Robertson's alleged activities on January 6, 2021?

21    If the answer is yes, please write 2 on your card.

22         And if anyone has any questions about the

23    questions I'm asking, just raise your hand.  Okay?

24         PROSPECTIVE JUROR:  For Question 1, do you mean

25    physical disabilities?  But what if you're expected to

```
1    travel?

2               THE COURT:  I can't hear you.

3               PROSPECTIVE JUROR:  What if you're expected to be

4    on travel on some of those days?

5               THE COURT:  We'll deal with that separately.  This

6    is just physical issues.

7               Okay.  Question 3:  Do you or anyone you are close

8    to live or work in the area of the Capitol Building located

9    on First Street, Southeast, in Washington, D.C., or are you

10   otherwise familiar with that area?  If yes, write Question 3

11   on your card.

12              Question 4:  Were you at or near the U.S. Capitol

13   on January 6, 2021?

14              I'm now going to ask government counsel to

15   introduce herself and the prosecution team.

16              MS. ALOI:  Good morning.  My name is Liz Aloi,

17   Elizabeth Aloi.  The prosecution team here consists of

18   myself, Ms. Risa Berkower, FBI Special Agent Kathryn

19   Camiliere, and our legal assistant Quiana Dunn-Gordon.

20              THE COURT:  Folks, would you please stand and take

21   down your mask, please.

22              Okay.  Do any of you know Ms. Berkower, Ms. Aloi,

23   or any other members of the government's trial team in this

24   case?  If you think you know any of these ladies, please

25   write 5 on your card.
```

```
1              MR. ROLLINS:  Good morning.  My name is Mark
2     Rollins.  I represent Mr. Thomas Robertson, the gentleman in
3     the blue suit.  And this is my colleague, another attorney,
4     Camille Wagner.
5              Mr. Robertson, if you could stand and take off
6     your mask.
7              Thank you.
8              THE COURT:  Okay.  Thank you, Mr. Rollins.
9              Do any of you know or believe that you might know
10    Mr. Robertson, Mr. Rollins, or Ms. Wagner?  If the answer's
11    yes, please write 6 on your card.
12             All right.  Please take a moment to look around
13    the courtroom at your fellow potential jurors.  I know it's
14    difficult because everyone is masked, but if you believe
15    that you know any other members of the jury panel, please
16    write 7 on your card.
17             Okay.  No. 8.  I'm going to read the names of a
18    number of people who may be witnesses in this case.  Just
19    because I mention a name, doesn't mean that they will be a
20    witness, but they may be a witness or you may hear testimony
21    about the following people:
22             Kathryn Camiliere, Bridgette Craighead, Noah
23    Duckett, James Ervin, Jacob Fracker, William Hackerman,
24    Aaron Kellerman, Mark Lovern, L-O-V-E-R-N, Ronald Ortega,
25    Chad Patter, Daniel Schwager, Paul Wade, Mark Whitefleet,
```

1    Carlton Wilhoit, W-I-L-H-O-I-T, Lynne Witt, Christen

2    Holcombe, George Bobbouine, B-O-B-B-O-U-I-N-E, Patrick

3    Arentz, A-R-E-N-T-Z, Ed Lavado, and Dennis Deacon, D-E-A-C-

4    O-N.

5            Do you know or think you might know any of those

6    prospective witnesses?  If yes, write 8 on your card and put

7    the name of the person who you think you might know on your

8    card as well.

9            All right.  Please take a minute to look at the

10   courtroom staff and my personal staff.  If you think you

11   know any members of my courtroom staff or if you think you

12   know me, please write 9 on your card.

13           Question 10:  If you are selected for this jury, I

14   will instruct you that your job is to determine whether the

15   defendant committed the charged offenses beyond a reasonable

16   doubt based only on the evidence presented, and that you are

17   not to consider the potential punishment the defendant could

18   receive if he is found guilty.  Would you have any

19   difficulty or hesitation following that instruction?

20           If the answer is yes, please write 10 on your

21   card.

22           Question 11:  The government has the burden of

23   proving Mr. Robertson guilty beyond a reasonable doubt, and

24   he is presumed to be innocent unless and until the

25   government meets that burden.  This burden of proof never

1    shifts to the defendant.  Would you have any difficulty or

2    hesitation with respecting this allocation of the burden of

3    proof?

4            Would you have any difficulty applying the burden

5    of proof, which is beyond a reasonable doubt?  If yes, write

6    11 on your card.

7            Because Mr. Robertson is presumed innocent, he

8    need not testify nor offer any evidence at this trial.  If

9    he were to choose not to testify or to present any evidence,

10   do you think that decision would make you think he is more

11   likely -- that it is more likely that he is guilty?

12           So, in other words, if Mr. Robertson were to

13   choose not to testify or to put on any evidence, would that

14   decision make you think it is more likely that he is guilty?

15   If the answer is yes, please write 12 on your card.

16           13:  There has been an indictment in this case.

17   An indictment is not evidence of a crime.  It merely

18   initiates a case and is a formal way of presenting the

19   charges.  Would the fact that an indictment charged

20   Mr. Robertson with a crime lead you to believe that he is

21   guilty or make it difficult for you to apply the presumption

22   of innocence?  If yes, please write 13 on your card.

23           If you are selected as a juror in this case, I

24   will instruct you to avoid all media coverage, including

25   radio, television, podcasts, social media, and not to use

1    the Internet with regard to this case for any purpose.  That

2    is, you will be forbidden from reading anything about the

3    case, listening to radio and podcasts about the case,

4    watching TV news or anything on the Internet about the case,

5    Googling or blogging or Tweeting or using any other social

6    media about this case, or reading or posting any comments

7    about the case on social media.  Do you have any

8    reservations or concerns about your ability or willingness

9    to follow this instruction?  If any concerns, please write

10   13 on your card -- I'm sorry, 14 on your card.

11        15:  As I said, Mr. Robertson has been charged

12   with six crimes related to Congress's meeting at the United

13   States Capitol on January 6, 2021, to certify the Electoral

14   College vote for President of the United States.  Is there

15   anything about the nature of these allegations that would

16   prevent you from being neutral and fair in evaluating the

17   evidence in this case?  If yes, write 15 on your card.

18        16:  Do you or does someone close to you have any

19   direct or indirect connection to the events at the U.S.

20   Capitol on January 6, 2021?  If yes, write 16 on your card.

21        17:  Have you ever watched video of what happened

22   at the Capitol on January 6th on the news, Internet, or

23   social media?

24        18:  Have you ever watched video or read any

25   articles about Mr. Jacob Fracker -- not the defendant, but

1    Mr. Jacob Fracker -- in relation to January 6, 2021?

2              No. 19:  I suspect that the vast majority of you

3    will have some feelings about the events that took place on

4    January 6th.  But my question is, do you have such strong

5    feelings about the events of January 6, 2021, that it would

6    be difficult for you to follow my instructions and render a

7    fair and impartial verdict if you were chosen as a juror?

8              Question 20:  One of the government witnesses in

9    this case may testify that he entered into a plea agreement

10   with the government under which the witness agreed to

11   testify truthfully in this case.  The government agreed to

12   dismiss the charge against him and bring his cooperation to

13   the attention of the sentencing judge.  Use of such

14   witnesses is lawful.  As a juror, you will assess the

15   credibility of each witness.  Is there any reason why you

16   could not fairly and impartially consider or render a

17   verdict based on the testimony of a witness who testified

18   that he or she participated in the offenses the defendant is

19   also charged with?

20             I know that is a mouthful, but let me just try to

21   summarize it in plainer terms.

22             One of the government's witnesses was offered a

23   plea agreement where the government agreed to drop at least

24   one charge against him in exchange for his testimony.  Would

25   you be able to assess that witness's testimony as you would

1    any other witness's testimony in this case based on my

2    instructions?

3            If you would have any difficulty assessing that

4    witness's testimony as any other witness's, please write 20

5    on your card.

6            21:  Do you think that your political views, or

7    those of your spouse, partner, or significant other, would

8    affect your ability to serve as a fair and impartial juror

9    in this case?  If yes, write 21 on your card.

10           Okay.  The next series of questions relate to you,

11   members of your immediate family, and close personal

12   friends, okay?  And when I say "members of your immediate

13   family," this is probably not your second cousin in Peoria

14   or a casual acquaintance.  I'm talking about, you know,

15   members of your family who are close or friends who are

16   close enough to potentially influence your views about this

17   particular case.  Okay?

18           So has any member of that group ever been arrested

19   or charged for any offense other than a traffic offense?  So

20   immediate family members, close personal friends, or you,

21   have any member of that group been arrested or charged for

22   any offense other than a traffic offense?  If yes, write 22

23   on your card.

24           Has any member of that group ever served as a

25   witness in any court case or other judicial proceedings?  If

1    yes, 23.

2          Has any member of that group been a victim of a

3    criminal offense?  If yes, 24.

4          Has any member of that group ever worked in any

5    aspect of the legal field; for instance, as a lawyer, a

6    prosecutor, a criminal defense attorney, a legal secretary,

7    a paralegal, a court reporter, an investigator, a judge, or

8    any similar occupation?  So any member of that group worked

9    in the legal field in any way?  If yes, 25.

10         Has any member of that group ever applied for

11   employment with, were employed by, or received training by

12   any local, state, or federal law enforcement agency; for

13   example, a prosecutor's office, the FBI, the Department of

14   Homeland Security, the Secret Service, the Park Police, the

15   Capitol Police, MPD, or any courthouse law enforcement

16   agency?  Any close friends, immediate family members, or you

17   ever applied for or worked for any type of law enforcement

18   agency like the ones that I mentioned?  If yes, write 26 on

19   your card.

20         27:  Has any member of that group ever served in

21   the military?

22         28:  Has any member of that group ever been a

23   party to or involved in any legal action or dispute with the

24   United States government or an agency of the United States

25   government, or had any interest in such legal action or

1    dispute?  If yes, write 28 on your card.

2              Okay.  All good.  Any questions?

3              All right.  Has any member of that group been

4    subject to any investigation by a government agency, or do

5    you have any case pending in federal or state court?  If

6    yes, 29.

7              30.  And this relates just to you individually,

8    not to family members or friends.  Have you ever had any

9    legal training or legal-related coursework, or have you ever

10   worked in a law office?  So any legal training, coursework,

11   or experience working in a law office, write 30 on your

12   card.

13             31:  Have you had experience as a juror in a

14   previous trial or experience on a grand jury that would

15   affect your ability to be a fair and impartial juror in this

16   case?  If yes, please write 31 on your card.

17             32.  Have you had any contact or dispute with a

18   department or agency of the United States government that

19   you feel was not handled to your satisfaction?  If yes,

20   write 32 on your card.

21             Do you have any opinions or beliefs concerning law

22   enforcement in general, including the Metropolitan Police

23   Department here in Washington, the Capitol Police, or the

24   U.S. Attorney's Office, that would affect your ability to

25   evaluate the evidence in this case fairly and impartially?

1      If yes, please write 33 on your card.

2              Several witnesses in this case may be law

3      enforcement officers.  I will instruct you that the

4      testimony of a law enforcement officer is to receive no

5      greater or no lesser consideration simply because that

6      person is a law enforcement officer.  Would you have any

7      difficulty following that instruction?  If yes, write 34 on

8      your card.

9              35:  Do you have any moral, religious, or ethical

10     beliefs that would prevent you from sitting in judgment of

11     another person?  If yes, 35.

12             Do you have any health problems that would

13     interfere with your ability to sit as a juror in this case?

14     This includes any medication that makes you drowsy or makes

15     it difficult for you to remain alert during these

16     proceedings and also includes any problems with your hearing

17     or your eyesight.  This is a similar question to the first,

18     but also includes any medications, prescription drugs, over-

19     the-counter drugs, anything like that that would prevent you

20     from concentrating or staying alert during a trial of this

21     matter.  If yes, 36.

22             Obviously, as you can see, the court has taken a

23     number of precautions related to the COVID-19 pandemic.  We

24     will remain socially distanced.  We have Plexiglas.  Court

25     staff will be wearing masks as will fellow jurors.  I will

1    permit lawyers and witnesses to remove their masks when they

2    are testifying in order for you to be able to assess the

3    full credibility of a witness based on their facial

4    expressions.

5          But despite all of the measures that the court has

6    taken, is there any reason that serving on a jury during the

7    pandemic would make it difficult for you to fulfill your

8    duties in this case?  If yes, write 37 on the card.

9          As I said at the outset, I expect the presentation

10   of evidence in this trial to conclude by the end of this

11   week.  After the close of the evidence, the jury will

12   deliberate until it has reached a decision.  I cannot tell

13   you how long deliberations will be because that is

14   determined by the jury itself.  Given that schedule, would

15   serving as a juror in this case be an extreme hardship to

16   you?

17         And when I say "extreme hardship," that recognizes

18   that jury service is an inconvenience for everyone.  And so

19   an extreme hardship is something beyond the normal

20   inconvenience that comes with jury service.

21         And I will tell you that if you were to be excused

22   from this case based on extreme hardship, your name would go

23   back into the jury pool, and you would be called to serve on

24   a different jury in the near future, okay?  So it would not

25   be an excuse to get out of jury service until the next

1    round.  You would go back into the pool, and you would be

2    asked to come back in the near future.

3              So with all of that, is there any reason why

4    serving on this jury would amount to an extreme hardship for

5    you?  If yes, write 38 on your card, and we will discuss

6    that at the bench when we go into the other courtroom.

7              All right.  Finally, last one, No. 39.  My final

8    question is a catch-all question.  Is there any reason that

9    I have not asked you about that would make it difficult for

10   you to sit as a fair and impartial juror in this case or

11   would make it difficult for you to accept and follow my

12   instructions on the law?  Anything else that I've not asked

13   about that you'd like to draw our attention to and discuss

14   privately at the bench, please write yes -- excuse me,

15   please write 39 on your card.

16             Any questions?

17             Good.  All right.  Ms. Jenkins will collect your

18   cards, and then we'll go from there.

