UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .  CR No. 21-0034 (CRC)
                               .
     v.                        .
                               .  Washington, D.C.
THOMAS ROBERTSON,              .  Wednesday, April 6, 2022
                               .  1:40 p.m.
          Defendant.           .
. . . . . . . . . . . . . . . . .      AFTERNOON SESSION



TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHRISTOPHER R. COOPER
UNITED STATES DISTRICT JUDGE



<u>APPEARANCES</u>:

For Government:              ELIZABETH A. ALOI, AUSA
                            RISA BERKOWER, AUSA
                            U.S. Attorney's Office
                            555 Fourth Street NW
                            Washington, DC 20530
                            (202) 252-7566

For Defendant:              MARK M. ROLLINS, ESQ.
                            CAMILLE WAGNER, ESQ.
                            Rollins & Chan
                            419 Seventh Street NW
                            Washington, DC 20004
                            (202) 455-5610

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001
                            (202) 354-3186



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

### TESTIMONY

NOAH DUCKETT:      Cross-Examination........................ 632
                   Redirect Examination..................... 636

DANIEL SCHWAGER:   Direct Examination....................... 638
                   Cross-Examination........................ 659
                   Redirect Examination..................... 661

PAUL WADE:         Direct Examination....................... 663
                   Cross-Examination........................ 673

JACOB FRACKER:     Direct Examination....................... 676

\*   \*   \*

### EXHIBITS RECEIVED

Government Exhibit Nos. 501.5, 505-507..................... 638
Government Exhibit No. 310 ............................... 679
Government Exhibit No. 309 ............................... 680
Government Exhibit No. 100A .............................. 690
Government Exhibit No. 101F .............................. 723
Government Exhibit No. 101G .............................. 727
Government Exhibit No. 103 ............................... 733
Government Exhibit No. 101A .............................. 735
Government Exhibit No. 101B .............................. 752
Government Exhibit No. 101E .............................. 754

\*   \*   \*

1              P R O C E E D I N G S

2          MR. ROLLINS:  Could we have a moment?

3       (Bench conference.)

4          MR. ROLLINS:  Yes, Your Honor.  The defense would

5    like to be able to cross-examine this office regarding the

6    PPMS issue that he had back in 2019 where he was investigated

7    for allegations of harassment and failure to identify himself

8    as an officer.  He was given an adverse action and suspended

9    without pay, and we'd like to be able to cross him, or at

10   least ask him about that.

11         MS. ALOI:  This is the first we're hearing of this.

12   What is the date of the incident?

13         MR. ROLLINS:  The date of the incident is May 8, 2019.

14         THE COURT:  So this goes to just general credibility?

15         MR. ROLLINS:  Yes.  Credibility.

16         THE COURT:  All right.  Okay.  Any objection?

17         MS. BERKOWER:  We do object, Your Honor.  I think --

18   there's no search here.  There's no -- like There isn't an

19   issue of a search here.  The allegation is that the officers

20   followed him and the officers didn't identify themselves when

21   asked to do so.  Just really don't see how that's at all

22   relevant to what this officer's testifying about.

23       At the very least, I think it would be worthwhile to have

24   the officer proffer some of the facts concerning this incident

25   if the Court is not satisfied, but we just don't think it's at

1    all relevant given his credibility given the very basic nature

2    of the allegations and how unrelated it is as to what he

3    testified to.

4        THE COURT:  What part of your testimony are you

5    questioning the veracity of?

6        MR. ROLLINS:  Specifically that he remembers this

7    incident and that he has a recollection of this incident when

8    we have documents from the government indicating that he, in

9    February, when they sent him a message about this case, he

10   didn't know anything about it and said that he thought it was

11   mistaken on a cams.

12       THE COURT:  Can you pass up the PPMS?

13       MS. BERKOWER:  Your Honor, what Mr. Rollins just

14   referred to is not part of his PPMS.  To be clear, I think we

15   had some initial communications with the witness and he was

16   unsure what he was being called to testify about.  That was

17   before we met with him to discuss the facts of the incident.

18   The cams came from out of the blue, and he had never heard my

19   name or Ms. Aloi's name and so was contacting us to get some

20   more information.

21       Upon sitting down with him and reviewing his body-worn

22   camera, which I don't believe he had necessarily done prior to

23   the meeting, he did recall the incident.  So I just wanted to

24   clarify that was the context for the email Mr. Rollins is

25   referring to and there was no PPMS action whatsoever relating

1   to that email.

2          THE COURT:  Okay.  Pass it up.  Let me look at it.

3      (Court reviewing document.)

4      Okay.  I'll sustain the government's objection.  I don't

5   think it goes to the testimony that he has offered.  This

6   isn't a search.  This doesn't go to his -- you know, there's

7   no harassment or any allegation at issue.  There's nothing

8   in the report related to his veracity or his not telling the

9   truth or a convenient failure to recollect anything.  So I

10  think it's not relevant to the issue that you have proffered

11  it for.  (End of bench conference.)

12     Bring the jury back.

13     (Jury in at 1:46 p.m.)

14         THE COURT:  Welcome back, everyone.  I think it's

15  a little warmer?  Good.  Everyone have a nice lunch?  The

16  cafeteria is pretty good.  I was not impressed with the

17  chicken gumbo, though.

18     (Laughter.)

19     All right.  Mr. Rollins will now proceed with his

20  cross-examination of Officer Duckett once we get Officer

21  Duckett back on the stand.

22     (Witness enters.)

23     Welcome back, sir.  Remember you're still under oath.

24         THE WITNESS:  Sure.

25     (Witness resumes the stand.)

1                          CROSS-EXAMINATION

2      BY MR. ROLLINS:

3      Q.   Good afternoon, Officer Duckett.

4      A.   Good afternoon.

5      Q.   Officer Duckett, you indicated that when you saw one

6      of the officers that you described in the port arms display

7      -- and that's basically both hands in front of your chest?

8      Right?

9      A.   Correct.

10     Q.   And you indicated that that's a defensive posture.

11     Correct?

12     A.   Correct.

13     Q.   That's not something that an officer would do in

14     an affirmative or an aggressive stance.  Correct?

15     A.   Correct.

16     Q.   And when you saw Mr. Robertson that day, he was in that

17     defensive posture.  Correct?

18     A.   Correct.

19     Q.   And if wasn't until the officers came through and they

20     rushed through his direction that you're indicating that

21     that's when you got hit.

22     A.   Correct.

23     Q.   Okay.  But it's fair to say that he was not acting

24     aggressively towards you.

25     A.   Correct.

1   Q.   And when you say that he was -- could you tell me what

2   part of your body got hit?

3   A.   Just where my pads are, the forearm area.

4   Q.   So the top of the stick hit you?

5   A.   Sure.  Yeah.  Top.  Definitely wasn't the bottom.  It was

6   the top, top portion of stick.

7   Q.   Are you sure which side of the stick hit you?  Was it the

8   top of the stick or the bottom of the stick?

9   A.   It was definitely the top, because you can see the bottom

10  part in the video.

11  Q.   It wasn't as if he took the stick and just hit you.

12  Correct?  It wasn't that kind of hit.  Correct?

13  A.   Correct.

14  Q.   It was almost as if you were running into him and you got

15  that stick -- you got hit by the stick as you were running

16  into him.  Correct?

17  A.   I wouldn't say that.

18  Q.   Well, before you got to Mr. Robinson [sic], you had to go

19  through a lot of people.  Right?

20  A.   Correct.

21  Q.   And I couldn't tell you if you were one of the officers

22  that engaged in hand-to-hand combat, but there was -- you had

23  to engage in hand-to-hand combat with people.  Correct?

24  A.   Correct.

25  Q.   And, obviously, he was not one of those individuals.

1   A.   Correct.

2   Q.   And you indicated that the weapons that are -- that you

3   had the situational awareness when you were going about that

4   you're afraid that anything -- well, almost anything could be

5   used as a weapon.  Correct?

6   A.   Correct.

7   Q.   So it's not just a stick.  People could use pens.  They

8   could use anything they have on them, right, to use that as a

9   weapon.  You have to be alarmed for all those things.  Correct?

10  A.   Correct.

11  Q.   I know you said you remember this case, but did you

12  remember all the people that you had contact with that day?

13  A.   No.

14  Q.   But you just remember him because the way he was holding

15  the stick in a ports arms fashion?

16  A.   No.  It wasn't just that.  It was the book bag, the gas

17  mask.

18  Q.   Okay.  So those things kind of stood out in your memory.

19  It's not because you were significantly wounded, right?  It

20  wasn't because of that.

21  A.   Correct.

22  Q.   It was just because of the way that he was displayed,

23  the way that you saw him.

24       And if you could play 202C for me?

25       So this was right before your team kind of came in his

1    direction.  Right?

2    A.   Correct.

3    Q.   And again, the way he's holding that stick in that

4    picture, that's a defensive posture.

5    A.   In my opinion, yes.

6    Q.   And the reason why that's a defensive posture is because

7    -- I mean I'm trying figure -- if you're holding the stick,

8    you have leverage -- if you're using it aggressively, you

9    would have more room at top of the stick, right?  I mean,

10   it should be even.  Even amount of room at the top and even

11   amount of room at the bottom so you could hit either way.

12   Right?

13   A.   Can you repeat that, please?

14   Q.   So the reason why you know that to be a defensive posture

15   is because the way that you're holding the stick, you don't --

16   it's not -- you're not holding the stick in the middle.  Right?

17   A.   Correct.

18   Q.   Because if you're holding the stick in the middle, you

19   would then have the ability to hit up or down.  Correct?

20   A.   Correct.

21   Q.   And that's the reason why you know that to be a defensive

22   posture.

23   A.   Correct.

24   Q.   And essentially to this day, you don't know whether

25   you were hit intentionally by Mr. Robertson.  Correct?

1    A.    No.

2              MR. ROLLINS:  No further questions.

3                    REDIRECT EXAMINATION

4    BY MS. BERKOWER:

5    Q.    Afternoon.

6    A.    Good afternoon, ma'am.

7    Q.    Mr. Rollins just asked you about whether Mr. Robertson

8    was holding the stick in a defensive posture, and you said

9    yes.  Do you remember being asked about that?

10   A.    Yes.

11   Q.    What does that mean exactly, to hold a stick in a

12   defensive posture?

13   A.    Best way I can put it is, in that situation, his refusal

14   to move, like a barrier.  It's like a shield.  Somebody had a

15   shield in front of them, kind of a riot shield, it's defensive

16   so we don't get hit.  It's in front of us for a reason.

17   Q.    And are you still able to injure someone from a defensive

18   posture?

19   A.    Absolutely.

20   Q.    Are you able to use the weapon -- excuse me -- use a

21   stick in a defensive posture to block someone's path?

22   A.    Yes.

23   Q.    And based on the way that Mr. Robertson positioned

24   himself, was he in your way?

25   A.    Yes.

1     Q.   Mr. Rollins asked you if you knew whether or not you were

2     hit intentionally, and you said you didn't know.  You remember

3     being asked about that?

4     A.   Yes.

5     Q.   Would you have gotten hit at all if he had moved out of

6     the way?

7     A.   No.

8     Q.   And was there room to move out of the way?

9     A.   Yes.

10    Q.   Were yourself or officers around you making your presence

11    known to the people in the immediate area?

12    A.   Yes.

13    Q.   Were you doing that by shouting commands?

14    A.   Yes.

15    Q.   Were you doing that by standing in formation?

16    A.   Yes.

17    Q.   And had you been doing that all the way up to the time

18    when Mr. Robertson appeared in front of you?

19    A.   Yes.

20         MS. BERKOWER:  Nothing further.

21         THE COURT:  Okay.

22      Thank you, Officer Duckett, for your testimony.  You're

23    excused.  Please don't discuss your testimony with anyone

24    until the trial is over.

25         THE WITNESS:  Yes, sir.

1          THE COURT:  Have a good day.

2        (Witness steps down.)

3          MS. ALOI:  The government calls Daniel Schwager.

4        Your Honor, we expect to use exhibits 505, 506, 507, and

5      501.5 with this witness and I understand there's no objection

6      from the defense so in the interest of expediency I would move

7      to admit them now.

8          MS. WAGNER:  No objection.

9          THE COURT:  So moved.

10                          (Government Exhibit Nos. 501.5,

11                           505-507 received into evidence.)

12        DANIEL SCHWAGER, WITNESS FOR THE GOVERNMENT, SWORN

13                      DIRECT EXAMINATION

14      BY MS. ALOI:

15      Q.   Mr. Schwager, can you please state and spell your name

16      for the record?

17      A.   Daniel Schwager.  S-C-H-W-A-G-E-R.

18      Q.   Mr. Schwager, where did you work on January 6 of 2021?

19      A.   I worked for the Secretary of the United States Senate.

20      Q.   And what was your job?

21      A.   I was the general counsel for the secretary.

22      Q.   And what does the Secretary of the United States Senate

23      do?

24      A.   The secretary is, in a sense, the chief administrative

25      officer of the Senate.  The secretary oversees a number of

1  departments that include all of the floor clerks and

2  legislative staff on the floor of the chamber, which includes

3  the financial office of the Senate, it includes other

4  administrative and support offices, the historian, the

5  curator, etc.

6  Q.   As the general counsel to the Secretary of the Senate,

7  what were some of your responsibilities?

8  A.   I advised the secretary on compliance, legal issues.  I

9  assisted all of the departments with a variety of issues and

10  concerns.  I advised on legal issues.  I was responsible for

11  working on continuity on government issues, various other

12  tasks, reviewed contracts.

13  Q.   Was yours a political job?

14  A.   It was not.

15  Q.   Is the Secretary of the Senate a political job?

16  A.   The secretary of the Senate is nominated by the majority

17  leader of the Senate and elected by the full Senate.

18  Q.   By the full Senate?  Do you work for any particular party,

19  or is that right R senator?

20  A.   I have never worked for a particular senator.  I've

21  always been known as a nonpartisan staffer in several jobs.

22  Q.   In your career history, have you had other jobs in

23  Congress?

24  A.   I have.

25  Q.   What were they?

A.   When I first went to the Hill from the executive branch,
I was a counsel in the Senate Ethics Committee.  It was also a
nonpartisan job.  From the Senate Ethics Committee I left to
go to the House Ethics Committee, where I was chief counsel
and staff director, also nonpartisan.

Q.   In total, how long did you work in Congress?

A.   I worked approximately ten and a half, eleven years,
I believe.

Q.   How long have you been a lawyer?

A.   I've been a lawyer for more than 20 years.

Q.   And do you still work at Congress?

A.   I do not.

Q.   When did you leave?

A.   I left at the end this past January, so about a month
ago, or two months ago.

Q.   Where are you working now?

A.   I work at a nonprofit organization in D.C.

Q.   Now that we know a little bit about your background,
I'm going to shift gears a little bit.  I want to show you
what has been marked as Exhibit 1002.  And this is actually a
stipulation between the parties, and so we can publish it to
the jury.

        THE COURT:  Okay.  Ladies and gentlemen, let's
just take a moment.  Ms. Aloi just referred to a stipulation.
A stipulation is simply an agreement to certain facts that

1    both parties have signed on to.  So you may consider the

2    stipulation as an admitted fact, as evidence in the case.

3    Okay?

4    BY MS. ALOI:

5    Q.   Mr. Schwager, can you please read the stipulation?

6    A.   I can.  "Stipulation of the Parties.  The United States

7    of America, by and through its attorney, the United States

8    Attorney for the District of Columbia, and the defendant,

9    Thomas Robertson, with the concurrence of his attorneys,

10   agree and stipulate to the following:

11        "The certification of the electoral college vote.

12   On January 6, 2021, a joint session of the United States

13   Congress convened at the U.S. Capitol.  During the joint

14   session, elected members of the United States House of

15   Representatives and the United States Senate were meeting in

16   both the House and Senate chambers of the Capitol to certify the

17   vote count of the electoral college of the 2020 presidential

18   election which had taken place on Tuesday, November 3, 2020.

19        "On January 6, 2021, the House of Representatives began

20   its session at approximately 12:00 p.m., the Senate began

21   its session at approximately 12:30 p.m., and the two houses

22   met together at approximately 1:00 p.m. in the House of

23   Representatives chamber to begin the joint session.  Vice

24   president Mike Pence was in the Capitol building and presiding

25   over the joint session.  At approximately 1:15 p.m., the House

and Senate withdrew to their separate chambers for up to two hours to resolve a particular objection.

"At approximately 2:12 p.m., Vice President Pence evacuated the Senate chamber, and approximately one minute later, the senator who had become the presiding officer in Vice President Pence's absence declared that the Senate would stand in recess. Senators evacuated the Senate chamber.

"At approximately 2:15 p.m., Speaker Nancy Pelosi, who was presiding over the House of Representatives, evacuated the chamber, and approximately 15 minutes later, the representative who had become the presiding officer in her absence declared that the House would stand in recess.  The representatives evacuated the House chamber.  The joint session was suspended.

"The Senate and House resumed meeting at approximately 8:06 p.m. and 9:02 p.m., respectively.  Congress's joint session continued until approximately 3:44 a.m. on January 7, 2021, when it completed the certification of the electoral college vote."

Q.   Thank you.  I now want to chat a little bit about the events you just described.  Were you at the United States Capitol on January 6, 2021?

A.   I was.

Q.   And so your testimony today, is it based on your personal knowledge of what occurred that day?

A.   It is.

1    Q.   And what you observed?

2    A.   Yes.

3    Q.   What you heard as well?

4    A.   Yes.

5    Q.   Okay.  Let's talk a little bit about Congress.

6    Are there two houses of Congress?

7    A.   There are.

8    Q.   What are they?

9    A.   The United States Senate and the United States House of

10   Representatives.

11   Q.   Now, when we say two "houses," do they also actually have

12   physical space that is separate from one another?

13   A.   They each have a chamber on opposite sides of the Capitol

14   building itself.

15   Q.   So when you're House chamber, who meets in the House

16   chamber?

17   A.   The House of representatives.

18   Q.   And who meets in the Senate chamber?

19   A.   The Senate.

20   Q.   So two houses figuratively and literally?

21   A.   One building, two different rooms.

22   Q.   I'm now going to show you what's been admitted as Exhibit

23   507, which is a compilation of footage from the Senate and

24   House galleries, but before we look more closely at that, who

25   is the person in charge of the House of Representatives?

1    A.    The members of the House of Representatives elect a

2    speaker to oversee administrative tasks and perform various

3    leadership functions.

4    Q.    And who was the Speaker of the House on January 6?

5    A.    Nancy Pelosi.

6    Q.    And what role does the vice president play in the Senate?

7    A.    The vice president, according to the Constitution, is the

8    president of the United States Senate.

9    Q.    And have you observed the vice president meeting in the

10   Senate?

11   A.    I have.

12   Q.    Have you observed him being protected by Secret Service

13   while there?

14   A.    I have.

15   Q.    Okay.  So going back to January 6, where were you on

16   January 6 starting around noon?

17   A.    I was preparing for the joint session.  I was somewhere

18   in the Capitol building.  I can't tell you exactly at noon

19   where I was.  I had a lot of preparation to do.

20   Q.    And what was the joint session that would occur that day?

21   A.    It was the joint session which fulfills the constitutional

22   and statutory responsibilities to count the electoral college

23   votes and declare who has received the most votes for president

24   of the United States.

25   Q.    And what role did you personally play in that process.

1    A.   I participated in -- I was one of the people who had a

2    role in administering the collection of the ballots.  They're

3    not called "ballots" under law; they're called "certificates

4    of vote."  They are, by law, sent to the president of the

5    Senate.  The president of the Senate shares them with the

6    Office of the Secretary, who is in charge of the administration

7    of this proceeding in coordination with the House.

8    Q.   And people vote in all different ways, right?  Are these

9    actually like pieces of paper you can see?

10    A.   The certificates of vote are pieces of paper that are

11    signed by the governor and secretary of each state, the seal

12    of the state.  I'm sorry.  The certificates of vote are signed

13    by the electors.

14    Q.   And actually, Ms. Dunn-Gordon, let's turn to Exhibit

15    501.15.

16        Mr. Schwager, what is this exhibit?

17    A.   This is a copy of Section 15 of Title 3 of the United

18    States Code.  It is one of the statutes that governs -- one

19    of the federal statutes, federal laws, that governs how the

20    electoral college vote is counted by Congress.

21    Q.   If we could pause for a moment.  This was admitted

22    previously.  Could you please publish it?  We admitted it

23    as a group at the beginning of the testimony.

24        THE DEPUTY CLERK:  This is?

25        MS. ALOI:  Just to confirm, 505, 506...

1    BY MS. ALOI:

2    Q.   Mr. Schwager, is this --

3             THE COURT:  Please don't ask him to read it.

4             THE WITNESS:  Thank you, Judge.

5       (Laughter.)

6    BY MS. ALOI:

7    Q.   Is this part of the federal code?

8    A.   It is.

9    Q.   Does that mean it's the federal law?

10   A.   This is a federal law, yes.

11   Q.   And are you familiar with this law?

12   A.   I am.

13   Q.   Does it require that the election certification that you

14   just described happen on January 6?

15   A.   Yes.  We refer to it as the counting of the votes, yes.

16   Q.   Does it require that it happen at 1 p.m.?

17   A.   Yes, it does.

18   Q.   Over the course of the day on January 6, did activities

19   relating to that certification start in the House chamber?

20   A.   That's my understanding.  I was with the Senate at the

21   beginning of it, but when the Senate proceeded into the House

22   chamber, they'd already begun the day.

23   Q.   We're going to speak more about that in a few minutes,

24   but you've just predicted my next question.  At some point did

25   the proceedings move to both chambers?

1    A.    I'm sorry?

2    Q.    At some point did the proceedings then continue in both

3    chambers that day?

4    A.    Yes.

5    Q.    Okay.  Now let's turn back to 507, please, Ms. Dunn-Gordon,

6    and please publish it to the jury.  Can you please play until .2.

7          (Video played.)

8          Mr. Schwager, could you hear the sound on that?

9    A.    I did not hear it.

10         MS. WAGNER:   Court's indulgence.

11         (Government conferring.)

12   BY MS. ALOI:

13   Q.    Mr. Schwager, as Ms. Dunn-Gordon sets that up, was

14   this the start of the meeting that the House and Senate

15   were having on January 6?

16   A.    This appears to be each chamber convening for the

17   day separately before beginning the joint session.

18   Q.    Can you please play it to one minute and 17 seconds?

19         Is this the House chamber?

20   A.    It is.

21         (Video played.)

22   Q.    Now, while this was happening, where were you on

23   January 6?

24   A.    Prior to one o'clock, I was on and off of the floor of

25   the Senate chamber, I believe.  May have been in my office

1    or my boss's office.  And then at this time, 12:56, I would

2    have been right outside those doors you see, waiting to

3    proceed with -- at the back end of the procession from the

4    Senate chamber to the House chamber.

5    Q.   So were the members of the Senate proceeding to the House

6    chamber at this time?

7    A.   Correct.  They're getting together to do that, lining up.

8    Q.   And how long does it take to walk from one side to the

9    other?

10   A.   It would take any of us, I don't know, maybe 30,

11   45 seconds, but a procession takes a little longer.

12   Q.   Can you actually like see both chambers from the Rotunda?

13   A.   Yes.  Well, not from the Rotunda.  You can see them from

14   each other.  It is a single hallway.  From this door you're

15   looking out from the chamber, you can see the House chamber

16   door.

17   Q.   And where we stopped the video here, which is at 1:17,

18   do you see the vice president?

19   A.   I do.

20   Q.   Could you please circle him?

21        (Witness complies.)

22        Could you please clear the screen, then once it's clear,

23   Ms. Dunn-Gordon, can you please play it until 2:05?

24        (Video played.)

25        Now, the people who just walked in that you can see on

1      the screen, are they senators?

2      A.    No.

3      Q.    Who are they?

4      A.    The people who are still on the screen?

5      Q.    Mm-hm.

6      A.    I think you're referring to the young staffers who are

7      walking down the aisle.  You can see members of the House in

8      the aisles, members of the House of Representatives,

9      congressmen and -women, but the people walking down the aisle

10     are young Senate staffers.

11     Q.    Can you see them carrying anything?

12     A.    Yes.

13     Q.    What are they carrying?

14     A.    They are carrying what we refer to as the ballots.

15     Most of them are carrying ballot boxes, which are ceremonial

16     boxes that contain the certificates of vote.

17     Q.    And where were you at this time?

18     A.    This is the very beginning of the Senate procession,

19     and I was at the back of it.

20     Q.    Okay.  Can you please fast-forward to minute 2:45 and

21     then stop.  At this point, had the senators made it into the

22     chamber?

23     A.    Yes.  I see some senators.

24     Q.    And what time is it?

25     A.    Looks to be 1:05 p.m. in a few seconds.

1    Q.   Do you see yourself in the frame?

2    A.   I do.

3    Q.   Could you please circle yourself.

4         (Witness complies.)

5         And what are you doing right now?

6    A.   I was part of the team of staff of the Secretary of

7    the Senate who were -- we were opening the ballots, or the

8    certificates of vote, as just before they were being passed

9    up to the vice president so they could be read by -- then

10   passed to the tellers and read by the tellers.

11   Q.   Ms. Dunn-Gordon, could you please play until minute 3:06?

12        (Video played.)

13        Okay.  Now what happened after this?

14   A.   As the vice president just said, or the president of

15   the Senate just said, each of the certificates were opened,

16   passed up to the vice president who commented on each

17   certificate of vote, and then passed them down to -- if there

18   were no objections, passed them down to tellers.  There are

19   two senators who are tellers and two members of the House of

20   Representatives who are tellers who pronounce what the vote

21   is from the certificate.

22   Q.   At some point, was there an objection?

23   A.   There were several objections.

24   Q.   Could you please play until 3:43.

25        (Video played.)

1          Okay.  Why did the Senate need to retire back to its

2     chamber?

3     A.   Well, according to the law that you showed earlier,

4     Title 3, Section 15, and other laws right after that, if there

5     is an objection to a state's certificate of vote that is

6     joined by both a member of the House of Representatives and a

7     United States senator, then there is a procedure in the law by

8     which the Senate retires to the Senate chamber and meets in

9     the Senate chamber, the House meets in the House chamber and

10    they debate for a limited time the objection, and then they

11    vote on whether to object to those votes.

12    Q.   And is this all part of the same proceeding?

13    A.   It is.

14    Q.   I now want to show you what's been admitted as Exhibit

15    505.  Mr. Schwager, what are we seeing, Exhibit 505?

16    A.   This is the Senate chamber, the presiding officer's

17    chair.  The vice president is sitting in the officer's chair

18    on what we call the dais with the secretary and staff of the

19    secretary on the next level of the dais and other Senate

20    staffers.  You can see one -- yes.  And others.

21    Q.   So after they went back to their own chambers, where did

22    you go?

23    A.   I went into the Senate chamber.

24    Q.   And what did you do?

25    A.   You're talking about after we retired to the Senate

1    chamber?

2    Q.   (Nods.)

3    A.   Initially, I was standing in the back of the chamber --

4    back of the floor of the chamber on some benches that staff

5    usually sit on with other staffers.

6    Q.   Were you observing the debate on the objection to the

7    certification?

8    A.   I was.

9    Q.   And is this roughly what you observed at that time?

10   A.   Yes.

11   Q.   Okay.  Ms. Dunn-Gordon, can we please pull up Exhibit

12   506?  And actually, before you do, what time is it there?

13   A.   Appears to be 1:39:45.

14   Q.   Thank you.  Mr. Schwager, what time is it here?

15   A.   1:43:15.

16   Q.   Was that just a few minutes later?

17   A.   Yes.

18   Q.   Do you recognize this as the House chamber?

19   A.   It is.

20   Q.   Do you see Speaker Pelosi?

21   A.   I do.

22   Q.   Could you please circle her for the jury?

23        (Witness complies.)

24        So when you got back to the Senate, was the vice

25   president presiding?

1    A.   Yes.

2    Q.   And at some point did you become aware that there had

3    been a breach of the Capitol building?

4    A.   Yes.

5    Q.   Did you move position within the chamber as a result?

6    A.   I did.

7    Q.   Why did you do that?

8    A.   When I was informed that the protesters had breached the

9    building, I knew it was a very serious situation.  And from

10   my training I expected certain things would probably follow.

11   I wanted to be near the secretary so that I could advise her

12   and assist her in whatever was to happen next.

13   Q.   What is the next thing that you recall happening?

14   A.   As I'm coming down -- I don't have the exact order in my

15   head, but I remember seeing the vice president being taken out

16   of the room, and I saw our staff and other staff bringing the

17   president pro tempore to the presider's chair.

18   Q.   Let's break that up into smaller pieces.  Was there a

19   lockdown?

20   A.   Yes.  I haven't gotten there yet.

21   Q.   Was this before or after the vice president left?

22   A.   I don't recall exactly when it started.  There was a

23   lot going on in a very short period of time.

24   Q.   Had you ever experienced anything like that before?

25   A.   Only in drills.  We've had drills for active threats

1    to the chamber.

2    Q.   Okay.  I think you used a phrase a few minutes ago,

3    "president pro tem," something to that effect?

4    A.   President pro tempore.

5    Q.   Is that somebody who took over for the vice president?

6    A.   Yes.  That is the person who is designated to preside

7    in the absence of the president of the Senate.

8    Q.   Okay.  So you recall the vice president leaving.  And

9    then --

10   A.   Yes.

11   Q.   And then if I'm understanding you right, you recall

12   somebody taking over.

13   A.   Yes.

14   Q.   Shortly after, did the Senate have to stop debating

15   the objection?

16   A.   Yes.  The president pro tempore took the stance

17   specifically to gavel us into recess, it's called, to stop

18   the debate subject to the call of the chair is what we call

19   it.  So to temporarily suspend.

20   Q.   Were the Capitol Police present?

21   A.   Yes.

22   Q.   Were you briefed by them?

23   A.   After the president pro tempore gaveled into recess

24   subject to the call of the chair, a Capitol Police officer

25   who I know and had seen in drills stood up at the presiding

1    officer's chair and gave information and instructions to the

2    chamber.

3    Q.   Did you observe anything else different in the chamber

4    at that time?

5    A.   Everything was different in the chamber at that time,

6    yes.  It was tense.  People were trying to figure out what to

7    do.  We were gathering our staff in from the lobby.  The doors

8    were being locked around the chamber floor and the gallery.

9    Q.   How did that make you feel?

10    A.   I was alarmed.  Yeah, I was alarmed, but I was comforted

11    to see that we were following what we had trained to do in a

12    threatening situation.

13    Q.   At some point, did you have to evacuate?

14    A.   We did.

15    Q.   Did the senators have to evacuate?

16    A.   Yes.  We evacuated together.  Everybody in the chamber

17    was evacuated together.

18    Q.   Did the Capitol Police direct the evacuation?

19    A.   They did.

20    Q.   What did you observe during the evacuation?

21    A.   There was a lot of commotion outside of the chamber.

22    But in general, all of the staff and the senators were very

23    serious and were following the directions, and we were moving

24    pretty intently along the path that Capitol Police were

25    directing us.

1    Q.   Were you escorted by the Capitol Police?

2    A.   I'm sure at the front of the evacuation there were

3    Capitol Police, and they were all along the pathway that

4    we were traveling.  But I was not at front of the line, so

5    I didn't see.

6    Q.   Did you see if they were armed in any way?

7    A.   Well, the Capitol Police are always armed.  There were

8    more visibly armed Capitol Police officers and others than

9    normal on the floor of the chamber and along the evacuation

10   route.

11   Q.   Ms. Dunn-Gordon, could we please play minute 5:15 to 5:22

12   of Exhibit 507?

13        (Video played.)

14        Now, is that the voice of the person who took over for

15   the vice president?

16   A.   Yes.

17   Q.   And where were you at that time?

18   A.   Actually, at this moment -- you just went past the

19   clip -- I ran along the wall you can see in the back, and ran

20   down to the dais and approached the dais.  I stopped running

21   and stood in a traditional position for me near the secretary

22   of the Senate.

23   Q.   Is that the move you mentioned earlier, that you

24   mentioned you went down to be with the secretary?

25   A.   Yes.

1    Q.   Ms. Dunn-Gordon, could you please play and pause on 5:44?

2         (Video played.)

3         Mr. Schwager, what time is it now on the video?

4    A.   It says 2:14:13.

5    Q.   Who is that standing in the middle where previously the

6    vice president had been?

7    A.   At this stage, that is the Capitol Police officer who

8    stood there to give instructions.

9    Q.   Could you please circle him for the jury?

10        (Witness complies.)

11        Is this the moment in time you previously described where

12   you were given instructions on what to do next?

13   A.   Yes.

14   Q.   And this is after the vice president was evacuated?

15   A.   Yes.

16   Q.   So during the lockdown period that you were describing?

17   A.   I'm sorry?

18   Q.   During the lockdown period you were describing?

19   A.   Yeah.  I believe they were locking down the chamber at

20   this time.

21   Q.   And do you see yourself in that frame?

22   A.   I do.

23   Q.   Would you please circle yourself for the jury.

24        (Witness complies.)

25

1        Thank you.  Could you please clear the circles, and then

2    we'll continue playing to 6:22.

3        (Video played.)

4        Mr. Schwager, based on your understanding of the time and

5    what you observed in the video, is this what was happening in

6    the House shortly after the Senate lockdown began?

7    A.   That's my understanding.

8    Q.   Ms. Dunn-Gordon, could you please play until minute 6:45?

9        (Video played.)

