```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                  Plaintiff,          1:21-cr-00034-CRC
                                        Thursday, April 7, 2022
 5    vs.                               9:14 a.m.

 6    THOMAS ROBERTSON,                 *MORNING SESSION*

 7
                    Defendant.
 8    - - - - - - - - - - - - - - - x

 9    _____

10                    TRANSCRIPT OF JURY TRIAL
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE

12    _____

      APPEARANCES:
13
      For the United States:      ELIZABETH ANN ALOI, ESQ.
14                                RISA BERKOWER, ESQ.
                                  UNITED STATES ATTORNEY'S OFFICE
15                                555 4th Street, NW
                                  Washington, DC 20530
16                                (202) 252-6782

17
      For Defendant Robertson:    MARK M ROLLINS, ESQ.
18                                CAMILLE WAGNER, ESQ.
                                  ROLLINS & CHAN
19                                419 Seventh Street, NW
                                  Washington, DC 20004
20                                (202) 455-5610

21    Court Reporter:            Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
22                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
23                                Washington, DC  20001
                                  202-354-3187
24

25
```

1                      I N D E X

2

       WITNESS                                          PAGE

3

JACOB FRACKER, Resumed
4        (By Mr. Rollins)................................. 790
         (By Ms. Berkower)............................... 827
5

SPECIAL AGENT KATHRYN CAMILIERE
6        (By Ms. Aloi)................................... 852
         (By Mr. Rollins)............................... 902
7        (By Ms. Aloi)................................... 912

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right.  Good morning, everybody.

3          COURTROOM IN UNISON:  Good morning.

4          THE COURT:  Okay.  We're still waiting for one

5     stray juror.

6          (Pause)

7          THE COURT:  We're still waiting on one stray

8     juror, I believe, but we have another juror issue.

9          Last night Juror No. 2 reported to the deputy that

10    he had been exposed to someone who has tested positive for

11    COVID.  We had him take a -- I believe a rapid test last

12    night.  He tested negative.

13         I believe the Court formerly had a policy for

14    employees that if they came into contact with someone with

15    COVID they would quarantine, I believe, for five days.  I

16    think that policy has recently been relaxed if they produce

17    a negative test.  It is Juror No. 2.

18         What I would propose is to bring him in and voir

19    dire him about, you know, who he came into contact with, how

20    close the contact was, was he masked or not when it

21    happened.  Unless it is some, you know, very close contact

22    that would give rise to, you know, a real possibility that

23    he has contracted it despite the negative test, I would be

24    inclined to keep him, but I want to hear from you all on

25    that and then hear from him.

```
 1              MS. ALOI:  Your Honor, the government agrees with

 2      that approach.

 3              THE COURT:  Okay.  Mr. Rollins or Ms. Wagner?

 4              MS. WAGNER:  The defense agrees as well.

 5              THE COURT:  Okay.  Lauren, if you could bring in

 6      Juror No. 2, please.

 7              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1219.

 8              THE COURT:  Good morning, sir.

 9              JUROR NO. 1219:  Good morning.

10              THE COURT:  How are you feeling?

11              JUROR NO. 1219:  Good.

12              THE COURT:  Okay.  So I understand that you

13      reported last night to the deputy that you've come into

14      contact with someone who has informed you that they've

15      tested positive for COVID; is that right?

16              JUROR NO. 1219:  That is correct.

17              THE COURT:  All right.  So I've discussed that

18      briefly with the parties.  I'd just like to ask you a few

19      more questions, and then we will discuss with them how they

20      want to proceed.

21              JUROR NO. 1219:  Okay.

22              THE COURT:  So tell us about what happened, who

23      the person is, how close the contact is, when it happened.

24      Were you masked or not?  Were you socially distanced?  Give

25      us the background.
```

```
1              JUROR NO. 1219:  I was at a social event on Sunday
2      afternoon, and a friend of mine was at the party.  It was --
3      it started on a rooftop so it was outside.  We were
4      unmasked.
5              It got cold.  We went inside.
6              Inside we were unmasked, but it was -- there were
7      probably around 15 people in an apartment setting.
8              Inside the individual -- my friend who has since
9      tested positive, she was there for approximately 15 minutes
10     inside and then left.  And then she informed all of us who
11     were there that she started having symptoms and then tested
12     positive.
13             THE COURT:  Okay.  To the extent you recall, how
14     closely in contact unmasked were you with him or her?
15             JUROR NO. 1219:  I would not -- I would say not
16     longer than five minutes within probably six feet.
17             THE COURT:  Okay.  And you've been asymptomatic?
18             JUROR NO. 1219:  Correct.
19             THE COURT:  And you tested negative last night?
20             JUROR NO. 1219:  Yes, I did.
21             THE COURT:  It was one of these --
22             JUROR NO. 1219:  I took at home a rapid antigen
23     test and tested negative, and I have not felt symptoms.
24             THE COURT:  Okay.  Counsel, anything else?
25             All right.  Thank you very much.  You can go back
```

1      to the jury room.

2                  (Juror exits courtroom)

3                  THE COURT:  All right.  So no objections to

4      keeping him?

5                  MS. WAGNER:  No objection.

6                  MS. ALOI:  No objection.

7                  THE COURT:  Thank you.  Okay.

8                  (To the Courtroom Deputy) All right.  Are we

9      ready?

10                 THE COURTROOM DEPUTY:  We're still waiting.

11                 THE COURT:  Okay.  Let's deal with the evidentiary

12     issue that the government raised last night.  Do you want to

13     be heard, Ms. Aloi or Ms. Berkower?

14                 MR. ROLLINS:  Can we be heard on the phone?

15                 THE COURT:  Why?  We're outside the presence of

16     the jury.

17                 MS. ALOI:  Your Honor, the government did not

18     intend to introduce any evidence of the defendant's honesty

19     in his case-in-chief.  In the cross-examination of a

20     government witness, the witness was asked point blank about

21     the defendant's honesty.  The government now intends to

22     rebut that testimony through the --

23                 THE COURT:  And I've read what the testimony is so

24     you don't have to.

25                 MS. ALOI:  The rebuttal evidence we intend to

1    offer we have provided the Court with an exhibit, which had

2    been previously disclosed to the defense that was obtained

3    by trial subpoena this week.  The defendant has represented

4    himself to be, to the town manager who had testified, a

5    graduate of the Army Ranger School.  The defendant is not a

6    graduate of the Army Ranger School.

7         THE COURT:  I can anticipate your argument,

8    Mr. Rollins, but why don't you make it yourself.

9         MR. ROLLINS:  The argument, I guess the Court

10   would reason, is that there is no mention of anything about

11   his service in the United States.  There was no mention

12   about his military service.

13        If the government wanted to challenge that issue,

14   I think it should have been brought out with Mr. Ervin, the

15   town manager, not call in some extrinsic evidence to suggest

16   otherwise, otherwise we'd have this mini trial -- I've

17   learned more about this Ranger School in the last ten

18   minutes, that you actually could be -- you don't actually

19   have to graduate from the Ranger School to be considered a

20   Ranger; that it encompassed, I guess, a large division.

21   It's not just -- you could be a Ranger and have been in that

22   division.  So at least that's what I'm reading on Wikipedia

23   and talking to my client.

24        So at this point I would -- I don't think we

25   should have this mini trial about whether, in fact, he was a

1    Ranger or whether he graduated from that Ranger School.

2          THE COURT:  Okay.  Do you intend or did you intend

3    to attempt to elicit any testimony from your character

4    witnesses going to his honesty?

5          MS. WAGNER:  The Court's indulgence.

6          (Pause)

7          MR. ROLLINS:  We're going to stick to just

8    peacefulness on the character witness.

9          THE COURT:  Okay.  So here's -- Ms. Aloi, so as we

10    discussed at the pretrial, the trait of honesty is not

11    intrinsic or, you know, entwined with any of the elements of

12    any of the offenses, right?  Which is why I was willing to

13    grant your motion in limine to prevent the defense from

14    bringing out any either general reputation or opinion

15    evidence on the trait of honesty or any specific acts.  All

16    right?

17          Mr. Rollins asked that question of the town

18    manager.  The government chose not to object, but I don't

19    think that was admissible.  Right?

20          Now you not only want to bring in, you know,

21    reputation or opinion testimony on that irrelevant trait,

22    but you also want to bolster that with a specific instance

23    of dishonesty.

24          That would then open the door for Mr. Rollins to

25    elicit testimony in his case on honesty, and I just -- you

1    know, I understand that he opened the door, but I'm not sure

2    that the one fleeting question was -- had a big enough

3    impact on the jury and certainly didn't go into specific

4    acts, which I would not have allowed, to sort of open this

5    whole can of worms.

6              So respond to that.

7              MS. ALOI:  Your Honor, given the Court's pretrial

8    rulings, the government had not prepared to cross-examine

9    that witness on this issue and had just obtained the records

10   confirming that the very resume that that witness was

11   relying on in judgment of the defendant's character contains

12   these false statements.  And so given the timing of when the

13   witness testified and when the government was able to review

14   the records to find out if the witness was relying on

15   truthful information in their testimony, we had -- we were

16   not, at that moment, prepared to conduct the cross-

17   examination.  And the very record on which the witness was

18   relying to evaluate, in part, the defendant's candor is the

19   one that we are now offering to show was simply not true.

20             And it actually, I just would point out --

21             THE COURT:  And instead of calling him back in

22   your rebuttal case from Roanoke, you want to put it on

23   through your agent?

24             MS. ALOI:  It's certainly a more efficient way of

25   doing it.

1           THE COURT:  But it still isn't relevant to the

2    charge.  That's my concern here, that we're -- you know, we

3    let in evidence of a trait that's not relevant.

4           So I would have sustained the objection had you

5    objected.  You let it come in by not objecting, and now

6    we're into this sort of spiral.

7           MS. ALOI:  I understand, Your Honor, but the

8    defense raised the defendant's military service in opening

9    at length, and there is no evidence right now in the case

10   about the defendant's military service except for the resume

11   that contains a false statement about the defendant's

12   military service.  Two false statements, I should add.  It's

13   mentioned more than once.  And so the jury has not had the

14   opportunity to hear evidence rebutting false statements that

15   are now in evidence.

16          And, again, we did not raise the military service

17   in our opening.  It was the defense who put it before the

18   jury in opening.

19          THE COURT:  All right.  Let me noodle a bit, and

20   we can deal with it when the time comes.

21          MS. ALOI:  Your Honor, I would just note that

22   false statements in the exhibit are on Pages 10 and 14, so

23   it's both in the resume and the application.

24          THE COURT:  Very well.

25          MS. ALOI:  Thank you.

```
 1              THE COURT:  Anything else?  I'm not sure our
 2      juror's here yet.
 3              MS. ALOI:  Yes, Your Honor, one other issue we
 4      wanted to raise.
 5              Yesterday, as the government's witness was
 6      exiting, the defendant both yelled out his name, tried to
 7      speak something we couldn't determine, and then gave him a
 8      gesture, and we would just ask the defendant not to
 9      communicate with the witnesses.
10              THE COURT:  Mr. Rollins.
11              MR. ROLLINS:  He understands.
12              THE COURT:  Okay.
13              All right.  If there's nothing else, once the
14      juror comes back, we'll get started.
15              (Recess taken)
16              THE COURT:  Good morning, ladies and gentlemen.
17      Hope everyone had a nice evening.  I think we are ready to
18      get started.
19              Can we bring Mr. Fracker back in?
20              Good morning, sir.
21              THE WITNESS:  Good morning.
22              THE COURT:  Please have a seat, and I will remind
23      you that you're still under oath, okay?
24              THE WITNESS:  Yes, sir.
25              THE COURT:  All right.  Mr. Rollins.
```

```
 1              MR. ROLLINS:  Yes, thank you, Your Honor.
 2                        CROSS-EXAMINATION
 3      BY MR. ROLLINS:
 4      Q.  Good morning, Mr. Fracker.
 5      A.  Good morning.
 6      Q.  I know yesterday you said you were a little nervous,
 7      correct?
 8      A.  Yes.
 9      Q.  All right.  And I guess it's fair to say you didn't want
10      to be here?
11      A.  Yes.
12      Q.  You became a police officer back in 2017?
13      A.  Yes, sir.
14      Q.  And TJ, Mr. Robertson, was instrumental in that?
15      A.  Yes.
16      Q.  And you became a police officer because you are a
17      protector by nature?
18      A.  Yes, sir.
19      Q.  Fair to say that because of that you don't like hurting
20      people, physically hurting people, or you don't like causing
21      harm to people?
22      A.  Correct.
23      Q.  And fair to say, absent what happened on January 6th,
24      you were a pretty good police officer.  Right?
25      A.  I think it's kind of opinion-based, but I think I was a
```

```
 1     fairly good officer.
 2     Q.  Now, turning your attention to that morning of January
 3     6th.  TJ packed the water, correct?
 4     A.  Yes.
 5     Q.  He packed the MREs, the meal -- those meals for you?
 6     A.  Correct.
 7     Q.  And packed three gas masks?
 8     A.  Yes.
 9     Q.  And it wasn't unusual for -- to bring gas masks.  That
10     was not something unusual given the things that happened
11     during the summertime, things you witnessed during the
12     summertime.  Correct?
13     A.  Correct.
14     Q.  And when I mean those things that you witnessed during
15     the summertime, you had seen protests on TV.  Correct?
16     A.  Yes.
17     Q.  So that wasn't something unusual.  Right?
18     A.  Not to me.
19     Q.  All right.  And you also saw TJ pack this stick,
20     correct?
21     A.  I remember seeing it in the picture.
22     Q.  Okay.
23     A.  And obviously he had it with him, so I would assume he
24     had it, yes, in the trunk.
25     Q.  And, in fact, when you saw him get out of the car --
```

1   when you stopped in Virginia and saw him get out of the car,

2   I think you made it a point to -- oh, we're about to do a

3   lot of walking.  Is that a point that you made?

4   A.  I don't really remember.

5   Q.  You don't remember telling the FBI that -- when you saw

6   the walking stick that you thought that that meant that

7   there was going to be a whole lot of walking?

8   A.  It sounds familiar.

9   Q.  And during the riot to D.C., there was no conversation

10  about what you were going to do when you got there, correct?

11  A.  Nothing about what did happen.

12  Q.  Okay.  And, for example, you never -- there was no

13  discussion about extremist groups like the Oath Keepers or

14  Proud Boys or anything like that.  Correct?

15  A.  If there was, we were probably making fun of them.

16  Q.  Okay.  So you are not a member.  You are not a member of

17  them, and TJ is not a member of that kind of extremist

18  organizations.  Correct?

19  A.  Correct.

20  Q.  In fact, TJ generally has a negative opinion of those

21  types of groups, correct?

22  A.  Yes.

23  Q.  And you likewise?

24  A.  Yes.

25  Q.  In fact, you understood that TJ was no real fan of

1    President Trump, correct?

2    A.  I knew him to be Republican, not the biggest supporter

3    of Trump himself.

4    Q.  Okay.  And you indicated that you were only going for

5    two reasons, right?

6    A.  Yes, sir.

7    Q.  The first reason is because TJ was this raggedy old

8    paratrooper, I think, as you described him.  Correct?

9    A.  I believe so.

10   Q.  And the other reason was because you wanted to see what

11   the plans were that the President had laid out for the plans

12   regarding -- specifically issues regarding your daughter and

13   whether she'll be going back to school, correct?

14   A.  Yes, sir.

15   Q.  So those were basically the only two reasons you were

16   going to that protest on January 6th.  Right?

17   A.  Yes, sir.

18   Q.  There was no discussion about going to impede law

19   enforcement.  Correct?

20   A.  Correct.

21   Q.  There was no discussion about influencing Congress.

22   Correct?

23   A.  Not that I can remember.

24   Q.  There was no discussion about trying to overturn the

25   election.  Correct?

1   A.  I don't believe so.

2   Q.  And then once you get to D.C., right, you -- I mean, you

3   and TJ generally take your weapons with you, right?  Because

4   you're police officers, right?

5   A.  Yes, sir.

6   Q.  And even when you're off duty.  You're still a police

7   officer even off duty?

8   A.  Yes.

9   Q.  And you carry those weapons with you sometimes even when

10  you're off duty.  Right?

11  A.  Yes.

12  Q.  But when you got to Virginia, whose idea was it to leave

13  those weapons in the car?

14  A.  TJ's idea.

15  Q.  Okay.  And one of the reasons why those weapons were to

16  be left in the car is because you'd been told that you

17  should not interfere in foreign jurisdictions.  Correct?

18  A.  Yes.  I'm sure that was a reason.

19  Q.  Okay.  And, in fact, that's part of the training you

20  were taught, is not to intervene in foreign jurisdictions.

21  Correct?

22  A.  Unless there's an immediate threat to a life or, you

23  know, substantial property.

24  Q.  Okay.  And do you recall TJ telling you not to bring

25  helmets, night vision, rifles or chemical weapons?  Do you

 1     recall anything like that?

 2     A.  I do not.

 3     Q.  Do you recall Mr. Robertson, TJ, telling you that he had

 4     a pocket knife that was 2.5 inches or greater?  Do you

 5     remember anything about a pocket knife?

 6     A.  I don't remember anything about that.

 7     Q.  Now, once you got out of the car, you get on the Metro,

 8     and you're walking -- after you get out of the Metro -- do

 9     you remember the Metro station you came out of?

10     A.  Are you asking which specific one?

11     Q.  Yes.

12     A.  I don't.

13     Q.  So once you come out of the Metro, do you recall having

14     a discussion regarding doing anything illegal on the

15     Capitol?

16     A.  No, sir.

17     Q.  Do you recall having a discussion at any time, in the

18     time that you're walking from the Metro to the Mall -- of

19     having a discussion regarding or an agreement doing

20     something illegal on the Capitol that day?

21     A.  Not in that time period, no.

22          MR. ROLLINS:  Can you pull up Government's Exhibit

23     603.  I'm sorry.  I didn't forewarn you.

24     Q.  So this is Government 603.  Can you show me where you

25     first got to the Capitol just by an X, the point where you

1    were at when you first got there.

2    A.   (Witness complies) It would be around here.

3    Q.   Okay.  And at that point were there any discussions

4    between you or anyone else regarding an agreement to go into

5    the Capitol?

6    A.   No.

7    Q.   Now, yesterday you indicated that the government asked

8    you about officers coming through there and coming through

9    at that point where you marked that X.  Do you recall ever

10   trying to impede or obstruct officers that were coming

11   through there where you were at?

12   A.   No, not intentionally.

13   Q.   Did you see officers coming through you?

14   A.   We did.

15   Q.   Okay.  And did you intentionally try to block those

16   officers?

17   A.   No, sir.

18   Q.   Did you try to impede them from doing their job?

19   A.   No, sir.

20   Q.   Did you see TJ or Mr. Robertson block or try to impede

21   officers?

22   A.   Not that I can remember.

23   Q.   Now, if you could -- and you can erase that X on the

24   screen with your thing.

25            MR. ROLLINS:  Would you pull up Exhibit 200B.

1    Q.  Do you see Mr. Robertson with that stick right there?

2    A.  I do.

3    Q.  Did you see Mr. Robertson at all, at that time when you

4    were in front of the Capitol, use that stick against an

5    officer?

6    A.  No.

7    Q.  Did you see him at any time use that stick as a weapon

8    against any officer?

9    A.  No.

10   Q.  At any time during that day, that entire day, did you

11   ever see Mr. Robertson use that stick as a weapon against

12   anyone?

13   A.  No.

14   Q.  Now --

15           MR. ROLLINS:  You can take that down.  Thank you.

16   Q.  Is it -- as a former police officer, and you being a

17   police officer that day, would you ever hit or hurt a police

18   officer?

19   A.  No.

20   Q.  Would you ever try to stop them from doing their job?

21   A.  Not from doing their job.

22   Q.  And Mr. Robertson was one of those individuals that

23   was -- influenced you in how you did your job.  Would that

24   be something he would ever do?

25           MS. BERKOWER:  Objection; calls for speculation.

```
1              THE COURT:  Rephrase.
2    Q.  You were trained to -- you were trained by
3    Mr. Robertson, and you -- also being a police officer, you
4    indicated today that you would never harm a police officer.
5    Correct?
6    A.  Correct.
7    Q.  And you would never try to stop a police officer from
8    doing their job?
9    A.  Correct.
10   Q.  The fundamental moral or the way you perceived to do
11   your job, where did you get that from?
12   A.  It would be a mixture of my upbringing plus compassion
13   for other police officers.
14   Q.  And did you also get that from TJ, from his being a
15   mentor to you?
16   A.  Yes.
17   Q.  So fair to say that, given that, TJ would not harm or
18   impede a police officer as well?
19   A.  That's fair to say.
20             MR. ROLLINS:  Can you pull up Exhibit 101C and go
21   to nine seconds.
22   Q.  There's a guy throwing a stick there, correct?
23   A.  Yes, sir.
24   Q.  Would you ever condone that type of behavior?
25   A.  No.
```

```
1    Q.  Would you ever do something like that?

2    A.  No.

3    Q.  Would TJ do something like that?

4    A.  No.

5    Q.  You see that words on that guy's shirt says "Stop the

6    Steal"?

7    A.  I do.

8    Q.  Prior to going there on January 6th, did you even know

9    what that meant?

10   A.  Not really.

11   Q.  So that's not something -- that's not something you --

12   you didn't realize what that even meant prior to getting

13   there that day?

14   A.  I would say it was, briefly prior to it, kind of a newer

15   phrase that was kind of going around.

16           MR. ROLLINS:  And if you could play 1:02 to 1:10.

17           (Video playing)

18           MR. ROLLINS:  It's okay if you don't have sound.

19           (Video playing)

20   Q.  Okay.  Do you see those people from 1:02 to 1:10?

21   A.  Yes.

22   Q.  Was there any agreement between you and those people?  I

23   mean, did you have any conversation, logical conversation,

24   with any of those people about what you were going to do

25   that day?
```

1    A.   There was no verbal conversation.

2    Q.   And was there any agreement with TJ or TJ's neighbor

3    about what was going to happen when you were going up those

4    steps?

5    A.   Not out loud.

6    Q.   Was there some type of informal agreement that you all

7    talked about?

8    A.   I think of it metaphorically, if I can speak a little

9    frankly.

10   Q.   "Metaphorically" meaning...?

11   A.   So you're stopped at a red light in your souped-up race

12   car, and somebody pulls up next to you, and he revs his

13   engine.  You rev your engine.  Kind of like -- just you

14   understand, like, once this light turns green we're going to

15   race.

16   Q.   Okay.  That's very good metaphor.

17            But in this case, you got to the top of the step

18   there, and you raced on, but the other person stayed.  Is

19   that fair to say?

20   A.   It's fair to say.  I don't know exactly what he was

21   doing once we lost contact with each other.

22   Q.   Because when you got to the top of those steps, you lost

23   TJ.  Right?

24   A.   Correct.

25   Q.   And so while you were in that race car getting ready to

1    race, Mr. Robertson did not engage in the race with you at

2    the same time.  Isn't that fair to say?

3    A.   Maybe.

4    Q.   Well, you did enter the Capitol by yourself.

5    A.   Yes.

6    Q.   With other people, right?

7    A.   Yes.

8           MR. ROLLINS:  Now if you could go to 1:52.  I

9    think we have sound at that point.

10          (Video playing)

11          MR. ROLLINS:  If you can go back to 1:52 or 1:49.

12          (Video playing)

13          MR. ROLLINS:  All right.

14   Q.   And you heard the officer in there saying, "Anyone want

15   water?"

16   A.   Yes, sir.

17   Q.   Did you sense any fear in that officer's voice at the

18   time?

19   A.   Not at the time, I don't believe.

20   Q.   And at that point, when he was saying "Does anyone want

21   water?," was anyone being violent out there?

22   A.   Not that I can remember.

23   Q.   If someone was being violent or harming that officer,

24   would you have stepped in at that point, if you saw that

25   officer being attacked?

1    A.   Absolutely.

2    Q.   Would TJ have stepped in if he saw that officer being

3    hurt?

4    A.   I believe he would have.

5             MR. ROLLINS:   Now, if you can pull up Exhibit 402.

6    Thank you.   2:09.   Sorry, 2:09.

7             (Video playing)

8             MR. ROLLINS:   2:09:10.   That's good.

9    Q.   So, Mr. Fracker, at that point that's when you entered

10   the building.   Correct?   You're in that picture?

11   A.   Yes.

12   Q.   And fair to say there was no agreement with anyone at

13   that point as well, right?   You didn't have an agreement

14   with anybody to do anything when you were entering the

15   Capitol.   Right?

16   A.   Not a spoken agreement, no.

17   Q.   All right.   And TJ hadn't -- you and him were at that

18   red light, and you moved on.   There was no agreement between

19   you and TJ at that point, correct?

20   A.   Not at that point.

21   Q.   And, in fact, you chose to enter the Capitol because you

22   were excited and you were -- you were feeling the crowd at

23   that point.   Right?

24   A.   Yes, sir.

25   Q.   And you learned that TJ entered the Capitol some three

1    minutes after you.  Correct?

2    A.  I didn't know the exact time, but...

3    Q.  But since then you've learned it was about three minutes

4    later?

5    A.  Yes.

6    Q.  And we see that when you go into the Capitol you take

7    out your phone, and you're using your phone, and you were

8    trying to contact people or contact TJ?

9    A.  And take a video.

10   Q.  Okay.  Was your phone working?  Could you communicate

11   with people?

12   A.  Not really.  The service was really bad.

13   Q.  All right.  So you were having a hard time communicating

14   with TJ, or anyone else for that matter.  Correct?

15   A.  Yes.

16   Q.  Then when you got into the building, it's call the Crypt

17   or the Hall of Statues.  Do you remember that?

18   A.  Yes.

19   Q.  So you went down that long corridor, and that long

20   corridor -- if you can, just show us with your finger the

21   corridor that you went down.

22   A.  (Witness complies)

23   Q.  Okay.  And how many minutes down that corridor does it

24   take you to get to the Hall of Statues or to the Crypt?

25   A.  I don't know exactly.

1      Q.  A minute or two?  Less than a minute?

2      A.  It's not very long.

3      Q.  Okay.

4      A.  I'd say a minute maybe.

5      Q.  Okay.  Now, while you're walking down that corridor, did

6      you go anywhere else?

7      A.  No.

8      Q.  Other than going down that corridor and going to the

9      Crypt?

10     A.  No.

11     Q.  So you didn't go to any corridors in Congress, to any

12     other corridors where the congressional body was sitting?

13     A.  No.

14     Q.  Did you even know where the congressional body was

15     sitting?

16     A.  I was ignorant to the layout of the building.

17     Q.  But once you got to -- once you got to the Crypt, you

18     could see there were other exits that you could go down, and

19     you could go down different hallways.  Correct?

20     A.  Yes.

21     Q.  In fact, you saw a big sign that said "Nancy Pelosi's

22     Office."  You could go down that hallway and go to her

23     office, right?

24     A.  I don't remember the sign.

25     Q.  But you saw that you could go in other directions from

1    this Hall of Statues?

2    A.  Sure.  Yes, sir.

3    Q.  And at some point during this did you learn that the

4    Hall of Statues is one of the areas that the public goes on

5    a tour -- can see as part of the tour?

6    A.  Are you asking at that time did I know that?

7    Q.  Well, did you later -- not at that time, but did you

8    later learn that that is actually open to the public when --

9    during normal hours?

10   A.  Open for tours, yes, sir.

11   Q.  And that would have been the only area that you went in,

12   correct?

13   A.  Yes.

14   Q.  Just that circular area within the Crypt?

15   A.  Correct.

16   Q.  You never left that area to go anywhere else?

17   A.  Except upon our exit.  I did use a restroom.

18   Q.  Okay.  And speaking of restrooms, sometimes -- and I

19   guess we've heard some of your social media posts.  You're

20   not always truthful in your social media posts.  Correct?

21   A.  I like to beef it up a little sometimes.

22   Q.  Right.  And, in fact, you said on your social media post

23   that you went to the bathroom in Nancy Pelosi's office,

24   correct?

25   A.  Uh-huh.

1    Q.  But that wasn't true.  Correct?

2    A.  Correct.

3    Q.  You were just being bolstering on social media?

4    A.  Correct.

5    Q.  So that people would kind -- well, so that you could get

6    a -- well, I don't know.  Why would you say that?  What was

7    the purpose of saying that you went to the bathroom in Nancy

8    Pelosi's bathroom, when you didn't, in fact, do that?

9    A.  Cool points, I guess.

10   Q.  But the fact is, if you saw Nancy Pelosi's office, would

11   you have gone in there?

12   A.  No.

13   Q.  So you knew that there were things that you shouldn't

14   do, right?  I mean, you understood that you were going to

15   stay in that Crypt area, right?  You weren't going to go

16   outside that Crypt area.  You could have gone down other

17   corridors.  Right?

18   A.  I don't think I thought that far ahead, to be honest.

19   Q.  Well, what caused you to leave the Crypt area?  Why did

20   you return and go back out the door?

21   A.  The police asked us to.

22   Q.  Okay.  So once the police asked you to do something, did

23   you fight with them?

24   A.  No.

25   Q.  So you just -- you agreed with them, and you just left

1    peacefully?

2    A.  Yes.

3    Q.  Did you argue or fight back with them?

4    A.  No.

5    Q.  Did TJ argue or fight back with the police?

6    A.  No.

7    Q.  And is it fair to say you were in that building for 20

8    minutes?  Less than 20?

9    A.  I think that's correct.

10   Q.  And while you were in that building, did you know what

11   Congress was doing in that building at the time?

12   A.  I guess I had somewhat of an understanding from what

13   that gentleman from earlier that I heard speaking was

14   saying, about if the vice president didn't do something then

15   the election results wouldn't be valid, or something like

16   that.  I don't know the exact, like, congressional progress

17   or process for that.

18   Q.  So you didn't know how Congress really certifies the

19   vote.  You didn't really understand that process.

20   A.  No.

21   Q.  And, in fact, I think you, at one point, said you

22   thought maybe they were on a Zoom call.  Right?

23   Congressional Congress was on a Zoom?  Did you tell the FBI

24   that?

25   A.  Yes.

1    Q.  And you also indicated that you were trying to keep TJ

2    safe.  Can you explain a little bit about that, why you felt

3    your duty was to keep him safe?

4    A.  He's my boy.  Like, I had to make sure he was good to

5    go, and if things got out of hand, I wanted to be able to

6    help him out.

7              MR. ROLLINS:  Could you pull up Exhibit 408.

8    Thank you.

9              408 zero to 15, zero to 15 seconds.

10             (Video playing)

11   Q.  Are you seeing that video there?

12   A.  Yes, sir.

13   Q.  And did you see any violence inside the Crypt while you

14   were in there?

15   A.  Violence how?

16   Q.  Did you see anybody attacking officers?

17   A.  Not vividly that I can remember.

18   Q.  And at that point in the video is TJ using or having

19   that stick in the port arms method, or is he using it as a

20   walking stick?  Do you want me to rewind it?

21   A.  Would you, please.

22             MR. ROLLINS:  Please go back to zero and go to 15.

23             (Video playing)

24   Q.  Do you see him there?

25   A.  I do.

1    Q.  And how is he using that stick at that point?

2    A.  Just as the walking stick method.

3    Q.  Outside of that picture with him holding it at port

4    arms, did you ever see him using that stick any other way

5    other than when he had it in the port arms or when he's

6    walking with it like that?

7    A.  Not that I can think of.

8    Q.  Do you recall, when you were inside the Crypt, hearing

9    TJ say "It's getting ugly in here" at some point?  Did you

10   remember him saying, "It's getting ugly, maybe we should

11   leave"?

12   A.  I don't remember that.

13   Q.  Okay.

14           MR. ROLLINS:  Can you go to 26 to 37 in 408.

15           Oh, same one we were in, 408, and just go to 26

16   seconds.

17           (Video playing)

18           MR. ROLLINS:  Play it through 40.

19           (Video playing)

20   Q.  Do you see at that point what the officer's doing?

21   A.  Yes, sir.

22   Q.  What was the officer telling you all at that point?

23   A.  He was directing us to leave the hallway.

24   Q.  And I think you said earlier, was there any protest at

25   that point?  You just -- did you go willingly?

1    A.  It was willing.

2              MR. ROLLINS:  Could you go to Exhibit 403, 1:07.

3              (Video playing)

4              MR. ROLLINS:  Can you go back to 1:07.

5    Q.  Do you see TJ in that photo right there, in that video?

6    A.  I do.

7    Q.  Do you see him right there at 1:07?  Who is he talking

8    with right there?

9    A.  It looks to be a Capitol Police officer.

10   Q.  Do you recall what the gist or what the discussion was

11   about that he was having with that officer?

12             MS. BERKOWER:  Your Honor, objection.  I think

13   this witness already -- Your Honor, I would object to that.

14   I think this witness already testified he doesn't remember

15   that.

16             THE COURT:  Overruled.  You can repeat your

17   answer.

18             And do you want to circle where he is in the

19   photograph for the jury's benefit, please?

20             MR. ROLLINS:  Yes.

21   Q.  Could you circle where TJ is with the officer.

22   A.  (Witness complies)

23   Q.  I know you said that you didn't remember what the

24   conversation was or couldn't hear it, but was there an

25   overall tone?  Was it anger?

1               Was there an angry tone going on between the two

2       of them, or was it pleasant?

3       A.  I don't remember any kind of anger or animosity.  I

4       couldn't say for sure.

5       Q.  Okay.  And, again, at any point while you were in

6       there -- and I see that you're in -- you're in that photo.

7       You're walking out with him, right?

8       A.  Yes.

9       Q.  You're either beside him or right behind him in that

10      photo that we're looking at, 1:07.  Right?

11      A.  Uh-huh.

12      Q.  At any point prior to that or while you were in the

13      Crypt, was there an agreement with you and TJ to obstruct

14      Congress?

15      A.  Not a verbal agreement.

16      Q.  Well, did you understand that TJ was trying to stop

17      Congress at some point?

18      A.  I kind of felt like everybody in that room had the same

19      goal.

20      Q.  And the same goal was to protest and let people -- I

21      think yesterday you said to let your voices be heard.

22      A.  Yes, sir.

23      Q.  And you think that's what the goal was, to let your

24      voice be heard?

25      A.  In a sense.

1    Q.  Okay.  But, and I think you said earlier -- I mean,

2    would you ever go onto the floor of Congress or try to stop

3    Congress from doing something?  Is that the type of person

4    you are?

5    A.  No.

6    Q.  Are you the type of person that would actually

7    physically do something that would have stopped Congress

8    other than your protesting and by walking into the building?

9    Would you have done something else?

10   A.  No.

11   Q.  So that brings us to when you first -- and after you

12   leave --

13            MR. ROLLINS:  And you can take that down.  Thank

14   you, ma'am.

15   Q.  So you leave on January 6th, and I think you indicated

16   yesterday there were no other -- you had no other issues or

17   confrontation with the police after you left the building.

18   Right?

19   A.  Just the interaction with the one female officer asking

20   her for directions.

21   Q.  And outside of that, you go home.  And you were

22   satisfied with the fact that you voiced your opinion that

23   day.  Correct?

24   A.  Yes.

25   Q.  And by voicing your opinion, you essentially went into

1    the building, and you clapped your hands a little bit,

2    right?  We saw in the video you clapped your hands.