19             (Pause)

20             THE COURT:  All right.  Ladies and gentlemen, the

21   nature of the jury selection process is it takes quite a

22   while.  I usually can pick a criminal jury in a day.  I hope

23   to do that in this case, but there's a possibility that this

24   process could run into tomorrow morning.  I try to be as

25   efficient as possible, and I try not to have folks waiting

1    around unnecessarily, but just given the nature of the

2    process, some waiting is unavoidable.

3         What I'd like to do is have -- if you are in the

4    first four rows on the far side or in the middle part of the

5    courtroom, I'd like for you to stay.  If you are on this

6    side of the courtroom or after the last four rows, I'm going

7    to dismiss you until 1:30 this afternoon.  Okay?

8         Now, I know that it is tempting, when you leave

9    the courthouse, to get on the phone and to call your friends

10   or your significant others to say, you know, "I've gotten on

11   a jury panel, and it's a January 6th case, and, you know,

12   here's what's involved," or do some research or go on the

13   Internet.  As I said, you may not do that, okay?

14        And I ask that you do that -- that you not do that

15   for a number of reasons, the most important of which is that

16   Mr. Robertson is entitled to a fair trial based only on the

17   evidence that is introduced in the courtroom, okay?  Not on

18   any other issues that you may learn about him, not based on

19   what you may learn about me or any of the witnesses that you

20   heard about.  And if you go and conduct research and talk to

21   other people who might volunteer things that they know, it

22   deprives Mr. Robertson of that right, and it's very

23   important for jurors not to do that.

24        And you've probably read about trials where jurors

25   have gone off and conducted independent research or talked

1    to folks, read articles, and it really can sort of wreak

2    havoc.  So I would emphasize to you folks who are -- to

3    everyone, but particularly the folks that we are dismissing

4    for the time being, not to do that.

5             So with that, please come back -- Ms. Jenkins, to

6    this courtroom?

7             THE COURTROOM DEPUTY:  Yes, Your Honor.

8             THE COURT:  Okay.  Come back to this courtroom.

9    Remember where you are seated, who you're seated next to,

10   and come back at 1:30 after lunch.  And then, in the

11   meantime, we will work through the folks who will remain,

12   and we will likely get to the rest of you or at least some

13   of the rest of you this afternoon.

14            All right.  So with that, enjoy the rest of your

15   morning.  Have a good lunch, and we'll see you back here at

16   1:30.

17            (Venire exits courtroom)

18            THE COURT:  All right.  For the rest of you, just

19   sit tight.  We're going to call you in order over to my

20   courtroom, and we'll bring you up.  We'll sit you in the

21   witness stand.  I will ask a -- I'll ask you about the

22   questions that you answered yes to, I'll ask a few follow-

23   up questions, and then I'll give each side, each of the

24   lawyers, an opportunity to also ask a few very brief follow-

25   up questions, and we'll just go in order.

```
1            Feel free to use your phone, read.  I'll tell you

2      what.  If you are not in the first two rows -- if you're not

3      in the first two rows, feel free to go down to the cafeteria

4      or elsewhere in the courthouse, but just be available, okay?

5      And if you do go elsewhere, be back by 11:30, about an hour,

6      hour and 15 minutes, okay?

7            (Recess taken)

8            THE COURTROOM DEPUTY:  Your Honor, Juror No. 1566.

9            THE COURT:  Good morning, ma'am.

10           PROSPECTIVE JUROR NO. 1566:  Good morning.

11           THE COURT:  Thank you very much for your service.

12           All right.  You've answered yes to a number of

13     questions, including the extreme hardship question.  Why did

14     you answer yes to that question?

15           PROSPECTIVE JUROR NO. 1566:  I have two elderly

16     sisters who are dependent on me, and also a son with

17     disabilities who is dependent on me.

18           THE COURT:  Okay.  And where do they live?

19           PROSPECTIVE JUROR NO. 1566:  My sisters live in

20     Southwest, and my son lives with me.

21           THE COURT:  Okay.  You also answered yes to a

22     number of questions regarding the nature of the charges.  Do

23     you have some reservations about your ability to be fair?

24           PROSPECTIVE JUROR NO. 1566:  Yes.

25           THE COURT:  Tell me about that.
```

1          PROSPECTIVE JUROR NO. 1566:  I was driving home on

2    January 6th, and my route is past the Capitol, and so I saw

3    some of what was happening towards the beginning of the

4    activity, and I'm -- and then the -- and since I live on

5    Capitol Hill, the consequences of the Capitol being closed

6    affected me personally, and I was -- mostly I was just

7    outraged that people would come into our city and behave

8    so...

9          THE COURT:  Right.  So obviously there were a lot

10   of people who came here, and they -- not all of them did the

11   same thing.

12         PROSPECTIVE JUROR NO. 1566:  Right.

13         THE COURT:  This gentleman is on trial for what he

14   did, not for what anybody else did.

15         PROSPECTIVE JUROR NO. 1566:  Right.

16         THE COURT:  Do you think that you could be fair

17   with respect to him once you hear all of the evidence?

18         PROSPECTIVE JUROR NO. 1566:  I probably could, but

19   with some reservations.

20         THE COURT:  Okay.  Let me go back to your

21   hardship.  I'm sorry, who is it again that you're taking

22   care of?

23         PROSPECTIVE JUROR NO. 1566:  My elderly sister

24   Ruth, my other elderly sister Gloria.

25         THE COURT:  And other than just being elderly, do

1   they have specific medical conditions that require your

2   presence?

3           PROSPECTIVE JUROR NO. 1566:  Yes.  Gloria has

4   recently had knee surgery, so she needs -- she needs help

5   doing like daily tasks.  And my other sister has rheumatoid

6   arthritis, and she has a caretaker that comes in three days

7   a week, but I cover the rest of the days.  So it's a daily

8   service.

9           THE COURT:  Okay.  And there's no one who would be

10   able to cover for you if you were to be called for service

11   in this case?

12           PROSPECTIVE JUROR NO. 1566:  No, unfortunately.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR NO. 1566:  There's unhappiness

15   in my life.

16           THE COURT:  All right, ma'am.  You can go back to

17   the ceremonial courtroom.

18           PROSPECTIVE JUROR NO. 1566:  Thank you.

19           THE COURT:  All right.  The Court will strike 1566

20   for cause based on the hardships related to her care for her

21   elderly siblings.

22           Generally speaking, Counsel, for hardship

23   exceptions like this one, if it's clear, I'll go ahead and

24   strike.  If not, I'll let you all weigh in.  Sometimes, if

25   it's, you know, an airline ticket or something like that, I

 1    might provisionally strike them to see whether, at the end

 2    of the day, we need that particular juror.  So sometimes I

 3    will do that, if it's a hardship that we would like to

 4    accommodate but may not be able to.  All right?

 5              But I'll strike 1566.

 6              THE COURTROOM DEPUTY:  Your Honor, are you ready

 7    for the next juror?

 8              THE COURT:  Yes, we're ready.

 9              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1431.

10              THE COURT:  Step right up, sir.  How are you this

11    morning?

12              PROSPECTIVE JUROR NO. 1431:  I'm doing well.  How

13    are you doing?

14              THE COURT:  Okay.  Feel free to take your mask

15    off, if you're comfortable doing so, okay?  Thanks.

16              All right.  So it says here that you are a

17    consultant with something called Veris; is that correct?

18              PROSPECTIVE JUROR NO. 1431:  Veris, yes.

19              THE COURT:  And what is Veris, and what do you do

20    basically?

21              PROSPECTIVE JUROR NO. 1431:  We're a research and

22    consulting company focused on helping companies and how they

23    hire to be more equitable and inclusive.

24              THE COURT:  Okay.  And how long have you been

25    doing that?

```
 1              PROSPECTIVE JUROR NO. 1431:  A little past five

 2      and a half years now.

 3              THE COURT:  Okay.  Did you grow up in D.C.?  From

 4      here?

 5              PROSPECTIVE JUROR NO. 1431:  In Bethesda,

 6      Maryland.  D.C./Maryland suburbs.

 7              THE COURT:  Where did you go to school?

 8              PROSPECTIVE JUROR NO. 1431:  High school?  I went

 9      to Landon School.

10              THE COURT:  And any college?

11              PROSPECTIVE JUROR NO. 1431:  I went to Harvard.

12              THE COURT:  And what did you study at Harvard?

13              PROSPECTIVE JUROR NO. 1431:  I studied romance

14      languages and literature, so French and Spanish literature,

15      and also economics.

16              THE COURT:  So you're an underachiever.

17              PROSPECTIVE JUROR NO. 1431:  That's what they say.

18              THE COURT:  All right.  So married?  Significant

19      other?

20              PROSPECTIVE JUROR NO. 1431:  I have a long-term

21      partner.

22              THE COURT:  And what does he or she do?

23              PROSPECTIVE JUROR NO. 1431:  She is a legal

24      historian.

25              THE COURT:  Legal historian.  Where does she work?
```

```
1               PROSPECTIVE JUROR NO. 1431:  At Johns Hopkins
2     University.
3               THE COURT:  All right.  You've answered yes to a
4     number of my questions, including -- let's start with --
5     let's start with No. 10, which is you have a concern about
6     the reasonable doubt burden and instruction.  Why did you
7     answer yes to that question?
8               PROSPECTIVE JUROR NO. 1431:  Can you repeat the
9     question?  I'm sorry.
10              THE COURT:  If you're selected for this jury, I
11    will instruct you that your job is to determine whether the
12    defendant committed the charged offense beyond a reasonable
13    doubt based on the evidence presented, and that you are not
14    to consider potential punishment.  Would you have any
15    difficulty or hesitation following that instruction?
16              PROSPECTIVE JUROR NO. 1431:  It was the part about
17    not considering potential punishment.  We can -- it touches
18    a number of the questions, but I have -- I take -- as I
19    mentioned, my partner is a legal historian, studies very
20    closely the, frankly, truly unjust underpinnings of the
21    legal system that we have in the United States, which I feel
22    would make me very concerned about being complicit in
23    sentencing someone to unfair violence by the state.
24              THE COURT:  Okay.  Now, as I said, the way it
25    works in federal court is that the jury does not sentence.
```

1     In some courts the jury imposes a sentence.

2            The sentence in this case, if the defendant is

3     found guilty, would be imposed by me, and I would instruct

4     you that, because the jury does not have a role, you are not

5     to consider that.

6            Now, other than these general concerns about the

7     criminal justice system being overly punitive, in your view,

8     could you follow that instruction?

9            PROSPECTIVE JUROR NO. 1431:  I understand the

10    distinction.  I answered the question yes because I feel

11    that it would be firmly in my head no matter how much I

12    tried to draw some sort of artificial distinction between my

13    role and your decision.

14           THE COURT:  Okay.  And you answered yes to a

15    couple of questions about the nature of this particular

16    alleged offense affecting your ability to be neutral and

17    fair.  Why did you answer yes to those?

18           PROSPECTIVE JUROR NO. 1431:  There's really two

19    parts.

20           One is that I have followed, quite closely, the

21    proceedings.  In fact, on my walk over this morning to the

22    courthouse I was listening to a podcast about Eastman and

23    Trump and the recent ruling.  I think that I have -- I

24    thought it would be relevant for everyone to be aware that

25    I've been following this quite closely.

1          The other aspect of this is my personal experience

2     in political protests in the last five or so years.  I've

3     been an avid protester from when -- well, before but most

4     definitively when Trump was elected and have had dozens of

5     interactions with, I would say, counter protesters who

6     espouse the exact same things that I've seen time and again

7     come up in January 6th related actions.

8          In fact, I was -- only by luck I briefly

9     managed -- I narrowly managed to avoid the illegal kettle on

10    January 20, 2017, by police officers where they then rounded

11    up many of the people that I'd been protesting alongside for

12    dozens of times.  And then I followed closely that -- what's

13    called the J20 trials, which I then saw, you know, police

14    officers submitting what turned out to be verified and

15    thrown out as falsified video evidence used against

16    protesters, all in what I see very clearly as an effort to

17    quell that type of protest, which I do not see being applied

18    to January 6th.

19         I'm sorry, I get -- I have a lot of personal -- I

20    get very connected with this.  This will touch on a number

21    of the questions.

22         THE COURT:  I understand.  Let me just -- let me

23    just ask you this.  I mean, obviously people have strong

24    feelings about January 6th, about the underlying political

25    issues.  Many people came to D.C. to voice their views on

1    January 6th.

2          Mr. Robertson is not being -- has not been charged

3    for anything that he believes or what his political views

4    are.  He's being charged with what he did, and that is a

5    very individualized question for each of the people who

6    chose to come to Washington to voice their views that day.

7    As I'm sure you can understand, folks have a First Amendment

8    right to do that and a right to a fair trial to be judged

9    just on their conduct, not on their beliefs.

10          With that in mind, would you still have

11    reservations sitting in this case?

12          PROSPECTIVE JUROR NO. 1431:  I think the simple

13    answer to that is yes.

14          I certainly agree with your points about First

15    Amendment rights, about fair trials.  That being said, every

16    time I start thinking about this, I find myself -- as you

17    can tell, I'm typically a fairly even-keeled person, and I

18    find myself quite worked up about any --

19          THE COURT:  Okay.  Counsel, any follow-up?

20          MS. BERKOWER:  Briefly, Your Honor.

21          Good morning.

22          PROSPECTIVE JUROR NO. 1431:  Good morning.

23          MS. BERKOWER:  You said that you would not be --

24    you mentioned being complicit in violence of the

25    underpinnings of the legal system.  Could you explain what

1    you meant by "complicit in violence."

2              PROSPECTIVE JUROR NO. 1431:  What I referred to is

3    what I see as the -- how do I describe it exactly? -- the

4    applications of -- the holding of people in jails and in

5    prisons, which I see as a wildly unjust system, that may be

6    the result -- and I would be very aware would likely be the

7    result of some potential decisions that I might have a place

8    in making, understanding the caveats that the judge shared

9    about who exactly is deciding what.  But that's the violence

10   of imprisonment, the violence of the state in imprisonment,

11   and other more -- other types of punishment that the state

12   inflicts.

13             MS. BERKOWER:  And that view you hold, you would

14   be unable to set that aside if you were selected?

15             PROSPECTIVE JUROR NO. 1431:  I believe I would be

16   unable to fully set that aside, though I understand the

17   instruction that would be to intend to.  I think that that

18   would be in my mind.