10       Mr. Schwager, what do you observe happening in the video

11   right now?

12   A.   It appears to me that they're responding to some

13   disruptions in the chamber somewhere.

14   Q.   And what time is it?

15   A.   2:16 or 2:17.

16   Q.   Turning back to your experience on January 6, what if

17   anything did you do with the boxes containing the certificates

18   of the votes?

19   A.   I was part of team who was ensuring that those boxes

20   remained secured and traveled with us between the chambers,

21   and then when we evacuated the Senate chamber, that we took

22   those boxes and all the certificates inside of them with us.

23   Q.   And at some point did the Senate resume its deliberation

24   over the objection to the ballots?

25   A.   We did.

1    Q.   When was that?

2    A.   Best of my recollection, it was around eight o'clock or

3    a little bit after.

4    Q.   Were you allowed to resume in the chamber?

5    A.   We were.

6    Q.   Did you go back in advance of the senators?

7    A.   I did.

8    Q.   Why did you do that?

9    A.   I was -- I think in the second small group to return,

10   and I needed to go back to the Senate chamber and make sure,

11   from the secretary's office perspective, it was in sufficient

12   condition to convene in the chamber and to note any damage and

13   see if we would need to make any adjustments before we

14   reconvened.  And then I reported back to the secretary.

15   Q.   And what time did the proceedings conclude?

16   A.   Around 3:45 in the morning.

17   Q.   The next day?

18   A.   The next morning, yeah.

19   Q.   Did the vice president participate when the proceedings

20   resumed?

21   A.   He did.

22            MS. ALOI:  I have no further questions.

23                      CROSS-EXAMINATION

24   BY MS. WAGNER:

25   Q.   Good afternoon.

 1      A.   Good afternoon.

 2      Q.   I just have a few questions for you, okay?

 3           So, Mr. Schwager, to the best of your recollection,

 4      the time stamp of approximately 1:14 p.m. on January 6, 2021,

 5      as far as you know, was correct in terms of when the joint

 6      session in the House chamber adjourned?

 7      A.   I wasn't looking at my watch, so I don't have any

 8      independent recollection.  I don't have any reason to

 9      doubt it.

10      Q.   Okay.  And if we could pull up Exhibit 507, please, with

11      the time stamp of 2:13.  Or when the actual time is 2:13.

12           Mr. Schwager, you have no reason to doubt that the Senate

13      recessed at 2:13 p.m.  Correct?

14      A.   I don't have any reason to doubt any of the time stamps

15      on this exhibit.

16      Q.   Thank you.  And when you were in the Senate chamber,

17      you did not see my client, Mr. Robertson.  Right?

18      A.   Inside the chamber?

19      Q.   Yes.

20      A.   I don't believe from inside the chamber I saw any people

21      who were not senators or staffers.

22      Q.   And when you left the Senate chamber, you did not see my

23      client, Mr. Robertson, did you?

24      A.   I don't know.  I don't know who were among the people

25      in the hallways that we passed by.

1  Q.   But you didn't see any of the protesters inside the

2  Capitol when you were exiting the Senate chamber.

3  A.   From my understanding, there were protesters inside the

4  Capitol that our route passed by, and they would have been in

5  my peripheral vision.

6  Q.   Okay.

7       And, Mr. Robertson, could you stand up and take off

8  your mask for a second?

9       (Defendant complies.)

10      Now that you see Mr. Robertson, you don't recollect

11 seeing him on January 6, 2021, do you?

12 A.   I don't recall seeing him.

13      MS. WAGNER:   I have no further questions.

14                    REDIRECT EXAMINATION

15 BY MS. ALOI:

16 Q.   Just briefly, because I want to make sure there's no

17 confusion, you read the stipulation between the parties

18 earlier.  Is that right?

19 A.   Yes.

20 Q.   Ms. Dunn-Gordon, could you please pull up the

21 stipulation?

22      I want to draw your attention to second paragraph and the

23 last sentence, which I think may have been a moment in time

24 that you were just asked about on cross-examination, although

25 I don't believe that they had the exact time.

1          Could you please read that last sentence?

2     A.    "At approximately 1:15 p.m., the House and Senate

3     withdrew to their separate chambers for up to two hours

4     to resolve a particular objection."

5     Q.    At that point in time, was the proceeding adjourned?

6     A.    No.

7     Q.    And what does "stand in recess" mean?

8     A.    "Stand in recess" is kind of like a temporary time-out

9     for a session.  It can happen in a session or in a proceeding

10    within a session.

11    Q.    So the proceeding that you were just describing with the

12    ballots, did that continue through until 3:45 the following

13    morning?

14    A.    It did, although interrupted for a time.  Yes.

15          MS. ALOI:  Nothing further.

16          THE COURT:  Okay.  Mr. Schwager, thank you very much

17    for your testimony.  You are excused.  Please don't discuss

18    your testimony with anyone until the end of the case.

19          THE WITNESS:  Thank you very much.

20          THE COURT:  Have a good day.

21       (Witness steps down.)

22          THE COURT:  Counsel?

23       (Bench conference.)

24          MS. WAGNER:  Your Honor, I just wanted to ask one

25    question.  I know we're going to begin with our next witness,

1    Mr. Wade, but after that is Mr. Fracker.  Mr. Fracker has

2    counsel who will be present in the courtroom, and he wanted

3    to know if there was a way he could -- if there was some sort

4    of signal someone he could provide if his client needed to

5    consult with him, and he asked how you would like to handle

6    that in the event his client would want to consult with him.

7              THE COURT:  Where does he plan to sit?

8              MS. WAGNER:  I think he can sit -- there's a lot of

9    empty space, if he can sit in the row reserved for the

10   government.  There's not really anyone there right now.

11             THE COURT:  I'll keep an eye on him, and if he gives me

12   the hi sign, I'll let him take a break.

13             MS. WAGNER:  Thank you, Your Honor.  Appreciate it.

14        (End of bench conference.)

15             MS. ALOI:  The government calls Paul Wade.

16             PAUL WADE, WITNESS FOR THE GOVERNMENT, SWORN

17                       DIRECT EXAMINATION

18   BY MS. ALOI:

19   Q.   Good afternoon, Mr. Wade.  Can you please state and spell

20   your name for the record.

21   A.   Paul Wade, W-A-D-E.

22   Q.   Mr. Wade, do you work at a federal agency?

23   A.   Yes.  United States Secret Service.

24   Q.   Is the Secret Service part of the executive branch?

25   A.   Yes.

1    Q.   Which department?

2    A.   Department of Homeland Security.

3    Q.   What is the mission of the Secret Service?

4    A.   We have dual missions: investigations and protection.

5    Q.   How long have you been with the Secret Service?

6    A.   Twenty-two and a half years.

7    Q.   And I think you said one of the missions is protection.

8    Is that right?

9    A.   Investigations and protection.

10   Q.   Does the Secret Service protect the vice president of

11   the United States?

12   A.   Yes.

13   Q.   What about his immediate family?

14   A.   Yes.

15   Q.   What are the agents signed to the vice president called?

16   A.   The Vice President Protection Division.  They're special

17   agents.

18   Q.   Are those special agents, are they referred to in a

19   specific way when they're with the vice president?

20   A.   I'm sorry.  They're special agents that are on a

21   protective detail?

22   Q.   Detail.  Are they on a detail if they're assigned to the

23   vice president?

24   A.   Yes.

25   Q.   And what is your primary role with the Secret Service?

1    A.   I am a supervisor over the Secret Service liaison

2    division.

3    Q.   And whom do you liaise with?

4    A.   Mostly the United States Capitol Police and the House

5    and Senate sergeant-at-arms.

6    Q.   Do you work out of the Capitol?

7    A.   Yes.

8    Q.   And is one of your jobs to coordinate with the Capitol

9    Police?

10   A.   Yes.

11   Q.   Are you aware -- were you aware that back in January of

12   2021, were you aware that there was an event scheduled at the

13   Capitol for January 6?

14   A.   Yes.

15   Q.   Was it scheduled to start at one o'clock?

16   A.   Yes.

17   Q.   And what was that event?

18   A.   It was the certification of the presidential election

19   vote.

20   Q.   Did that involve the vice president?

21   A.   Yes.

22   Q.   And his family?

23   A.   Yes.

24   Q.   Was the Secret Service scheduled to provide security

25   to the vice president and his family during that event?

1    A.   Yes.

2    Q.   Did you have to coordinate with the Capitol Police for

3    that?

4    A.   Yes.

5    Q.   And when the vice president travels, does he use a

6    motorcade?

7    A.   Yes.

8    Q.   What is a motorcade?

9    A.   Group of vehicles that the vice president rides in that

10   are controlled by the Secret Service.

11   Q.   Was it the plan that day for the Secret Service to have the

12   vice president travel to and from the Capitol in a motorcade?

13   A.   Yes.

14   Q.   Were you at the Capitol that day?

15   A.   Yes.

16   Q.   Approximately what time did the vice president arrive at

17   the Capitol?

18   A.   Approximately 12:30.

19   Q.   Did you and your colleagues greet the motorcade when it

20   arrived?

21   A.   Yes.

22   Q.   While you were waiting, did you have the opportunity to

23   observe the security perimeter set up around the Capitol?

24   A.   Yes.

25   Q.   If you had thought it insufficient, could you have raised

1   that as an issue at that time?

2   A.   Yes.

3   Q.   Did it appear sufficient based on past visits of the vice

4   president to the Capitol?

5   A.   Yes.

6   Q.   I now want to show you what has been admitted as

7   Government Exhibit 601A, and please publish it to the jury.

8        Based on your observations, does that look like the

9   security perimeter that had been set up that day, the red

10  line around the building?

11  A.   Yes.

12  Q.   While the vice president is at the Capitol, what is your

13  role with respect to his security?

14  A.   As liaison, we coordinate with the Capitol Police and

15  the Secret Service protective details.

16  Q.   Did any members of his family accompany him to the

17  Capitol on January 6?

18  A.   Yes.  Mrs. Karen Pence and daughter Charlotte Pence.

19  Q.   And upon their arrival in the motorcade, what did the

20  vice president do?

21  A.   Upon arrival to the Capitol?

22  Q.   Upon the vice president's arrival to the Capitol on

23  January 6.

24  A.   I don't know what he did.  I was standing by at the

25  Capitol.

1    Q.   You were standing by the Capitol.  When he arrived, do

2    you know where the vice president went in the building after

3    the motorcade arrived?

4    A.   Upon arrival, yes.  I met him at the Senate carriage,

5    him and his family.  The motorcade arrived, and then we went

6    upstairs to the Vice President's Ceremonial Office.

7    Q.   Is that an office that the vice president has in the

8    Capitol building?

9    A.   Yes.

10   Q.   And where does his family go?

11   A.   Well, at first we were all in the ceremonial office, and

12   then at approximately one o'clock, when he went to the Senate

13   floor, I escorted Mrs. Pence and Charlotte Pence up to the

14   third floor at the gallery level.

15   Q.   Is the gallery the balcony that you see overlooking the

16   Senate chamber?

17   A.   Yes.

18   Q.   Did there come a time when the vice president went to

19   the House chamber?

20   A.   Yes.

21   Q.   Why did he do that?

22   A.   As part of the program.  You first assemble on the Senate

23   floor, and then the vice president escorted the senators over

24   to the House chamber to assemble as one body to begin the

25   certification of the vote.

1    Q.    And at that time, what did you do?

2    A.    I was escorting Mrs. Pence and Charlotte Pence to the

3    gallery level of the House chamber.

4    Q.    When you got to the House gallery, what did you do?

5    A.    I stood by outside the gallery after placing them in

6    the gallery, and I was coordinating with my partners and just

7    standing by until the next movement.

8    Q.    Did there come a time when you escorted Mrs. Pence and

9    Ms. Pence back to the Senate chamber gallery?

10   A.    Yes.  We were advised there was an objection on the

11   House floor, and at that point the vice president and family

12   and senators went back to the Senate chamber.

13   Q.    Now, at some point in this process, did you learn that

14   there was a mob outside the Capitol building?

15   A.    Yes.

16   Q.    What did you do as a result when you arrived at the

17   Senate chamber gallery?

18   A.    As we do with everything, regardless of the crowd

19   outside, I made sure I briefed up emergency action procedures

20   to the detail as I had to run to the basement level to acquire

21   some documents.

22   Q.    Let's take that in smaller pieces.

23   A.    Sure.

24   Q.    When you got back to the gallery, did you brief the

25   vice president's detail leader?

1    A.   Yes.

2    Q.   And also a Capitol Police officer?

3    A.   Yes, our counterpart.

4    Q.   Were you briefing them on emergency measures?

5    A.   Yes.

6    Q.   And did you discuss a rendezvous point in the event that

7    the vice president's security was threatened?

8    A.   Yes.

9    Q.   And after briefing them, did you remain outside the

10   Senate chamber gallery?

11   A.   For a short period of time.  I had to respond to the

12   basement to get some documents.

13   Q.   So you went to the basement to get some paperwork.

14   While you were in the basement of the Capitol, what if

15   anything did you hear?

16   A.   I was down there for just a few minutes gathering some

17   inauguration documents.  At that point I heard some commotion

18   outside the office.

19   Q.   Did you go back upstairs?

20   A.   Yes.  As soon as I poked my head out, I saw officers

21   scurrying in the hallway.  So I knew at that point we had

22   a situation, so I went directly to the second floor to the

23   vice president's office.

24   Q.   En route, did you speak with a colleague?

25   A.   Yes.

1    Q.   Did you learn of a decision to relocate the motorcade?

2    A.   Yes.  That was my first question.  I heard that people

3    were breaching the bike racks outside on the plaza and on the

4    west front, and so my first question to her was, hey, what

5    are we doing with the motorcade?

6    Q.   Where did you go next?

7    A.   After she acknowledged, yes, the motorcade was in process

8    and moving, I went around to the vice president's office to

9    then talk with the supervisors.

10   Q.   Did you go there because it was the rendezvous point that

11   you had decided on earlier?

12   A.   Yes.

13   Q.   Where is the Vice President's Ceremonial Office located?

14   A.   Behind the Senate chamber on the second floor.

15   Q.   Who was there when you got there?

16   A.   The vice president's detail supervisors.  There was some

17   uniformed Capitol Police.

18   Q.   Did you discuss what was going on outside the Capitol

19   with your colleagues?

20   A.   Yes.  I discussed with the uniformed officers there to

21   get understanding, because a lot of the radio traffic was

22   broken, to get an assessment of the situation.  I made a phone

23   call to the inspector of the Capitol division to understand

24   what was going on outside the building, and at that point I

25   had more information to discuss with the detail.

1    Q.   Was a decision made to move the vice president?

2    A.   Yes.

3    Q.   Did the Secret Service escort the vice president out

4    of his ceremonial office?

5    A.   Yes.

6    Q.   What role did you have in that?

7    A.   I helped coordinate and move the vice president to a

8    secure location.

9    Q.   Do you know approximately what time this was?

10   A.   2:30.

11   Q.   And did you stay with the vice president's family after

12   he exited the area of the Senate chamber?

13   A.   Yes.

14   Q.   Did you return with the vice president and his family

15   to the Senate the evening of January 6?

16   A.   Yes.

17   Q.   Approximately what time?

18   A.   A little before seven o'clock.

19   Q.   Now, you mentioned earlier emergency measures.

20   What emergency measures -- what are emergency measures?

21   A.   Well, an emergency action plan is a contingency plan

22   in the event there's a threat or an incident that affects

23   a protectee.

24   Q.   Did the Secret Service take emergency action on

25   January 6?

```
 1    A.    Yes.
 2    Q.    Did they do that in coordination with the Capitol Police?
 3    A.    Yes.
 4    Q.    Was relocating the vice president and his family members
 5    an emergency action?
 6    A.    Yes.
 7    Q.    Was relocating the motorcade an emergency action?
 8    A.    Yes.
 9    Q.    Did the Secret Service have to bring additional personnel
10    to the Capitol?
11    A.    Yes.
12    Q.    Can you recall ever invoking emergency action before?
13    A.    No.  Not me personally.
14    Q.    How many years do you have on the job?
15    A.    Twenty-two and a half.
16    Q.    Have you ever been involved in the evacuation of a Secret
17    Service protectee?
18    A.    No.
19              MS. ALOI:  No further questions.
20                            CROSS-EXAMINATION
21    BY MS. WAGNER:
22    Q.    Good afternoon.
23          Mr. Robertson, could you stand up and remove your mask,
24    please?  (Defendant complies.)
25          At any time on January 6, 2021, did you see my client?
```

 1    A.   No.

 2              MS. WAGNER:  Thank you.

 3              THE COURT:  All right.  Mr. Wade --

 4              MS. ALOI:  Nothing further, Your Honor.

 5              THE COURT:  Thank you very much for your testimony.

 6    You are excused.  Please don't discuss your testimony with

 7    anyone else until the case is over.  Thank you.

 8         (Witness steps down.)

 9              THE COURT:  Counsel, might it make sense to take our

10    break before the next witness?

11         Ladies and gentlemen, we're going to take our next break

12    a little early this afternoon.  I understand we may only have

13    one more witness today, so let's take a our 15-minute break,

14    and if any of you need a little more time, we can accommodate

15    that.  Why don't we reconvene at about five after 3:00.  Okay?

16         (Jury out at 2:51 p.m.)

17              THE COURT:  All right.  You want to go get Mr. Crane?

18         (Counsel enters.)

19              THE COURT:  Good afternoon, sir.  Why don't you

20    introduce yourself for the record.

21              MR. CRANE:  Bernard Crane on behalf of Jacob Fracker.

22              THE COURT:  So you'll be present, obviously, during the

23    testimony.  He has no Fifth Amendment issues any longer.

24    Correct?

25              MR. CRANE:  Correct.

1        THE COURT:  And what is it that you think you might

2   want to consult with him about?

3        MR. CRANE:  In the several times I've been in this

4   situation for clients, it has never been an issue that I've

5   had to actually consult with a client.

6        THE COURT:  Okay.

7        MR. CRANE:  But you never know.

8        THE COURT:  I would not expect that either.

9        MR. CRANE:  I don't expect it either.

10        THE COURT:  But if it happens to occur, where do you

11   plan on sitting?

12        MR. CRANE:  Behind the government.

13        THE COURT:  Okay.  We have two jurors in that first

14   row, so maybe...

15        MR. CRANE:  Wherever you'd like me to be.

16        THE COURT:  Yeah, I'm just trying to figure it out.

17   Maybe at the end of the aisle, this side of the aisle on the

18   first row, and just give me the hi sign if you think you need

19   to consult.  We've been using these bat phones to do the

20   virtual equivalent of a bench conference.  Maybe you can use

21   one of the government's bat phones and we can discuss what it

22   is.  Okay?

23        MR. CRANE:  The other judges, when I've been in this

24   situation, have said if there is an issue I'll just look at

25   the jury and say, "Let's take a break for way few minutes."

1    I don't know if that would be something...

2             THE COURT:  Yeah, let's see what the issue is.

3             MR. CRANE:  Again, I don't expect it will happen.

4    It's never happened before.

5             THE COURT:  Let's just play it by ear.  Okay.

6        (Recess from 2:5 p.m. to 3:12 p.m.)

7             THE COURT:  All right.  Welcome back, ladies and

8    gentlemen.  Ms. Berkower?

9             MS. BERKOWER:  The government calls Jacob Fracker.

10           JACOB FRACKER, WITNESS FOR THE GOVERNMENT, SWORN

11                         DIRECT EXAMINATION

12   BY MS. BERKOWER:

13   Q.   Good afternoon.  Could you please tell us your name and

14   spell it.

15   A.   Jacob Malone Fracker, J-A-C-O-B, M-A-L-O-N-E,

16   F-R-A-C-K-E-R.

17   Q.   Where are you from?

18   A.   Rocky Mount, Virginia.

19   Q.   Are you working right now?

20   A.   I am.

21   Q.   What kind of work do you do?

22   A.   I sometimes work the desk and personal train at a gym in

23   town.

24   Q.   On January 6 of last year, did you have a different job?

25   A.   I did.

1    Q.   What job did you have then?

2    A.   I was a police officer with the Rocky Mount Police

3    Department.

4    Q.   Do you know someone named Thomas Robertson?

5    A.   I do.

6    Q.   How do you know him?

7    A.   He was my patrol sergeant.

8    Q.   At the Rocky Mount Police Department?

9    A.   Yes.

10   Q.   On January 6 of last year, did you travel to Washington,

11   D.C.?

12   A.   Yes.

13   Q.   Who did you travel with?

14   A.   With him and his neighbor.

15   Q.   Did there come a time that day when you entered the U.S.

16   Capitol building?

17   A.   Yes.

18   Q.   Do you know anyone else who was inside?

19   A.   I do.

20   Q.   Who?

21   A.   It was T.J.

22   Q.   Is that Mr. Robertson?

23   A.   Yes.

24   Q.   Did you take videos and photos on your cell phone while

25   you were in D.C. on January 6?

1    A.    I did.

2    Q.    Do you still have that phone?

3    A.    No.

4    Q.    Who has it?

5    A.    Nobody has it.

6    Q.    Why don't you have it anymore?

7    A.    Got rid of it.

8    Q.    Did you get rid of it yourself or did someone get rid of

9    it for you?

10   A.    I handed it to T.J.

11   Q.    Now, I'm going to ask you more details about each of

12   those topics but I'm going to ask you about a few other things

13   first, okay?

14        After January 6 of last year, were you charged with

15   crimes for what you did at the Capitol?

16   A.    Yes.

17   Q.    Have you since pleaded guilty to a crime arising from

18   your involvement in those events?

19   A.    Yes.

20   Q.    Specifically, did you plead guilty to conspiring to stop

21   Congress's meeting on January 6th inside the Capitol building?

22   A.    Yes.

23   Q.    As part of that agreement, did you sign a written

24   statement of facts that described what you did on January 6?

25   A.    Yes.

1    Q.   And if we could have for the Court, counsel, and witness

2    only, Government's Exhibit 310.

3         Mr. Fracker, are you familiar with this document?

4    A.   Yes.

5    Q.   Is it titled "Statement of Offense"?

6    A.   Yes.

7    Q.   If we could go to the last page of that document, please,

8    Ms. Dunn-Gordon?

9         Did you sign it?

10   A.   I did.

11   Q.   Were the facts in that statement true?

12   A.   Yes.

13        MS. BERKOWER:   Your Honor, I'd ask if we could admit

14   and publish Government's Exhibit 310.

15        MS. WAGNER:   No objection.

16        THE COURT:   So moved.

17                              (Government Exhibit No. 310

18                               received into evidence.)

19   BY MS. BERKOWER:

20   Q.   Does this statement of offense explain who you agreed to

21   commit the crime of conspiracy with?

22   A.   Yes.

23   Q.   Who was that?

24   A.   T.J. and an unknown number of people.

25   Q.   Is the crime you pled guilty to a felony?

1    A.   Yes.

2    Q.   Now, if we could have for the Court, counsel, and witness

3    only Government's Exhibit 309, please.

4         Do you recognize this?

5    A.   Yes.

6    Q.   Is this your plea agreement?

7    A.   Yes.

8    Q.   Did you sign it?

9    A.   I did.

10   Q.   Did your lawyer sign it?

11   A.   Yes.

12   Q.   And did an attorney for the government sign it?

13   A.   Yes.

14        MS. BERKOWER:  Your Honor, I'd ask to admit

15   Government's Exhibit 309.

16        MS. WAGNER:  No objection.

17        THE COURT:  So moved.

18                         (Government Exhibit No. 309

19                          received into evidence.)

20        MS. BERKOWER:  And if we may publish, please.

21   BY MS. BERKOWER:

22   Q.   As part of this agreement, because you pleaded guilty to

23   conspiracy, has the government agreed not to charge you with

24   other crimes arising from January 6?

25   A.   Yes.

1    Q.   And as part of this agreement, have you agreed to
2    cooperate with the government in its case against Thomas
3    Robertson?
4    A.   Yes.
5    Q.   As part of this agreement, if you're not honest during
6    your testimony, may the government prosecute you in a separate
7    case for perjury or false statements?
8    A.   Yes.
9    Q.   And sitting here today, have you been sentenced for this
10   crime you've pled guilty to?
11   A.   No.
12   Q.   Do you hope to get a more lenient sentence because you're
13   testifying here and cooperating?
14   A.   Yes.
15   Q.   Has anyone promised you what that sentence would be?
16   A.   No.
17   Q.   And before we go on, could you tell us how you're feeling
18   about being here today?
19   A.   I absolutely hate this.
20   Q.   Why?
21   A.   Never thought this would be a thing.
22   Q.   Why did you never thought this is what it would be like?
23   A.   I've always been on the other side of things.
24   Q.   What do you mean by that?
25   A.   Like the -- the good guy side, so to speak.

1    Q.   And how do you feel sitting on the other side today?

2    A.   Nervous.  Uncomfortable.

3    Q.   Is part of why you're uncomfortable because of how you

4    know Mr. Robertson?

5    A.   Yes.

6    Q.   So let's talk more about that now.

7         How did you first meet him?

8    A.   I first met him through the hiring process at the PD.

9    Q.   What year was that, around?

10   A.   2017.

11   Q.   And did you get to know him through that process?

12   A.   Yes.

13   Q.   Were you ultimately hired at the PD?

14   A.   Yes.

15   Q.   And did you work together once you were hired?

16   A.   We did.

17   Q.   Did you have background in common with him?

18   A.   Yes.

19   Q.   What did you have in common?

20   A.   Military service, combat service.

21   Q.   What military service do you have?

22   A.   Maybe I don't understand what specifically you're asking.

23   Q.   What branch of the military did you serve in?

24   A.   Four years active duty in the Marine Corps, and then from

25   2015 until the present in the Army National Guard.

```
 1    Q.    And did Mr. Robertson tell you he had military experience

 2    as well?

 3    A.    Yes.

 4    Q.    What did he tell you his experience was?

 5    A.    His full time being in the Army and/or the reserves and

 6    the Guard.

 7    Q.    And when you -- after you started working at the police

 8    department, were you on the same shift?

 9    A.    Yes.

10    Q.    How many other people were on your shift?

11    A.    It kind of depended.  Officers would kind of come and go,

12    but there was usually one other person.

13    Q.    So about three of you usually?

14    A.    About three.

15    Q.    And in terms of rank, what was your rank at the PD?

16    A.    I was just a patrolman.

17    Q.    What was his rank?

18    A.    Sergeant on patrol.

19    Q.    So did he supervise you?

20    A.    Yes.

21    Q.    And what shift did you work?

22    A.    Delta shift.

23    Q.    Sorry?  I didn't hear your answer.

24    A.    The delta shift.  I'm not sure...

25    Q.    Was that days, nights or some of both?
```

1    A.    It was two-week split.  Two weeks of days, two weeks of

2    nights.

3    Q.    Now, did you become close with him over the time you

4    worked at the police department?

5    A.    I did.

6    Q.    How close did you become with him?

7    A.    I would say very close.

8    Q.    Did you have nicknames for each other?

9    A.    Yes.

10   Q.    What would you call him?

11   A.    I would call him Dad.

12   Q.    What would he call you?

13   A.    Son.

14   Q.    And you referred to him by T.J.  Is that also a name you

15   know him by?

16   A.    Yes.

17   Q.    What's the age difference between you?

18   A.    17 or 18 years, maybe.

19   Q.    Did he have more experience as a police officer than you?

20   A.    Yes.

21   Q.    Who taught you how to be a police officer?

22   A.    Amongst my other field training officers, I got most of

23   my knowledge from him.

24   Q.    And did there come a time when you were terminated from

25   the police department?

1    A.    Yes.

2    Q.    When was that, or around when was that?

3    A.    A week or two after the January 6 events.

4    Q.    Did you stay close with him after you were fired?

5    A.    Yes.

6    Q.    How often would you see him?

7    A.    Couple times a week, maybe.

8    Q.    Is this relationship that you have part of why you're

9    nervous here today?

10   A.    Absolutely.

11   Q.    So when you were -- let's go on to another topic.  In

12   particular, some of your military experience.  Did you say you

13   saw active duty?

14   A.    Yes, ma'am.

15   Q.    Where were you deployed?

16   A.    I did two combat deployments to Afghanistan, a foreign

17   military training deployment through Southeast Asia, and a

18   base security operations deployment to Qatar.

19   Q.    After your military experience, why did you become a

20   police officer?

21   A.    I have a savior complex.

22   Q.    A what?

23   A.    A savior complex.  I have to make sure everybody and

24   everything's okay.

25   Q.    And how did that impact your decision to be an officer?

1    A.   It was a good portion of the reason, the other being my

2    daughter.

3    Q.   What about --

4    A.   She went to school locally, and I just felt like if I was

5    in that type of position I could watch out for her a little

6    better.

7    Q.   Now, when you became an officer at the police department,

8    did you go to a police academy?

9    A.   Yes.

10   Q.   What police academy did you go to?

11   A.   Cardinal Criminal Justice Academy.

12   Q.   While you were there, did you learn about different

13   topics in policing?

14   A.   Yes.

15   Q.   Did you take a class about riot control?

16   A.   Yes.

17   Q.   What did you -- what were you learned there -- what did

18   you learn there about riot control?

19   A.   Sitting here today, I can't really remember the

20   specifics.

21   Q.   Well, did you learn how to use a baton while you were

22   trained?

23   A.   Yes.

24   Q.   Did you learn how to use a shield?

25   A.   I think so.

1    Q.   Now, that's what you were trained on.  Did you expect

2    your supervisors to have similar training?

3    A.   I would assume so.

4    Q.   Are you familiar with the term "situational awareness"?

5    A.   Yes.

6    Q.   What does that mean to you?

7    A.   Pretty much knowing what's going on around you at all

8    times.

9    Q.   And how important is that to police work?

10    A.   It's very important.

11    Q.   Why?

12    A.   Officer safety.

13    Q.   Is that also important when you're in the military?

14    A.   Yes.

15    Q.   Why?

16    A.   Just overall safety of you and those around you.

17    Q.   And when you're engaged in situational awareness, what

18    are you paying attention to?

19    A.   Are you asking me personally?

20    Q.   Yeah.

21    A.   I'll look at someone's demeanor, I'll look at their

22    hands, their body language, like unusual bulges in clothing,

23    exits, stuff like that.

24    Q.   Why are those the things you're considering?  What do you

25    have in mind?

1    A.    I want to be ready for any kind of threat that might

2    present itself.

3    Q.    Based on your knowledge of Mr. Robertson, does he have

4    good situational awareness?

5    A.    Yes.

6    Q.    Now, in the time that you knew Mr. Robertson, did you

7    know him to use a walking stick?

8    A.    No.

9    Q.    Had you ever seen him use one?

10    A.    Not for anything outside of maybe going up a hill.

11    Q.    And did you know Mr. Robertson to be the type of person

12    to keep his beliefs to himself?

13    A.    No.

14    Q.    So what's he like in that regard?

15    A.    He's very passionate and outspoken.

16    Q.    After the 2020 election, did Mr. Robertson have an

17    opinion about the outcome?

18    A.    Yes.

19    Q.    What was his opinion?

20    A.    That the election was rigged.

21    Q.    Did you share those concerns?

22    A.    I did.

23    Q.    And based on what you knew about him, how much did that

24    issue bother him?

25          MS. WAGNER:   Objection.

```
1              THE COURT:  Overruled.

2              MS. BERKOWER:  You may answer.  Do you need me to

3      repeat it?

4              THE WITNESS:  If you don't mind.

5      BY MS. BERKOWER:

6      Q.   Based on what you knew about Mr. Robertson, how much did

7      the issue of fraud in the 2020 election bother him?

8      A.   Very much.

9      Q.   And did it also bother you a good deal?

10     A.   Yes.

11     Q.   Now, are you and Mr. Robertson friends on social media?

12     Or were you?

13     A.   Yes.

14     Q.   If we could have for the Court, counsel, and witness

15     only, Government's Exhibit 100A, please.

16          Mr. Fracker, do you know this to be a Facebook post by

17     Mr. Robertson?  Can you see it?

18     A.   Yes.  I can see it.

19             MS. BERKOWER:  And Your Honor, it's my understanding

20     there's no objection to the authenticity of this exhibit, so

21     I'd ask for its admission.

22             MS. WAGNER:  Court's indulgence.

23          (Defense conferring.)

24        No objection.

25             THE COURT:  So moved.
```

```
 1                               (Government Exhibit No. 100A

 2                                 received into evidence.)

 3               MS. BERKOWER:  May we publish it?

 4               THE COURT:  You may.

 5      BY MS. BERKOWER:

 6      Q.   Ms. Dunn-Gordon, if you could please blow up the

 7      highlighted portion.

 8           Mr. Fracker, could you tell us the date that this post

 9      was made?

10      A.   November 7th of 2020.

11      Q.   And can you read the post?

12      A.   "A legitimate republic stands on 4 boxes.  The soap box,

13      the ballot box, the jury box, and then the cartridge box.  We

14      just moved to step 3.  Step 4 will not be pretty.  I cannot

15      speak for others, but being disenfranchised by fraud is my

16      hard line.  I've spent most of my adult life fighting a

17      counterinsurgency.  I'm about to become part of one and a very

18      effective one."

19      Q.   Now, are you familiar with this post?

20      A.   Not vividly.

21      Q.   Do you have some recollection of seeing Mr. Robertson

22      express views like this on social media?

23      A.   Yes.

24      Q.   And before the election, how often would you hear him

25      express views like this?
```

1    A.   I guess sporadically.

2    Q.   After the election, did you hear that more often, these

3    kinds of views expressed more often?