3              But outside of that, did you do anything else?

4    Other than going into the building and stating your position

5    of protest, did you do anything else?

6    A.  No.

7    Q.  And then we come into the next week, and you learn that

8    an FBI agent's trying to contact you regarding turning

9    yourself in.  Right?

10   A.  Yes.

11   Q.  And at that point you believed that that was a whole lot

12   of, I think the word that you used was "hoopla," because you

13   did nothing more than trespass.  Is that the way you felt?

14   A.  Yes.

15   Q.  You didn't feel as though you had done anything else

16   other than trespass and enter that building, and that was

17   the only thing that you would have done.  Right?

18   A.  Correct.

19   Q.  I mean, you told TJ that you were not a criminal, and

20   you were just standing up for -- protesting for what you

21   believed in.

22   A.  Yes.

23   Q.  And you understood that when you were charged on January

24   13th, you were charged with misdemeanor charges.  Correct?

25   A.  Yes.

1    Q.  And you were comfortable with that.  Correct?

2    A.  Yes.

3    Q.  And you were willing to accept that.  Correct?

4    A.  Yes.

5    Q.  But then a few weeks later you learned that you were

6    indicted on January 29th of felony charges, right?

7    A.  I don't know the exact date, but that sounds correct.

8    Q.  And at that point you grew somewhat concerned because,

9    as you told TJ, you're not a criminal.  Right?

10   A.  Right.

11   Q.  And while it's one thing to be charged with trespass.

12   It's another thing to be charged with obstruction to

13   Congress.  Right?

14   A.  Correct.

15   Q.  And you didn't really believe that you obstructed

16   Congress.  Correct?

17   A.  No.

18   Q.  But you admitted that you trespassed.

19   A.  Yes.

20   Q.  And then a lawyer was employed.  You contacted a lawyer,

21   and you were told at that point that you were being charged

22   with impeding and corruptly impeding Congress.  Right?  As

23   well as trespass.

24           But the main charge that you were charged with was

25   impeding and obstructing Congress, right?

1    A.  I believe that's how it was worded.

2    Q.  And at that point you told people, "I didn't even know

3    what Congress was doing," right?  As you've already told us.

4    Right?

5    A.  Correct.

6    Q.  And then you understood at that point that you were

7    facing serious charges.  Right?  I mean, this was no longer

8    a trespass case.

9    A.  Yes.

10   Q.  And then at some point within the last month you pled

11   guilty to conspiracy to commit an unlawful act.

12   A.  Correct.

13   Q.  Now, you understand that conspiracy has two elements

14   plus the crime.  You've been told that by your lawyer?

15   A.  Yes.

16   Q.  Okay.  So conspiracy is an agreement to do an unlawful

17   act with another person, right?  Two or more.  As well as

18   the second part element requires that there be some type of

19   acknowledgement or agreement that you're going to engage in

20   this act.  You understood those were the two things that you

21   need in order to plead guilty to conspiracy.

22        You took us through the last 20 minutes about you

23   never had a formal agreement with anybody.  What is it that

24   you conspired to do with someone else?

25   A.  To try to get the election results overturned.

1    Q.  But you just said moments ago you didn't even know --

2    when you went into there, you weren't trying to impede

3    Congress.  Right?

4    A.  Right, not at that time.

5    Q.  Okay.  Well, when you went into the building you weren't

6    trying to do that.  Is there some other time that you tried

7    to do that?

8    A.  It was after that, I think, that I realized what that

9    meant.

10   Q.  So you were told that anybody who went into that

11   building, they were impeding Congress.  Everybody who went

12   into that building was impeding and trying to corruptly

13   impede Congress?

14   A.  Yes.

15   Q.  Is that what you were told?

16   A.  That's what I assumed.

17   Q.  You assumed that everyone that went into that building,

18   that's what they were all -- everyone who went in there,

19   regardless of their reasons, was facing a 20-year felony?

20   A.  I don't think at the time I knew that portion of the

21   penalty, but it was my personal understanding that we all

22   pretty much had the same goal.  It didn't really need to be

23   said out loud.

24   Q.  So the goal being that -- was it to protest to get your

25   opinion heard, or was it to actually stop and corruptly

1    influence Congress?  What was your goal?

2    A.  I would say both.

3    Q.  So your goal was to -- you would actually go and

4    corruptly impede Congress and obstruct Congress?

5    A.  I would not personally, but looking back on my actions

6    of that day, it just makes sense in my head that that's what

7    was going on.

8    Q.  Well -- and I appreciate that.  There was a heartfelt

9    yesterday when you talked.

10         You saw people that were there doing stuff on that

11   day, right?  Doing violent acts.

12   A.  Yes.

13   Q.  Were you one of those people doing violent acts?

14   A.  No.

15   Q.  Do you think that you should be treated the same as

16   people that were doing the violent acts that day?

17         MS. BERKOWER:  Objection, Your Honor.

18         THE COURT:  Sustained.

19   Q.  So you then plead to conspiracy, which is still a

20   felony, and you conspired at that point to basically impede

21   or obstruct Congress.

22   A.  Yes.

23   Q.  Is that what you were admitting to?

24   A.  Yes.

25   Q.  Even though in your heart of hearts do you believe

1   that's what you were really doing, or were you protesting?

2   A.  Are you asking at the time, or are you asking me how I

3   feel right now?

4   Q.  How were you feeling at the time?  What was your motive,

5   intent, at the time?

6   A.  I guess to make a big enough fuss that, I mean, they

7   would have to listen to just the shear numbers alone that

8   were there.

9   Q.  Right.  But you could have made a bigger fuss.  You

10  could have went from the Crypt.  You could have gone into

11  other hallways.  You could have gone into Nancy Pelosi's

12  office.  You could have done all those things.  Correct?

13  A.  Correct.

14  Q.  But the officer asked you to leave, and you left.

15  A.  Yes.

16  Q.  So you believe that your actions were to the level of

17  corrupting Congress even though, when the officer asked you

18  to leave, you left?

19  A.  That's just how I perceive it now.

20  Q.  And it's fair to say that now because you've seen the

21  national news, and you see the way the country has looked

22  down upon anybody who entered that building, right?

23  A.  Yes.

24  Q.  At the time you felt like you were standing up for what

25  you believed in.

```
 1    A.  At the time, yes.

 2    Q.  And you understood that by pleading guilty to that

 3    felony charge you were giving up your dream job of being a

 4    police officer.  Right?

 5    A.  Yes.

 6    Q.  Being in the National Guard.

 7    A.  Yes.

 8    Q.  And admitting that you were a felon even when you

 9    initially said that you didn't think you were actually a

10    criminal.

11    A.  Correct.

12    Q.  And you understood that that plea offer reduced your

13    time from 20 years to five years, right, as a felony?

14    A.  Yes.

15    Q.  And you understood that you accepting this -- and

16    there's a lot of reasons why you accepted this.

17              You didn't want to take the risk due to the fact

18    that you would leave your daughter.  Right?

19    A.  Yes.

20    Q.  And it was almost one of your primary reasons for doing

21    what you did.  Right?

22    A.  Almost.

23    Q.  Right.  Because you realized that you had to think

24    more -- you had to think about your daughter and your family

25    as well.  Right?
```

1    A.   Yes, sir.

2    Q.   And just kind of going back to when this first happened

3    and when you first were arrested, the government said that

4    TJ gave you -- $30,000?

5    A.   Roughly.

6    Q.   All right.  And let's just unpack that a little bit.

7    Why did TJ give you $30,000?

8    A.   He said he would cover a year's salary for me.

9    Q.   And is that because -- what happened?  What happened as

10   a result of January 6th when you went back?

11   A.   We got terminated from the police department.

12   Q.   And did you have a family at that point?

13   A.   I did.

14   Q.   Did you have legal fees at that point?

15   A.   He had offered to cover legal fees.

16   Q.   So he covered your legal fees, right?

17   A.   Yes.

18   Q.   He took care of your family.

19   A.   Yes.

20   Q.   And fair to say that he's not -- he didn't do that

21   because he was -- he didn't do that because he was trying to

22   tell you -- to buy your testimony, right?

23   A.   No, I don't believe so.

24   Q.   Right.  In fact, what has TJ always told you to do in

25   reference to this case?

1   A.  Tell the truth.

2   Q.  He never asked you to do anything else.  Right?

3   A.  No.

4   Q.  And fair enough to say you love TJ?  Right?

5   A.  Yes.

6   Q.  TJ loves you.  Fair enough?

7   A.  I hope so.

8   Q.  You're not a member of any radical group.  Right?

9   A.  No.

10  Q.  He's not a member of any radical group?

11  A.  No.

12  Q.  But that also takes us to when you were first contacted

13  by the FBI regarding this case and, more specifically,

14  regarding the telephone that you had, or that there was a

15  notion that the telephones were gotten rid of.  Right?  Do

16  you remember that discussion yesterday?

17  A.  I do.

18  Q.  And, in fact, when you were first contacted by the FBI

19  or you first had discussions with the FBI, you told them

20  that you lost your phone on the Metro.  Right?

21  A.  I think I had gotten it mixed up with my iPod.

22  Q.  Okay.  But I think the words were to the effect that TJ

23  had not asked you to get -- he did not say he would get rid

24  of the phones.  Right?

25  A.  Are you talking about on that day?

1   Q.  Yes.

2   A.  The only thing I recall is him saying for me to hand him

3   my phone.

4   Q.  Right.  But you told the FBI that he never told you --

5   he never -- he never said he was ditching the phones.  You

6   don't remember telling the FBI that?

7           Well, let me back up a little bit before you

8   answer that.

9           You were in a room with the FBI, two prosecutors,

10  your lawyer, and the question came about did TJ tell you to

11  get rid of the phones, and you said, "He did not ask me to

12  ditch the phones."  You don't remember having that

13  discussion?

14  A.  Very vaguely.

15  Q.  Okay.  And at that point the room had to be cleared of

16  the FBI agent and the two prosecutors.  And just you and

17  your lawyer were in the room, right?

18  A.  I believe so.

19  Q.  Okay.  Your lawyer has a discussion with you.  A few

20  minutes later, everybody comes back in the room, and then

21  you say, "I was mistaken.  It was my iPod."  Right?

22  A.  Yes.

23  Q.  So after the lawyer talked to you and you realized what

24  was happening, that story kind of changed about you losing

25  the phone.  Right?

```
1    A.  It did change.

2    Q.  Okay.

3    A.  I often have memory problems, and it does help sometimes

4    to go over things to help jar the memories back.

5    Q.  So the lawyer jarred your memory back as to what exactly

6    happened with the phone.  Right?

7    A.  I guess as to what we had previously discussed.

8    Q.  Right.  Because you understood that this was part of the

9    deal and that you had to kind of come in there and say your

10   part, right?  And you understood that was part of the deal

11   with this whole thing, right?

12   A.  Yes.

13   Q.  That the government was trying to charge TJ with

14   additional charges with reference to the phone?

15        MS. BERKOWER:  Objection, Your Honor.  I think

16   what this witness knows about that is irrelevant.

17        THE COURT:  Overruled.

18   A.  Can you say it again.

19   Q.  So you understood that the government was trying to

20   charge him with additional charges, right?  Did you

21   understand that they were charging him with additional

22   charges?

23   A.  I feel like I knew that they could have.  I didn't know

24   if they were for sure or what the charge would be.

25   Q.  But did they tell you specifically that they wanted you
```

1   to speak about the phone?  Did they -- were you instructed

2   about that?

3   A.  They asked me about the phone.

4   Q.  All right.  And this phone had essentially -- the only

5   thing it had to do with January 6th is that it occurred

6   afterward.  Right?

7   A.  Maybe I'm --

8   Q.  This whole getting rid of the phone occurred sometime

9   between January 13th and January 19th, right?

10  A.  That sounds right.

11  Q.  All right.  Which brings me back to my original thought,

12  which is that on January 13th you were charged with a crime,

13  right?  The misdemeanor crime.

14  A.  Uh-huh.

15  Q.  Did you -- at that point you didn't turn your phone in,

16  right?  Or whatever happened to the phone, you didn't turn

17  it in.  Right?

18  A.  What do you mean, turn it in?

19  Q.  When you went to the police station to turn yourself in,

20  you didn't take the phone with you.

21  A.  Correct.

22  Q.  And fair to say that you understood you were not going

23  to bring your phone into the police station to help give

24  them additional evidence.  Right?

25  A.  Correct.

1   Q.  But also if you -- was there really any additional

2   evidence to really give?  Was there something else on your

3   phone that maybe they didn't have?  Something else you did?

4           Do you want me to clarify that a little bit?

5   A.  If you don't mind.

6   Q.  So we know you went into the Capitol.  We know that you

7   ran in there.  You went through the door.  You were in there

8   for about 20 minutes.  You didn't go anywhere else, and then

9   you left.

10  A.  Uh-huh.

11  Q.  Was there something on the phone that would have

12  suggested that you did something else other than that?

13  A.  No.

14  Q.  So then what's all the hoopla about getting rid of the

15  phone?  I don't -- what was so critical about you needing to

16  get rid of the phone?

17  A.  I guess the fact that it just showed that I was there

18  whatsoever, and that really freaked me out.

19  Q.  But that's not something you were contesting, right?

20  You admit -- you agree you are the ones on the photo taking

21  the picture, right?

22  A.  Yes.

23  Q.  So there really -- there's no other evidence that would

24  have been on the phone that you did something else illegal,

25  right?

1    A.   Correct.

2    Q.   There's nothing on there with you hurting somebody or

3    doing something wrong, other than what you did.

4    A.   Correct.

5    Q.   So getting rid of the phone just was a natural response

6    to just not wanting to turn something in.   Right?

7    A.   I would say so.

8    Q.   Because it didn't really hurt or help you.   Right?

9    A.   I mean, I hadn't thought about it.   I don't really know

10   how to answer that.

11   Q.   Well, most of the stuff that you took with your phone

12   you uploaded to the cloud anyway, right?   Facebook, social

13   media?

14   A.   Uh-huh.

15   Q.   Couldn't get rid of that stuff, right?

16   A.   Correct.

17   Q.   So fair to say that there's -- there would be no other

18   incriminating evidence on that phone, your phone, or TJ's

19   phone.   Right?

20   A.   I can't speak for his phone; but my phone, yes.

21   Q.   You were with him most of that day except for the time

22   that you ran into the building, correct?

23   A.   Yes.

24   Q.   And outside of that time, is there -- do you think that

25   TJ did something illegal and was trying to hide that?

```
1    A.  I don't believe he did.

2    Q.  Okay.  And last few questions.

3            But did you see TJ when he was inside the Crypt?

4    Because that was really the only time you were with him

5    outside of walking out.  Did you ever see him yelling or

6    clapping or doing anything like that disorderly?

7    A.  He was going on with the chanting.

8    Q.  He was chanting?

9    A.  I believe.

10   Q.  He was excited?

11   A.  We all were.

12   Q.  But you never saw him do anything to hurt anybody or

13   left any -- didn't go anywhere outside of that Crypt, right?

14   A.  Once we were together, no.

15   Q.  And to this day, is it in your -- I realize what you

16   pled guilty to and why you did what you did.  But outside of

17   entering that building, do you really think you did anything

18   greater than trespass?

19   A.  Sitting here today, yes.  At the time, no.

20           MR. ROLLINS:  Thank you.  No further questions.

21           THE COURT:  Ms. Berkower.

22                      REDIRECT EXAMINATION

23   BY MS. BERKOWER:

24   Q.  Good morning.

25   A.  Good morning.
```

```
1    Q.  Let's pick up where Mr. Rollins left off.
2              You were just asked about whether you think you,
3    at the time, did anything more than just go into the
4    building and come back out.  Right?
5    A.  Correct.
6    Q.  He asked you about that.
7    A.  Uh-huh.
8    Q.  What did you want to happen that day, January 6th?
9    A.  I guess I wanted the election results overturned.
10   Q.  And given what you saw that day, you saw an enormous
11   crowd.  Right?
12   A.  I did.
13   Q.  You saw a lot of -- I think you described it as
14   pandemonium yesterday?
15   A.  That or chaotic, yes.
16   Q.  Chaotic.
17              You saw violence against -- among members of the
18   crowd, people throwing things?
19   A.  Yes.
20   Q.  You saw police officers retreating?
21   A.  Yes.
22   Q.  You heard alarms going off inside the building?
23   A.  Uh-huh.
24   Q.  You saw broken glass?
25   A.  I did.
```

1    Q.  You saw people climbing in through windows?

2    A.  Yes.

3    Q.  You saw overturned furniture?

4    A.  Yes.

5    Q.  And the crowd inside was huge.  Right?

6    A.  Yes.

7    Q.  It was loud.  Right?

8    A.  I'm sorry?

9    Q.  It was loud in there?

10   A.  Yes.

11   Q.  And when you were in that circular room, there was a

12   police line, a small number of people, trying to hold the

13   crowd from getting further inside.  Right?

14   A.  Yes.

15   Q.  And that was where you met up with TJ again.  Right?

16   A.  Correct.

17           MS. BERKOWER:  Ms. Dunn-Gordon, if you don't mind,

18   could we pull up Government's Exhibit 407A in evidence,

19   please.  And go to the next slide, please.

20   Q.  That arrow shows you guys meeting back up.  Right?

21   A.  Yes.

22   Q.  What's the time, the clock time, on that camera?

23   A.  2:24 and 34 seconds.

24           MS. BERKOWER:  And if we could now go on to 406

25   and play from one minute to 1:28.

```
1                    (Video playing)
2     Q.  We're looking at that police line, that same room.
3     Right?
4     A.  Yes.
5     Q.  What's the time stamp there?
6     A.  2:25 and --
7     Q.  Well, it's going up, right?
8     A.  Five seconds along.
9     Q.  So 30 seconds after you meet back up with TJ in this
10    room, this is what happened, isn't it?
11    A.  Yes.
12                   (Video playing)
13    Q.  Given what was happening all around you and everything
14    you saw, did you think you needed to do anything more than
15    that to stop the election or overturn the election?
16    A.  I couldn't honestly say what my thought process was.
17    Q.  Did you need to do anything more?  Mr. Rollins asked
18    you, did you go down the halls of Congress?
19    A.  No, I did not.
20    Q.  You said that was something you would never do.
21    A.  Correct.
22    Q.  But when you left that day, did you think you had done
23    enough to overturn the election or the crowd had done enough
24    that day?
25    A.  I think so.
```

1    Q.  And you were part of that, right?

2    A.  Yes.

3    Q.  You were in that room when the crowd swept through.

4    Right?

5    A.  Yes.

6    Q.  And TJ was standing right next to you.  Right?

7    A.  Yes.

8              MS. BERKOWER:  Now, if we can go to Government's

9    Exhibit -- or sorry, stay in this exhibit and jump to 7:15

10   and play to 17:34 [sic].

11             (Video playing)

12   Q.  This is after that crowd swept through, right?

13   A.  Yes.

14   Q.  You stayed in the room, right?

15   A.  Yes.

16   Q.  What's the time stamp there?

17   A.  2:31:26.

18   Q.  The crowd was still loud, wasn't it?

19   A.  Yes.

20             MS. BERKOWER:  If we could play.

21             (Video playing)

22   Q.  What are you doing?

23   A.  I'm going along with chanting, I believe.

24   Q.  And what are you doing with your hands?

25   A.  Clapping.

1    Q.   What's TJ doing?

2    A.   He was tapping his stick along with the chant.

3    Q.   You guys were part of that crowd in that room, weren't

4    you?

5    A.   Yes.

6    Q.   Now, Mr. Rollins showed you another piece of this

7    video -- or, excuse me, another video, 408.

8               MS. BERKOWER:  If we could please pull that up.

9    Q.   This is that same room, right?

10              MS. BERKOWER:  Just pause it there.

11   A.   It is.

12   Q.   And at this point it's much emptier, right?

13   A.   Yes.

14   Q.   You guys are still there.  What's the time now?

15   A.   2:34 and five seconds.

16   Q.   This is where you took photos, right?

17   A.   Yes.

18              MS. BERKOWER:  And if we could play this to 26

19   seconds.

20              (Video playing)

21   Q.   You said you left because officers told you to leave?

22   A.   Yes.

23   Q.   And it's right around this time, right?

24   A.   Yes.

25   Q.   How many officers came out to tell you to leave?

```
1    A.  About four that I can count.

2    Q.  And there's no crowd in this room anymore, is there?

3    A.  Unless that's it on the other side in the middle.  But

4    no, not --

5    Q.  The immediate area is pretty empty, right?

6    A.  Correct.

7              MS. BERKOWER:  Let's go to 403A starting at Slide

8    1.

9    Q.  This is you guys leaving now, right?

10   A.  Yes.

11   Q.  Fair to say there's a lot of officers here now?

12   A.  Yes.

13   Q.  And there are still people outside trying to come in,

14   right?

15   A.  It looks like it, yes.

16   Q.  You left, and there was a line of people from the crowd

17   trying to go out that window.  Right?

18   A.  Yes.

19   Q.  And the rest of the room was filled with officers.

20   A.  Yes.

21   Q.  Now, I want to talk a little bit about your phone.

22             MS. BERKOWER:  We can take that down.

23   Q.  Mr. Rollins asked you about you getting rid of your

24   phone.  Do you remember those questions?

25   A.  Yes.
```

1    Q.  And do you remember testifying on direct examination

2    that you had taken maybe ten or more photos or videos that

3    day?

4    A.  Yes.

5    Q.  You posted some of them on or communicated them on

6    social media in some way?

7    A.  Yes, ma'am.

8    Q.  At the time you got that phone call from the FBI, did

9    you know anything one way or the other about what evidence

10   the FBI had about you?

11   A.  No.

12   Q.  And did you know you had evidence on your phone?

13   A.  Yes.

14   Q.  You had no idea what they knew about what was on your

15   phone, right?

16   A.  Correct.

17   Q.  You didn't know if they'd even gotten into your social

18   media.

19   A.  Correct.

20   Q.  You just knew that there was information that

21   incriminated you in your phone.

22   A.  Yes.

23   Q.  And that's when you got rid of it.

24   A.  Yes.

25   Q.  And how did you get rid of it?

1    A.  I gave it to TJ.

2    Q.  And what did he do when you gave it to him?

3    A.  Put it in a can.

4    Q.  What did he do with his phone?

5    A.  It was -- went into the same can.

6    Q.  And you've been a policeman for several years, right?

7    A.  Yes.

8    Q.  You know that evidence of a crime with a picture is

9    stronger than without, right?

10   A.  Yes.

11   Q.  Is that why you got rid of your phone?

12   A.  Yes.

13   Q.  And what did you understand TJ to be doing with his

14   phone?

15   A.  Not having it as well.

16   Q.  I'm sorry, what did you say?

17   A.  Maybe I'm misunderstanding you.

18   Q.  I just didn't hear you, I'm sorry.

19   A.  Can you ask it again?

20   Q.  I'll ask the question again.

21       You said TJ put his phone in that same ammunition

22   can?

23   A.  Yes.

24   Q.  Was it your understanding -- what was your understanding

25   about what he was going to do with both of those phones?

1              MR. ROLLINS:  Objection.

2              THE COURT:  Overruled.

3    A.  Make them disappear.

4    Q.  Did you ever get your phone back from him?

5    A.  No.

6    Q.  Did you ever ask?

7    A.  No.

8    Q.  Did he ever say to you, "Come get your phone.  You left

9    it at my house"?

10   A.  No.

11   Q.  What did you do the next day?

12   A.  I bought a new phone.

13   Q.  And as far as you know, did the FBI ever get -- obtain

14   that phone?

15   A.  As far as I know, no.

16   Q.  Have you ever seen any evidence that the FBI has from

17   that phone?

18   A.  Other than the pictures and videos.

19   Q.  Well, the pictures and videos came from Facebook, right?

20   A.  Right.

21   Q.  Because you put them up there before you gave TJ your

22   phone, right?

23   A.  Right.

24   Q.  But the FBI's never shown you text messages from your

25   phone, have they?  From your phone.

```
1    A.  No.

2    Q.  And that's because the FBI doesn't have it, right?

3    A.  Correct.

4    Q.  The only evidence the FBI has from your phone is what

5    they could get off of social media, right?

6    A.  Yes.

7    Q.  And from other sources other than your phone.

8            Now, you were asked about your social media posts.

9    A.  Uh-huh.

10   Q.  And, for instance, you said you went to the bathroom in

11   Nancy Pelosi's office.  Do you remember being asked about

12   that?

13   A.  Yes.

14   Q.  You said you did that for cool points, right?

15   A.  Correct.

16   Q.  In the days after January 6th, were you making posts

17   that expressed how you felt about the events of that day?

18   A.  I remember one in particular.

19   Q.  And you said you did that for cool points.  Was that

20   because you were proud of what you had done?

21   A.  Yes.

22   Q.  And you wanted it to sound like even more exciting than

23   what you actually did?

24   A.  Yes.

25   Q.  But it's because you were proud, right?
```

1    A.   Correct.

2    Q.   Now, Mr. Rollins asked you questions about whether you

3    saw TJ ever use his stick as a weapon that day.

4    A.   Correct.

5    Q.   At the police department, you were trained in how to use

6    a baton, right?

7    A.   Yes.

8    Q.   TJ also knew how to use a baton as far as you knew,

9    right?

10   A.   As far as I knew.

11   Q.   And would you agree that a baton in the hands of someone

12   trained is -- can be used as a weapon more effectively than

13   in someone who isn't trained?

14   A.   I agree.

15   Q.   You also said that the PD has sticks in a supply room.

16   Right?

17   A.   Yes.

18   Q.   They don't -- you don't use them on the street anymore?

19   A.   Correct.

20   Q.   How long had TJ been a police officer at the Rocky Mount

21   Police Department?

22   A.   A number of years.  I don't know the exact number.

23   Q.   And had he been a police officer for a long time when

24   you started in 2017?

25   A.   Yes.

1   Q.  And I think you said that those were now just sort of
2   held back there in case of a riot; is that right?
3   A.  It was either for that purpose or, like I said, just
4   nostalgia.
5   Q.  But that's something the police department used to use?
6   A.  I believe so.
7   Q.  And I think Mr. Rollins asked you if you ever saw
8   Mr. Robertson use a weapon against a police officer that
9   day.  Do you remember being asked about that?
10  A.  I do.
11  Q.  Do you also remember being asked about your training of
12  when you had to step in and help an officer in distress?
13  A.  About the training for it?
14  Q.  Let me rephrase that.
15         I think you were asked about some of your law
16  enforcement duties.  Do you remember being asked about that?
17  A.  I do.
18  Q.  And you said you had a duty -- you knew you had a duty
19  as an officer to help when there was a threat to life or
20  property.
21  A.  Yes.
22  Q.  Did you see threats to life and property on January 6th?
23  A.  I did.
24  Q.  Did you step in to help?
25  A.  Once.

1    Q.  You testified about that yesterday, right?

2    A.  Yes.

3    Q.  And you said that after that very initial incident, when

4    you first got to the bottom of the Capitol in the plaza

5    area, you didn't help again that day, did you?

6    A.  Correct.

7    Q.  You also said you never saw TJ help.

8    A.  Right.

9    Q.  And you saw violence directed at officers that day,

10   didn't you?

11   A.  Yes.

12           MS. BERKOWER:  If we --

13   Q.  I think Mr. Rollins showed you Government's Exhibit 101C

14   at nine seconds.

15           MS. BERKOWER:  If we could please pull that up.

16           (Video playing)

17   Q.  We just saw someone throw a pole at a police officer,

18   didn't we?

19   A.  Yes.

20   Q.  Was TJ standing next to you when this happened?

21   A.  Probably, yes.

22   Q.  He was definitely in the immediate area around you,

23   right?

24   A.  Yes.

25   Q.  Did TJ step in to help that police officer?

1    A.  No.

2    Q.  Did he do anything to stop this man from taking other

3    action against officers that day?

4    A.  No.

5    Q.  Did you?

6    A.  No.

7    Q.  Can you explain why you didn't do anything to help

8    police other than that very initial moment.  Why the rest of

9    the day you didn't?

10   A.  I think, as a cop, I felt like they should have been on

11   our side, like marching with us and doing stuff instead of

12   trying to hold us back.

13   Q.  Can you explain why you felt that way.

14   A.  Maybe it was just like a one-track mind kind of thing.

15   Well, I'm a cop, so all cops need to think like this.

16   Q.  And that's why you didn't assist them in what they were

17   doing?

18   A.  I think so.

19   Q.  And you didn't see TJ help them either.

20   A.  Correct.

21          MS. BERKOWER:  Now, if we could go up in that

22   video, I think it's about one minute and 40 seconds, I

23   think.

24          (Video playing)

25          MS. BERKOWER:  You can stop there.

1    Q.  Mr. --

2            MS. BERKOWER:  And we're at 1:51.

3    Q.  Mr. Rollins asked you about this part of your Facebook

4    video.  Right?

5    A.  Yes.

6    Q.  And he asked you about that officer handing out water?

7    A.  Yes.

8    Q.  And you said that you -- well, previously did you tell

9    the FBI that at the time you just kept going up the stairs

10   and toward the building?

11   A.  Yes.

12   Q.  Did you also tell the FBI that it would have been -- it

13   was -- it would have been obvious to anybody that this was

14   not a safe situation for that officer?

15   A.  Yes, and I can dive into that a little bit more.

16   Q.  Yes.  Feel free to explain.

17   A.  This officer here, whether or not he's genuinely being

18   nice, I don't know.  Maybe.  But it's safer for him to play

19   the part and offer people water and be nice because he's

20   outnumbered a million to one at that point.  And so I think

21   the smartest thing for him to have done is what he did and,

22   you know, act like the nice -- you know, here have some

23   water, please don't hurt me kind of thing.

24   Q.  As a trained officer, would you be able to see that upon

25   seeing this situation?

1    A.  I don't know if being an officer has anything to do with

2    it.  It's just my personal opinions.

3    Q.  And based on your understanding of what it takes for an

4    officer to be safe, you can see here that's not safe?

5    A.  Correct.

6    Q.  No matter how he was interacting with the people around

7    him.

8    A.  Correct.

9    Q.  Now, Mr. Rollins asked you about the agreement that you

10   had with TJ.  Do you remember being asked about that?

11   A.  Yes.

12   Q.  And you described it like when you were going to drag

13   race at a red light.

14   A.  Right.

15   Q.  And he pointed out that when you went into the building

16   Mr. Robertson wasn't with you, right?

17   A.  Correct.

18   Q.  But you met back up in that building, right?

19   A.  Yes.

20   Q.  We looked at that.

21          He was still part of that race when you met back

22   up in the building, wasn't he?

23   A.  Yes.

24   Q.  He had just taken a different route to get to the same

25   point?

1     A.  Yes.

2              MS. BERKOWER:  The Court's brief indulgence.

3              (Pause)

4     Q.  Mr. Fracker, you were asked about the guilty plea you

5     entered into.

6     A.  Yes.

7     Q.  And you did sign a factual statement when you entered

8     that guilty plea, right?

9     A.  Yes.

10    Q.  Was everything in that statement true?

11    A.  Yes.

12             MS. BERKOWER:  And if we could go to Government's

13    Exhibit 201C.  Actually, I think I meant 200B, sorry.

14    Q.  You know that that's TJ there, right?

15    A.  Yes.

16             MS. BERKOWER:  And, Ms. Dunn-Gordon, if we could

17    also pull up Government's Exhibit 310 and go to Page 5.

18    Q.  Is this the "Statement of Facts" that you signed?

19    A.  Yes.

20    Q.  On Paragraph 17, does it read:  "Metropolitan Police

21    Department (MPD) officers from Civil Disturbance Platoon

22    Unit 42 (CDU-42) arrived at the U.S. Capitol after

23    Robertson, Franker, and Person A, and proceeded in the

24    restricted area to the lower west terrace to assist U.S.

25    Capitol Police officers attempting to hold back the mob."

1              Did you read that correctly?

2     A.  Yes.

3     Q.  And going on to Paragraph 18, does it read:  "Based on

4     his own law enforcement and combat experience, Fracker

5     understood what the officers were trying to do - they were

6     attempting to keep the protesters away from the Capitol

7     building and control the crowd."

8              Did I read that correctly?

9     A.  Yes, ma'am.

10             MS. BERKOWER:  And if we can go on to Paragraph

11    19.

12    Q.  "At approximately 2:03 p.m., Robertson, Fracker, and

13    Person A stood in the path of the MPD officers CDU-42, and

14    Robertson used his stick to impede the officers' path."

15             Did I read that correctly?

16    A.  Yes.

17    Q.  Those are all part of the statement that you signed

18    under oath.

19    A.  Correct.

20             MS. BERKOWER:  No further questions, Your Honor.

21             THE COURT:  Okay.  Mr. Fracker, thank you very

22    much for your testimony.  You are excused.  Please don't

23    discuss your testimony with anyone other than your lawyer

24    until the case is over.  All right?

25             THE WITNESS:  Yes, sir.

1        THE COURT:  Have a nice day.  Safe travels.

2        THE WITNESS:  Thank you.

3        THE COURT:  Thank you, Mr. Crane.

4        All right.  Take our morning break?

5        Ladies and gentlemen, we're going to take our 15-

6   minute morning break.  It's 10:53 by my count, so let's

7   reconvene at about ten minutes after 11:00.

8        (Jury exits courtroom)

9        THE COURT:  All right.  Please be seated.

10       Ms. Aloi, on this Ranger issue, did -- I know that

11  we introduced a compilation exhibit through Mr. Ervin, and

12  you asked him about certain things but not others, and I

13  think we agreed to redact anything that he was not asked

14  about or that was referred to when we send that compilation

15  exhibit back to the jury.  Is the resume -- did you ask him

16  about the resume, or is that something that would be

17  redacted when it goes back to the jury?

18       MS. ALOI:  Your Honor, we did ask him about the

19  resume.  At the time we were highlighting a different

20  portion, but it is contained within the resume.  We showed

21  the jury the resume.

22       THE COURT:  Which portion did you ask him about?

23       MS. ALOI:  The law enforcement emergency response,

24  I believe.

25       THE COURT:  Okay.  Here's where I've come out on

1       this issue.

2              As I said, the trait of honesty is not an

3       essential element of the crime charged; so, therefore,

4       evidence of his reputation and opinion evidence or specific

5       events or instances really are not admissible.

6              The government did not object to the question

7       asked by Mr. Rollins of Mr. Ervin regarding his reputation

8       for honesty, and so it -- I think it was error for that to

9       come in, but it was invited error in a sense because there

10      was no objection.  I'm not going to compound the error by

11      allowing additional testimony regarding his reputation for

12      honesty or specific instances of honesty.

13             So I'm going to not allow the government to pursue

14      questioning regarding the Ranger on the understanding that

15      the defense not elicit any such evidence from its character

16      witnesses or refer to Mr. Ervin's testimony regarding his

17      honesty in closing.  If the defense is not agreeable to

18      that, then I think the other stuff comes in.

19             MS. WAGNER:  Your Honor, we are amenable to that.

20      Just for clarification purposes, to not have any issues

21      later, the character witnesses that we have, we had intended

22      to elicit opinion and reputation testimony to honesty and

23      peacefulness.  But now, based on Your Honor's ruling

24      regarding the government's exhibit, we will be intending to

25      only bring out opinion and reputation to peacefulness since

1        that should be an element of the crime.