19             MS. BERKOWER:  Thank you.

20             THE COURT:  Anything else, Mr. Rollins?

21             MR. ROLLINS:  No.

22             THE COURT:  Okay.  You're excused, sir.

23             PROSPECTIVE JUROR NO. 1431:  Thank you.

24             MS. BERKOWER:  Your Honor, we would move to strike

25   that juror for cause.

1          MR. ROLLINS:  We would oppose that.  This

2     gentleman seems to be conscientious on another level, but I

3     think we're going to have the same issues from almost

4     everyone who comes to the court today because everyone's

5     going to have an opinion on it.  And frankly, I couldn't

6     figure out which way he went, except on sentencing, but I

7     would assume everyone's going to have an opinion just like

8     that.

9          THE COURT:  All right.  The Court will sustain the

10    government's objection.  I thought that he was sort of all

11    over the map but clearly, based on my follow-up and the

12    government's, was pretty firm that he would have a hard time

13    setting his political views as well as his general views

14    about the criminal justice system aside and follow the

15    Court's instructions.

16          As I said at the pretrial, obviously you're

17    correct, Mr. Rollins, we will have people with feelings and

18    some strong feelings.  But the question is whether they can

19    look beyond that, and with respect to this juror, I don't

20    believe that he can.  So the Court will strike him on the

21    government's motion for cause.

22          (The following is a bench conference)

23          THE COURT:  So for witnesses like that one or

24    jurors like that one where I think that there is a grounds

25    to challenge for cause, if I decide to strike myself, I may

1    ask you "Any objection?" which is my cue to you that I'm

2    going to dismiss him just in the interest of time; whereas

3    if I want to invite follow-up, I'll ask, "Any follow-up,

4    Counsel?"  Okay?  Is that fair?

5              MR. ROLLINS: Yes.

6              THE COURT:  Okay.

7              MS. ALOI:  Thank you.

8              (This is the end of the bench conference)

9              THE COURT:  Okay, next juror.

10             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0448.

11             THE COURT:  Good morning, sir.

12             PROSPECTIVE JUROR NO. 0448:  Good morning.

13             THE COURT:  Step right up.  You can take your mask

14   off, if you're comfortable doing so.  Just have a seat.

15             PROSPECTIVE JUROR NO. 0448:  Thanks.

16             THE COURT:  How are you feeling?

17             PROSPECTIVE JUROR NO. 0448:  Good.

18             THE COURT:  Thank you for your service.  Just

19   scoot up and speak into the mic so the court reporter can

20   pick you up.

21             PROSPECTIVE JUROR NO. 0448:  Yes.

22             THE COURT:  All right.  So it says here you are an

23   interpreter at Children's Hospital; is that correct?

24             PROSPECTIVE JUROR NO. 0448:  That's correct.

25             THE COURT:  What sort of interpreter?

```
1              PROSPECTIVE JUROR NO. 0448:  Medical
2     interpretation, Spanish.
3              THE COURT:  Okay.  And how long have you been
4     doing that?
5              PROSPECTIVE JUROR NO. 0448:  How long have I been
6     an interpreter?
7              THE COURT:  First at Children's.
8              PROSPECTIVE JUROR NO. 0448:  Oh, at Children's?
9     I've been there for about two and a half years.  Maybe a
10    little less than that.
11             THE COURT:  Okay.  And did you grow up in this
12    area?
13             PROSPECTIVE JUROR NO. 0448:  I grew up -- I've
14    been all over; New York, New Jersey, Baltimore, now D.C.
15             THE COURT:  How long have you lived in D.C.?
16             PROSPECTIVE JUROR NO. 0448:  A little over eight
17    years maybe.
18             THE COURT:  Okay.  And do you have a significant
19    other?
20             PROSPECTIVE JUROR NO. 0448:  I do, yes.
21             THE COURT:  And what does he or she do?
22             PROSPECTIVE JUROR NO. 0448:  She now works as a
23    consultant.
24             THE COURT:  What sort of consultant?
25             PROSPECTIVE JUROR NO. 0448:  Wealth management.
```

1      THE COURT:  Okay.  All right.  You answered yes to

2   two questions.  Question No. 3, do you know someone who

3   lives or works near the Capitol, and Question No. 17, which

4   is, have you ever watched video of what happened at the

5   Capitol on January 6th?

6      Obviously you are aware of what happened.

7      PROSPECTIVE JUROR NO. 0448:  Yes.

8      THE COURT:  What about Question 3?  Who do you

9   know who lives or works at the Capitol?

10     PROSPECTIVE JUROR NO. 0448:  So I was living in

11  Southeast, so I don't know how -- it's technically nearby,

12  but it's not on the grounds of the Capitol or near the

13  Capitol.  It's Anacostia.

14     THE COURT:  Okay.  And you didn't answer yes to

15  any of the questions about whether the nature of the charges

16  might affect your ability to be fair in this case.  You

17  think you can be a fair juror here?

18     PROSPECTIVE JUROR NO. 0448:  Yes.

19     THE COURT:  Okay.  When I said at the opening that

20  this was a January 6th related case, what was your first

21  reaction?

22     PROSPECTIVE JUROR NO. 0448:  I don't think I had

23  one.

24     THE COURT:  Okay.

25     All right.  Counsel, follow-up?

```
1                    MS. BERKOWER:  Not from the government.

2                    THE COURT:  Mr. Rollins?

3                    MR. ROLLINS:  No.

4                    THE COURT:  Okay.  Thank you, sir.

5                    PROSPECTIVE JUROR NO. 0448:  Thank you.

6                    THE COURT:  You can go back to the ceremonial

7      courtroom.

8                    PROSPECTIVE JUROR NO. 0448:  Okay.  Thank you.

9                    THE COURT:  Okay.  Any challenge to 448, Counsel?

10                   MS. BERKOWER:  Not from the government.

11                   MR. ROLLINS:  Not from defense.

12                   THE COURT:  Okay.  448 is qualified.

13                   THE COURTROOM DEPUTY:  Your Honor, Juror No. 0601.

14                   THE COURT:  Good morning, ma'am.

15                   PROSPECTIVE JUROR NO. 0601:  Good morning, sir.

16                   THE COURT:  How are you?

17                   PROSPECTIVE JUROR NO. 0601:  I'm well.  How are

18     you?

19                   THE COURT:  Good.  Thank you for your service.

20     You should feel free to remove your mask, if you're

21     comfortable doing so.

22                   PROSPECTIVE JUROR NO. 0601  okay.

23                   THE COURT:  Okay.  So you work at the House of

24     Representatives; is that right?

25                   PROSPECTIVE JUROR NO. 0601:  That's correct.
```

```
 1              THE COURT:  Tell us what you do.

 2              PROSPECTIVE JUROR NO. 0601:  I'm the legislative

 3    director for a House member.

 4              THE COURT:  Which member?

 5              PROSPECTIVE JUROR NO. 0601:  Val Demings, Florida.

 6              THE COURT:  Orlando, right?

 7              PROSPECTIVE JUROR NO. 0601:  Yes, sir.

 8              THE COURT:  Are you from Orlando?

 9              PROSPECTIVE JUROR NO. 0601:  No, South Florida,

10    sir.

11              THE COURT:  Where about?

12              PROSPECTIVE JUROR NO. 0601:  Palm Beach County.

13              THE COURT:  How long have you been in D.C.?

14              PROSPECTIVE JUROR NO. 0601:  Nine years.

15              THE COURT:  Okay.  And working in politics, or

16    have you done other things?

17              PROSPECTIVE JUROR NO. 0601:  Just working for the

18    House of Representatives.

19              THE COURT:  Okay.  Have you worked for any other

20    members besides Demings.

21              PROSPECTIVE JUROR NO. 0601:  Yes, sir.

22              THE COURT:  Who is that?

23              PROSPECTIVE JUROR NO. 0601:  Patrick Murphy from

24    Florida.

25              THE COURT:  Got it.  Do you have a significant
```

1    other?

2              PROSPECTIVE JUROR NO. 0601:  I do, sir.

3              THE COURT:  And what do they do?

4              PROSPECTIVE JUROR NO. 0601:  He works for the

5    State Department doing press.  He does communications and

6    press.

7              THE COURT:  Okay.  All right.  You answered a

8    number of questions.  They all seem to relate to your job

9    with the House.  Obviously you know people who work in the

10   Capitol.

11             No. 16, you have a direct or indirect connection.

12   Were you at the Capitol on January 6th?

13             PROSPECTIVE JUROR NO. 0601:  No, sir.

14             THE COURT:  Where were you?

15             PROSPECTIVE JUROR NO. 0601:  At home, sir.

16             THE COURT:  Okay.  You've obviously watched video

17   of what transpired.

18             PROSPECTIVE JUROR NO. 0601:  Yes, sir.

19             THE COURT:  Either you or a close family member or

20   friend has worked in the legal profession.  Tell us about

21   that.

22             PROSPECTIVE JUROR NO. 0601:  In high school I was

23   an intern at the public defender's office -- I can't

24   remember the circuit -- in South Florida.

25             THE COURT:  Okay.  A member of that group has

1    served in the military?

2              PROSPECTIVE JUROR NO. 0601:  Close friend.

3              THE COURT:  Okay.  How close, and do you know what

4    service, and what he or she did?

5              PROSPECTIVE JUROR NO. 0601:  Retired, Army

6    intelligence officer, close family friend.

7              THE COURT:  Okay.  And it says that you've had

8    some legal training or law coursework.  Does that relate to

9    your stint at PDS?

10             PROSPECTIVE JUROR NO. 0601:  That's correct, sir.

11             THE COURT:  Okay.  So you worked at the Capitol,

12   but you did not tell me, in response to the questions, that

13   you would have difficulty giving Mr. Robertson a fair trial

14   based just on the evidence.  Do you think that's right?

15             PROSPECTIVE JUROR NO. 0601:  I believe that's

16   correct, sir.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR NO. 0601:  I believe I can

19   separate one experience from giving somebody a fair trial --

20   fair consideration based off of the evidence presented.

21             THE COURT:  Okay.  Tell me this:  Do you have any

22   colleagues or do you know anyone personally who works at the

23   Capitol who was injured that day, either physically or

24   emotionally, such that that would affect your ability to

25   deliberate and be fair in the case?

1          PROSPECTIVE JUROR NO. 0601:  No physical injuries,

2     sir.  A number of my colleagues have sought counseling, but

3     I don't believe that would impact my decisions.

4          THE COURT:  Okay.  Ms. Berkower?

5          MS. BERKOWER:  Good morning.

6          PROSPECTIVE JUROR NO. 0601:  Good morning.

7          MS. BERKOWER:  So in your work as a legislative

8     director for the House, have you been involved with any of

9     the investigations into what happened on January 6th?

10          PROSPECTIVE JUROR NO. 0601:  No, not directly.  My

11     member does serve on the Committee on Homeland Security, and

12     we did have an oversight hearing or we've had maybe two

13     oversight hearings.

14          MS. BERKOWER:  Did you -- were you involved at all

15     with the House impeachment process of President Trump?

16          PROSPECTIVE JUROR NO. 0601:  Not directly.

17          MS. BERKOWER:  Were you indirectly involved?

18          PROSPECTIVE JUROR NO. 0601:  Yes.

19          THE COURT:  Could you explain how you were

20     involved.

21          PROSPECTIVE JUROR NO. 0601:  My member was an

22     impeachment manager.

23          MS. BERKOWER:  Did you work on that process at

24     all?

25          PROSPECTIVE JUROR NO. 0601:  No.

```
 1            MS. BERKOWER:  And did you review any of the

 2    videos or other evidence or footage in connection with the

 3    House impeachment process?

 4            PROSPECTIVE JUROR NO. 0601:  The first or second?

 5    Sorry.

 6            MS. BERKOWER:  Sorry, the second.

 7            PROSPECTIVE JUROR NO. 0601:  So sorry, she was not

 8    an impeachment manager for the second trial or impeachment

 9    hearing.  And yes, I'm sure I watched testimony.

10            MS. BERKOWER:  So you think you watched

11    testimony -- and I should have been more clear.  That's my

12    fault.  I'm sorry.

13            The impeachment process related to January 6th,

14    did you watch that testimony?

15            PROSPECTIVE JUROR NO. 0601:  Not actively.

16            MS. BERKOWER:  And are you familiar with any of

17    the video footage or other evidence that was used in that

18    second impeachment process?

19            PROSPECTIVE JUROR NO. 0601:  I believe so.

20            MS. BERKOWER:  Do you have specific memories of

21    what footage you watched or were exposed to?

22            PROSPECTIVE JUROR NO. 0601:  The -- and I don't

23    know the location.  The officer who was at one of the

24    doorways.  It was an exterior door, and he was wearing a

25    helmet, and something between him and the door.
```

```
 1              MS. BERKOWER:  And you watched that in person, or

 2     you watched that on like the news or --

 3              PROSPECTIVE JUROR NO. 0601:  Oh, it was on the

 4     news.

 5              MS. BERKOWER:  And do you have friends who have --

 6     who worked on that second impeachment process?

 7              PROSPECTIVE JUROR NO. 0601:  No.

 8              MS. BERKOWER:  And you said that you have watched

 9     videos and other news.  Could you explain where you saw

10     those videos or news.

11              PROSPECTIVE JUROR NO. 0601:  So the regular

12     reviewing press clips process.  They were included in our

13     daily clips that are compiled by our communications

14     director.

15              And then I watched one of the hearings with -- for

16     the Special Select Committee on January 6th.  I think two

17     officers were witnesses.

18              MS. BERKOWER:  Did you also see information about

19     January 6th on the news?

20              PROSPECTIVE JUROR NO. 0601:  Yes.

21              MS. BERKOWER:  On what news sources did you see

22     that?

23              PROSPECTIVE JUROR NO. 0601:  Gosh, CNN, MSNBC,

24     CBS, kind of all the broadcast networks, online and, I

25     think, Twitter.
```

1          MS. BERKOWER:  And based on that, all of that

2     information that you have, have you formed an opinion about

3     the guilt or innocence of people involved with the events of

4     the Capitol on January 6th?