4    A.   If not the same amount.

5    Q.   If not the same amount?  Is that what you said?

6    A.   Mm-hmm.

7    Q.   If we could take that down, please.

8         Let's talk now about your decision to go to Washington,

9    D.C., for January 6.  When did you decide to go?

10   A.   Just a few days prior.

11   Q.   And how did you decide to go?

12   A.   He invited me -- or T.J. invited me to go with him.

13   Q.   So what did he tell you about it?

14   A.   Nothing really.  It was just kind of a casual invite.

15   Q.   Was anyone else you know also invited?

16   A.   I do believe so.

17   Q.   Who else did he invite?

18   A.   One of our fellow officers.

19   Q.   And did that fellow officer end up going with you?

20   A.   No.

21   Q.   Now, why did you agree to go?

22   A.   I had a couple reasons.  I knew it was going to be a big

23   deal, there was going to be a lot of people, kind of wanted to

24   just make sure he was okay and good to go.  Also wanted to

25   hear about plans that the government had for the future.

```
 1    Q.   And when you say the government, who are you referring to
 2    specifically?
 3    A.   I guess the Republican party.
 4    Q.   And are you referring particularly to President Trump?
 5    A.   Yes.
 6    Q.   Would you have gone to D.C. if Mr. Robertson had not
 7    invited you?
 8    A.   No.
 9    Q.   Who made the plans for your trip there?
10    A.   He did.
11    Q.   Would you have gone if he hadn't made the plans?
12    A.   If he hadn't made plans but still invited me?
13    Q.   Sure.  Would you have gone if the planning was left up to
14    you?
15    A.   Probably.
16    Q.   Now, let's go on to January 6 itself.  What was the plan
17    for getting to D.C.?
18    A.   To drive up there.
19    Q.   Who was going to drive?
20    A.   T.J.
21    Q.   And was anyone else going with you?
22    A.   Yes.
23    Q.   Who was going with you?
24    A.   His neighbor.
25    Q.   Do you know his neighbor's name?
```

1    A.    Pat.

2    Q.    What was the meeting spot before you all drove up?

3    A.    T.J.'s house.

4    Q.    And about how long does it take to drive from the Rocky

5    Mount area to D.C.?

6    A.    Roughly four hours.

7    Q.    Do you know how many miles it is?

8    A.    I do not.

9    Q.    Now, when you met to begin the day, where were you?

10   A.    Just outside of his garage.

11   Q.    And what happened when you got to his garage?

12   A.    The car was being loaded up, and I offered assistance to

13   do so.

14   Q.    And what was being loaded into the car?

15   A.    I think a case of water, some MREs.

16         THE COURT:  Could you tell the jury what MREs are?

17         THE WITNESS:  MREs stands for meals ready to eat.  It's

18   like a quick way for, you know, military members to eat while

19   they're out in the field, stuff like that.

20         THE COURT:  Thank you.

21   BY MS. BERKOWER:

22   Q.    What else was packed in the car?

23   A.    Just our bags.

24   Q.    Did you bring gas masks?

25   A.    Yes.

1    Q.   Who supplied the gas masks?

2    A.   T.J.

3    Q.   How many gas masks did you pack?

4    A.   Three.

5    Q.   So was that one for each person?

6    A.   Yes.

7    Q.   And what did you do with your gas mask?

8    A.   Put it in my backpack.

9    Q.   Now, did Mr. Robertson bring a stick?

10    A.   Yes.

11    Q.   Had you ever seen the stick he brought before that day?

12    A.   Maybe if it was around in his garage, I'm not sure.

13    Q.   Did you ever see him use a stick like that one he brought

14    before?

15    A.   No.

16    Q.   If we could have Government's Exhibit 612 in evidence,

17    please.  Can you tell us what we're looking at here?

18    A.   That would be the car that we took.

19    Q.   And who owns that car?

20    A.   I'm not sure whose name it's under, if it's his or his

21    wife's.

22    Q.   Do you know it to be either his or his wife's car,

23    though?

24    A.   Yes.

25    Q.   And if we could go to Government's Exhibit 609, please,

1    in evidence.  What are we looking at here?

2    A.   The trunk of that car.

3    Q.   Are there items in the trunk in this photo that were with

4    you when you were packing and diving up to D.C. on January 6?

5    A.   Yes.

6    Q.   What do you see that you recognize?

7    A.   The water, the bags, the stick.

8    Q.   After the car was packed, what did you do?

9    A.   We left.

10   Q.   Who drove?

11   A.   T.J.

12   Q.   And who was sitting where in the car?

13   A.   I was in the front passenger seat, and the neighbor was

14   in the row behind us.

15   Q.   Did Mr. Robertson drive you all the way into downtown

16   D.C.?

17   A.   No.

18   Q.   Where did you stop?

19   A.   At a train or Metro station somewhere in Virginia.

20   Q.   And what did you do at the Metro station?

21   A.   I guess prepared to get onto the Metro.

22   Q.   Did you take some additional preparations for the day?

23   A.   Yes.

24   Q.   Now, did you have your backpack?

25   A.   Yes.

1    Q.   What was in your backpack at that point?

2    A.   A gas mask, MRE, and some water, and probably my inhaler.

3    Q.   Now, at the time you were a police officer with Rocky

4    Mount.  Is that right?

5    A.   Mm-hmm.

6    Q.   Is that a yes?

7    A.   Yes.  I'm sorry.

8    Q.   Did you have your badge and gun with you when you drove

9    up to the D.C. area that morning?

10   A.   Yes.

11   Q.   What did you do with your badge and gun before getting on

12   the Metro?

13   A.   They were left behind in the car.

14   Q.   Why?

15   A.   Just seemed kind of out of place for us to have badges

16   and guns for a jurisdiction that wasn't ours.

17   Q.   Were you also concerned about getting identified as law

18   enforcement?

19   A.   Yes.

20   Q.   Can you explain what your concern was?

21   A.   We'd been watching for the past, I don't know, maybe a

22   year of people just not being supporters of cops, kind of

23   indiscriminately attacking them.  We were going into an

24   unknown area of people we don't know and don't really want to

25   present ourselves as targets.

1    Q.   So whose idea was it to leave your badge and gun behind?

2    A.   T.J.'s, I believe.

3    Q.   And where in the car did you put those items?

4    A.   I don't remember if it was either in the door panel

5    pocket or under the seat.

6    Q.   Now, after you took these preparations at the Metro

7    station, where did you go next?

8    A.   To the Mall, the National Mall.

9    Q.   Did you go to a certain area of the mall?

10   A.   Near the Washington Monument.

11   Q.   What were you doing over near the Washington Monument?

12   A.   Listening to speeches.

13   Q.   Who did you hear speak that day?

14   A.   I think it was Rudy Giuliani, and I remember a female, I

15   don't know who exactly, I couldn't really hear anything.

16   Maybe Donald Trump, Jr., and Donald Trump.

17   Q.   Did you also hear members of the crowd talking around

18   you?

19   A.   Yes.

20   Q.   And did any of those individuals catch your attention?

21   A.   After the speeches were done, one man did.

22   Q.   So could you explain what happened with that man and why

23   it caught your attention?

24   A.   There was an older gentleman going on about if Mike Pence

25   did some certain thing that the election results would be

1    overturned.

2    Q.   Is that what you wanted to have happen?

3    A.   That day, yes.

4    Q.   Now, did you stay to the end of the speeches?

5    A.   Yes.

6    Q.   And what happened after that?

7    A.   There was a big crowd going down a street.  I don't know

8    which street it was.  And we followed with them.

9    Q.   What direction were you going?

10   A.   Towards the Capitol building.

11   Q.   Could you see the Capitol building from where you were?

12   A.   I believe so.

13   Q.   And who were you with in this crowd?

14   A.   T.J. and his neighbor.

15   Q.   What was the mood of the crowd as you were walking?

16   A.   Like hyper.  I don't know if angry would be the right

17   word, but they were hyped up.

18   Q.   Did you also feel that way?

19   A.   Yes.

20   Q.   Now let's talk about what happened when you got closer to

21   the Capitol.  Were you still with Mr. Robertson and his

22   neighbor when you got closer to the Capitol?

23   A.   Yes.

24   Q.   And can you describe -- did you make it all the way to

25   the Capitol, like the plaza area in front of the building,

```
 1    with the two of them?
 2    A.   Are you asking like -- where specifically --
 3    Q.   I can rephrase it.
 4    A.   Okay.
 5    Q.   When you walked to the Capitol, did you get to the plaza
 6    area in front of the building?
 7    A.   On the upper story?
 8    Q.   On the lower story.  On the ground level.
 9    A.   Yes.
10    Q.   And were you still with Mr. Robertson and his neighbor at
11    that point?
12    A.   Yes.
13    Q.   Could you describe what you saw when you got to that
14    area?
15    A.   A huge crowd getting pretty out of hand.
16    Q.   What do you mean by "out of hand"?
17    A.   Like there was yelling, screaming, people were throwing
18    things, flash bangs, smoke grenades, stuff like that.
19    Q.   And did you see police officers there as well?
20    A.   Yes.
21    Q.   How did the number of people in the crowd compare to the
22    number of police officers that you saw?
23    A.   It was an overwhelming comparison.
24    Q.   Overwhelming in which direction?
25    A.   The protesters outnumbered the police by a lot.
```

1    Q.   Did you hear shouting?

2    A.   I did.

3    Q.   What were people shouting?

4    A.   Different things.  I'm sure there was a bunch of

5    profanity.  "Stop the Steal," election fraud stuff, along

6    those lines.

7    Q.   And at some point did you see officers that you thought

8    may be in trouble?

9    A.   Yes.

10    Q.   What did you do?

11    A.   I attempted to place myself in between them and the

12    crowd.

13    Q.   Well, what was happening to the officers that you saw?

14    A.   It appeared to me that this group of officers had maybe

15    gotten separated from either a larger group or what have you,

16    and one of them was missing his head protection, and the crowd

17    was just wildly getting out of hand.  And as a cop, I don't

18    want to see cops get hurt.  So I did what I could.  I had my

19    arms up.  I can't do it in this suit, sorry.  And I'm just

20    shaking my head no, like that's not what we're supposed to be

21    doing.

22    Q.   And where was Mr. Robertson at this point?

23    A.   I'm assuming behind me, but I couldn't tell you for sure

24    because I was kind of focused straight ahead.

25    Q.   Were you able to assist the officers in that moment?

1    A.   I believe so.

2    Q.   Compared, though, to what was going on around you, how

3    much did your assistance help the police overall?

4    A.   It would have had the same effect if I hadn't done

5    anything.

6    Q.   And after that point did you take any other efforts that

7    day to ever help law enforcement?

8    A.   Not that I can think of.

9    Q.   Based on your own time as an officer and what you saw in

10   the crowd, how safe was that area for police?

11   A.   Not safe.

12   Q.   What makes you say that?

13   A.   It's pretty much the number game at that point.

14   Q.   What about the number game?

15   A.   If you've got 10 to 15 people per one officer, that's not

16   safe at all.  And I don't even know if that would be the right

17   number, to be honest.

18   Q.   Do you think the ratio would be even more disparate or

19   less disparate?

20   A.   I really can't say.

21   Q.   Now, at some point did you get closer to the Capitol

22   building itself?

23   A.   Yes.

24   Q.   If we could have Government's Exhibit 603 in evidence,

25   please.  Do you recognize this to be the Capitol?

1    A.    I do.

2    Q.    And can you point out -- you can touch the screen to do

3    so -- where you approached from when you were walking toward

4    the Capitol.

5    A.    From down in this area here.

6    Q.    Did there come a time when you put on your gas mask?

7    A.    Yes.

8    Q.    Why?

9    A.    A couple different reasons.  One being people were

10   yelling about gas, gas, pepper spray, stuff like that.  We

11   were seeing people come down the Hill with the signs and

12   symptoms of having been exposed to it, and you could smell and

13   taste it in the air.  I wear contacts, and it sticks to mucus

14   membranes more so, and I didn't want to have any eye injuries

15   and stuff like that.

16   Q.    Now, are you familiar with the smell and taste of those

17   kinds of chemicals based on your military and police training?

18   A.    Yes.

19   Q.    Were you exposed to those in the course of your training

20   for the military and the police?

21   A.    Yes.

22   Q.    And so when you say there was the taste and smell of

23   those chemicals in the air, how do you know that?

24   A.    Given my experience.

25   Q.    And did Mr. Robertson also use his gas mask?

1    A.    Yes.

2    Q.    What about his neighbor Pat?

3    A.    I believe so.

4    Q.    Now, did there come a time after you had your gas mask on

5    where you saw officers trying to make their way through the

6    crowd?

7    A.    Yes, but it wasn't until later on.

8    Q.    Okay.   Was there a time when you were in that area when

9    you were approaching the Capitol where you left off that mark

10   closest to the building where you saw officers trying to make

11   their way through the crowd?   Or where were you, I guess, if

12   not there?

13   A.    Roughly right around in here.   That group of officers

14   that I was trying to help seemed to be coming from this

15   direction, and then my interaction with them would have taken

16   place somewhere around here.

17   Q.    And after that initial interaction, you didn't do

18   anything to help any officers again.   Right?

19   A.    Correct.

20   Q.    So did you see more officers approaching from that same

21   direction while you were standing in the area at the base of

22   the stairs that you marked?

23   A.    Not that I can vividly recall.

24   Q.    Now, I'm going to show you -- and in this area that you

25   marked at the base of the stairs, what was the mood of the

 1     crowd?

 2     A.   Hyper, angry, any kind of synonym for those words.

 3     Q.   Did you see people with weapons?

 4     A.   Weapons how?

 5     Q.   Well, did you see people with objects they were using as

 6     weapons?

 7     A.   I did.

 8     Q.   What kind of objects did you see people using as weapons?

 9     A.   I believe somebody had torn apart like a bike rack or

10     maybe like a barricade or something like that.

11     Q.   What was the person doing with that?

12     A.   I do remember one person throwing it in the direction of

13     the police that were over here.

14     Q.   Now, I'm going to show you what's been admitted into

15     evidence -- and actually before we do that, do you see that

16     "clear" button on the screen?

17     A.   Yes.

18     Q.   Can you touch that?  Thank you.

19          I'm going to show you what's been admitted into evidence

20     as Government's Exhibit 201C.  Do you recognize anyone in this

21     picture?

22     A.   I do.

23     Q.   Can you point out who you recognize?

24     A.   That being myself, T.J., and his neighbor.

25     Q.   So could you make an arrow or an X where you see

1    yourself?

2    A.   Right here.

3    Q.   And what are you wearing on your face?

4    A.   A gas mask.

5    Q.   Could you mark where you see Mr. Robertson?

6    A.   Right here.

7    Q.   What is he wearing on his face?

8    A.   A gas mask.

9    Q.   What is he wearing on his back?

10   A.   A backpack.

11   Q.   And what is he holding in his hands?

12   A.   A stick.

13   Q.   How is he holding his stick?

14   A.   I refer to it as port arms.

15   Q.   What's port arms mean to you?

16   A.   Essentially you're holding -- for the military it would

17   be your rifle, or if you're doing baton stuff, you would hold

18   it out in front of you as to kind of act as a blocking tool

19   initially.

20   Q.   And was that the stick that you saw Mr. Robertson bring

21   with him in the car that day?

22   A.   It looks like it.

23   Q.   Do you see anyone else that you recognize in this

24   picture?

25   A.   Yes.

1    Q.   Who do you recognize?

2    A.   His neighbor.

3    Q.   And what does he have on his face?

4    A.   A gas mask.

5    Q.   Now, you mentioned a minute ago that you know the port

6    arms position from your military service.  Is that right?

7    A.   Mm-hmm.  Yes.

8    Q.   At the police department, did you use batons?

9    A.   We had collapsible ASPs.

10   Q.   Could you explain what that is?

11   A.   It's pretty much it starts out -- you know, it's about

12   this long, and if a situation presents itself, you kind of

13   flick it and it'll expand.

14   Q.   And what do you do with it once you have it expanded like

15   that?

16   A.   It depends on the situation.

17   Q.   Can you use it defensively?

18   A.   Yes.

19   Q.   How would you use it defensively?

20   A.   For blocking strikes, stuff like that.

21   Q.   And how would you use it offensively?

22   A.   By striking meatier portions of the extremities.

23   Q.   Now, if you're using it offensively, do you hold it

24   differently?

25   A.   Yes.

Q.   How do you hold it differently if you're using it offensively?

A.   It would be in your dominant hand up across your shoulder, prepared to strike.

Q.   But you mentioned a moment ago when you're using it defensively, are you holding it in this port arms position?

A.   Yes.

Q.   Can you still strike someone from a defensive position?

A.   Yes.

Q.   Now, in addition to the expandable batons or collapsible batons that the police department had, did they also have wooden sticks?

A.   They weren't issued, but we did have some in the supply room.

Q.   And what do you mean, they weren't issued?

A.   I guess they were outdated.  Maybe the department used to carry them, but I guess with the changing of the times they switched to the collapsible batons.

Q.   So what did they still have them in the supply room for?

A.   If not for riot control, then maybe just nostalgia.

Q.   Now, if we could have Government's Exhibit in evidence 200B, please.  And if you could clear the screen, please.

     Who is in the center of this picture?

A.   It looks to be T.J.

Q.   And if we could have Government Exhibit 200C in evidence.

1   Who's in the center of this picture?

2   A.   I'm assuming it's the same, just maybe like a split

3   second later, so same answer.

4   Q.   And what makes you assume it's the same?

5   A.   The jacket and the stick and the backpack strap.

6   Q.   Were these photographs that you were just looking at

7   taken in the area you described at the base of the stairs?

8   A.   I think so.

9   Q.   At some point after you were at the base of the stairs,

10   did you climb up into the scaffolding?

11   A.   Not climbed up like onto it, but climbed -- like there's

12   regular stairs underneath it, so maybe underneath the

13   scaffolding.

14   Q.   So you climbed up the stairs underneath the scaffolding?

15   A.   Yes.

16   Q.   So we're going to talk about that now.  And if we could

17   have Government's Exhibit 603 again, please, in evidence.

18        Mr. Fracker, when you're talking about the scaffolding,

19   can you circle the area you're referring to?

20   A.   Yes, ma'am.

21   Q.   And while you were standing at the bottom of that area,

22   did you still have your gas mask on?

23   A.   Yes.

24   Q.   What was happening with the crowd around you?

25   A.   I'm assuming the stuff that had been going on before.

```
1    Q.   Any reason to think there had been a change in what was
2    going on around you from before?
3    A.   Not really.
4    Q.   So could you explain how you ended up walking up the
5    stairs under the scaffolding?
6    A.   After somebody or a number of people had sort of breached
7    into the scaffolding, there was just a pour of people into the
8    stairwell and just followed suit.
9    Q.   Who was with you when you followed suit?
10   A.   T.J.
11   Q.   And where did you go?
12   A.   Up the stairs.
13   Q.   How far up the stairs did you go?
14   A.   All the way to the -- like this courtyard area.
15   Q.   Now, before we get to what happened up there, did you
16   take a video on your phone of your trip from the bottom to the
17   top of that landing?
18   A.   I believe so.
19   Q.   So if you could clear that screen and then if we could
20   pull up for Court, counsel -- actually, court's brief
21   indulgence.  I think this may be admitted.
22        (Government conferring.)
23        MS. BERKOWER:  Actually, this exhibit is admitted in
24   evidence.  So if we could please pull up Government's Exhibit
25   101C.  (Video played.)
```

1    BY MS. BERKOWER:

2    Q.   Now, we'll play that from the beginning, but before we

3    do, who's in the middle of the screen right now?

4    A.   Me.

5    Q.   What are you wearing on your face?

6    A.   A gas mask.

7    Q.   What are you wearing on your back?

8    A.   A backpack.

9    Q.   And where are you taking this video at this moment in

10   time?

11   A.   I believe it's on the lower level just outside the

12   scaffolding.

13   Q.   So is this before you started going up?

14   A.   Yes.

15   Q.   If we could start this video from zero seconds and play

16   to 9 seconds, please.

17        (Video played.)

18        Stop right there.  Mr. Fracker, did you just see someone

19   throw an object in that portion of the video?

20   A.   Yes.

21   Q.   What was being thrown?

22   A.   Some kind of stick-like object.

23   Q.   What was the direction it was being thrown?

24   A.   Towards the officers.

25   Q.   And the person who threw it, do you see lettering on his

1      jacket or sweatshirt?

2      A.   I do.

3      Q.   Could you read that, please?

4      A.   "Stop the Steal.  Four More Years."

5      Q.   Now let's continue on, please, to 49 seconds.

6           (Video played.)

7           Okay.  Actually, if we could stop there, at 20 seconds.

8           Does this show what you just described as a flood of

9      people coming up the stairs?

10     A.   Yes.

11     Q.   Was Mr. Robertson still with you at this point?

12     A.   I believe he was behind me.

13     Q.   Like close behind or far behind?

14     A.   Fairly close.

15     Q.   So if we could play from here to 49 seconds, please.

16          (Video played.)

17          What did we just watch in that clip?  What happened?

18     A.   The crowd of people and myself ascending the stairs.

19     Q.   Was Mr. Robertson still with you when you got to the top

20     of those stairs?

21     A.   I do believe so.

22     Q.   Now, at this point are you on like a landing?

23     A.   Yes.

24     Q.   After this, did you go around a corner and proceed up

25     another flight of stairs?

1    A.   Yes.

2    Q.   So if we could play this to 1:16, please.

3         (Video played.)

4         Now, Mr. Fracker, did that clip show you coming around

5    the landing and going up another flight of stairs?

6    A.   Yes.

7    Q.   And before coming to court, did you watch CCTV video from

8    the Capitol?

9    A.   I did.

10   Q.   Ms. Dunn-Gordon, if we could please pull up Government's

11   Exhibit 409 in evidence and start at 50 seconds.  But pause

12   before you hit play, please.

13        Now, Mr. Fracker, I'm going to ask you, as we play this

14   video, watch the corner area.  And Ms. Dunn-Gordon, if you

15   could play to 55 seconds, please.

16        (Video played.)

17        Mr. Fracker, do you see yourself?

18   A.   I do.

19   Q.   What did you do in that segment of video that we watched?

20   A.   Came around a corner.

21   Q.   And can you point an arrow to where you are and where you

22   see yourself.

23        (Witness complies.)

24        Now, if you could clear that off, please.  And

25   Ms. Dunn-Gordon, if we could please play to 1:04.

1          (Video played.)

2          And stop right there, actually, at 1:04.  Thank you.

3          Do you see anyone else you recognize enter the screen?

4   A.   Yes.

5   Q.   Who did you see?

6   A.   I see T.J.

7   Q.   Could you make an arrow pointing out where he is?

8          (Witness complies.)

9          And what does he have on his face?

10   A.   A gas mask.

11   Q.   What does he have on his back?

12   A.   A backpack.

13   Q.   What is he holding?

14   A.   The stick.

15   Q.   Now, if we could please play -- first clear the screen if

16   you don't mind.  And then if we could please play to 1:12,

17   focusing on Mr. Robertson and how he's holding the stick.

18         Now, at this point where we've stopped, where is

19   Mr. Robertson going?

20   A.   Up the stairs.

21   Q.   And how -- is he leaning on the stick as he does?

22   A.   What was that last part?

23   Q.   Is he leaning on the stick as he's going up the stairs?

24   A.   It didn't look like it.

25   Q.   Is he leaning on the railing?

1    A.   No.

2    Q.   Now, if we could please have Government's Exhibit 411 in

3    evidence.

4         Mr. Fracker, do you recognize this to be still

5    photographs of some of the same camera footage that we just

6    looked at?

7    A.   Yes.

8    Q.   Do you see a yellow arrow on the screen?

9    A.   I do.

10   Q.   Who is that arrow pointing to?

11   A.   That's me.

12   Q.   If we could go to the next slide, please.  Do you see a

13   yellow arrow on this slide?

14   A.   I do.

15   Q.   Who is that pointing to?

16   A.   It looks to be what T.J. was wearing, so I would think

17   T.J.

18   Q.   And if we could go to the next slide, please.  Is this a

19   slightly different camera view?

20   A.   It is.

21   Q.   Do you see two arrows?

22   A.   I do.

23   Q.   What is the left arrow pointing to?

24   A.   That would be myself.

25   Q.   And what is the right arrow pointing to?

1    A.   What I assume to be T.J.

2    Q.   Well, you say you assume.  Can you tell if it's him or

3    not?  And do you need it to be bigger?

4    A.   I can't tell exactly from this angle.

5    Q.   Ms. Dunn-Gordon just made it a little bigger.  Did that

6    help you at all with seeing the person that the arrow's

7    pointing to?

8    A.   Not really.  I can see what looks to be the back straps

9    of a gas mask but I can't say for sure.  It's very pixilated.

10   Q.   Can we go on to the next slide, please.

11        Now, in this image do you see two arrows?

12   A.   I do.

13   Q.   Who is under the arrow on the left?

14   A.   That would be me.

15   Q.   Who is under the arrow on the right?

16   A.   T.J.

17   Q.   On the next slide, do you see again two arrows?

18   A.   I do.

19   Q.   Who is under the slide -- sorry, the arrow to the left?

20   A.   I am.

21   Q.   Who is under the arrow to the right?

22   A.   T.J.

23   Q.   Now, do you see a time stamp marking the time of day at

24   which this footage was captured?

25   A.   I do.

1    Q.    What is it?

2    A.    It's 2:11 p.m. and 11 seconds.

3    Q.    Now, if we could go back to Government's Exhibit 101C,

4    please, and stop at 1 -- and start at 1:16.

5          (Video played.)

6          Now, what happened in that part of the video we just

7    watched?

8    A.    We're going up the stairs.

9    Q.    Are you getting closer to the building?

10   A.    Yes.

11   Q.    And did you see people carrying signs around you?

12   A.    I did.

13   Q.    What did the signs say?

14   A.    I think it was like a "Stop the Steal" kind of sign.

15   Q.    And did you hear someone say, "Keep moving"?

16   A.    I think so.

17   Q.    Did you hear someone say, "The barricade's down"?

18   A.    Yes.

19   Q.    Did you hear someone say, "We're going to get in today"?

20   A.    Yes.

21   Q.    Now if you could please play, Ms. Dunn-Gordon, to 1:55.

22         (Video played.)

23         What happened in that part of the video?  Where did you

24   get to?

25   A.    I guess the opening to the big pavilion area.

1    Q.   Did you see an officer?

2    A.   I did.

3    Q.   What was he doing?

4    A.   Handing out water.

5    Q.   And did you take that as -- how did you take that when

6    you saw that?

7    A.   I don't remember an exact, like, interpretation of it.

8    Q.   Well, did you take it as an invitation to keep going?

9    A.   It would make sense, seeing as he wasn't being defensive

10   or something like that.

11   Q.   Now, you talked before about officer safety when they're

12   outnumbered.  Do you remember talking about that?

13   A.   I do.

14   Q.   How safe was this situation for that officer?

15   A.   It was not a safe situation for him.

16   Q.   And based on that, is it reasonable for you to understand

17   this as an invitation to keep going forward?

18   A.   I -- I guess I'm getting mixed up on the word

19   "invitation."

20   Q.   Well, is it reasonable to think he was telling you, go

21   ahead on in?

22   A.   Possibly.

23   Q.   Is that what you thought at the time?

24   A.   At the time, yes, probably.

25   Q.   At the same time, did you know you weren't supposed to be

1     there?

2     A.   Yes.

3     Q.   Had you crossed barricades to get to where you were?

4     A.   Yes.

5     Q.   And had you seen officers trying to keep people out of

6     the area?

7     A.   Yes.

8     Q.   Did you see a crowd flood up the stairs in front of you?

9     A.   I did.

10    Q.   And did you join that group to go up?

11    A.   Yes.

12    Q.   Now if we could play this to the end.

13         (Video played.)

14         At the end of that video, where were you headed?

15    A.   Into the building, or towards the entrance.  Excuse me.

16    Q.   Where was Mr. Robertson at the end of that video?

17    A.   I have no idea.

18    Q.   Had you lost him at that point?

19    A.   Yes.

20    Q.   When do you last remember seeing him?

21    A.   The way I remember it was sometime going up the stairs.

22    I think maybe I had glanced back to see if he was still there,

23    and then another time further up the stairs I looked back.  I

24    don't believe I saw him any further.

25    Q.   Was that after those screenshots we looked at where you

1    identified both yourself and him?

2    A.   That would make sense to me.

3    Q.   Now let's talk about what happened after this video

4    ended.  Did you actually go up to the building?

5    A.   I did.

6    Q.   And did you go inside?

7    A.   I did.

8    Q.   Could you explain what happened next?

9    A.   From making entry or before?

10   Q.   Well, walk us through it.

11   A.   So I entered through a doorway, kind of looked around a

12   bit.  I took a video kind of in that main foyer area.  And I

13   believe I was also trying to locate T.J. around that time.

14   Q.   Why were you looking for him?

15   A.   Because I didn't know where he was.

16   Q.   And if we could have Government's Exhibit 402 and start

17   it at time stamp 2:10, please.

18        (Video played.)

19        This doorway we see here in the middle of the screen, is

20   that the doorway you came in?

21   A.   Yes.

22   Q.   When you got up to the door from the outside, how many

23   police officers were there?

24   A.   None that I can remember.

25   Q.   And when you came inside, how many police officers were

```
 1        there?

 2        A.    None.

 3        Q.    Do you see yourself entering in this screen?

 4        A.    I do.

 5        Q.    Could you circle or make an arrow to where you are.

 6              (Witness complies.)

 7              And if you could clear the screen, please.

 8              As you entered, were people coming in through windows?

 9        A.    Yes.

10        Q.    Was there broken glass?

11        A.    Yes.

12        Q.    Was there overturned furniture?

13        A.    Yes.

14        Q.    Was there an alarm going off?

15        A.    I believe so.  Yes.

16        Q.    Sorry?

17        A.    Yes.

18        Q.    There was an alarm going off?

19        A.    Yes, ma'am.

20        Q.    And what was the mood when you got inside the building?

21        A.    Personally or generally?

22        Q.    Well, let's start with personally, and then we'll go to

23        generally.

24        A.    I guess hyped up.  Adrenaline flowing.  Maybe excitement.

25        Q.    Why were you hyped up and full of adrenaline?
```

1    A.   I just -- I guess given everything that was going on,

2    kind of just drove that type of mood.

3    Q.   Were you excited?

4    A.   I believe so.

5    Q.   What were you excited about?

6    A.   I guess having been a part of what was going on.

7    Q.   And what was going on in your mind?

8    A.   Getting into the building, and I guess in my head on that

9    day thinking that, you know, if we could make a big enough

10   fuss, that the government would have to listen.

11   Q.   And listen in what way?

12   A.   Overturn the election results.

13   Q.   Is that what you wanted that day?

14   A.   That day, yes.

15   Q.   And is that what you were thinking while you were in the

16   building?

17   A.   I'm not sure if I thought that far ahead, but it would

18   make sense.

19   Q.   Now, did you -- did you take -- let's play this,

20   actually.  Let's play this forward, Ms. Dunn-Gordon.  Thank

21   you.

22        (Video played.)

23        What are you holding when you come in the building?

24   A.   A flag.

25   Q.   Where did you get that?

1    A.   I found it on the ground.

2    Q.   Are the other people inside making a lot of noise?

3    A.   A lot of what?

4    Q.   Noise.

5    A.   Yes, ma'am.

6    Q.   What kinds of things -- what kinds of noise?

7    A.   I can't say any one specific noise.

8    Q.   Now, if we could pause there.  Do you see yourself in the

9    bottom left corner of the screen?

10   A.   I do.

11   Q.   We paused at 2:44.  What are you doing with your hands in

12   that --

13   A.   It looks like I have my phone in my hand.

14   Q.   And what are you doing with it?

15   A.   Probably taking a video, or maybe trying to contact

16   someone.

17   Q.   If we could play just a few seconds of this more, please.

18        (Video played.)

19        Can you tell now what you're doing with your phone?

20   A.   Taking a video.

21   Q.   Now, if we could go to Government's Exhibit 100F for the

22   Court, counsel, and witness only, please.  101F, I'm sorry.

23   And it's a video, Ms. Dunn-Gordon.  I'm sorry.  That was my

24   mistake.

25        And if we could just pause that and perhaps play just a

1  few seconds of this for the Court, counsel, and witness only

2  so he can see what this is.  We can stop there.

3       Mr. Fracker, do you know what this exhibit is?

4  A.   What I assume is my video.

5  Q.   Do you recognize it to be your video that you were taking

6  in the CCTV footage?

7  A.   Yes.

8       MS. BERKOWER:  Your Honor, I would ask to admit

9  Government's Exhibit 101F.

10      MS. WAGNER:  No objection.

11      THE COURT:  So moved.

12                         (Government Exhibit No. 101F

13                          received into evidence.)

14      MS. BERKOWER:  And if we could publish, please, and

15 once we do, play the video from the start.

16    (Video played.)

17 BY MS. BERKOWER:

18 Q.   Now, Mr. Fracker, in that video, did you hear an alarm

19 going off?

20 A.   I did.

21 Q.   Where was that alarm coming from?  That was a bad

22 question.  Let me rephrase.  Was it inside or outside the

23 building?

24 A.   Inside.

25 Q.   How would you describe what was going on around you at

1     the time?

2     A.   Chaotic.

3     Q.   Did you post this video on Facebook at some point?

4     A.   Not publicly, but I believe through message to a friend,

5     to our group chat.