2                    THE COURT:  That's fine.  I think the traits at

3        issue are law abidingness and peaceability.

4                    MS. WAGNER:  Regarding law abidingness --

5                    THE COURT:  Like does the guy follow the rules?

6        Not is he honest?  There's some gray area between those, but

7        those are the two different character traits.

8                    MS. WAGNER:  Right, and for law abidingness

9        specifically, I would want to get on the bat phones, if we

10       could, just for a minute.

11                   THE COURT:  Let's do it in -- the jury's not here.

12                   MS. WAGNER:  Okay.  If the government is going to

13       intend to cross-examine on what happened pretrial with the

14       reason that Mr. Robertson is now incarcerated, we would want

15       to argue this objection now.

16                   THE COURT:  Okay.

17                   MS. WAGNER:  We would argue 403.  It is

18       substantially more prejudicial than --

19                   THE COURT:  Let's deal with the Ranger issue

20       first, and then we'll get to the violations of conditions

21       issue.

22                   MS. WAGNER:  Ranger issue.  As far as the defense

23       goes, we're okay with Your Honor's ruling.

24                   THE COURT:  Okay.

25                   Now, Ms. Aloi, I could instruct the jury to

1   disregard Mr. Ervin's testimony regarding honesty, but that

2   may just draw more attention to it.

3              MS. ALOI:  We're not asking for that instruction

4   at this time.

5              THE COURT:  Okay.  And I would also permit the

6   government to redact the portion of the resume that touts

7   the Ranger training because that was not mentioned in

8   Mr. Ervin's testimony, and there's other stuff that's going

9   to be redacted from that compilation exhibit.  I'd like to

10  just take that issue out of the case to the extent possible.

11             So, you know, not to prejudice you for not being

12  able to cross on it, we'll take out the reference to the

13  Ranger training in the resume.

14             MS. ALOI:  Your Honor, that -- we certainly would

15  support that approach.  But if the defendant should testify,

16  we expect on cross-examination to be able to inquire as to

17  his honesty and law abidingness.

18             THE COURT:  Absolutely, if he testifies.

19             MS. ALOI:  Okay.

20             THE COURT:  Okay.

21             MS. ALOI:  And could --

22             THE COURT:  And obviously, Mr. Rollins, no mention

23  of the Ranger training, no mention of Mr. Ervin's testimony

24  about honesty in closings.

25             MR. ROLLINS:  Understood.

1          THE COURT:  All right.

2          MS. ALOI:  Your Honor, if I could inquire?  I

3     believe that Ms. Wagner was just trying to draw a

4     distinction between the character trait of peacefulness and

5     the character trait of law abidingness, and if we could have

6     a better understanding of that?  Because the government

7     would expect to be able to cross-examine the character

8     witnesses on law abidingness should "peacefulness" be

9     interpreted as "conforms with the law."

10          THE COURT:  Give me more specifics or give us more

11     specifics about what types of testimony you plan on

12     eliciting from the character witnesses, both in terms of

13     general law abidingness or peaceableness.

14          MS. WAGNER:  Well, law abidingness will all have

15     to do with how Your Honor rules on whether the pretrial

16     issue is going to be admitted, if offered by the government

17     on cross.  So if Your Honor is going to say, yes, the

18     government can cross on that, we're not going to even touch

19     law abidingness.

20          When it comes to peacefulness, we will just ask

21     the character witnesses whether they have an opinion as to

22     whether Mr. Robertson is a peaceful person in general and

23     whether he has a reputation for being a peaceful person.  I

24     will not use any other synonyms or words when I ask the

25     question to the character witnesses.

 1            THE COURT:  Okay.  Ms. Aloi?

 2            MS. ALOI:  The Court's indulgence.

 3            (Pause)

 4            MS. ALOI:  Your Honor, we've brought this to the

 5      attention of the defense counsel, but should there be

 6      witnesses who testify specifically about peacefulness, the

 7      government intends to cross-examine them about specific

 8      instances of nonpeaceful behavior that are somewhat

 9      sensitive and involve threats made to law enforcement and

10      government personnel and the press.

11            THE COURT:  Should we handle that now or --

12            MS. ALOI:  Your Honor, I don't know that there's

13      much to handle.  I think that that testimony is admissible

14      should that evidence come in.

15            THE COURT:  I'm inclined to agree with that.

16      We'll see what the line of questioning is, and if you want

17      to object to it, you can object, but, you know, if you open

18      the door to his reputation for peaceableness, I think the

19      government can seek to introduce instances of conduct that

20      are contrary to that reputation.

21            MS. ALOI:  Thank you.

22            MS. WAGNER:  Understood.

23            (Recess taken)

24            THE COURT:  Do you think we'll go through lunch?

25            MS. ALOI:  I think we will likely be done with at

1    least the direct exam by lunchtime.

2              THE COURT:  Okay.

3              (Jury enters courtroom)

4              THE COURT:  Welcome back, everyone.

5              MS. ALOI:  Thank you.  The government calls

6    Special Agent Kathryn Camiliere.

7              THE COURT:  All right.  Ms. Camiliere.

8              SPECIAL AGENT KATHRYN CAMILIERE, Sworn

9                       DIRECT EXAMINATION

10   BY MS. ALOI:

11   Q.  Good morning, Special Agent Camiliere.

12   A.  Good morning.

13   Q.  Could you please state and spell your name for the

14   record?

15   A.  Yes.  It's Kathryn Camiliere, K-A-T-H-R-Y-N, C-A-M, as

16   in Mike, I-L-I-E-R-E.

17   Q.  And where do you work?

18   A.  The Federal Bureau of Investigation.

19   Q.  How long have you been an FBI agent?

20   A.  Approximately six years now.

21   Q.  Did you have experience -- professional experience

22   before that?

23   A.  Yes, I did.

24   Q.  What did you do?

25   A.  I was in the Army.

1    Q.  And what is your current assignment at the FBI?

2    A.  I'm currently assigned to work matters of international

3    terrorism, but after January 6th a great deal of us began

4    investigating the events that occurred on January 6th.

5    Q.  As a result, are you familiar with the investigation

6    into Thomas Robertson and Jacob Fracker?

7    A.  Yes, I am.

8    Q.  Why are you familiar with that investigation?

9    A.  Because I'm the lead case agent for those cases.

10   Q.  As the lead case agent, did you gather and review

11   evidence about Thomas Robertson's activities on and around

12   January 6th?

13   A.  I did.

14   Q.  And are you familiar with the evidence that's been

15   collected?

16   A.  Yes.

17   Q.  Did you review photos and videos from the events at the

18   Capitol on January 6th that relate to the defendant's

19   activities?

20   A.  I did.

21   Q.  I'm going to ask you more questions about those topics,

22   but first let's cover a few other things.

23          In the course of your investigation, did you learn

24   about some of the ways the events of January 6th impacted

25   the District of Columbia beyond the Capitol area?

1    A.  Yes.

2              MS. ALOI:  I now want to mark or show what's been

3    marked and move to admit a stipulation.  It's Exhibit 1004,

4    and it's on interstate commerce.

5              THE COURT:  Okay.  Ladies and gentlemen, this is

6    another of the stipulations or agreements between the

7    parties that are evidence in the case, and these written

8    stipulations will go back to the jury room with you, and you

9    can review them there as well.

10   BY MS. ALOI:

11   Q.  Special Agent Camiliere, can you please read Exhibit

12   1004.

13   A.  Yes.  "Stipulation of the Parties.

14             "The United States of America, by and through its

15   attorneys, the United States Attorney for the District of

16   Columbia, and the defendant, Thomas Robertson, with the

17   concurrent of his attorneys, agree and stipulate to the

18   following?

19             "Interstate commerce.

20             "The events on the Grounds of the U.S. Capitol and

21   in the U.S. Capitol building on January 6, 2021, obstructed,

22   delayed, or adversely affected commerce or the movement of

23   any article or commodity in commercial as those terms are

24   used in Title 18, United States Code, Section 231(a)(3).

25   The term 'commerce' means commerce (A) between any state or

1    the District of Columbia and any place outside thereof; (B)

2    between points within any State or the District of Columbia,

3    but through any place outside thereof; or (C) wholly within

4    the District of Columbia.

5             "Under the Constitution, Congress has the

6    exclusive power to enact laws for the District of Columbia."

7    Q.  Thank you.

8             MS. ALOI:  I now want to direct your attention,

9    just for the Court and the parties, to Government's Exhibit

10   300.  And I understand there are actually no objections to

11   Exhibit 300, so upon review I would move to admit.

12            MS. WAGNER:  No objection.

13            THE COURT:  So moved.

14            MS. ALOI:  Please publish Government's Exhibit

15   300.

16   Q.  Special Agent Camiliere, what is this?

17   A.  This is a declaration of a city wide curfew on January

18   6, 2021.

19   Q.  And what does that mean?

20   A.  It means that a curfew was enacted after a certain hour

21   on January 6th due to the events on January 6th.

22   Q.  And did that curfew affect the ability of stores and

23   restaurants to be open and serving food and selling goods?

24   A.  Yes, it did.  Only non -- only essential personnel were

25   allowed to be out and about after a certain time.

1    Q.   Thank you.

2         I now want to turn attention to four other

3    stipulations.  They are Exhibits 1000, 1001, 1003 and 1005.

4    I'm not going to make you read them all, but I would move to

5    admit them at this time and actually ask you to read 1001

6    and 1003.

7         MS. WAGNER:  No objection.

8         THE COURT:  So moved.

9         MS. ALOI:  Could we please publish 1003 to the

10   jury.  Or actually, start with 1001.

11   Q.  Special Agent Camiliere, can you please read the

12   stipulation.

13   A.   Yes.  "The United States of America, by and through its

14   attorney, the United States Attorney for the District of

15   Columbia, and the defendant, Thomas Robertson, with the

16   concurrence of his attorneys, agree and stipulate to the

17   following:

18        "Officers from the United States Capitol Police

19   and Washington, D.C., Metropolitan Police Department.

20        "On January 6, 2021, officers from the United

21   States Capitol police (USCP) on the U.S. Capitol Grounds and

22   in the U.S. Capitol building were engaged in their official

23   duties as officers or employees of the United States or of

24   any agency in any branch of the United States Government, as

25   those terms are used in Title 18, United States Code,

857

 1   Section 1114.

 2             "On January 6, 2021, officers from the Washington,

 3   D.C., Metropolitan Police Department (MPD) on the U.S.

 4   Capitol Grounds and in the U.S. Capitol building were

 5   assisting officers from the USCP who were engaged in their

 6   official duties as officers or employee of the United States

 7   or of any agency in any branch of the United States

 8   Government, as those terms are used in Title 18, United

 9   States Code, Section 1114.

10   Q.  Thank you.

11             MS. ALOI:  And if we could now publish

12   Exhibit 1003.

13   Q.  Could you please read this one as well.

14   A.  Yes.

15             "Stipulation of the Parties.

16             "The United States of America, by and through its

17   attorney, the United States Attorney for the District of

18   Columbia, and the defendant, Thomas Robertson, with the

19   concurrence of his attorneys, agree and stipulate to the

20   following:

21             "Federally Protected Function.

22             "The events on the grounds of the U.S. Capitol and

23   in the U.S. Capitol building on January 6, 2021, adversely

24   affected 'a federally protected function' as that term is

25   used in Title 18, United States Code, Section 231(a)(3).

1    That means that the events adversely affected any function,

2    operation, or action carried out, under the laws of the

3    United States, by any department, agency, or instrumentality

4    of the United States or by any officer or employee thereof.

5    The federal protected functions that were adversely affected

6    included the following:  the United States Capitol Police's

7    protection of the U.S. Capitol and the Capitol grounds, and

8    the United States Secret Service's protection of the Vice

9    President of the United States and immediate family members

10    of the Vice President."

11    Q.  Thank you.  With that done, let's turn to your

12    investigation.

13          How did the FBI first become aware of the

14    defendant?

15    A.  We received a tip from the public access line, and that

16    tipster referred me to someone else, who I followed up with,

17    referencing the defendant and Mr. Fracker.

18    Q.  Okay.  I now want to show you what's been admitted as

19    Government's Exhibit 103.

20          Was this photo part of the tip?

21    A.  Yes, it was.

22    Q.  So at the outset, is this all you knew about the

23    defendant's participation in the riots?

24    A.  Yes.  This photo was identified by the second tipster.

25    Q.  Okay.  After reviewing the photograph, did you take

1   steps to identify who was in it?

2   A.  Yes, we did.

3   Q.  And were you able to identify Thomas Robertson?

4   A.  Yes.

5   Q.  Is he the person holding a stick?

6   A.  Yes, he is.

7   Q.  And wearing the blue backpack?

8   A.  Yes.

9   Q.  And is he with a person named Jacob Fracker?

10  A.  Yes.

11  Q.  Did you also learn where and when this photo was taken?

12  A.  Yes.

13  Q.  Okay.  Now, were other FBI offices also involved in your

14  investigation?

15  A.  Yes, they were.

16  Q.  Which ones?

17  A.  The Richmond Field Office and the Roanoke Resident

18  Agency assisted in our investigation.

19  Q.  Who were some of the agents who worked on the case?

20  A.  Special Agent Lynne Witt and Special Agent Chad Potter.

21  Q.  Okay.  Now, as part of that investigation, were you --

22  so following this tip, did the FBI open up an investigation

23  into the defendant specifically?

24  A.  Yes, we did.

25  Q.  Were you involved in initiating a search warrant for the

1    search of the defendant's home after January 6th?

2    A.  Yes, I was.

3    Q.  What was your role?

4    A.  I was the affiant on the search warrant.

5    Q.  Were you present for a search of the defendant's house

6    on January 19th?

7    A.  I was not present there.

8    Q.  Who did the search?

9    A.  The Richmond Field Office with the Roanoke Resident

10   Agency.

11   Q.  Are you familiar with what was taken?

12   A.  Yes.

13   Q.  And I'd like to show you Government's Exhibit 607.  Are

14   you familiar with the room depicted here?

15   A.  Yes.

16   Q.  Was it on -- is it on the defendant's property?

17   A.  Yes, it is.

18   Q.  Okay.

19           MS. ALOI:  And could we now show Government's

20   Exhibit 608.

21   Q.  Are these -- could you --

22           MS. ALOI:  Actually, in the interest of time,

23   could you scroll through 608 and 609.  Stop there.

24   Q.  Exhibit 608, was that an item taken from the defendant's

25   property that day?

```
 1    A.  Yes, it was.

 2    Q.  Okay.  And what do you observe here?

 3    A.  There is a long wooden stick, a blue backpack, water,

 4    and assorted other items as well.

 5    Q.  Now, did you have a chance to observe -- was a stick

 6    taken from the defendant's house that day?

 7    A.  Yes, it was.

 8    Q.  Did you have a chance to observe the stick?

 9    A.  Yes, I have.

10    Q.  Based on your observations of the stick that was taken,

11    is it the same stick that was in the trunk of that car?

12    A.  I believe it is.  It's an octagonal shape and

13    approximately the same length as the one that we have taken

14    into custody.

15    Q.  And based on your observations, is it also the same

16    stick that was in Government's Exhibit 103, the photo from

17    the Crypt?

18    A.  Yes.

19    Q.  Now, the agents who conducted the search that day, were

20    they briefed on what to look for?

21    A.  Yes, they were.

22    Q.  Was the blue backpack seen in this picture highlighted

23    as something to take?

24    A.  No, it was snot.

25    Q.  Why not?
```

1    A.  It was early on in the investigation, and we hadn't yet

2    obtained photos and videos except to a lesser extent from

3    public tips, so we weren't yet aware of the significance of

4    the blue backpack.

5    Q.  Okay.  Now, in the course of your investigation, did you

6    also have the opportunity to review body-worn camera footage

7    from police officers from CDU 42 who were at the Capitol on

8    January 6th?

9    A.  I did.

10         MS. ALOI:  I now want to show you what's been

11   admitted as Government's Exhibit 201C.

12   Q.  Based on your observations of what was seized from the

13   defendant's home, do you believe the stick in this photo to

14   be the same wooden stick from the seizure?

15   A.  Yes, I do.

16   Q.  And is it your understanding or is it -- based on your

17   observations, do you believe the backpack in the picture to

18   be the backpack from the car?

19   A.  Yes, I do.

20   Q.  Okay.  I'd now like to show you Exhibit 411.

21         MS. ALOI:  And, Ms. Dunn-Gordon, could you

22   please -- we'll start with this one, and then we'll go

23   through the pictures that have the yellow arrows on them.

24   Can you please publish this to the jury.

25   Q.  Special Agent Camiliere, who is that yellow arrow

1    pointed to?

2    A.  Mr. Fracker.

3              MS. ALOI:  Next slide, please.

4    Q.  Who is that yellow arrow pointed at?

5    A.  The defendant.

6              MS. ALOI:  Next slide, please.

7    Q.  Who are these yellow arrows pointed at?

8    A.  The arrow on the left is pointed at Mr. Fracker, and the

9    arrow on the right is the defendant.

10             MS. ALOI:  Next slide, please.

11   Q.  Who are these arrows pointed at?

12   A.  There on the left is Mr. Fracker, and there on the right

13   is the defendant.

14             MS. ALOI:  Next slide, please.

15   Q.  Who are these arrows pointed at?

16   A.  The arrow on the left is Mr. Fracker, and the arrow on

17   the right is the defendant.

18             MS. ALOI:  Next slide.

19   Q.  Who is this arrow pointed at?

20   A.  The defendant.

21             MS. ALOI:  Now, please, pull and -- pull up and

22   publish to the jury Exhibit 402A, which has been admitted.

23   If you could advance to the slides of the arrows, please.

24   Q.  Who is that arrow pointed at?

25   A.  The defendant.

1          MS. ALOI:  Next slide, please.

2     Q.  Who is the arrow pointing at?

3     A.  The defendant.

4          MS. ALOI:  Next slide, please.

5     Q.  Who is the arrow pointing at?

6     A.  The defendant.

7          MS. ALOI:  Next slide, please.  Okay.

8          Now, please, pull up Exhibit 405A and publish it

9     to the jury, please.

10         If you could just advance it to where you see the

11    arrows.

12    Q.  Who is that arrow pointing at?

13    A.  The defendant.

14         MS. ALOI:  If we can now please pull up Exhibit

15    406A, which is in evidence, and publish it to the jury,

16    please.  Please advance it to where you see the arrows.

17    Q.  Who is that arrow pointing at?

18         MS. ALOI:  Ms. Dunn-Gordon, are you able to blow

19    that up?

20    A.  I'm having trouble seeing who that is.

21    Q.  Okay.

22         MS. ALOI:  If we could advance to the next slide.

23    A.  That arrow is pointing at the defendant.

24         MS. ALOI:  Next slide, please.

25    A.  Again, I'm having trouble seeing it.

1    Q.  Okay.

2            MS. ALOI:  Next slide.

3            Ms. Dunn-Gordon, could you please pull up Exhibit

4    412A, and please scroll through until you see the circle.

5    Q.  Special Agent Camiliere --

6            MS. ALOI:  Please publish it to the jury.

7    Q.  -- what is circled here in this screenshot?

8    A.  So this is the area to which CDU 42 proceeded to

9    reinforce the police line on the western side of the U.S.

10   Capitol on January 6th.

11   Q.  And these observations you have just made about what you

12   have seen, are they based on the entirety of your

13   investigation and your understanding of events that day?

14   A.  Yes.

15   Q.  Okay.  So is it fair to say that over the course of this

16   investigation you have reviewed countless hours of footage?

17   A.  Yes.

18   Q.  And in the course of the trial have you had a chance to

19   observe the defendant?

20   A.  I have.

21   Q.  And any point in time did you see him limp?

22   A.  I have not.

23   Q.  Okay.  Now, I'm going to shift gears a bit.  I expect to

24   use Exhibits 100, 100A through 100S.

25           MS. ALOI:  These are business records from

1    Facebook, and I would move to admit them as I understand the

2    defendant does not object to them.

3                    THE COURT:  Ms. Wagner?

4                    MS. WAGNER:  No objection, Your Honor.

5                    THE COURT:  So moved.

6    Q.  Special Agent Camiliere, are you familiar with Facebook?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's a social media platform.

10   Q.  Can people post their thoughts on that platform?

11   A.  Yes, they can.

12   Q.  Can they make those posts public?

13   A.  Yes.

14   Q.  Can they also share them selectively?

15   A.  They can.

16   Q.  So what does that mean?

17   A.  So if they have posts that they only want certain people

18   to see, such as their friends or they can even limit it to

19   particular people, they can limit the post in that manner,

20   or they can send it via private message.

21   Q.  And are there private group messages on Facebook?

22   A.  There are.

23   Q.  Okay.  Did the defendant use Facebook?

24   A.  Yes.

25   Q.  Did Jacob Fracker use Facebook?

1    A.  Yes, he did.

2    Q.  Were the defendant and Mr. Fracker friends on Facebook?

3    A.  Yes, they were.

4    Q.  Does that mean under certain circumstances they can see

5    each other's posts?

6    A.  Yes.

7    Q.  And did you obtain a search warrant to obtain the

8    content of the defendant's Facebook account?

9    A.  I did.

10   Q.  Okay.  And have you reviewed that content?

11   A.  I have.

12   Q.  In the course of that review, did you find posts the

13   defendant made before January 6th?

14   A.  Yes.

15   Q.  Did you also see content that he made after January 6th?

16   A.  Yes.

17   Q.  Okay.

18           MS. ALOI:  Ms. Dunn-Gordon, can you please pull up

19   Exhibit 103.

20   Q.  Now, this photo, was this contained within the

21   defendant's Facebook account?

22   A.  Yes, it was.

23   Q.  Was it also contained within Mr. Fracker's Facebook

24   account?

25   A.  It was.

 1   Q.   Did the defendant comment on this photo?

 2   A.   Yes.

 3   Q.   I'd now like to draw your attention to Exhibit 100D.

 4          MS. ALOI:  Please publish it to the jury.

 5          Ms. Dunn-Gordon, would you mind blowing up the

 6   highlighted portion.

 7   Q.   Special Agent Camiliere, is this a comment written by

 8   Mr. Robertson on his Facebook page?

 9   A.   It is.

10   Q.   What is the date and time of it?

11   A.   So the date is January 10, 2021, and the time is

12   02:22:57 UTC.

13   Q.   What does "UTC" mean?

14   A.   It's Coordinated Universal Time.  It's a standard by

15   which the majority of the clocks within the world are set

16   to.  At this point in time it was -- Eastern Time is five

17   hours behind UTC time, so this would actually make the post

18   on January 9, 2021.

19   Q.   So three days after the events at the Capitol?

20   A.   Yes, ma'am.

21   Q.   Could you please read it for the jury.

22   A.   "Thomas Robertson commented.  PS.  Here's the picture in

23   question and I am fucking PROUD of it.  It shows 2 men

24   willing to actually put skin in the game and stand up for

25   their rights.  If you are too much of a coward to risk

1    arrest, being fired, and actual gunfire to secure your

2    rights, you have no words to speak I value.  Enjoy your feel

3    good protests and fame.  I'll simply accept a 'Thank you'

4    for the very blanket of freedom that you live and sleep

5    under."

6    Q.  Thank you.

7            I now want to draw your attention to Exhibit 101E.

8    Is this a record from Mr. Fracker's Facebook account?

9    A.  Yes.

10           MS. ALOI:  I would move to admit and publish it to

11   the jury.  Actually, it's already in.

12   Q.  What is the date and time of this post?

13   A.  January 10, 2021 at 01:39:47 UTC.

14   Q.  So would you say that that's within an hour of when the

15   defendant posted his message?

16   A.  Yes, approximately.

17   Q.  And is it also about the picture in the Crypt?

18   A.  Yes, it is.

19   Q.  Could you please read it for the jury.

20   A.  "Lol to anyone who's possibly concerned about the

21   picture of me going around.... sorry I hate freedom?  Sorry

22   I fought hard for it and lost friends for it?  Not like I

23   did anything illegal, WAY too much to lose to go there but,

24   y'all do what you feel you need to lol.  And a foot note:  I

25   can protest for what I believe in and still support your

1    protest for what you believe in.  Just saying...after all, I

2    fought for your right to do it..."

3    Q.  Thank you.  Now, this photo that the defendant and

4    Mr. Fracker are commenting on, was it taken in the Crypt?

5    A.  Yes, it was.

6    Q.  And is that a room in the U.S. Capitol?

7    A.  It is.

8    Q.  How close is that room from the Senate floor?

9    A.  It's fairly close.

10   Q.  Now, have you reviewed the footage from the Crypt?

11   A.  Yes, I have.

12   Q.  Did you observe the defendant and Mr. Fracker hugging?

13   A.  Yes, I did.

14   Q.  Did you observe them clapping?

15   A.  Yes, I did.

16   Q.  Did you observe Mr. Robertson keeping beat with a stick

17   he was holding?

18   A.  I did.

19   Q.  And how long were they in the Crypt?

20   A.  Approximately ten minutes.

21              THE COURT:  Ms. Aloi, if you could slow down just

22   a little bit, please.

23   Q.  How long were they in the Crypt?

24   A.  Approximately ten minutes.

25   Q.  So based on your observations, did Mr. Robertson, the

1    defendant, depart the Crypt right after they reconnected?

2    A.  No.

3    Q.  And are your observations consistent with the sentiment

4    that is being shared in these messages?

5    A.  Yes, I believe it is.

6    Q.  And is it fair to say that, based on what you have read

7    and what you observed, you believe they were proud of what

8    happened that day?

9            MS. WAGNER:  Objection.

10           THE COURT:  Overruled.

11   Q.  They were proud of what happened that day?

12   A.  Yes.

13   Q.  Okay.

14           Now, turning back to the defendant, did he make

15   other comments on Facebook about the events of January 6th

16   after January 6th?

17   A.  Yes, he did.

18   Q.  And I want to draw your attention to Exhibit 100C.

19           MS. ALOI:  Please publish it to the jury.  Thank

20   you.

21   Q.  Is this another Facebook post by the defendant?

22   A.  Yes, it is.

23   Q.  Does it also have posts by other people on it?

24   A.  It does.

25   Q.  Are they commenting on what the picture is showing?

1    A.  Yes.

2    Q.  What do you see here?

3    A.  So I see now President Biden appearing to wave at a

4    cemetery with the words, "Thanks For Voting!"

5    Q.  All right.  Now, when was this picture posted?

6    A.  It was posted on November 7, 2020, at 18:23 and 50

7    seconds UTC.

8    Q.  And when was the election?

9    A.  November 3, 2020.

10   Q.  So was this shortly after the election?

11   A.  It was.

12   Q.  And what do you -- what is your understanding of what is

13   being depicted here?

14   A.  My understanding is it's being implied that now

15   President Biden is thanking dead people for voting in the

16   election.

17   Q.  President-Elect Biden?

18   A.  Yes.

19   Q.  Now, I'd like to draw your attention to the highlighted

20   portion.  Can you please read it?

21   A.  "CNN and the Left are just mad because we actually

22   attacked the government who is the problem and not some

23   random small business.  The Left rioted all Summer and just

24   burned their own neighborhoods, assaulted numerous

25   civilians, and destroyed and looted small family owned

1  stores.  The Right IN ONE DAY (without weapons) took the

2  fucking U.S. Capitol.  Keep poking us."

3  Q.  Now, does this suggest to you that the defendant was

4  upset at the idea that dead people may have voted for

5  President Biden?

6  A.  Yes.

7  Q.  And that he wanted to do something about it?

8  A.  Yes.

9  Q.  And is "attacked the government" one of the things that

10  he said that was done?

11  A.  Yes.

12  Q.  Now, in reviewing the defendant's Facebook account, did

13  you find anything to suggest that he was injured on January

14  6th?

15  A.  Yes, I did.

16       MS. ALOI:  I'd like to now publish what has been

17  admitted as Government's Exhibit 100S.  And actually, before

18  we do, let's make sure it's the right version of it.

19       Can you please take down the...  Thank you.

20       Can you please publish that to the jury.  Thank

21  you.

22       Ms. Dunn-Gordon, can you please turn to the page

23  of 100S that has the photo on it.

24  Q.  Special Agent Camiliere, is this something -- a photo

25  you observed in the defendant's Facebook account?

1    A.  Yes.

2    Q.  What are we looking at here?

3    A.  The defendant referred to it as his ass.

4    Q.  And how do you know that?

5    A.  He made a comment about it.

6          MS. ALOI:  Ms. Dunn-Gordon, can you please scroll

7    to the next page.

8    Q.  I'd like to direct your attention to the highlighted

9    portion.  Can you please read that to the jury.

10   A.  Yes, Freddie Conner said:  "I know one thing they were

11   scared shitless inside."

12          Thomas Robertson said:  "Oh yeah.  Bad."

13          Thomas Robertson also said:  "We were stomping on

14   the roof of their safe room chanting WHOS HOUSE?  OUR

15   HOUSE."

16          MS. ALOI:  Ms. Dunn-Gordon, can you please turn to

17   the next page.

18   Q.  Could you please continue reading the highlighted

19   portion.

20   A.  Thomas Robertson said:  "Shot in the ass with a rubber

21   bullet," and then it said he sent a photo.

22   Q.  So is the photo that he sent the one we just saw?

23   A.  Yes.

24   Q.  And are these -- is this a conversation that he had with

25   a person named Freddie Conner?

1    A.  Yes.  It appears to be.

2    Q.  Do you know who Freddie Conner is?

3    A.  I do not.

4    Q.  And what date and time was the photo sent?

5    A.  It was sent on January 9, 2021, at 01:20:11 UTC, so that

6    means it was sent on January 8th of 2021.

7    Q.  And in this conversation, are Mr. Robertson and

8    Mr. Conner discussing what had happened on January 6th?

9    A.  Yes.

10   Q.  Including the stomping, whose house, our house?

11   A.  Yes.

12   Q.  Okay.  In other posts, did the defendant describe his

13   actions on January 6th at part of the next American

14   revolution?

15   A.  Yes, he did.

16   Q.  Did he suggest that people should just buckle up or stay

17   home?

18   A.  Yes.

19   Q.  Now, these posts we were just looking at were made after

20   January 6th, correct?

21   A.  That's correct.

22   Q.  Did the defendant also post on Facebook about his

23   dissatisfaction with the election results and his plans for

24   the future before January 6th?

25   A.  He did.

1    Q.  I'd like to draw your attention to Exhibit 100A.

2           MS. ALOI:  Please publish it for the jury,

3    Ms. Dunn-Gordon, and would you mind, please, blowing up the

4    highlighted portion.

5    Q.  Special Agent Camiliere, is this a post from the

6    defendant's Facebook account?

7    A.  It is.

8    Q.  What is the date and time of the post?

9    A.  November 7, 2020, at 18:20 and 23 seconds UTC.

10   Q.  And what does it say?

11   A.  "A legitimate republic stands on 4 boxes.  The soapbox,

12   the ballot box, the jury box, and then the cartridge box.

13   We just moved to step 3.  Step 4 will not be pretty.  I

14   cannot speak for others, but being disenfranchised by fraud

15   is my hard line.  I've spent most of my adult life fighting

16   a counter insurgency.  I'm about to become part of one, and

17   a very effective one."

18   Q.  Now, I think you said the presidential election was

19   November 3rd; is that right?

20   A.  Yes, ma'am.

21   Q.  So this is just a few days later?

22   A.  Yes.

23   Q.  Based on your experience in law enforcement, do you

24   understand what a cartridge box is?

25   A.  Yes, I do.

1    Q.  What is it?

2    A.  It's a box used to hold ammunition.

3    Q.  And what is an insurgency?

4    A.  An insurgency is an organized uprising that uses both

5    violent and nonviolent means to overthrow an existing

6    government.

7    Q.  Thank you.

8              I now want to draw your attention to Exhibit 100H.

9              MS. ALOI:  Please take this one down.

10             And before it's published to the jury, we'll

11   confirm that it's the correct version we'd like to use.

12             May I please publish it to the jury?

13             THE COURTROOM DEPUTY:  Okay.

14   Q.  Special Agent --

15             THE COURT:  Ladies and gentlemen, you know,

16   sometimes the Court will allow the parties to introduce only

17   certain parts of a particular document, and this is an

18   example of that.  And so you shouldn't speculate what may or

19   may not be behind the redactions, okay?

20   Q.  Special Agent Camiliere, is this another post from the

21   defendant's Facebook account?

22   A.  It is.

23   Q.  Is there -- what is the date of this post?

24   A.  December 19th of 2020, 15:05 and 51 seconds UTC.

25   Q.  Could you please read it for the jury.

1    A.   Thomas Robertson commented:  "Not at all.  Civility has

2    left me.  Im tired of always taking the high road and being

3    beat by those who cheat, lie, and steel to win and then

4    allow their media to paint me as the bad guy.  I won't be

5    disenfranchised.  I'll follow the path our founders gave us.

6    Redress of grievances (already done) civil disobedience

7    (here now) and then open armed rebellion.  I've spent the

8    last 10 years fighting an insurgency in Iraq and then

9    Afghanistan.  Im prepared to start one here and know a bunch

10   of like minded and trained individuals."

11   Q.   Special Agent Camiliere, in the course of your

12   investigation, did you discover another social media

13   platform used by the defendant?

14   A.   Yes, I did.

15   Q.   What is it?

16   A.   AR-15.com.

17   Q.   Did law enforcement obtain the contents of the

18   defendant's AR-15.com account through a search warrant?

19   A.   Yes, we did.

20   Q.   I want to show you what has been admitted as Exhibit

21   10 -- actually, marked as Exhibit 102.

22             MS. ALOI:  And please do not publish it yet.

23   Q.   Is this the defendant's AR-15 account?

24   A.   Yes, it is.

25             MS. ALOI:  I understand there are no objections to

1    this exhibit so I'd move to admit it now.

2              MS. WAGNER:  No objection.

3              THE COURT:  So moved.

4              MS. ALOI:  Please publish it to the jury.

5    BY MS. ALOI:

6    Q.  Now, let's actually specifically look at an excerpt from

7    this exhibit, which is Exhibit 102B, so we just looked --

8    was what we were just looking at the entirety of the content

9    from the AR-15 account?

10   A.  It was.

11   Q.  Now let's look at one portion.  Is this a photograph the

12   defendant sent to a friend using the AR-15.com platform?

13   A.  He sent it to someone else on AR-15.com, yes.

14   Q.  I guess you don't know if they're friends.

15   A.  Correct.

16   Q.  Where is this photo taken from?

17   A.  It appears to be taken at the U.S. Capitol.

18   Q.  And do you have -- based on having reviewed footage from

19   the Capitol, do you have an understanding of when this photo

20   was taken?

21   A.  I believe it was taken later in the day on January 6,

22   2021.