5          PROSPECTIVE JUROR NO. 0601:  No.

6          MS. BERKOWER:  Can you explain --

7          PROSPECTIVE JUROR NO. 0601:  Sure.

8          MS. BERKOWER:  Can you explain that a little more.

9          PROSPECTIVE JUROR NO. 0601:  It was a very large

10     event with a lot of people.  There were a lot of different

11     events going on, and so it would be impossible for any one

12     person to know every single event that was going on unless

13     they have personal knowledge to identify a single individual

14     or victim or what have you.

15          MS. BERKOWER:  And do you have an office in the

16     Capitol Building?

17          PROSPECTIVE JUROR NO. 0601:  No.

18          MS. BERKOWER:  And does your member have an office

19     in the Capitol Building?

20          PROSPECTIVE JUROR NO. 0601:  No.

21          MS. BERKOWER:  Was any of your office space or the

22     office space of folks you know through work damaged in the

23     process of January 6th?

24          PROSPECTIVE JUROR NO. 0601:  No.

25          MS. BERKOWER:  The Court's brief indulgence.

```
 1                    (Pause)
 2                    MS. BERKOWER:  Thank you, Your Honor.
 3                    Thank you, ma'am.
 4                    THE COURT:  Mr. Rollins?
 5                    MR. ROLLINS:  No questions.
 6                    THE COURT:  Okay.  Thank you, ma'am.  You can step
 7      down.
 8                    PROSPECTIVE JUROR NO. 0601:  Thank you, sir.
 9                    THE COURT:  All right.  Any objections, Counsel?
10                    MR. ROLLINS:  Not from the defense.
11                    MS. BERKOWER:  The Court's indulgence.
12                    Not from the government, Your Honor.
13                    THE COURT:  Okay.  601 is qualified.
14                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0181.
15                    THE COURT:  Counsel, we don't need to stand every
16      time, okay?
17                    Good morning, ma'am.  How are you?
18                    PROSPECTIVE JUROR NO. 0181:  Fine, thank you.
19                    THE COURT:  Good.  Have a seat.  Thank you for
20      your service.  Feel free to remove your mask, if you are
21      comfortable.
22                    All right.  So it says here that you are not
23      presently employed; is that correct?
24                    PROSPECTIVE JUROR NO. 0181:  Correct.
25                    THE COURT:  And have you been employed previously?
```

```
1                    PROSPECTIVE JUROR NO. 0181:  I think 2014 was the

2         last time.

3                    THE COURT:  What did you do back in 2014?

4                    If you could move a little closer to that mic so

5         the court reporter can pick you up.

6                    PROSPECTIVE JUROR NO. 0181:  I administered a

7         program for English As a Second Language for a library in

8         Connecticut.

9                    THE COURT:  And you have since moved to D.C.?

10                   PROSPECTIVE JUROR NO. 0181:  Yes.  My husband

11        retired, and we moved to D.C. in August of '20.

12                   THE COURT:  Okay.  And what did your husband do

13        before he retired?

14                   PROSPECTIVE JUROR NO. 0181:  Oh, finance.  He was

15        involved in investments and the mutual fund business.

16                   THE COURT:  Okay.  And since you've moved to D.C.,

17        have you been involved in any sort of volunteer work or

18        anything other than work in the home?

19                   PROSPECTIVE JUROR NO. 0181:  Yes, Washington Parks

20        & People.  I've been working on the community garden.

21                   THE COURT:  Okay.  Great.  And which part of the

22        city do you live in?

23                   PROSPECTIVE JUROR NO. 0181:  I live in Northwest.

24                   THE COURT:  Okay.

25                   All right.  You answered yes to a number of
```

1    questions.  Let's start with 38 and 39, the hardship

2    question and the catch-all question.  Why did you answer yes

3    to those?

4              PROSPECTIVE JUROR NO. 0181:  38 -- I'm not sure if

5    it counts as hardship, but we do have plans to travel to

6    Ireland on April 14th.

7              THE COURT:  April 14th?

8              PROSPECTIVE JUROR NO. 0181:  Yes.  It's Thursday

9    next week.

10             THE COURT:  I'm just making a note here, okay?

11             All right.  Question 17, you obviously watched

12   video of what happened on January 6th.

13             PROSPECTIVE JUROR NO. 0181:  Yes.

14             THE COURT:  Okay.  22, member of your close --

15   your family or close friends that have been arrested or

16   charged with any offense other than a traffic offense.

17             And if you're uncomfortable speaking about any of

18   this stuff in public, we can put you on a husher so that

19   it's private, so it's up to you.

20             PROSPECTIVE JUROR NO. 0181:  I guess I prefer

21   that.

22             THE COURT:  All right.

23             (The following is a bench conference)

24             THE COURT:  Ma'am, can you tell us what happened.

25             PROSPECTIVE JUROR NO. 0181:  I had a family

1    member -- it was dismissed, but he was arrested for

2    mistakenly -- for trespassing.  He went into someone's

3    apartment and fell asleep on their sofa thinking it was his

4    friend's apartment.  But yeah, the charges were dismissed.

5              THE COURT:  Okay.  And any concerns about how the

6    police or the prosecutor or his defense lawyer handled that

7    situation that would affect your ability to be fair in this

8    case?

9              PROSPECTIVE JUROR NO. 0181:  No.

10             THE COURT:  Okay.  Thanks.

11             (This is the end of the bench conference)

12             THE COURT:  All right.  24, victim of a criminal

13   offense.

14             PROSPECTIVE JUROR NO. 0181:  My mother's house was

15   burglarized twice.

16             THE COURT:  Okay.  Any concerns or issues with how

17   that was handled by the police or the prosecutors or

18   anything like that?

19             PROSPECTIVE JUROR NO. 0181:  No.

20             THE COURT:  Okay.  Family member or close friend

21   served in the military.

22             PROSPECTIVE JUROR NO. 0181:  My husband was in the

23   Navy, and my son is serving in the Marine Corps right now.

24   He's a first lieutenant.

25             THE COURT:  Okay.  It will likely come out that

1    the defendant served in the military.  Would your family's

2    experience in the military cause you to either credit the

3    defendant or discredit the defendant more or less because of

4    his military service?

5              PROSPECTIVE JUROR NO. 0181:  No.

6              THE COURT:  And you've had some legal training or

7    taken a law course?

8              PROSPECTIVE JUROR NO. 0181:  No.  I worked in a

9    law office.  I did administrative duties in a law office.

10             THE COURT:  Okay.  Do you remember what kind of

11   law office?

12             PROSPECTIVE JUROR NO. 0181:  It was a personal

13   injury attorney in Texas.

14             THE COURT:  Okay.  Counsel, follow-up?

15             MS. ALOI:  Good morning.

16             PROSPECTIVE JUROR NO. 0181:  Hi.  Good morning.

17             MS. ALOI:  You indicated that you had seen videos

18   and news of the events of January 6th.  What was the source

19   of the videos, news, or social media you may have reviewed?

20             PROSPECTIVE JUROR NO. 0181:  Just generally on the

21   news and documentaries.

22             I did -- that was part of 39.  I just wanted to be

23   up front about that.  I do have a son that has been working

24   on a documentary.

25             MS. ALOI:  I'm sorry?

1          PROSPECTIVE JUROR NO. 0181:  I have a son who is

2     working on a documentary film, and we've been interviewing

3     Capitol Police officers.

4          MS. ALOI:  About January 6th specifically?

5          PROSPECTIVE JUROR NO. 0181:  Yes, uh-huh.

6          MS. ALOI:  And are there certain like channels or

7     blogs or pieces of the media where you get your information

8     from?

9          PROSPECTIVE JUROR NO. 0181:  I think it's fairly

10    general.  I subscribe to the *Washington Post* and the *New

11    York Times* and NPR and things like that.

12         MS. ALOI:  Nothing further.  Thanks.

13         THE COURT:  What is your son's documentary about

14    specifically, to the extent you know?

15         PROSPECTIVE JUROR NO. 0181:  The documentary is

16    about the events of January 6th.

17         THE COURT:  But generally?  Just --

18         PROSPECTIVE JUROR NO. 0181:  They're doing --

19    they're interviewing people, members of Congress and police

20    officers, about their experiences that day.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR NO. 0181:  It's not finished

23    so...

24         THE COURT:  Would you be able to refrain from

25    talking to your son about January 6th if you were a juror in

1    this case?

2              PROSPECTIVE JUROR NO. 0181:  Yes.  He's not living

3    with me right now.

4              THE COURT:  And where does he live?

5              PROSPECTIVE JUROR NO. 0181:  He's in Seattle.

6              THE COURT:  Okay.  And is that -- is he a

7    documentary filmmaker by profession?

8              PROSPECTIVE JUROR NO. 0181:  No.

9              THE COURT:  Okay.  What does he do?

10             PROSPECTIVE JUROR NO. 0181:  He's working for a

11   school right now, doing marketing films for them right now.

12             THE COURT:  Okay.  Mr. Rollins?

13             MR. ROLLINS:  Good morning, ma'am.  Does your

14   son's documentary take a position one way or the other

15   regarding the January 6th?

16             PROSPECTIVE JUROR NO. 0181:  I don't believe so,

17   no.

18             MR. ROLLINS:  It's just a neutral documentary?

19             PROSPECTIVE JUROR NO. 0181:  I think they're just

20   interviewing people and getting their stories, yes.

21             MR. ROLLINS:  Okay.  Thank you.  No further

22   questions.

23             THE COURT:  Thank you, ma'am.  You can go back to

24   the big courtroom.

25             PROSPECTIVE JUROR NO. 0181:  Thank you.

1    MR. ROLLINS:  The defense just asks to be heard on

2    one matter.

3    I noticed the government is asking about which

4    news station they're trying to listen to to try to get

5    either a Fox or which way they slant.  I don't think it's

6    appropriate for us to ask them the news channel that they're

7    watching.  I realize that what they're basically trying to

8    figure out is whether they're conservative or liberal by the

9    news station they're watching.

10    THE COURT:  Counsel?

11    MS. BERKOWER:  Your Honor, there's no restriction

12    on the government finding out more specifically what kind of

13    information that jurors have been exposed to, and, in fact,

14    that's a routine part of jury selection and voir dire.  And

15    so we would submit that we're not looking for any particular

16    source, but just to better understand the information that

17    the juror has seen in the news and whether they formed an

18    opinion.

19    THE COURT:  Okay.  I'll allow those questions.

20    MS. BERKOWER:  Thank you.

21    THE COURT:  All right.  Any objections to 181?

22    MR. ROLLINS:  Not from defense.

23    MS. ALOI:  We have concerns that the juror had not

24    disclosed at the outset that a family member was making a

25    documentary about the very events that are the subject of

1    the trial, although I'm not --

2              THE COURT:  Was it called for by one of the

3    questions?

4              MS. ALOI:  The Court's indulgence.  We were just

5    taking a look to make sure.

6              THE COURT:  I don't think it was.  And even if it

7    wasn't, she volunteered it without prompting so I don't

8    think it's a problem.

9              MS. ALOI:  Okay.

10             THE COURT:  Other than that, any concern?

11             MS. ALOI:  No, Your Honor.

12             THE COURT:  All right.  181 is qualified.

13             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0762.

14             THE COURT:  Good morning, ma'am.

15             PROSPECTIVE JUROR NO. 0762:  Good morning, Your

16   Honor.

17             THE COURT:  How are you?  Please have a seat.  And

18   remove your mask, if you're comfortable doing so.

19             PROSPECTIVE JUROR NO. 0762:  Yes.

20             THE COURT:  And just speak into the microphone.

21             PROSPECTIVE JUROR NO. 0762:  Okay.

22             THE COURT:  All right.  So you are a trial

23   attorney with the antitrust division; is that correct?