6     Q.   Did you also save this on your cell phone that you had

7     with you that day?

8     A.   Yes.

9     Q.   Now, let's go back to Government's Exhibit 402, if we can

10    pick up where we left off there.   I believe it was around

11    2:24.

12         (Video played.)

13         And we played that through 4:50.

14         Do you see anyone come in the door here that you

15    recognize?

16    A.   Yes.

17    Q.   Who came in?

18    A.   T.J.

19    Q.   Can you circle him or point him out.

20         (Witness complies.)

21         And what does he have in his hand?

22    A.   A stick.

23    Q.   What's on his back?

24    A.   The backpack.

25    Q.   And could you tell us the time stamp that he came in on

1    in the CCTV?

2    A.   It looks to be 2:16:50.

3    Q.   Now, if you could just follow him where he goes as we

4    play the video.  And actually, I'm sorry.  Before we do, after

5    you came into this area through that -- did you come in

6    through that same door?

7    A.   Yes.

8    Q.   After you came into this area, what direction did you

9    head?

10   A.   Do you want me to do it on the screen?

11   Q.   Sure.

12   A.   I went this way.

13   Q.   And when you went that way, what was the next room that

14   you came to?

15   A.   The circular room full of statues.

16   Q.   So if you could clear that screen.  And let's watch

17   Mr. Robertson as we play this video.

18       (Video played.)

19       What direction is he walking?

20   A.   The same direction as me.

21   Q.   Had you communicated with him at this point?

22   A.   No.

23   Q.   Were you trying to find him?

24   A.   Probably.

25   Q.   Why?

1    A.   Make sure he was safe.

2    Q.   Now, did you see him disappear out the left side of your

3    screen in the same direction that you went?

4    A.   Yes.

5    Q.   Now, let's go on to what happened when you got into that

6    circular room with statues, is that how you described it?

7    A.   Yes, ma'am.

8    Q.   When you got in there, what was happening?

9    A.   When I got there, there was a crowd, I guess closer

10   towards me, in the opening where I came through, and then

11   there was police in front of them, I guess trying to hold them

12   back.

13   Q.   Did you take another video when you got in there?

14   A.   I did.

15   Q.   So if we could have Government's Exhibit 101G for the

16   Court, counsel, and witness only, please.

17        (Video played.)

18        Mr. Fracker, do you recognize what this is?

19   A.   Yes.

20   Q.   Is this the video you took in that circular room with the

21   statues?

22   A.   Yes.

23        MS. BERKOWER:   I would ask to admit and publish this

24   exhibit.

25        MS. WAGNER:   No objection.

1          THE COURT:  So moved.

2                         (Government Exhibit No. 101G

3                         received into evidence.)

4     BY MS. BERKOWER:

5     Q.   Could we play this from the beginning, please,

6     Ms. Dunn-Gordon.

7          (Video played.)

8          Now, does that show what you were just describing about a

9     crowd of people with the police line?

10    A.   Yes.

11    Q.   Behind the police line, were there other members of the

12    crowd at that point?

13    A.   I don't believe so.

14    Q.   And did you see yourself make a gesture to the camera?

15    A.   I did.

16    Q.   What was that gesture about?

17    A.   Kind of like, I don't know what's going on.

18    Q.   Now, was that room loud?

19    A.   Yes.

20    Q.   Did you hear someone shout the word "Pelosi"?

21    A.   I did.

22    Q.   Did you know what that was a reference to?

23    A.   Like why he shouted it, or what Pelosi is or was?

24    Q.   What is that?  What is Pelosi?

25    A.   Speaker of the House.

```
1     Q.   Do you know who that is?

2     A.   Yes.

3     Q.   Who?

4     A.   Nancy Pelosi.

5     Q.   And in your view, did she have a role to play in the

6     fraudulent election?

7     A.   Yes.

8     Q.   Now, if we could pull up Government's Exhibit 407A in

9     evidence, please.

10          Did there come a time when you met back up with

11    Mr. Robertson?

12    A.   Yes.

13    Q.   What room were you in when that happened?

14    A.   In the room I just described, the statue room.

15    Q.   And -- you said you met up with him in that circular

16    room?

17    A.   Yes, ma'am.

18    Q.   Do you see an arrow -- well, before we get there, is this

19    the circular room you were talking about?

20    A.   Yes.

21    Q.   Do you see a yellow arrow?

22    A.   I do.

23    Q.   Do you recognize the person underneath the yellow arrow?

24    A.   I do.

25    Q.   Who is it?
```

1    A.    That's T.J.

2    Q.    What does he have in his hand?

3    A.    It looks to be like the stick he's had.

4    Q.    Now, do you see yourself in this picture?

5    A.    Not clearly.

6    Q.    Okay.  Is this the room, though, where you met back up

7    with him?

8    A.    Yes.

9    Q.    Now if we could go to the next slide, please, and can we

10    zoom in on the area with the arrow.  Do you see who's

11    underneath that arrow?

12    A.    Yes.

13    Q.    Who is it?

14    A.    It's myself and T.J.

15    Q.    And what are you doing?

16    A.    Talking.

17    Q.    Was this when you met back up with him?

18    A.    Yes.

19    Q.    Now let's watch this.  And before we leave this, can you

20    tell us what time this is at.

21    A.    It's 24 minutes after 2:00 and 34 seconds.

22    Q.    Now, if we could go to camera, Government's Exhibit 407,

23    and play it starting at 4 minutes and 22 seconds.

24         And before we play it, Mr. Fracker, I'm going to ask you

25    to keep your focus on the right side of the screen in the area

1      between the statue and the wall, and tell us when you

2      recognize someone.

3              If we could play it, please.

4              (Video played.)

5              Pause it there.  Did you see yourself?

6      A.     I do.

7      Q.     And do you see Mr. Robertson?

8      A.     I do.

9      Q.     What just happened?

10     A.     We had just linked back up.

11     Q.     And can you circle yourself and him.

12             (Witness complies.)

13             Are you hugging?

14     A.     Yes.

15     Q.     Did he say anything to you when you reunited?

16     A.     I'm sure he did.

17     Q.     Do you remember what he said?

18     A.     I have no idea.

19     Q.     Did he tell you, "Let's get out of here"?

20     A.     If he did, I don't remember.

21     Q.     After this, did you stay in this room with him?

22     A.     Yes.

23     Q.     Now, if we could play this until 5:26, please.  And

24     actually, before we do, do you see this time stamp here on the

25     camera?

1    A.   I do.

2    Q.   What is it?

3    A.   It's 24 minutes past 2:00 with 34 seconds.

4    Q.   If we could please play this to 5:26.

5         (Video played.)

6         Are you and Mr. Robertson still in the same area of the

7    room here?

8    A.   Yes.

9    Q.   Are more people continuing to enter the room as you stand

10   there?

11   A.   Yes.

12   Q.   Now, you said there was a police line on the other side

13   of the room when you first got there.  Is that right?

14   A.   Correct.  I don't remember if it was like a shoulder to

15   shoulder kind of police line, so to speak, or if it was just

16   officers kind of sporadically throughout.

17   Q.   In the clip we just watched, did the crowd move through

18   the entire room?

19   A.   Yes.

20   Q.   Now, if we could pull up -- and what's the time stamp

21   here?

22   A.   25 past 2:00.

23   Q.   And how many seconds?

24   A.   26 seconds.

25   Q.   If we could pull up Government's Exhibit 406 in evidence

1    and play it from 1 minute to 1:28, please.

2         (Video played.)

3         Now, Mr. Fracker, do you know this to be the view from

4    the other side of the circular room you were in?

5    A.   I do believe so.

6    Q.   Is that the police line you were talking about?

7    A.   Not so much the officers back here, but these up here.

8    Q.   If we could please play this through 1 minute, 28

9    seconds.

10        (Video played.)

11        What's the time stamps on the video here where we

12   stopped?

13   A.   25 past 2:00 and 28 seconds.

14   Q.   So is this the same time that you and Mr. Robertson are

15   in the room?

16   A.   I believe so.

17   Q.   How loud was it while you were in that room?

18   A.   Deafening.

19   Q.   Deafening?  Now, did you and Mr. Robertson take

20   photographs in this room?

21   A.   Yes.

22   Q.   If we could have Government's Exhibit 103 for the Court,

23   counsel, and witness only, please.

24        Mr. Fracker, do you recognize this photograph?

25   A.   I do.

1    Q.   Is it a photograph that you and Mr. Robertson are in

2    inside the Capitol on January 6?

3    A.   Yes.

4    Q.   Is it accurate?

5    A.   What do you mean?

6    Q.   Is it an accurate copy of a photograph that you took?

7    A.   Yes.

8         MS. BERKOWER:  Your Honor, I'd ask to admit this photo.

9         MS. WAGNER:  No objection.

10        THE COURT:  So moved.

11                          (Government Exhibit No. 103

12                           received into evidence.)

13        MS. BERKOWER:  And may we publish?

14   BY MS. BERKOWER:

15   Q.   Mr. Fracker, can you explain what we're looking at in

16   this photo?

17   A.   It's myself and T.J. in front of a statue.

18   Q.   And who's taking this photo?

19   A.   I believe it was me taking a selfie of us.

20   Q.   And why did you take this photo?

21   A.   It was kind of a -- like a check-in photo for one of our

22   buddies, I think.

23   Q.   And what had happened with one of your buddies?

24   A.   They had, I guess at some point a text or something had

25   gotten through, and they were checking in to see if we were

1    okay or not.

2    Q.   And what was the purpose of this photo, then?

3    A.   Just kind of like -- it's like a we're still alive, we're

4    okay kind of picture.

5    Q.   What are you doing yourself in this photo?

6    A.   Holding the middle finger up.

7    Q.   What's Mr. Robertson doing?

8    A.   Pointing to me.

9    Q.   Do you know why he's pointing to you?

10   A.   Not really.

11   Q.   Now, after taking this photo, did you take another photo

12   in this room?

13   A.   Yes.

14   Q.   If we could have what's been marked -- for the Court,

15   counsel, and witness only, please, what's been marked as

16   Government's Exhibit 101A.

17       Mr. Fracker, are you familiar with what this is?

18   A.   I am.

19   Q.   Is this something from your Facebook account?

20   A.   Yes.

21   Q.   Does it show a photo from January 6?

22   A.   It does.

23       MS. BERKOWER:  Your Honor, I would ask for admission of

24   Government's Exhibit 101A.

25       MS. WAGNER:  No objection.

```
1              THE COURT:  101A is admitted.

2                            (Government Exhibit No. 101A

3                               received into evidence.)

4          MS. BERKOWER:  And may we publish?

5          THE COURT:  Yes.

6    BY MS. BERKOWER:

7    Q.   Mr. Fracker, where was this photograph taken?

8    A.   The same room.

9    Q.   Who took this?

10   A.   If not T.J., then somebody else close by.

11   Q.   And who's in this photo?

12   A.   Myself and somebody I don't know.

13   Q.   Did you previously say that T.J. took this photo?

14   A.   I believe so.

15   Q.   And is that who took it?

16   A.   I do believe so.

17   Q.   Now, if we could go back to Government's Exhibit 406,

18   please, and go to time stamp 7:15.

19        Mr. Fracker, do you recognize yourself in this?

20   A.   I do.

21   Q.   We could pause it here.  And do you see Mr. Robertson?

22   A.   Yes.

23   Q.   Could you circle the two of you.

24        (Witness complies.)

25        Is this a point in that circular room after the crowd
```

1    swept through and pushed the officers back?

2    A.   Yes.

3    Q.   Now, if you could clear that screen, and I'm going to ask

4    you to focus on what you and Mr. Robertson are doing in this

5    video.  And if we could play to 7:34.

6         (Video played.)

7         Mr. Fracker, what were you doing with your hands in that

8    video?

9    A.   Clapping.

10   Q.   Why were you clapping?

11   A.   It looks like there was some kind of chant going on.

12   Q.   Who was chanting?

13   A.   Everybody.

14   Q.   Everybody who?

15   A.   Everybody in that area, it seemed like.

16   Q.   People in law enforcement or people in the crowd?

17   A.   I would say just the crowd.

18   Q.   And what was Mr. Robertson doing during that same time?

19   A.   Tapping his stick along to the clapping.

20   Q.   Now, did there come a time where you left this room?

21   A.   Yes.

22   Q.   If we could go to Government's Exhibit 408 and pause at 1

23   second, please.  This is also -- 408 is in evidence.

24        (Video played.)

25        Now, Mr. Fracker, do you see yourself and Mr. Robertson

1    in this room?

2    A.    Yes.

3    Q.    Could you circle where you are so the jury can see and

4    then clear the screen.

5         (Witness complies.)

6    A.    Ready?

7    Q.    Clear, yeah.   Thank you.   Now, what's the time stamp on

8    this video?

9    A.    2:34:01.

10   Q.    Compared to the part of the video at 2:25, are there more

11   or less members of the crowd in this circular room now?

12   A.    Less.

13   Q.    And if we could play to 26 seconds, and I'd ask you to

14   follow you and Mr. Robertson in this video as it plays.

15        (Video played.)

16        And if we could pause that here.   What happened at the

17   end of that clip we just watched?

18   A.    Police officers came in from the right.

19   Q.    And what did those police officers do?

20   A.    Kind of motioning where they just came from.

21   Q.    Did they interact with you and Mr. Robertson?

22   A.    Yes.

23   Q.    What did they do?

24   A.    They told us to leave that way.

25   Q.    Was it more than one officer that came out?

1    A.   Yes.  It was about three or four.

2    Q.   And it was just you and Mr. Robertson they were talking

3    to?

4    A.   I believe so.

5    Q.   And they told you to leave.

6    A.   Yes.

7    Q.   So at that point did you start making your way out?

8    A.   Yes.

9    Q.   So where'd you go next?

10    A.   Following that same path of travel, just in reverse.

11    Down the hallway towards the door and windows we saw from the

12    other video.

13    Q.   And if we could have Government's Exhibit 403A in

14    evidence, starting at slide 1.  Does this show the area where

15    you left the building?

16    A.   Yes.

17    Q.   Do you see a yellow arrow?

18    A.   I do.

19    Q.   Who is it pointing to?

20    A.   Me and T.J.

21    Q.   And specifically is the arrow above Mr. Robertson?

22    A.   Yes.

23    Q.   Can you just make an arrow to where you are as well.

24         (Witness complies.)

25         And at this point in time, do you see officers in this

1     area?

2     A.    Yes.

3     Q.    How many officers?

4     A.    A good number.  I'd say around 12 to 15.

5     Q.    And at this point are there more officers than people

6     from the crowd in this area?

7     A.    Yes.

8     Q.    When you entered this area, how many officers were there?

9     A.    Zero.

10    Q.    Now, on your way out, did Mr. Robertson have a

11    conversation with one of the officers?

12    A.    I don't know to what lengths, but there was interaction.

13    Q.    And what was the demeanor of the officer that he talked

14    to?

15    A.    I couldn't really say.

16    Q.    How did you exit the building?

17    A.    Through a window.

18    Q.    Could you mark the window that you exited out of.

19          (Witness complies.)

20          Now, you came in through a door.  Is that right?

21    A.    Yes.

22    Q.    What's happening here, when you were leaving through the

23    window, what's happening at that door?

24    A.    There's police blocking it.

25    Q.    And do you see a window to the right of that door?

1    A.   I do.

2    Q.   What's happening there?

3    A.   It looks like there's the police and the crowd are

4    exchanging words.

5    Q.   Now, if you could clear the screen, please.  If we could

6    go to the next slide.

7         Do you see a yellow arrow there?

8    A.   I do.

9    Q.   Who is it pointing to?

10   A.   T.J.

11   Q.   And at this point in time, are there more people from the

12   crowd or more officers visible?

13   A.   Officers.

14   Q.   If we could go to the next slide, please.  Do you see a

15   yellow arrow?

16   A.   I do.

17   Q.   Who is it pointing to?

18   A.   T.J.

19   Q.   And what's he doing in this picture?

20   A.   It looks like he's about to exit the window.

21   Q.   And are there more members of the crowd or more officers

22   in this area of the building at this point?

23   A.   Officers.

24   Q.   Now, from the time you entered, did you know you weren't

25   supposed to be in this building?

1    A.    Yes.

2    Q.    How'd you know that?

3    A.    Barricades and the police.

4    Q.    And in this building did you see broken glass?

5    A.    I did.

6    Q.    Did you hear alarms going off?

7    A.    Yes.

8    Q.    Did you see overturned furniture?

9    A.    Yes.

10   Q.    Did you see busted-out windows?

11   A.    Yes.

12   Q.    The entire time you were there, did you ever identify

13   yourself to anyone as a police officer?

14   A.    Not to my recollection.

15   Q.    In the entire time that you were with Mr. Robertson, did

16   he ever identify himself as a police officer?

17   A.    I don't think so.

18   Q.    Did you ever offer to help any of the officers inside the

19   building?

20   A.    I don't think so.

21   Q.    Did he?  From the time you were with him, did you see him

22   do that?

23   A.    Not that I can remember.

24   Q.    Did he ever -- and did either of you ever actually do

25   anything to help officers clear the building out of the people

1    who had entered?

2    A.    No.

3    Q.    Now let's talk about -- did you exit through this window

4    as well?

5    A.    Yes.

6    Q.    Let's talk about what happened when you got back out.

7    When you got back outside, what'd you do next?

8    A.    Made our way across the pavilion and met back up with the

9    neighbor.

10    Q.    And did you stay in that area for a while?

11    A.    Not a super long amount of time, but a little bit.

12    Q.    Did you stay there until police officers lined up and

13    pushed you out of that area?

14    A.    They were lining up, kind of remember like thinking, all

15    right, well, this has been enough, the cops are coming like

16    more so, and it was just time to go.

17    Q.    What was the mood like out on the terrace or the pavilion

18    when you got back out there?

19    A.    Probably the same as it was throughout the course of

20    events.

21    Q.    And how were you personally feeling?

22    A.    I think excited.

23    Q.    Did you and Mr. Robertson and his neighbor talk about

24    what had happened?

25    A.    I'm sure we did.

 1    Q.   What was discussed?

 2    A.   I don't remember anything specific.

 3    Q.   After that, when you saw the police lining up, what did

 4    you do next?

 5    A.   We -- I'm not sure which direction it was, but we made

 6    our way away from the area.  We asked an officer where the

 7    nearest Metro station was and then proceeded to it.

 8    Q.   The entire time that you were in the building when you

 9    were with Mr. Robertson, did he ever suggest that you leave?

10    A.   He may have.  If he did, I don't remember.

11    Q.   When you say he may have, what do you think he may have

12    said?

13    A.   It would be hard for me to give you a solid answer on it.

14    Q.   Did he go in there to find you and take you out of the

15    building?

16    A.   If he did, I was unaware of that.

17    Q.   Did he ever say anything to you indicating that that was

18    his goal of going into the building?

19    A.   I don't believe so.

20    Q.   What was his mood like after you got out of the building?

21    A.   About the same as mine, excited.  You know, adrenaline

22    going.

23    Q.   And what were you excited about?

24    A.   I guess just everything that had just taken place.

25    Q.   Did you feel like you had accomplished something that

1    day?

2    A.   That day I did, yes.

3    Q.   What did you feel like you had accomplished?

4    A.   I felt like we had maybe been heard by whoever it was we

5    needed to be heard by.

6    Q.   Heard for what purpose?

7    A.   To maybe possibly have the election results overturned.

8    Q.   And when you say maybe you had been heard, what made you

9    think maybe you'd been heard?

10    A.   I'm not really sure.

11    Q.   Did it have to do with being inside the Capitol with such

12    a large number of people?

13    A.   I would say so.

14    Q.   Now, when you drove -- when you took the Metro back to

15    the car, what did you do after that?

16    A.   Headed back to our respective homes.

17    Q.   And did you drive back in Mr. Robertson's car?

18    A.   Yes.

19    Q.   Who drove?

20    A.   He did.

21    Q.   Where were you sitting?

22    A.   The front passenger seat.

23    Q.   And where was the neighbor, Pat?

24    A.   In the row behind us.

25    Q.   What'd you guys talk about on the way home?

1    A.   I'm sure there was a mixture of conversation.  I don't

2    remember one specific thing.

3    Q.   Did you talk about what happened at the Capitol that day?

4    A.   Probably.

5    Q.   Did you talk -- did the topic of a next civil war come

6    up?

7    A.   It may have.  I wouldn't be surprised if it had.

8    Q.   Did you previously tell the FBI that the topic of a next

9    civil war came up on that ride?

10   A.   Yes.

11   Q.   Is that in fact what was discussed?

12   A.   Yes.

13   Q.   Now, during the day of January 6, had you been using your

14   phone to take videos and photos?

15   A.   Yes.

16   Q.   Did we see some of those in the government's exhibits

17   here?

18   A.   We did.

19   Q.   And about how many videos or photos would you estimate

20   you took that day?

21   A.   I don't know an exact number.  Probably more than 10.

22   Q.   And during the day did you see Mr. Robertson use his

23   phone to take photos and videos?

24   A.   I do believe so.

25   Q.   And did you post photos or share photos or videos on

1    social media?

2    A.   I don't think publicly.  I believe it was through like a

3    messenger kind of deal.

4    Q.   And did Mr. Robertson also share photos or videos on

5    social media, or through text messages, I guess?

6    A.   Yes.

7    Q.   So let's jump ahead a few days.  On January 13, did you

8    get a call from the FBI?

9    A.   Yes.

10   Q.   What were you told?

11   A.   That there were warrants for my arrest.

12   Q.   And what were you asked to do in light of the warrant for

13   your arrest?

14   A.   Turn myself in.

15   Q.   What did you do after you got off the phone with the FBI?

16   A.   I called T.J.

17   Q.   And tell us about that conversation.

18   A.   Specifically I don't really remember.  I know it was kind

19   of like here's what's going on.  He had gotten the same type

20   of phone call, and I needed to -- excuse me.  I needed to

21   secure childcare for my daughter because I had her with me at

22   the time.  And he suggested to come to his house and have his

23   wife watch my daughter while we turned ourselves in together.

24   Q.   So did you go to his house to drop off your daughter with

25   his wife?

1    A.   Yes.

2    Q.   And what happened after you dropped off your daughter?

3    A.   Once I knew she was good to go and squared away, I made

4    my way to the truck and handed my phone over to T.J.

5    Q.   Why did you hand your phone over to him?

6    A.   He'd asked for it.

7    Q.   And what was your understanding of why he was asking for

8    your phone?

9    A.   So they wouldn't be on our persons when we were searched

10   when we turned ourselves in.

11   Q.   Now, you've been a police officer for a number of years

12   at that point.  Is that right?

13   A.   Mm-hmm.

14   Q.   Is it standard practice to search someone when you arrest

15   them?

16   A.   Yes.

17   Q.   Is it standard practice for law enforcement to take a

18   cell phone if they find it during that kind of a search?

19   A.   Yes, to take it away from the --

20   Q.   Why didn't you want law enforcement to find your phone

21   when you turned yourself in?

22   A.   I was terrified about the videos and pictures that were

23   on it.

24   Q.   And so when Mr. Robertson asked you to give it to him,

25   what did you do?

1    A.   I gave it to him.

2    Q.   And what was your understanding of why you were giving

3    him your phone?

4    A.   Essentially so I wouldn't get caught with incriminating

5    photos and videos.

6    Q.   What did you think he was going to do with it?

7            MS. WAGNER:   Objection.

8            THE COURT:   Overruled.

9    BY MS. BERKOWER:

10   Q.   You can answer.

11   A.   I guess just make it disappear.

12   Q.   And did he say anything to you that made you think that?

13   A.   At the time?

14   Q.   Or at any time.

15   A.   I believe there was a like "problem solved" kind of term

16   at some point.

17   Q.   Now, after you handed him your phone, what did he do with

18   it?

19   A.   Put it in a ammo can.

20   Q.   What else did he put in the ammo can?

21   A.   His phone.

22   Q.   And what did you do next?

23   A.   We drove to town and turned ourselves in.

24   Q.   Where did you turn yourselves in?

25   A.   At the police department.

1   Q.   Were you searched?

2   A.   Yes.

3   Q.   And did the FBI find any phones on you?

4   A.   No.

5   Q.   Now, after that, were you taken for processing and

6   booking?

7   A.   Yes.

8   Q.   Did you see a judge later that day?

9   A.   I did.

10  Q.   Did you get to go home after that?

11  A.   Yes.

12  Q.   Did you ever go back to Mr. Robertson's house to get your

13  phone?

14  A.   No.

15  Q.   Why not?

16  A.   I guess I just didn't want anything to do with those

17  pictures or videos existing anymore.

18  Q.   After that, did you ever ask him for the phone back?

19  A.   No.

20  Q.   The next day, did you get a new phone?

21  A.   Yes.

22  Q.   And at any point after that did Mr. Robertson ever ask

23  you to come retrieve your phone?

24  A.   No.

25  Q.   Did he tell you he had it for you?

1    A.    No.

2    Q.    What was your understanding of what had happened to your

3    phone?

4    A.    Just didn't exist anymore.

5    Q.    Now, the same day that you were arrested, or turned

6    yourself in and were arrested, did you have a court hearing to

7    see a judge?

8    A.    Yes.

9    Q.    During that -- while you were waiting for the court

10   hearing, were you waiting in a room with Mr. Robertson?

11   A.    Yes.

12   Q.    While you were there, did he offer to give you money?

13   A.    He did.

14   Q.    Did you accept?

15   A.    I did.

16   Q.    And did he pay you money?

17   A.    Yes.

18   Q.    How much money did he pay you?

19   A.    Roughly 30,000.

20   Q.    When did he pay you?

21   A.    It was supposed to be like a normal biweekly check.

22   That's what we had talked about initially.  But I told him,

23   you know, I don't like talking about money or asking for money

24   and stuff like that, so I wanted to kind of avoid that

25   conversation.  So then we agreed to just a lump sum.

1          MS. BERKOWER:  Court's brief indulgence.

2      (Government conferring.)

3    BY MS. BERKOWER:

4    Q.   Now, Mr. Fracker, in the days after January 6, did you

5    make social media posts?

6    A.   I did.

7    Q.   And you said that you were feeling good when you left the

8    Capitol.  Is that right?

9    A.   Mm-hmm.

10   Q.   Were you still feeling good in the days after?

11   A.   For a few days after.

12   Q.   And were you proud of what you had done?

13   A.   Yes.

14   Q.   Can you explain why you were proud?

15   A.   I guess maybe I had felt like I took a step in making a

16   difference in the election results.

17   Q.   And when you were posting on social media in those days

18   after, did your posts reflect how you were feeling at that

19   time?

20   A.   I believe so.

21   Q.   If we could have for the Court, counsel, and witness

22   only, Government's Exhibit 101B.

23          MS. BERKOWER:  And Your Honor, I do see the time and we

24   do have a few more exhibits.

25          THE COURT:  How much longer do you think you need?

1              MS. BERKOWER:  I think about five to 10 more minutes.

2              THE COURT:  Five to 10 more minutes, ladies and

3     gentlemen?

4        Press on.

5     BY MS. BERKOWER:

6     Q.    Do you see this exhibit, Mr. Fracker?

7     A.    I do.

8     Q.    Do you know this to be from your Facebook account?

9     A.    Yes.

10    Q.    And Ms. Dunn-Gordon, if you could please blow up the

11    message at the top -- or I'm sorry.  Before you -- well, you

12    can do that, but, Your Honor, I would ask to admit this

13    exhibit.

14             MS. WAGNER:  No objection.

15             THE COURT:  So moved.

16                              (Government Exhibit No. 101B

17                               received into evidence.)

18             MS. BERKOWER:  And could we publish it, and

19    Ms. Dunn-Gordon, if you could please blow up that top message.

20    BY MS. BERKOWER:

21    Q.    Mr. Fracker, could you read this post?  Actually, first

22    tell us what day did you post this?

23    A.    It was the 6th of January.

24    Q.    Was this after you had left the Capitol?

25    A.    Yes.

1    Q.   Could you read this post?

2    A.   "Sorry bud, but from my POV" -- which is point of view --

3    "there was lots of white dudes getting fucked up, LOL, black

4    dudes too.  Hell, even Asian and Hispanic dudes, not to

5    mention all the ladies that got face fulls of CS that we gave

6    water to and got them the fuck out of the clouds.  You put

7    almost if not more than a million of us against the 25 cops

8    that were up there, things are going to get spicy."

9    Q.   Now, Mr. Fracker, do you remember specifically posting

10   that, or writing that?

11   A.   Vaguely.

12   Q.   But did that express how you were feeling after you left

13   the Capitol that day?

14   A.   Yes.

15   Q.   And if we could have for the Court, counsel, and witness

16   only, Government's Exhibit 101A.

17        Mr. Fracker -- oh, this is admitted.  Sorry.  We can

18   publish this.  Ms. Dunn-Gordon, can you blow up the comment

19   underneath the photograph?

20        Mr. Fracker, is this one of the photos that you took

21   inside the Capitol?

22   A.   Yes.

23   Q.   Could you read the message that you posted on January 7?

24   A.   "Don't share these.  Just thought you should know there's

25   hitters out here trying to make a fucking difference at any

1    cost."

2    Q.   And do you remember making this post?

3    A.   Not really.

4    Q.   Does this express how you were feeling in the time after

5    you left the Capitol?

6    A.   During that time, yes.

7    Q.   And if we could go to Government's Exhibit 101E, which is

8    not in evidence yet.

9         Mr. Fracker, do you know this to be from your Facebook

10   account?

11   A.   Yes.

12        MS. BERKOWER:   I would ask to admit Government's

13   Exhibit 101E.

14        MS. WAGNER:   No objection.

15        THE COURT:   So moved.

16                              (Government Exhibit No. 101E

17                               received into evidence.)

18   BY MS. BERKOWER:

19   Q.   Mr. Fracker, is this a message in which you wrote, "LOL

20   to anyone who's possibly concerned about the picture of me

21   going around.  Sorry I hate freedom?  Sorry I fought hard for

22   it and lost friends for it?  Not like I did anything illegal.

23   Way too much to lose to go there, but y'all do what you feel

24   you need to do LOL.  And a foot note: I can protest for what I

25   believe in and still support your protest for what you believe

1    in.  Just saying.  After all I fought for your right to do

2    it."  Did I read that correctly?

3    A.   Yes.

4    Q.   And do you remember posting that?

5    A.   I do.

6    Q.   Did that reflect how you were feeling in the days after

7    January 6?

8    A.   Yes.

9    Q.   And in that post you said, "Not like I did anything

10   illegal."  Is that right?

11   A.   Yes.

12   Q.   When you wrote that, did you know you had in fact done

13   something illegal?

14   A.   Yeah.

15   Q.   Why did you write that?

16   A.   I guess maybe to -- I don't know -- have some kind of

17   false sense of security.

18   Q.   About what was going to happen to you?

19   A.   Mm-hmm.

20   Q.   Mr. Fracker, those posts, did you make other posts like

21   those posts in the time after -- immediately after January 6?

22   A.   Probably.  I don't remember any specific one.

23   Q.   Did they reflect how you were feeling then?

24   A.   I don't know.  I don't remember any specific posts

25   from --

1    Q.   Other than the ones you just looked at?

2    A.   Right.

3    Q.   Do you still feel the way about -- the way that you

4    expressed in these posts what happened on January 6, do you

5    still feel that way here today?

6    A.   I do not.

7    Q.   Can you explain how you feel sitting here today?

8    A.   I feel weird.  The person in those videos and the photos

9    and that day -- at the time it was all fun and games.  Here

10   lately I've had it actually presented to me and shown to me

11   for what it is.  And that's not the person I am.  That's not

12   how I act.  Like, I don't do those things.  I don't behave

13   like that.  I wasn't raised like that.  Like, I know for a

14   fact my mom would slap me in the face if she had saw what I

15   was doing that day.  And so I sit here today just ashamed of

16   my actions.  I didn't have to do all that stuff, but I did.

17        MS. BERKOWER:  Thank you, Mr. Fracker.  Nothing

18   further.

19        THE COURT:  All right.  Ladies and gentlemen, we are

20   concluded for the day.  You can leave your notebooks on your

21   chair.  Have a good evening.  We'll see you back at nine

22   o'clock tomorrow morning.  You guys know the drill.  No

23   discussions about the case, no research about the case.

24   Have a great evening.

25        (Jury out at 5:05 p.m.)

 1          THE COURT:  Okay.  Mr. Fracker, you're excused for the

 2   evening.  We'll see you back here at nine in the morning.

 3   Please don't discuss your testimony overnight apart from just

 4   the logistics of where to go and when to show up.  We'll see

 5   you in the morning.

 6       (Witness steps down.)

 7          THE COURT:  All right.  We seem to be pretty much on

 8   schedule, Ms. Berkower?  What do we have tomorrow after we

 9   conclude Mr. Fracker?

10          MS. BERKOWER:  Yes, Your Honor.  We have one more --

11   Your Honor, we have one more MPD officer and then our case

12   agent.  So we are, we believe, on schedule.

13          THE COURT:  Okay.  Hold on.  Mr. Wilhoit?

14          MS. BERKOWER:  Correct.

15          THE COURT:  And then Ms. Camiliere?

16          MS. BERKOWER:  Correct.

17          THE COURT:  So no Ms. Craighead?

18          MS. BERKOWER:  Correct.

19          THE COURT:  And Kellerman, Lovern?

20          MS. BERKOWER:  Correct, Your Honor.  I think some of

21   the other witnesses on there are for a potential government

22   rebuttal case.  So the only remaining witnesses for the

23   case-in-chief are Officer Wilhoit and Special Agent Camiliere.