23              THE COURTROOM DEPUTY:  It's not in.

24              MS. ALOI:  It's an excerpt from the -- I would

25   move to admit Exhibit 102B.

```
1              THE COURTROOM DEPUTY:  Thank you.

2              MS. WAGNER:  No objection.

3              THE COURT:  So moved.

4    BY MS. ALOI:

5    Q.  Did the defendant also send this photo to reporters?

6    A.  Yes.

7    Q.  Okay.

8              MR. ALOI:  Now I'd like to turn now to Exhibit

9    102A, and I would move to publish it.  It's an excerpt from

10   the previously admitted exhibit.

11             MS. WAGNER:  No objection.

12             THE COURT:  So moved.

13   Q.  Are these messages sent by the defendant using

14   AR-15.com?

15   A.  Yes.

16   Q.  And the message we were looking at now, was it sent on

17   January 7th?

18   A.  I don't see the date and time stamp on there so I'm not

19   sure.

20   Q.  Okay.  Can you please read it starting with "Ive seen

21   for" -- "Ive seen for the first time."

22             MS. ALOI:  If you could blow it up, Ms. Dunn-

23   Gordon.

24   A.  "Ive seen for the first time in my life....  A

25   government scared of its people.  The pictures of them
```

1    huddled in the floor crying is the most American thing I

2    have ever seen.  Regardless of what else happens those

3    Senators and Congressmen now understand who they truly are

4    accountable to in the end.  They have paid lip service to

5    'Working for the people' for so long its become a hollow

6    phrase.  They have been reminded."

7    Q.  And could you please continue reading.

8    A.  Yes.  "Delete."

9             And then, "Capitol steps from when we....not

10   Antifa.  Stormed it.  You tell me."

11   Q.  Now, in these messages -- which you have reviewed from

12   AR-15.com, right?

13   A.  Yes.

14   Q.  -- is the phrase "Capitol steps from when we....not

15   Antifa.  Stormed it" referring to the picture that we just

16   saw?

17   A.  I believe it is because that file was linked to that

18   particular post.

19   Q.  Now, did the defendant also post other pictures on

20   AR-15.com?

21   A.  Yes, he did.

22   Q.  Was one of those pictures a screenshot from a Department

23   of Justice website?

24   A.  It was.

25   Q.  Did it list all of the criminal prosecutions brought on

1     January 6th -- it brought arising from the January 6th

2     conduct?

3     A.  The Department of Justice website does so, but he took a

4     screenshot of a particular part of that.

5     Q.  Okay.  Was the defendant listed on that screenshot?

6     A.  Yes, he was.

7     Q.  What did he have to say about that?

8     A.  Another user asked whether -- something to the effect of

9     whether the people that participated were proud, and he

10    replied something to the effect of I sure as fuck am.

11    Q.  Okay.  Shifting gears a bit, let's talk about some of

12    the investigative work you did concerning videos that are in

13    evidence in this case.  I'd now like to show you what's been

14    admitted as Government's Exhibit 901.

15          MS. ALOI:  And please publish it to the jury.

16    Q.  Are you familiar with this exhibit?

17    A.  I am.

18    Q.  What is it?

19    A.  So it's a video taken by an individual, and it shows

20    footage from the lower west terrace, the scaffolding, and

21    the upper west terrace within the Capitol.

22    Q.  Does this particular video have time stamps?

23    A.  It does not.

24    Q.  Were you able to determine what time the video was taken

25    at?

1    A.  I was.

2    Q.  Now, let's talk about how you did that.  Did you review

3    footage from the U.S. Capitol CCTV system?

4    A.  Yes.

5    Q.  And did you review footage from that system from the

6    Senate wing door?

7    A.  Yes.

8    Q.  Does that footage have time stamps?

9    A.  It does.

10   Q.  Did a portion of Exhibit 901, which we just saw, show

11   the same area of the Senate wing door?

12   A.  It did.

13   Q.  And could you see the same people in the videos?

14   A.  Yes.  We looked at a particular moment in time and

15   matched up people that were the same.

16   Q.  So were you able to match up the people's position in

17   901, the video without the time stamps, with the people in

18   Video 402, which is the Senate wing door video with the time

19   stamps?

20   A.  Yes, we were.

21   Q.  So, Special Agent Camiliere, based on that information,

22   can you tell what time in clock time Video 901 starts?

23   A.  Yes, approximately 1:58 p.m. Eastern Time.

24   Q.  So right before 2:00 p.m.?

25   A.  Yes, ma'am.

1    Q.  Okay.  Does that mean, when we see a time stamp on

2    Exhibit 901, if we subtract a minute and nine seconds it

3    will provide us with the clock time within the 2:00 hour?

4    A.  Yes.

5    Q.  Okay.

6             MS. ALOI:  Now, turning back to Exhibit 901,

7    Ms. Dunn-Gordon, can you please play from 2:10:30, which is

8    11:45 on the tape, to 2:11:03 p.m., which is 12:12 on the

9    tape.

10            (Video playing)

11   Q.  Special Agent Camiliere, what do you observe happening

12   here?

13   A.  So this is essentially the last stand of the police

14   officers in the upper west terrace before the mob breaks

15   through the police line.

16   Q.  And now I'd like to turn to Exhibit 801.

17            Special Agent Camiliere, is Exhibit 801 clips in

18   which you matched up the time stamps from Exhibit 901 and

19   Exhibit 402?

20   A.  Yes.

21            MS. ALOI:  I would move to admit it at this time.

22            MS. WAGNER:  No objection.

23            THE COURT:  So moved.

24            MS. ALOI:  And please move to Slide 3.

25   Q.  Is this a moment in the clip that we just watched?

```
1    A.   It is.

2    Q.   What time is it?

3    A.   It's 2:10 and 44 seconds p.m.

4              MS. ALOI:   And please turn to Slide 4.

5    Q.   And what time is this?

6    A.   2:11 and three seconds.

7    Q.   And right before this happened, what did you observe

8    this gentleman do?

9    A.   He appeared to shake the barrier.

10   Q.   And is this roughly where we stopped the video we just

11   saw?

12   A.   Roughly.

13   Q.   And based on your understanding of what was going on,

14   what was -- why was the officer shaking the barrier?

15   A.   He appeared to be testing the security of the barrier.

16   Q.   Okay.   Were you able to determine where the defendant

17   was at this time?

18   A.   Yes, we were.

19             MS. ALOI:   Please turn to Slide 5.

20   Q.   Is this where the defendant was at 2:11:03 p.m.?

21   A.   Yes.

22   Q.   So is that the same time we just saw on Video 901?

23   A.   It is.

24   Q.   Okay.   Now, where is the defendant?

25   A.   So the defendant is coming up the stairs.   He just
```

1    exited where the scaffolding is, and he's moving towards the

2    upper west terrace.

3    Q.  And have you been to these stairs?

4    A.  I have.

5    Q.  How long does it -- would you estimate it takes to go up

6    the stairs?

7    A.  20 seconds or so.

8    Q.  Okay.  And is this just a few minutes after the

9    defendant's interaction with CDU 42?

10   A.  Yes.

11          MS. ALOI:  Ms. Dunn-Gordon, let's turn back to

12   Exhibit 901.  Can you please play from 2:10 to 2:26 or 14:10

13   to 14:26.

14          Go to 14:10.

15          (Video playing)

16   Q.  Is this video from the upper west terrace?

17   A.  We can't see it.

18          MS. ALOI:  Oh, I'm sorry, could you please take

19   down Exhibit 801 and -- hold on.

20          Please play it.

21          (Video playing)

22          MS. ALOI:  Continue, please.

23          (Video playing)

24   Q.  Is this video from the upper west terrace?

25   A.  Yes, it is.

```
1    Q.  I want to draw your attention to the individual with the

2    clean --

3              THE COURT:  Is this in evidence?  I don't think

4    we've seen it.

5              MS. ALOI:  It's in the video that's already been

6    admitted.

7              THE COURT:  Okay.  Very well.

8    Q.  I'd like to draw your attention to the person with the

9    green backpack on.

10             MS. ALOI:  Please play it.

11             (Video playing)

12   Q.  What did the person in the green backpack just do?

13   A.  He was scaling the wall to reach the upper west terrace.

14   Q.  Do you see anyone else that you recognize in this frame?

15   A.  Yes.  I see the defendant.

16   Q.  Were you able to determine what time that was?

17   A.  Yes.

18             MS. ALOI:  I'd like to turn back to Exhibit 801,

19   Slide 7.

20   Q.  Is this the moment in time -- is this a moment in time

21   that we were just discussing?

22   A.  Yes, ma'am.

23   Q.  What time is it?

24   A.  2:13 and 17 seconds.

25   Q.  Can you please...
```

```
 1              (Pause)
 2              MS. ALOI:  Can you please advance to the next
 3     slide.
 4     Q.  Now, are these also the same moments in time?
 5     A.  Yes, they are.
 6     Q.  Okay.  We're going to turn back to that, but who is the
 7     arrow pointing to?
 8     A.  The defendant.
 9     Q.  And where is he looking?
10     A.  He's looking in the direction of the individual that is
11     scaling the wall.
12     Q.  Now, from this moment in time are the Senate wing --
13     from where the defendant is standing, are the Senate wing
14     doors visible?
15     A.  Yes, they are.
16     Q.  Okay.  Now, what is the defendant holding in his hands?
17     A.  A stick and a gas mask.
18     Q.  I'd now like to turn to Slide 10.
19              MS. ALOI:  Actually, please -- go up, please.
20     Q.  Is this the same moment in time we just saw?
21     A.  Approximately.
22     Q.  Could you please circle the gas mask and the stick.
23     A.  (Witness complies) Yes.
24              MS. ALOI:  You can clear that.
25     Q.  And from where that moment is, you said you could see
```

1    the Senate wing door, right?

2    A.  Yes.

3    Q.  Okay.  Would you also be able to see if there were any

4    Capitol Police officers there?

5    A.  Yes.

6    Q.  Have you reviewed footage from that door?

7    A.  I have.

8    Q.  At this time?

9    A.  Yes.

10   Q.  Were there any Capitol Police officers out front?

11   A.  There were not.

12   Q.  Okay.  Please advance to Slide 10, which is minute 4:58.

13        Is this the footage that you reviewed?

14   A.  Yes.

15   Q.  Where you did not see any Capitol Police officers?

16   A.  Yes.

17   Q.  What do you see?

18   A.  I see individuals beginning to move towards the Senate

19   wing door.

20   Q.  And based on your review of the CCTV and Video 901, did

21   the defendant just then also start walking towards the door?

22   A.  Yes.

23   Q.  And what time roughly did Mr. Fracker enter the

24   building?

25   A.  I believe it was 14:14 or, excuse me, 2:14 or so.

1    Q.  So this is shortly after Mr. Fracker entered the

2    building?

3    A.  Yes.

4              MS. ALOI:  Okay.  Please advance to the next

5    slide.

6    Q.  Do you see the defendant in this photo?

7    A.  I do.

8    Q.  What time is it?

9    A.  2:15 and 18 seconds.

10   Q.  So is it about a minute later?

11   A.  Yes, ma'am.

12   Q.  Are there any Capitol Police officers there?

13   A.  No.

14             MS. ALOI:  Please advance the next slide.

15   Q.  And what do we see here?

16   A.  We see the defendant entering the Senate wing door.

17   Q.  And what time is it?

18   A.  2:16 and 51 seconds.

19   Q.  And at this point you've reviewed footage from the House

20   Chamber and the Senate Chamber; is that right?

21   A.  Yes.

22   Q.  At this point was the House still debating the objection

23   to the electoral ballots?

24   A.  It was.

25   Q.  All right.  I'd now like to move to Exhibit 402.  Are

 1    you familiar with --

 2                MS. ALOI:  If you could pause that for a moment.

 3                We can take that down.  I apologize.

 4    Q.  Are you familiar with body-worn camera?

 5    A.  I am.

 6    Q.  Have you reviewed Officer Hodges's body-worn camera

 7    starting when the defendant is visible?

 8    A.  Yes, I did.

 9    Q.  Have you reviewed it through when the defendant made

10    contact with the officers?

11    A.  I did.

12    Q.  Is that about 45 seconds?

13    A.  I believe it's about 51 or so, so approximately.

14    Q.  Where did that incident occur?

15    A.  The lower west terrace.

16    Q.  And where did you see the officers go next in the

17    footage?

18    A.  They proceeded further along to support the line of

19    police officers in the amphitheater-like area.

20    Q.  Were you able to find that time on Exhibit 901?

21    A.  Yes.

22                MS. ALOI:  Ms. Dunn-Gordon, could you please pull

23    up Exhibit 901 and play from 4:21 and pause at 4:25.

24                (Video playing)

25    Q.  Special Agent Camiliere, what are we looking at right

1    now?

2    A.  So we're looking at the mob moving up the scaffolding

3    towards the upper west terrace.

4    Q.  Okay.  And can you please point out where the

5    interaction with the CDU officers and the defendant was.

6    A.  Yes.  As we're facing the picture, it would have been

7    down in this lower area.

8    Q.  Okay.

9         MS. ALOI:  And please continue playing to minute

10   5:03.

11        (Video playing)

12        MS. ALOI:  Thank you.

13   Q.  Now, again, the defendant's not in this particular clip,

14   right?

15   A.  That's correct.

16   Q.  But did it show what was going on in the scaffolding

17   while he's interacting with the officers?

18   A.  Yes, it does.

19   Q.  What are some of your observations about that?

20   A.  There are members of the mob using chemical agents

21   against the officers.  They're trying to dismantle the

22   remaining barrier so they can proceed up to the upper west

23   terrace.

24   Q.  And shortly after the footage we just saw, which is the

25   45 seconds of the CDU 42 interaction, did the defendant come

1    up the scaffolding?

2    A.  Yes, he did.

3    Q.  This scaffolding?

4    A.  Yes.

5    Q.  I now want to shift gears a bit.

6         Was the defendant arrested on January 13th of

7    2021?

8    A.  He was.

9         MS. ALOI:  We can take that exhibit down.

10   Q.  Was Mr. Fracker arrested that day as well?

11   A.  He was.

12   Q.  And did either Mr. Fracker or Mr. Robertson have a phone

13   on them when they were arrested?

14   A.  They did not.

15   Q.  At this time were you looking for their phone?

16   A.  Absolutely.

17   Q.  If they had a phone, would it have been seized?

18   A.  Yes.

19   Q.  Was it significant to you that they didn't have a phone?

20   A.  Yes, it was.

21   Q.  Why is that?

22   A.  Because when we seize phones or electronic devices,

23   we're searching not just for evidence of a crime but also

24   evidence that a crime did not occur.

25         As police officers, at least as an FBI agent, I am

 1    trained that, when someone is arrested, to seize that phone

 2    incident to the arrest.

 3    Q.  And at this point were you trying to gather up as much

 4    information as possible about the defendant and Mr. Fracker?

 5    A.  Yes, I was.

 6    Q.  And when you first started investigating, did you have

 7    CCTV to review?

 8    A.  No, not at that time.

 9    Q.  Had you seen some social media?

10    A.  I had.

11    Q.  Had you had access to all the social media that was

12    available?

13    A.  Not at all.

14    Q.  But could you tell from the social media that the

15    defendant had taken videos and photos in the Capitol?

16    A.  It appeared that he did.

17    Q.  And was the same true of Mr. Fracker?

18    A.  Yes.

19    Q.  Okay.  Later did you review video footage from the

20    Capitol Police, the CCTV footage that we just discussed?

21    A.  I did.

22    Q.  And could you observe the defendant, Mr. Fracker, with

23    their phones out?

24    A.  I did.

25    Q.  Now, on January 13th, when the defendant was searched,

1    there was no phone; is that right?

2    A.  That's right.

3    Q.  Now, after the arrest did law enforcement then search

4    the defendant's home again?

5    A.  Yes, on January 19th.

6    Q.  In that request did you include a request that the

7    officers executing the search take a phone, if they saw one?

8    A.  Yes.

9    Q.  And that was just a couple of days later?

10   A.  That's correct.

11   Q.  On that day did the officers seize a phone?

12   A.  Yes.

13   Q.  Were you able to tell, based on your examination of that

14   phone, when it was activated?

15   A.  It was activated on January 14th.

16   Q.  So the day after he was arrested?

17   A.  Yes.

18   Q.  Did Mr. Fracker also activate a new phone on January

19   14th?

20   A.  Yes, he did.

21   Q.  So if I'm understanding the timeline right, the

22   defendants were arrested on the 13th.

23   A.  Yes.

24   Q.  And they both activate new phones on the 14th.

25   A.  That's correct.

1    Q.  Okay.  I now want to draw your attention to Exhibit

2    314A.  Is this a report of data from the phone that was

3    seized from the defendant on January 19th?

4    A.  Yes.

5          MS. ALOI:  And I understand there are no

6    objections so at this point I would move to admit it.

7          MS. WAGNER:  No objection.

8          THE COURT:  So moved.

9    Q.  Now, are these text messages that were on the

10   defendant's phone?

11   A.  They were.

12   Q.  And are they between the defendant and a person -- I

13   realize it can be hard to see because we redacted some of

14   the names, but a person with the initials MW?

15   A.  Yes.

16   Q.  And it can be a little bit hard to follow, but are they

17   roughly in chronological order?

18   A.  They are.

19   Q.  And when people are texting with each other, do

20   sometimes they text -- they send messages as another one is

21   coming in so some of the back-and-forth is not always clear?

22   A.  Yes, that's right.

23   Q.  Okay.  For that reason, we're going to look carefully at

24   the date and times of each message as we review them.

25          MS. ALOI:  Could you please turn to Page 8, and,

1    Ms. Dunn-Gordon, could you please blow up the message

2    starting with, "Anything problematic would have been

3    destroyed" on the top of that page.

4    BY MS. ALOI:

5    Q.   Ms. Camiliere, what does that message say?

6    A.   "Anything that may have been problematic is destroyed."

7    Q.   And who is it from?

8    A.   It's from the defendant.

9    Q.   And who is it to?

10   A.   MW.

11   Q.   And how can you tell that?

12   A.   Because I can see MW's phone number in the "To" portion

13   of it.

14   Q.   Okay.  And were these taken from the defendant's -- were

15   you reviewing these off of the defendant's phone; is that

16   right?

17   A.   Yes.

18   Q.   Does it also say that that message is in the sent

19   messages?

20   A.   Yes.

21   Q.   Okay.

22          MS. ALOI:  So, Ms. Dunn-Gordon, if you could

23   please pull it up again.

24   Q.   What is the date and time this one was sent?

25   A.   January 15, 2021, at 5:09 and 54 seconds a.m. UTC, so it

1    would have been sent roughly after midnight on the 15th of

2    January.

3    Q.   Okay.  Now, can you please read the next message that is

4    in blue.

5             Who is this message from?

6    A.   This is message is from MW.

7    Q.   And who is it to?

8    A.   The defendant.

9    Q.   And what is the status of this message?

10   A.   Read.

11   Q.   And what was the date and time it was delivered?

12   A.   January 15, 2021, at 15:10 and 10 seconds a.m. UTC.

13   Q.   What does it say?

14   A.   "So they didn't seize your phone and search your house

15   and interrogate your wife and dogs and neighbors who don't

16   have."

17   Q.   Let's look at the next message.

18             Ms. Camiliere, what is the next message?  Who is

19   it to?

20   A.   This is to MW.

21   Q.   So the same person who sent the previous message?

22   A.   Yes, ma'am.

23   Q.   And what is the date and time it was sent?

24   A.   January 15, 2021, at 5:10 and 15 seconds a.m. UTC.

25   Q.   And what is its status?

```
1    A.   Sent.

2    Q.   By whom?

3    A.   The defendant.

4    Q.   And what does it say?

5    A.   "Including my old phone."

6    Q.   Now, based on your reading of the text messages, is

7         that -- can that be understood in the context of the

8         previous message --

9    A.   Yes.

10   Q.   -- in which it said anything problematic has been

11        destroyed?

12   A.   Yes.

13   Q.   Including the phone?

14   A.   Yes.

15   Q.   Okay.

16              MS. ALOI:  Now, please let's turn to the next

17        message.

18   Q.   Who is this message to?

19   A.   MW.

20   Q.   And who is it from?

21   A.   The defendant.

22   Q.   And what are the date and time it was sent?

23   A.   January 15, 2021, at 5:10 and 25 seconds a.m. UTC.

24   Q.   And what is the status of that message?

25   A.   Sent.
```

1    Q.  And what does it say?

2    A.  "Took a lake swim."

3    Q.  So based on the context, is it your understanding that

4    this is referring back to the phone?

5    A.  Yes.

6          MS. ALOI:  Ms. Dunn-Gordon, can you please turn to

7    the next page and pull up the first message.

8    Q.  Could you please read the date and time of this message.

9    A.  Yes; January 15, 2021 at 5:11:03 seconds a.m. UTC.

10   Q.  And who is it to?

11   A.  MW.

12   Q.  And who is it from?

13   A.  The defendant.

14   Q.  And did we just see a message from MW in which he's

15   asking whether or not he was searched or, you know, whether

16   or not he talked to his neighbors?

17   A.  Yes, we did.

18   Q.  Okay.  And how does the defendant respond to that

19   message?

20   A.  He says, "No.  They asked for my phone but I'm not a

21   retard."

22   Q.  And was that message sent?

23   A.  It was.

24          MS. ALOI:  Can you please turn to the next message

25   on the next page.

1    Q.  Special Agent Camiliere, what is the date and time of

2    this message?

3    A.  January 15, 2021, at 5:11 and 49 seconds a.m. UTC.

4    Q.  And is this the next message that the defendant sends to

5    Mr. --

6           MS. ALOI:  I'm sorry.  Excuse me.  If we could

7    strike that from the record.

8    Q.  To MW?

9    A.  Yes.

10    Q.  What does he say?

11    A.  "And later had a tragic boating accident."

12    Q.  And what is he referring back to?

13    A.  The phone.

14    Q.  And what did the phone do?

15    A.  I'm sorry?

16    Q.  What did the phone do?

17    A.  That it had a tragic boating accident and went for a

18    lake swim.

19    Q.  Went for a lake swim.

20           And this information, is it consistent with what

21    Mr. Fracker has told law enforcement?

22    A.  Yes, it is.

23           MS. ALOI:  Special Agent Camiliere, I have no

24    further questions.

25           But I did want to correct something for the record

1    or confirm that where we didn't make reference to the

2    entirety of the Facebook account, we are moving to admit

3    only the portions that were shown.

4              THE COURT:  Very well.

5              Mr. Rollins.

6              Ladies and gentlemen, feel free to take a stretch

7    before the cross-examination.  Same for the witness.

8              All right.  Mr. Rollins.

9                        CROSS-EXAMINATION

10   BY MR. ROLLINS:

11   Q.  Good morning, FBI agent.

12   A.  Good morning.

13   Q.  As part of your investigation, did you see the defendant

14   destroy any property?

15   A.  No, I did not.

16   Q.  Throw any objects?

17   A.  No.

18   Q.  Get in a fight with any officers?

19   A.  Not in a fight, no.

20   Q.  Attempt to climb the scaffolding?

21   A.  No.

22   Q.  Attempt to break down any barriers?

23   A.  No.

24   Q.  And when we get to your -- how long have you been an

25   agent for?

1    A.   Approximately six years.

2    Q.   Okay.  And so when you arrest somebody, do you ask them

3    to give you all the evidence that they may have to

4    incriminate themselves?

5    A.   No.  We conduct a search incident to arrest.

6    Q.   Right.  So in this case did you have a search warrant

7    for the phones when you arrested them?

8    A.   When he was arrested, no, there was not.

9    Q.   So he wouldn't be required to turn over the phone to you

10   at that point, correct?

11   A.   If he'd had one on him and we searched him incident to

12   arrest, we could see it.

13   Q.   Right.  And at that point you would have to get a search

14   warrant, and then you would have to go -- you could get

15   inside the phone at that point, correct?

16   A.   Yes.

17   Q.   And so when you arrested him, it was on January 13th,

18   right?

19   A.   Yes.

20   Q.   And they were charged with the misdemeanor offenses

21   then, right?

22   A.   Yes.

23   Q.   And you didn't request their phones at that point?

24   A.   I wasn't present.

25   Q.   Okay.  And when they got to the house, they turned over

1 the phones that they had that were there, right, or -- I

2 mean the FBI agents confiscated the phones that were there,

3 right?

4 A.   On January 19th during the search the FBI confiscated

5 the phone they found, yes.

6 Q.   Right.  And still at that point on January 19th there's

7 no search warrant for those phones, right?

8 A.   No, there was.  There was a search warrant for any

9 electronic devices found at the house.

10 Q.   And that search warrant would have been given to them on

11 January 19th, correct?

12 A.   I believe it was on the 18th; but yes, approximately.

13 Q.   And the conversation that you're alleging, that

14 occurred -- that occurred on January 15th, correct?

15 A.   What conversation are you referring to?

16 Q.   The text messaging between MW?

17 A.   On January 15th, yes, sir.

18 Q.   Right.  So fair to say that they would not have been on

19 notice that you wanted their phones on January 15th because

20 they hadn't received the warrant until January 18th?

21 A.   As a law enforcement officer, I think they would have

22 been aware that we would have liked the phones, yes.

23 Q.   So because you're a law enforcement officer, they should

24 have had specialized knowledge that you were coming for the

25 phone?

1    A.   Yes.  Not that they would be treated differently, but

2    they would know that we would want the phones.

3    Q.   And we saw these exhibits, Exhibit 901, and we saw the

4    people trying to break through the barricades.  But

5    Mr. Robertson's not in those photos at all, correct, when

6    there are people trying to break through the barricades?

7    A.   That's correct.

8    Q.   And, in fact, there's probably at least about a hundred

9    people in front of him from where we saw him in your photo

10   in the exhibit.  I think it's 402.

11   A.   I don't know the exact number, but there were people in

12   front of him, yes.

13   Q.   About 100, maybe more?

14   A.   I couldn't estimate.

15   Q.   And when we see them in that Crypt -- and I'm sure

16   you've now been to the Capitol several times.

17   A.   Yes, sir.

18   Q.   That Crypt is considered -- that would actually be one

19   of the areas of Congress that the public is allowed to be in

20   if, in fact, they were permitted to be there that day.

21   A.   Yes, that's correct.

22   Q.   Right.  So it's not like one of the offices that people

23   are not allowed to go into even during touring, right?

24   A.   It's not a personal space, no.

25   Q.   Right.  So the Crypt is a spot that the public is

1    entitled to be in if and when they have tours?

2    A.  If it is not a restricted area, then yes.

3    Q.  Right.  And referencing Exhibit 100S where you see that

4    bullet or his buttocks in that photo.

5    A.  Yes.

6    Q.  That wasn't in reference to anything -- I mean, was that

7    just in reference to something occurred, or is that just --

8    what did you think that was -- what he was doing by that

9    buttocks picture?

10   A.  I would need to see the context of the conversation, but

11   from what I recall it was a reference to essentially being

12   shot with a rubber bullet on January 6th.

13   Q.  But there's no mention of January 6th in reference to

14   the rubber bullet, right?

15   A.  I would need to see the transcript again.

16   Q.  And so are you -- now you've been working these January

17   6th cases.  You've read through multiple social media.  Fair

18   enough to say that most people are boasting and not being

19   exactly truthful on social media?

20               MS. ALOI:  Objection.

21               THE COURT:  Overruled.

22   A.  I would say that a lot of people were proud of what

23   occurred on January 6th in the social media accounts I

24   reviewed.

25   Q.  Right.  But not everyone's being truthful, right?

```
 1    A.  I don't know.  I haven't fully investigated those cases.

 2    Q.  Well, you investigated Mr. Fracker's case, and he -- you

 3    learned that he said that he had gone to the bathroom in

 4    Nancy Pelosi's toilet, and your investigation revealed that

 5    never occurred.  Correct?

 6    A.  That's correct.

 7    Q.  So, in fact, he's just completely not being truthful in

 8    his social media, correct?

 9    A.  It appeared to be hyperbole.

10    Q.  And in referencing --

11            MR. ROLLINS:  If you can pull up Government's

12    Exhibit 100A.

13            And if you can bring up that portion before --

14    that may not be the one.  I'm sorry.  101E, I'm sorry.

15            (Pause)

16            MR. ROLLINS:  No, that's not it.

17    Q.  I can't find the exact exhibit, but do you remember when

18    he said they came and seized on the Capitol without weapons?

19    A.  Yes.

20    Q.  Okay.  So he specifically, in his Facebook post,

21    although I can't recall what exhibit it was, he said that

22    this was done without weapons, correct?

23    A.  Yes.

24            MS. ALOI:  Objection.

25            THE COURT:  Basis?
```

```
 1                   (The following is a bench conference)
 2               MS. ALOI:  That mischaracterizes the evidence.
 3       The statement about without weapons was on a different page.
 4               MR. ROLLINS:  If you can tell me what exhibit it
 5       was, I can pull it up.
 6               THE COURT:  You can clean it up on redirect.
 7               (This is the end of bench the conference)
 8       BY MR. ROLLINS:
 9       Q.  I'm going back to the phone issue.  When someone is
10       seeking an indictment against someone, right, those are
11       supposed to be in secret, correct?  When they go before the
12       grand jury to seek an indictment, correct?
13       A.  You're not supposed to speak about going in front of the
14       grand jury, that's correct.
15       Q.  In fact, most defendants are not supposed to know that
16       they're under indictment or that there's a grand jury
17       proceeding.
18       A.  No, I disagree.  Most defendants do know that they're
19       under indictment once they're actually under indictment.
20       Q.  When they're actually under indictment, but while a
21       proceeding is taking place, they may not even know that
22       they're under indictment, especially if they've already been
23       charged with a crime?
24       A.  It's possible.
25       Q.  I'm going to circle back around to this 100S, the rubber
```

1    bullet on the back, on his buttocks.

2         You didn't find any evidence to corroborate that

3    he was shot with a rubber bullet on January 6th, right?

4    A.  He, in a Facebook message to someone that he refers to

5    as his mom, did refer to rubber bullets on January 6th.

6    Q.  But not that he had been shot with them?

7    A.  No.

8    Q.  Did you learn that he was -- in fact, that happened as

9    an accident at home?  Did you ask him about that?

10   A.  Ask who?  I'm sorry.

11   Q.  Ask Mr. Robertson about why he had that?

12   A.  I've not spoken to Mr. Robertson.

13   Q.  Okay.  You spoke with Mr. Fracker at some length --

14        THE COURT:  Mr. Rollins.

15        (The following is a bench conference)

16        MS. ALOI:  Your Honor, the defendant can't suggest

17   that the government witness should have spoken to his

18   client, and we would ask for an instruction to that effect

19   with the jury.

20        MR. ROLLINS:  Why is that?  Why can't I expect her

21   to have talked to him early on or before that?

22        MS. ALOI:  Because she can only answer that

23   question honestly if she discusses your client's right not

24   to incriminate himself.

25        MR. ROLLINS:  She could --

```
 1                THE COURT:  It was just a brief reference.  I'm
 2      going to let it slide, okay?  Let's move on.
 3                (This is the end of the bench conference)
 4      BY MR. ROLLINS:
 5      Q.  You spoke to Mr. Fracker at some length, correct?
 6      A.  Yes, that's right.
 7      Q.  And it's fair to say that Mr. Fracker gave you
 8      conflicting statements about what happened to the
 9      phone?
10      A.  He did at times.
11      Q.  In fact, at one point he said that the phones were --
12      that he lost it on the Metro?
13      A.  Yes.  He corrected himself later.
14      Q.  Yes, he corrected himself after everyone left the
15      room, and he was able to speak with his attorney alone,
16      correct?
17      A.  Yes.
18      Q.  And then, when you came back in, his statement changed
19      regarding what happened to the phones?
20      A.  That's right.
21      Q.  He also indicated that he had significant memory issues
22      regarding what had happened?
23      A.  He said that he had some short-term memory issues.
24      Q.  Have you ever had the opportunity to observe
25      Mr. Robertson walking long distances?
```

```
1    A.   No.

2    Q.   Or for standing for long periods of time?

3    A.   Just what I've seen in the footage from January 6th.

4    Q.   Do you remember Mr. Fracker telling you that when he saw

5    the stick he presumed there was going to be a lot of walking

6    that day?

7    A.   I do recall that, yes.

8    Q.   And -- strike that.

9              And the Facebook post that you observed and read,

10   such as the four boxes, the jury box, the soapbox, none of

11   those things rose to the level of a threat, correct?

12   A.   I would need to see the post again.  Can we pull it up,

13   please?

14             MR. ROLLINS:  Can you pull up the -- I don't know

15   what number that is.  100A.  Thank you.

16   A.   So if you're talking about a threat in a legal sense,

17   no.

18   Q.   Okay.  So it's just somebody exercising their right to

19   just kind of speak, right?

20   A.   Yes.  He has a First Amendment right.

21   Q.   All right.

22             MR. ROLLINS:  No further questions.  Thank you.

23             THE WITNESS:  Thank you.

24             THE COURT:  Ms. Aloi.

25             MS. ALOI:  Briefly.
```

```
 1                       REDIRECT EXAMINATION
 2     BY MS. ALOI:
 3     Q.  Special Agent Camiliere, let's walk through the timeline
 4     of the arrest and the phone seizure briefly.  Was the
 5     defendant arrested on January 13th?
 6     A.  He was.
 7     Q.  And when he was arrested, was he transported for
 8     processing?
 9     A.  Yes.
10     Q.  And during that transport, was he told that the FBI in
11     Washington might be interested in looking at his phone?
12     A.  Yes.
13     Q.  And what got him there that day?  Was he also told that
14     he had been charged with a crime?
15     A.  Yes.
16     Q.  So on January 13th he knew that he had been charged with
17     a crime?
18     A.  Yes.
19     Q.  And that the FBI was interested in his phone.
20     A.  Yes.
21     Q.  And the text that we saw with the individual in which
22     there is a discussion of the phone being destroyed, was that
23     two days later?
24     A.  It was.
25     Q.  And what date did the defendant activate a new phone?
```

```
1    A.   January 14th.

2    Q.   So he's told that there's a crime.  He activates a new

3    phone.  And then using that phone did he tell a friend or

4    some individual that his phone had been destroyed?

5    A.   Yes.

6    Q.   I want to speak for a minute about Mr. Fracker.  In the

7    course of your meetings with Mr. Fracker, did you have the

8    opportunity to assess his credibility?

9    A.   Yes, I did.

10   Q.   And I think you testified a few minutes ago that his

11   story may have changed a bit?

12   A.   Yes.

13   Q.   Over time -- what was your impression of his -- the

14   changing of his story over time?

15   A.   I felt that the more we talked with him and the more

16   comfortable he became, the more credible he became.

17   Q.   And you didn't just take his word for it, right?

18   A.   Absolutely not.

19   Q.   Did you take steps to corroborate what he was telling

20   law enforcement?

21   A.   Numerous steps.

22   Q.   Did those steps include finding out, for example, that

23   he had also gotten a new phone?

24   A.   Yes.

25   Q.   And had paid for it on January 14th or 15th?
```

1    A.  Yes.

2    Q.  And it had been activated around that time?

3    A.  That's correct.

4    Q.  And is Mr. Fracker's understanding of the events of

5    January 6th corroborated by what you see on video?

6    A.  Yes.

7    Q.  And you understand of his intent from reading things

8    like the Facebook posts?

9    A.  Yes.

10   Q.  Now, I think Mr. Rollins asked you a few minutes ago

11   about the wooden stick and whether or not you had observed

12   the defendant walking long distances.

13   A.  Yes.

14   Q.  When the stick was seized from the defendant, did he

15   identify it as a flagpole or as a walking stick?

16   A.  He identified it as a flagpole.

17          MS. ALOI:  Nothing further.

18          THE COURT:  Okay.  Agent Camiliere, thank you very

19   much for your testimony.  You can step down.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Okay.  You folks hungry?

22          All right.  Let's take our lunch break.  Why don't

23   we reconvene at 1:45.  No discussions about the case.  No

24   research about the case.  Have a nice lunch.