24             PROSPECTIVE JUROR NO. 0762:  That's correct.

25             THE COURT:  All right.  And how long have you done

```
1    that?
2               PROSPECTIVE JUROR NO. 0762:  Since 2013.
3               THE COURT:  Okay.  And were you in private
4    practice previously, or with the government?
5               PROSPECTIVE JUROR NO. 0762:  I was -- I worked on
6    the Hill on the Commission on China.  Before that -- for
7    four years, and before that I was in private practice in
8    Beijing and Hong Kong.
9               THE COURT:  Okay.  And is your trial practice
10   civil or criminal?
11              PROSPECTIVE JUROR NO. 0762:  I'm in one of the two
12   nonlitigating sections in the antitrust division.  I work on
13   antitrust mainly with China and Southeast Asian countries
14   and their antitrust systems.
15              THE COURT:  Okay.  And so that's more of a
16   consultative and negotiating role?
17              PROSPECTIVE JUROR NO. 0762:  It's international
18   relations.
19              THE COURT:  Okay.
20              PROSPECTIVE JUROR NO. 0762:  My background is in
21   Chinese law.
22              THE COURT:  All right.  Do you have a significant
23   other?
24              PROSPECTIVE JUROR NO. 0762:  I do.
25              THE COURT:  And what do they do?
```

```
1              PROSPECTIVE JUROR NO. 0762:  He's retired.  He's a
2       retired university professor.
3              THE COURT:  What did he teach?
4              PROSPECTIVE JUROR NO. 0762:  He taught
5       linguistics, sociolinguistics.
6              THE COURT:  And you live on the Hill, it looks
7       like.
8              PROSPECTIVE JUROR NO. 0762:  Yes.  I live on 7th
9       Street, just north of Mass.
10             THE COURT:  Okay.  And were you home on January
11      6th?
12             PROSPECTIVE JUROR NO. 0762:  I was virtually
13      working, so I was in my home office.
14             THE COURT:  Okay.  And did you see or hear the
15      protests that took place that day?
16             PROSPECTIVE JUROR NO. 0762:  No.  No, I was
17      working and stayed away from the protests.
18             THE COURT:  Okay.  Going back to your role at
19      antitrust, do you ever assist trial lawyers in either
20      criminal or civil antitrust trials?
21             PROSPECTIVE JUROR NO. 0762:  No.
22             THE COURT:  Okay.
23             All right.  You answered yes to 17.  You've
24      obviously watched video of what happened.
25             PROSPECTIVE JUROR NO. 0762:  Yes.  It was on the
```

```
 1    news.
 2              THE COURT:  You or a close family member or friend
 3    has worked in the legal profession.  That's obviously you,
 4    your husband, and --
 5              PROSPECTIVE JUROR NO. 0762:  My daughter is a
 6    lawyer in New York.  She does international arbitration.
 7              THE COURT:  Okay.  A member of your family or a
 8    close friend served in the military?
 9              PROSPECTIVE JUROR NO. 0762:  My husband was in the
10    Swedish Army.  That was over 50 years ago, but he was a
11    Russian translator.
12              THE COURT:  Okay.  Close family member or friend
13    been the subject of an investigation by a government agency,
14    or do you have a case pending in state or federal court?
15              If you would like to discuss the answer to that in
16    private, we can give you a phone.
17              (The following is a bench conference)
18              PROSPECTIVE JUROR NO. 0762:  I have a security
19    clearance.
20              THE COURT:  Okay.
21              PROSPECTIVE JUROR NO. 0762:  I had a security
22    clearance from whenever.  I was at the embassy for a while
23    in Beijing for which I have a security clearance.  I was
24    investigated for that.
25              THE COURT:  Okay.  What was the result of that
```

```
 1    investigation?
 2               PROSPECTIVE JUROR NO. 0762:  I have a Top Secret
 3    clearance.
 4               THE COURT:  Oh, so you received a clearance.  It
 5    was not an investigation to remove the clearance.
 6               PROSPECTIVE JUROR NO. 0762:  No, no, no.
 7               THE COURT:  Okay.  And that's all?
 8               PROSPECTIVE JUROR NO. 0762:  Sorry, there was
 9    one I was involved in on the sidewalk in D.C., and
10    discussions with the District of Columbia for damages for
11    broken bones.
12               THE COURT:  Okay.  Thank you.
13               (This is the end of the bench conference)
14               THE COURT:  All right.  Counsel, follow-up?
15               MR. ROLLINS:  Not from the defense.
16               MS. BERKOWER:  Good morning.
17               PROSPECTIVE JUROR NO. 0762:  Good morning.
18               MS. BERKOWER:  You said that you watched videos of
19    January 6th?
20               PROSPECTIVE JUROR NO. 0762:  It was impossible
21    almost not to, actually.  It was on the news.
22               MS. BERKOWER:  And what news stations do you
23    remember seeing that stuff on?
24               PROSPECTIVE JUROR NO. 0762:  Usually I watch NBC,
25    sometimes CBS.
```

1           MS. BERKOWER:  And did you follow the story after

2      the immediate aftermath of January 6th?

3           PROSPECTIVE JUROR NO. 0762:  I think it was

4      impossible not to.  Yes, of course.

5           MS. BERKOWER:  How long did you follow it for?

6           PROSPECTIVE JUROR NO. 0762:  You know, when it was

7      on the news.  So I wasn't going out of my way to investigate

8      it or anything, but I did watch it.

9           MS. BERKOWER:  And in the time since, have you

10     seen less news or have you kept up with it, with the story,

11     as time has passed?

12          PROSPECTIVE JUROR NO. 0762:  Less.  Much less.

13     There still are commercials on TV and some news, but I

14     haven't been -- it's not one of the things I'm following

15     when I read the paper.

16          MS. BERKOWER:  And do you have any like neighbors

17     on Capitol Hill that were involved in the events of January

18     6th?

19          PROSPECTIVE JUROR NO. 0762:  No.

20          MS. BERKOWER:  Or present?

21          PROSPECTIVE JUROR NO. 0762:  No.

22          MS. BERKOWER:  All right.  Thank you.

23          THE COURT:  Okay.  Thank you, ma'am.  You can go

24     back to the big courtroom.

25          PROSPECTIVE JUROR NO. 0762:  Okay.  Thank you.

```
1                    THE COURT:  Counsel, any challenge to 1125?

2                    MR. ROLLINS:  Not from the defense.

3                    MS. BERKOWER:  Not from the government.

4                    THE COURT:  Okay.  Hearing none, 1125 is

5       qualified.

6                    I'm sorry, that was 762 is qualified.  1125 is our

7       next juror.

8                    I'm sorry, Counsel, going back to 601, the woman

9       whose family has a trip planned for Ireland next Thursday.

10      You think that's safe, or is that potentially in jeopardy?

11                   MS. ALOI:  The government thinks that's pretty

12      safe.

13                   THE COURT:  I'm sorry.  Come to the mic.

14                   MS. ALOI:  I'm sorry, Your Honor.  The government

15      thinks that's pretty safe.

16                   THE COURT:  Okay.

17                   MR. ROLLINS:  Defense concurs.

18                   THE COURT:  Very well.

19                   THE COURTROOM DEPUTY:  Your Honor, Juror No. 1125.

20                   THE COURT:  Good morning, ma'am.

21                   PROSPECTIVE JUROR NO. 1125:  Good morning.  How

22      are you?

23                   THE COURT:  I'm doing okay.  Just step right up.

24      Have a seat.

25                   PROSPECTIVE JUROR NO. 1125:  Okay.
```

```
1                  THE COURT:  Feel free to remove your mask, if
2        you're comfortable.
3                  PROSPECTIVE JUROR NO. 1125:  Okay.
4                  THE COURT:  All right.  So it says here you're a
5        program manager for the D.C. government.
6                  PROSPECTIVE JUROR NO. 1125:  Yes, sir, that is
7        correct.
8                  THE COURT:  Which agency or department?
9                  PROSPECTIVE JUROR NO. 1125:  Department of Human
10       Services, DSS.
11                 THE COURT:  And just generally speaking, what do
12       you do?
13                 PROSPECTIVE JUROR NO. 1125:  I'm sorry?
14                 THE COURT:  Generally speaking, what sort of
15       projects, what sort of work do you do?
16                 PROSPECTIVE JUROR NO. 1125:  I'm a liaison between
17       our technical team and our users to help deal with system
18       issues that they're having with the programs that we use
19       to -- for public assistance benefits.
20                 THE COURT:  Okay.  And do you have an IT or
21       computer science background?
22                 PROSPECTIVE JUROR NO. 1125:  Actually, no.  I just
23       kind of fell into that position.
24                 I love it.  I've been doing it for 20 years.
25                 THE COURT:  Okay.  And did you grow up in the D.C.
```

```
 1    area?

 2              PROSPECTIVE JUROR NO. 1125:  I'm a native

 3    Washingtonian.

 4              THE COURT:  Great.  And do you have a significant

 5    other?

 6              PROSPECTIVE JUROR NO. 1125:  I'm sorry?

 7              THE COURT:  Do you have a significant other?

 8              PROSPECTIVE JUROR NO. 1125:  I do.

 9              THE COURT:  And what do they do?

10              PROSPECTIVE JUROR NO. 1125:  Sorry?

11              THE COURT:  What do they do?

12              PROSPECTIVE JUROR NO. 1125:  He is a maintenance

13    worker.

14              THE COURT:  Private or public sector?

15              PROSPECTIVE JUROR NO. 1125:  Private sector.

16              THE COURT:  Okay.

17              All right.  You answered yes to a few questions.

18    Obviously you've seen video of January 6th.

19              PROSPECTIVE JUROR NO. 1125:  Yes.

20              THE COURT:  No. 17.

21              No. 22, any member of your family or a close

22    friend been arrested or charged for any offense?  You can

23    speak about it in public.  If you prefer to have that

24    private, we can use these bat phones to do it.

25              PROSPECTIVE JUROR NO. 1125:  I have no problems
```

1    with speaking about it in public.

2          THE COURT:  Okay.  Why did you answer yes to that

3    question?

4          PROSPECTIVE JUROR NO. 1125:  So the father of my

5    two children was arrested maybe 30-plus years ago for

6    breaking and entering.

7          THE COURT:  Okay.  And did you have any issues

8    with how that case was handled by the police?  By the

9    prosecutor?  By any defense attorneys that may have been

10   involved?

11         PROSPECTIVE JUROR NO. 1125:  No, not at all.  He

12   was guilty, and he knew it, and he admitted to it.

13         THE COURT:  Okay.  A family member or close friend

14   worked with law enforcement in any capacity?

15         PROSPECTIVE JUROR NO. 1125:  Yes.  I have a first

16   cousin who is a Metropolitan Police Department officer.

17         THE COURT:  Okay.  So obviously in this case you

18   may hear testimony or see videos regarding, you know, the

19   response by MPD or the Capitol Police.  The defendant,

20   Mr. Robertson, is a police officer, or he was a police

21   officer in a small town in western Virginia.  So there will

22   be law enforcement testimony or testimony about law

23   enforcement.

24         Your cousin's service in law enforcement, would

25   that affect in any way your ability to judge Mr. Robertson's

```
 1        conduct in this case?

 2                    PROSPECTIVE JUROR NO. 1125:  Not at all.

 3                    THE COURT:  Okay.  Counsel, follow-up?

 4                    MR. ROLLINS:  Not from the defense.

 5                    MS. ALOI:  Good morning.

 6                    PROSPECTIVE JUROR NO. 1125:  Good morning.

 7                    MS. ALOI:  You had indicated you had seen video or

 8        other reporting about the events of January 6th.  What is

 9        the source of your news?

10                    PROSPECTIVE JUROR NO. 1125:  I was watching, when

11        it unfolded, NBC or Fox News, one of the two.  That was it.

12                    MS. ALOI:  Thank you.

13                    PROSPECTIVE JUROR NO. 1125:  Uh-huh.

14                    THE COURT:  Okay.  Do you work on the SNAP

15        program?

16                    PROSPECTIVE JUROR NO. 1125:  SNAP?  Medicaid.

17                    THE COURT:  How are the timeliness rates going?

18                    PROSPECTIVE JUROR NO. 1125:  Do I really have to

19        answer that question?

20                    THE COURT:  No, you don't.

21                    PROSPECTIVE JUROR NO. 1125:  Not well.

22                    THE COURT:  Okay.  Well, say no more.

23                    All right.  You can go back to the main courtroom.

24                    PROSPECTIVE JUROR NO. 1125:  Okay.

25                    THE COURT:  Thank you.
```

1           PROSPECTIVE JUROR NO. 1125:  Thank you.

2           THE COURT:  Okay.  Counsel, any challenge to 1125?

3           MR. ROLLINS:  Not from defense.

4           MS. ALOI:  Not from the government.

5           THE COURT:  Okay.  She is qualified.

6           (Pause)

7           THE COURT:  Counsel, we have a few jurors who were

8    next in line who have -- are AWOL.  I hope temporarily.  But

9    we may go out of order just to keep the ball moving, okay?

10          So, Ms. Jenkins, who would we have next?

11          THE COURTROOM DEPUTY:  Juror No. 0254.

12          THE COURT:  So we're going to skip over 258 and

13   826 and go to 254, so we're just skipping two for now.

14          MS. BERKOWER:  Thank you.

15          THE COURTROOM DEPUTY:  Your Honor, Juror No. 0254.

16          THE COURT:  Good morning, sir.

17          PROSPECTIVE JUROR NO. 0254:  Good morning.

18          THE COURT:  How are you feeling?

19          PROSPECTIVE JUROR NO. 0254:  I'm doing well.  How

20   are you?

21          THE COURT:  All right.  Thank you for your

22   service.  You can remove your mask, if you're comfortable

23   doing so.

24          All right.  It says here you work for the U.S.

25   Rice Foundation; is that right?

```
 1              PROSPECTIVE JUROR NO. 0254:  Yes, sir.

 2              THE COURT:  Tell me what that is, and tell me what

 3      you do.

 4              PROSPECTIVE JUROR NO. 0254:  So I'm director of

 5      government affairs, so a federal lobbyist.  So we're a trade

 6      association representing farmers, millers, merchants, and

 7      allied businesses throughout the U.S. rice industry.

 8              THE COURT:  Got it.  How's the U.S. rice industry

 9      these days?

10              PROSPECTIVE JUROR NO. 0254:  Not as great as some

11      of the other commodities right now.

12              THE COURT:  All right.  And where are you from

13      originally?

14              PROSPECTIVE JUROR NO. 0254:  Georgia.

15              THE COURT:  How long have you been in D.C.?

16              PROSPECTIVE JUROR NO. 0254:  Six and a half years.

17              THE COURT:  Okay.  And you came up here for that

18      job, or another?

19              PROSPECTIVE JUROR NO. 0254:  For a different

20      position.  So American Farm Bureau Federation was my

21      employer then.

22              THE COURT:  Got it.  And where did you go to

23      school?

24              PROSPECTIVE JUROR NO. 0254:  University of

25      Georgia.
```

```
1              THE COURT:  And do you have a significant other?
2              PROSPECTIVE JUROR NO. 0254:  I do, yes.
3              THE COURT:  And what do they do?
4              PROSPECTIVE JUROR NO. 0254:  My wife works at
5    American Farm Bureaus.  She is a managing director of
6    training and leadership development.
7              THE COURT:  You all are a farming family.
8              PROSPECTIVE JUROR NO. 0254:  We are.
9              THE COURT:  All right.  You answered yes to a few
10   questions.
11             First, No. 2, you think you may have seen
12   something about Mr. Robertson's case; is that right?
13             PROSPECTIVE JUROR NO. 0254:  Yes, sir.  I believe
14   so.
15             THE COURT:  All right.  Tell me why you say that.
16             PROSPECTIVE JUROR NO. 0254:  So through social
17   media.  I believe there's an account -- Seamus Hughes I
18   think is the gentleman's name.  He does -- goes through
19   court documents and different pieces.  It's just general
20   intrigue of being in D.C. and following the news and the
21   events.
22             THE COURT:  Okay.  Now, there are obviously a
23   number of these cases.  You have a specific recollection of
24   Mr. Robertson's case?
25             PROSPECTIVE JUROR NO. 0254:  Yes, sir.
```

1          THE COURT:  All right.  And other than what I

2     described this morning generally about the case, any details

3     stand out?

4          PROSPECTIVE JUROR NO. 0254:  Just honestly the

5     stick was the one thing that really brought the, you know,

6     memory back.