24          THE COURT:  Okay.  How long do you think -- when will

25   you wrap up, do you think?

1          MS. BERKOWER:  Your Honor, depending on the

2     cross-examination of Mr. Fracker, I think reasonable to think

3     by lunchtime tomorrow.

4          THE COURT:  And Mr. Rollins, I won't hold you to it,

5     but how long do you think you'll have with Mr. Fracker?

6          MR. ROLLINS:  Estimating between half an hour and 45

7     minutes.

8          THE COURT:  And are you planning to put on a case?

9          MR. ROLLINS:  We are.  Three character witnesses,

10    probably no more than --

11         THE COURT:  I'm sorry?

12         MR. ROLLINS:  It will be three character witnesses, no

13    more than probably a half an hour.  And we have one witness

14    that is still somewhat up in the air.  We spoke with the

15    public defender today and he hasn't given me an answer yet but

16    said to call him this evening.

17         THE COURT:  Okay.  So the character witnesses are

18    Bobbouine, Lavado and Deacon?

19         MR. ROLLINS:  That's correct.

20         THE COURT:  And Arentz is still a question mark?

21         MR. ROLLINS:  That's correct.

22         THE COURT:  And the defendant is planning not to

23    testify?

24         MR. ROLLINS:  He may testify, and that would probably

25    go about an hour, or a little bit over an hour.

1          THE COURT:  Okay.  And would you like me to inquire

2     either way?

3          MR. ROLLINS:  Yes.

4          THE COURT:  All right.  So it sounds like we can do our

5     charge conference tomorrow afternoon at some point depending

6     on whether there's a rebuttal case.

7          MS. BERKOWER:  Your Honor, we do expect there will be a

8     rebuttal case, especially if there's testimony from certain

9     witnesses.

10         THE COURT:  Yeah.  Okay.  Well, let's tentatively plan

11    to try to do the charge conference after the conclusion of the

12    evidence tomorrow.  And then that way we may be able to

13    instruct and do closings on Friday.  Otherwise, we have the

14    jury come in a little later on Friday morning and do our

15    charge conference, prepare the instructions Friday morning,

16    and then instruct and close on Friday.  Okay?

17        All right.  Anything else?  All right.  See you in the

18    morning.  Have a good night.

19         (Proceedings adjourned at 5:10 p.m.)

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

## /

**/s** [1] - 760:9

## 1

**1** [6] - 646:16, 716:4, 732:1, 732:8, 736:22, 738:14
**10** [4] - 701:15, 745:21, 752:1, 752:2
**1002** [1] - 640:20
**100A** [3] - 628:13, 689:15, 690:1
**100F** [1] - 722:21
**101A** [6] - 628:15, 734:16, 734:24, 735:1, 735:2, 753:16
**101B** [3] - 628:16, 751:22, 752:16
**101C** [2] - 709:25, 716:3
**101E** [4] - 628:16, 754:7, 754:13, 754:16
**101F** [4] - 628:14, 722:22, 723:9, 723:12
**101G** [3] - 628:14, 726:15, 727:2
**103** [3] - 628:15, 732:22, 733:11
**11** [1] - 716:2
**12** [1] - 739:4
**12:00** [1] - 641:20
**12:30** [2] - 641:21, 666:18
**12:56** [1] - 648:1
**13** [1] - 746:7
**15** [5] - 642:10, 645:17, 651:4, 701:15, 739:4
**15-minute** [1] - 674:13
**17** [2] - 647:18, 684:18
**18** [1] - 684:18
**1:00** [1] - 641:22
**1:04** [2] - 712:25, 713:2
**1:05** [1] - 649:25
**1:12** [1] - 713:16
**1:14** [1] - 660:4
**1:15** [2] - 641:25, 662:2
**1:16** [2] - 712:2, 716:4
**1:17** [1] - 648:17
**1:28** [1] - 732:1
**1:39:45** [1] - 652:13
**1:40** [1] - 627:7

**1:43:15** [1] - 652:15
**1:46** [1] - 631:13
**1:55** [1] - 716:21

## 2

**2** [1] - 647:6
**20** [2] - 640:10, 711:7
**20001** [1] - 627:22
**20004** [1] - 627:19
**200B** [1] - 707:22
**200C** [1] - 707:25
**2015** [1] - 682:25
**2017** [1] - 682:10
**2019** [2] - 629:6, 629:13
**201C** [1] - 704:20
**202** [3] - 627:16, 627:20, 627:23
**2020** [5] - 641:17, 641:18, 688:16, 689:7, 690:10
**2021** [9] - 638:18, 641:12, 641:19, 642:16, 642:21, 660:4, 661:11, 665:12, 673:25
**2022** [1] - 627:6
**202C** [1] - 634:24
**20530** [1] - 627:16
**21-0034** [1] - 627:4
**22** [1] - 729:23
**24** [2] - 729:21, 731:3
**25** [3] - 731:22, 732:13, 753:7
**252-7566** [1] - 627:16
**26** [2] - 731:24, 737:13
**28** [2] - 732:8, 732:13
**2:00** [4] - 729:21, 731:3, 731:22, 732:13
**2:05** [1] - 648:23
**2:10** [1] - 719:17
**2:11** [1] - 716:2
**2:12** [1] - 642:3
**2:13** [2] - 660:11, 660:13
**2:14:13** [1] - 657:4
**2:15** [1] - 642:8
**2:16** [1] - 658:15
**2:16:50** [1] - 725:2
**2:17** [1] - 658:15
**2:24** [1] - 724:11
**2:25** [1] - 737:10
**2:30** [1] - 672:10
**2:34:01** [1] - 737:9
**2:44** [1] - 722:11
**2:45** [1] - 649:20
**2:5** [1] - 676:6

**2:51** [1] - 674:16

## 3

**3** [4] - 641:18, 645:17, 651:4, 690:14
**30** [1] - 648:10
**30,000** [1] - 750:19
**309** [4] - 628:13, 680:3, 680:15, 680:18
**310** [4] - 628:12, 679:2, 679:14, 679:17
**333** [1] - 627:22
**34** [2] - 729:21, 731:3
**354-3186** [1] - 627:23
**3:00** [1] - 674:15
**3:06** [1] - 650:11
**3:12** [1] - 676:6
**3:43** [1] - 650:24
**3:44** [1] - 642:16
**3:45** [2] - 659:16, 662:12

## 4

**4** [3] - 690:12, 690:14, 729:23
**402** [2] - 719:16, 724:9
**403A** [1] - 738:13
**406** [2] - 731:25, 735:17
**407** [1] - 729:22
**407A** [1] - 728:8
**408** [2] - 736:22, 736:23
**409** [1] - 712:11
**411** [1] - 714:2
**419** [1] - 627:19
**45** [2] - 648:11, 758:6
**455-5610** [1] - 627:20
**4704-A** [1] - 627:21
**49** [2] - 711:5, 711:15
**4:50** [1] - 724:13

## 5

**50** [1] - 712:11
**501.15** [1] - 645:15
**501.5** [3] - 628:12, 638:5, 638:10
**505** [4] - 638:4, 645:25, 651:15
**505-507** [1] - 638:11
**505-507.....................**
  [1] - 628:12
**506** [2] - 638:4, 652:12

**506..** [1] - 645:25
**507** [5] - 638:4, 643:23, 647:5, 656:12, 660:10
**55** [1] - 712:15
**555** [1] - 627:15
**5:05** [1] - 756:25
**5:10** [1] - 759:19
**5:15** [1] - 656:11
**5:22** [1] - 656:11
**5:26** [2] - 730:23, 731:4
**5:44** [1] - 657:1

## 6

**6** [38] - 627:6, 638:18, 641:12, 641:19, 642:21, 644:4, 644:15, 644:16, 646:14, 646:18, 647:15, 647:23, 658:16, 660:4, 661:11, 665:13, 667:17, 667:23, 672:15, 672:25, 673:25, 676:24, 677:10, 677:25, 678:14, 678:24, 680:24, 685:3, 691:9, 692:16, 695:4, 733:2, 734:21, 745:13, 751:4, 755:7, 755:21, 756:4
**601A** [1] - 667:7
**603** [2] - 701:24, 708:17
**609** [1] - 694:25
**612** [1] - 694:16
**632** [1] - 628:3
**636** [1] - 628:4
**638** [2] - 628:5, 628:12
**659** [1] - 628:5
**661** [1] - 628:6
**663** [1] - 628:7
**673** [1] - 628:7
**676** [1] - 628:8
**679** [1] - 628:12
**680** [2] - 628:13
**690** [1] - 628:13
**6:22** [1] - 658:2
**6:45** [1] - 658:8
**6th** [2] - 678:21, 752:23

## 7

**7** [2] - 642:16, 753:23
**723** [1] - 628:14
**727** [1] - 628:14
**733** [1] - 628:15
**735** [1] - 628:15
**752** [1] - 628:16
**754** [1] - 628:16
**7:15** [1] - 735:18
**7:34** [1] - 736:5
**7th** [1] - 690:10

## 8

**8** [1] - 629:13
**8:06** [1] - 642:14

## 9

**9** [1] - 710:16
**9:02** [1] - 642:15

## A

**a.m** [1] - 642:16
**ability** [1] - 635:19
**able** [6] - 629:5, 629:9, 636:17, 636:20, 700:25, 759:12
**above-entitled** [1] - 760:5
**absence** [3] - 642:6, 642:11, 654:7
**absolutely** [3] - 636:19, 681:19, 685:10
**academy** [2] - 686:8, 686:10
**Academy** [1] - 686:11
**accept** [1] - 750:14
**accommodate** [1] - 674:14
**accompany** [1] - 667:16
**accomplished** [2] - 743:25, 744:3
**according** [2] - 644:7, 651:3
**account** [3] - 734:19, 752:8, 754:10
**accurate** [2] - 733:4, 733:6
**acknowledged** [1] - 671:7
**acquire** [1] - 669:20
**act** [2] - 705:18,

756:12

**acting** [1] - 632:23
**action** [8] - 629:8,
630:25, 669:19,
672:21, 672:24,
673:5, 673:7, 673:12
**actions** [1] - 756:16
**active** [3] - 653:25,
682:24, 685:13
**activities** [1] - 646:18
**actual** [1] - 660:11
**addition** [1] - 707:10
**additional** [2] - 673:9,
695:22
**adjourned** [3] - 660:6,
662:5, 759:19
**adjustments** [1] -
659:13
**administering** [1] -
645:2
**administration** [1] -
645:6
**administrative** [3] -
638:24, 639:4, 644:2
**admission** [2] -
689:21, 734:23
**admit** [8] - 638:7,
679:13, 680:14,
723:8, 726:23,
733:8, 752:12,
754:12
**admitted** [12] - 641:2,
643:22, 645:21,
645:22, 651:14,
667:6, 704:14,
704:19, 709:21,
709:23, 735:1,
753:17
**adrenaline** [3] -
720:24, 720:25,
743:21
**adult** [1] - 690:16
**advance** [1] - 659:6
**adverse** [1] - 629:8
**advise** [1] - 653:11
**advised** [3] - 639:8,
639:10, 669:10
**affects** [1] - 672:22
**Afghanistan** [1] -
685:16
**afraid** [1] - 634:4
**AFTERNOON** [1] -
627:8
**afternoon** [12] - 632:3,
632:4, 636:5, 636:6,
659:25, 660:1,
663:19, 673:22,
674:12, 674:19,
676:13, 759:5
**age** [1] - 684:17

**agency** [1] - 663:22
**Agent** [1] - 757:23
**agent** [1] - 757:12
**agents** [4] - 664:15,
664:17, 664:18,
664:20
**aggressive** [1] -
632:14
**aggressively** [2] -
632:24, 635:8
**ago** [5] - 640:15,
654:2, 706:5, 707:5
**agree** [2] - 641:10,
691:21
**agreed** [4] - 679:20,
680:23, 681:1,
750:25
**agreement** [1] -
640:25, 678:23,
680:6, 680:22,
681:1, 681:5
**ahead** [4] - 700:24,
717:21, 721:17,
746:7
**aided** [1] - 627:25
**air** [3] - 702:13,
702:23, 758:14
**aisle** [4] - 649:7,
649:9, 675:17
**aisles** [1] - 649:8
**alarm** [4] - 720:14,
720:18, 723:18,
723:21
**alarmed** [3] - 634:9,
655:10
**alarms** [1] - 741:6
**alive** [1] - 734:3
**allegation** [2] -
629:19, 631:7
**allegations** [2] -
629:7, 630:2
**allowed** [1] - 659:4
**almost** [3] - 633:14,
634:4, 753:7
**Aloi** [1] - 640:24
**ALOI** [16] - 627:14,
629:11, 638:3,
638:14, 641:4,
645:25, 646:1,
646:6, 647:12,
659:22, 661:15,
662:15, 663:15,
663:18, 673:19,
674:4
**Aloi's** [1] - 630:19
**Amendment** [1] -
674:23
**AMERICA** [1] - 627:3
**America** [1] - 641:7
**ammo** [2] - 748:19,

748:20
**amount** [5] - 635:10,
635:11, 691:4,
691:5, 742:11
**angle** [1] - 715:4
**angry** [2] - 698:16,
704:2
**answer** [6] - 683:23,
689:2, 708:3,
743:13, 748:10,
758:15
**apart** [2] - 704:9,
757:3
**appear** [1] - 667:3
**APPEARANCES** [1] -
627:13
**appeared** [2] - 637:18,
700:14
**appreciate** [1] -
663:13
**approached** [2] -
656:20, 702:3
**approaching** [2] -
703:9, 703:20
**April** [1] - 627:6
**area** [37] - 633:3,
637:11, 672:12,
693:5, 696:9,
696:24, 697:9,
698:25, 699:6,
699:14, 701:10,
702:5, 703:8,
703:21, 703:24,
708:7, 708:19,
708:21, 709:14,
712:14, 716:25,
718:6, 719:12,
725:5, 725:8,
729:10, 729:25,
731:6, 736:15,
738:14, 739:1,
739:6, 739:8,
740:22, 742:10,
742:13, 743:6
**Arentz** [1] - 758:20
**arising** [2] - 678:17,
680:24
**armed** [2] - 656:6,
656:7, 656:8
**arms** [8] - 632:6,
634:15, 665:5,
700:19, 705:14,
705:15, 706:6, 707:6
**Army** [2] - 682:25,
683:5
**arrest** [3] - 746:11,
746:13, 747:14
**arrested** [2] - 750:5,
750:6
**arrival** [4] - 667:19,

667:21, 667:22,
668:4
**arrive** [1] - 666:16
**arrived** [5] - 666:20,
668:1, 668:3, 668:5,
669:16
**arrow** [23] - 704:25,
712:21, 713:7,
714:8, 714:10,
714:13, 714:23,
714:25, 715:13,
715:15, 715:19,
715:21, 720:5,
728:18, 728:21,
728:23, 729:10,
729:11, 738:17,
738:21, 738:23,
740:7, 740:15
**arrow's** [1] - 715:6
**arrows** [3] - 714:21,
715:11, 715:17
**ascending** [1] -
711:18
**ashamed** [1] - 756:15
**Asia** [1] - 685:17
**Asian** [1] - 753:4
**ASPs** [1] - 706:9
**assemble** [2] - 668:22,
668:24
**assessment** [1] -
671:22
**assigned** [1] - 664:22
**assist** [2] - 653:12,
700:25
**assistance** [2] -
693:12, 701:3
**assisted** [1] - 639:9
**assume** [3] - 687:3,
708:4, 715:1, 715:2,
723:4
**assuming** [3] -
700:23, 708:2,
708:25
**attacking** [1] - 696:23
**attempted** [1] - 700:11
**attention** [2] - 661:22,
687:18, 697:20,
697:23
**attorney** [2] - 641:7,
680:12
**Attorney** [1] - 641:8
**Attorney's** [1] - 627:15
**attorneys** [1] - 641:9
**AUSA** [2] - 627:14,
627:14
**authenticity** [1] -
689:20
**Avenue** [1] - 627:22
**avoid** [1] - 750:24
**aware** [4] - 653:2,

665:11, 665:12
**awareness** [4] - 634:3,
687:4, 687:17, 688:4

**B**

**background** [2] -
640:18, 682:17
**backpack** [8] - 694:8,
695:24, 696:1,
705:10, 708:5,
710:8, 713:12,
724:24
**bad** [1] - 723:21
**badge** [3] - 696:8,
696:11, 697:1
**badges** [1] - 696:15
**bag** [1] - 634:16
**bags** [2] - 693:23,
695:7
**balcony** [1] - 668:15
**ballot** [2] - 649:15,
690:13
**ballots** [6] - 645:2,
645:3, 649:14,
650:7, 658:24,
662:12
**bangs** [1] - 699:18
**barricade** [1] - 704:10
**barricade's** [1] -
716:17
**barricades** [2] - 718:3,
741:3
**barrier** [1] - 636:14
**base** [5] - 685:18,
703:21, 703:25,
708:7, 708:9
**based** [11] - 636:23,
642:23, 658:4,
667:3, 667:8, 688:3,
688:23, 689:6,
701:9, 702:17,
717:16
**basement** [4] -
669:20, 670:12,
670:13, 670:14
**basic** [1] - 630:1
**bat** [2] - 675:19,
675:21
**baton** [2] - 686:21,
705:17
**batons** [4] - 706:8,
707:10, 707:11,
707:18
**became** [1] - 686:7
**become** [7] - 642:5,
642:11, 653:2,
684:3, 684:6,
685:19, 690:17

**BEFORE** [1] - 627:10
**began** [3] - 641:19, 641:20, 658:6
**begin** [4] - 641:23, 662:25, 668:24, 693:9
**beginning** [6] - 645:23, 646:21, 647:17, 649:18, 710:2, 727:5
**begun** [1] - 646:22
**behalf** [1] - 674:21
**behave** [1] - 756:12
**behind** [11] - 671:14, 675:12, 695:14, 696:13, 697:1, 700:23, 711:12, 711:13, 727:11, 744:24
**beliefs** [1] - 688:12
**Bench** [2] - 629:3, 662:23
**bench** [3] - 631:11, 663:14, 675:20
**benches** [1] - 652:4
**Berkower** [2] - 676:8, 757:8
**BERKOWER** [49] - 627:14, 629:17, 630:13, 636:4, 637:20, 676:9, 676:12, 679:13, 679:19, 680:14, 680:20, 680:21, 689:2, 689:5, 689:19, 690:3, 690:5, 693:21, 709:23, 710:1, 723:8, 723:14, 723:17, 726:23, 727:4, 733:8, 733:13, 733:14, 734:23, 735:4, 735:6, 748:9, 751:1, 751:3, 751:23, 752:1, 752:5, 752:18, 752:20, 754:12, 754:18, 756:17, 757:10, 757:14, 757:16, 757:18, 757:20, 758:1, 759:7
**Bernard** [1] - 674:21
**best** [3] - 636:13, 659:2, 660:3
**better** [1] - 686:6
**between** [7] - 640:21, 658:20, 661:17, 684:17, 700:11, 730:1, 758:6

**big** [4] - 691:22, 698:7, 716:25, 721:9
**bigger** [2] - 715:3, 715:5
**bike** [2] - 671:3, 704:9
**bit** [8] - 640:18, 640:19, 642:19, 643:5, 659:3, 719:12, 742:11, 758:25
**biweekly** [1] - 750:21
**black** [1] - 753:3
**block** [1] - 636:21
**blocking** [3] - 705:18, 706:20, 739:24
**blow** [4] - 690:6, 752:10, 752:19, 753:18
**blue** [1] - 630:18
**Bobbouine** [1] - 758:18
**body** [4] - 630:21, 633:2, 668:24, 687:22
**body-worn** [1] - 630:21
**book** [1] - 634:16
**booking** [1] - 749:6
**boss's** [1] - 648:1
**bother** [3] - 688:24, 689:7, 689:9
**bottom** [7] - 633:5, 633:8, 633:9, 635:11, 708:21, 709:16, 722:9
**box** [4] - 690:12, 690:13
**boxes** [6] - 649:15, 649:16, 658:17, 658:19, 658:22, 690:12
**branch** [3] - 640:1, 663:24, 682:23
**breach** [1] - 653:3
**breached** [2] - 653:8, 709:6
**breaching** [1] - 671:3
**break** [6] - 653:18, 663:12, 674:10, 674:11, 674:13, 675:25
**brief** [3] - 669:24, 709:20, 751:1
**briefed** [2] - 654:22, 669:19
**briefing** [2] - 670:4, 670:9
**briefly** [1] - 661:16
**bring** [5] - 631:12, 673:9, 693:24,

694:9, 705:20
**bringing** [1] - 653:16
**broken** [3] - 671:22, 720:10, 741:4
**brought** [2] - 694:11, 694:13
**Bryan** [2] - 760:9, 760:9
**BRYAN** [2] - 627:21, 760:3
**bud** [1] - 753:2
**buddies** [2] - 733:22, 733:23
**building** [38] - 641:24, 643:14, 643:21, 644:18, 653:3, 653:9, 667:10, 668:2, 668:8, 669:14, 671:24, 677:16, 678:21, 698:10, 698:11, 698:25, 699:6, 701:22, 703:10, 716:9, 718:15, 719:4, 720:20, 721:8, 721:16, 721:23, 723:23, 738:15, 739:16, 740:22, 740:25, 741:4, 741:19, 741:25, 743:8, 743:15, 743:18, 743:20
**bulges** [1] - 687:22
**bunch** [1] - 700:4
**busted** [1] - 741:10
**busted-out** [1] - 741:10
**button** [1] - 704:16
**BY** [27] - 632:2, 636:4, 638:14, 641:4, 646:1, 646:6, 647:12, 659:24, 661:15, 663:18, 673:21, 676:12, 679:19, 680:21, 689:5, 690:5, 693:21, 710:1, 723:17, 727:4, 733:14, 735:6, 748:9, 751:3, 752:5, 752:20, 754:18

**C**

**cafeteria** [1] - 631:16
**camera** [6] - 630:22, 714:5, 714:19, 727:14, 729:22, 730:25

**Camiliere** [2] - 757:15, 757:23
**CAMILLE** [1] - 627:18
**cams** [2] - 630:11, 630:18
**cannot** [1] - 690:14
**Capitol** [66] - 641:13, 641:16, 641:24, 642:21, 643:13, 644:18, 653:3, 654:20, 654:24, 655:18, 655:24, 656:1, 656:3, 656:7, 656:8, 657:7, 661:2, 661:4, 665:4, 665:6, 665:8, 665:13, 666:2, 666:12, 666:14, 666:17, 666:23, 667:4, 667:12, 667:14, 667:17, 667:21, 667:22, 667:25, 668:1, 668:8, 669:14, 670:2, 670:14, 671:17, 671:18, 671:23, 673:2, 673:10, 677:16, 678:15, 678:21, 698:10, 698:11, 698:21, 698:22, 698:25, 699:5, 701:21, 701:25, 702:4, 703:9, 712:8, 733:2, 744:11, 745:3, 751:8, 752:24, 753:13, 753:21, 754:5
**captured** [1] - 715:24
**car** [14] - 693:12, 693:14, 693:22, 694:18, 694:19, 694:22, 695:2, 695:8, 695:12, 696:13, 697:3, 705:21, 744:15, 744:17
**cardinal** [1] - 686:11
**career** [1] - 639:22
**carriage** [1] - 668:4
**carry** [1] - 707:17
**carrying** [5] - 649:11, 649:13, 649:14, 649:15, 716:11
**cartridge** [1] - 690:13
**case** [16] - 630:9, 634:11, 641:2, 662:18, 674:7, 681:2, 681:7, 693:15, 756:23,

757:11, 757:22, 757:23, 758:8, 759:6, 759:8
**case-in-chief** [1] - 757:23
**casual** [1] - 691:14
**catch** [1] - 697:20
**caught** [2] - 697:23, 748:4
**CCTV** [3] - 712:7, 723:6, 725:1
**cell** [3] - 677:24, 724:6, 747:18
**center** [2] - 707:23, 708:1
**Ceremonial** [2] - 668:6, 671:13
**ceremonial** [3] - 649:15, 668:11, 672:4
**certain** [5] - 640:25, 653:10, 697:9, 697:25, 759:8
**CERTIFICATE** [1] - 760:2
**certificate** [3] - 650:17, 650:21, 651:5
**certificates** [8] - 645:3, 645:10, 645:12, 649:16, 650:8, 650:15, 658:17, 658:22
**certification** [7] - 641:11, 642:17, 646:13, 646:19, 652:7, 665:18, 668:25
**certify** [2] - 641:16, 760:3
**chair** [5] - 651:17, 653:17, 654:18, 654:24, 655:1, 756:21
**chamber** [62] - 639:2, 641:23, 642:4, 642:7, 642:10, 642:13, 643:13, 643:15, 643:16, 643:18, 646:19, 646:22, 647:16, 647:19, 647:25, 648:4, 648:6, 648:15, 649:22, 651:2, 651:8, 651:9, 651:16, 651:23, 652:1, 652:3, 652:4, 652:18, 653:5, 654:1, 655:2, 655:3, 655:5, 655:8,

655:16, 655:21,
656:9, 657:19,
658:13, 658:21,
659:4, 659:10,
659:12, 660:6,
660:16, 660:18,
660:20, 660:22,
661:2, 668:16,
668:19, 668:24,
669:3, 669:9,
669:12, 669:17,
670:10, 671:14,
672:12
**chambers** [8] -
641:16, 642:1,
646:25, 647:3,
648:12, 651:21,
658:20, 662:3
**Chan** [1] - 627:18
**change** [1] - 709:1
**changing** [1] - 707:17
**chant** [1] - 736:11
**chanting** [1] - 736:12
**chaotic** [1] - 724:2
**character** [3] - 758:9,
758:12, 758:17
**charge** [6] - 643:25,
645:6, 680:23,
759:5, 759:11,
759:15
**charged** [1] - 678:14
**Charlotte** [3] - 667:18,
668:13, 669:2
**chat** [2] - 642:19,
724:5
**check** [2] - 733:21,
750:21
**check-in** [1] - 733:21
**checking** [1] - 733:25
**chemicals** [2] -
702:17, 702:23
**chest** [1] - 632:7
**chicken** [1] - 631:17
**chief** [3] - 638:24,
640:4, 757:23
**childcare** [1] - 746:21
**CHRISTOPHER** [1] -
627:10
**circle** [11] - 648:20,
650:3, 652:22,
657:9, 657:23,
708:19, 720:5,
724:19, 730:11,
735:23, 737:3
**circles** [1] - 658:1
**circular** [8] - 725:15,
726:6, 726:20,
728:15, 728:19,
732:4, 735:25,
737:11

**civil** [2] - 745:5, 745:9
**clapping** [3] - 736:9,
736:10, 736:19
**clarify** [1] - 630:24
**class** [1] - 686:15
**clear** [16] - 630:14,
648:22, 658:1,
704:16, 707:22,
709:19, 712:24,
713:15, 720:7,
725:16, 736:3,
737:4, 737:7, 740:5,
741:25
**clearly** [1] - 729:5
**CLERK** [1] - 645:24
**clerks** [1] - 639:1
**client** [6] - 660:17,
660:23, 663:4,
663:6, 673:25, 675:5
**clients** [1] - 675:4
**climb** [1] - 708:10
**climbed** [3] - 708:11,
708:14
**clip** [5] - 656:19,
711:17, 712:4,
731:17, 737:17
**close** [8] - 684:3,
684:6, 684:7, 685:4,
711:13, 711:14,
735:10, 759:16
**closely** [1] - 643:24
**closer** [5] - 698:20,
698:22, 701:21,
716:9, 726:9
**closest** [1] - 703:10
**closings** [1] - 759:13
**clothing** [1] - 687:22
**clouds** [1] - 753:6
**Code** [1] - 645:18
**code** [1] - 646:7
**collapsible** [3] -
706:9, 707:10,
707:18
**colleague** [1] - 670:24
**colleagues** [2] -
666:19, 671:19
**collection** [1] - 645:2
**college** [5] - 641:11,
641:17, 642:17,
644:22, 645:20
**COLUMBIA** [1] - 627:1
**Columbia** [1] - 641:8
**combat** [4] - 633:22,
633:23, 682:20,
685:16
**comforted** [1] - 655:10
**coming** [8] - 653:14,
703:14, 711:9,
712:4, 712:7, 720:8,
723:21, 742:15

**commands** [1] -
637:13
**comment** [1] - 753:18
**commented** [1] -
650:16
**commit** [1] - 679:21
**Committee** [3] -
640:2, 640:3, 640:4
**common** [2] - 682:17,
682:19
**commotion** [2] -
655:21, 670:17
**communicated** [1] -
725:21
**communications** [1] -
630:15
**compare** [1] - 699:21
**compared** [2] - 701:2,
737:10
**comparison** [1] -
699:23
**compilation** [1] -
643:23
**completed** [1] -
642:17
**complex** [2] - 685:21,
685:23
**compliance** [1] -
639:8
**complies** [16] -
648:21, 650:4,
652:23, 657:10,
657:24, 661:9,
673:24, 712:23,
713:8, 720:6,
724:20, 730:12,
735:24, 737:5,
738:24, 739:19
**computer** [1] - 627:25
**computer-aided** [1] -
627:25
**concern** [1] - 696:20
**concerned** [2] -
696:17, 754:20
**concerning** [1] -
629:24
**concerns** [2] - 639:10,
688:21
**conclude** [2] - 659:15,
757:9
**concluded** [1] -
756:20
**conclusion** [1] -
759:11
**concurrence** [1] -
641:9
**condition** [1] - 659:12
**conference** [1] -
629:3, 631:11,
662:23, 663:14,

675:20, 759:5,
759:11, 759:15
**conferring** [4] -
647:11, 689:23,
709:22, 751:2
**confirm** [1] - 645:25
**confusion** [1] - 661:17
**Congress** [7] -
639:23, 640:6,
640:11, 641:13,
643:5, 643:6, 645:20
**Congress's** [2] -
642:15, 678:21
**congressmen** [1] -
649:9
**consider** [1] - 641:1
**considering** [1] -
687:24
**conspiracy** [2] -
679:21, 680:23
**conspiring** [1] -
678:20
**Constitution** [2] -
627:22, 644:7
**constitutional** [1] -
644:21
**consult** [5] - 663:5,
663:6, 675:2, 675:5,
675:19
**contact** [2] - 634:12,
722:15
**contacting** [1] -
630:19
**contacts** [1] - 702:13
**contain** [1] - 649:16
**containing** [1] -
658:17
**context** [1] - 630:24
**contingency** [1] -
672:21
**continue** [4] - 647:2,
658:2, 662:12, 711:5
**continued** [1] - 642:16
**continuing** [1] - 731:9
**continuity** [1] - 639:11
**contracts** [1] - 639:12
**control** [3] - 686:15,
686:18, 707:20
**controlled** [1] - 666:10
**convene** [1] - 659:12
**convened** [1] - 641:13
**convenient** [1] - 631:9
**convening** [1] -
647:16
**conversation** [4] -
739:11, 745:1,
746:17, 750:25
**COOPER** [1] - 627:10
**cooperate** [1] - 681:2
**cooperating** [1] -

681:13
**coordinate** [4] - 665:8,
666:2, 667:14, 672:7
**coordinating** [1] -
669:6
**coordination** [2] -
645:7, 673:2
**cop** [1] - 700:17
**cops** [4] - 696:22,
700:18, 742:15,
753:7
**copy** [2] - 645:17,
733:6
**corner** [4] - 711:24,
712:14, 712:20,
722:9
**Corps** [1] - 682:24
**correct** [38] - 632:9,
632:11, 632:14,
632:17, 632:18,
633:12, 633:13,
633:16, 633:20,
633:23, 633:24,
634:1, 634:5, 634:6,
634:9, 634:10,
634:21, 635:2,
635:17, 635:19,
635:20, 635:23,
635:25, 648:7,
660:5, 660:13,
674:24, 674:25,
703:19, 731:14,
757:14, 757:16,
757:18, 757:20,
758:19, 758:21,
760:4
**Correct** [4] - 632:12,
632:15, 632:22,
632:25
**correctly** [1] - 755:2
**cost** [1] - 754:1
**counsel** [19] - 638:21,
639:6, 640:2, 640:4,
662:22, 663:2,
674:9, 674:18,
679:1, 680:2,
689:14, 709:20,
722:22, 723:1,
726:16, 732:23,
734:15, 751:21,
753:15
**count** [2] - 641:17,
644:22
**counted** [1] - 645:20
**counterinsurgency**
[1] - 690:17
**counterpart** [1] -
670:3
**counting** [1] - 646:15
**couple** [3] - 685:7,

691:22, 702:9
**course** [3] - 646:18, 702:19, 742:19
**COURT** [66] - 627:1, 629:14, 629:16, 630:4, 630:12, 631:2, 631:14, 637:21, 638:1, 638:9, 640:23, 646:3, 662:16, 662:20, 662:22, 663:7, 663:11, 674:3, 674:5, 674:9, 674:17, 674:19, 674:22, 675:1, 675:6, 675:8, 675:10, 675:13, 675:16, 676:2, 676:5, 676:7, 679:16, 680:17, 689:1, 689:25, 690:4, 693:16, 693:20, 723:11, 727:1, 733:10, 735:1, 735:5, 748:8, 751:25, 752:2, 752:15, 754:15, 756:19, 757:1, 757:7, 757:13, 757:15, 757:17, 757:19, 757:24, 758:4, 758:8, 758:11, 758:17, 758:20, 758:22, 759:1, 759:4, 759:10
**court** [3] - 712:7, 750:6, 750:9
**Court** [15] - 627:21, 629:25, 631:3, 679:1, 680:2, 689:14, 709:20, 722:22, 723:1, 726:16, 732:22, 734:14, 751:21, 753:15, 760:3
**court's** [4] - 647:10, 689:22, 709:20, 751:1
**Courthouse** [1] - 627:21
**courtroom** [1] - 663:2
**courtyard** [1] - 709:14
**CR** [1] - 627:4
**Craighead** [1] - 757:17
**crane** [1] - 674:17
**CRANE** [9] - 674:21, 674:25, 675:3, 675:7, 675:9, 675:12, 675:15,