25          (Jury exits courtroom)

```
 1                THE COURT:  All right.  Please be seated.

 2                All right.  Do we still have Officer Wilhoit, or

 3      is that it?

 4                MS. ALOI:  Your Honor, we are not going to call

 5      Officer Wilhoit unless we bring a rebuttal case.

 6                THE COURT:  Okay.  So you will rest your case-in-

 7      chief when we come back?

 8                MS. ALOI:  Yes, Your Honor.

 9                THE COURT:  And, Mr. Rollins, you can make a

10      motion on the bat phone, and I'll reserve, but make your

11      motion and then be ready to go.  We still think three or --

12      three witnesses or fewer now?

13                MS. WAGNER:  Things have slightly changed.  We're

14      now at zero to one.

15                THE COURT:  Zero to one.

16                MS. WAGNER:  Yes; and if one, it will probably

17      take about five minutes.

18                THE COURT:  Okay.  Then at that point the defense

19      will rest.  The government will rest assuming that five

20      minutes does not require a rebuttal witness.  We will try to

21      have the proposed jury instructions ready for you folks

22      after lunch.

23                We could certainly instruct -- we could instruct

24      today.  Do you want to try to close today, or do you want to

25      take a break and close tomorrow morning?
```

1          MS. BERKOWER:  I think we'd prefer to close

2     tomorrow morning, Your Honor.

3          MR. ROLLINS:  Likewise.

4          THE COURT:  So since we're on track, let's have

5     that be the plan.  We'll instruct today and close tomorrow.

6     Okay?

7          All right.  Have a good lunch break.

8          (Lunch recess taken at 12:32 p.m.)

9

10          **CERTIFICATE OF OFFICIAL COURT REPORTER**

11

12          I, LISA A. MOREIRA, RDR, CRR, do hereby

13     certify that the above and foregoing constitutes a true and

14     accurate transcript of my stenographic notes and is a full,

15     true and complete transcript of the proceedings to the best

16     of my ability.

17     Dated this 7th day of April, 2022.

18

19                                   /s/Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
20                                   United States Courthouse
                                     Room 6718
21                                   333 Constitution Avenue, NW
                                     Washington, DC 20001
22

23

24

25

917

## $

**$30,000** [2] - 820:4, 820:7

## '

**'commerce'** [1] - 854:25
**'Thank** [1] - 869:3
**'Working** [1] - 881:5

## /

**/s/Lisa** [1] - 916:19

## 0

**01:20:11** [1] - 875:5
**01:39:47** [1] - 869:13
**02:22:57** [1] - 868:12

## 1

**1** [1] - 833:8
**10** [8] - 788:22, 868:11, 869:13, 878:8, 878:21, 888:18, 889:12, 898:12
**100** [2] - 865:24, 905:13
**1000** [1] - 856:3
**1001** [3] - 856:3, 856:5, 856:10
**1003** [4] - 856:3, 856:6, 856:9, 857:12
**1004** [2] - 854:3, 854:12
**1005** [1] - 856:3
**100A** [4] - 865:24, 876:1, 907:12, 911:15
**100C** [1] - 871:18
**100D** [1] - 868:3
**100H** [1] - 877:8
**100S** [5] - 865:24, 873:17, 873:23, 906:3, 908:25
**101C** [2] - 798:20, 840:13
**101E** [2] - 869:7, 907:14
**102** [1] - 878:21
**102A** [1] - 880:9
**102B** [2] - 879:7, 879:25
**103** [3] - 858:19, 861:16, 867:19
**10:53** [1] - 846:6
**1114** [2] - 857:1, 857:9

**11:00** [1] - 846:7
**11:45** [1] - 884:8
**1219** [10] - 782:7, 782:9, 782:11, 782:16, 782:21, 783:1, 783:15, 783:18, 783:20, 783:22
**12:12** [1] - 884:8
**12:32** [1] - 916:8
**13th** [9] - 813:24, 824:9, 824:12, 893:6, 894:25, 895:22, 903:17, 912:5, 912:16
**14** [1] - 788:22
**14:10** [2] - 886:12, 886:14
**14:14** [1] - 889:25
**14:26** [1] - 886:13
**14th** [5] - 895:15, 895:19, 895:24, 913:1, 913:25
**15** [13] - 783:7, 783:9, 808:9, 808:22, 846:5, 897:25, 898:12, 898:24, 899:23, 900:9, 901:3
**15:05** [1] - 877:24
**15:10** [1] - 898:12
**15th** [5] - 898:1, 904:14, 904:17, 904:19, 913:25
**17** [2] - 844:20, 887:24
**17:34** [1] - 831:10
**18** [6] - 845:3, 854:24, 856:25, 857:8, 857:25, 890:9
**18:20** [1] - 876:9
**18:23** [1] - 872:6
**18th** [2] - 904:12, 904:20
**19** [1] - 845:11
**19th** [8] - 824:9, 860:6, 877:24, 895:5, 896:3, 904:4, 904:6, 904:11
**1:02** [2] - 799:16, 799:20
**1:07** [4] - 810:2, 810:4, 810:7, 811:10
**1:10** [2] - 799:16, 799:20
**1:21-cr-00034-CRC** [1] - 779:4
**1:28** [1] - 829:25
**1:45** [1] - 914:23
**1:49** [1] - 801:11
**1:51** [1] - 842:2
**1:52** [2] - 801:8,

**801:11**
**1:58** [1] - 883:23

## 2

**2** [4] - 781:9, 781:17, 782:6, 868:23
**2.5** [1] - 795:4
**20** [6] - 807:7, 807:8, 815:22, 819:13, 825:8, 886:7
**20-year** [1] - 816:19
**20001** [2] - 779:23, 916:22
**20004** [1] - 779:19
**200B** [2] - 796:25, 844:13
**2017** [2] - 790:12, 838:24
**201C** [2] - 844:13, 862:11
**202** [2] - 779:16, 779:20
**202-354-3187** [1] - 779:23
**2020** [4] - 872:6, 872:9, 876:9, 877:24
**2021** [18] - 854:21, 855:18, 856:20, 857:2, 857:23, 868:11, 868:18, 869:13, 875:5, 875:6, 879:22, 893:7, 897:25, 898:12, 898:24, 899:23, 900:9, 901:3
**2022** [2] - 779:4, 916:17
**20530** [1] - 779:15
**23** [1] - 876:9
**231(a)(3)** [2] - 854:24, 857:25
**25** [1] - 899:23
**252-6782** [1] - 779:16
**26** [3] - 809:14, 809:15, 832:18
**29th** [1] - 814:6
**2:00** [2] - 883:24, 884:3
**2:03** [1] - 845:12
**2:09** [2] - 802:6
**2:09:10** [1] - 802:8
**2:10** [2] - 885:3, 886:12
**2:10:30** [1] - 884:7
**2:11** [1] - 885:6
**2:11:03** [2] - 884:8, 885:20
**2:13** [1] - 887:24
**2:14** [1] - 889:25

**2:15** [1] - 890:9
**2:16** [1] - 890:18
**2:24** [1] - 829:23
**2:25** [1] - 830:6
**2:26** [1] - 886:12
**2:31:26** [1] - 831:17
**2:34** [1] - 832:15

## 3

**3** [3] - 872:9, 876:13, 884:24
**30** [1] - 830:9
**300** [3] - 855:10, 855:11, 855:15
**310** [1] - 844:17
**314A** [1] - 896:2
**333** [2] - 779:22, 916:21
**34** [1] - 829:23
**37** [1] - 809:14
**3rd** [1] - 876:19

## 4

**4** [3] - 876:11, 876:13, 885:4
**40** [2] - 809:18, 841:22
**402** [5] - 802:5, 883:18, 884:19, 890:25, 905:10
**402A** [1] - 863:22
**403** [2] - 810:2, 848:17
**403A** [1] - 833:7
**405A** [1] - 864:8
**406** [1] - 829:24
**406A** [1] - 864:15
**407A** [1] - 829:18
**408** [5] - 808:7, 808:9, 809:14, 809:15, 832:7
**411** [1] - 862:20
**412A** [1] - 865:4
**419** [1] - 779:19
**42** [5] - 844:22, 862:7, 865:8, 886:9, 892:25
**44** [1] - 885:3
**45** [2] - 891:12, 892:25
**455-5610** [1] - 779:20
**49** [1] - 901:3
**4:21** [1] - 891:23
**4:25** [1] - 891:23
**4:58** [1] - 889:12
**4th** [1] - 779:15

## 5

**5** [2] - 844:17, 885:19
**50** [1] - 872:6
**51** [3] - 877:24, 890:18, 891:13

**54** [1] - 897:25
**555** [1] - 779:15
**5:03** [1] - 892:10
**5:09** [1] - 897:25
**5:10** [2] - 898:24, 899:23
**5:11** [1] - 901:3
**5:11:03** [1] - 900:9

## 6

**6** [6] - 854:21, 855:18, 856:20, 857:2, 857:23, 879:21
**603** [2] - 795:23, 795:24
**607** [1] - 860:13
**608** [3] - 860:20, 860:23, 860:24
**609** [1] - 860:23
**6718** [2] - 779:22, 916:21
**6th** [39] - 790:23, 791:3, 793:16, 799:8, 812:15, 820:10, 824:5, 828:8, 837:16, 839:22, 853:3, 853:4, 853:12, 853:18, 853:24, 855:21, 860:1, 862:8, 865:10, 867:13, 867:15, 871:15, 871:16, 873:14, 875:8, 875:13, 875:20, 875:24, 882:1, 906:12, 906:13, 906:17, 906:23, 909:3, 909:5, 911:3, 914:5

## 7

**7** [4] - 779:4, 872:6, 876:9, 887:19
**790** [1] - 780:4
**7:15** [1] - 831:9
**7th** [2] - 880:17, 916:17

## 8

**8** [1] - 896:25
**801** [4] - 884:16, 884:17, 886:19, 887:18
**827** [1] - 780:4
**852** [1] - 780:6
**8th** [1] - 875:6

**9**

**9** [2] - 868:18, 875:5
**901** [13] - 882:14, 883:10, 883:17, 883:22, 884:2, 884:6, 884:18, 885:22, 886:12, 889:20, 891:20, 891:23, 905:3
**902** [1] - 780:6
**912** [1] - 780:7
**9:14** [1] - 779:5

**A**

**a.m** [7] - 779:5, 897:25, 898:12, 898:24, 899:23, 900:9, 901:3
**abidingness** [9] - 848:3, 848:4, 848:8, 849:17, 850:5, 850:8, 850:13, 850:14, 850:19
**ability** [2] - 855:22, 916:16
**able** [16] - 787:13, 808:5, 842:24, 849:12, 849:16, 850:7, 859:3, 864:18, 882:24, 883:16, 885:16, 887:16, 889:3, 891:20, 895:13, 910:15
**absent** [2] - 790:23
**absolutely** [4] - 802:1, 849:18, 893:16, 913:18
**accept** [2] - 814:3, 869:3
**accepted** [1] - 819:16
**accepting** [1] - 819:15
**access** [2] - 858:15, 894:11
**accident** [3] - 901:11, 901:17, 909:9
**account** [12] - 867:8, 867:21, 867:24, 869:8, 873:12, 873:25, 876:6, 877:21, 878:18, 878:23, 879:9, 902:2
**accountable** [1] - 881:4
**accounts** [1] - 906:23
**accurate** [1] - 916:14
**acknowledgement** [1] - 815:19
**act** [4] - 815:11,

815:17, 815:20, 842:22
**Action** [1] - 779:3
**action** [2] - 841:3, 858:2
**actions** [3] - 817:5, 818:16, 875:13
**activate** [3] - 895:18, 895:24, 912:25
**activated** [3] - 895:14, 895:15, 914:2
**activates** [1] - 913:2
**activities** [2] - 853:11, 853:19
**acts** [5] - 786:15, 787:4, 817:11, 817:13, 817:16
**actual** [1] - 869:1
**add** [1] - 788:12
**additional** [6] - 823:14, 823:20, 823:21, 824:24, 825:1, 847:11
**admissible** [3] - 786:19, 847:5, 851:13
**admit** [11] - 825:20, 854:3, 855:11, 856:5, 866:1, 869:10, 879:1, 879:25, 884:21, 896:6, 902:2
**admitted** [10] - 814:18, 850:16, 858:18, 862:11, 863:22, 873:17, 878:20, 880:10, 882:14, 887:6
**admitting** [2] - 817:23, 819:8
**adult** [1] - 876:15
**advance** [8] - 863:23, 864:10, 864:16, 864:22, 888:2, 889:12, 890:4, 890:14
**adversely** [4] - 854:22, 857:23, 858:1, 858:5
**affect** [1] - 855:22
**affected** [4] - 854:22, 857:24, 858:1, 858:5
**affiant** [1] - 860:4
**Afghanistan** [1] - 878:9
**afternoon** [1] - 783:2
**agency** [2] - 856:24, 857:7, 858:3
**Agency** [2] - 859:18, 860:10
**agent** [9] - 787:23,

822:16, 852:19, 853:9, 853:10, 893:25, 902:11, 902:25, 914:18
**Agent** [23] - 852:6, 852:11, 854:11, 855:16, 856:11, 859:20, 862:25, 865:5, 866:6, 868:7, 873:24, 876:5, 877:14, 877:20, 878:11, 883:21, 884:11, 884:17, 891:25, 901:1, 901:23, 912:3
**AGENT** [2] - 780:5, 852:8
**agent's** [1] - 813:8
**agents** [4] - 859:19, 861:19, 892:20, 904:2
**ago** [3] - 816:1, 913:10, 914:10
**agree** [7] - 825:20, 838:11, 838:14, 851:15, 854:17, 856:16, 857:19
**agreeable** [1] - 847:17
**agreed** [2] - 806:25, 846:13
**agreement** [15] - 795:19, 796:4, 799:22, 800:6, 802:12, 802:13, 802:16, 802:18, 811:13, 811:15, 815:16, 815:19, 815:23, 843:9
**agreements** [1] - 854:6
**agrees** [2] - 782:1, 782:4
**ahead** [1] - 806:18
**alarms** [1] - 828:22
**alleging** [1] - 904:13
**allow** [3] - 847:13, 877:16, 878:4
**allowed** [4] - 787:4, 855:25, 905:19, 905:23
**allowing** [1] - 847:11
**almost** [2] - 819:20, 819:22
**Aloi** [7] - 784:13, 786:9, 846:10, 848:25, 851:1, 870:21, 911:24
**ALOI** [109] - 779:13, 782:1, 784:6,

784:17, 784:25, 787:7, 787:24, 788:7, 788:21, 788:25, 789:3, 846:18, 846:23, 849:3, 849:14, 849:19, 849:21, 850:2, 851:2, 851:4, 851:12, 851:21, 851:25, 852:5, 852:10, 854:2, 854:10, 855:8, 855:14, 856:9, 857:11, 860:19, 860:22, 862:10, 862:21, 863:3, 863:6, 863:10, 863:14, 863:18, 863:21, 864:1, 864:4, 864:7, 864:14, 864:18, 864:22, 864:24, 865:2, 865:6, 865:25, 867:18, 868:4, 869:10, 871:19, 873:16, 874:6, 874:16, 876:2, 877:9, 878:22, 878:25, 879:4, 879:5, 879:24, 880:4, 880:8, 880:22, 882:15, 884:6, 884:21, 884:24, 885:4, 885:19, 886:11, 886:18, 886:22, 887:5, 887:10, 887:18, 888:2, 888:19, 888:24, 890:4, 890:14, 891:2, 891:22, 892:9, 892:12, 893:9, 896:5, 896:25, 897:4, 897:22, 899:16, 900:6, 900:24, 901:6, 901:23, 906:20, 907:24, 908:2, 909:16, 909:22, 911:25, 912:2, 914:17, 915:4, 915:8
**Aloi)........................
.......... [2] - 780:6, 780:7
**alone** [2] - 818:7, 910:15
**amenable** [1] - 847:19
**Amendment** [1] - 911:20

**AMERICA** [1] - 779:3
**America** [3] - 854:14, 856:13, 857:16
**American** [2] - 875:13, 881:1
**ammunition** [2] - 835:21, 877:2
**amphitheater** [1] - 891:19
**amphitheater-like** [1] - 891:19
**anger** [2] - 810:25, 811:3
**angry** [1] - 811:1
**animosity** [1] - 811:3
**ANN** [1] - 779:13
**answer** [4] - 810:17, 822:8, 826:10, 909:22
**anticipate** [1] - 785:7
**Antifa** [2] - 881:10, 881:15
**antigen** [1] - 783:22
**anyway** [1] - 826:12
**apartment** [1] - 783:7
**apologize** [1] - 891:3
**APPEARANCES** [1] - 779:12
**appeared** [4] - 885:9, 885:15, 894:16, 907:9
**appearing** [1] - 872:3
**application** [1] - 788:23
**appreciate** [1] - 817:8
**approach** [2] - 782:2, 849:15
**April** [2] - 779:4, 916:17
**AR-15** [2] - 878:23, 879:9
**AR-15.com** [7] - 878:16, 878:18, 879:12, 879:13, 880:14, 881:12, 881:20
**area** [17] - 805:11, 805:14, 805:16, 806:15, 806:16, 806:19, 833:5, 840:5, 840:22, 844:24, 848:6, 853:25, 865:8, 883:11, 891:19, 892:7, 906:2
**areas** [2] - 805:4, 905:19
**argue** [4] - 807:3, 807:5, 848:15, 848:17

919

**argument** [2] - 785:7, 785:9
**arising** [1] - 882:1
**armed** [1] - 878:7
**arms** [3] - 808:19, 809:4, 809:5
**Army** [3] - 785:5, 785:6, 852:25
**around...** [1] - 869:21
**arrest** [7] - 869:1, 894:2, 895:3, 903:2, 903:5, 903:12, 912:4
**arrested** [12] - 820:3, 893:6, 893:10, 893:13, 894:1, 895:16, 895:22, 903:7, 903:8, 903:17, 912:5, 912:7
**arrived** [1] - 844:22
**arrow** [15] - 829:20, 862:25, 863:4, 863:8, 863:9, 863:16, 863:19, 863:24, 864:2, 864:5, 864:12, 864:17, 864:23, 888:7
**arrows** [7] - 862:23, 863:7, 863:11, 863:15, 863:23, 864:11, 864:16
**article** [1] - 854:23
**ass** [2] - 874:3, 874:20
**assaulted** [1] - 872:24
**assess** [1] - 913:8
**assigned** [1] - 853:2
**assignment** [1] - 853:1
**assist** [2] - 841:16, 844:24
**assisted** [1] - 859:18
**assisting** [1] - 857:5
**assorted** [1] - 861:4
**assume** [1] - 791:23
**assumed** [2] - 816:16, 816:17
**assuming** [1] - 915:19
**asymptomatic** [1] - 783:17
**attacked** [3] - 801:25, 872:22, 873:9
**attacking** [1] - 808:16
**attempt** [3] - 786:3, 902:20, 902:22
**attempting** [2] - 844:25, 845:6
**attention** [15] - 791:2, 849:2, 851:5, 855:8, 856:2, 868:3, 869:7, 871:18, 872:19,

874:8, 876:1, 877:8, 887:1, 887:8, 896:1
**Attorney** [3] - 854:15, 856:14, 857:17
**attorney** [3] - 856:14, 857:17, 910:15
**ATTORNEY'S** [1] - 779:14
**attorneys** [4] - 854:15, 854:17, 856:16, 857:19
**available** [1] - 894:12
**Avenue** [2] - 779:22, 916:21
**aware** [3] - 858:13, 862:3, 904:22

**B**

**back-and-forth** [1] - 896:21
**background** [1] - 782:25
**backpack** [8] - 859:7, 861:3, 861:22, 862:4, 862:17, 862:18, 887:9, 887:12
**bad** [3] - 803:12, 874:12, 878:4
**ballot** [1] - 876:12
**ballots** [1] - 890:23
**barricades** [2] - 905:4, 905:6
**barrier** [4] - 885:9, 885:14, 885:15, 892:22
**barriers** [1] - 902:22
**based** [19] - 790:25, 843:3, 845:3, 847:23, 861:10, 861:15, 862:12, 862:16, 865:12, 870:25, 871:6, 876:23, 879:18, 883:21, 885:13, 889:20, 895:13, 899:6, 900:3
**basis** [1] - 907:25
**bat** [2] - 848:9, 915:10
**bathroom** [5] - 805:23, 806:7, 806:8, 837:10, 907:3
**baton** [3] - 838:6, 838:8, 838:11
**beat** [2] - 870:16, 878:3
**became** [4] - 790:12, 790:16, 913:16
**become** [3] - 858:13,

876:16, 881:5
**beef** [1] - 805:21
**BEFORE** [1] - 779:10
**began** [1] - 853:3
**beginning** [1] - 889:18
**behavior** [2] - 798:24, 851:8
**behind** [3] - 811:9, 868:17, 877:19
**bench** [4] - 908:1, 908:7, 909:15, 910:3
**benefit** [1] - 810:19
**Berkower** [2] - 784:13, 827:21
**BERKOWER** [26] - 779:14, 797:25, 810:12, 817:17, 823:15, 827:23, 829:17, 829:24, 831:8, 831:20, 832:8, 832:10, 832:18, 833:7, 833:22, 840:12, 840:15, 841:21, 841:25, 842:2, 844:2, 844:12, 844:16, 845:10, 845:20, 916:1
**Berkower)................ ..............** [1] - 780:4
**beside** [1] - 811:9
**best** [1] - 916:15
**better** [1] - 850:6
**between** [12] - 796:4, 799:22, 802:18, 811:1, 824:9, 848:6, 850:4, 854:6, 854:25, 855:2, 896:12, 904:16
**beyond** [1] - 853:25
**Biden** [4] - 872:3, 872:15, 872:17, 873:5
**big** [3] - 787:2, 804:21, 818:6
**bigger** [1] - 818:9
**biggest** [1] - 793:2
**bit** [14] - 788:19, 808:2, 813:1, 820:6, 822:7, 825:4, 833:21, 842:15, 865:23, 870:22, 882:11, 893:5, 896:16, 913:11
**blank** [1] - 784:20
**blanket** [1] - 869:4
**block** [2] - 796:15, 796:20
**blow** [3] - 864:18, 880:22, 897:1

**blowing** [2] - 868:5, 876:3
**blue** [5] - 859:7, 861:3, 861:22, 862:4, 898:4
**boasting** [1] - 906:18
**boating** [2] - 901:11, 901:17
**body** [5] - 804:12, 804:14, 862:6, 891:4, 891:6
**body-worn** [3] - 862:6, 891:4, 891:6
**bolster** [1] - 786:22
**bolstering** [1] - 806:3
**bottom** [1] - 840:4
**bought** [1] - 836:12
**box** [6] - 876:12, 876:24, 877:2, 911:10
**boxes** [2] - 876:11, 911:10
**boy** [1] - 808:4
**Boys** [1] - 792:14
**branch** [2] - 856:24, 857:7
**break** [8] - 846:4, 846:6, 902:22, 905:4, 905:6, 914:22, 915:25, 916:7
**breaks** [1] - 884:14
**brief** [2] - 844:2, 910:1
**briefed** [1] - 861:20
**briefly** [4] - 782:18, 799:14, 911:25, 912:4
**bring** [10] - 781:18, 782:5, 786:20, 789:19, 791:9, 794:24, 824:23, 847:25, 907:13, 915:5
**bringing** [1] - 786:14
**brings** [2] - 812:11, 824:11
**broken** [1] - 828:24
**brought** [4] - 785:14, 851:4, 881:25, 882:1
**buckle** [1] - 875:16
**building** [31] - 802:10, 803:16, 804:16, 807:7, 807:10, 807:11, 812:8, 812:17, 813:1, 813:4, 813:16, 816:5, 816:11, 816:12, 816:17, 818:22, 826:22, 827:17, 828:4, 828:22, 842:10,

843:15, 843:18, 843:22, 845:7, 854:21, 856:22, 857:4, 857:23, 889:24, 890:2
**bullet** [6] - 874:21, 906:4, 906:12, 906:14, 909:1, 909:3
**bullets** [1] - 909:5
**bunch** [1] - 878:9
**Bureau** [1] - 852:18
**burned** [1] - 872:24
**business** [2] - 865:25, 872:23
**but..** [1] - 803:2
**buttocks** [3] - 906:4, 906:9, 909:1
**buy** [1] - 820:22
**BY** [11] - 790:3, 827:23, 852:10, 854:10, 879:5, 880:4, 897:4, 902:10, 908:8, 910:4, 912:2

**C**

**CAM** [1] - 852:15
**camera** [4] - 829:22, 862:6, 891:4, 891:6
**CAMILIERE** [2] - 780:5, 852:8
**Camiliere** [25] - 852:6, 852:7, 852:11, 852:15, 854:11, 855:16, 856:11, 862:25, 865:5, 866:6, 868:7, 873:24, 876:5, 877:20, 878:11, 883:21, 884:11, 884:17, 891:25, 897:5, 898:18, 901:1, 901:23, 912:3, 914:18
**CAMILLE** [1] - 779:18
**candor** [1] - 787:18
**cannot** [1] - 876:14
**Capitol** [50] - 795:15, 795:20, 795:25, 796:5, 797:4, 801:4, 802:15, 802:21, 802:25, 803:6, 810:9, 825:6, 840:4, 844:22, 844:25, 845:6, 853:18, 853:25, 854:20, 854:21, 856:18, 856:21, 856:22, 857:4, 857:22,

857:23, 858:6,
858:7, 862:7,
865:10, 868:19,
870:6, 873:2,
879:17, 879:19,
881:9, 881:14,
882:21, 883:3,
889:4, 889:10,
889:15, 890:12,
894:15, 894:20,
905:16, 907:18
**car** [9] - 791:25, 792:1,
794:13, 794:16,
795:7, 800:12,
800:25, 861:11,
862:18
**care** [1] - 820:18
**carefully** [1] - 896:23
**carried** [1] - 858:2
**carry** [1] - 794:9
**cartridge** [2] - 876:12,
876:24
**case** [22] - 784:19,
786:25, 787:22,
788:9, 800:17,
815:8, 820:25,
821:13, 839:2,
845:24, 849:10,
853:9, 853:10,
854:7, 859:19,
882:13, 903:6,
907:2, 914:23,
914:24, 915:5, 915:6
**case-in** [1] - 915:6
**case-in-chief** [1] -
784:19
**cases** [3] - 853:9,
906:17, 907:1
**caused** [1] - 806:19
**causing** [1] - 790:20
**CCTV** [4] - 883:3,
889:20, 894:7,
894:20
**CDU** [5] - 862:7, 865:8,
886:9, 892:5, 892:25
**CDU-42** [2] - 844:22,
845:13
**cemetery** [1] - 872:4
**certain** [6] - 846:12,
855:20, 855:25,
866:17, 867:4,
877:17
**certainly** [4] - 787:3,
787:24, 849:14,
915:23
**CERTIFICATE** [1] -
916:10
**certifies** [1] - 807:18
**certify** [1] - 916:13
**Chad** [1] - 859:20

**challenge** [1] - 785:13
**Chamber** [2] - 890:20
**CHAN** [1] - 779:18
**chance** [3] - 861:5,
861:8, 865:18
**change** [1] - 823:1
**changed** [4] - 822:24,
910:18, 913:11,
915:13
**changing** [1] - 913:14
**chant** [1] - 832:2
**chanting** [4] - 827:7,
827:8, 831:23,
874:14
**chaotic** [2] - 828:15,
828:16
**character** [12] - 786:3,
786:8, 787:11,
847:15, 847:21,
848:7, 850:4, 850:5,
850:7, 850:12,
850:21, 850:25
**charge** [6] - 788:2,
814:24, 819:3,
823:13, 823:20,
823:24
**charged** [12] - 813:23,
813:24, 814:11,
814:12, 814:21,
814:24, 824:12,
847:3, 903:20,
908:23, 912:14,
912:16
**charges** [6] - 813:24,
814:6, 815:7,
823:14, 823:20,
823:22
**charging** [1] - 823:21
**cheat** [1] - 878:3
**chemical** [2] - 794:25,
892:20
**chief** [2] - 784:19,
915:7
**chose** [2] - 786:18,
802:21
**CHRISTOPHER** [1] -
779:10
**chronological** [1] -
896:17
**circle** [5] - 810:18,
810:21, 865:4,
888:22, 908:25
**circled** [1] - 865:7
**circular** [2] - 805:14,
829:11
**circumstances** [1] -
867:4
**city** [1] - 855:17
**Civil** [1] - 844:21
**civil** [1] - 878:6

**civilians** [1] - 872:25
**civility** [1] - 878:1
**clapped** [2] - 813:1,
813:2
**clapping** [3] - 827:6,
831:25, 870:14
**clarification** [1] -
847:20
**clarify** [1] - 825:4
**clean** [2] - 887:2,
908:6
**clear** [2] - 888:24,
896:21
**cleared** [1] - 822:15
**client** [2] - 785:23,
909:18
**client's** [1] - 909:23
**climb** [1] - 902:20
**climbing** [1] - 829:1
**clip** [2] - 884:25,
892:13
**clips** [1] - 884:17
**clock** [3] - 829:22,
883:22, 884:3
**clocks** [1] - 868:15
**close** [9] - 781:20,
781:21, 782:23,
870:8, 870:9,
915:24, 915:25,
916:1, 916:5
**closely** [1] - 783:14
**closing** [1] - 847:17
**closings** [1] - 849:24
**cloud** [1] - 826:12
**CNN** [1] - 872:21
**Code** [4] - 854:24,
856:25, 857:9,
857:25
**cold** [1] - 783:5
**collected** [1] - 853:15
**COLUMBIA** [1] - 779:1
**Columbia** [8] - 853:25,
854:16, 855:1,
855:2, 855:4, 855:6,
856:15, 857:18
**combat** [1] - 845:4
**comfortable** [2] -
814:1, 913:16
**coming** [7] - 796:8,
796:10, 796:13,
885:25, 896:21,
904:24
**comment** [3] - 868:1,
868:7, 874:5
**commented** [2] -
868:22, 878:1
**commenting** [2] -
870:4, 871:25
**comments** [1] -
871:15

**commerce** [4] - 854:4,
854:19, 854:22,
854:25
**commercial** [1] -
854:23
**commit** [1] - 815:11
**commodity** [1] -
854:23
**communicate** [2] -
789:9, 803:10
**communicated** [1] -
834:5
**communicating** [1] -
803:13
**compassion** [1] -
798:12
**compilation** [3] -
846:11, 846:14,
849:9
**complete** [1] - 916:15
**completely** [1] - 907:7
**complies** [4] - 796:2,
803:22, 810:22,
888:23
**compound** [1] -
847:10
**concern** [1] - 788:2
**concerned** [2] - 814:8,
869:20
**concerning** [1] -
882:12
**concurrence** [2] -
856:16, 857:19
**concurrent** [1] -
854:17
**conditions** [1] -
848:20
**condone** [1] - 798:24
**conduct** [4] - 787:16,
851:19, 882:2, 903:5
**conducted** [1] -
861:19
**conference** [4] -
908:1, 908:7,
909:15, 910:3
**confirm** [2] - 877:11,
902:1
**confirming** [1] -
787:10
**confiscated** [2] -
904:2, 904:4
**conflicting** [1] - 910:8
**conforms** [1] - 850:9
**confrontation** [1] -
812:17
**Congress** [26] -
793:21, 804:11,
807:11, 807:18,
807:23, 811:14,
811:17, 812:2,

812:3, 812:7,
814:13, 814:16,
814:22, 814:25,
815:3, 816:3,
816:11, 816:13,
817:1, 817:4,
817:21, 818:17,
830:18, 855:5,
905:19
**congressional** [4] -
804:12, 804:14,
807:16, 807:23
**Congressmen** [1] -
881:3
**Conner** [3] - 874:10,
874:25, 875:2
**conner** [1] - 875:8
**considered** [2] -
785:19, 905:18
**consistent** [2] - 871:3,
901:20
**conspiracy** [5] -
815:11, 815:13,
815:16, 815:21,
817:19
**conspired** [2] -
815:24, 817:20
**constitutes** [1] -
916:13
**Constitution** [3] -
779:22, 855:5,
916:21
**contact** [12] - 781:14,
781:19, 781:20,
781:21, 782:14,
782:23, 783:14,
800:21, 803:8,
813:8, 891:10
**contacted** [3] -
814:20, 821:12,
821:18
**contained** [3] -
846:20, 867:20,
867:23
**contains** [2] - 787:11,
788:11
**content** [4] - 867:8,
867:10, 867:15,
879:8
**contents** [1] - 878:17
**contesting** [1] -
825:19
**context** [3] - 899:7,
900:3, 906:10
**continue** [4] - 874:18,
881:7, 886:22, 892:9
**contracted** [1] -
781:23
**contrary** [1] - 851:20
**control** [1] - 845:7

conversation [10] - 792:9, 799:23, 800:1, 810:24, 874:24, 875:7, 904:13, 904:15, 906:10
cool [3] - 806:9, 837:14, 837:19
COOPER [1] - 779:10
Coordinated [1] - 868:14
cop [2] - 841:10, 841:15
cops [1] - 841:15
correct [104] - 782:16, 783:18, 790:7, 790:22, 791:3, 791:6, 791:12, 791:13, 791:15, 791:20, 792:10, 792:14, 792:18, 792:19, 792:21, 793:1, 793:8, 793:13, 793:19, 793:20, 793:22, 793:25, 794:17, 794:21, 798:5, 798:6, 798:9, 798:22, 800:24, 802:10, 802:19, 803:1, 803:14, 804:19, 805:12, 805:15, 805:20, 805:24, 806:1, 806:2, 806:4, 807:9, 812:23, 813:18, 813:24, 814:1, 814:3, 814:7, 814:14, 814:16, 815:5, 815:12, 818:12, 818:13, 819:11, 824:21, 824:25, 826:1, 826:4, 826:16, 826:22, 828:5, 829:16, 830:21, 833:6, 834:16, 834:19, 837:3, 837:15, 838:1, 838:4, 838:19, 840:6, 841:20, 843:5, 843:8, 843:17, 845:19, 875:20, 875:21, 877:11, 879:15, 892:15, 895:10, 895:25, 901:25, 903:10, 903:15, 904:11, 904:14, 905:5, 905:7,

905:21, 907:5, 907:6, 907:8, 907:22, 908:11, 908:12, 908:14, 910:5, 910:16, 911:11, 914:3
corrected [2] - 910:13, 910:14
correctly [3] - 845:1, 845:8, 845:15
corridor [6] - 803:19, 803:20, 803:21, 803:23, 804:5, 804:8
corridors [3] - 804:11, 804:12, 806:17
corroborate [2] - 909:2, 913:19
corroborated [1] - 914:5
corrupting [1] - 818:17
corruptly [4] - 814:22, 816:12, 816:25, 817:4
counsel [2] - 783:24, 851:5
count [2] - 833:1, 846:6
counter [1] - 876:16
countless [1] - 865:16
country [1] - 818:21
couple [1] - 895:9
course [7] - 853:23, 862:5, 865:15, 865:18, 867:12, 878:11, 913:7
COURT [96] - 779:1, 781:2, 781:4, 781:7, 782:3, 782:5, 782:8, 782:10, 782:12, 782:17, 782:22, 783:13, 783:17, 783:19, 783:21, 783:24, 784:3, 784:7, 784:11, 784:15, 784:23, 785:7, 786:2, 786:9, 787:21, 788:1, 788:19, 788:24, 789:1, 789:10, 789:12, 789:16, 789:22, 789:25, 798:1, 810:16, 817:18, 823:17, 827:21, 836:2, 845:21, 846:1, 846:3, 846:9, 846:22, 846:25, 848:2, 848:5, 848:11, 848:16,