7          THE COURT:  Okay.  And, you know, let's say that

8     we're, you know, two days into trial and you remember

9     something more specific about Mr. Robertson or about his

10    case that does not come out in trial.  Would you be able to

11    set that aside and just concentrate on the evidence that you

12    hear in this case?

13         PROSPECTIVE JUROR NO. 0254:  Yes, sir, I believe

14    so.

15         THE COURT:  All right.  No. 3, you or someone you

16    know lives or works near the Capitol.  Which part of the

17    city do you live in?

18         PROSPECTIVE JUROR NO. 0254:  I live in Hill East,

19    so 15th and East Capitol Street.

20         THE COURT:  Okay.

21         All right.  Question 15, the nature of the charges

22    might make it difficult for you to be neutral and fair in

23    this case.  Why did you answer yes to that question?

24         PROSPECTIVE JUROR NO. 0254:  A couple of reasons.

25         So just the nature of my work and the people that

1    I know and deal with.  I knew several people who were in the

2    Capitol that day, both staff and members of Congress, and

3    have had conversations about the predicament that they were

4    in and just the nature of what all happened that day.

5              You know, I guess knowing from more of an inside

6    perspective and what they went through, you know, makes it

7    somewhat difficult in that regard.

8              THE COURT:  Okay.  So obviously there was a large

9    event that day, but there were also a lot of individuals who

10   came for different reasons who did different things.  And

11   Mr. Robertson is on trial for what he did, not because of

12   the, you know, overall effect or reasons for January 6th.

13             And so having said that, do you think that you

14   would be able to put aside just your general feelings about

15   January 6th, even if they are strong feelings, and give this

16   gentleman a fair trial?

17             PROSPECTIVE JUROR NO. 0254:  Yes, sir.

18             THE COURT:  Okay.  And I don't want you to tell me

19   yes just because you think that's what I want to hear.  I

20   want an honest answer.

21             PROSPECTIVE JUROR NO. 0254:  Yes, sir.

22             THE COURT:  Okay.  Talk about -- you say you know

23   folks who worked on the Hill or who were there that day.  Do

24   you know anyone who was injured?

25             PROSPECTIVE JUROR NO. 0254:  I do not know anyone

1    who's injured.

2              THE COURT:  Do you know anyone who, you know,

3    experienced any sort of psychological or emotional trouble

4    that would -- that caused them to go get help?  You know,

5    not just the general trauma that many experienced that day,

6    but anyone who was particularly traumatized from an

7    emotional or psychological perspective?

8              PROSPECTIVE JUROR NO. 0254:  No, sir, not

9    particularly.

10             THE COURT:  Okay.  Either you or a close friend or

11   family member worked -- has worked for or has applied for

12   employment with any -- some sort of law enforcement agency.

13             PROSPECTIVE JUROR NO. 0254:  Yes, sir.  My father

14   was a law enforcement officer for the state of Georgia for

15   20 years.

16             THE COURT:  Okay.  So you will likely either hear

17   testimony or certainly see videos that will depict law

18   enforcement, their role that day, their response that day.

19   Mr. Robertson, you will hear, I believe, that he is a law

20   enforcement officer or was a law enforcement officer for a

21   small town in western Virginia.

22             Given your dad's service as a law enforcement

23   officer, would that have any effect one way or the other on

24   your ability to assess Mr. Robertson's guilt or innocence?

25             PROSPECTIVE JUROR NO. 0254:  No, sir.

 1              THE COURT:  Counsel, follow-up?

 2          MS. ALOI:  Good morning.

 3          PROSPECTIVE JUROR NO. 0254:  Good morning.

 4          MS. ALOI:  Did you say you had seen the stick on

 5      Shameless News or you had seen coverage of Mr. Robertson on

 6      Shameless News?  Is that --

 7          PROSPECTIVE JUROR NO. 0254:  Sorry, the accent's a

 8      little thick.  Seamus Hughes.

 9          MS. ALOI:  Seamus Hughes.

10          PROSPECTIVE JUROR NO. 0254:  A reporter.

11          MS. ALOI:  Who is that?

12          PROSPECTIVE JUROR NO. 0254:  It's just an account.

13      It's a general account on Twitter.  The gentleman just goes

14      through court records and makes various postings of, you

15      know, cases.

16          MS. ALOI:  Is that an account you regularly watch

17      or regularly, I guess, follow?

18          PROSPECTIVE JUROR NO. 0254:  I mean, not

19      particularly.  It was at the time just out of general

20      interest and intrigue.

21          MS. ALOI:  And you suggested that you remembered

22      the stick.  What do you remember about the stick?

23          PROSPECTIVE JUROR NO. 0254:  Just a picture

24      because, you know, in an evidence file you could see the --

25      it had obviously a bunch of text, but obviously specific

1    pictures for some of the evidence.

2              MS. ALOI:  Was there any information associated

3    with the picture, or did you just happen to see a picture?

4              PROSPECTIVE JUROR NO. 0254:  I just remember the

5    picture.

6              MS. ALOI:  Okay, and what agency does your father

7    work for or did your father work for?

8              PROSPECTIVE JUROR NO. 0254:  It was Department of

9    Natural Resources.

10             MS. ALOI:  Natural resources.  And I think you had

11   described that some of the people you know went through like

12   a predicament at the Capitol.  Could you give us an

13   explanation of what you mean by "predicament."

14             PROSPECTIVE JUROR NO. 0254:  Sure.  So the one

15   friend in particular that sticks out was in the House

16   cloakroom, Republican cloakroom, and ended up shuffled to

17   the House floor and escorted out with the members of

18   Congress to a secure location.

19             MS. ALOI:  Would you describe that as a positive

20   or negative experience for them?

21             PROSPECTIVE JUROR NO. 0254:  I would say it was a

22   negative experience for them.

23             MS. ALOI:  But am I right in understanding that

24   wasn't -- that it wasn't your experience.  You weren't there

25   that day.

1      PROSPECTIVE JUROR NO. 0254:  That's correct, no.

2      THE COURT:  Mr. Rollins?

3      MR. ROLLINS:  Good morning, sir.  That Facebook

4   site or Twitter account, Shameless Hughes, is it a negative,

5   or is it -- does it slant a certain way?

6      PROSPECTIVE JUROR NO. 0254:  So it -- just to

7   clear that up, Seamus, S-E-A-M-U-S, is in the name, Hughes.

8   It's just a general informational account as far as I'm

9   aware.  I don't know of any slant one way or the other.

10     MR. ROLLINS:  All right.  Do you think you formed

11  a specific opinion?  Since your friends and you have people

12  that work there, did you form an opinion regarding -- a

13  strong opinion of what happened?

14     PROSPECTIVE JUROR NO. 0254:  I mean, it's hard not

15  to have any opinion at all of what happened.  I would say

16  that generally I have an opinion, but I don't know that I

17  have a strong opinion.

18     MR. ROLLINS:  Okay.  Thank you.

19     THE COURT:  Thank you.

20     All right.  Sir, you can go back to the big

21  courtroom.

22     PROSPECTIVE JUROR NO. 0254:  Thank you.

23     THE COURT:  Okay.  Any challenge to 254?

24     MS. ALOI:  Not for the government.

25     MR. ROLLINS:  No, Your Honor.

```
1                THE COURT:  254 is qualified.

2                THE COURTROOM DEPUTY:  Your Honor, Juror No. 1248.

3                THE COURT:  Good morning, ma'am.

4                PROSPECTIVE JUROR NO. 1248:  Good morning.

5                THE COURT:  Step right up.  Have a seat.

6                Okay.  You can feel free to remove your mask, if

7     you're comfortable doing so, and speak into the microphone,

8     if you would.

9                All right.  So you're with the UN High Commission

10    and that part was cut off.

11               PROSPECTIVE JUROR NO. 1248:  On Refugees, Your

12    Honor.

13               THE COURT:  On refugees, so you've been busy

14    recently.

15               PROSPECTIVE JUROR NO. 1248:  Indeed.

16               THE COURT:  Yes.  And how long have you -- and

17    you're an attorney?

18               PROSPECTIVE JUROR NO. 1248:  I am.

19               THE COURT:  And what, generally, do you do?

20               PROSPECTIVE JUROR NO. 1248:  I'm a very useless

21    attorney, Your Honor.  I primarily do policy, but on the

22    side I try to do refugee and asylum law wherever possible.

23               THE COURT:  Okay.  And how long have you been with

24    the UN?

25               PROSPECTIVE JUROR NO. 1248:  I've been with the UN
```

1    for 13 years.  First with the World Health Organization, Pan

2    American Health Organization, and in August 2020 I moved

3    over to the High Commission for Refugees.

4              THE COURT:  And both of those were in D.C., not

5    New York?

6              PROSPECTIVE JUROR NO. 1248:  Well, as you see me

7    right now, I am technically in Geneva, Switzerland, but I've

8    been teleworking from D.C. during the duration of the

9    pandemic.

10             THE COURT:  All right.  And do you have a

11   significant other?

12             PROSPECTIVE JUROR NO. 1248:  I do.

13             THE COURT:  And what does he or she do?

14             PROSPECTIVE JUROR NO. 1248:  He is an attorney.

15   His primary practice is before the U.S. Supreme Court.

16             THE COURT:  Okay.  At a firm?

17             PROSPECTIVE JUROR NO. 1248:  He is.

18             THE COURT:  Which firm?

19             PROSPECTIVE JUROR NO. 1248:  Goldstein & Russell.

20   He's the Russell.

21             THE COURT:  Yes.

22             All right.  You answered yes to a few questions.

23   You know someone who lives or works at the Capitol or near

24   the Capitol?

25             PROSPECTIVE JUROR NO. 1248:  You said or otherwise

1    are aware of the Capitol.  So prior to joining the UN, I was

2    an advocate and did a lot of lobbying or other advocacy work

3    on the Hill, so I'm rather familiar with the layout of

4    Capitol Hill.

5                THE COURT:  And for whom were you an advocate?

6                PROSPECTIVE JUROR NO. 1248:  I was an advocate for

7    the Global Health Council and the Center for Health and

8    Gender Equity, amongst other groups.

9                THE COURT:  Okay.  You've obviously watched some

10   video of what happened on January 6th.

11               PROSPECTIVE JUROR NO. 1248:  I'm familiar with the

12   *Washington Post* news feed, and they did contain video for

13   that.

14               THE COURT:  Okay.  Either you or a close family

15   member or friend has been a witness in a court case?

16               PROSPECTIVE JUROR NO. 1248:  Yes.  It's been 25

17   years, but I was a witness in a court case.

18               THE COURT:  Okay.

19               PROSPECTIVE JUROR NO. 1248:  But when I was in

20   college.

21               THE COURT:  Okay.  Without going into any details,

22   anything about that experience make you hesitate to be

23   involved in another trial?

24               PROSPECTIVE JUROR NO. 1248:  None whatsoever.

25               THE COURT:  Okay.  You or a family member or close

1    friend worked in the legal profession.  Obviously your

2    husband and you probably know a lot of lawyers, huh?

3                    PROSPECTIVE JUROR NO. 1248:  We tend to hang out,

4    yes.

5                    THE COURT:  Yes.  Any member of that close group

6    been a party to or involved in any legal action or dispute

7    with an agency of the United States?

8                    PROSPECTIVE JUROR NO. 1248:  My husband was an

9    attorney at the Department of Justice for many years, and so

10   I imagine he was involved in various disputes for the United

11   States, but not necessarily against them.

12                   THE COURT:  Got it.  And was he in the criminal

13   division?

14                   PROSPECTIVE JUROR NO. 1248:  He was in the civil

15   rights appellate division.

16                   THE COURT:  Civil rights appellate, okay.

17                   All right.  Counsel, follow-up?

18                   MS. BERKOWER:  Good morning.

19                   PROSPECTIVE JUROR NO. 1248:  Good morning.

20                   MS. BERKOWER:  It's just barely afternoon.  You

21   said that you -- when you were asked by Judge Cooper about

22   videos that you've seen, you say that you watched the

23   *Washington Post* news feed, and videos come up on that; is

24   that right?

25                   PROSPECTIVE JUROR NO. 1248:  Yes.

1          MS. BERKOWER:  How closely did you follow the

2     story of January 6th?

3          PROSPECTIVE JUROR NO. 1248:  I guess as relatively

4     closely as anybody living in D.C. who was aware of

5     helicopters flying over their homes or road closures due to

6     the incident.

7          MS. BERKOWER:  Is that something that you still

8     closely follow, or was it more just at the time of the

9     events?

10          PROSPECTIVE JUROR NO. 1248:  It was more at the

11     time of the events.

12          MS. BERKOWER:  And so in recent times, have you

13     kept up with the story, or is it just that feed that you

14     get?

15          PROSPECTIVE JUROR NO. 1248:  No more than just

16     reading the daily newspaper.

17          MS. BERKOWER:  Thank you.

18          Actually, before I go -- sorry -- based on what

19     you saw on the *Washington Post* news feed, did you develop an

20     opinion about what happened and the guilt or innocence of

21     the people involved with January 6th?

22          PROSPECTIVE JUROR NO. 1248:  I'm unaware of the

23     particulars of any specific person and that person's guilt

24     or innocence with respect to those events.