675:23, 676:3
**Crane** [1] - 674:21
**CRC** [1] - 627:4
**credibility** [3] - 629:14, 629:15, 630:1
**crime** [4] - 678:17, 679:21, 679:25, 681:10
**crimes** [2] - 678:15, 680:24
**Criminal** [1] - 686:11
**cross** [5] - 629:5, 629:9, 631:20, 661:24, 758:2
**CROSS** [3] - 632:1, 659:23, 673:20
**Cross** [3] - 628:3, 628:5, 628:7
**cross-examination** [3] - 631:20, 661:24, 758:2
**CROSS-EXAMINATION** [3] - 632:1, 659:23, 673:20
**Cross-Examination..**
**......................** [1] - 628:5
**Cross-Examination..**
**......................** [2] - 628:3, 628:7
**cross-examine** [1] - 629:5
**crossed** [1] - 718:3
**crowd** [28] - 669:18, 697:17, 698:7, 698:13, 698:15, 699:15, 699:21, 700:12, 700:16, 701:10, 703:6, 703:11, 704:1, 708:24, 711:18, 718:8, 726:9, 727:9, 727:12, 731:17, 735:25, 736:16, 736:17, 737:11, 739:6, 740:3, 740:12, 740:21
**CRR** [1] - 627:21
**CS** [1] - 753:5
**curator** [1] - 639:5

---

# D

**D.C** [11] - 627:6, 640:17, 677:11, 677:25, 691:9, 692:6, 692:17,

693:5, 695:4, 695:16, 696:9
**Dad** [1] - 684:11
**dais** [4] - 651:18, 651:19, 656:20
**damage** [1] - 659:12
**DANIEL** [2] - 628:5, 638:12
**Daniel** [2] - 638:3, 638:17
**date** [3] - 629:12, 629:13, 690:8
**daughter** [6] - 667:18, 686:2, 746:21, 746:23, 746:24, 747:2
**days** [9] - 683:25, 684:1, 691:10, 746:7, 751:4, 751:10, 751:11, 751:17, 755:6
**DC** [3] - 627:16, 627:19, 627:22
**Deacon** [1] - 758:18
**deafening** [2] - 732:18, 732:19
**deal** [3] - 689:9, 691:23, 746:3
**debate** [3] - 651:10, 652:6, 654:18
**debating** [1] - 654:14
**decide** [2] - 691:9, 691:11
**decided** [1] - 671:11
**decision** [4] - 671:1, 672:1, 685:25, 691:8
**declare** [1] - 644:23
**declared** [2] - 642:6, 642:11
**defendant** [3] - 641:8, 661:9, 758:22
**Defendant** [3] - 627:7, 627:17, 673:24
**defender** [1] - 758:15
**defense** [3] - 629:4, 638:6, 689:23
**defensive** [13] - 632:10, 632:17, 635:4, 635:6, 635:14, 635:21, 636:8, 636:12, 636:15, 636:17, 636:21, 707:8, 717:9
**defensively** [3] - 706:17, 706:19, 707:6
**definitely** [2] - 633:5, 633:9
**deliberation** [1] - 658:23

**delta** [2] - 683:22, 683:24
**demeanor** [2] - 687:21, 739:13
**department** [9] - 664:1, 683:8, 684:4, 684:25, 686:7, 706:8, 707:11, 707:16, 748:25
**Department** [3] - 664:2, 677:3, 677:8
**departments** [2] - 639:1, 639:9
**depended** [1] - 683:11
**deployed** [1] - 685:15
**deployment** [2] - 685:17, 685:18
**deployments** [1] - 685:16
**DEPUTY** [1] - 645:24
**describe** [2] - 698:24, 699:13, 723:25
**described** [9] - 632:6, 642:20, 646:14, 657:11, 678:24, 708:7, 711:8, 726:6, 728:14
**describing** [4] - 657:16, 657:18, 662:11, 727:8
**designated** [1] - 654:6
**desk** [1] - 676:22
**detail** [7] - 664:21, 664:22, 669:20, 669:25, 671:16, 671:25
**details** [2] - 667:15, 678:11
**difference** [3] - 684:17, 751:16, 753:25
**different** [9] - 643:21, 645:8, 655:3, 655:5, 676:24, 686:12, 700:4, 702:9, 714:19
**differently** [2] - 706:24, 707:1
**Direct** [3] - 628:5, 628:7, 628:8
**DIRECT** [3] - 638:13, 663:17, 676:11
**direct** [1] - 655:18
**directing** [1] - 655:25
**direction** [13] - 632:20, 635:1, 698:9, 699:24, 703:15, 703:21, 704:12, 710:23, 725:8, 725:19, 725:20, 726:3, 743:5

**directions** [1] - 655:23
**directly** [1] - 670:22
**director** [1] - 640:5
**disappear** [2] - 726:2, 748:11
**discuss** [9] - 630:17, 637:23, 662:17, 670:6, 671:18, 671:25, 674:6, 675:21, 757:3
**discussed** [3] - 671:20, 743:1, 745:11
**discussions** [1] - 756:23
**disenfranchised** [1] - 690:15
**disparate** [2] - 701:18, 701:19
**display** [1] - 632:6
**displayed** [1] - 634:22
**disruptions** [1] - 658:13
**District** [1] - 641:8
**DISTRICT** [3] - 627:1, 627:1, 627:11
**diving** [1] - 695:4
**Division** [1] - 664:16
**division** [2] - 665:2, 671:23
**document** [3] - 631:3, 679:3, 679:7
**documents** [4] - 630:8, 669:21, 670:12, 670:17
**dominant** [1] - 707:3
**Donald** [2] - 697:16
**done** [5] - 630:22, 697:21, 701:4, 751:12, 755:12
**door** [10] - 648:14, 648:16, 697:4, 719:22, 724:14, 725:6, 738:11, 739:20, 739:23, 739:25
**doors** [2] - 648:2, 655:7
**doorway** [3] - 719:11, 719:19, 719:20
**doubt** [3] - 660:9, 660:12, 660:14
**down** [21] - 630:21, 635:19, 638:2, 649:7, 649:9, 650:17, 650:18, 653:14, 656:20, 656:24, 657:19, 662:21, 670:16, 674:8, 691:7, 698:7,

702:5, 702:11,
716:17, 738:11,
757:6
**downtown** [1] -
695:15
**draw** [1] - 661:22
**drill** [1] - 756:22
**drills** [3] - 653:25,
654:25
**drive** [5] - 692:18,
692:19, 693:4,
695:15, 744:17
**drop** [1] - 746:24
**dropped** [1] - 747:2
**drove** [7] - 693:2,
695:10, 696:8,
721:2, 744:14,
744:19, 748:23
**dual** [1] - 664:4
**Duckett** [5] - 631:20,
631:21, 632:3,
632:5, 637:22
**DUCKETT** [1] - 628:3
**dudes** [3] - 753:3,
753:4
**Dunn** [23] - 645:14,
647:5, 647:13,
648:23, 650:11,
652:11, 656:11,
657:1, 658:8,
661:20, 679:8,
690:6, 712:10,
712:14, 712:25,
715:5, 716:21,
721:20, 722:23,
727:6, 752:10,
752:19, 753:18
**Dunn-Gordon** [23] -
645:14, 647:5,
647:13, 648:23,
650:11, 652:11,
656:11, 657:1,
658:8, 661:20,
679:8, 690:6,
712:10, 712:14,
712:25, 715:5,
716:21, 721:20,
722:23, 727:6,
752:10, 752:19,
753:18
**during** [13] - 641:13,
655:20, 657:16,
657:18, 665:25,
674:22, 681:5,
736:18, 745:13,
745:22, 747:18,
750:9, 754:6
**duty** [2] - 682:24,
685:13

# E

**ear** [1] - 676:5
**early** [1] - 674:12
**eat** [2] - 693:17,
693:18
**effect** [2] - 654:3,
701:4
**effective** [1] - 690:18
**efforts** [1] - 701:6
**eight** [1] - 659:2
**either** [8] - 635:11,
675:8, 675:9,
694:22, 697:4,
700:15, 741:24,
759:2
**elect** [1] - 644:1
**elected** [2] - 639:17,
641:14
**election** [14] - 641:18,
646:13, 665:18,
688:16, 688:20,
689:7, 690:24,
691:2, 697:25,
700:5, 721:12,
728:6, 744:7, 751:16
**electoral** [5] - 641:11,
641:17, 642:17,
644:22, 645:20
**electors** [1] - 645:13
**eleven** [1] - 640:7
**ELIZABETH** [1] -
627:14
**email** [2] - 630:24,
631:1
**emergency** [10] -
669:19, 670:4,
672:19, 672:20,
672:21, 672:24,
673:5, 673:7, 673:12
**empty** [1] - 663:9
**en** [1] - 670:24
**end** [10] - 640:14,
648:3, 662:18,
675:17, 691:19,
698:4, 718:12,
718:14, 718:16,
737:17
**End** [2] - 631:11,
663:14
**ended** [2] - 709:4,
719:4
**enforcement** [5] -
696:18, 701:7,
736:16, 747:17,
747:20
**engage** [1] - 633:23
**engaged** [2] - 633:22,
687:17

**ensuring** [1] - 658:19
**enter** [2] - 713:3,
731:9
**entered** [6] - 677:15,
719:11, 720:8,
739:8, 740:24, 742:1
**entering** [1] - 720:3
**enters** [2] - 631:22,
674:18
**entire** [4] - 731:18,
741:12, 741:15,
743:8
**entitled** [1] - 760:5
**entrance** [1] - 718:15
**entry** [1] - 719:9
**equivalent** [1] -
675:20
**escort** [1] - 672:3
**escorted** [4] - 656:1,
668:13, 668:23,
669:8
**escorting** [1] - 669:2
**especially** [1] - 759:8
**ESQ** [2] - 627:17,
627:18
**essentially** [1] -
635:24, 705:16,
748:4
**estimate** [1] - 745:19
**estimating** [1] - 758:6
**etc** [1] - 639:5
**Ethics** [3] - 640:2,
640:3, 640:4
**evacuate** [2] - 655:13,
655:15
**evacuated** [8] - 642:3,
642:7, 642:9,
642:13, 655:16,
655:17, 657:14,
658:21
**evacuation** [5] -
655:18, 655:20,
656:2, 656:9, 673:16
**evening** [5] - 672:15,
756:21, 756:24,
757:2, 758:16
**event** [6] - 663:6,
665:12, 665:17,
665:25, 670:6,
672:22
**events** [4] - 642:20,
678:18, 685:3,
742:20
**evidence** [28] -
638:11, 641:2,
679:18, 680:19,
690:2, 694:16,
695:1, 701:24,
704:15, 704:19,
707:21, 707:25,

708:17, 709:24,
712:11, 714:3,
723:13, 727:3,
728:9, 731:25,
733:12, 735:3,
736:23, 738:14,
752:17, 754:8,
754:17, 759:12
**exact** [4] - 653:14,
661:25, 717:7,
745:21
**exactly** [5] - 636:11,
644:18, 653:22,
697:15, 715:4
**examination** [3] -
631:20, 661:24,
758:2
**EXAMINATION** [8] -
632:1, 636:3,
638:13, 659:23,
661:14, 663:17,
673:20, 676:11
**Examination............**
**.......** [2] - 628:4,
628:6
**Examination............**
**.........** [4] - 628:5,
628:5, 628:7, 628:8
**Examination............**
**..........** [2] - 628:3,
628:7
**examine** [1] - 629:5
**exchanging** [1] -
740:4
**excited** [5] - 721:3,
721:5, 742:22,
743:21, 743:23
**excitement** [1] -
720:24
**excuse** [3] - 636:20,
718:15, 746:20
**excused** [4] - 637:23,
662:17, 674:6, 757:1
**executive** [2] - 640:1,
663:24
**exhibit** [8] - 645:16,
660:15, 689:20,
709:23, 723:3,
726:24, 752:6,
752:13
**Exhibit** [63] - 628:12,
628:12, 628:13,
628:13, 628:14,
628:14, 628:15,
628:15, 628:16,
628:16, 638:10,
640:20, 643:22,
645:14, 651:14,
651:15, 652:11,
656:12, 660:10,

667:7, 679:2,
679:14, 679:17,
680:3, 680:15,
680:18, 689:15,
690:1, 694:16,
694:25, 701:24,
704:20, 707:21,
707:25, 708:17,
709:24, 712:11,
714:2, 716:3,
719:16, 722:21,
723:9, 723:12,
724:9, 726:15,
727:2, 728:8,
729:22, 731:25,
732:22, 733:11,
734:16, 734:24,
735:2, 735:17,
736:22, 738:13,
751:22, 752:16,
753:16, 754:7,
754:13, 754:16
**exhibits** [3] - 638:4,
745:16, 751:24
**EXHIBITS** [1] - 628:11
**exist** [1] - 750:4
**existing** [1] - 749:17
**exit** [3] - 739:16,
740:20, 742:3
**exited** [2] - 672:12,
739:18
**exiting** [1] - 661:2
**exits** [1] - 687:23
**expand** [1] - 706:13
**expandable** [1] -
707:10
**expanded** [1] - 706:14
**expect** [6] - 638:4,
675:8, 675:9, 676:3,
687:1, 759:7
**expected** [1] - 653:10
**expediency** [1] - 638:6
**experience** [7] -
658:16, 683:1,
683:4, 684:19,
685:12, 685:19,
702:24
**experienced** [1] -
653:24
**explain** [9] - 679:20,
696:20, 697:22,
706:10, 709:4,
719:8, 733:15,
751:14, 756:7
**exposed** [2] - 702:12,
702:19
**express** [4] - 690:22,
690:25, 753:12,
754:4
**expressed** [2] - 691:3,

756:4
**extremities** [1] - 706:22
**eye** [2] - 663:11, 702:14

## F

**F-R-A-C-K-E-R** [1] - 676:16
**face** [7] - 705:3, 705:7, 706:3, 710:5, 713:9, 753:5, 756:14
**Facebook** [5] - 689:16, 724:3, 734:19, 752:8, 754:9
**fact** [4] - 641:2, 745:11, 755:12, 756:14
**facts** [5] - 629:24, 630:17, 640:25, 678:24, 679:11
**failure** [2] - 629:7, 631:9
**fair** [1] - 632:23
**fairly** [1] - 711:14
**false** [2] - 681:7, 755:17
**familiar** [6] - 646:11, 679:3, 687:4, 690:19, 702:16, 734:17
**family** [10] - 664:13, 665:22, 665:25, 667:16, 668:5, 668:10, 669:11, 672:11, 672:14, 673:4
**far** [4] - 660:5, 709:13, 711:13, 721:17
**fashion** [1] - 634:15
**fast** [1] - 649:20
**fast-forward** [1] - 649:20
**FBI** [4] - 745:8, 746:8, 746:15, 749:3
**February** [1] - 630:9
**federal** [6] - 645:19, 646:7, 646:9, 646:10, 663:22
**fellow** [2] - 691:18, 691:19
**felony** [1] - 679:25
**felt** [3] - 686:4, 744:4, 751:15
**female** [1] - 697:14
**few** [14] - 646:23, 649:25, 652:16, 654:2, 660:2,

670:16, 675:25, 678:12, 691:10, 722:17, 723:1, 746:7, 751:11, 751:24
**field** [2] - 684:22, 693:19
**Fifth** [1] - 674:23
**fighting** [1] - 690:16
**figuratively** [1] - 643:20
**figure** [3] - 635:7, 655:6, 675:16
**financial** [1] - 639:3
**finger** [1] - 734:6
**fired** [1] - 685:4
**first** [14] - 629:11, 640:1, 668:11, 668:22, 671:2, 671:4, 675:13, 675:18, 678:13, 682:7, 682:8, 713:15, 731:13, 752:21
**five** [3] - 674:15, 752:1, 752:2
**flag** [1] - 721:24
**flash** [1] - 699:18
**flick** [1] - 706:13
**flight** [2] - 711:25, 712:5
**flood** [2] - 711:8, 718:8
**floor** [12] - 639:1, 639:2, 647:24, 652:4, 655:8, 656:9, 668:13, 668:14, 668:23, 669:11, 670:22, 671:14
**flowing** [1] - 720:24
**focus** [2] - 729:25, 736:4
**focused** [1] - 700:24
**focusing** [1] - 713:17
**follow** [3] - 653:10, 725:3, 737:14
**followed** [4] - 629:20, 698:8, 709:8, 709:9
**following** [5] - 641:10, 655:11, 655:23, 662:12, 738:10
**foot** [1] - 754:24
**footage** [4] - 643:23, 714:5, 715:24, 723:6
**FOR** [4] - 627:1, 638:12, 663:16, 676:10
**forearm** [1] - 633:3
**foregoing** [1] - 760:4
**foreign** [1] - 685:16

**formation** [1] - 637:15
**forward** [3] - 649:20, 717:17, 721:20
**fought** [2] - 754:21, 755:1
**Four** [1] - 711:4
**four** [3] - 682:24, 693:6, 738:1
**Fourth** [1] - 627:15
**foyer** [1] - 719:12
**FRACKER** [2] - 628:8, 676:10
**Fracker** [40] - 663:1, 674:21, 676:9, 676:15, 679:3, 689:16, 690:8, 708:18, 710:18, 712:4, 712:13, 712:17, 714:4, 723:3, 723:18, 726:18, 729:24, 732:3, 732:24, 733:15, 734:17, 735:7, 735:19, 736:7, 736:25, 751:4, 752:6, 752:21, 753:9, 753:17, 753:20, 754:9, 754:19, 755:20, 756:17, 757:1, 757:9, 758:2, 758:5
**frame** [2] - 650:1, 657:21
**fraud** [3] - 689:7, 690:15, 700:5
**fraudulent** [1] - 728:6
**freedom** [1] - 754:21
**Friday** [4] - 759:13, 759:14, 759:15, 759:16
**friend** [1] - 724:4
**friends** [2] - 689:11, 754:22
**front** [15] - 632:7, 636:15, 636:16, 637:18, 656:2, 656:4, 671:4, 695:13, 698:25, 699:6, 705:18, 718:8, 726:11, 733:17, 744:22
**fuck** [1] - 753:6
**fucked** [1] - 753:3
**fucking** [1] - 753:25
**fulfills** [1] - 644:21
**full** [5] - 639:17, 639:18, 683:5, 720:25, 725:15
**fulls** [1] - 753:5

**fun** [1] - 756:9
**functions** [1] - 644:3
**furniture** [2] - 720:12, 741:8
**fuss** [1] - 721:10
**future** [1] - 691:25

## G

**galleries** [1] - 643:24
**gallery** [11] - 655:8, 668:14, 668:15, 669:3, 669:4, 669:5, 669:6, 669:9, 669:17, 669:24, 670:10
**game** [2] - 701:13, 701:14
**games** [1] - 756:9
**garage** [3] - 693:10, 693:11, 694:12
**gas** [18] - 634:16, 693:24, 694:1, 694:3, 694:7, 696:2, 702:6, 702:10, 702:25, 703:4, 705:4, 705:8, 706:4, 708:22, 710:6, 713:10, 715:9
**gathering** [2] - 655:7, 670:16
**gavel** [1] - 654:17
**gaveled** [1] - 654:23
**gears** [1] - 640:19
**general** [4] - 629:14, 638:21, 639:6, 655:22
**generally** [2] - 720:21, 720:23
**gentleman** [1] - 697:24
**gentlemen** [5] - 640:23, 674:11, 676:8, 752:3, 756:19
**gesture** [2] - 727:14, 727:16
**Giuliani** [1] - 697:14
**given** [7] - 629:8, 630:1, 657:12, 702:24, 721:1, 758:15
**glanced** [1] - 718:22
**glass** [2] - 720:10, 741:4
**goal** [1] - 743:18
**Gordon** [23] - 645:14, 647:5, 647:13, 648:23, 650:11, 652:11, 656:11,

657:1, 658:8, 661:20, 679:8, 690:6, 712:10, 712:14, 712:25, 715:5, 716:21, 721:20, 722:23, 727:6, 752:10, 752:19, 753:18
**government** [18] - 630:8, 638:3, 639:11, 647:11, 663:10, 663:15, 675:12, 676:9, 680:12, 680:23, 681:2, 681:6, 691:25, 692:1, 709:22, 721:10, 751:2, 757:21
**GOVERNMENT** [3] - 638:12, 663:16, 676:10
**Government** [23] - 627:14, 628:12, 628:12, 628:13, 628:13, 628:14, 628:14, 628:15, 628:15, 628:16, 628:16, 638:10, 667:7, 679:17, 680:18, 690:1, 707:25, 723:12, 727:2, 733:11, 735:2, 752:16, 754:16
**Government's** [33] - 679:2, 679:14, 680:3, 680:15, 689:15, 694:16, 694:25, 701:24, 704:20, 707:21, 708:17, 709:24, 712:10, 714:2, 716:3, 719:16, 722:21, 723:9, 724:9, 726:15, 728:8, 729:22, 731:25, 732:22, 734:16, 734:24, 735:17, 736:22, 738:13, 751:22, 753:16, 754:7, 754:12
**government's** [3] - 631:4, 675:21, 745:16
**governor** [1] - 645:11
**governs** [2] - 645:18, 645:19
**great** [1] - 756:24
**greet** [1] - 666:19

**grenades** [1] - 699:18
**ground** [2] - 699:8, 722:1
**group** [8] - 645:23, 659:9, 666:9, 700:14, 700:15, 703:13, 718:10, 724:5
**Guard** [2] - 682:25, 683:6
**guess** [21] - 691:1, 692:3, 695:21, 703:11, 707:16, 707:17, 716:25, 717:18, 720:24, 721:1, 721:6, 721:8, 726:9, 726:11, 733:24, 743:24, 746:5, 748:11, 749:16, 751:15, 755:16
**guilty** [5] - 678:17, 678:20, 679:25, 680:22, 681:10
**gumbo** [1] - 631:17
**gun** [3] - 696:8, 696:11, 697:1
**guns** [1] - 696:16
**guy** [1] - 681:25
**guys** [2] - 744:25, 756:22
**gym** [1] - 676:22

**H**

**half** [5] - 640:7, 664:6, 673:15, 758:6, 758:13
**hallway** [3] - 648:14, 670:21, 738:11
**hallways** [1] - 660:25
**hand** [12] - 632:22, 633:23, 699:15, 699:16, 700:17, 707:3, 722:13, 724:21, 729:2, 747:5
**hand-to-hand** [2] - 633:22, 633:23
**handed** [3] - 678:10, 747:4, 748:17
**handing** [1] - 717:4
**handle** [1] - 663:5
**hands** [5] - 632:7, 687:22, 705:11, 722:11, 736:7
**harassment** [2] - 629:7, 631:7
**hard** [3] - 690:16, 743:13, 754:21

**hate** [1] - 681:19, 754:21
**head** [6] - 653:15, 670:20, 700:16, 700:20, 721:8, 725:9
**headed** [2] - 718:14, 744:16
**hear** [17] - 647:8, 647:9, 670:15, 683:23, 690:24, 691:2, 691:25, 697:13, 697:15, 697:17, 700:1, 716:15, 716:17, 716:19, 723:18, 727:20, 741:6
**heard** [9] - 630:18, 643:3, 670:17, 671:2, 744:4, 744:5, 744:6, 744:8, 744:9
**hearing** [2] - 629:11, 750:6, 750:10
**hell** [1] - 753:4
**help** [7] - 701:3, 701:7, 703:14, 703:18, 715:6, 741:18, 741:25
**helped** [1] - 672:7
**hi** [2] - 663:12, 675:18
**highlighted** [1] - 690:7
**Hill** [2] - 640:1, 702:11
**hill** [1] - 688:10
**himself** [4] - 629:7, 636:24, 688:12, 741:16
**hired** [2] - 682:13, 682:15
**hiring** [1] - 682:8
**Hispanic** [1] - 753:4
**historian** [1] - 639:4
**history** [1] - 639:22
**hit** [14] - 632:21, 633:2, 633:4, 633:7, 633:11, 633:12, 633:15, 635:11, 635:19, 635:25, 636:16, 637:2, 637:5, 712:12
**hitters** [1] - 753:25
**hm** [1] - 649:5
**hmm** [6] - 691:6, 696:5, 706:7, 747:13, 751:9, 755:19
**hold** [7] - 636:11, 705:17, 706:23, 707:1, 726:11, 757:13, 758:4
**holding** [15] - 634:14, 635:3, 635:7,

635:15, 635:16, 635:18, 636:8, 705:11, 705:13, 705:16, 707:6, 713:13, 713:17, 721:23, 734:6
**home** [2] - 744:25, 749:10
**Homeland** [1] - 664:2
**homes** [1] - 744:16
**honest** [2] - 681:5, 701:17
**Honor** [20] - 629:4, 629:17, 630:13, 638:4, 662:24, 663:13, 674:4, 679:13, 680:14, 689:19, 723:8, 733:8, 734:23, 751:23, 752:12, 757:10, 757:11, 757:20, 758:1, 759:7
**HONORABLE** [1] - 627:10
**hope** [1] - 681:12
**hour** [4] - 758:6, 758:13, 758:25
**hours** [3] - 642:2, 662:3, 693:6
**house** [4] - 693:3, 746:22, 746:24, 749:12
**House** [43] - 640:4, 641:14, 641:16, 641:19, 641:22, 641:25, 642:9, 642:12, 642:13, 642:14, 643:9, 643:15, 643:17, 643:24, 643:25, 644:1, 644:4, 645:7, 646:19, 646:21, 647:14, 647:19, 648:4, 648:5, 648:15, 649:7, 649:8, 650:19, 651:6, 651:9, 652:18, 658:6, 660:6, 662:2, 665:4, 668:19, 668:24, 669:3, 669:4, 669:11, 727:25
**houses** [4] - 641:21, 643:6, 643:11, 643:20
**how'd** [1] - 741:2
**huge** [1] - 699:15
**hugging** [1] - 730:13
**hurt** [1] - 700:18
**hyped** [3] - 698:17,

720:24, 720:25
**hyper** [2] - 698:16, 704:2

**I**

**idea** [3] - 697:1, 718:17, 730:18
**identified** [2] - 696:17, 719:1
**identify** [4] - 629:7, 629:20, 741:12, 741:16
**illegal** [3] - 754:22, 755:10, 755:13
**image** [1] - 715:11
**immediate** [2] - 637:11, 664:13
**immediately** [1] - 755:21
**impact** [1] - 685:25
**important** [3] - 687:9, 687:10, 687:13
**impressed** [1] - 631:16
**inauguration** [1] - 670:17
**incident** [8] - 629:12, 629:13, 629:24, 630:7, 630:17, 630:23, 672:22
**include** [1] - 639:1
**includes** [2] - 639:2, 639:3
**incriminating** [1] - 748:4
**independent** [1] - 660:8
**indicated** [3] - 632:5, 632:10, 634:2
**indicating** [3] - 630:8, 632:20, 743:17
**indiscriminately** [1] - 696:23
**individuals** [2] - 633:25, 697:20
**indulgence** [4] - 647:10, 689:22, 709:21, 751:1
**information** [3] - 630:20, 655:1, 671:25
**informed** [1] - 653:8
**inhaler** [1] - 696:2
**initial** [2] - 630:15, 703:17
**injure** [1] - 636:17
**injuries** [1] - 702:14
**inquire** [1] - 759:1

**inside** [17] - 658:22, 660:18, 660:20, 661:1, 661:3, 677:18, 678:21, 719:6, 719:25, 720:20, 722:2, 723:22, 723:24, 733:2, 741:18, 744:11, 753:21
**inspector** [1] - 671:23
**instruct** [2] - 759:13, 759:16
**instructions** [4] - 655:1, 657:8, 657:12, 759:15
**insufficient** [1] - 666:25
**intentionally** [2] - 635:25, 637:2
**intently** [1] - 655:24
**interact** [1] - 737:21
**interaction** [3] - 703:15, 703:17, 739:12
**interest** [1] - 638:6
**interpretation** [1] - 717:7
**interrupted** [1] - 662:14
**introduce** [1] - 674:20
**investigated** [1] - 629:6
**investigations** [2] - 664:4, 664:9
**invitation** [3] - 717:8, 717:17, 717:19
**invite** [2] - 691:14, 691:17
**invited** [5] - 691:12, 691:15, 692:7, 692:12
**invoking** [1] - 673:12
**involve** [1] - 665:20
**involved** [1] - 673:16
**involvement** [1] - 678:18
**issue** [10] - 629:6, 629:19, 631:7, 631:10, 667:1, 675:4, 675:24, 676:2, 688:24, 689:7
**issued** [2] - 707:13, 707:15
**issues** [5] - 639:8, 639:9, 639:10, 639:11, 674:23
**it'll** [1] - 706:13
**items** [2] - 695:3, 697:3
**itself** [5] - 643:14,

688:2, 692:16,
701:22, 706:12

**J**

**jacket** [2] - 708:5,
711:1
**JACOB** [3] - 628:8,
676:10, 676:15
**Jacob** [3] - 674:21,
676:9, 676:15
**January** [44] - 638:18,
640:14, 641:12,
641:19, 642:16,
642:21, 644:4,
644:15, 644:16,
646:14, 646:18,
647:15, 647:23,
658:16, 660:4,
661:11, 665:11,
665:13, 667:17,
667:23, 672:15,
672:25, 673:25,
676:24, 677:10,
677:25, 678:14,
678:21, 678:24,
680:24, 685:3,
691:9, 692:16,
695:4, 733:2,
734:21, 745:13,
746:7, 751:4,
752:23, 753:23,
755:7, 755:21, 756:4
**job** [7] - 638:20,
639:13, 639:15,
640:3, 673:14,
676:24, 677:1
**jobs** [3] - 639:21,
639:22, 665:8
**join** [1] - 718:10
**joined** [1] - 651:6
**joint** [11] - 641:12,
641:13, 641:23,
641:25, 642:13,
642:15, 644:17,
644:20, 644:21,
647:17, 660:5
**Jr** [1] - 697:16
**Judge** [1] - 646:4
**judge** [2] - 749:8,
750:7
**JUDGE** [1] - 627:11
**judges** [1] - 675:23
**jump** [1] - 746:7
**jurisdiction** [1] -
696:16
**jurors** [1] - 675:13
**jury** [15] - 631:12,
631:13, 640:22,

647:6, 652:22,
657:9, 657:23,
667:7, 674:16,
675:25, 690:13,
693:16, 737:3,
756:25, 759:14
**JURY** [1] - 627:10
**Justice** [1] - 686:11

**K**

**Karen** [1] - 667:18
**Keep** [1] - 716:15
**keep** [6] - 663:11,
688:12, 717:8,
717:17, 718:5,
729:25
**Kellerman** [1] - 757:19
**kind** [38] - 633:12,
634:18, 634:25,
636:15, 662:8,
676:21, 683:11,
688:1, 691:14,
691:23, 696:15,
696:22, 700:24,
704:2, 704:8,
705:18, 706:12,
710:22, 716:14,
719:11, 719:12,
721:2, 727:17,
731:15, 731:16,
733:21, 734:3,
734:4, 736:11,
737:20, 742:14,
746:3, 746:18,
747:18, 748:15,
750:24, 755:16
**kinds** [4] - 691:3,
702:17, 722:6
**knowing** [1] - 687:7
**knowledge** [3] -
642:24, 684:23,
688:3
**known** [2] - 637:11,
639:21

**L**

**ladies** [6] - 640:23,
674:11, 676:7,
752:2, 753:5, 756:19
**landing** [3] - 709:17,
711:22, 712:5
**language** [1] - 687:22
**large** [1] - 744:12
**larger** [1] - 700:15
**last** [5] - 661:23,
662:1, 676:24,
677:10, 678:14,

679:7, 713:22,
718:20
**lately** [1] - 756:10
**Laughter** [2] - 631:18,
646:5
**Lavado** [1] - 758:18
**law** [12] - 645:3, 645:4,
646:9, 646:10,
646:11, 651:3,
651:7, 696:17,
701:7, 736:16,
747:17, 747:20
**laws** [2] - 645:19,
651:4
**lawyer** [3] - 640:9,
640:10, 680:10
**leader** [2] - 639:17,
669:25
**leadership** [1] - 644:3
**leaning** [3] - 713:21,
713:23, 713:25
**learn** [6] - 669:13,
671:1, 686:12,
686:18, 686:21,
686:24
**learned** [1] - 686:17
**least** [2] - 629:10,
629:23
**leave** [7] - 640:13,
697:1, 729:19,
737:24, 738:5,
743:9, 756:20
**leaving** [2] - 654:8,
739:22
**left** [20] - 640:3,
640:14, 653:21,
660:22, 692:13,
695:9, 696:13,
703:9, 714:23,
715:13, 715:19,
722:9, 724:10,
726:2, 736:20,
738:15, 751:7,
752:24, 753:12,
754:5
**legal** [2] - 639:8,
639:10
**legislative** [1] - 639:2
**legitimate** [1] - 690:12
**lengths** [1] - 739:12
**lenient** [1] - 681:12
**less** [2] - 701:19,
737:11, 737:12
**lettering** [1] - 710:25
**level** [6] - 651:19,
668:14, 669:3,
669:20, 698:8,
710:11
**leverage** [1] - 635:8
**liaise** [1] - 665:3