848:19, 848:24, 849:5, 849:18, 849:20, 849:22, 850:1, 850:10, 851:1, 851:11, 851:15, 851:24, 852:2, 852:4, 852:7, 854:5, 855:13, 856:8, 866:3, 866:5, 870:21, 871:10, 877:15, 879:3, 880:3, 880:12, 884:23, 887:3, 887:7, 896:8, 902:4, 906:21, 907:25, 908:6, 909:14, 910:1, 911:24, 914:18, 914:21, 915:1, 915:6, 915:9, 915:15, 915:18, 916:4, 916:10
Court [8] - 779:21, 779:21, 781:13, 785:1, 785:9, 855:9, 877:16, 916:20
Court's [4] - 786:5, 787:7, 844:2, 851:2
Courthouse [2] - 779:22, 916:20
courtroom [4] - 784:2, 846:8, 852:3, 914:25
COURTROOM [6] - 781:3, 782:7, 784:10, 877:13, 879:23, 880:1
Courtroom [1] - 784:8
cover [3] - 820:8, 820:15, 853:22
covered [1] - 820:16
COVID [3] - 781:11, 781:15, 782:15
coward [1] - 868:25
Crane [1] - 846:3
credibility [1] - 913:8
credible [1] - 913:16
crime [12] - 815:14, 824:12, 824:13, 835:8, 847:3, 848:1, 893:23, 893:24, 908:23, 912:14, 912:17, 913:2
criminal [4] - 813:19, 814:9, 819:10, 881:25
Criminal [1] - 779:3
critical [1] - 825:15
cross [11] - 784:19, 787:8, 787:16, 848:13, 849:12, 849:16, 850:7,

850:17, 850:18, 851:7, 902:7
CROSS [2] - 790:2, 902:9
cross-examination [3] - 784:19, 849:16, 902:7
CROSS-EXAMINATION [2] - 790:2, 902:9
cross-examine [4] - 787:8, 848:13, 850:7, 851:7
crowd [13] - 802:22, 828:11, 828:18, 829:5, 829:13, 830:23, 831:3, 831:12, 831:18, 832:3, 833:2, 833:16, 845:7
CRR [3] - 779:21, 916:12, 916:19
crying [1] - 881:1
Crypt [24] - 803:16, 803:24, 804:9, 804:17, 805:14, 806:15, 806:16, 806:19, 808:13, 809:8, 811:13, 818:10, 827:3, 827:13, 861:17, 869:17, 870:4, 870:10, 870:19, 870:23, 871:1, 905:15, 905:18, 905:25
curfew [3] - 855:17, 855:20, 855:22
current [1] - 853:1
custody [1] - 861:14

# D

D.C [4] - 792:9, 794:2, 856:19, 857:3
data [1] - 896:2
date [16] - 814:7, 868:10, 868:11, 869:12, 875:4, 876:8, 877:23, 880:18, 896:24, 897:24, 898:11, 898:23, 899:22, 900:8, 901:1, 912:25
Dated [1] - 916:17
daughter [3] - 793:12, 819:18, 819:24
DAY [1] - 873:1
days [6] - 781:15, 837:16, 868:19,

876:21, 895:9, 912:23
DC [4] - 779:15, 779:19, 779:23, 916:22
dead [2] - 872:15, 873:4
deal [6] - 784:11, 788:20, 823:9, 823:10, 848:19, 853:3
debating [1] - 890:22
December [1] - 877:24
declaration [1] - 855:17
Defendant [2] - 779:7, 779:17
defendant [78] - 785:3, 785:5, 789:6, 789:8, 849:15, 854:16, 856:15, 857:18, 858:14, 858:17, 859:23, 863:5, 863:9, 863:13, 863:17, 863:20, 863:25, 864:3, 864:6, 864:13, 864:23, 865:19, 866:2, 866:23, 867:2, 867:13, 868:1, 869:15, 870:3, 870:12, 871:1, 871:14, 871:21, 873:3, 874:3, 875:12, 875:22, 878:13, 879:12, 880:5, 880:13, 881:19, 882:5, 885:16, 885:20, 885:24, 885:25, 887:15, 888:8, 888:13, 888:16, 889:21, 890:6, 890:16, 891:7, 891:9, 892:5, 892:25, 893:6, 894:4, 894:15, 894:22, 894:25, 896:3, 896:12, 897:8, 898:8, 899:3, 899:21, 900:13, 900:18, 901:4, 902:13, 909:16, 912:5, 912:25, 914:12, 914:14
defendant's [29] - 784:18, 784:21, 787:11, 787:18, 788:8, 788:10, 788:11, 853:18,

858:23, 860:1,
860:5, 860:16,
860:24, 861:6,
862:13, 867:8,
867:21, 873:12,
873:25, 876:6,
877:21, 878:18,
878:23, 886:9,
892:13, 895:4,
896:10, 897:14,
897:15
**defendants** [3] -
895:22, 908:15,
908:18
**defense** [10] - 782:4,
785:2, 786:13,
788:8, 788:17,
847:15, 847:17,
848:22, 851:5,
915:18
**definitely** [1] - 840:22
**delayed** [1] - 854:22
**delete** [1] - 881:8
**delivered** [1] - 898:11
**depart** [1] - 871:1
**department** [4] -
820:11, 838:5,
839:5, 858:3
**Department** [6] -
838:21, 844:21,
856:19, 857:3,
881:22, 882:3
**depicted** [2] - 860:14,
872:13
**DEPUTY** [5] - 782:7,
784:10, 877:13,
879:23, 880:1
**Deputy** [1] - 784:8
**deputy** [2] - 781:9,
782:13
**describe** [1] - 875:12
**described** [3] - 793:8,
828:13, 843:12
**despite** [1] - 781:23
**destroy** [1] - 902:14
**destroyed** [6] -
872:25, 897:3,
897:6, 899:11,
912:22, 913:4
**determine** [4] - 789:7,
882:24, 885:16,
887:16
**devices** [2] - 893:22,
904:9
**different** [5] - 804:19,
843:24, 846:19,
848:7, 908:3
**differently** [1] - 905:1
**dire** [1] - 781:19
**direct** [4] - 834:1,

852:1, 855:8, 874:8
**DIRECT** [1] - 852:9
**directed** [1] - 840:9
**directing** [1] - 809:23
**direction** [1] - 888:10
**directions** [2] -
804:25, 812:20
**disagree** [1] - 908:18
**disappear** [1] - 836:3
**disclosed** [1] - 785:2
**discover** [1] - 878:12
**discuss** [2] - 782:19,
845:23
**discussed** [4] -
782:17, 786:10,
823:7, 894:20
**discusses** [1] - 909:23
**discussing** [2] - 875:8,
887:21
**discussion** [12] -
792:13, 793:18,
793:21, 793:24,
795:14, 795:17,
795:19, 810:10,
821:16, 822:13,
822:19, 912:22
**discussions** [3] -
796:3, 821:19,
914:23
**disenfranchised** [2] -
876:14, 878:5
**dishonesty** [1] -
786:23
**dismantle** [1] - 892:21
**disobedience** [1] -
878:6
**disorderly** [1] - 827:6
**disregard** [1] - 849:1
**dissatisfaction** [1] -
875:23
**distanced** [1] - 782:24
**distances** [2] - 910:25,
914:12
**distinction** [1] - 850:4
**distress** [1] - 839:12
**District** [8] - 853:25,
854:15, 855:1,
855:2, 855:4, 855:6,
856:14, 857:17
**DISTRICT** [3] - 779:1,
779:1, 779:11
**Disturbance** [1] -
844:21
**ditch** [1] - 822:12
**ditching** [1] - 822:5
**dive** [1] - 842:15
**division** [2] - 785:20,
785:22
**document** [1] - 877:17
**dogs** [1] - 898:15

**done** [13] - 812:9,
813:15, 813:17,
818:12, 830:22,
830:23, 837:20,
842:21, 851:25,
858:11, 873:10,
878:6, 907:22
**door** [13] - 786:24,
787:1, 806:20,
825:7, 851:18,
883:6, 883:11,
883:18, 889:1,
889:6, 889:19,
889:21, 890:16
**doors** [1] - 888:14
**down** [23] - 797:15,
803:19, 803:21,
803:23, 804:5,
804:8, 804:18,
804:19, 804:22,
806:16, 812:13,
818:22, 830:18,
833:22, 870:21,
873:19, 877:9,
886:19, 891:3,
892:7, 893:9,
902:22, 914:19
**drag** [1] - 843:12
**draw** [11] - 849:2,
850:3, 868:3, 869:7,
871:18, 872:19,
876:1, 877:8, 887:1,
887:8, 896:1
**dream** [1] - 819:3
**due** [2] - 819:17,
855:21
**Dunn** [18] - 829:17,
844:16, 862:21,
864:18, 865:3,
867:18, 868:5,
873:22, 874:6,
874:16, 876:3,
880:22, 884:7,
886:11, 891:22,
897:1, 897:22, 900:6
**Dunn-Gordon** [17] -
829:17, 844:16,
862:21, 864:18,
865:3, 867:18,
868:5, 873:22,
874:6, 874:16,
876:3, 884:7,
886:11, 891:22,
897:1, 897:22, 900:6
**during** [10] - 791:11,
791:14, 792:9,
797:10, 805:3,
805:9, 904:4,
905:23, 912:10
**duties** [3] - 839:16,

856:23, 857:6
**duty** [6] - 794:6, 794:7,
794:10, 808:3,
839:18

## E

**early** [2] - 862:1,
909:21
**Eastern** [2] - 868:16,
883:23
**effect** [4] - 821:22,
882:8, 882:10,
909:18
**effective** [1] - 876:17
**effectively** [1] - 838:12
**efficient** [1] - 787:24
**either** [5] - 786:14,
811:9, 839:3,
841:19, 893:12
**Elect** [1] - 872:17
**election** [12] - 793:25,
807:15, 815:25,
828:9, 830:15,
830:23, 872:8,
872:10, 872:16,
875:23, 876:18
**electoral** [1] - 890:23
**electronic** [2] -
893:22, 904:9
**element** [3] - 815:18,
847:3, 848:1
**elements** [2] - 786:11,
815:13
**elicit** [4] - 786:3,
786:25, 847:15,
847:22
**eliciting** [1] - 850:12
**ELIZABETH** [1] -
779:13
**emergency** [1] -
846:23
**employed** [1] - 814:20
**employee** [2] - 857:6,
858:4
**employees** [2] -
781:14, 856:23
**emptier** [1] - 832:12
**empty** [1] - 833:5
**enact** [1] - 855:6
**enacted** [1] - 855:20
**encompassed** [1] -
785:20
**end** [3] - 881:4, 908:7,
910:3
**enforcement** [12] -
793:19, 839:16,
845:4, 846:23,
851:9, 876:23,
878:17, 895:3,

901:21, 904:21,
904:23, 913:20
**engage** [2] - 801:1,
815:19
**engaged** [2] - 856:22,
857:5
**engine** [1] - 800:13
**enjoy** [1] - 869:2
**enormous** [1] - 828:10
**enter** [4] - 801:4,
802:21, 813:16,
889:23
**entered** [6] - 802:9,
802:25, 818:22,
844:5, 844:7, 890:1
**entering** [3] - 802:14,
827:17, 890:16
**enters** [1] - 852:3
**entire** [1] - 797:10
**entirety** [3] - 865:12,
879:8, 902:2
**entitled** [1] - 906:1
**entwined** [1] - 786:11
**erase** [1] - 796:23
**error** [3] - 847:8,
847:9, 847:10
**Ervin** [3] - 785:14,
846:11, 847:7
**Ervin's** [4] - 847:16,
849:1, 849:8, 849:23
**especially** [1] - 908:22
**ESQ** [4] - 779:13,
779:14, 779:17,
779:18
**essential** [2] - 847:3,
855:24
**essentially** [4] -
812:25, 824:4,
884:13, 906:11
**estimate** [2] - 886:5,
905:14
**evaluate** [1] - 787:18
**evening** [1] - 789:17
**event** [1] - 783:1
**events** [13] - 837:17,
847:5, 853:4,
853:17, 853:24,
854:20, 855:21,
857:22, 858:1,
865:13, 868:19,
871:15, 914:4
**evidence** [33] - 784:18,
784:25, 785:15,
786:15, 788:3,
788:9, 788:14,
788:15, 824:24,
825:2, 825:23,
826:18, 829:18,
834:9, 834:12,
835:8, 836:16,

837:4, 847:4,
847:15, 851:14,
853:11, 853:14,
854:7, 864:15,
882:13, 887:3,
893:23, 893:24,
903:3, 908:2, 909:2
**evidentiary** [1] -
784:11
**exact** [6] - 803:2,
807:16, 814:7,
838:22, 905:11,
907:17
**exactly** [4] - 800:20,
803:25, 823:5,
906:19
**exam** [1] - 852:1
**EXAMINATION** [5] -
790:2, 827:22,
852:9, 902:9, 912:1
**examination** [6] -
784:19, 787:17,
834:1, 849:16,
895:13, 902:7
**examine** [4] - 787:8,
848:13, 850:7, 851:7
**example** [2] - 792:12,
877:18, 913:22
**except** [4] - 788:10,
805:17, 826:21,
862:2
**excerpt** [3] - 879:6,
879:24, 880:9
**excited** [2] - 802:22,
827:10
**exciting** [1] - 837:22
**exclusive** [1] - 855:6
**Excuse** [1] - 901:6
**excuse** [2] - 832:7,
889:25
**excused** [1] - 845:22
**executing** [1] - 895:7
**exercising** [1] - 911:18
**exhibit** [16] - 785:1,
788:22, 831:9,
846:11, 846:15,
847:24, 849:9,
879:1, 879:7,
880:10, 882:16,
893:9, 905:10,
907:17, 907:21,
908:4
**Exhibit** [58] - 795:22,
796:25, 798:20,
802:5, 808:7, 810:2,
829:18, 831:9,
840:13, 844:13,
844:17, 854:3,
854:11, 855:9,
855:11, 855:14,

857:12, 858:19,
860:13, 860:20,
860:24, 861:16,
862:11, 862:20,
863:22, 864:8,
864:14, 865:3,
867:19, 868:3,
869:7, 871:18,
873:17, 876:1,
877:8, 878:20,
878:21, 879:7,
879:25, 880:8,
882:14, 883:10,
884:2, 884:6,
884:16, 884:17,
884:18, 884:19,
886:12, 886:19,
887:18, 890:25,
891:20, 891:23,
896:1, 905:3, 906:3,
907:12
**Exhibits** [2] - 856:3,
865:24
**exhibits** [1] - 905:3
**existing** [1] - 877:5
**exit** [1] - 805:17
**exited** [1] - 886:1
**exiting** [1] - 789:6
**exits** [4] - 784:2,
804:18, 846:8,
914:25
**expect** [4] - 849:16,
850:7, 865:23,
909:20
**experience** [4] - 845:4,
852:21, 876:23
**explain** [4] - 808:2,
841:7, 841:13,
842:16
**exposed** [1] - 781:10
**expressed** [1] - 837:17
**extent** [3] - 783:13,
849:10, 862:2
**extremist** [2] - 792:13,
792:17
**extrinsic** [1] - 785:15

## F

**Facebook** [26] -
826:12, 836:19,
842:3, 866:1, 866:6,
866:21, 866:23,
866:25, 867:2,
867:8, 867:21,
867:23, 868:8,
869:8, 871:15,
871:21, 873:12,
873:25, 875:22,
876:6, 877:21,
902:2, 907:20,

909:4, 911:9, 914:8
**facing** [3] - 815:7,
816:19, 892:6
**fact** [22] - 785:25,
791:25, 792:20,
792:25, 794:19,
802:21, 804:21,
805:22, 806:8,
806:10, 807:21,
812:22, 819:17,
820:24, 821:18,
825:17, 905:8,
905:20, 907:7,
908:15, 909:8,
910:11
**Facts** [1] - 844:18
**factual** [1] - 844:7
**fair** [22] - 790:9,
790:19, 790:23,
798:17, 798:19,
800:19, 800:20,
801:2, 802:12,
807:7, 818:20,
820:20, 821:4,
821:6, 824:22,
826:17, 833:11,
865:15, 871:6,
904:18, 906:17,
910:7
**fairly** [2] - 791:1, 870:9
**false** [5] - 787:12,
788:11, 788:12,
788:14, 788:22
**fame** [1] - 869:3
**familiar** [10] - 792:8,
853:5, 853:8,
853:14, 860:11,
860:14, 866:6,
882:16, 891:1, 891:4
**family** [5] - 819:24,
820:12, 820:18,
858:9, 872:25
**fan** [1] - 792:25
**far** [6] - 806:18,
836:13, 836:15,
838:8, 838:10,
848:22
**FBI** [29] - 792:5,
807:23, 813:8,
821:13, 821:18,
821:19, 822:4,
822:6, 822:9,
822:16, 834:8,
834:10, 836:13,
836:16, 837:2,
837:4, 842:9,
842:12, 852:19,
853:1, 858:13,
859:13, 859:22,
893:25, 902:11,

904:2, 904:4,
912:10, 912:19
**FBI's** [1] - 836:24
**fear** [1] - 801:17
**federal** [1] - 858:5
**Federal** [1] - 852:18
**Federally** [1] - 857:21
**federally** [1] - 857:24
**fees** [3] - 820:14,
820:15, 820:16
**feet** [1] - 783:16
**felon** [1] - 819:8
**felony** [5] - 814:6,
816:19, 817:20,
819:3, 819:13
**felt** [9] - 783:23, 808:2,
811:18, 813:13,
818:24, 837:17,
841:10, 841:13,
913:15
**female** [1] - 812:19
**few** [9] - 782:18,
814:5, 822:19,
827:2, 853:22,
876:21, 886:8,
913:10, 914:10
**fewer** [1] - 915:12
**Field** [2] - 859:17,
860:9
**fight** [5] - 806:23,
807:3, 807:5,
902:18, 902:19
**fighting** [2] - 876:15,
878:8
**file** [1] - 881:17
**filled** [1] - 833:19
**fine** [1] - 848:2
**finger** [1] - 803:20
**fired** [1] - 869:1
**first** [17] - 793:7,
795:25, 796:1,
812:11, 820:2,
820:3, 821:12,
821:18, 821:19,
840:4, 848:20,
853:22, 858:13,
880:21, 880:24,
894:6, 900:7
**First** [1] - 911:20
**five** [8] - 781:15,
783:16, 819:13,
830:8, 832:15,
868:16, 915:17,
915:19
**flagpole** [2] - 914:15,
914:16
**fleeting** [1] - 787:2
**floor** [3] - 812:2,
870:8, 881:1
**folks** [2] - 914:21,

915:21
**follow** [3] - 848:5,
878:5, 896:16
**followed** [1] - 858:16
**following** [7] - 854:18,
856:17, 857:20,
858:6, 859:22,
908:1, 909:15
**food** [1] - 855:23
**foot** [1] - 869:24
**footage** [16] - 862:6,
865:16, 870:10,
879:18, 882:20,
883:3, 883:5, 883:8,
889:6, 889:13,
890:19, 891:17,
892:24, 894:19,
894:20, 911:3
**FOR** [1] - 779:1
**foregoing** [1] - 916:13
**foreign** [2] - 794:17,
794:20
**forewarn** [1] - 795:23
**formal** [1] - 815:23
**former** [1] - 797:16
**formerly** [1] - 781:13
**forth** [1] - 896:21
**fought** [2] - 869:22,
870:2
**founders** [1] - 878:5
**four** [3] - 833:1, 856:2,
911:10
**FRACKER** [1] - 780:3
**Fracker** [33] - 789:19,
790:4, 802:9, 844:4,
845:4, 845:12,
845:21, 853:6,
858:17, 859:9,
863:2, 863:8,
863:12, 863:16,
866:25, 867:2,
870:4, 870:12,
889:23, 890:1,
893:10, 893:12,
894:4, 894:17,
894:22, 895:18,
901:21, 909:13,
910:5, 910:7, 911:4,
913:6, 913:7
**Fracker's** [4] - 867:23,
869:8, 907:2, 914:4
**frame** [1] - 887:14
**Franker** [1] - 844:23
**frankly** [1] - 800:9
**fraud** [1] - 876:14
**freaked** [1] - 825:18
**Freddie** [3] - 874:10,
874:25, 875:2
**free** [2] - 842:16, 902:6
**freedom** [2] - 869:4,

924

869:21
**friend** [4] - 783:2,
783:8, 879:12, 913:3
**friends** [4] - 866:18,
867:2, 869:22,
879:14
**front** [5] - 797:4,
889:10, 905:9,
905:12, 908:13
**fuck** [1] - 882:10
**fucking** [2] - 868:23,
873:2
**full** [1] - 916:14
**fully** [1] - 907:1
**fun** [1] - 792:15
**Function** [1] - 857:21
**function** [1] - 858:1
**function'** [1] - 857:24
**functions** [1] - 858:5
**fundamental** [1] -
798:10
**furniture** [1] - 829:3
**fuss** [2] - 818:6, 818:9
**future** [1] - 875:24

## G

**game** [1] - 868:24
**gas** [4] - 791:7, 791:9,
888:17, 888:22
**gather** [2] - 853:10,
894:3
**gears** [3] - 865:23,
882:11, 893:5
**general** [3] - 786:14,
850:13, 850:22
**generally** [2] - 792:20,
794:3
**gentleman** [2] -
807:13, 885:8
**gentlemen** [5] -
789:16, 846:5,
854:5, 877:15, 902:6
**genuinely** [1] - 842:17
**gesture** [1] - 789:8
**gist** [1] - 810:10
**given** [7] - 787:7,
787:12, 791:10,
798:17, 828:10,
830:13, 904:10
**glass** [1] - 828:24
**goal** [7] - 811:19,
811:20, 811:23,
816:22, 816:24,
817:1, 817:3
**goods** [1] - 855:23
**Gordon** [18] - 829:17,
844:16, 862:21,
864:18, 865:3,
867:18, 868:5,

873:22, 874:6,
874:16, 876:3,
880:23, 884:7,
886:11, 891:22,
897:1, 897:22, 900:6
**Government** [3] -
795:24, 856:24,
857:8
**government** [30] -
782:1, 784:12,
784:17, 784:20,
784:21, 785:13,
786:18, 787:8,
787:13, 796:7,
820:3, 823:13,
823:19, 847:6,
847:13, 848:12,
849:6, 850:6,
850:16, 850:18,
851:7, 851:10,
851:19, 852:5,
872:22, 873:9,
877:6, 880:25,
909:17, 915:19
**government's** [2] -
789:5, 847:24
**Government's** [16] -
795:22, 829:18,
831:8, 840:13,
844:12, 844:17,
855:9, 855:14,
858:19, 860:13,
860:19, 861:16,
862:11, 873:17,
882:14, 907:11
**graduate** [3] - 785:5,
785:6, 785:19
**graduated** [1] - 786:1
**grand** [3] - 908:12,
908:14, 908:16
**grant** [1] - 786:13
**gray** [1] - 848:6
**great** [1] - 853:3
**greater** [2] - 795:4,
827:18
**green** [3] - 800:14,
887:9, 887:12
**grew** [1] - 814:8
**grievances** [1] - 878:6
**grounds** [2] - 857:22,
858:7
**Grounds** [3] - 854:20,
856:21, 857:4
**group** [3] - 821:8,
821:10, 866:21
**groups** [2] - 792:13,
792:21
**Guard** [1] - 819:6
**guess** [11] - 785:9,
785:20, 790:9,

805:19, 806:9,
807:12, 818:6,
823:7, 825:17,
828:9, 879:14
**guilty** [6] - 815:11,
815:21, 819:2,
827:16, 844:4, 844:8
**gunfire** [1] - 869:1
**guy** [3] - 798:22,
848:5, 878:4
**guys** [4] - 829:20,
832:3, 832:14, 833:9

## H

**Hall** [4] - 803:17,
803:24, 805:1, 805:4
**halls** [1] - 830:18
**hallway** [2] - 804:22,
809:23
**hallways** [2] - 804:19,
818:11
**hand** [2] - 808:5, 822:2
**handing** [1] - 842:6
**handle** [2] - 851:11,
851:13
**hands** [5] - 813:1,
813:2, 831:24,
838:11, 888:16
**hard** [5] - 803:13,
869:22, 876:15,
896:13, 896:16
**harm** [2] - 791:20,
798:4, 798:17
**harming** [1] - 801:23
**hate** [1] - 869:21
**head** [1] - 817:6
**hear** [5] - 781:24,
781:25, 788:14,
810:24, 835:18
**heard** [9] - 784:13,
784:14, 801:14,
805:19, 807:13,
811:21, 811:24,
816:25, 828:22
**hearing** [1] - 809:8
**heart** [1] - 817:25
**heartfelt** [1] - 817:8
**hearts** [1] - 817:25
**held** [1] - 839:2
**HELD** [1] - 779:10
**helmets** [1] - 794:25
**help** [13] - 808:6,
823:3, 823:4,
824:23, 826:8,
839:12, 839:19,
839:24, 840:5,
840:7, 840:25,
841:7, 841:19
**hereby** [1] - 916:12

**hide** [1] - 826:25
**high** [1] - 878:2
**highlighted** [6] -
861:22, 868:6,
872:19, 874:8,
874:18, 876:4
**highlighting** [1] -
846:19
**himself** [5] - 785:4,
793:3, 909:24,
910:13, 910:14
**hit** [1] - 797:17
**Hodges's** [1] - 891:6
**hold** [5] - 829:12,
841:12, 844:25,
877:2, 886:19
**holding** [4] - 809:3,
859:5, 870:17,
888:16
**hollow** [1] - 881:5
**home** [7] - 783:22,
812:21, 860:1,
862:13, 875:17,
895:4, 909:9
**honest** [2] - 806:18,
848:6
**honestly** [2] - 830:16,
909:23
**honesty** [15] - 784:18,
784:21, 786:4,
786:10, 786:15,
786:25, 847:2,
847:8, 847:12,
847:17, 847:22,
849:1, 849:17,
849:24
**Honor** [27] - 782:1,
782:7, 784:17,
787:7, 788:7,
788:21, 789:3,
790:1, 810:12,
810:13, 817:17,
823:15, 845:20,
846:18, 847:19,
849:14, 850:2,
850:15, 850:17,
851:4, 851:12,
866:4, 909:16,
914:20, 915:4,
915:8, 916:2
**Honor's** [2] - 847:23,
848:23
**HONORABLE** [1] -
779:10
**hoopla** [2] - 813:12,
825:14
**hope** [2] - 789:17,
821:7
**hour** [3] - 855:20,
869:14, 884:3

**hours** [3] - 805:9,
865:16, 868:17
**HOUSE** [2] - 874:14,
874:15
**house** [8] - 836:9,
860:5, 861:6,
875:10, 898:14,
903:25, 904:9
**House** [2] - 890:19,
890:22
**huddled** [1] - 881:1
**huge** [1] - 829:5
**hugging** [1] - 870:12
**hundred** [1] - 905:8
**hungry** [1] - 914:21
**hurt** [5] - 797:17,
802:3, 826:8,
827:12, 842:23
**hurting** [3] - 790:19,
790:20, 826:2
**hyperbole** [1] - 907:9

## I

**I-L-I-E-R-E** [1] - 852:16
**idea** [4] - 794:12,
794:14, 834:14,
873:4
**identified** [2] - 858:24,
914:16
**identify** [3] - 859:1,
859:3, 914:15
**ignorant** [1] - 804:16
**illegal** [5] - 795:14,
795:20, 825:24,
826:25, 869:23
**immediate** [4] -
794:22, 833:5,
840:22, 858:9
**impact** [1] - 787:3
**impacted** [1] - 853:24
**impede** [10] - 793:18,
796:10, 796:18,
796:20, 798:18,
816:2, 816:13,
817:4, 817:20,
845:14
**impeding** [5] - 814:22,
814:25, 816:11,
816:12
**implied** [1] - 872:14
**impression** [1] -
913:13
**IN** [3] - 779:1, 781:3,
873:1
**incarcerated** [1] -
848:14
**inches** [1] - 795:4
**incident** [5] - 840:3,
891:14, 894:2,

925

903:5, 903:11
**inclined** [2] - 781:24, 851:15
**include** [2] - 895:6, 913:22
**included** [1] - 858:6
**including** [3] - 875:10, 899:5, 899:13
**incriminate** [2] - 903:4, 909:24
**incriminated** [1] - 834:21
**incriminating** [1] - 826:18
**indicated** [6] - 793:4, 796:7, 798:4, 808:1, 812:15, 910:21
**indicted** [1] - 814:6
**indictment** [7] - 908:10, 908:12, 908:16, 908:19, 908:20, 908:22
**individual** [6] - 783:8, 882:19, 887:1, 888:10, 912:21, 913:4
**individuals** [3] - 797:22, 878:10, 889:18
**indulgence** [3] - 786:5, 844:2, 851:2
**influence** [1] - 817:1
**influenced** [1] - 797:23
**influencing** [1] - 793:21
**informal** [1] - 800:6
**information** [5] - 787:15, 834:20, 883:21, 894:4, 901:20
**informed** [2] - 782:14, 783:10
**initial** [2] - 840:3, 841:8
**initials** [1] - 896:14
**initiating** [1] - 859:25
**injured** [1] - 873:13
**inquire** [2] - 849:16, 850:2
**inside** [12] - 783:5, 783:6, 783:8, 783:10, 808:13, 809:8, 827:3, 828:22, 829:5, 829:13, 874:11, 903:15
**instance** [2] - 786:22, 837:10
**instances** [4] - 847:5,

847:12, 851:8, 851:19
**instead** [2] - 787:21, 841:11
**instruct** [4] - 848:25, 915:23, 916:5
**instructed** [1] - 824:1
**instruction** [2] - 849:3, 909:18
**instructions** [1] - 915:21
**instrumental** [1] - 790:14
**instrumentality** [1] - 858:3
**insurgency** [4] - 876:16, 877:3, 877:4, 878:8
**intend** [5] - 784:18, 784:25, 786:2, 848:13
**intended** [1] - 847:21
**intending** [1] - 847:24
**intends** [2] - 784:21, 851:7
**intent** [2] - 818:5, 914:7
**intentionally** [2] - 796:12, 796:15
**interacting** [2] - 843:6, 892:17
**interaction** [4] - 812:19, 886:9, 892:5, 892:25
**interest** [1] - 860:22
**interested** [2] - 912:11, 912:19
**interfere** [1] - 794:17
**international** [1] - 853:2
**interpreted** [1] - 850:9
**interrogate** [1] - 898:15
**interstate** [2] - 854:4, 854:19
**intervene** [1] - 794:20
**intrinsic** [1] - 786:11
**introduce** [3] - 784:18, 851:19, 877:16
**introduced** [1] - 846:11
**investigated** [2] - 907:1, 907:2
**investigating** [2] - 853:4, 894:6
**Investigation** [1] - 852:18
**investigation** [15] - 853:5, 853:8, 853:23, 858:12,

859:14, 859:18, 859:21, 859:22, 862:1, 862:5, 865:13, 865:16, 878:12, 902:13, 907:4
**investigative** [1] - 882:12
**invited** [1] - 847:9
**involve** [1] - 851:9
**involved** [2] - 859:13, 859:25
**iPod** [2] - 821:21, 822:21
**Iraq** [1] - 878:8
**irrelevant** [2] - 786:21, 823:16
**issue** [14] - 781:8, 784:12, 785:13, 787:9, 789:3, 846:10, 847:1, 848:3, 848:19, 848:21, 848:22, 849:10, 850:16, 908:9
**issues** [5] - 793:12, 812:16, 847:20, 910:21, 910:23
**it..** [1] - 870:2
**item** [1] - 860:24
**items** [1] - 861:4

## J

**Jacob** [3] - 853:6, 859:9, 866:25
**JACOB** [1] - 780:3
**January** [82] - 790:23, 791:2, 793:16, 799:8, 812:15, 813:23, 814:6, 820:10, 824:5, 824:9, 824:12, 828:8, 837:16, 839:22, 853:3, 853:4, 853:12, 853:18, 853:24, 854:21, 855:17, 855:21, 856:20, 857:2, 857:23, 860:1, 860:6, 862:8, 865:10, 867:13, 867:15, 868:11, 868:18, 869:13, 871:15, 871:16, 873:13, 875:5, 875:6, 875:8, 875:13, 875:20, 875:24, 879:21, 880:17, 882:1, 893:6, 894:25,

895:5, 895:15, 895:18, 896:3, 897:25, 898:2, 898:12, 898:24, 899:23, 900:9, 901:3, 903:17, 904:4, 904:6, 904:11, 904:14, 904:17, 904:19, 904:20, 906:12, 906:13, 906:16, 906:23, 909:3, 909:5, 911:3, 912:5, 912:16, 913:1, 913:25, 914:5
**jar** [1] - 823:4
**jarred** [1] - 823:5
**job** [7] - 796:18, 797:20, 797:21, 797:23, 798:8, 798:11, 819:3
**JUDGE** [1] - 779:11
**judgment** [1] - 787:11
**jump** [1] - 831:9
**jurisdictions** [2] - 794:17, 794:20
**JUROR** [9] - 782:9, 782:11, 782:16, 782:21, 783:1, 783:15, 783:18, 783:20, 783:22
**juror** [4] - 781:5, 781:8, 789:14
**Juror** [5] - 781:9, 781:17, 782:6, 782:7, 784:2
**juror's** [1] - 789:2
**JURY** [1] - 779:10
**Jury** [1] - 852:3
**jury** [38] - 784:1, 784:16, 787:3, 788:13, 788:18, 846:8, 846:15, 846:17, 846:21, 848:25, 854:8, 856:10, 862:24, 863:22, 864:9, 864:15, 865:6, 868:4, 868:21, 869:11, 869:19, 871:19, 873:20, 874:9, 876:2, 876:12, 877:10, 877:12, 877:25, 879:4, 882:15, 908:12, 908:14, 908:16, 909:19, 911:10, 914:25, 915:21
**jury's** [2] - 810:19,

848:11
**Justice** [2] - 881:23, 882:3

## K

**KATHRYN** [3] - 780:5, 852:8, 852:15
**Kathryn** [2] - 852:6, 852:15
**keep** [5] - 781:24, 808:1, 808:3, 845:6, 873:2
**Keepers** [1] - 792:13
**keeping** [2] - 784:4, 870:16
**kept** [1] - 842:9
**kind** [4] - 790:25, 792:17, 799:14, 799:15, 800:13, 806:5, 811:3, 811:18, 820:2, 822:24, 823:9, 841:14, 842:23, 911:19
**knife** [2] - 795:4, 795:5
**knowledge** [1] - 904:24
**knows** [1] - 823:16