25          MS. BERKOWER:  Thank you.

```
 1                    THE COURT:  Okay.  Thank you, ma'am.  You can go
 2        back to the big courtroom.
 3                    PROSPECTIVE JUROR NO. 1248:  Thank you.
 4                    THE COURT:  Okay.  Any challenge to 1248?
 5                    MR. ROLLINS:  No, Your Honor.
 6                    MS. BERKOWER:  No, Your Honor.
 7                    THE COURT:  Hearing none, she is qualified.
 8                    Counsel, can we go until 12:30?
 9                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 1229.
10                    THE COURT:  Okay.  Good morning, ma'am.
11                    PROSPECTIVE JUROR NO. 1229:  Good morning.
12                    THE COURT:  How are you?
13                    PROSPECTIVE JUROR NO. 1229:  I'm well.  How are
14        you?
15                    THE COURT:  Good.  Thank you for your service.
16        You can remove your mask, if you're comfortable doing so.
17                    All right.  So you are a case administrator for
18        Youth Rehabilitation Services.
19                    PROSPECTIVE JUROR NO. 1229:  Yes.
20                    THE COURT:  In D.C.?
21                    PROSPECTIVE JUROR NO. 1229:  Yes.
22                    THE COURT:  You've got a hard job.
23                    PROSPECTIVE JUROR NO. 1229:  Yes.
24                    THE COURT:  And how long have you been doing that?
25                    PROSPECTIVE JUROR NO. 1229:  A little over two
```

```
 1    years, but I've been with the agency for -- this is my 13th

 2    year.

 3              THE COURT:  Okay.  And do you have a significant

 4    other?

 5              PROSPECTIVE JUROR NO. 1229:  No.

 6              THE COURT:  And are you from D.C. or the D.C.

 7    area?

 8              PROSPECTIVE JUROR NO. 1229:  Yes.  From D.C.

 9              THE COURT:  Where did you go to school?

10              PROSPECTIVE JUROR NO. 1229:  Say that again.

11              THE COURT:  Where did you go to school?

12              PROSPECTIVE JUROR NO. 1229:  I graduated from

13    Dunbar High School.

14              THE COURT:  All right.  And you answered yes to

15    one question.  I think this is 17, but it could be 12.

16              PROSPECTIVE JUROR NO. 1229:  17.

17              THE COURT:  17, okay.  You've seen videos or

18    footage of the events of January 6th, right?

19              PROSPECTIVE JUROR NO. 1229:  Yes.

20              THE COURT:  And no "yes" answers to any other of

21    the questions that I had?

22              PROSPECTIVE JUROR NO. 1229:  No.

23              THE COURT:  All right.  Counsel, follow-up?

24              Let me ask you this:  When I gave the overview of

25    the case this morning in the big courtroom, and I said it
```

1    was going to be a January 6th related case, did you have a

2    reaction one way or the other to that?

3                 PROSPECTIVE JUROR NO. 1229:  No.

4                 THE COURT:  Okay.  And you'd be comfortable

5    serving as a juror and being fair and giving Mr. Robertson a

6    fair trial?

7                 PROSPECTIVE JUROR NO. 1229:  Yes.

8                 THE COURT:  Counsel?

9                 MS. BERKOWER:  Good afternoon.

10                PROSPECTIVE JUROR NO. 1229:  Good afternoon.

11                MS. BERKOWER:  So I think you said that you

12   remember seeing videos of the events of January 6th; is that

13   right?

14                PROSPECTIVE JUROR NO. 1229:  Yes.

15                MS. BERKOWER:  Could you explain where you saw

16   those videos.

17                PROSPECTIVE JUROR NO. 1229:  The news.

18                MS. BERKOWER:  What news stations?

19                PROSPECTIVE JUROR NO. 1229:  So I think it's NBC.

20   I just have the news on really to listen to the weather, but

21   that's just my normal routine in the morning.

22                MS. BERKOWER:  And was that a news story that you

23   followed at all?

24                PROSPECTIVE JUROR NO. 1229:  No.

25                MS. BERKOWER:  And did you also -- do you look at

1     any news like online as well or through social media?

2              PROSPECTIVE JUROR NO. 1229:  Sometimes on an app,

3     yes.

4              MS. BERKOWER:  Did you see anything about January

5     6th there?

6              PROSPECTIVE JUROR NO. 1229:  I mean, they had

7     articles, but it wasn't of any significance to me.

8              MS. BERKOWER:  Did you read any articles that you

9     saw on social media?

10             PROSPECTIVE JUROR NO. 1229:  No.

11             MS. BERKOWER:  And in your job at the

12    Department -- at your job at DYRS, do you work with police

13    officers or encounter police officers in your work there?

14             PROSPECTIVE JUROR NO. 1229:  In this role, not

15    really.  Only if a youth is missing or something like that.

16             MS. BERKOWER:  Okay.  And based on your time

17    working -- well, do you work with other types of law

18    enforcement officers, or not?

19             PROSPECTIVE JUROR NO. 1229:  No.

20             MS. BERKOWER:  And based on your experience

21    working -- encountering police officers sometimes in your

22    job, do you have an opinion one way or the other about the

23    police?

24             PROSPECTIVE JUROR NO. 1229:  No.

25             MS. BERKOWER:  And in the time -- I'm sorry, going

1    back just to the news and story of January 6th.  Have you

2    followed that at all in the time -- the news story since

3    January 6th has occurred?

4              PROSPECTIVE JUROR NO. 1229:  No.

5              MS. BERKOWER:  The Court's brief indulgence.

6              And you said a moment ago that in your current

7    role you don't work much with police officers, but did you

8    have a prior job where you did work more closely with

9    officers?

10             PROSPECTIVE JUROR NO. 1229:  No.

11             MS. BERKOWER:  Okay.

12             Thank you, ma'am.

13             PROSPECTIVE JUROR NO. 1229:  You're welcome.

14             MR. ROLLINS:  No questions.

15             THE COURT:  Okay.  Thank you, ma'am.  You can go

16   back to the big courtroom.

17             PROSPECTIVE JUROR NO. 1229:  Thank you.

18             THE COURT:  Any challenge to 1229?

19             MS. BERKOWER:  Not from the government, Your

20   Honor.

21             MR. ROLLINS:  No.

22             THE COURT:  Okay.  She is qualified.

23             I don't know what the Nielsen ratings say, but it

24   seems like NBC is winning the ratings sweepstakes in

25   Washington, D.C.

 1            No offense to any of our members of the press who

 2      may not be representing an NBC affiliate.

 3            MS. ALOI:  Your Honor, we just wanted to note that

 4      the address of the next juror is in Arlington, Virginia.

 5            THE COURT:  That could be a problem unless she's

 6      recently moved here.

 7            MS. ALOI:  Your Honor, it's our understanding you

 8      have to live here for eight months.

 9            THE COURT:  Excuse me?

10            MS. ALOI:  It's our understanding that you have to

11      reside here eight months in order to qualify.

12            THE COURT:  Ms. Jenkins, do you know offhand the

13      residency threshold for D.C.?

14            THE COURTROOM DEPUTY:  No, Your Honor, I do not.

15            THE COURT:  All right.  Well, let's bring here in

16      and voir dire.  It could be a mistake.

17            THE COURTROOM DEPUTY:  Your Honor, Juror No. 1027.

18            THE COURT:  Good afternoon, ma'am.  How are you?

19            PROSPECTIVE JUROR NO. 1027:  I'm good.  How are

20      you?

21            THE COURT:  Pretty good.  You can remove your

22      mask, if you're comfortable doing so.

23            So let me start.  On my list it says that you live

24      in Alexandria.

25            PROSPECTIVE JUROR NO. 1027:  Arlington.

```
1              THE COURT:  Arlington.  Is that right?

2              PROSPECTIVE JUROR NO. 1027:  I recently moved.

3              THE COURT:  Okay.  When did you move?

4              PROSPECTIVE JUROR NO. 1027:  Saturday, March 26th.

5              THE COURT:  Just to avoid me?

6         I think you're actually disqualified because of

7    that, so you can go back to the main courtroom.

8              PROSPECTIVE JUROR NO. 1027:  All right.  Thank

9    you.

10             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1529.

11             THE COURT:  Step right up, ma'am.  Right here.

12             All right.  How are you feeling today?

13             PROSPECTIVE JUROR NO. 1529:  Good.

14             THE COURT:  Good.  You can take your mask off, if

15   you feel free to.

16             You're a Nats fan, I see.

17             PROSPECTIVE JUROR NO. 1529:  What?

18             THE COURT:  You're a Nats fan, I see.

19             PROSPECTIVE JUROR NO. 1529:  Yes.

20             THE COURT:  Not too confident about this coming up

21   year.

22             PROSPECTIVE JUROR NO. 1529:  Yes.  I'm nervous

23   about it.

24             THE COURT:  All right.  It says here that you work

25   for the VA as a medical technologist.  Tell us briefly what
```

1    you do.

2                    PROSPECTIVE JUROR NO. 1529:  Yes.  I work in the

3    laboratory doing lab tests on blood samples mostly.

4                    THE COURT:  Okay.  And do you have a medical

5    background or...?

6                    PROSPECTIVE JUROR NO. 1529:  It's just a medical

7    lab science background, yes.

8                    THE COURT:  Okay.  Is that what you studied in

9    school?

10                   PROSPECTIVE JUROR NO. 1529:  Yes.

11                   THE COURT:  Where did you go to school?

12                   PROSPECTIVE JUROR NO. 1529:  The University of

13   Iowa.

14                   THE COURT:  Okay.  Do you have a significant

15   other?

16                   PROSPECTIVE JUROR NO. 1529:  Yes.

17                   THE COURT:  And what do they do?

18                   PROSPECTIVE JUROR NO. 1529:  They're a student at

19   American University getting their graduate degree.

20                   THE COURT:  In what area?

21                   PROSPECTIVE JUROR NO. 1529:  International

22   relations and -- actually, I can't remember the whole --

23   it's kind of long.

24                   THE COURT:  All right.

25                   PROSPECTIVE JUROR NO. 1529:  Global governments, I

```
 1      think.
 2                  THE COURT:  And are you from Iowa originally?
 3                  PROSPECTIVE JUROR NO. 1529:  Yes.
 4                  THE COURT:  You answered yes to Question 17 only,
 5      which is I believe you've seen video of --
 6                  PROSPECTIVE JUROR NO. 1529:  Yes.
 7                  THE COURT:  -- the events of January 6th, right?
 8                  PROSPECTIVE JUROR NO. 1529:  Yes.
 9                  THE COURT:  And no "yes" answers to any of the
10      other questions that I had?
11                  PROSPECTIVE JUROR NO. 1529:  No.
12                  THE COURT:  So when we were all in the big
13      courtroom and I gave a summary of the case, and I said that
14      this was related to January 6th, did you have a reaction one
15      way or the other?
16                  PROSPECTIVE JUROR NO. 1529:  No.  Maybe a little
17      bit surprised.  That's all.
18                  THE COURT:  Okay.  That's natural.
19                  PROSPECTIVE JUROR NO. 1529:  Yes.
20                  THE COURT:  Counsel, follow-up?
21                  MS. ALOI:  Good afternoon.  So you indicated that
22      you had seen some media or videos about the events of
23      January 6th.  What was the source of your -- of the videos
24      you watched or the articles you read?
25                  PROSPECTIVE JUROR NO. 1529:  I can't remember.  I
```

1    remember I think it was -- might have been live footage the

2    day of.  It was on a news channel somewhere.  I was with my

3    parents, and they had turned on the news and told me to come

4    look at it.

5              I was in Florida at the time so...

6              MS. ALOI:  And did you continue to follow the news

7    story after January 6th?

8              PROSPECTIVE JUROR NO. 1529:  I did see some

9    videos, you know, circulating online and some news articles.

10   There was a lot of information, so I don't remember

11   everything.  You know, there was a lot so...

12             MS. ALOI:  Are you still following the story?

13             PROSPECTIVE JUROR NO. 1529:  No.

14             MS. ALOI:  Do you remember anything specific about

15   what you saw?

16             PROSPECTIVE JUROR NO. 1529:  I do remember the one

17   person that got shot.  I kind of remember seeing that video

18   a little bit more, but not a lot of other videos.  Maybe

19   besides the videos outside of the Capitol with people

20   climbing the stairs and stuff, but that was about all I can

21   really remember.

22             MS. ALOI:  What do you remember about the woman

23   who got shot?  What was the context for the story?

24             PROSPECTIVE JUROR NO. 1529:  I saw the video of

25   her trying to climb through the window and the officer

1   telling her to stop, and, you know, it was -- I heard the

2   gunshot, and that's where the video ended that I had seen.

3            MS. ALOI:  Did you watch any of the commentary

4   about that?

5            PROSPECTIVE JUROR NO. 1529:  Not really, no.

6            MS. ALOI:  Nothing further.

7            THE COURT:  Mr. Rollins?

8            Ms. Wagner?

9            MS. WAGNER:  Good afternoon.  Just one follow-up

10   question.  You said you were a little surprised when you

11   found out it was a January 6th case or a trial.  Can you

12   explain what you mean.

13            PROSPECTIVE JUROR NO. 1529:  I've never been on

14   jury duty before so I didn't expect it to be a big case, is

15   all I mean.

16            MS. WAGNER:  Okay.  Nothing further, Your Honor.

17            THE COURT:  All right.  Ma'am, you can step down

18   and go back to the big courtroom.

19            Any challenge to 529?

20            MR. ROLLINS:  Not from the defense.

21            MS. ALOI:  No, not from the government.

22            THE COURT:  Sorry, 1529 is qualified.

23            THE COURTROOM DEPUTY:  Your Honor, Juror No. 1398.

24            THE COURT:  Good afternoon, ma'am.

25            PROSPECTIVE JUROR NO. 1398:  Hi.

```
 1                THE COURT:  How are you?

 2                PROSPECTIVE JUROR NO. 1398:  I'm fine.

 3                THE COURT:  Step right up.  Feel free to remove

 4      your mask, if you're comfortable doing so.

 5                PROSPECTIVE JUROR NO. 1398:  Okay.

 6                THE COURT:  Hi.  How are you?

 7                PROSPECTIVE JUROR NO. 1398:  Hi.  I'm fine.

 8                THE COURT:  So you're a deputy clerk over in

 9      Superior Court?

10                PROSPECTIVE JUROR NO. 1398:  Yes.

11                THE COURT:  So how do we do it over here compared

12      to how you do it over there?

13                PROSPECTIVE JUROR NO. 1398:  It's a little

14      different, but still the same.  I've never been in this

15      building though.

16                THE COURT:  Well, if there's anything we can do

17      better, you feel free to tell Ms. Jenkins, okay?

18                PROSPECTIVE JUROR NO. 1398:  Okay.

19                THE COURT:  All right.  And how long have you

20      worked at Superior Court?

21                PROSPECTIVE JUROR NO. 1398:  For about a year.

22                THE COURT:  What did you do before that?

23                PROSPECTIVE JUROR NO. 1398:  I was a probation

24      officer at the Fairfax County General District Court.

25                THE COURT:  Okay.  And do you have a significant
```

```
 1    other?
 2                 PROSPECTIVE JUROR NO. 1398:  Yes.
 3                 THE COURT:  And what does he or she do?
 4                 PROSPECTIVE JUROR NO. 1398:  He's a chef.
 5                 THE COURT:  Chef.  Private sector.
 6                 PROSPECTIVE JUROR NO. 1398:  Yes.
 7                 THE COURT:  Okay.  Did you grow up in D.C. or the
 8    D.C. area?
 9                 PROSPECTIVE JUROR NO. 1398:  Yes.
10                 THE COURT:  All right.  You answered yes to 3, 26,
11    and 27.
12                 3 is just do you live on Capitol Hill or you know
13    folks who live on Capitol Hill?
14                 PROSPECTIVE JUROR NO. 1398:  I work around Capitol
15    Hill.
16                 THE COURT:  Okay.  Were you there at work on
17    January 6th?
18                 PROSPECTIVE JUROR NO. 1398:  No.
19                 THE COURT:  You were at home?
20                 PROSPECTIVE JUROR NO. 1398:  No.  I was at the --
21    my other job, the older job.
22                 THE COURT:  Okay.
23                 All right.  And you or a close family member or
24    friend had been employed by a law enforcement agency --
25                 PROSPECTIVE JUROR NO. 1398:  Yes.
```

1          THE COURT:  -- or a court?  That's your job.

2          PROSPECTIVE JUROR NO. 1398:  That's my job, and my

3     aunt is a retired Metropolitan Police.