**liaison** [2] - 665:1,
667:14
**life** [1] - 690:16
**light** [1] - 746:12
**limited** [1] - 651:10
**line** [8] - 656:4,
667:10, 690:16,
727:9, 727:11,
731:12, 731:15,
732:6
**lined** [1] - 742:12
**lines** [1] - 700:6
**lining** [3] - 648:7,
742:14, 743:3
**linked** [1] - 730:10
**listen** [2] - 721:10,
721:11
**listening** [1] - 697:12
**literally** [1] - 643:20
**loaded** [2] - 693:12,
693:14
**lobby** [1] - 655:7
**locally** [1] - 686:4
**locate** [1] - 719:13
**located** [1] - 671:13
**location** [1] - 672:8
**lockdown** [4] -
653:19, 657:16,
657:18, 658:6
**locked** [1] - 655:8
**locking** [1] - 657:19
**logistics** [1] - 754:4
**LOL** [3] - 753:3,
754:19, 754:24
**look** [7] - 631:2,
643:24, 667:8,
675:24, 687:21,
713:24
**looked** [5] - 714:6,
718:23, 718:25,
719:11, 756:1
**looking** [7] - 648:15,
660:7, 694:17,
695:1, 708:6,
719:14, 733:15
**looks** [11] - 649:25,
705:22, 707:24,
714:16, 715:8,
722:13, 725:2,
729:3, 736:11,
740:3, 740:20
**lose** [1] - 754:23
**lost** [2] - 718:18,
754:22
**loud** [2] - 727:18,
732:17
**Lovern** [1] - 757:19
**lower** [2] - 699:8,
710:11
**lump** [1] - 750:25

**lunch** [1] - 631:15
**lunchtime** [1] - 758:3

**M**

**ma'am** [7] - 636:6,
685:14, 708:20,
720:19, 722:5,
726:7, 728:17
**main** [1] - 719:12
**majority** [1] - 639:16
**mall** [2] - 697:8, 697:9
**Mall** [1] - 697:8
**Malone** [1] - 676:15
**MALONE** [1] - 676:15
**man** [2] - 697:21,
697:22
**Marine** [1] - 682:24
**MARK** [1] - 627:17
**mark** [4] - 703:9,
705:5, 739:18,
758:20
**marked** [5] - 640:20,
703:22, 703:25,
734:14, 734:15
**marking** [1] - 715:23
**mask** [15] - 634:17,
661:8, 673:23,
694:7, 696:2, 702:6,
702:25, 703:4,
705:4, 705:8, 706:4,
708:22, 710:6,
713:10, 715:9
**masks** [3] - 693:24,
694:1, 694:3
**matter** [1] - 760:5
**maybe..** [1] - 675:14
**meals** [1] - 693:17
**mean** [11] - 635:7,
635:9, 636:11,
646:9, 662:7,
681:24, 687:6,
699:16, 705:15,
707:15, 733:5
**measures** [4] - 670:4,
672:19, 672:20
**meatier** [1] - 706:22
**media** [6] - 689:11,
690:22, 746:1,
746:5, 751:5, 751:17
**meet** [1] - 682:7
**meeting** [7] - 630:23,
641:15, 642:14,
644:9, 647:14,
678:21, 693:2
**meets** [4] - 643:15,
643:18, 651:8, 651:9
**member** [1] - 651:6
**members** [13] -

641:14, 644:1, 648:5, 649:7, 649:8, 650:19, 667:16, 673:4, 693:18, 697:17, 727:11, 737:11, 740:21
**membranes** [1] - 702:14
**memory** [1] - 634:18
**mention** [1] - 753:5
**mentioned** [5] - 656:23, 656:24, 672:19, 706:5, 707:5
**message** [6] - 630:9, 724:4, 752:11, 752:19, 753:23, 754:19
**messages** [1] - 746:5
**messenger** [1] - 746:3
**met** [10] - 630:17, 641:22, 668:4, 682:8, 693:9, 728:10, 728:15, 729:6, 729:17, 742:8
**Metro** [7] - 695:19, 695:20, 695:21, 696:12, 697:6, 743:7, 744:14
**middle** [6] - 635:16, 635:18, 657:5, 710:3, 719:19, 734:6
**might** [3] - 674:9, 675:1, 688:1
**Mike** [2] - 641:24, 697:24
**miles** [1] - 693:7
**military** [13] - 682:20, 682:21, 682:23, 683:1, 685:12, 685:17, 685:19, 687:13, 693:18, 702:17, 702:20, 705:16, 706:6
**million** [1] - 753:7
**mind** [4] - 687:25, 689:4, 713:16, 721:7
**mine** [1] - 743:21
**minute** [9] - 642:4, 647:18, 649:20, 650:11, 656:11, 658:8, 706:5, 732:1, 732:8
**minutes** [12] - 642:10, 646:23, 652:16, 654:2, 670:16, 675:25, 729:21, 729:23, 731:3, 752:1, 752:2, 758:7
**missing** [1] - 700:16
**mission** [1] - 664:3

**missions** [2] - 664:4, 664:7
**mistake** [1] - 722:24
**mistaken** [1] - 630:11
**mixed** [1] - 717:18
**mixture** [1] - 745:1
**mm-hm** [1] - 649:5
**mob** [1] - 669:14
**mom** [1] - 756:14
**moment** [9] - 629:2, 640:24, 645:21, 656:18, 657:11, 661:23, 700:25, 707:5, 710:9
**money** [5] - 750:12, 750:16, 750:18, 750:23
**month** [1] - 640:14
**months** [1] - 640:15
**Monument** [2] - 697:10, 697:11
**mood** [6] - 698:15, 703:25, 720:20, 721:2, 742:17, 743:20
**morning** [10] - 659:16, 659:18, 662:13, 696:9, 756:22, 757:2, 757:5, 759:14, 759:15, 759:18
**most** [4] - 644:23, 649:15, 684:22, 690:16
**mostly** [1] - 665:4
**motioning** [1] - 737:20
**motorcade** [11] - 666:6, 666:8, 666:12, 666:19, 667:19, 668:3, 668:5, 671:1, 671:5, 671:7, 673:7
**Mount** [5] - 676:18, 677:2, 677:8, 693:5, 696:4
**move** [9] - 636:14, 637:8, 638:6, 646:25, 653:5, 656:23, 672:1, 672:7, 731:17
**moved** [11] - 637:5, 638:9, 679:16, 680:17, 689:25, 690:14, 723:11, 727:1, 733:10, 752:15, 754:15
**movement** [1] - 669:7
**moving** [3] - 655:23, 671:8, 716:15
**MPD** [1] - 757:11

**MR** [23] - 629:2, 629:4, 629:13, 629:15, 630:6, 632:2, 636:2, 674:21, 674:25, 675:3, 675:7, 675:9, 675:12, 675:15, 675:23, 676:3, 758:6, 758:9, 758:12, 758:19, 758:21, 758:24, 759:3
**MRE** [1] - 696:2
**MREs** [3] - 693:15, 693:16, 693:17
**MS** [83] - 629:11, 629:17, 630:13, 636:4, 637:20, 638:3, 638:8, 638:14, 641:4, 645:25, 646:1, 646:6, 647:10, 647:12, 659:22, 659:24, 661:13, 661:15, 662:15, 662:24, 663:8, 663:13, 663:15, 663:18, 673:19, 673:21, 674:2, 674:4, 676:9, 676:12, 679:13, 679:15, 679:19, 680:14, 680:16, 680:20, 680:21, 688:25, 689:2, 689:5, 689:19, 689:22, 690:3, 690:5, 693:21, 709:23, 710:1, 723:8, 723:10, 723:14, 727:7, 726:23, 726:25, 727:4, 733:8, 733:9, 733:13, 733:14, 734:23, 734:25, 735:4, 735:6, 748:7, 748:9, 751:1, 751:3, 751:23, 752:1, 752:5, 752:14, 752:18, 752:20, 754:12, 754:14, 754:18, 756:17, 757:10, 757:14, 757:16, 757:18, 757:20, 758:1, 759:7
**mucus** [1] - 702:13

**N**

**name** [8] - 630:19, 638:15, 663:20,

676:13, 684:14, 692:25, 694:20
**named** [1] - 677:4
**Nancy** [3] - 642:8, 644:5, 728:4
**National** [2] - 682:25, 697:8
**nature** [1] - 630:1
**near** [4] - 653:11, 656:21, 697:10, 697:11
**nearest** [1] - 743:7
**necessarily** [1] - 630:22
**need** [8] - 651:1, 659:13, 674:14, 675:18, 689:2, 715:3, 751:25, 754:24
**needed** [5] - 659:10, 663:4, 744:5, 746:20
**neighbor** [12] - 677:14, 692:24, 695:13, 698:14, 698:22, 699:10, 703:2, 704:24, 706:2, 742:9, 742:23, 744:23
**neighbor's** [1] - 692:25
**nervous** [2] - 682:2, 685:9
**never** [7] - 630:18, 639:20, 675:4, 675:7, 676:4, 681:21, 681:22
**new** [1] - 749:20
**next** [29] - 646:24, 651:19, 653:12, 653:13, 657:12, 659:17, 659:18, 662:25, 669:7, 671:6, 674:10, 674:11, 697:7, 714:12, 714:18, 715:10, 715:17, 719:8, 725:13, 729:9, 738:9, 740:6, 740:14, 742:7, 743:4, 745:5, 745:8, 748:22, 749:20
**nice** [1] - 631:15
**nicknames** [1] - 684:8
**night** [1] - 759:18
**nights** [2] - 683:25, 684:2
**nine** [2] - 756:21, 757:2
**NOAH** [1] - 628:3
**nobody** [1] - 678:5

**noise** [4] - 722:2, 722:4, 722:6, 722:7
**nominated** [1] - 639:16
**none** [2] - 719:24, 720:2
**nonpartisan** [3] - 639:21, 640:3, 640:5
**nonprofit** [1] - 640:17
**noon** [2] - 644:16, 644:18
**normal** [2] - 656:9, 750:21
**Nos** [2] - 628:12, 638:10
**nostalgia** [1] - 707:20
**note** [2] - 659:12, 754:24
**notebooks** [1] - 756:20
**nothing** [6] - 631:7, 637:20, 662:15, 674:4, 691:14, 756:17
**November** [2] - 641:18, 690:10
**number** [12] - 638:25, 679:24, 699:21, 699:22, 701:13, 701:14, 701:17, 709:6, 739:4, 744:12, 745:21, 747:11
**NW** [3] - 627:15, 627:19, 627:22

**O**

**o'clock** [6] - 647:24, 659:2, 665:15, 668:12, 672:18, 756:22
**oath** [1] - 631:23
**object** [4] - 629:17, 651:11, 710:19, 710:22
**objection** [25] - 629:16, 631:4, 638:5, 638:8, 642:2, 650:22, 651:5, 651:10, 652:6, 654:15, 658:24, 662:4, 669:10, 679:15, 680:16, 688:25, 689:20, 689:24, 723:10, 726:25, 733:9, 734:25, 748:7, 752:14, 754:14

**objections** [2] - 650:18, 650:23
**objects** [2] - 704:5, 704:8
**observations** [1] - 667:8
**observe** [4] - 655:3, 655:20, 658:10, 666:23
**observed** [5] - 643:1, 644:9, 644:12, 652:9, 658:5
**observing** [1] - 652:6
**obviously** [2] - 633:25, 674:22
**occur** [2] - 644:20, 675:10
**occurred** [1] - 642:24
**OF** [3] - 627:1, 627:3, 627:10
**Offense** [1] - 679:5
**offense** [1] - 679:20
**offensively** [3] - 706:21, 706:23, 707:2
**offer** [2] - 741:18, 750:12
**offered** [2] - 631:5, 693:12
**Office** [4] - 627:15, 645:6, 668:6, 671:13
**office** [11] - 629:5, 639:3, 647:25, 648:1, 659:11, 668:7, 668:11, 670:18, 670:23, 671:8, 672:4
**Officer** [6] - 631:20, 632:3, 632:5, 637:22, 757:23
**officer** [30] - 629:8, 629:24, 632:13, 638:25, 642:5, 642:11, 654:24, 657:7, 670:2, 677:2, 684:19, 684:21, 685:20, 685:25, 686:7, 687:12, 691:19, 696:3, 701:9, 701:15, 717:1, 717:11, 717:14, 737:25, 739:13, 741:13, 741:16, 743:6, 747:11, 757:11
**officer's** [4] - 629:22, 651:16, 651:17, 655:1
**officers** [44] - 629:19, 629:20, 632:6,

632:19, 633:21, 637:10, 656:8, 670:20, 671:20, 683:11, 684:22, 691:18, 699:19, 699:22, 700:7, 700:13, 700:14, 700:25, 703:5, 703:10, 703:13, 703:18, 703:20, 710:24, 718:5, 719:23, 719:25, 731:16, 732:7, 736:1, 737:18, 737:19, 738:25, 739:3, 739:5, 739:8, 739:11, 740:12, 740:13, 740:21, 740:23, 741:18, 741:25, 742:12
**offices** [1] - 639:4
**Official** [1] - 760:3
**often** [6] - 685:6, 690:24, 691:2, 691:3
**older** [1] - 697:24
**once** [6] - 631:20, 648:22, 682:15, 706:14, 723:15, 747:3
**one** [44] - 632:5, 633:21, 633:25, 642:4, 643:12, 643:21, 645:1, 645:18, 647:18, 647:24, 648:8, 651:20, 662:24, 664:7, 665:8, 665:15, 668:12, 668:24, 674:13, 675:21, 683:12, 688:9, 690:17, 690:18, 691:18, 694:5, 694:13, 697:21, 700:16, 701:15, 702:9, 704:12, 722:7, 733:21, 733:23, 737:25, 739:11, 745:2, 753:20, 755:22, 757:10, 757:11, 758:13
**ones** [1] - 756:1
**opened** [1] - 650:15
**opening** [3] - 650:7, 726:15, 726:10
**operations** [1] - 685:18
**opinion** [3] - 635:5, 688:17, 688:19
**opportunity** [1] -

666:22
**opposite** [1] - 643:13
**order** [1] - 653:14
**organization** [1] - 640:17
**otherwise** [1] - 759:13
**ourselves** [4] - 696:25, 746:23, 747:10, 748:23
**outcome** [1] - 688:17
**outdated** [1] - 707:16
**outnumbered** [2] - 699:25, 717:12
**outside** [16] - 648:2, 655:21, 669:5, 669:14, 669:19, 670:9, 670:18, 671:3, 671:18, 671:24, 688:10, 693:10, 710:11, 719:22, 723:22, 742:7
**outspoken** [1] - 688:15
**overall** [2] - 687:16, 701:3
**overlooking** [1] - 668:15
**overnight** [1] - 757:3
**overruled** [2] - 689:1, 748:8
**oversee** [1] - 644:2
**oversees** [1] - 638:25
**overturn** [1] - 721:12
**overturned** [4] - 698:1, 720:12, 741:8, 744:7
**overwhelming** [2] - 699:23, 699:24
**own** [2] - 651:21, 701:9
**owns** [1] - 694:19

**P**

**p.m** [21] - 627:7, 631:13, 641:20, 641:21, 641:22, 641:25, 642:3, 642:8, 642:15, 646:16, 649:25, 660:4, 660:13, 662:2, 674:16, 676:6, 716:2, 756:25, 759:19
**pack** [1] - 694:3
**packed** [2] - 693:22, 695:8
**packing** [1] - 695:4

**pads** [1] - 633:3
**page** [1] - 679:7
**pages** [1] - 760:4
**panel** [1] - 697:4
**paper** [2] - 645:9, 645:10
**paperwork** [1] - 670:13
**paragraph** [1] - 661:22
**part** [22] - 630:4, 630:14, 633:2, 633:10, 646:7, 650:6, 651:12, 658:19, 663:24, 668:22, 678:23, 680:22, 681:1, 681:5, 682:3, 685:8, 690:17, 713:22, 716:6, 716:23, 721:6, 737:10
**participate** [1] - 659:19
**participated** [1] - 645:1
**particular** [5] - 639:18, 639:20, 642:2, 662:4, 685:12
**particularly** [1] - 692:4
**parties** [3] - 640:21, 641:1, 661:17
**Parties** [1] - 641:6
**partners** [1] - 669:6
**party** [2] - 639:18, 692:3
**pass** [2] - 630:12, 631:2
**passed** [7] - 650:8, 650:10, 650:16, 650:17, 650:18, 660:25, 661:4
**passenger** [2] - 695:13, 744:22
**passionate** [1] - 688:15
**past** [7] - 640:14, 656:18, 667:3, 696:21, 731:3, 731:22, 732:13
**pat** [2] - 693:1, 703:2
**Pat** [1] - 744:23
**path** [3] - 636:21, 655:24, 738:10
**pathway** [1] - 656:3
**patrol** [2] - 677:7, 683:18
**patrolman** [1] - 683:16
**Paul** [2] - 663:15, 663:21
**PAUL** [2] - 628:7, 663:16

**pause** [9] - 645:21, 657:1, 712:11, 722:8, 722:25, 730:5, 735:21, 736:22, 737:16
**paused** [1] - 722:11
**pavilion** [3] - 716:25, 742:8, 742:17
**pay** [4] - 629:9, 750:16, 750:18, 750:20
**paying** [1] - 687:18
**PD** [3] - 682:8, 682:13, 683:15
**Pelosi** [7] - 642:8, 644:5, 652:20, 727:20, 727:23, 727:24, 728:4
**Pence** [11] - 641:24, 642:3, 667:18, 668:13, 669:2, 669:8, 669:9, 697:24
**Pence's** [1] - 642:6
**pens** [1] - 634:7
**people** [44] - 633:19, 633:23, 634:7, 634:12, 637:11, 645:1, 645:8, 648:25, 649:4, 649:9, 655:6, 660:20, 660:24, 671:2, 679:24, 683:10, 691:23, 696:22, 696:24, 699:17, 699:21, 700:3, 701:15, 702:9, 702:11, 704:3, 704:5, 704:8, 709:6, 709:7, 711:9, 711:18, 716:11, 718:5, 720:8, 722:2, 727:9, 731:9, 736:16, 739:5, 740:11, 741:25, 744:12
**pepper** [1] - 702:10
**per** [1] - 701:15
**perform** [1] - 644:2
**perhaps** [1] - 722:25
**perimeter** [2] - 666:23, 667:9
**period** [4] - 653:23, 657:16, 657:18, 670:11
**peripheral** [1] - 661:5
**perjury** [1] - 681:7
**person** [13] - 643:25, 654:6, 656:14, 683:12, 688:11, 694:5, 704:11,

704:12, 710:25, 715:6, 728:23, 756:8, 756:11
**personal** [2] - 642:23, 676:22
**personally** [6] - 644:25, 673:13, 687:19, 720:21, 720:22, 742:21
**personnel** [1] - 673:9
**persons** [1] - 747:9
**perspective** [1] - 659:11
**phone** [24] - 671:22, 677:24, 678:2, 709:16, 722:13, 722:19, 724:6, 745:14, 745:23, 746:15, 746:20, 747:4, 747:5, 747:8, 747:18, 747:20, 748:3, 748:17, 748:21, 749:13, 749:18, 749:20, 749:23, 750:3
**phones** [3] - 675:19, 675:21, 749:3
**photo** [13] - 695:3, 733:8, 733:16, 733:18, 733:20, 733:21, 734:2, 734:5, 734:11, 734:21, 735:11, 735:13
**photograph** [5] - 732:24, 733:1, 733:6, 735:7, 753:19
**photographs** [3] - 708:6, 714:5, 732:20
**photos** [10] - 677:24, 745:14, 745:19, 745:23, 745:25, 746:4, 748:5, 753:20, 756:8
**phrase** [1] - 654:2
**physical** [1] - 643:12
**pick** [1] - 724:10
**picture** [9] - 635:4, 704:21, 705:24, 707:23, 708:1, 729:4, 734:4, 740:19, 754:20
**pictures** [2] - 747:22, 749:17
**pieces** [4] - 645:9, 645:10, 653:18, 669:22
**pixilated** [1] - 715:9
**place** [5] - 641:18, 696:15, 700:11,

703:16, 743:24
**placing** [1] - 669:5
**Plaintiff** [1] - 627:4
**plan** [7] - 663:7, 666:11, 672:21, 675:11, 692:16, 759:10
**planning** [3] - 692:13, 758:8, 758:22
**plans** [4] - 691:25, 692:9, 692:11, 692:12
**play** [42] - 634:24, 644:6, 644:25, 647:6, 647:18, 648:23, 650:11, 650:24, 656:11, 657:1, 658:8, 676:5, 710:2, 710:15, 711:15, 712:2, 712:12, 712:13, 712:15, 712:25, 713:15, 713:16, 716:21, 718:12, 721:19, 721:20, 722:17, 722:25, 723:15, 725:4, 725:17, 727:5, 728:5, 729:23, 729:24, 730:3, 730:23, 731:4, 732:1, 732:8, 736:5, 737:13
**played** [35] - 647:7, 647:21, 648:24, 650:12, 650:25, 656:13, 657:2, 658:3, 658:9, 709:25, 710:17, 711:6, 711:16, 712:3, 712:16, 713:1, 716:5, 716:22, 718:13, 719:18, 721:22, 722:18, 723:16, 724:12, 724:13, 725:18, 726:17, 727:7, 730:4, 731:5, 732:2, 732:10, 736:6, 736:24, 737:15
**playing** [1] - 658:2
**plays** [1] - 737:14
**plaza** [3] - 671:3, 698:25, 699:5
**plea** [1] - 680:6
**plead** [1] - 678:20
**pleaded** [2] - 678:17, 680:22
**pled** [2] - 679:25,

681:10
**pocket** [1] - 697:5
**point** [46] - 646:24, 647:2, 649:21, 650:22, 653:2, 655:13, 658:23, 662:5, 669:11, 669:13, 670:6, 670:17, 670:21, 671:10, 671:24, 696:1, 699:11, 700:7, 700:22, 701:6, 701:13, 701:21, 702:2, 704:23, 708:9, 711:11, 711:22, 712:21, 713:18, 718:18, 724:3, 724:19, 725:21, 727:12, 733:24, 735:25, 738:7, 738:25, 739:5, 740:11, 740:22, 747:12, 748:16, 749:22, 753:2, 759:5
**pointing** [11] - 713:7, 714:10, 714:15, 714:23, 714:25, 715:7, 734:8, 734:9, 738:19, 740:9, 740:17
**poked** [1] - 670:20
**police** [41] - 677:2, 683:7, 684:4, 684:19, 684:21, 684:25, 685:20, 686:7, 686:8, 686:10, 687:9, 696:3, 699:19, 699:22, 699:25, 701:3, 701:10, 702:17, 702:20, 704:13, 706:8, 707:11, 719:23, 719:25, 726:11, 727:9, 727:11, 731:12, 731:15, 732:6, 737:18, 737:19, 739:24, 740:3, 741:3, 741:13, 741:16, 742:12, 743:3, 747:11, 748:25
**Police** [18] - 654:20, 654:24, 655:18, 655:24, 656:1, 656:3, 656:7, 656:8, 657:7, 665:4, 665:9, 666:2, 667:14, 670:2, 671:17,

673:2, 677:2, 677:8
**policing** [1] - 686:13
**political** [2] - 639:13, 639:15
**port** [5] - 632:6, 705:14, 705:15, 706:5, 707:6
**portion** [4] - 633:6, 686:1, 690:7, 710:19
**portions** [1] - 706:22
**ports** [1] - 634:15
**position** [6] - 653:5, 656:21, 686:5, 706:6, 707:6, 707:8
**positioned** [1] - 636:23
**possibly** [3] - 717:22, 744:7, 754:20
**post** [11] - 689:16, 690:8, 690:11, 690:19, 724:3, 745:25, 752:21, 752:22, 753:1, 754:2, 755:9
**posted** [1] - 753:23
**posting** [3] - 751:17, 753:9, 755:4
**posts** [7] - 751:5, 751:18, 755:20, 755:21, 755:24, 756:4
**posture** [10] - 632:10, 632:17, 635:4, 635:6, 635:14, 635:22, 636:8, 636:12, 636:18, 636:21
**potential** [1] - 757:21
**pour** [1] - 709:7
**POV** [1] - 753:2
**PPMS** [4] - 629:6, 630:12, 630:14, 630:25
**practice** [2] - 747:14, 747:17
**predicted** [1] - 646:24
**preparation** [1] - 644:19
**preparations** [2] - 695:22, 697:6
**prepare** [1] - 759:15
**prepared** [2] - 695:21, 707:4
**preparing** [1] - 644:17
**presence** [1] - 637:10
**present** [6] - 654:20, 663:2, 674:22, 682:25, 688:2, 696:25
**presented** [1] - 756:10

**presents** [1] - 706:12
**preside** [1] - 654:6
**president** [52] - 641:24, 644:6, 644:7, 644:8, 644:9, 644:23, 645:4, 645:5, 648:18, 650:9, 650:14, 650:16, 651:17, 652:25, 653:15, 653:17, 653:21, 654:3, 654:4, 654:5, 654:7, 654:8, 654:16, 654:23, 656:15, 657:6, 657:14, 659:19, 664:10, 664:15, 664:19, 664:23, 665:20, 665:25, 666:5, 666:9, 666:12, 666:16, 667:4, 667:12, 667:20, 668:2, 668:7, 668:18, 668:23, 669:11, 672:1, 672:3, 672:7, 672:14, 673:4
**President** [4] - 642:3, 642:5, 664:16, 692:4
**president's** [7] - 667:22, 669:25, 670:7, 670:23, 671:8, 671:16, 672:11
**President's** [2] - 668:6, 671:13
**presidential** [2] - 641:17, 665:18
**presider's** [1] - 653:17
**presiding** [5] - 641:24, 642:5, 642:9, 642:11, 651:16, 652:25, 654:25
**press** [1] - 752:4
**pretty** [8] - 631:16, 655:24, 687:7, 690:14, 699:15, 701:13, 706:11, 757:7
**previously** [5] - 645:22, 657:5, 657:11, 735:13, 745:8
**primary** [1] - 664:25
**pro** [5] - 653:17, 654:3, 654:4, 654:16, 654:23
**problem** [1] - 748:15
**procedure** [1] - 651:7
**procedures** [1] -

669:19
**proceed** [3] - 631:19, 648:3, 711:24
**proceeded** [2] - 646:21, 743:7
**proceeding** [6] - 645:7, 648:5, 651:12, 662:5, 662:9, 662:11
**Proceedings** [1] - 627:25
**proceedings** [6] - 646:25, 647:2, 659:15, 659:19, 759:19, 760:5
**process** [5] - 644:25, 669:13, 671:7, 682:8, 682:11
**processing** [1] - 749:5
**procession** [3] - 648:3, 648:11, 649:18
**produced** [1] - 627:25
**profanity** [1] - 700:5
**proffer** [1] - 629:24
**proffered** [1] - 631:10
**program** [1] - 668:22
**promised** [1] - 681:15
**pronounce** [1] - 650:20
**prosecute** [1] - 681:6
**protect** [1] - 664:10
**protected** [1] - 644:12
**protectee** [2] - 672:23, 673:17
**protection** [4] - 664:4, 664:7, 664:9, 700:16
**Protection** [1] - 664:16
**protective** [2] - 664:21, 667:15
**protest** [2] - 754:24, 754:25
**protesters** [4] - 653:8, 661:1, 661:3, 699:25
**proud** [2] - 751:12, 751:14
**provide** [2] - 663:4, 665:24
**public** [1] - 758:15
**publicly** [2] - 724:4, 746:2
**publish** [13] - 640:21, 645:22, 647:6, 667:7, 679:14, 680:20, 690:3, 723:14, 726:23, 733:13, 735:4, 752:18, 753:18
**pull** [9] - 652:11,

660:10, 661:20, 709:20, 709:24, 712:10, 728:8, 731:20, 731:25
**purpose** [2] - 734:2, 744:6
**pushed** [2] - 736:1, 742:13
**put** [8] - 636:13, 694:8, 697:3, 702:6, 748:19, 748:20, 753:6, 758:8

## Q

**Qatar** [1] - 685:18
**questioning** [1] - 630:5
**questions** [5] - 636:2, 659:22, 660:2, 661:13, 673:19
**quick** [1] - 693:18

## R

**rack** [1] - 704:9
**racks** [1] - 671:3
**radio** [1] - 671:21
**railing** [1] - 713:25
**raised** [2] - 666:25, 756:13
**ran** [2] - 656:19
**rank** [3] - 683:15, 683:17
**ratio** [1] - 701:18
**read** [12] - 641:5, 646:3, 650:9, 650:10, 661:17, 662:1, 690:11, 711:3, 752:21, 753:1, 753:23, 755:2
**ready** [3] - 688:1, 693:17, 737:6
**really** [14] - 629:21, 663:10, 686:19, 691:14, 696:24, 697:15, 701:20, 709:3, 715:8, 734:10, 739:15, 744:10, 746:18, 754:3
**reason** [9] - 635:6, 635:14, 635:21, 636:16, 660:8, 660:12, 660:14, 686:1, 709:1
**reasonable** [3] - 717:16, 717:20, 758:2

**reasons** [2] - 691:22, 702:9
**rebuttal** [3] - 757:22, 759:6, 759:8
**received** [11] - 638:11, 644:23, 679:18, 680:19, 690:2, 723:13, 727:3, 733:12, 735:3, 752:17, 754:17
**RECEIVED** [1] - 628:11
**recess** [6] - 642:6, 642:12, 654:17, 654:23, 662:7, 662:8
**Recess** [1] - 676:6
**recessed** [1] - 660:13
**recognize** [17] - 652:18, 680:4, 695:6, 701:25, 704:20, 704:23, 705:23, 706:1, 713:3, 714:4, 723:5, 724:15, 726:18, 728:23, 730:2, 732:24, 735:19
**recollect** [2] - 631:9, 661:10
**recollection** [6] - 630:7, 659:2, 660:3, 660:8, 690:21, 741:14
**reconvene** [1] - 674:15
**reconvened** [1] - 659:14
**record** [4] - 638:16, 663:20, 674:20, 760:5
**red** [1] - 667:9
**REDIRECT** [2] - 636:3, 661:14
**Redirect** [2] - 628:4, 628:6
**refer** [3] - 646:15, 649:14, 705:14
**reference** [1] - 727:22
**referred** [4] - 630:14, 640:24, 664:18, 684:14
**referring** [5] - 630:25, 649:6, 692:1, 692:4, 708:19
**reflect** [3] - 751:18, 755:6, 755:23
**refusal** [1] - 636:13
**regard** [1] - 688:14
**regarding** [1] - 629:5
**regardless** [1] - 669:18

**regular** [1] - 708:12
**related** [1] - 631:8
**relating** [2] - 630:25, 646:19
**relationship** [1] - 685:8
**relevant** [3] - 629:22, 630:1, 631:10
**relocate** [1] - 671:1
**relocating** [2] - 673:4, 673:7
**remain** [1] - 670:9
**remained** [1] - 658:20
**remaining** [1] - 757:22
**remember** [30] - 631:23, 634:11, 634:12, 634:14, 636:9, 637:2, 653:15, 686:19, 697:4, 697:14, 704:12, 717:7, 717:12, 718:20, 718:21, 719:24, 730:17, 730:20, 731:14, 741:23, 742:14, 743:2, 743:10, 745:2, 746:18, 753:9, 754:2, 755:4, 755:22, 755:24
**remembers** [1] - 630:6
**remove** [1] - 673:23
**rendezvous** [2] - 670:6, 671:10
**repeat** [2] - 635:13, 689:3
**rephrase** [2] - 699:3, 723:22
**report** [1] - 631:8
**reported** [2] - 627:25, 659:14
**Reporter** [1] - 627:21, 760:3
**representative** [1] - 642:10
**Representatives** [10] - 641:15, 641:19, 641:23, 642:9, 643:10, 643:25, 644:1, 649:8, 650:20, 651:6
**representatives** [2] - 642:12, 643:17
**republic** [1] - 690:12
**Republican** [1] - 692:3
**require** [2] - 646:13, 646:16
**research** [1] - 756:23
**reserved** [1] - 663:9
**reserves** [1] - 683:5

**resolve** [2] - 642:2, 662:4
**respect** [1] - 667:13
**respective** [1] - 744:16
**respectively** [1] - 642:15
**respond** [2] - 670:11
**responding** [1] - 658:12
**responsibilities** [2] - 639:7, 644:22
**responsible** [1] - 639:10
**result** [2] - 653:5, 669:16
**results** [4] - 697:25, 721:12, 744:7, 751:16
**resume** [2] - 658:23, 659:4
**resumed** [2] - 642:14, 659:20
**resumes** [1] - 631:25
**retire** [1] - 651:1
**retired** [1] - 651:25
**retires** [1] - 651:8
**retrieve** [1] - 749:23
**return** [2] - 659:9, 672:14
**reunited** [1] - 730:15
**reverse** [1] - 738:10
**reviewed** [1] - 639:12
**reviewing** [2] - 630:21, 631:3
**rid** [3] - 678:7, 678:8
**ride** [1] - 745:9
**rides** [1] - 666:9
**rifle** [1] - 705:17
**rigged** [1] - 688:20
**riot** [4] - 636:15, 686:15, 686:18, 707:20
**RISA** [1] - 627:14
**Robertson** [63] - 632:16, 635:25, 636:7, 636:23, 637:18, 641:9, 660:17, 660:23, 661:7, 661:10, 673:23, 677:4, 677:22, 681:3, 682:4, 683:1, 688:3, 688:6, 688:11, 688:16, 689:6, 689:11, 689:17, 690:21, 692:6, 694:9, 695:15, 698:21, 699:10, 700:22, 702:25,