## L

**ladies** [5] - 789:16, 846:5, 854:5, 877:15, 902:6
**laid** [1] - 793:11
**lake** [3] - 900:2, 901:18, 901:19
**large** [1] - 785:20
**last** [11] - 781:9, 781:11, 782:13, 783:19, 784:12, 785:17, 815:10, 815:22, 827:2, 878:8, 884:13
**Lauren** [1] - 782:5
**law** [22] - 793:18, 839:15, 845:4, 846:23, 848:3, 848:4, 848:8, 849:17, 850:5, 850:8, 850:9, 850:13, 850:14, 850:19, 851:9, 876:23, 878:17, 895:3, 901:21, 904:21, 904:23, 913:20
**laws** [2] - 855:6, 858:2
**lawyer** [9] - 814:20, 815:14, 822:10,

822:17, 822:19, 822:23, 823:5, 845:23
**layout** [1] - 804:16
**lead** [2] - 853:9, 853:10
**learn** [6] - 805:3, 805:8, 813:7, 853:23, 859:11, 909:8
**learned** [5] - 785:17, 802:25, 803:3, 814:5, 907:3
**least** [4] - 785:22, 852:1, 893:25, 905:8
**leave** [1] - 794:12, 806:19, 809:11, 809:23, 812:12, 812:15, 818:14, 818:18, 819:18, 832:21, 832:25
**leaving** [1] - 833:9
**Left** [2] - 872:21, 872:23
**left** [19] - 783:10, 794:16, 805:16, 806:25, 812:17, 818:14, 818:18, 825:9, 827:13, 828:1, 830:22, 832:21, 833:16, 836:8, 863:8, 863:12, 863:16, 878:2, 910:14
**legal** [4] - 820:14, 820:15, 820:16, 911:16
**legitimate** [1] - 876:11
**length** [4] - 788:9, 861:13, 909:13, 910:5
**less** [2] - 804:1, 807:8
**lesser** [1] - 862:2
**level** [2] - 818:16, 911:11
**lie** [1] - 878:3
**life** [4] - 794:22, 839:19, 839:22, 876:15
**life...** [1] - 880:24
**light** [4] - 800:11, 800:14, 802:18, 843:13
**likely** [1] - 851:25
**likewise** [2] - 792:23, 916:3
**limine** [1] - 786:13
**limit** [2] - 866:18, 866:19
**limp** [1] - 865:21

**line** [9] - 829:12, 830:2, 833:16, 851:16, 858:15, 865:9, 876:15, 884:15, 891:18
**linked** [1] - 881:17
**lip** [1] - 881:4
**Lisa** [1] - 779:21
**LISA** [1] - 916:12
**list** [1] - 881:25
**listed** [1] - 882:5
**listen** [1] - 818:7
**live** [1] - 869:4
**logical** [1] - 799:23
**Lol** [1] - 869:20
**lol** [1] - 869:24
**look** [5] - 861:20, 879:6, 879:11, 896:23, 898:17
**looked** [4] - 818:21, 843:20, 879:7, 883:14
**looking** [13] - 811:10, 817:5, 830:2, 874:2, 875:19, 879:8, 880:16, 888:9, 888:10, 891:25, 892:2, 893:15, 912:11
**looks** [2] - 810:9, 833:15
**looted** [1] - 872:25
**lose** [1] - 869:23
**losing** [1] - 822:24
**lost** [5] - 800:21, 800:22, 821:20, 869:22, 910:12
**loud** [5] - 800:5, 816:23, 829:7, 829:9, 831:18
**love** [1] - 821:4
**loves** [1] - 821:6
**lower** [4] - 844:24, 882:20, 891:15, 892:7
**lunch** [6] - 851:24, 914:22, 914:24, 915:22, 916:7, 916:8
**lunchtime** [1] - 852:1
**Lynne** [1] - 859:20

**M**

**ma'am** [9] - 812:14, 834:7, 845:9, 868:20, 876:20, 883:25, 887:22, 890:11, 898:22
**mad** [1] - 872:21
**main** [1] - 814:24

**majority** [1] - 868:15
**Mall** [1] - 795:18
**man** [1] - 841:2
**manager** [3] - 785:4, 785:15, 786:18
**manner** [1] - 866:19
**marching** [1] - 841:11
**MARK** [1] - 779:17
**mark** [1] - 854:2
**marked** [3] - 796:9, 854:3, 878:21
**mask** [2] - 888:17, 888:22
**masked** [2] - 781:20, 782:24
**masks** [2] - 791:7, 791:9
**match** [1] - 883:16
**matched** [2] - 883:15, 884:18
**matter** [2] - 803:14, 843:6
**matters** [1] - 853:2
**meal** [1] - 791:5
**meals** [1] - 791:5
**mean** [17] - 791:14, 794:2, 799:23, 806:14, 812:1, 813:19, 815:7, 818:6, 824:18, 826:9, 855:19, 866:16, 867:4, 868:13, 884:1, 904:2, 906:6
**meaning..** [1] - 800:10
**means** [5] - 854:25, 855:20, 858:1, 875:6, 877:5
**meant** [5] - 792:6, 799:9, 799:12, 816:9, 844:13
**media** [19] - 805:19, 805:20, 805:22, 806:3, 826:13, 834:6, 834:18, 837:5, 837:8, 866:9, 878:4, 878:12, 894:9, 894:11, 894:14, 906:17, 906:19, 906:23, 907:8
**meet** [1] - 830:9
**meeting** [1] - 829:20
**meetings** [1] - 913:7
**member** [5] - 792:16, 792:17, 821:8, 821:10
**members** [3] - 828:17, 858:9, 892:20
**memories** [1] - 823:4

**memory** [4] - 823:3, 823:5, 910:21, 910:23
**men** [1] - 868:23
**mention** [5] - 785:10, 785:11, 849:22, 849:23, 906:13
**mentioned** [2] - 788:13, 849:7
**mentor** [1] - 798:15
**message** [27] - 866:20, 869:15, 880:16, 896:24, 897:1, 897:5, 897:18, 898:3, 898:5, 898:6, 898:9, 898:17, 898:18, 898:21, 899:8, 899:17, 899:18, 899:24, 900:7, 900:8, 900:14, 900:19, 900:22, 900:24, 901:2, 901:4, 909:4
**messages** [9] - 836:24, 866:21, 871:4, 880:13, 881:11, 896:9, 896:20, 897:19, 899:6
**messaging** [1] - 904:16
**met** [3] - 829:15, 843:18, 843:21
**metaphor** [1] - 800:16
**metaphorically** [2] - 800:8, 800:10
**method** [2] - 808:19, 809:2
**Metro** [7] - 795:7, 795:8, 795:9, 795:13, 795:18, 821:20, 910:12
**Metropolitan** [3] - 844:20, 856:19, 857:3
**middle** [1] - 833:3
**midnight** [1] - 898:1
**might** [1] - 912:11
**Mike** [1] - 852:16
**military** [5] - 785:12, 788:8, 788:10, 788:12, 788:16
**million** [1] - 842:20
**mind** [5] - 825:5, 829:17, 841:14, 868:5, 876:3
**minded** [1] - 878:10
**mine** [1] - 783:2
**mini** [2] - 785:16, 785:25

**minute** [12] - 804:1, 804:4, 829:25, 841:22, 846:6, 848:10, 884:2, 889:12, 890:10, 892:9, 913:6
**minutes** [18] - 783:9, 783:16, 785:18, 803:1, 803:3, 803:23, 807:8, 815:22, 822:20, 825:8, 846:7, 870:20, 870:24, 886:8, 913:10, 914:10, 915:17, 915:20
**mischaracterizes** [1] - 908:2
**misdemeanor** [3] - 813:24, 824:13, 903:20
**mistaken** [1] - 822:21
**misunderstanding** [1] - 835:17
**mixed** [1] - 821:21
**mixture** [1] - 798:12
**mob** [4] - 844:25, 884:14, 892:2, 892:20
**mom** [1] - 909:5
**moment** [10] - 787:16, 841:8, 883:14, 884:25, 887:20, 888:12, 888:20, 888:25, 891:2
**moments** [2] - 816:1, 888:4
**month** [1] - 815:10
**moral** [1] - 798:10
**MOREIRA** [1] - 916:12
**Moreira** [2] - 779:21, 916:19
**MORNING** [1] - 779:6
**morning** [20] - 781:2, 781:3, 782:8, 782:9, 789:16, 789:20, 789:21, 790:4, 790:5, 791:2, 827:24, 827:25, 846:4, 846:6, 852:11, 852:12, 902:11, 902:12, 915:25, 916:2
**most** [7] - 826:11, 826:21, 876:15, 881:1, 906:18, 908:15, 908:18
**motion** [3] - 786:13, 915:10, 915:11
**motive** [1] - 818:4

927

**Mount** [1] - 838:20
**move** [14] - 854:3,
855:11, 856:4,
866:1, 869:10,
879:1, 879:25,
880:9, 884:21,
884:24, 889:18,
890:25, 896:6, 910:2
**moved** [10] - 802:18,
855:13, 856:8,
866:5, 876:13,
879:3, 880:3,
880:12, 884:23,
896:8
**movement** [1] -
854:22
**moving** [3] - 886:1,
892:2, 902:2
**MPD** [3] - 844:21,
845:13, 857:3
**MR** [40] - 784:14,
785:9, 786:7,
789:11, 790:1,
790:3, 795:22,
796:25, 797:15,
798:20, 799:16,
799:18, 801:8,
801:11, 801:13,
802:5, 802:8, 808:7,
808:22, 809:14,
809:18, 810:2,
810:4, 810:20,
812:13, 827:20,
836:1, 849:25,
880:8, 902:10,
907:11, 907:16,
908:4, 908:8,
909:20, 909:25,
910:4, 911:14,
911:22, 916:3
**MREs** [1] - 791:5
**MS** [154] - 782:1,
782:4, 784:5, 784:6,
784:17, 784:25,
786:5, 787:7,
787:24, 788:7,
788:21, 788:25,
789:3, 797:25,
810:12, 817:17,
823:15, 827:23,
829:17, 829:24,
831:8, 831:20,
832:8, 832:10,
832:18, 833:7,
833:22, 840:12,
840:15, 841:21,
841:25, 842:2,
844:2, 844:12,
844:16, 845:10,
845:20, 846:18,

846:23, 847:19,
848:4, 848:8,
848:12, 848:17,
848:22, 849:3,
849:14, 849:19,
849:21, 850:2,
850:14, 851:2,
851:4, 851:12,
851:21, 851:22,
851:25, 852:5,
852:10, 854:2,
854:10, 855:8,
855:12, 855:14,
856:7, 856:9,
857:11, 860:19,
860:22, 862:10,
862:21, 863:3,
863:6, 863:10,
863:14, 863:18,
863:21, 864:1,
864:4, 864:7,
864:14, 864:18,
864:22, 864:24,
865:2, 865:6,
865:25, 866:4,
867:18, 868:4,
869:10, 871:9,
871:19, 873:16,
874:6, 874:16,
876:2, 877:9,
878:22, 878:25,
879:2, 879:4, 879:5,
879:24, 880:2,
880:4, 880:11,
880:22, 882:15,
884:6, 884:21,
884:22, 884:24,
885:4, 885:19,
886:11, 886:18,
886:22, 887:5,
887:10, 887:18,
888:2, 888:19,
888:24, 890:4,
890:14, 891:2,
891:22, 892:9,
892:12, 893:9,
896:5, 896:7,
896:25, 897:4,
897:22, 899:16,
900:6, 900:24,
901:6, 901:23,
906:20, 907:24,
908:2, 909:16,
909:22, 911:25,
912:2, 914:17,
915:4, 915:8,
915:13, 915:16,
916:1
**multiple** [1] - 906:17
**MW** [9] - 896:14,
897:10, 898:6,

898:20, 899:19,
900:11, 900:14,
901:8, 904:16
**MW's** [1] - 897:12

# N

**name** [2] - 789:6,
852:13
**named** [2] - 859:9,
874:25
**names** [1] - 896:14
**Nancy** [7] - 804:21,
805:23, 806:7,
806:10, 818:11,
837:11, 907:4
**National** [1] - 819:6
**national** [1] - 818:21
**natural** [1] - 826:5
**nature** [1] - 790:17
**need** [8] - 815:21,
816:22, 830:17,
841:15, 869:24,
906:10, 906:15,
911:12
**needed** [1] - 830:14
**needing** [1] - 825:15
**negative** [6] - 781:12,
781:17, 781:23,
783:19, 783:23,
792:20
**neighbor** [1] - 800:2
**neighborhoods** [1] -
872:24
**neighbors** [2] -
898:15, 900:16
**nervous** [1] - 790:6
**never** [14] - 792:12,
798:4, 798:7,
805:16, 815:23,
821:2, 822:4, 822:5,
827:12, 830:20,
836:24, 840:7, 907:5
**new** [6] - 836:12,
895:18, 895:24,
912:25, 913:2,
913:23
**newer** [1] - 799:14
**news** [1] - 818:21
**next** [32] - 800:12,
813:7, 829:19,
831:6, 836:11,
840:20, 863:3,
863:6, 863:10,
863:14, 863:18,
864:1, 864:4, 864:7,
864:22, 864:24,
865:2, 874:7,
874:17, 875:13,
888:2, 890:4,

890:14, 891:16,
898:3, 898:17,
898:18, 899:16,
900:7, 900:24,
900:25, 901:4
**nice** [6] - 789:17,
842:18, 842:19,
842:22, 846:1,
914:24
**night** [6] - 781:9,
781:12, 782:13,
783:19, 784:12,
794:25
**nine** [3] - 798:21,
840:14, 884:2
**NO** [9] - 782:9, 782:11,
782:16, 782:21,
783:1, 783:15,
783:18, 783:20,
783:22
**non** [1] - 855:24
**none** [1] - 911:10
**nonpeaceful** [1] -
851:8
**nonviolent** [1] - 877:5
**noodle** [1] - 788:19
**normal** [1] - 805:9
**nostalgia** [1] - 839:4
**note** [2] - 788:21,
869:24
**notes** [1] - 916:14
**nothing** [5] - 789:13,
792:11, 813:13,
826:2, 914:17
**notice** [1] - 904:19
**notion** [1] - 821:15
**November** [4] - 872:6,
872:9, 876:9, 876:19
**number** [6] - 829:12,
838:22, 897:12,
905:11, 911:15
**numbers** [1] - 818:7
**numerous** [2] -
872:24, 913:21
**NW** [4] - 779:15,
779:19, 779:22,
916:21

# O

**oath** [2] - 789:23,
845:18
**Oath** [1] - 792:13
**object** [6] - 786:18,
810:13, 847:6,
851:17, 866:2
**objected** [1] - 788:5
**objecting** [1] - 788:5
**objection** [22] - 784:5,
784:6, 788:4,

797:25, 810:12,
817:17, 823:15,
836:1, 847:10,
848:15, 855:12,
856:7, 866:4, 871:9,
879:2, 880:2,
880:11, 884:22,
890:22, 896:7,
906:20, 907:24
**objections** [4] - 784:3,
855:10, 878:25,
896:6
**objects** [1] - 902:16
**observations** [8] -
861:10, 861:15,
862:12, 862:17,
865:11, 870:25,
871:3, 892:19
**observe** [11] - 861:2,
861:5, 861:8,
865:19, 870:12,
870:14, 870:16,
884:11, 885:7,
894:22, 910:24
**observed** [4] - 871:7,
873:25, 911:9,
914:11
**obstruct** [4] - 796:10,
811:13, 817:4,
817:21
**obstructed** [2] -
814:15, 854:21
**obstructing** [1] -
814:25
**obstruction** [1] -
814:12
**obtain** [4] - 836:13,
867:7, 878:17
**obtained** [3] - 785:2,
787:9, 862:2
**obvious** [1] - 842:13
**obviously** [2] - 791:23,
849:22
**occur** [2] - 891:14,
893:24
**occurred** [8] - 824:5,
824:8, 853:4,
904:14, 906:7,
906:23, 907:5
**octagonal** [1] - 861:12
**OF** [4] - 779:1, 779:3,
779:10, 916:10
**offenses** [2] - 786:12,
903:20
**offer** [3] - 785:1,
819:12, 842:19
**offered** [2] - 820:15,
850:16
**offering** [1] - 787:19
**Office** [3] - 804:22,

859:17, 860:9
**OFFICE** [1] - 779:14
**office** [5] - 804:23,
805:23, 806:10,
818:12, 837:11
**officer** [43] - 790:12,
790:16, 790:24,
791:1, 794:7, 797:5,
797:8, 797:16,
797:17, 797:18,
798:3, 798:4, 798:7,
798:18, 801:14,
801:23, 801:25,
802:2, 809:22,
810:9, 810:11,
810:21, 812:19,
818:14, 818:17,
819:4, 838:20,
838:23, 839:8,
839:12, 839:19,
840:17, 840:25,
842:6, 842:14,
842:17, 842:24,
843:1, 843:4, 858:4,
885:14, 904:21,
904:23
**Officer** [3] - 891:6,
915:2, 915:5
**officer's** [2] - 801:17,
809:20
**officers** [41] - 794:4,
796:8, 796:10,
796:13, 796:16,
796:21, 798:13,
808:16, 828:20,
832:21, 832:25,
833:11, 833:19,
840:9, 841:3,
844:21, 844:25,
845:5, 845:13,
856:18, 856:20,
856:23, 857:2,
857:5, 857:6, 862:7,
884:14, 889:4,
889:10, 889:15,
890:12, 891:10,
891:16, 891:19,
892:5, 892:17,
892:21, 893:25,
895:7, 895:11,
902:18
**officers'** [1] - 845:14
**offices** [2] - 859:13,
905:22
**official** [3] - 856:22,
857:6, 916:20
**Official** [1] - 779:21
**OFFICIAL** [1] - 916:10
**often** [1] - 823:3
**old** [1] - 793:7, 899:5

**once** [13] - 788:13,
789:13, 794:2,
795:7, 795:13,
800:14, 800:21,
804:17, 806:22,
827:14, 839:25,
908:19
**ONE** [1] - 873:1
**one** [45] - 781:4,
781:7, 783:21,
787:2, 787:19,
789:3, 794:15,
795:10, 797:22,
805:4, 807:21,
809:15, 812:19,
814:11, 817:13,
819:20, 829:25,
834:9, 837:18,
841:14, 841:22,
842:20, 857:13,
861:13, 862:22,
873:9, 874:10,
874:22, 876:16,
876:17, 877:9,
878:9, 879:11,
881:22, 895:7,
896:20, 897:24,
903:11, 905:18,
905:22, 907:14,
910:11, 915:14,
915:15, 915:16
**one-track** [1] - 841:14
**ones** [2] - 825:20,
859:16
**open** [8] - 786:24,
787:4, 805:8,
805:10, 851:17,
855:23, 859:22,
878:7
**opened** [1] - 787:1
**opening** [3] - 788:8,
788:17, 788:18
**operation** [1] - 858:2
**opinion** [11] - 786:14,
786:21, 790:25,
792:20, 812:22,
812:25, 816:25,
847:4, 847:22,
847:25, 850:21
**opinion-based** [1] -
790:25
**opinions** [1] - 843:2
**opportunity** [4] -
788:14, 862:6,
910:24, 913:8
**order** [2] - 815:21,
896:17
**organizations** [1] -
792:18
**organized** [1] - 877:4

**original** [1] - 824:11
**otherwise** [2] - 785:16
**OUR** [1] - 874:14
**outnumbered** [1] -
842:20
**outset** [1] - 858:22
**outside** [13] - 783:3,
784:15, 806:16,
809:3, 812:21,
813:3, 826:24,
827:5, 827:13,
827:16, 833:13,
855:1, 855:3
**overall** [1] - 810:25
**overruled** [5] - 810:16,
823:17, 836:2,
871:10, 906:21
**overthrow** [1] - 877:5
**overturn** [3] - 793:24,
830:15, 830:23
**overturned** [3] -
815:25, 828:9, 829:3
**own** [2] - 845:4,
872:24
**owned** [1] - 872:25

---

**P**

**p.m** [7] - 845:12,
883:23, 883:24,
884:8, 885:3,
885:20, 916:8
**pack** [1] - 791:19
**packed** [3] - 791:3,
791:5, 791:7
**Page** [2] - 844:17,
896:25
**PAGE** [1] - 780:2
**page** [8] - 868:8,
873:22, 874:7,
874:17, 897:3,
900:7, 900:25, 908:3
**Pages** [1] - 788:22
**paid** [2] - 881:4,
913:25
**paint** [1] - 878:4
**pandemonium** [1] -
828:14
**Paragraph** [3] -
844:20, 845:3,
845:10
**paratrooper** [1] -
793:8
**part** [19] - 787:18,
794:19, 805:5,
815:18, 823:8,
823:10, 831:1,
832:3, 842:3,
842:19, 843:21,
845:17, 858:20,

859:21, 875:13,
876:16, 882:4,
902:13
**participated** [1] -
882:9
**participation** [1] -
858:23
**particular** [8] - 837:18,
866:19, 877:17,
881:18, 882:4,
882:22, 883:14,
892:13
**parties** [4] - 782:18,
854:7, 855:9, 877:16
**Parties** [2] - 854:13,
857:15
**parts** [1] - 877:17
**party** [1] - 783:2
**path** [3] - 845:13,
845:14, 878:5
**Pause** [6] - 781:6,
786:6, 844:3, 851:3,
888:1, 907:15
**pause** [3] - 832:10,
891:2, 891:23
**PD** [1] - 838:15
**peaceability** [1] -
848:3
**peaceableness** [2] -
850:13, 851:18
**peaceful** [2] - 850:22,
850:23
**peacefully** [1] - 807:1
**peacefulness** [7] -
786:8, 847:23,
847:25, 850:4,
850:8, 850:20, 851:6
**Pelosi's** [7] - 804:21,
805:23, 806:8,
806:10, 818:11,
837:11, 907:4
**penalty** [1] - 816:21
**people** [43] - 783:7,
790:20, 790:21,
799:20, 799:22,
799:24, 801:6,
803:8, 803:11,
806:5, 811:20,
815:2, 817:10,
817:13, 817:16,
828:18, 829:1,
829:12, 833:13,
833:16, 842:19,
843:6, 866:10,
866:17, 866:19,
871:23, 872:15,
873:4, 875:16,
880:25, 882:9,
883:13, 883:15,
883:17, 896:19,

905:4, 905:6, 905:9,
905:11, 905:22,
906:18, 906:22
**people'** [1] - 881:5
**people's** [1] - 883:16
**perceive** [1] - 818:19
**perceived** [1] - 798:10
**period** [1] - 795:21
**periods** [1] - 911:2
**permit** [1] - 849:5
**permitted** [1] - 905:20
**person** [15] - 782:23,
800:18, 812:3,
812:6, 815:17,
850:22, 850:23,
859:5, 859:9,
874:25, 887:8,
887:12, 896:12,
896:14, 898:21
**Person** [2] - 844:23,
845:13
**personal** [3] - 816:21,
843:2, 905:24
**personally** [1] - 817:5
**personnel** [2] -
851:10, 855:24
**phone** [87] - 784:14,
803:7, 803:10,
821:20, 822:3,
822:25, 823:6,
823:14, 824:1,
824:3, 824:4, 824:8,
824:15, 824:16,
824:20, 824:23,
825:3, 825:11,
825:15, 825:16,
825:24, 826:5,
826:11, 826:18,
826:19, 826:20,
833:21, 833:24,
834:8, 834:12,
834:15, 834:21,
835:4, 835:11,
835:14, 835:21,
836:4, 836:8,
836:12, 836:14,
836:17, 836:22,
836:25, 837:4,
837:7, 893:12,
893:15, 893:17,
893:19, 894:1,
895:1, 895:7,
895:11, 895:14,
895:18, 896:2,
896:10, 897:12,
897:15, 898:14,
899:5, 899:13,
900:4, 900:20,
901:13, 901:14,
901:16, 903:9,

903:15, 904:5,
904:25, 908:9,
910:9, 912:4,
912:11, 912:19,
912:22, 912:25,
913:3, 913:4,
913:23, 915:10
**phones** [19] - 821:24,
822:5, 822:11,
822:12, 835:25,
848:9, 893:22,
894:23, 895:24,
903:7, 903:23,
904:1, 904:2, 904:7,
904:19, 904:22,
905:2, 910:11,
910:19
**photo** [23] - 810:5,
811:6, 811:10,
825:20, 858:20,
858:24, 859:11,
861:16, 862:13,
867:20, 868:1,
870:3, 873:23,
873:24, 874:21,
874:22, 875:4,
879:16, 879:19,
880:5, 890:6, 905:9,
906:4
**photograph** [3] -
810:19, 858:25,
879:11
**photos** [6] - 832:16,
834:2, 853:17,
862:2, 894:15, 905:5
**phrase** [3] - 799:15,
881:6, 881:14
**physically** [2] -
790:20, 812:7
**pick** [1] - 828:1
**picture** [15] - 791:21,
802:10, 809:3,
825:21, 835:8,
861:22, 862:17,
868:22, 869:17,
869:21, 871:25,
872:5, 881:15,
892:6, 906:9
**pictures** [6] - 836:18,
836:19, 862:23,
880:25, 881:19,
881:22
**piece** [1] - 832:6
**place** [3] - 855:1,
855:3, 908:21
**Plaintiff** [1] - 779:4
**plan** [2] - 850:11,
916:5
**plans** [3] - 793:11,
875:23

**platform** [4] - 866:9,
866:10, 878:13,
879:12
**Platoon** [1] - 844:21
**play** [12] - 799:16,
809:18, 829:25,
831:10, 831:20,
832:18, 842:18,
884:7, 886:12,
886:20, 887:10,
891:23
**playing** [25] - 799:17,
799:19, 801:10,
801:12, 802:7,
808:10, 808:23,
809:17, 809:19,
810:3, 830:1,
830:12, 831:11,
831:21, 832:20,
840:16, 841:24,
884:10, 886:15,
886:21, 886:23,
887:11, 891:24,
892:9, 892:11
**plaza** [1] - 840:4
**plea** [3] - 819:12,
844:4, 844:8
**plead** [2] - 815:21,
817:19
**pleading** [1] - 819:2
**pleasant** [1] - 811:2
**please..** [1] - 887:25
**pled** [2] - 815:10,
827:16
**plus** [2] - 798:12,
815:14
**pocket** [2] - 795:4,
795:5
**point** [55] - 784:20,
785:24, 787:20,
792:2, 792:3,
795:25, 796:3,
796:9, 801:9,
801:20, 801:24,
802:9, 802:13,
802:19, 802:20,
802:23, 805:3,
807:21, 808:18,
809:1, 809:9,
809:20, 809:22,
809:25, 811:5,
811:12, 811:17,
813:11, 814:8,
814:21, 815:2,
815:6, 815:10,
817:20, 820:12,
820:14, 822:15,
824:15, 832:12,
842:20, 843:25,
865:21, 868:16,

890:19, 890:22,
892:4, 894:3, 896:6,
903:10, 903:13,
903:15, 903:23,
904:6, 910:11,
915:18
**pointed** [9] - 843:15,
863:1, 863:4, 863:7,
863:8, 863:11,
863:15, 863:19,
863:24
**pointing** [6] - 864:2,
864:5, 864:12,
864:17, 864:23,
888:7
**points** [4] - 806:9,
837:14, 837:19,
855:2
**poking** [1] - 873:2
**pole** [1] - 840:17
**police** [37] - 790:12,
790:16, 790:24,
794:4, 794:6,
797:16, 797:17,
798:3, 798:4, 798:7,
798:13, 798:18,
806:21, 806:22,
807:5, 812:17,
819:4, 820:11,
824:19, 824:23,
828:20, 829:12,
830:2, 838:5,
838:20, 838:23,
839:5, 839:8,
840:17, 840:25,
841:8, 856:21,
862:7, 865:9,
884:13, 884:15,
891:19, 893:25
**Police** [12] - 810:9,
838:21, 844:20,
844:25, 856:18,
856:19, 857:3,
889:4, 889:10,
889:15, 890:12,
894:20
**Police's** [1] - 858:6
**policeman** [1] - 835:6
**policy** [2] - 781:13,
781:16
**port** [3] - 808:19,
809:3, 809:5
**portion** [13] - 816:20,
846:20, 846:22,
849:6, 868:6,
872:20, 874:9,
874:19, 876:4,
879:11, 883:10,
897:12, 907:13
**portions** [1] - 902:3

**position** [2] - 813:4,
883:16
**positive** [4] - 781:10,
782:15, 783:9,
783:12
**possibility** [1] - 781:22
**possible** [3] - 849:10,
894:4, 908:24
**possibly** [1] - 869:20
**post** [16] - 805:22,
866:10, 866:19,
868:17, 869:12,
871:21, 875:22,
876:5, 876:8,
877:20, 877:23,
881:18, 881:19,
907:20, 911:9,
911:12
**posted** [4] - 834:5,
869:15, 872:5, 872:6
**posts** [12] - 805:19,
805:20, 837:8,
837:16, 866:12,
866:17, 867:5,
867:12, 871:23,
875:12, 875:19,
914:8
**Potter** [1] - 859:20
**power** [1] - 855:6
**prefer** [1] - 916:1
**prejudice** [1] - 849:11
**prejudicial** [1] -
848:18
**prepared** [3] - 787:8,
787:16, 878:9
**presence** [1] - 784:15
**present** [3] - 860:5,
860:7, 903:24
**President** [7] - 793:1,
793:11, 858:9,
858:10, 872:3,
872:15, 873:5
**president** [2] - 807:14,
872:17
**president-Elect** [1] -
872:17
**presidential** [1] -
876:18
**press** [1] - 851:10
**presumed** [1] - 911:5
**pretrial** [4] - 786:10,
787:7, 848:13,
850:15
**pretty** [4] - 790:24,
816:22, 833:5,
876:13
**prevent** [1] - 786:13
**previous** [2] - 898:21,
899:8
**previously** [4] - 785:2,

823:7, 842:8, 880:10
**primary** [1] - 819:20
**private** [2] - 866:20,
866:21
**problem** [1] - 872:22
**problematic** [3] -
897:2, 897:6, 899:10
**problems** [2] - 823:3
**proceed** [2] - 782:20,
892:22
**proceeded** [3] -
844:23, 865:8,
891:18
**proceeding** [2] -
908:17, 908:21
**proceedings** [1] -
916:15
**process** [3] - 807:17,
807:19, 830:16
**processing** [1] - 912:8
**produce** [1] - 781:16
**professional** [1] -
852:21
**progress** [1] - 807:16
**property** [6] - 794:23,
839:20, 839:22,
860:16, 860:25,
902:14
**propose** [1] - 781:18
**proposed** [1] - 915:21
**prosecutions** [1] -
881:25
**prosecutors** [2] -
822:9, 822:16
**Protected** [1] - 857:21
**protected** [2] - 857:24,
858:5
**protection** [2] - 858:7,
858:8
**protector** [1] - 790:17
**protest** [7] - 793:16,
809:24, 811:20,
813:5, 816:24,
869:25, 870:1
**protesters** [1] - 845:6
**protesting** [3] - 812:8,
813:20, 818:1
**protests** [2] - 791:15,
869:3
**PROUD** [1] - 868:23
**Proud** [1] - 792:14
**proud** [6] - 837:20,
837:25, 871:7,
871:11, 882:9,
906:22
**provide** [1] - 884:3
**provided** [1] - 785:1
**PS** [1] - 868:22
**public** [2] - 805:4,
805:8, 858:15,

862:3, 866:12,
905:19, 905:25
**publish** [19] - 855:14,
856:9, 857:11,
862:24, 863:22,
864:8, 864:15,
865:6, 868:4,
869:10, 871:19,
873:16, 873:20,
876:2, 877:12,
878:22, 879:4,
880:9, 882:15
**published** [1] - 877:10
**pull** [22] - 795:22,
796:25, 798:20,
802:5, 808:7,
829:18, 832:8,
840:15, 844:17,
863:21, 864:8,
864:14, 865:3,
867:18, 891:22,
897:23, 900:7,
907:11, 908:5,
911:12, 911:14
**pulls** [1] - 800:12
**purpose** [2] - 806:7,
839:3
**purposes** [1] - 847:20
**pursue** [1] - 847:13
**put** [6] - 787:22,
788:17, 835:3,
835:21, 836:21,
868:24

# Q

**quarantine** [1] -
781:15
**questioning** [2] -
847:14, 851:16
**questions** [9] -
782:19, 827:2,
827:20, 833:24,
838:2, 845:20,
853:21, 901:24,
911:22

# R

**race** [7] - 800:11,
800:15, 800:25,
801:1, 843:13,
843:21
**raced** [1] - 800:18
**radical** [2] - 821:8,
821:10
**raggedy** [1] - 793:7
**raise** [2] - 788:16,
789:4
**raised** [2] - 784:12,
788:8

**ran** [2] - 825:7, 826:22
**random** [1] - 872:23
**Ranger** [14] - 785:5,
785:6, 785:17,
785:19, 785:20,
785:21, 786:1,
846:10, 847:14,
848:19, 849:7,
849:13, 849:23
**ranger** [1] - 848:22
**rapid** [2] - 781:11,
783:22
**RDR** [3] - 779:21,
916:12, 916:19
**reach** [1] - 887:13
**read** [23] - 784:23,
844:20, 845:1,
845:3, 845:8,
845:15, 854:11,
856:4, 856:5,
856:11, 857:13,
868:21, 869:19,
871:6, 872:20,
874:9, 877:25,
880:20, 898:3,
898:10, 900:8,
906:17, 911:9
**reading** [5] - 785:22,
874:18, 881:7,
899:6, 914:7
**ready** [5] - 784:9,
789:17, 800:25,
915:11, 915:21
**real** [2] - 781:22,
792:25
**realize** [3] - 799:12,
827:15, 896:13
**realized** [3] - 816:8,
819:23, 822:23
**really** [18] - 792:4,
799:10, 803:12,
807:18, 807:19,
814:15, 816:22,
818:1, 825:1, 825:2,
825:18, 825:23,
826:8, 826:9, 827:4,
827:17, 847:5
**reason** [6] - 785:10,
793:7, 793:10,
794:18, 848:14,
896:23
**reasons** [6] - 793:5,
793:15, 794:15,
816:19, 819:16,
819:20
**rebellion** [1] - 878:7
**rebut** [1] - 784:22
**rebuttal** [4] - 784:25,
787:22, 915:5,
915:20

**rebutting** [1] - 788:14
**received** [2] - 858:15,
904:20
**recently** [1] - 781:16
**Recess** [2] - 789:15,
851:23
**recess** [1] - 916:8
**recognize** [1] - 887:14
**reconnected** [1] -
871:1
**reconvene** [2] - 846:7,
914:23
**record** [5] - 787:17,
852:14, 869:8,
901:7, 901:25
**records** [3] - 787:9,
787:14, 865:25
**red** [3] - 800:11,
802:18, 843:13
**redact** [2] - 846:13,
849:6
**redacted** [3] - 846:17,
849:9, 896:13
**redactions** [1] -
877:19
**redirect** [1] - 908:6
**REDIRECT** [2] -
827:22, 912:1
**redress** [1] - 878:6
**reduced** [1] - 819:12
**refer** [2] - 847:16,
909:5
**reference** [9] - 820:25,
823:14, 849:12,
902:1, 906:6, 906:7,
906:11, 906:13,
910:1
**referencing** [3] -
858:17, 906:3,
907:10
**referred** [3] - 846:14,
858:16, 874:3
**referring** [4] - 881:15,
900:4, 901:12,
904:15
**refers** [1] - 909:4
**regarding** [17] -
793:12, 795:14,
795:19, 796:4,
813:8, 821:13,
821:14, 847:7,
847:11, 847:14,
847:16, 847:24,
848:4, 849:1,
910:19, 910:22
**regardless** [2] -
816:19, 881:2
**reinforce** [1] - 865:9
**relate** [1] - 853:18
**relaxed** [1] - 781:16