4          THE COURT:  Okay.  You may hear testimony from

5     police officers, maybe including MPD.  You may see videos

6     depicting what the police did that day.  Mr. Robertson, as I

7     said, is a member or was a member of law enforcement.

8          Do you think -- was it your mother?

9          PROSPECTIVE JUROR NO. 1398:  No, that's actually

10    my aunt.

11         THE COURT:  Your aunt?

12         PROSPECTIVE JUROR NO. 1398:  Yes.

13         THE COURT:  Do you think her service at MPD will

14    affect your ability to be a fair juror?

15         PROSPECTIVE JUROR NO. 1398:  No.

16         THE COURT:  Do you have any particular views

17    towards law enforcement based on your aunt's service?

18         PROSPECTIVE JUROR NO. 1398:  No.

19         THE COURT:  No.  And you know someone who has

20    served in the military?

21         PROSPECTIVE JUROR NO. 1398:  Yes, my uncle.

22         THE COURT:  Your uncle.  Which branch?

23         PROSPECTIVE JUROR NO. 1398:  Air Force.  It was

24    Air Force.

25         THE COURT:  Same question.  You may hear that

1    Mr. Robertson served in the military.  Your uncle's service,

2    would that affect your assessment of his character or his

3    credibility one way or the other because he, too, served in

4    the military?

5                    PROSPECTIVE JUROR NO. 1398:  No.

6                    THE COURT:  Okay.  Counsel, follow-up?

7                    MS. ALOI:  Good afternoon.  How long were you a

8    probation officer?

9                    PROSPECTIVE JUROR NO. 1398:  For about a year.

10                   MS. ALOI:  What did you do before that?

11                   PROSPECTIVE JUROR NO. 1398:  I recently just

12   graduated college.

13                   MS. ALOI:  What made you decide to become a

14   probation officer?

15                   PROSPECTIVE JUROR NO. 1398:  I was -- my major in

16   college was criminal justice, so that kind of inspired me to

17   work with individuals and just, you know, I guess help them

18   get on the right path.

19                   MS. ALOI:  Do you have strong feelings about the

20   criminal justice system as a result?

21                   PROSPECTIVE JUROR NO. 1398:  As far as helping

22   people I do because I believe not everyone deserves to be

23   put in jail.  There's other ways around that that you can

24   help them as far as rehabilitation and, you know, just

25   basically pointing them in the right direction to become a

1    better individual.

2            MS. ALOI:  Does that influence your understanding

3    of whether or not you can be impartial as a juror?

4            PROSPECTIVE JUROR NO. 1398:  I don't think so.

5    I'm sorry, can you say that one more time?

6            MS. ALOI:  Would that influence -- would your

7    opinions about people's rehabilitation influence your

8    ability to be impartial as a juror?

9            PROSPECTIVE JUROR NO. 1398:  No.

10           THE COURT:  Let me put that another way.  So if

11   you were a juror on this case, you would have to determine

12   Mr. Robertson's guilt or innocence, and I would instruct you

13   that the punishment is something that the Court decides and

14   that you can't consider what jail time or whether he would

15   get jail time --

16           PROSPECTIVE JUROR NO. 1398:  Okay.

17           THE COURT:  -- in making your determination of

18   guilt or innocence.  Would you have any problem following

19   that instruction?

20           PROSPECTIVE JUROR NO. 1398:  Oh, no, I don't have

21   no problem.

22           THE COURT:  Mr. Rollins?

23           MR. ROLLINS:  No questions.

24           THE COURT:  All right.  Thank you, ma'am.  You can

25   go back to the big courtroom.

94

```
 1                  PROSPECTIVE JUROR NO. 1398:  Thank you.

 2                  THE COURT:  Okay.  Any challenge?

 3                  MR. ROLLINS:  No, Your Honor.

 4                  MS. ALOI:  No challenge.

 5                  THE COURT:  All right.  Hearing none, 1398 is

 6         qualified.

 7                  THE COURTROOM DEPUTY:  Your Honor, Juror No. 0243.

 8                  THE COURT:  Good afternoon, ma'am.

 9                  PROSPECTIVE JUROR NO. 0243:  Good afternoon.

10                  THE COURT:  You should feel free to remove your

11         mask, if you're comfortable.

12                  PROSPECTIVE JUROR NO. 0243:  Sure.

13                  THE COURT:  Thank you for your patience.

14                  All right.  It says here that you are a historian

15         with something called History Associates, Inc.  Tell us

16         about that.

17                  PROSPECTIVE JUROR NO. 0243:  Yes, so I work for a

18         company that works for a bunch of different clients.  Some

19         of them are museums or educational companies.  Sometimes

20         it's corporations, documenting their history; and sometimes

21         it's litigation cases, usually for environment, you know,

22         related cases.

23                  THE COURT:  And how long have you been employed

24         there?

25                  PROSPECTIVE JUROR NO. 0243:  For about three,
```

1    three and a half years.

2              THE COURT:  And what did you do before that?

3              PROSPECTIVE JUROR NO. 0243:  Prior to that I was

4    in grad school, and before that I did some teaching of

5    English abroad.

6              THE COURT:  Okay.  And where did you go to grad

7    school?

8              PROSPECTIVE JUROR NO. 0243:  I went to Georgetown

9    for German and European studies.

10             THE COURT:  And did you write a thesis for your

11   master's?

12             PROSPECTIVE JUROR NO. 0243:  I did, yes.

13             THE COURT:  What was it on?

14             PROSPECTIVE JUROR NO. 0243:  It was on West

15   Germany's post-war culture particularly related to food, so

16   the cooking -- there was a big cooking show at the time, and

17   that's what I wrote about.

18             THE COURT:  And where did you go to undergrad?

19             PROSPECTIVE JUROR NO. 0243:  I went to University

20   of Minnesota.

21             THE COURT:  Did you study history?

22             PROSPECTIVE JUROR NO. 0243:  No.  I studied

23   English and speech language hearing science, which is sort

24   of pre speech therapy.

25             THE COURT:  And do you have a significant other?

1          PROSPECTIVE JUROR NO. 0243:  I do not.

2          THE COURT:  Okay.  And you've lived in D.C. since

3     coming to grad school at Georgetown?

4          PROSPECTIVE JUROR NO. 0243:  Yes.  That's correct.

5          THE COURT:  All right.  You answered yes to two

6     questions.

7          17.  You've obviously watched video of the events

8     of January 6th.  Where do you recall watching those videos?

9     Which news outlets or Internet sources?

10          PROSPECTIVE JUROR NO. 0243:  I don't recall

11    exactly which outlets.  It was probably ABC and also online,

12    probably NPR online.

13          THE COURT:  Okay.  And did you watch them real-

14    time, and have you continued to follow the story since it

15    happened?

16          PROSPECTIVE JUROR NO. 0243:  I saw some real-time

17    video on January 6th, and then, I mean, I've just heard

18    what's sort of been in the headlines since then.

19          THE COURT:  Okay.  And you say "in the headlines,"

20    do you read the *Washington Post*?  What other news sources

21    may you have read about January 6th?

22          PROSPECTIVE JUROR NO. 0243:  Yes.  So mainly it's

23    NPR stories, so any time that they covered anything related

24    to that.

25          THE COURT:  Okay.  And a close friend or family

1    member or you have worked in the legal profession in some

2    respect?

3              PROSPECTIVE JUROR NO. 0243:  Yes, that's correct.

4    I have a close friend who works as a staff attorney at a

5    firm in D.C.

6              THE COURT:  And do you know what kind of work that

7    person does?  What kind of law?

8              PROSPECTIVE JUROR NO. 0243:  I have a sense.  She

9    works on sort of big corporate cases, but that's all I know.

10             THE COURT:  Okay.  Counsel, any follow-up?

11             MS. ALOI:  Not from the government.

12             MR. ROLLINS:  Nothing from defense.

13             THE COURT:  Okay.  Thank you, ma'am.  You can go

14   back to the big courtroom.

15             Any objection to -- any challenge to 243?

16             MR. ROLLINS:  Not from defense.

17             MS. ALOI:  Not from the government.

18             THE COURT:  Hearing none, 243 is qualified.

19             One more, Counsel?

20             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1567.

21             THE COURT:  Good afternoon, sir.

22             PROSPECTIVE JUROR NO. 1567:  Good afternoon.

23             THE COURT:  Step right up.  Have a seat.

24             All right.  You can feel free to take your mask

25   off, if you're comfortable doing so.

1          All right.  And I'd ask you to speak into that

2     microphone so that everybody can hear you, okay?

3          PROSPECTIVE JUROR NO. 1567:  Okay.

4          THE COURT:  All right.  So I don't have an

5     occupation for you.  Are you working at the moment?

6          PROSPECTIVE JUROR NO. 1567:  No, I'm not.

7          THE COURT:  All right.  And what was your last

8     job?

9          PROSPECTIVE JUROR NO. 1567:  Sign graphics.

10          THE COURT:  Sign graphics.

11          PROSPECTIVE JUROR NO. 1567:  Uh-huh.

12          THE COURT:  Tell me about that.  What do you do?

13          PROSPECTIVE JUROR NO. 1567:  I ran my own

14     business.  It just got a little slow.

15          THE COURT:  Okay.  Because of COVID, or other

16     reasons?

17          PROSPECTIVE JUROR NO. 1567:  Yes, because of other

18     reasons; and sometimes it's slow and it picks up, slows

19     down.

20          THE COURT:  So posters and announcements and

21     things like that?

22          PROSPECTIVE JUROR NO. 1567:  Basically storefront

23     signs, window signs, truck lettering.

24          THE COURT:  Uh-huh.  Got it.

25          And is that -- how long did you do that for?

```
 1                    PROSPECTIVE JUROR NO. 1567:  Since 1976.

 2                    THE COURT:  Okay.  So you're a master, huh?

 3                    PROSPECTIVE JUROR NO. 1567:  Yes, I guess so.

 4                    THE COURT:  Did you grow up in this area?

 5                    PROSPECTIVE JUROR NO. 1567:  Yes, I did.

 6                    THE COURT:  Where did you go to school?

 7                    PROSPECTIVE JUROR NO. 1567:  Calvin Coolidge High

 8      School and UDC.

 9                    THE COURT:  What did you study at UDC?

10                    PROSPECTIVE JUROR NO. 1567:  Communications.

11                    THE COURT:  And are you married?

12                    PROSPECTIVE JUROR NO. 1567:  No, single.

13                    THE COURT:  Single.

14                    All right.  You answered yes to a couple of

15      questions.

16                    Question 10.  I asked you about reasonable doubt

17      and consideration of punishment; that if you were a juror on

18      this case, the government would have to prove the case

19      beyond a reasonable doubt, and I would instruct you of that,

20      and also that you couldn't consider the punishment that this

21      gentleman would get, if he were convicted.  I determine the

22      punishment, if there were a conviction.  And you said that

23      you might have trouble following that instruction.

24                    PROSPECTIVE JUROR NO. 1567:  Yes, because I'm --

25      it wouldn't be fair to him for me to sit on the trial.
```

```
 1              THE COURT:  Why is that?
 2              PROSPECTIVE JUROR NO. 1567:  Well, I really felt
 3    bad about what happened at the Capitol, and somewhat I felt
 4    that everyone that entered the building that day were
 5    definitely wrong, in my -- you know, in my opinion.
 6              THE COURT:  Now, you know, a lot of people came
 7    here that day.  A lot of people came for different reasons,
 8    and they did different things.  And Mr. Robertson is on
 9    trial not for what he believes, but for what he did or did
10    not do that day.
11              And I know that many people have strong feelings
12    about January 6th generally, but do you think -- and I want
13    you to be honest.  Would that get in the way of your giving
14    this gentleman a fair trial?
15              PROSPECTIVE JUROR NO. 1567:  Yes.  It wouldn't be
16    fair to him.
17              THE COURT:  Okay.
18              All right.  You can go back to the big courtroom,
19    all right?
20              PROSPECTIVE JUROR NO. 1567:  All right.
21              THE COURT:  Thanks.
22              Okay.  The Court will strike 1567 for cause based
23    on his fairly forthright statement that he wouldn't be able
24    to be fair in the case.
25              All right.  Let's take our lunch break.  Counsel,
```

1    it's basically 12:30.  Why don't we be back ready to go at

2    1:30, okay?  Have a good lunch.

3             (Lunch recess taken at 12:34 p.m.)

4

5              **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7             I, LISA A. MOREIRA, RDR, CRR, do hereby

8    certify that the above and foregoing constitutes a true and

9    accurate transcript of my stenographic notes and is a full,

10   true and complete transcript of the proceedings to the best

11   of my ability.

12        Dated this 4th day of April, 2022.

13

14

15                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
16                          United States Courthouse
                            Room 6718
17                          333 Constitution Avenue, NW
                            Washington, DC 20001

18

19

20

21

22

23

24

25