705:5, 705:20,
711:11, 711:19,
713:17, 713:19,
718:16, 725:17,
728:11, 730:7,
731:6, 732:14,
732:19, 733:1,
734:7, 735:21,
736:4, 736:18,
736:25, 737:14,
737:21, 738:2,
738:21, 739:10,
741:15, 742:23,
743:9, 745:22,
746:4, 747:24,
749:22, 750:10
**ROBERTSON** [1] -
627:6
**Robertson's** [2] -
744:17, 749:12
**Robinson** [1] - 633:18
**Rocky** [5] - 676:18,
677:2, 677:8, 693:4,
696:3
**role** [7] - 644:6,
644:25, 645:2,
664:25, 667:13,
672:6, 728:5
**ROLLINS** [15] -
627:17, 629:2,
629:4, 629:13,
629:15, 630:6,
632:2, 636:2, 758:6,
758:9, 758:12,
758:19, 758:21,
758:24, 759:3
**Rollins** [7] - 627:18,
630:13, 630:24,
631:19, 636:7,
637:1, 758:4
**room** [34] - 635:9,
635:10, 635:11,
637:8, 653:16,
707:14, 707:19,
725:13, 725:15,
726:6, 726:20,
727:18, 728:13,
728:14, 728:16,
728:19, 729:6,
730:21, 731:7,
731:9, 731:13,
731:18, 732:4,
732:15, 732:17,
732:20, 734:12,
735:8, 735:25,
736:20, 737:1,
737:11, 750:10
**Room** [1] - 627:21
**rooms** [1] - 643:21
**Rotunda** [2] - 648:12,

648:13
**roughly** [4] - 652:9,
693:6, 703:13,
750:19
**route** [3] - 656:10,
661:4, 670:24
**row** [5] - 663:9,
675:14, 675:18,
695:14, 744:24
**RPR** [1] - 627:21
**Rudy** [1] - 697:14
**run** [1] - 669:20
**running** [3] - 633:14,
633:15, 656:20
**rushed** [1] - 632:20

---

## S

**S-C-H-W-A-G-E-R** [1]
- 638:17
**safe** [6] - 701:10,
701:11, 701:16,
717:14, 717:15,
726:1
**safety** [3] - 687:12,
687:16, 717:11
**satisfied** [1] - 629:25
**save** [1] - 724:6
**savior** [2] - 685:21,
685:23
**saw** [19] - 632:5,
632:16, 634:23,
653:16, 660:20,
670:20, 685:13,
699:13, 699:22,
700:13, 701:9,
703:5, 703:10,
705:20, 717:6,
718:24, 738:11,
743:3, 756:14
**scaffolding** [7] -
708:10, 708:13,
708:14, 708:18,
709:5, 709:7, 710:12
**schedule** [2] - 757:8,
757:12
**scheduled** [3] -
665:12, 665:15,
665:24
**school** [1] - 686:4
**Schwager** [17] - 638:3,
638:15, 638:17,
638:18, 641:5,
645:16, 646:2,
647:8, 647:13,
651:15, 652:14,
657:3, 658:4,
658:10, 660:3,
660:12, 662:16

**SCHWAGER** [2] -
628:5, 638:12
**screaming** [1] -
699:17
**screen** [22] - 648:22,
649:1, 649:4, 702:2,
704:16, 707:22,
709:19, 710:3,
713:3, 713:15,
714:8, 719:19,
720:3, 720:7, 722:9,
725:10, 725:16,
726:3, 729:25,
736:3, 737:4, 740:5
**screenshots** [1] -
718:25
**scurrying** [1] - 670:21
**seal** [1] - 645:11
**search** [5] - 629:18,
629:19, 631:6,
747:14, 747:18
**searched** [2] - 747:9,
749:1
**seat** [3] - 695:13,
697:5, 744:22
**second** [7] - 659:9,
661:8, 661:22,
670:22, 671:14,
708:3, 736:23
**seconds** [21] - 647:18,
648:11, 649:25,
710:15, 710:16,
711:5, 711:7,
711:15, 712:11,
712:15, 716:2,
722:17, 723:1,
729:21, 729:23,
731:3, 731:23,
731:24, 732:9,
732:13, 737:13
**Secret** [16] - 644:12,
663:23, 663:24,
664:3, 664:5,
664:10, 664:25,
665:1, 665:24,
666:10, 666:11,
667:15, 672:3,
672:24, 673:9,
673:16
**Secretary** [6] - 638:19,
638:22, 639:6,
639:15, 645:6, 650:6
**secretary** [12] -
638:21, 638:24,
638:25, 639:8,
639:16, 645:11,
651:18, 651:19,
653:11, 656:21,
656:24, 659:14
**secretary's** [1] -

659:11
**Section** [2] - 645:17,
651:4
**secure** [2] - 672:8,
746:21
**secured** [1] - 658:20
**Security** [1] - 664:2
**security** [7] - 665:24,
666:23, 667:9,
667:13, 670:7,
685:18, 755:17
**see** [100] - 629:21,
633:9, 645:9, 648:2,
648:12, 648:13,
648:15, 648:18,
648:25, 649:7,
649:11, 649:23,
650:1, 651:20,
652:20, 655:11,
656:5, 656:6,
656:19, 657:21,
659:13, 660:17,
660:22, 661:1,
661:10, 668:15,
673:25, 676:2,
685:6, 689:17,
689:18, 694:13,
695:6, 698:11,
699:19, 700:7,
700:18, 703:20,
704:3, 704:5, 704:8,
704:15, 704:25,
705:5, 705:23,
710:18, 710:25,
712:17, 712:22,
713:3, 713:5, 713:6,
714:8, 714:12,
714:21, 715:8,
715:11, 715:17,
715:23, 716:11,
717:1, 718:8,
718:22, 719:19,
720:3, 722:8, 723:2,
724:14, 726:2,
727:14, 728:18,
728:21, 729:4,
729:10, 730:5,
730:7, 730:24,
733:25, 735:21,
736:25, 737:3,
738:17, 738:25,
739:25, 740:7,
740:14, 741:4,
741:8, 741:10,
741:21, 745:16,
745:22, 749:8,
750:7, 751:23,
752:6, 756:21,
757:2, 757:4, 759:17
**seeing** [9] - 651:15,

653:15, 661:11,
661:12, 690:21,
702:11, 715:6,
717:9, 718:20
**seem** [1] - 757:7
**segment** [1] - 712:19
**selfie** [1] - 733:19
**Senate** [72] - 638:19,
638:22, 638:25,
639:3, 639:6,
639:15, 639:16,
639:17, 639:18,
640:2, 640:3,
641:15, 641:16,
641:20, 642:1,
642:4, 642:6, 642:7,
642:14, 643:9,
643:18, 643:19,
643:23, 644:6,
644:8, 644:10,
645:5, 646:20,
646:21, 647:14,
647:25, 648:4,
648:5, 649:10,
649:18, 650:7,
650:15, 651:1,
651:8, 651:9,
651:16, 651:19,
651:23, 651:25,
652:24, 654:7,
654:14, 656:22,
658:6, 658:21,
658:23, 659:10,
660:12, 660:16,
660:22, 661:2,
662:2, 665:5, 668:4,
668:12, 668:16,
668:22, 669:9,
669:12, 669:17,
670:10, 671:14,
672:12, 672:15
**senator** [4] - 639:19,
639:20, 642:5, 651:7
**senators** [11] - 642:7,
649:1, 649:21,
649:23, 650:19,
655:15, 655:22,
659:6, 660:21,
668:23, 669:12
**sense** [6] - 638:24,
674:9, 717:9, 719:2,
721:18, 755:17
**sent** [2] - 630:9, 645:4
**sentence** [4] - 661:23,
662:1, 681:12,
681:15
**sentenced** [1] - 681:9
**separate** [4] - 642:1,
643:12, 662:3, 681:6
**separated** [1] - 700:15

separately [1] - 647:17

sergeant [2] - 665:5, 677:7, 683:18

sergeant-at-arms [1] - 665:5

serious [2] - 653:9, 655:23

serve [1] - 682:23

Service [16] - 644:12, 663:23, 663:24, 664:3, 664:5, 664:10, 664:25, 665:1, 665:24, 666:10, 666:11, 667:15, 672:3, 672:24, 673:9, 673:17

service [4] - 682:20, 682:21, 706:6

SESSION [1] - 627:8

session [16] - 641:12, 641:14, 641:20, 641:21, 641:23, 642:15, 644:17, 644:20, 644:21, 647:17, 660:6, 662:9, 662:10

set [2] - 666:23, 667:9

sets [1] - 647:13

seven [1] - 672:18

Seventh [1] - 627:19

several [3] - 639:21, 650:23, 675:3

shaking [1] - 700:20

share [4] - 688:21, 745:25, 746:4, 753:24

shares [1] - 645:5

shield [4] - 636:14, 636:15, 686:24

shift [6] - 640:19, 683:8, 683:10, 683:21, 683:22, 683:24

short [2] - 653:23, 670:11

shorthand [1] - 627:25

shortly [2] - 654:14, 658:6

shoulder [3] - 707:4, 731:14, 731:15

shout [1] - 727:20

shouted [1] - 727:23

shouting [3] - 637:13, 700:1, 700:3

show [13] - 640:19, 643:22, 651:14,

667:6, 703:24, 704:14, 704:19, 711:8, 712:4, 727:8, 734:21, 738:14, 757:4

showed [1] - 651:3

shown [1] - 756:10

sic [1] - 633:18

side [10] - 633:7, 648:8, 675:17, 681:23, 681:25, 682:1, 726:2, 729:25, 731:12, 732:4

sides [1] - 643:13

sign [8] - 663:12, 675:18, 678:23, 679:9, 680:8, 680:10, 680:12, 716:14

signal [1] - 663:4

signed [4] - 641:1, 645:11, 645:12, 664:15

significantly [1] - 634:19

signs [3] - 702:11, 716:11, 716:13

similar [1] - 687:2

simply [1] - 640:25

single [1] - 648:14

sit [5] - 652:5, 663:7, 663:8, 663:9, 756:15

sitting [9] - 630:21, 651:17, 675:11, 681:9, 682:1, 686:19, 695:12, 744:21, 756:7

situation [11] - 636:13, 653:9, 655:12, 670:22, 671:22, 675:4, 675:24, 706:12, 706:16, 717:14, 717:15

situational [4] - 634:3, 687:4, 687:17, 688:4

slap [1] - 756:14

slide [10] - 714:12, 714:13, 714:18, 715:10, 715:17, 715:19, 729:9, 738:14, 740:6, 740:14

slightly [1] - 714:19

small [1] - 659:9

smaller [2] - 653:18, 669:22

smell [3] - 702:12, 702:16, 702:22

smoke [1] - 699:18

soap [1] - 690:12

social [6] - 689:11, 690:22, 746:1, 746:5, 751:5, 751:17

solid [1] - 743:13

solved [1] - 748:15

someone [13] - 636:17, 663:4, 677:4, 678:8, 707:8, 710:18, 716:15, 716:17, 716:19, 722:16, 727:20, 730:2, 747:14

something.. [1] - 676:1

sometime [1] - 718:21

sometimes [1] - 676:22

somewhat [1] - 758:14

somewhere [4] - 644:17, 658:13, 695:19, 703:16

son [1] - 684:13

soon [1] - 670:20

sorry [18] - 645:12, 647:1, 657:17, 664:20, 683:23, 696:7, 700:19, 715:19, 720:16, 722:22, 722:23, 725:4, 752:11, 753:2, 753:17, 754:21, 758:11

sort [2] - 663:3, 709:6

sound [1] - 647:8

sounds [1] - 759:4

Southeast [1] - 685:17

space [2] - 643:12, 663:9

Speaker [4] - 642:8, 644:4, 652:20, 727:25

speaker [1] - 644:2

special [3] - 664:16, 664:18, 664:20

Special [1] - 757:23

specific [6] - 664:19, 722:7, 743:2, 745:2, 755:22, 755:24

specifically [9] - 630:6, 654:17, 678:20, 682:22, 692:2, 699:2, 738:21, 746:18, 753:9

specifics [1] - 686:20

speeches [3] - 697:12, 697:21, 698:4

spell [3] - 638:15,

663:19, 676:14

spent [1] - 690:16

spicy [1] - 753:8

split [2] - 684:1, 708:2

sporadically [2] - 691:1, 731:16

spot [1] - 693:2

spray [1] - 702:10

squared [1] - 747:3

staff [9] - 639:2, 640:5, 650:6, 651:18, 652:4, 653:16, 655:7, 655:22

staffer [1] - 639:21

staffers [5] - 649:6, 649:10, 651:20, 652:5, 660:21

stage [1] - 657:7

stairs [20] - 703:22, 703:25, 708:7, 708:9, 708:12, 708:14, 709:5, 709:12, 709:13, 711:9, 711:18, 711:20, 711:25, 712:5, 713:20, 713:23, 716:8, 718:8, 718:21, 718:23

stairwell [1] - 709:8

stamp [9] - 660:4, 660:11, 715:23, 719:17, 724:25, 730:24, 731:20, 735:18, 737:7

stamps [2] - 660:14, 732:11

stance [2] - 632:14, 654:16

stand [3] - 631:21, 631:25, 642:6, 642:12, 661:7, 662:7, 662:8, 673:23, 731:9

standard [2] - 747:14, 747:17

standing [8] - 637:15, 652:3, 657:5, 667:24, 668:1, 669:7, 703:21, 708:21

stands [2] - 690:12, 693:17

start [10] - 646:19, 647:14, 665:15, 710:15, 712:11, 716:4, 719:16, 720:22, 723:15, 738:7

started [1] - 653:22, 683:7, 710:13

starting [3] - 644:16, 729:23, 738:14

starts [1] - 706:11

state [4] - 638:15, 645:11, 645:12, 663:19

state's [1] - 651:5

statement [3] - 678:24, 679:11, 679:20

Statement [1] - 679:5

statements [1] - 681:7

STATES [3] - 627:1, 627:3, 627:11

States [17] - 638:19, 638:22, 641:6, 641:7, 641:12, 641:14, 641:15, 642:20, 643:9, 644:8, 644:24, 645:18, 651:7, 663:23, 664:11, 665:4

station [4] - 695:19, 695:20, 697:7, 743:7

statue [3] - 728:14, 730:1, 733:17

statues [3] - 725:15, 726:6, 726:21

statutes [2] - 645:18, 645:19

statutory [1] - 644:22

stay [6] - 672:11, 685:4, 698:4, 730:21, 742:10, 742:12

Steal [3] - 700:5, 711:4, 716:14

stenotype [1] - 627:25

step [3] - 690:14, 751:15

steps [4] - 638:2, 662:21, 674:8, 757:6

stick [36] - 633:4, 633:6, 633:7, 633:8, 633:11, 633:15, 634:7, 634:15, 635:3, 635:7, 635:9, 635:15, 635:16, 635:18, 636:8, 636:11, 636:21, 688:7, 694:9, 694:11, 694:13, 695:7, 705:12, 705:13, 705:20, 708:5, 710:22, 713:14, 713:17, 713:21, 713:23,

724:22, 729:3, 736:19
**stick-like** [1] - 710:22
**sticks** [2] - 702:13, 707:12
**still** [23] - 631:23, 636:17, 640:11, 649:4, 678:2, 692:12, 698:21, 699:10, 707:8, 707:19, 708:22, 711:11, 711:19, 714:4, 718:22, 731:6, 734:3, 751:10, 754:25, 756:3, 756:5, 758:14, 758:20
**stipulate** [1] - 641:10
**stipulation** [8] - 640:21, 640:24, 640:25, 641:2, 641:5, 641:6, 661:17, 661:21
**stood** [5] - 634:18, 654:25, 656:21, 657:8, 669:5
**stop** [10] - 649:21, 654:14, 654:17, 678:20, 695:18, 710:18, 711:7, 713:2, 716:4, 723:2
**Stop** [3] - 700:5, 711:4, 716:14
**stopped** [4] - 648:17, 656:20, 713:18, 732:12
**story** [2] - 699:7, 699:8
**straight** [1] - 700:24
**strap** [1] - 708:5
**straps** [1] - 715:8
**street** [2] - 698:7, 698:8
**Street** [2] - 627:15, 627:19
**strike** [2] - 707:4, 707:8
**strikes** [1] - 706:20
**striking** [1] - 706:22
**stuff** [12] - 687:23, 693:19, 699:18, 700:5, 702:10, 702:15, 705:17, 706:20, 708:25, 750:24, 756:16
**subject** [2] - 654:18, 654:24
**sufficient** [2] - 659:11, 667:3
**suggest** [1] - 743:9

**suggested** [1] - 746:22
**suit** [3] - 700:19, 709:8, 709:9
**sum** [1] - 750:25
**super** [1] - 742:11
**supervise** [1] - 683:19
**supervisor** [1] - 665:1
**supervisors** [3] - 671:9, 671:16, 687:2
**supplied** [1] - 694:1
**supply** [2] - 707:13, 707:19
**support** [2] - 639:4, 754:25
**supporters** [1] - 696:22
**supposed** [4] - 700:20, 717:25, 740:25, 750:21
**sure..** [1] - 683:24
**surprised** [1] - 745:7
**suspend** [1] - 654:19
**suspended** [2] - 629:8, 642:13
**sustain** [1] - 631:4
**sweatshirt** [1] - 711:1
**swept** [1] - 736:1
**switched** [1] - 707:18
**SWORN** [3] - 638:12, 663:16, 676:10
**symptoms** [1] - 702:12
**synonym** [1] - 704:2

## T

**T.J** [30] - 677:21, 678:10, 679:24, 684:14, 691:12, 692:20, 694:2, 695:11, 698:14, 704:24, 707:24, 709:10, 713:6, 714:16, 714:17, 715:1, 715:16, 715:22, 719:13, 724:18, 729:1, 729:14, 733:17, 735:10, 735:13, 738:20, 740:10, 740:18, 746:16, 747:4
**T.J.'s** [2] - 693:3, 697:2
**tapping** [1] - 736:19
**targets** [1] - 696:25
**tasks** [2] - 639:12, 644:2

**taste** [3] - 702:13, 702:16, 702:22
**taught** [1] - 684:21
**team** [3] - 634:25, 650:6, 658:19
**tellers** [5] - 650:10, 650:18, 650:19, 650:20
**tem** [1] - 654:3
**temporarily** [1] - 654:19
**temporary** [1] - 662:8
**tempore** [4] - 653:17, 654:4, 654:16, 654:23
**ten** [1] - 640:7
**tense** [1] - 655:6
**tentatively** [1] - 759:10
**term** [2] - 687:4, 748:15
**terminated** [1] - 684:24
**terms** [2] - 660:5, 683:15
**terrace** [1] - 742:17
**terrified** [1] - 747:22
**testified** [1] - 630:3
**testify** [3] - 630:16, 758:23, 758:24
**testifying** [2] - 629:22, 681:13
**TESTIMONY** [1] - 628:2
**testimony** [14] - 630:4, 631:5, 637:22, 637:23, 642:23, 645:23, 662:17, 662:18, 674:5, 674:6, 674:23, 681:6, 757:3, 759:8
**text** [2] - 733:24, 746:5
**THE** [77] - 627:1, 627:10, 629:14, 629:16, 630:4, 630:12, 631:2, 631:14, 631:24, 637:21, 637:25, 638:1, 638:9, 638:12, 640:23, 645:24, 646:3, 646:4, 662:16, 662:19, 662:20, 662:22, 663:7, 663:11, 663:16, 674:3, 674:5, 674:9, 674:17, 674:19, 674:22, 675:1, 675:6, 675:8, 675:10, 675:13,

675:16, 676:2, 676:5, 676:7, 676:10, 679:16, 680:17, 689:1, 689:4, 689:25, 690:4, 693:16, 693:17, 693:20, 723:11, 727:1, 733:10, 735:1, 735:5, 748:8, 751:25, 752:2, 752:15, 754:15, 756:19, 757:1, 757:7, 757:13, 757:15, 757:17, 757:19, 757:24, 758:4, 758:8, 758:11, 758:17, 758:20, 758:22, 759:1, 759:4, 759:10
**themselves** [1] - 629:20
**thinking** [3] - 721:9, 721:15, 742:14
**third** [1] - 668:14
**Thomas** [3] - 641:9, 677:4, 681:2
**THOMAS** [1] - 627:6
**threat** [2] - 672:22, 688:1
**threatened** [1] - 670:7
**threatening** [1] - 655:12
**threats** [1] - 653:25
**three** [6] - 683:13, 683:14, 694:4, 738:1, 758:9, 758:12
**threw** [1] - 710:25
**throughout** [2] - 731:16, 742:19
**throw** [1] - 710:19
**throwing** [2] - 699:17, 704:12
**thrown** [2] - 710:21, 710:23
**time-out** [1] - 662:8
**Title** [2] - 645:17, 651:4
**titled** [1] - 679:5
**today** [12] - 642:23, 674:13, 681:9, 681:18, 682:1, 685:9, 686:19, 716:19, 756:5, 756:7, 756:15, 758:15
**together** [6] - 641:22, 648:7, 655:16, 655:17, 682:15, 746:23

**tomorrow** [5] - 756:22, 757:8, 758:3, 759:5, 759:12
**took** [17] - 633:11, 654:5, 654:16, 656:14, 658:21, 694:18, 697:6, 719:12, 726:20, 733:6, 735:9, 735:13, 735:15, 744:14, 745:20, 751:15, 753:20
**tool** [1] - 705:18
**top** [12] - 633:4, 633:5, 633:6, 633:8, 633:9, 635:9, 635:10, 709:17, 711:19, 752:11, 752:19
**topic** [3] - 685:11, 745:5, 745:8
**topics** [2] - 678:12, 686:13
**torn** [1] - 704:9
**total** [1] - 640:6
**touch** [2] - 702:2, 704:18
**toward** [1] - 702:3
**towards** [6] - 632:24, 698:10, 710:24, 718:15, 726:10, 738:11
**town** [2] - 676:23, 748:23
**traditional** [1] - 656:21
**traffic** [1] - 671:21
**train** [2] - 676:22, 695:19
**trained** [3] - 655:11, 686:22, 687:1
**training** [6] - 653:10, 684:22, 685:17, 687:2, 702:17, 702:19
**transcript** [1] - 760:4
**Transcript** [1] - 627:25
**TRANSCRIPT** [1] - 627:10
**transcription** [1] - 627:25
**travel** [4] - 666:12, 677:10, 677:13, 738:10
**traveled** [1] - 658:20
**traveling** [1] - 656:4
**travels** [1] - 666:5
**trial** [1] - 637:24
**TRIAL** [1] - 627:10
**trip** [2] - 692:9, 709:16
**trouble** [1] - 700:8
**truck** [1] - 747:4

**true** [1] - 679:11
**Trump** [3] - 692:4, 697:16
**trunk** [2] - 695:2, 695:3
**truth** [1] - 631:9
**try** [1] - 759:11
**trying** [12] - 635:7, 655:6, 675:16, 703:5, 703:10, 703:14, 718:5, 719:13, 722:15, 725:23, 726:11, 753:25
**Tuesday** [1] - 641:18
**turn** [4] - 645:14, 647:5, 746:14, 748:24
**turned** [5] - 746:23, 747:10, 747:21, 748:23, 750:5
**turning** [1] - 658:16
**twenty** [2] - 664:6, 673:15
**twenty-two** [2] - 664:6, 673:15
**two** [23] - 640:15, 641:21, 642:1, 643:6, 643:11, 643:20, 643:21, 650:19, 662:3, 664:6, 673:15, 675:13, 684:1, 685:3, 685:16, 699:1, 714:21, 715:11, 715:17, 735:23
**two-week** [1] - 684:1
**type** [4] - 686:5, 688:11, 721:2, 746:19

# U

**U.S** [4] - 627:15, 627:21, 641:13, 677:15
**ultimately** [1] - 682:13
**unaware** [1] - 743:16
**uncomfortable** [2] - 682:2, 682:3
**under** [9] - 631:23, 645:3, 694:20, 697:5, 709:5, 715:13, 715:15, 715:19, 715:21
**underneath** [6] - 708:12, 708:14, 728:23, 729:11,

753:19
**uniformed** [2] - 671:17, 671:20
**UNITED** [3] - 627:1, 627:3, 627:11
**United** [17] - 638:19, 638:22, 641:6, 641:7, 641:12, 641:14, 641:15, 642:20, 643:9, 644:8, 644:24, 645:17, 651:7, 663:23, 664:11, 665:4
**unknown** [2] - 679:24, 696:24
**unrelated** [1] - 630:2
**unsure** [1] - 630:16
**unusual** [1] - 687:22
**up** [85] - 630:12, 631:2, 635:19, 637:17, 642:1, 647:13, 648:7, 650:9, 650:16, 652:11, 653:18, 654:25, 660:10, 661:7, 661:20, 662:3, 666:23, 667:9, 668:13, 669:19, 673:23, 688:10, 690:6, 691:19, 692:13, 692:18, 693:2, 693:12, 695:4, 696:9, 698:17, 700:19, 707:3, 708:10, 708:11, 708:14, 709:4, 709:12, 709:13, 709:15, 709:20, 709:24, 710:13, 711:9, 711:24, 712:5, 712:10, 713:20, 713:23, 716:8, 717:18, 718:8, 718:10, 718:21, 718:23, 719:4, 719:22, 720:24, 720:25, 724:10, 728:8, 728:10, 728:15, 729:6, 729:17, 730:10, 731:20, 731:25, 732:7, 734:6, 742:8, 742:12, 742:14, 743:3, 745:6, 745:9, 752:10, 752:19, 753:3, 753:8, 753:18, 757:4,

757:25, 758:14
**upper** [1] - 699:7
**upstairs** [2] - 668:6, 670:19

# V

**vaguely** [1] - 753:11
**variety** [1] - 639:9
**various** [2] - 639:11, 644:2
**vehicles** [1] - 666:9
**veracity** [2] - 630:5, 631:8
**Vice** [5] - 642:3, 642:5, 664:16, 668:6, 671:13
**vice** [48] - 641:23, 644:6, 644:7, 644:9, 648:18, 650:9, 650:14, 650:16, 651:17, 652:24, 653:15, 653:21, 654:5, 654:8, 656:15, 657:6, 657:14, 659:19, 664:10, 664:15, 664:19, 664:23, 665:20, 665:25, 666:5, 666:9, 666:12, 666:16, 667:3, 667:12, 667:20, 667:22, 668:2, 668:7, 668:18, 668:23, 669:11, 669:25, 670:7, 670:23, 671:8, 671:16, 672:1, 672:3, 672:7, 672:11, 672:14, 673:4
**video** [42] - 633:10, 647:7, 647:21, 648:17, 648:24, 650:12, 650:25, 657:3, 658:5, 658:10, 709:16, 710:9, 710:15, 710:19, 712:7, 712:14, 712:19, 716:6, 716:23, 718:14, 718:16, 719:3, 719:12, 722:15, 722:20, 722:23, 723:4, 723:5, 723:15, 723:18, 724:3, 725:4, 725:17, 726:13, 726:20, 732:11, 736:5,

736:8, 737:8, 737:10, 737:14, 738:12
**Video** [29] - 656:13, 657:2, 658:3, 658:9, 709:25, 710:17, 711:6, 711:16, 712:3, 712:16, 713:1, 716:5, 716:22, 718:13, 719:18, 721:22, 722:18, 723:16, 724:12, 725:18, 726:17, 727:7, 730:4, 731:5, 732:2, 732:10, 736:6, 736:24, 737:15
**videos** [10] - 677:24, 745:14, 745:19, 745:23, 745:25, 746:4, 747:22, 748:5, 749:17, 756:8
**view** [4] - 714:19, 728:5, 732:3, 753:2
**views** [3] - 690:22, 690:25, 691:3
**Virginia** [2] - 676:18, 695:19
**virtual** [1] - 675:20
**visible** [1] - 740:12
**visibly** [1] - 656:8
**vision** [1] - 661:5
**visits** [1] - 667:3
**vividly** [2] - 690:20, 703:23
**voice** [1] - 656:14
**vote** [16] - 641:11, 641:17, 642:18, 645:4, 645:8, 645:10, 645:12, 645:20, 649:16, 650:8, 650:17, 650:20, 651:5, 651:11, 665:19, 668:25
**votes** [5] - 644:23, 646:15, 651:11, 658:18

# W

**W-A-D-E** [1] - 663:21
**WADE** [2] - 628:7, 663:16
**Wade** [6] - 663:1, 663:15, 663:19, 663:21, 663:22, 674:3
**WAGNER** [21] -

736:8, 737:8,
**Video** [29] - 656:13,
627:18, 638:8, 647:10, 659:24, 661:13, 662:24, 663:8, 663:13, 673:21, 674:2, 679:15, 680:16, 688:25, 689:22, 723:10, 726:25, 733:9, 734:25, 748:7, 752:14, 754:14
**waiting** [4] - 648:2, 666:22, 750:9, 750:10
**walk** [2] - 648:8, 719:10
**walked** [2] - 648:25, 699:5
**walking** [7] - 649:7, 649:9, 688:7, 698:15, 702:3, 709:4, 725:19
**wall** [2] - 656:19, 730:1
**war** [2] - 745:5, 745:9
**warmer** [1] - 631:15
**warrant** [1] - 746:12
**warrants** [1] - 746:11
**Washington** [8] - 627:6, 627:16, 627:19, 627:22, 677:10, 691:8, 697:10, 697:11
**watch** [8] - 660:7, 686:5, 711:17, 712:7, 712:14, 725:16, 729:19, 746:23
**watched** [4] - 712:19, 716:7, 731:17, 737:17
**watching** [1] - 696:21
**water** [5] - 693:15, 695:7, 696:2, 717:4, 753:6
**Wayne** [2] - 760:9, 760:9
**WAYNE** [2] - 627:21, 760:3
**ways** [1] - 645:8
**weapon** [3] - 634:5, 634:9, 636:20
**weapons** [5] - 634:2, 704:3, 704:4, 704:6, 704:8
**wear** [1] - 702:13
**wearing** [6] - 705:3, 705:7, 705:9, 710:5, 710:7, 714:16
**Wednesday** [1] -

627:6
**week** [3] - 684:1, 685:3, 685:7
**weeks** [2] - 684:1
**weird** [1] - 756:8
**welcome** [3] - 631:14, 631:23, 676:7
**west** [1] - 671:4
**what'd** [2] - 742:7, 744:25
**whatsoever** [1] - 630:25
**where'd** [1] - 738:9
**white** [1] - 753:3
**wife** [2] - 746:23, 746:25
**wife's** [2] - 694:21, 694:22
**wildly** [1] - 700:17
**Wilhoit** [2] - 757:13, 757:23
**window** [6] - 739:17, 739:18, 739:23, 739:25, 740:20, 742:3
**windows** [3] - 720:8, 738:11, 741:10
**withdrew** [2] - 642:1, 662:3
**WITNESS** [9] - 631:24, 637:25, 638:12, 646:4, 662:19, 663:16, 676:10, 689:4, 693:17
**witness** [17] - 630:15, 631:22, 638:5, 662:25, 674:10, 674:13, 679:1, 680:2, 689:14, 722:22, 723:1, 726:16, 732:23, 734:15, 751:21, 753:15, 758:13
**Witness** [19] - 631:25, 638:2, 648:21, 650:4, 652:23, 657:10, 657:24, 662:21, 674:8, 712:23, 713:8, 720:6, 724:20, 730:12, 735:24, 737:5, 738:24, 739:19, 757:6
**witnesses** [6] - 757:21, 757:22, 758:9, 758:12, 758:17, 759:9
**women** [1] - 649:9
**wooden** [1] - 707:12
**word** [3] - 698:17,

717:18, 727:20
**words** [2] - 704:2, 740:4
**worn** [1] - 630:21
**worthwhile** [1] - 629:23
**wounded** [1] - 634:19
**wrap** [1] - 757:25
**write** [1] - 755:15
**writing** [1] - 753:10
**written** [1] - 678:23
**wrote** [2] - 754:19, 755:12

## Y

**y'all** [1] - 754:23
**year** [5] - 676:24, 677:10, 678:14, 682:9, 696:22
**years** [7] - 640:7, 640:10, 664:6, 673:14, 682:24, 684:18, 747:11
**Years** [1] - 711:4
**yelling** [2] - 699:17, 702:10
**yellow** [7] - 714:8, 714:13, 728:21, 728:23, 738:17, 740:7, 740:15
**young** [2] - 649:6, 649:10
**yourself** [23] - 637:10, 650:1, 650:3, 657:21, 657:23, 674:20, 678:8, 705:1, 712:17, 712:22, 719:1, 720:3, 722:8, 727:14, 729:4, 730:5, 730:11, 734:5, 735:19, 736:25, 741:13, 747:21, 750:6
**yourselves** [1] - 748:24

## Z

**zero** [2] - 710:15, 739:9
**zoom** [1] - 729:10