**relevant** [2] - 788:1,
788:3
**relying** [3] - 787:11,
787:14, 787:18
**remaining** [1] - 892:22
**remember** [30] -
791:21, 792:4,
792:5, 793:23,
795:5, 795:6, 795:9,
796:22, 801:22,
803:17, 804:24,
808:17, 809:10,
809:12, 810:14,
810:23, 811:3,
821:16, 822:6,
822:12, 833:24,
834:1, 837:11,
837:18, 839:9,
839:11, 839:16,
843:10, 907:17,
911:4
**remind** [1] - 789:22
**reminded** [1] - 881:6
**repeat** [1] - 810:16
**rephrase** [2] - 798:1,
839:14
**replied** [1] - 882:10
**report** [1] - 896:2
**reported** [2] - 781:9,
782:13
**REPORTER** [1] -
916:10
**Reporter** [3] - 779:21,
779:21, 916:20
**reporters** [1] - 880:5
**represented** [1] -
785:3
**republic** [1] - 876:11
**Republican** [1] - 793:2
**reputation** [10] -
786:14, 786:21,
847:4, 847:7,
847:11, 847:22,
847:25, 850:23,
851:18, 851:20
**request** [3] - 895:6,
903:23
**require** [1] - 915:20
**required** [1] - 903:9
**requires** [1] - 815:18
**research** [1] - 914:24
**reserve** [1] - 915:10
**Resident** [2] - 859:17,
860:9
**respond** [2] - 787:6,
900:18
**response** [2] - 826:5,
846:23
**rest** [5] - 833:19,
841:8, 915:6, 915:19

**restaurants** [1] -
855:23
**restricted** [2] - 844:24,
906:2
**restroom** [1] - 805:17
**restrooms** [1] - 805:18
**result** [2] - 820:10,
863:5
**results** [4] - 807:15,
815:25, 828:9,
875:23
**resume** [10] - 787:10,
788:10, 788:23,
846:15, 846:16,
846:19, 846:20,
846:21, 849:6,
849:13
**Resumed** [1] - 780:3
**retard** [1] - 900:21
**retreating** [1] - 828:20
**return** [1] - 806:20
**rev** [1] - 800:13
**revealed** [1] - 907:4
**review** [13] - 787:13,
853:10, 853:17,
854:9, 855:11,
862:6, 867:12,
883:2, 883:5,
889:20, 894:7,
894:19, 896:24
**reviewed** [11] - 865:16,
867:10, 870:10,
879:18, 881:11,
889:6, 889:13,
890:19, 891:6,
891:9, 906:24
**reviewing** [3] - 858:25,
873:12, 897:15
**revolution** [1] - 875:14
**revs** [1] - 800:12
**rewind** [1] - 808:20
**Richmond** [2] -
859:17, 860:9
**rid** [12] - 821:15,
821:23, 822:11,
824:8, 825:14,
825:16, 826:5,
826:15, 833:23,
834:23, 834:25,
835:11
**rifles** [1] - 794:25
**rights** [2] - 868:25,
869:2
**riot** [2] - 792:9, 839:2
**rioted** [1] - 872:23
**riots** [1] - 858:23
**RISA** [1] - 779:14
**rise** [1] - 781:22
**risk** [2] - 819:17,
868:25

**road** [1] - 878:2
**Roanoke** [3] - 787:22, 859:17, 860:9
**ROBERTSON** [1] - 779:6
**Robertson** [35] - 779:17, 790:14, 795:3, 796:20, 797:1, 797:3, 797:11, 797:22, 798:3, 801:1, 839:8, 843:16, 844:23, 845:12, 845:14, 848:14, 850:22, 853:6, 854:16, 856:15, 857:18, 859:3, 868:8, 868:22, 870:16, 870:25, 874:12, 874:13, 874:20, 875:7, 878:1, 893:12, 909:11, 909:12, 910:25
**Robertson's** [2] - 853:11, 905:5
**Rocky** [1] - 838:20
**role** [1] - 860:3
**ROLLINS** [41] - 779:17, 779:18, 784:14, 785:9, 786:7, 789:11, 790:1, 790:3, 795:22, 796:25, 797:15, 798:20, 799:16, 799:18, 801:8, 801:11, 801:13, 802:5, 802:8, 808:7, 808:22, 809:14, 809:18, 810:2, 810:4, 810:20, 812:13, 827:20, 836:1, 849:25, 902:10, 907:11, 907:16, 908:4, 908:8, 909:20, 909:25, 910:4, 911:14, 911:22, 916:3
**Rollins** [22] - 782:3, 785:8, 786:17, 786:24, 789:10, 789:25, 828:1, 830:17, 832:6, 833:23, 838:2, 839:7, 840:13, 842:3, 843:9, 847:7, 849:22, 902:5, 902:8, 909:14, 914:10, 915:9

**Rollins)......................
..........** [2] - 780:4, 780:6
**roof** [1] - 874:14
**rooftop** [1] - 783:3
**room** [22] - 784:1, 811:18, 822:9, 822:15, 822:17, 822:20, 829:11, 830:2, 830:10, 831:3, 831:14, 832:3, 832:9, 833:2, 833:19, 838:15, 854:8, 860:14, 870:6, 870:8, 874:14, 910:15
**Room** [2] - 779:22, 916:21
**rose** [1] - 911:11
**roughly** [6] - 820:5, 885:10, 885:12, 889:23, 896:17, 898:1
**route** [1] - 843:24
**rubber** [6] - 874:20, 906:12, 906:14, 908:25, 909:3, 909:5
**rules** [2] - 848:5, 850:15
**ruling** [2] - 847:23, 848:23
**rulings** [1] - 787:8

**S**

**safe** [7] - 808:2, 808:3, 842:14, 843:4, 846:1, 874:14
**safer** [1] - 842:18
**salary** [1] - 820:8
**satisfied** [1] - 812:22
**saw** [39] - 791:19, 791:25, 792:1, 792:5, 801:24, 802:2, 804:21, 804:25, 806:10, 813:2, 817:10, 827:12, 828:10, 828:13, 828:17, 828:20, 828:24, 829:1, 829:3, 830:14, 838:3, 839:7, 840:7, 840:9, 840:17, 874:22, 881:16, 883:10, 885:11, 885:22, 888:20, 892:24, 895:7, 905:3, 905:9, 911:4, 912:21
**saying...after** [1] -

870:1
**scaffolding** [7] - 882:20, 886:1, 892:2, 892:16, 893:1, 893:3, 902:20
**scaling** [2] - 887:13, 888:11
**scared** [2] - 874:11, 880:25
**School** [5] - 785:5, 785:6, 785:17, 785:19, 786:1
**school** [1] - 793:13
**screen** [1] - 796:24
**screenshot** [4] - 865:7, 881:22, 882:4, 882:5
**scroll** [3] - 860:23, 865:4, 874:6
**search** [18] - 859:25, 860:1, 860:4, 860:5, 860:8, 861:19, 867:7, 878:18, 895:3, 895:7, 898:14, 903:5, 903:6, 903:13, 904:4, 904:7, 904:8, 904:10
**searched** [3] - 894:25, 900:15, 903:11
**searching** [1] - 893:23
**seat** [1] - 789:22
**seated** [2] - 846:9, 915:1
**second** [2] - 815:18, 858:24
**seconds** [28] - 798:21, 808:9, 809:16, 829:23, 830:8, 830:9, 832:15, 832:19, 840:14, 841:22, 872:7, 876:9, 877:24, 884:2, 885:3, 885:6, 886:7, 887:24, 890:9, 890:18, 891:12, 892:25, 897:25, 898:12, 898:24, 899:23, 900:9, 901:3
**Secret** [1] - 858:8
**secret** [1] - 908:11
**Section** [4] - 854:24, 857:1, 857:9, 857:25
**secure** [1] - 869:1
**security** [1] - 885:15
**see** [63] - 793:10, 796:13, 796:20, 797:1, 797:3, 797:7, 797:11, 799:5,

799:20, 803:6, 804:18, 805:5, 808:13, 808:16, 808:24, 809:4, 809:20, 810:5, 810:7, 811:6, 818:21, 827:3, 827:5, 839:22, 841:19, 842:24, 843:4, 851:16, 864:10, 864:16, 865:4, 865:21, 866:18, 867:4, 867:15, 872:2, 872:3, 880:18, 883:13, 884:1, 886:17, 887:14, 887:15, 888:25, 889:3, 889:15, 889:17, 889:18, 890:6, 890:15, 890:16, 891:16, 896:13, 897:12, 900:14, 902:13, 903:12, 905:15, 906:3, 906:10, 906:15, 911:12, 914:5
**seeing** [5] - 791:21, 808:11, 842:25, 864:20, 864:25
**seek** [2] - 851:19, 908:12
**seeking** [1] - 908:10
**seize** [4] - 893:22, 894:1, 895:11, 898:14
**seized** [5] - 862:12, 893:17, 896:3, 907:18, 914:14
**seizure** [2] - 862:14, 912:4
**selectively** [1] - 866:14
**selling** [1] - 855:23
**Senate** [10] - 870:8, 883:6, 883:11, 883:18, 888:12, 888:13, 889:1, 889:18, 890:16, 890:20
**Senators** [1] - 881:3
**send** [4] - 846:14, 866:20, 880:5, 896:20
**sends** [1] - 901:4
**sense** [5] - 801:17, 811:25, 817:6, 847:9, 911:16
**sensitive** [1] - 851:9

**sent** [18] - 874:21, 874:22, 875:4, 875:5, 875:6, 879:12, 879:13, 880:13, 880:16, 897:18, 897:24, 898:1, 898:21, 898:23, 899:1, 899:22, 899:25, 900:22
**sentiment** [1] - 871:3
**serious** [1] - 815:7
**service** [8] - 785:11, 785:12, 788:8, 788:10, 788:12, 788:16, 803:12, 881:4
**Service's** [1] - 858:8
**serving** [1] - 855:23
**SESSION** [1] - 779:6
**set** [1] - 868:15
**setting** [1] - 783:7
**Seventh** [1] - 779:19
**several** [2] - 835:6, 905:16
**shake** [1] - 885:9
**shaking** [1] - 885:14
**shape** [1] - 861:12
**share** [1] - 866:14
**shared** [1] - 871:4
**shear** [1] - 818:7
**shift** [2] - 865:23, 893:5
**shifting** [1] - 882:11
**shirt** [1] - 799:5
**shitless** [1] - 874:11
**short** [1] - 910:23
**short-term** [1] - 910:23
**shortly** [3] - 872:10, 890:1, 892:24
**shot** [4] - 874:20, 906:12, 909:3, 909:6
**show** [13] - 787:19, 795:24, 803:20, 854:2, 858:18, 860:13, 860:19, 862:10, 862:20, 878:20, 882:13, 883:10, 892:16
**showed** [4] - 825:17, 832:6, 840:13, 846:20
**showing** [1] - 871:25
**shown** [2] - 836:24, 902:3
**shows** [3] - 829:20, 868:23, 882:19
**sic]** [1] - 831:10
**side** [3] - 833:3,

841:11, 865:9

**sign** [3] - 804:21, 804:24, 844:7

**signed** [2] - 844:18, 845:17

**significance** [1] - 862:3

**significant** [2] - 893:19, 910:21

**simply** [2] - 787:19, 869:3

**sitting** [3] - 804:12, 804:15, 827:19

**situation** [3] - 842:14, 842:25

**six** [3] - 783:16, 852:20, 903:1

**skin** [1] - 868:24

**sleep** [1] - 869:4

**Slide** [7] - 833:7, 884:24, 885:4, 885:19, 887:19, 888:18, 889:12

**slide** [16] - 829:19, 863:3, 863:6, 863:10, 863:14, 863:18, 864:1, 864:4, 864:7, 864:22, 864:24, 865:2, 888:3, 890:5, 890:14, 910:2

**slides** [1] - 863:23

**slightly** [1] - 915:13

**slow** [1] - 870:21

**small** [3] - 829:12, 872:23, 872:25

**smartest** [1] - 842:21

**snot** [1] - 861:24

**soapbox** [2] - 876:11, 911:10

**social** [19] - 783:1, 805:19, 805:20, 805:22, 806:3, 826:12, 834:6, 834:17, 837:5, 837:8, 866:9, 878:12, 894:9, 894:11, 894:14, 906:17, 906:19, 906:23, 907:8

**socially** [1] - 782:24

**someone** [14] - 781:10, 781:14, 782:14, 801:23, 815:24, 838:11, 838:13, 840:17, 858:16, 879:13, 894:1, 908:9, 908:10, 909:4

**sometime** [1] - 824:8

**sometimes** [6] - 794:9, 805:18, 805:21, 823:3, 877:16, 896:20

**somewhat** [3] - 807:12, 814:8, 851:8

**sorry** [15] - 795:23, 802:6, 829:8, 831:9, 835:16, 835:18, 844:13, 869:21, 886:18, 901:6, 901:15, 907:14, 909:10

**sort** [3] - 787:4, 788:6, 839:1

**sound** [3] - 799:18, 801:9, 837:22

**sounds** [3] - 792:8, 814:7, 824:10

**souped** [1] - 800:11

**souped-up** [1] - 800:11

**sources** [1] - 837:7

**space** [1] - 905:24

**speaking** [2] - 805:18, 807:13

**SPECIAL** [2] - 780:5, 852:8

**Special** [20] - 852:6, 852:11, 854:11, 856:11, 859:20, 862:25, 865:5, 866:6, 868:7, 873:24, 876:5, 877:20, 878:11, 883:21, 884:11, 884:17, 891:25, 901:1, 901:23, 912:3

**special** [3] - 855:16, 859:20, 877:14

**specialized** [1] - 904:24

**specific** [7] - 786:15, 786:22, 787:3, 795:10, 847:4, 847:12, 851:7

**specifically** [8] - 793:12, 821:13, 823:25, 848:9, 851:6, 859:23, 879:6, 907:20

**specifics** [2] - 850:10, 850:11

**speculate** [1] - 877:18

**speculation** [1] - 797:25

**spell** [1] - 852:13

**spent** [2] - 876:15, 878:7

**spiral** [1] - 788:6

**spoken** [3] - 802:16, 909:12, 909:17

**spot** [1] - 905:25

**stairs** [1] - 842:9, 885:25, 886:3, 886:6

**stamp** [4] - 830:5, 831:16, 880:18, 884:1

**stamps** [5] - 882:22, 883:8, 883:17, 883:19, 884:18

**stand** [2] - 868:24, 884:13

**standard** [1] - 868:14

**standing** [6] - 813:20, 818:24, 831:6, 840:20, 888:13, 911:2

**stands** [1] - 876:11

**start** [4] - 856:10, 862:22, 878:9, 889:21

**started** [6] - 783:3, 783:11, 789:14, 789:18, 838:24, 894:6

**starting** [4] - 833:7, 880:20, 891:7, 897:2

**starts** [1] - 883:22

**State** [1] - 855:2

**state** [2] - 852:13, 854:25

**statement** [6] - 788:11, 844:7, 844:10, 845:17, 908:3, 910:18

**Statement** [1] - 844:18

**statements** [5] - 787:12, 788:12, 788:14, 788:22, 910:8

**STATES** [4] - 779:1, 779:3, 779:11, 779:14

**States** [24] - 779:13, 785:11, 854:14, 854:15, 854:24, 856:13, 856:14, 856:18, 856:21, 856:23, 856:24, 856:25, 857:6, 857:7, 857:9, 857:16, 857:17, 857:25, 858:3, 858:4, 858:6, 858:8, 858:9, 916:20

**stating** [1] - 813:4

**station** [3] - 795:9, 824:19, 824:23

**Statues** [4] - 803:17,

803:24, 805:1, 805:4

**status** [3] - 898:9, 898:25, 899:24

**stay** [3] - 806:15, 831:9, 875:16

**stayed** [2] - 800:18, 831:14

**Steal** [1] - 799:6

**steel** [1] - 878:3

**stenographic** [1] - 916:14

**step** [7] - 800:17, 839:12, 839:24, 840:25, 876:13, 914:19

**stepped** [2] - 801:24, 802:2

**steps** [8] - 800:4, 800:22, 859:1, 881:9, 881:14, 913:19, 913:21, 913:22

**stick** [32] - 786:7, 791:19, 792:6, 797:1, 797:4, 797:7, 797:11, 798:22, 808:19, 808:20, 809:1, 809:2, 809:4, 832:2, 838:3, 845:14, 859:5, 861:3, 861:5, 861:8, 861:10, 861:11, 861:16, 862:13, 862:14, 870:16, 888:17, 888:22, 911:5, 914:11, 914:14, 914:15

**sticks** [1] - 838:15

**still** [16] - 781:4, 781:7, 784:10, 788:1, 789:23, 794:6, 817:19, 831:18, 832:14, 833:13, 843:21, 869:25, 890:22, 904:6, 915:2, 915:11

**stipulate** [3] - 854:17, 856:16, 857:19

**Stipulation** [1] - 857:15

**stipulation** [3] - 854:3, 854:13, 856:12

**stipulations** [3] - 854:6, 854:8, 856:3

**stomping** [2] - 874:13, 875:10

**stood** [1] - 845:13

**stop** [9] - 797:20, 798:7, 811:16, 812:2, 816:25,

830:15, 841:2, 841:25, 860:23

**Stop** [1] - 799:5

**stopped** [4] - 792:1, 800:11, 812:7, 885:10

**stores** [2] - 855:22, 873:1

**stormed** [2] - 881:10, 881:15

**story** [3] - 822:24, 913:11, 913:14

**stray** [2] - 781:5, 781:7

**street** [1] - 838:18

**Street** [2] - 779:15, 779:19

**stretch** [1] - 902:6

**strike** [2] - 901:7, 911:8

**stronger** [1] - 835:9

**stuff** [6] - 817:10, 826:11, 826:15, 841:11, 847:18, 849:8

**subpoena** [1] - 785:3

**substantial** [1] - 794:23

**substantially** [1] - 848:18

**subtract** [1] - 884:2

**suggest** [5] - 785:15, 873:3, 873:13, 875:16, 909:16

**suggested** [1] - 825:12

**Summer** [1] - 872:23

**summertime** [3] - 791:11, 791:12, 791:15

**Sunday** [1] - 783:1

**supply** [1] - 838:15

**support** [3] - 849:15, 869:25, 891:18

**supporter** [1] - 793:2

**supposed** [3] - 908:11, 908:13, 908:15

**sustained** [2] - 788:4, 817:18

**swept** [2] - 831:3, 831:12

**swim** [2] - 900:2, 901:18, 901:19

**Sworn** [1] - 852:8

**symptoms** [2] - 783:11, 783:23

**synonyms** [1] - 850:24

**system** [2] - 883:3, 883:5

**T**

tape [2] - 884:8, 884:9
tapping [1] - 832:2
taught [1] - 794:20
telephone [1] - 821:14
telephones [1] -
  821:15
ten [5] - 785:17, 834:2,
  846:7, 870:20,
  870:24
term [3] - 854:25,
  857:24, 910:23
terminated [1] -
  820:11
terms [4] - 850:12,
  854:23, 856:25,
  857:8
terrace [11] - 844:24,
  882:20, 882:21,
  884:14, 886:2,
  886:16, 886:24,
  887:13, 891:15,
  892:3, 892:23
terrorism [1] - 853:3
test [4] - 781:11,
  781:17, 781:23,
  783:23
tested [7] - 781:10,
  781:12, 782:15,
  783:9, 783:11,
  783:19, 783:23
testified [5] - 785:4,
  787:13, 810:14,
  840:1, 913:10
testifies [1] - 849:18
testify [2] - 849:15,
  851:6
testifying [1] - 834:1
testimony [18] -
  784:22, 784:23,
  786:3, 786:21,
  786:25, 787:15,
  820:22, 845:22,
  845:23, 847:11,
  847:16, 847:22,
  849:1, 849:8,
  849:23, 850:11,
  851:13, 914:19
testing [1] - 885:15
text [6] - 836:24,
  896:9, 896:20,
  899:6, 904:16,
  912:21
texting [1] - 896:19
thanking [1] - 872:15
THE [108] - 779:1,
  779:1, 779:10,
  781:2, 781:4, 781:7,
  782:3, 782:5, 782:7,

782:8, 782:10,
  782:12, 782:17,
  782:22, 783:13,
  783:17, 783:19,
  783:21, 783:24,
  784:3, 784:7,
  784:10, 784:11,
  784:15, 784:23,
  785:7, 786:2, 786:9,
  787:21, 788:1,
  788:19, 788:24,
  789:1, 789:10,
  789:12, 789:16,
  789:21, 789:22,
  789:24, 789:25,
  798:1, 810:16,
  817:18, 823:17,
  827:21, 836:2,
  845:21, 845:25,
  846:1, 846:2, 846:3,
  846:9, 846:22,
  846:25, 848:2,
  848:5, 848:11,
  848:16, 848:19,
  848:24, 849:5,
  849:18, 849:20,
  849:22, 850:1,
  850:10, 851:1,
  851:11, 851:15,
  851:24, 852:2,
  852:4, 852:7, 854:5,
  855:13, 856:8,
  866:3, 866:5,
  870:21, 871:10,
  877:13, 877:15,
  879:3, 879:23,
  880:1, 880:3,
  880:12, 884:23,
  887:3, 887:7, 896:8,
  902:4, 906:21,
  907:25, 908:6,
  909:14, 910:1,
  911:23, 911:24,
  914:18, 914:20,
  914:21, 915:1,
  915:6, 915:9,
  915:15, 915:18,
  916:4
the.. [1] - 873:19
themselves [1] - 903:4
therefore [1] - 847:3
thereof [3] - 855:1,
  855:3, 858:4
they've [2] - 782:14,
  908:22
Thomas [11] - 853:6,
  853:11, 854:16,
  856:15, 857:18,
  859:3, 868:22,
  874:12, 874:13,

874:20, 878:1
THOMAS [1] - 779:6
thoughts [1] - 866:10
threat [4] - 794:22,
  839:19, 911:11,
  911:16
threats [2] - 839:22,
  851:9
three [7] - 791:7,
  802:25, 803:3,
  868:19, 885:6,
  915:11, 915:12
throw [2] - 840:17,
  902:16
throwing [2] - 798:22,
  828:18
Thursday [1] - 779:4
timeline [2] - 895:21,
  912:3
timing [1] - 787:12
tip [3] - 858:17,
  858:20, 859:22
tips [1] - 862:3
tipster [2] - 858:16,
  858:24
tired [1] - 878:2
Title [4] - 854:24,
  856:25, 857:8,
  857:25
TJ [59] - 790:14, 791:3,
  791:19, 792:17,
  792:20, 792:25,
  793:7, 794:3,
  794:24, 795:3,
  796:20, 798:14,
  798:17, 799:3,
  800:2, 800:23,
  802:2, 802:17,
  802:19, 802:25,
  803:8, 803:14,
  807:5, 808:1,
  808:18, 809:9,
  810:5, 810:21,
  811:13, 811:16,
  813:19, 814:9,
  820:4, 820:7,
  820:24, 821:4,
  821:6, 821:22,
  822:10, 823:13,
  826:25, 827:3,
  829:15, 830:9,
  831:6, 832:1, 835:1,
  835:13, 835:21,
  836:21, 838:3,
  838:8, 838:20,
  840:7, 840:20,
  840:25, 841:19,
  843:10, 844:14
TJ's [3] - 794:14,
  800:2, 826:18

today [5] - 798:4,
  827:19, 915:24,
  916:5
together [1] - 827:14
toilet [1] - 907:4
tomorrow [3] - 915:25,
  916:2, 916:5
tone [2] - 810:25,
  811:1
took [8] - 783:22,
  815:22, 820:18,
  826:11, 832:16,
  873:1, 882:3, 900:2
top [3] - 800:17,
  800:22, 897:3
topics [1] - 853:21
touch [1] - 850:18
tour [2] - 805:5
touring [1] - 905:23
tours [2] - 805:10,
  906:1
touts [1] - 849:6
toward [1] - 842:10
towards [4] - 886:1,
  889:18, 889:21,
  892:3
town [3] - 785:4,
  785:15, 786:17
track [2] - 841:14,
  916:4
tragic [2] - 901:11,
  901:17
trained [8] - 798:2,
  838:5, 838:12,
  838:13, 842:24,
  878:10, 894:1
training [6] - 794:19,
  839:11, 839:13,
  849:7, 849:13,
  849:23
trait [7] - 786:10,
  786:15, 786:21,
  788:3, 847:2, 850:4,
  850:5
traits [2] - 848:2, 848:7
transcript [3] - 906:15,
  916:14, 916:15
TRANSCRIPT [1] -
  779:10
transport [1] - 912:10
transported [1] -
  912:7
travels [1] - 846:1
treated [2] - 817:15,
  905:1
trespass [6] - 813:13,
  813:16, 814:11,
  814:23, 815:8,
  827:18
trespassed [1] -

814:18
trial [4] - 785:3,
  785:16, 785:25,
  865:18
TRIAL [1] - 779:10
tried [2] - 789:6, 816:6
trouble [2] - 864:20,
  864:25
true [6] - 787:19,
  806:1, 844:10,
  894:17, 916:13,
  916:15
truly [1] - 881:3
Trump [2] - 793:1,
  793:3
trunk [2] - 791:24,
  861:11
truth [1] - 821:1
truthful [5] - 787:15,
  805:20, 906:19,
  906:25, 907:7
try [9] - 796:15,
  796:18, 796:20,
  797:20, 798:7,
  812:2, 815:25,
  915:20, 915:24
trying [23] - 793:24,
  796:10, 803:8,
  808:1, 811:16,
  813:8, 816:2, 816:6,
  816:12, 820:21,
  823:13, 823:19,
  826:25, 829:12,
  833:13, 833:17,
  841:12, 845:5,
  850:3, 892:21,
  894:3, 905:4, 905:6
turn [22] - 824:15,
  824:16, 824:18,
  824:19, 826:6,
  856:2, 858:11,
  873:22, 874:16,
  880:8, 884:16,
  885:4, 885:19,
  886:11, 887:18,
  888:6, 888:18,
  896:25, 899:16,
  900:6, 900:24, 903:9
turned [1] - 903:25
turning [4] - 791:2,
  813:8, 871:14, 884:6
turns [1] - 800:14
TV [1] - 791:15
two [12] - 788:12,
  793:5, 793:15,
  804:1, 811:1,
  815:13, 815:17,
  815:20, 822:9,
  822:16, 848:7,
  912:23

**type** [5] - 798:24, 800:6, 812:3, 812:6, 815:18
**types** [2] - 792:21, 850:11

## U

**U.S** [17] - 779:22, 844:22, 844:24, 854:20, 854:21, 856:21, 856:22, 857:3, 857:4, 857:22, 857:23, 858:7, 865:9, 870:6, 873:2, 879:17, 883:3
**ugly** [2] - 809:9, 809:10
**under** [11] - 789:23, 845:18, 855:5, 858:2, 867:4, 869:5, 908:16, 908:19, 908:20, 908:22
**understood** [16] - 792:25, 806:14, 813:23, 815:6, 815:20, 819:2, 819:12, 819:15, 823:8, 823:10, 823:19, 824:22, 845:5, 849:25, 851:22, 899:7
**UNISON** [1] - 781:3
**Unit** [1] - 844:22
**UNITED** [4] - 779:1, 779:3, 779:11, 779:14
**United** [24] - 779:13, 785:11, 854:14, 854:15, 854:24, 856:13, 856:14, 856:18, 856:20, 856:23, 856:24, 856:25, 857:6, 857:7, 857:8, 857:16, 857:17, 857:25, 858:3, 858:4, 858:6, 858:8, 858:9, 916:20
**Universal** [1] - 868:14
**unlawful** [2] - 815:11, 815:16
**unless** [4] - 781:21, 794:22, 833:3, 915:5
**unmasked** [2] - 783:4, 783:6, 783:14
**unpack** [1] - 820:6
**unusual** [3] - 791:9, 791:10, 791:17
**up** [61] - 795:22, 796:25, 798:20,

800:3, 800:11, 800:12, 802:5, 805:21, 808:7, 813:20, 818:24, 819:3, 821:21, 822:7, 828:1, 829:15, 829:18, 829:20, 830:7, 830:9, 832:8, 836:21, 840:15, 841:21, 842:9, 843:18, 843:22, 844:17, 858:16, 859:22, 863:21, 864:8, 864:14, 864:19, 865:3, 867:18, 868:5, 868:24, 875:16, 876:3, 880:22, 883:15, 883:16, 884:18, 885:25, 886:5, 888:19, 891:23, 892:2, 892:22, 893:1, 894:3, 897:1, 897:23, 900:7, 907:11, 907:13, 908:5, 908:6, 911:12, 911:14
**upbringing** [1] - 798:12
**uploaded** [1] - 826:12
**upper** [8] - 882:21, 884:14, 886:2, 886:16, 886:24, 887:13, 892:3, 892:22
**uprising** [1] - 877:4
**upset** [1] - 873:4
**USCP** [2] - 856:21, 857:5
**user** [1] - 882:8
**uses** [1] - 877:4
**UTC** [14] - 868:12, 868:13, 868:17, 869:13, 872:7, 875:5, 876:9, 877:24, 897:25, 898:12, 898:24, 899:23, 900:9, 901:3

## V

**vaguely** [1] - 822:14
**valid** [1] - 807:15
**value** [1] - 869:2
**verbal** [2] - 800:1, 811:15
**version** [2] - 873:18, 877:11
**via** [1] - 866:20

**vice** [1] - 807:14
**Vice** [2] - 858:8, 858:10
**video** [20] - 803:9, 808:11, 808:18, 810:5, 813:2, 832:7, 841:22, 842:4, 882:19, 882:22, 882:24, 883:17, 883:18, 885:10, 886:16, 886:24, 887:5, 894:19, 914:5
**Video** [1] - 799:17, 799:19, 801:10, 801:12, 802:7, 808:10, 808:23, 809:17, 809:19, 810:3, 830:1, 830:12, 831:11, 831:21, 832:20, 840:16, 841:14, 883:18, 883:22, 884:10, 885:22, 886:15, 886:21, 886:23, 887:11, 889:20, 891:24, 892:11
**videos** [1] - 834:2, 836:18, 836:19, 853:17, 862:2, 882:12, 883:13, 894:15
**violations** [1] - 848:20
**violence** [4] - 808:13, 808:15, 828:17, 840:9
**violent** [6] - 801:21, 801:23, 817:11, 817:13, 817:16, 877:5
**Virginia** [2] - 792:1, 794:12
**visible** [2] - 888:14, 891:7
**vision** [1] - 794:25
**vividly** [1] - 808:17
**voice** [2] - 801:17, 811:24
**voiced** [1] - 812:22
**voices** [1] - 811:21
**voicing** [1] - 812:25
**voir** [1] - 781:18
**vote** [1] - 807:19
**voted** [1] - 873:4
**Voting** [1] - 872:4
**voting** [1] - 872:15
**vs** [1] - 779:5

## W

**Wagner** [3] - 782:3, 850:3, 866:3
**WAGNER** [23] - 779:18, 782:4, 784:5, 786:5, 847:19, 848:4, 848:8, 848:12, 848:17, 848:22, 850:14, 851:22, 855:12, 856:7, 866:4, 871:9, 879:2, 880:2, 880:11, 884:22, 896:7, 915:13, 915:16
**waiting** [3] - 781:4, 781:7, 784:10
**walk** [1] - 912:3
**walking** [1] - 792:3, 792:6, 792:7, 795:8, 795:18, 804:5, 808:20, 809:2, 809:6, 811:7, 812:8, 827:5, 889:21, 910:25, 911:5, 914:12, 914:15
**wall** [2] - 887:13, 888:11
**warrant** [10] - 859:25, 860:4, 867:7, 878:18, 903:6, 903:14, 904:7, 904:8, 904:10, 904:20
**Washington** [7] - 779:15, 779:19, 779:23, 856:19, 857:2, 912:11, 916:22
**watched** [1] - 884:25
**water** [7] - 791:3, 801:15, 801:21, 842:6, 842:19, 842:23, 861:3
**wave** [1] - 872:3
**WAY** [1] - 869:23
**ways** [1] - 853:24
**we....not** [2] - 881:9, 881:14
**weapon** [5] - 797:7, 797:11, 838:3, 838:12, 839:8
**weapons** [9] - 794:3, 794:9, 794:13, 794:15, 794:25, 873:1, 907:18, 907:22, 908:3
**wearing** [1] - 859:7
**website** [2] - 881:23,

882:3
**week** [2] - 785:3, 813:7
**weeks** [1] - 814:5
**welcome** [1] - 852:4
**west** [11] - 844:24, 882:20, 882:21, 884:14, 886:2, 886:16, 886:24, 887:13, 891:15, 892:3, 892:22
**western** [1] - 865:9
**whatsoever** [1] - 825:18
**whole** [5] - 787:5, 792:7, 813:11, 823:11, 824:8
**wholly** [1] - 855:3
**WHOS** [1] - 874:14
**wide** [1] - 855:17
**wife** [1] - 898:15
**Wikipedia** [1] - 785:22
**Wilhoit** [2] - 915:2, 915:5
**willing** [4] - 786:12, 810:1, 814:3, 868:24
**willingly** [1] - 809:25
**win** [1] - 878:3
**window** [1] - 833:17
**windows** [1] - 829:1
**wing** [8] - 883:6, 883:11, 883:18, 888:12, 888:13, 889:1, 889:19, 890:16
**WITNESS** [7] - 780:2, 789:21, 789:24, 845:25, 846:2, 911:23, 914:20
**Witness** [4] - 796:2, 803:22, 810:22, 888:23
**witness** [15] - 784:20, 786:8, 787:9, 787:10, 787:13, 787:14, 787:17, 789:5, 810:13, 810:14, 823:16, 902:7, 909:17, 915:20
**witnessed** [2] - 791:11, 791:14
**witnesses** [10] - 786:4, 789:9, 847:16, 847:21, 850:8, 850:12, 850:21, 850:25, 851:6, 915:12
**Witt** [1] - 859:20
**wooden** [3] - 861:3, 862:14, 914:11

935

**word** [2] - 813:12, 913:17
**worded** [1] - 815:1
**words** [5] - 799:5, 821:22, 850:24, 869:2, 872:4
**world** [1] - 868:15
**worms** [1] - 787:5
**worn** [3] - 862:6, 891:4, 891:6
**written** [2] - 854:7, 868:7

## Y

**y'all** [1] - 869:24
**year's** [1] - 820:8
**years** [7] - 819:13, 835:6, 838:22, 852:20, 878:8, 903:1
**yelled** [1] - 789:6
**yelling** [1] - 827:5
**yellow** [4] - 862:23, 862:25, 863:4, 863:7
**yesterday** [9] - 789:5, 790:6, 796:7, 811:21, 812:16, 817:9, 821:16, 828:14, 840:1
**you'** [1] - 869:3
**yourself** [4] - 785:8, 801:4, 813:9, 824:19

## Z

**zero** [5] - 808:9, 808:22, 915:14, 915:15
**Zoom** [2] - 807:22, 807:23