UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 21-cr-00034 (CRC) |
| | : | |
| v. | : | |
| | : | |
| THOMAS ROBERTSON, | : | |
| | : | |
| Defendant. | : | |

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL

The Court should not disturb the jury's guilty verdict in this case. The defendant's post-trial Motion for Judgment of Acquittal on Counts One, Three, and Four (ECF 114) has no merit and should be denied.

## PROCEDURAL HISTORY

On April 11, 2022, after hearing three days of evidence, the jury convicted the defendant on all counts in a six-count indictment. The charges arose from the defendant's participation in the riot at the U.S. Capitol on January 6, 2021. The defendant now moves, pursuant to Fed. R. Crim. P. 29, to overturn the jury's verdict on three of those counts of conviction: Count One, obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); Count Three, entering or remaining in a restricted building or grounds while carrying a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A); and Count Four, disorderly or disruptive conduct in a restricted building or grounds while carrying a deadly or dangerous weapon, in violation of 18 U.S.C. §  1752(a)(2) & (b)(1)(A).

The defendant also orally moved under Rule 29 for a judgment of acquittal on all counts in the indictment at the close of the government's case in chief. The government opposed the motion. The Court reserved ruling on that motion, and it remains pending.

**LEGAL STANDARD**

Rule 29 permits the defendant the move for judgment of acquittal at the close of the government's case in chief or at the close of all evidence on the ground that the evidence presented is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court must consider the evidence "in the light most favorable to the government" to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) (citations omitted). Stated otherwise, "a judgment of acquittal is warranted 'only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt.'" *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) (quoting *United States v. Byfield*, 928 F.2d 1163, 1165 (D.C. Cir. 1991)). When considering a Rule 29 motion after a verdict, the Court "must view the evidence in the light most favorable to the verdict and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). Credibility determinations are for the jury, not for the judge when deciding a motion under Rule 29. *United States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) (courts should not "weigh the evidence or determine the credibility of witnesses").

A defendant's Rule 29 burden at the post-verdict stage is "very high," in part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). Indeed, the Court owes "tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). The defendant cannot surmount that demanding standard here.

2

## ARGUMENT

To set aside the jury's verdict under Rule 29, the defendant must convince this Court that no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.  Not one of the arguments advanced by the defendant comes close to meeting that burden.  To the contrary, the evidence readily supports the jury's guilty verdict on all three counts he has challenged.

## I.   Count One, Obstruction of an Official Proceeding

A rational jury could have found—as it did—that the defendant violated 18 U.S.C. § 1512(c)(2).  Here, the defendant does not seriously argue this point; rather, he unsuccessfully attempts to re-litigate the correctness of the Court's instructions to the jury.

### A.  There is sufficient evidence that the defendant violated Section 1512(c)(2)

To prove a violation of Section 1512(c)(2), the government had to prove beyond a reasonable doubt the following four elements:

First, the defendant attempted to or did obstruct or impede an official proceeding.

Second, the defendant acted with the intent to obstruct or impede the official proceeding.

Third, the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding.

Fourth, the defendant acted corruptly.

Final Jury Instructions (ECF No. 86), at 11-12.  The government can satisfy its burden on this count by proving (a) that the defendant obstructed an official proceeding, (b) attempted to obstruct an official proceeding, and/or (c) aided and abetted others to obstruct an official proceeding.  *Id.* at 11-14.

Ample evidence supported the jury's conclusion that the defendant's conduct met each of

these elements. As an initial matter, Congress's Joint Session on January 6, 2021, was an "official proceeding" as a matter of law. *Id.* at 12 ("As used in Count 1, the term 'official proceeding' means Congress's Joint Session to certify the Electoral College vote."); Opinion and Order, ECF No. 63 at 9 (Feb. 25, 2022) ("the certification of the Electoral College vote qualifies as an 'official proceeding,' specifically 'a proceeding before the Congress'"). The government also presented evidence that on January 6, 2021, that official proceeding was obstructed: the riot in which the defendant and others participated forced Vice President Mike Pence, Speaker of the House Nancy Pelosi, and senators and representatives to evacuate from the Senate and House chambers and thus could not proceed with the Joint Session for several hours. *See* Gov. Ex. 1002 (stipulation); Gov. Ex. 507 (video montage of proceedings); Trial Tr. 3/6/22 at 638-61 (testimony of Dan Schwager, counsel to the Secretary of the Senate); Trial Tr. 3/6/22 at 663-73 (testimony of Secret Service Agent Paul Wade).

The jury also heard substantial evidence that the defendant intended to stop the Certification proceeding. The defendant's own statements prior to January 6 show that he acted knowingly and with the intent to obstruct the Joint Session. In the time between the 2020 Presidential Election in November 2020 and January 6, 2021, the defendant believed the election results to be fraudulent, and he advocated on social media to overturn them. Gov. Ex. 100A, 100B, 100H, 100J (defendant's Facebook posts); Trial Tr. 4/7/22, at 688-91 (Fracker test.) (explaining that the defendant believed "[t]hat the election was rigged," that this bothered the defendant "very much," and that the defendant discussed these views). And after January 6, he again used social media to confirm that disrupting the proceeding was the intended consequence of his actions on January 6. Gov. Ex. 100C, 100D, 100E, 100F, 100G, 100S (Facebook posts).

There is also no question that the defendant acted corruptly.  As the Court explained in its Final Jury Instructions, to act "corruptly" for these purposes means acting with unlawful means or an unlawful purpose, as well as with consciousness of wrongdoing—"an awareness that what the person is doing is wrong." Jury Instructions, ECF 86, at 12.  That standard was satisfied in multiple ways.  First, the defendant's intent to use *violence* to stop the Certification proceeding shows that he acted with an unlawful purpose.  Indeed, the defendant anticipated violence on January 6 before even leaving home to travel to D.C.:  he packed a gas mask for himself, his co-defendant Jacob Fracker, and a third traveling companion, as well as military food rations, water, and a large wooden stick.  Trial Tr. 4/6/22, at 693 (Fracker test.).  The defendant had training on how to use that stick as a weapon; in connection with his work as a police sergeant in Rocky Mount, Virginia, the defendant had been trained and certified to use police batons.   Trial Tr. 4/5/22, at 459 (Ervin test.); Gov. Ex. 304B (personnel file records).  He also had combat experience in the U.S. military and many years of experience and training in law enforcement.  Trial Tr. 4/5/22, at 457-60 (Ervin test.); Gov. Ex. 304B.  In brief, the defendant's preparations to use violence to stop Congress from certifying the results of the 2020 Presidential Election demonstrated that he acted corruptly by acting with unlawful purpose.  *See United States v. Reffitt*, No. 21-cr-148, 2022 WL 1404247, at *4 (D.D.C. May 4, 2022) (Friedrich, J.) (defendant acted corruptly for purposes of Section 1512(c)(2) where he "acted with an unlawful purpose to physically overthrow Congress").

Second, the defendant acted with unlawful means and with consciousness of wrongdoing.  Corrupt intent is proven where a defendant obstructs "by engaging in other independently unlawful conduct." Jury Instructions, ECF 86, at 12-13.  At trial, the defendant conceded this point:  he did not contest that while at the Capitol on January 6, he was engaged in independently unlawful

conduct by entering and remaining in the restricted area of the Capitol without lawful authority to do so, and by engaging in disruptive and disorderly conduct while in the restricted area. Indeed, he urged the jury to find him guilty of the two misdemeanor offenses that criminalize this conduct—18 U.S.C. §§ 1752(a)(1) and 1752(a)(2)—which are lesser included offenses for Counts Three and Four. Trial Tr. 4/8/22, at 1041 (conceding guilt on lesser included offenses in defense closing). This concession, on its own, establishes that the defendant used unlawful means. It also establishes the defendant's consciousness of wrongdoing, as a conviction under § 1752(a)(1) requires, as an element of the offense, proof that the defendant act knowingly. Jury Instructions, ECF 86, at 19.

In addition, the defendant does not challenge the jury's finding that he impeded law enforcement during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). Mot., at 6 ("Mr. Robertson does not dispute that the prosecution presented evidence from which a rational jury could infer that he resisted or impeded the officers when they were coming through the crowd."). The evidence that supported this conviction established that while at the base of the steps on the West Front of the Capitol, which is within the restricted area of the Capitol grounds, the defendant used a large wooden stick to block Metropolitan Police Department (MPD) officers who were trying to assist Capitol Police officers in defending the Capitol against the encroaching mob. The elements of this crime required the jury to find that the defendant acted knowingly, with the intended purpose of interfering with officers engaged in the performance of their law enforcement duties during a civil disorder. This, too, provides a separate unlawful means and independent knowledge of wrongdoing that establishes the defendant's corrupt intent.

Further, the defendant's actions at the U.S. Capitol on January 6 proved he aided and

abetted others in obstructing the Joint Session of Congress.  *See Reffitt*, 2022 WL 1404247, at *4 (defendant acted corruptly when he "assisted and encouraged others to use unlawful means to breach the Capitol").  The evidence established that the defendant willingly joined in the riot from its inception, and that the purpose of the crowd was to overcome the police, break into the Capitol building, and stop the proceedings inside.  As Mr. Fracker testified, when he and the defendant first arrived at the Capitol plaza the scene was chaotic, and any trained police officer would recognize the situation to be volatile and dangerous.  Trial Tr. 4/6/22, at 699-702 (Fracker test.).  An angry crowd was growing, while a small group of vastly outnumbered law enforcement officers were struggling to hold the mob back from encroaching on the Capitol.  *Id*.  Pepper spray was in the air and flash bang devices were being deployed.  *Id*.  Rather than leaving the area or providing help to these officers, the defendant put on his gas mask and remained in the midst of the angry crowd.  *Id*. at 702-703, 713.

From that point on, the defendant's conduct served to advance the mob's progress toward the building.  While the defendant stood in the crowd near the base of the inaugural scaffolding on the Capitol's West Front, he was directly in front of MPD's Civil Disturbance Unit 42 (CDU-42) as it struggled to move through the crowd to the West Plaza.  With the defendant standing right in front of them, the crowd assaulted the CDU-42 officers, threw a smoke grenade at them, and tried to block their path forward.  Trial Tr. 4/6/22, at 592-97 (Duckett test.).  When the officers finally regrouped, resumed marching forward, and reached the defendant, he stood firmly in front of them, blocked their path, and raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away.  Trial Tr. 4/6/22, at 523 (Hackerman test.) ("It looks like he's brought the stick up and is pretty much at port arms."); *id*. at 534 ("I observe the

man with the gas mask and the blue backpack with the stick holding at what exactly appears to be port arms directly in front of my officer."); *id*. (Hackerman test.) (Q: "Is he blocking your path?" A: "Yes." Q: "Is he blocking that officer's path?" A: "Yes."); *id*. at 602 (Duckett test.) ("It's port arms, similar to how we hold ours."); *id*. at 590 (Duckett test.) ("So when we're coming in contact with a crowd that we know is going to be hostile, the way we're taught is to hold it in front and use it as a means of force to push them back."); *id*. at 705 (Fracker test.) (Q: "How is he holding his stick?" A: "I refer to it as port arms." Q: "What's port arms mean to you?" A: "Essentially you're holding—for the military it would be your rifle, or if you're doing baton stuff, you would hold it out in front of you as to kind of act as a blocking tool initially."). The officers had to physically move the defendant out of their way to get through. Trial Tr. 4/6/22, at 600-01 (Duckett test.). His stick struck two separate CDU-42 officers as they tried to move past him. Trial Tr. 4/6/22, at 599 (Duckett test.) The defendant did not assist the CDU officers at any point, nor did he assist any other officers while at the Capitol. Trial Tr. 4/6/22 at 530 (Hackerman test.); *id.* at 602 (Duckett test.); *id*. at 741-42 (Fracker test.).

While the defendant engaged with the CDU-42 officers at the base of the scaffolding, rioters inside the scaffolding clashed with the line of Capitol police officers holding back the crowd from advancing up toward the Capitol building itself. Tr. Test. 4/7/22, at 892 (Camiliere test.) (discussing Gov. Ex. 901). Within minutes, the crowd overwhelmed this police line and surged up the stairs toward the Upper West Terrace. *Id*. The defendant joined them in climbing up the stairs, putting himself in the midst of the first wave of rioters to advance to the Upper West Terrace. *Id*. at 892-93; Gov. Ex. 801 (comparing screenshots of different camera angles from this time frame). Mr. Fracker, who was with the defendant as they climbed these stairs, testified that it was

clear from being there that the crowd was united in trying to stop the proceedings inside.  Trial Tr. 4/7/22, at 800 (Fracker test.) (Q: "Was there some type of informal agreement that you all talked about?" A: "I think of it metaphorically . . .  So you're stopped at a red light in your souped-up race car, and somebody pulls up next to you, and he revs his engine.  You rev your engine.  Kind of like—just you understand, like, once this light turns green we're going to race.").  Indeed, this is the group that committed the first breach of the Capitol building that day, by breaking the windows next to the Senate Wing Door at 2:13 p.m.—a time at which the defendant stood nearby on the terrace outside, as rioters scaled the walls directly next to him.  Gov. Ex. 801 (comparing screenshots from different camera footage).  Despite having become separated from Mr. Fracker as they mounted the final set of stairs, the defendant entered the building with this first wave at 2:16 pm, while alarms blared around him, the windows around him were busted out, and broken glass and overturned furniture were visible on the floor.  *Id*.; Gov. Ex. 102 (CCTV footage); Gov. Ex. 102A (screenshots); Gov. Ex. 101C (Fracker cell phone video of area inside Senate wing door); Gov. Ex. 901 (video footage of Senate wing door with audio).

Once inside, the defendant proceeded to the Crypt, where he re-united with Mr. Fracker. Trial Tr. 4/6/22, at 728 (Fracker test.).  Together they were part of a crowd that overcome yet another police line that had formed in that room.  Trial Tr. 4/6/22, at 730-32 (Fracker test.); Gov. Ex. 406, Gov. Ex. 407.  As rioters chanted, the defendant showed his support by banging his stick in time on the ground, while Mr. Fracker clapped along.  Trial Tr. 4/6/22, at 736 (Fracker test.); Gov. Ex. 406.  After the crowd advanced further into the building, the defendant and Mr. Fracker remained in the Crypt taking selfie photographs.  Trial Tr. 4/6/22, at 732-35 (Fracker test.).  Mr. Fracker testified that at this point, after the crowd swept past the police officers in the Crypt, it did

not seem that they needed to do anything more themselves to achieve their goal of stopping the proceedings. Trial Tr. 4/7/22, at 830-31 (Fracker test.). The defendant and Mr. Fracker agreed to leave the building only after a group of U.S. Capitol police officers confronted them (who now, for the first time in the day, were outnumbered by enforcement) and ordered them to leave. Trial Tr. 4/6/22, at 736-42 (Fracker test.); Gov. Ex. 408; Gov. Ex. 403A.

Taking these facts together, in the light most favorable to the jury's verdict, the evidence amply supports the defendant's conviction on Count One. The defendant's preparations before arriving at the Capitol, everything he did at the West Front, starting with his confrontation of the CDU-42 officers at the base of the scaffolding and afterward, served his and the mob's goal of stopping the proceedings inside. The defendant put himself in midst of the first group of rioters who pushed up the stairs, overcame the Capitol Police officers' defenses on the West Front, and breached the Capitol building for the first time on January 6, 2021. Inside, he joined a crowd that pushed the police line further back through the Crypt, located at the very center of the building. The chaos this first wave of rioters kicked off inside the building led to the evacuation of the House and Senate chambers only minutes later, suspending their proceedings. The defendant's own role in this mob obstructed that proceeding under all three charged theories of liability.[1] The jury's verdict on Count 1 should stand.

---

[1] The defendant himself did not assault officers, steal or break items inside the Capitol, or enter the House or Senate chambers, nor was he charged with doing so. However, he was present in the first wave of rioters to overcome the final police line on the Upper West Terrace, break into the Senate Wing door, and flood into the building; once inside, he joined another large crowd in the Crypt that overcame another police line there. In so doing, the defendant's participation in these crowds aided and abetted the other rioters around him who did commit acts of violence and property damage—additional unlawful means that independently establish corrupt intent. *See* Gov. Tr. Ex. 404 (CCTV montage); 406 & 406A (Crypt CCTV and screenshots); 407 & 407A (Crypt CCTV and screenshots); 411 (screenshots of defendant ascending the West Front stairs); 801 (screenshots showing the front of the crowd and the defendant); 901 (video with audio showing West Front stairs, Upper West Terrace, and Senate Wing Door).

**B.  The Court's instructions to the jury were correct**

In seeking a judgment of acquittal, the defendant proposes a set of jury instructions that are wrong as a matter of law and that no court has adopted.[2]  Element two of this new proposal would require the government to prove that the defendant "impair[ed] the integrity and availability of non-object information."   And element three would require obstruction with the "due administration of justice, that is, the defendant acted knowingly and dishonestly with the intent to obtain an unlawful advantage for himself or an associate, and that he influenced another to violate their legal duty."  Neither is supported.

> 1.  There is no requirement that "the integrity and availability of non-object information" be impaired.

Title 15, United States Code, Section 1512(c)(2) does not require proof that the "integrity and availability of non-object information" be impaired; there is no basis for this extratextual limitation in the statute.  *See United States v. Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006, at *8 (D.D.C. Dec. 10, 2021) (rejecting "defendants' narrow construction of subsection (c)(2), which would limit its scope to acts affecting evidence"); *see also id.* at *4 (noting that a court should "ordinarily resist reading words or elements into a statute that do not appear on its face") (quoting

---

[2] The defendant's proposed instruction, which is different from the jury instruction he proposed for Count One (ECF 76, at 6) is on page 7-8 of his motion:

1) that the defendant acted knowingly;

2) that the defendant obstructed, influenced, or impeded, or attempted to obstruct, influence or impede an official proceeding by impairing the integrity and availability of non-object information to be used in the official proceeding;

3) that the defendant acted corruptly to obstruct, influence, or impede the due administration of justice, that is, the defendant acted knowingly and dishonestly with the intent to obtain an unlawful advantage for himself or an associate, and that he influenced another to violate their legal duty; and

4) that the defendant's alleged actions had a relationship in time, causation, or logic with the proceeding such that it was foreseeable that defendant's conduct would interfere with the proceeding. In other words, the government must prove to you beyond a reasonable doubt that obstruction of an official proceeding was the natural and probable outcome of defendant's conduct.

*Bates v. United States*, 522 U.S. 23, 29 (1997)).  The defendant's exact argument was recently rejected by Judge Friedrich, in *United States v. Reffitt*, where it was advanced by the defense in a post-conviction motion nearly identical to the instant motion.  2022 WL 1404247 (D.D.C. May 4, 2022).  No court appears to have instructed a jury in this manner.  Indeed, while the defendant cites *United States v. Ahrensfield*, 698 F.3d 1310, 1324 n.8 (10th Cir. 2012), in that case there was no such limitation in the jury instructions that the obstruction relate to some type of information, whether "non-object," documentary, or otherwise.[3]

In addition, the defendant's proposal is *not* the one recently endorsed by Judge Nichols in *United States v. Miller*, No. 21-cr-119 (CJN), 2022 WL 823070, at *15 (D.D.C. Mar. 7, 2022), which held that the defendant must "take some action with respect to a document, record, or other object" to corruptly obstruct an official proceeding.  (Notably, the conviction in *Ahrensfield*, which was premised on a law enforcement officer disclosing the existence of an undercover investigation to the target of that investigation, would not survive the "document, record, or other object" requirement imposed by Judge Nichols's decision in *Miller*.)  And while the defendant relies on Judge Nichols's decision in *Miller*, that decision is unpersuasive and out of step with the great weight of authority,[4] including this Court's own evaluation of this issue in this case.  Opinion and Order, ECF 63, at 11 (Feb. 25, 2022) (defining corruptly broadly to mean "acting with consciousness of wrongdoing"); *see also United States v. McHugh*, No. 21-cr-453, 2022 WL

---

[3] The defendant's citation to *United States v. Ermoian*, 752 F.3d 1165, 1171-72 (9th Cir. 2013) is wholly inapposite, as that case addresses the definition of an official proceeding under § 1512, and does not speak at all to the additional element that the defendant proposes here concerning the impairment of the "integrity and availability of non-object information."

[4] On April 1, 2022, the government asked Judge Nichols to reconsider his decision; that motion is attached here as Exhibit 1 and the government incorporates those arguments.  The briefing schedule for the motion for reconsideration in that case is ongoing.

1302880, at *2-13 (D.D.C. May 2, 2022) (Bates, J.) (describing disagreement with *Miller*).

Judge Nichols's decision in *Miller* also did not grapple with the unanimous legal analyses of seven other judges of this Court that subsection (c)(2) is not limited by subsection (c)(1).[5]  In *United States v. Caldwell*, 21-cr-28, 2021 WL 6062718 (D.D.C. Dec. 20, 2021), Judge Mehta concluded that Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or availability of evidence in a proceeding." *Id.* at *11.  In *Sandlin*, Judge Friedrich found that Section 1512(c)(2) "is not limited to acts affecting evidence."  2021 WL 5865006, at *5; *id*. at *7 "obstructing, influencing, or impeding an official proceeding naturally come in numerous forms, including both evidence impairment and the halting of the proceeding altogether").  In *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021), Judge Boasberg's brief analysis endorsed *Sandlin* and *Caldwell*.  In *United States v. Nordean*, 21-cr-175, 2021 WL 6134595 (D.D.C. Dec. 28, 2021), Judge Kelly reasoned that an interpretation of Section 1512(c)(2) limiting it to "impairment of evidence" could not "be squared with" Section 1512(c)(2)'s "statutory text or structure." *Id.* at *6.  Judge Bates followed suit in *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022), and so did Judge Kollar-Kotelly in *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022).  Moreover, in *United States v. Puma*, 21-cr-454, 2022 WL 823079, at *13 (D.D.C. Mar. 19, 2022), Judge Friedman explicitly disagreed with Judge Nichols's decision in *Miller*, instead endorsing Judge Friedrich's conclusion in *Sandlin* that "Section 1512(c)'s structure [ ] does not support narrowly construing subsection (c)(2)'s otherwise expansive plain text." *Id.* at *13 (quoting *Sandlin*, 2021 WL 5865006, at *6) (alteration

---

[5] In *Miller*, Judge Nichols did cite *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591, at *10-*18 (D.D.C. Dec. 28, 2021), in which Judge Moss reached the same conclusion as these other seven judges, following an extended discussion of Section 1512(c)'s text, structure, and legislative history.

in *Puma*).

As explained in the government's motion to reconsider in *Miller*, Judge Nichols's decision is based primarily on erroneously applying the "rule of lenity." Judge Friedman explained why Judge Nichols is wrong on this point, *see Puma*, 2022 WL 823079, at *12, and in *Sandlin* and *Reffitt* Judge Friedrich explicitly rejected the application of the rule of lenity, *see Sandlin*, 2021 WL 5865006, at *10 (holding that "the rule of lenity does not apply" because Section 1512(c)(2) is "unambiguous"); *Reffitt* 2022 WL 1404247, at *10. ("Finally, contrary to *Miller's* conclusion, the rule of lenity does not apply here."). It is well-settled that "a Court must first exhaust all the tools of statutory interpretation and determine the best reading of the statute before the rule of lenity comes into play and only then when the Court has identified a grievous ambiguity." *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring). Indeed, "because a court must exhaust all the tools of statutory interpretation before resorting to the rule of lenity, and because a court that does so often determines the best reading of the statute, the rule of lenity rarely if ever comes into play." *Wooden*, 142 S. Ct. at 1075 (Kavanaugh, J., concurring). Contrary to Judge Nichols's approach of "resolv[ing] ambiguities in favor of the defendant," *see Miller*, 2022 WL 823070, at *15 (internal citation and quotation marks omitted), the rule of lenity is *not* an "overriding consideration of being lenient to wrongdoers." *Wooden*, 142 S. Ct. at 1075 (Kavanaugh, J., concurring); *see Reffitt*, 2022 WL 1404247, at * 10 (rejecting application of the rule of lenity to § 1512(c)(2) for these same reasons); *McHugh*, 2022 WL 1302880, at *12 (same).

As Judge Friedrich further explained in *Sandlin,* while Section 1512(c)(1) prohibits the corrupt destruction or alteration of documents, records, and other objects in connection with an official proceeding, Section 1512(c)(2) "prohibits obstruction by means *other than* document

destruction." 2021 WL 5865006, at *6; *see Reffitt* 2022 WL 1404247, at * 7. (reaching the same conclusion post- *Miller*). That conclusion follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself, *Montgomery*, 2021 WL 6134591, at *12 (quoting *Texas Dep't of Hous. & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015)).

The authority the defendant cites simply does not support finding the impairment of "non-object information" to be a required element of Count 1. Rather, the plain text, properly applied principles of statutory construction, and numerous recent decisions by other judges within this District support the jury instruction that the Court used at trial. The defendant's motion should be denied.

2. A Section 1512(c)(2) offense does not require obstruction of the "due administration of justice," the transitive use of "corruptly," or that the defendant act "dishonestly" or with "an intent to gain an advantage for oneself or another"

The weight of authority does not support the defendant's contention that the "due administration of justice" is an element of a § 1512(c)(2) offense. This Court already ruled this is not a requirement for obstruction of a congressional proceeding. Opinion and Order, ECF 63, at 8 ("Other provisions show also show that a congressional proceeding need not be adjudicatory. For instance, 18 U.S.C. § 1503 targets obstruction of the 'due administration of justice,' indicating a requirement for more 'court-like' proceedings . . . Section 1512(c)(2), however, 'targets proceedings more broadly.'" (citing *Sandlin*, 2021 WL 5865006, at *4)). This decision is in line

with the others that have addressed this specific argument, including *Sandlin*, *Caldwell*, 2021 WL

6062718, at *5 and *Reffitt*, 2022 WL 1404247, at *6-7, in which Judge Friedrich most recently

rejected this argument in the context of a motion nearly identical to the defendant's here.

The defendant's motion provides no basis for this Court to reverse its own prior decision.

Though the defendant's motion relies on *Miller*, that decision did not adopt the defendant's

proposed "due administration of justice" argument.   While the phrase "due administration of

justice" did appear in the jury instruction in *Ahrensfield*, (a) the phrase made sense in that that case

because the official proceeding in question was a grand jury investigation rather than a proceeding

before the Congress, and (b) the Tenth Circuit expressly disclaimed any reliance on the propriety

of the district court's jury instructions.   *See* 698 F.3d at 1324 n.8 (noting that the court did "not

have occasion to review the correctness of this instruction" for Section 1512(c)(2)).

The defendant's motion also provides no basis for reading into § 1512(c)(2) a requirement

that the defendant must corruptly influence *another* person to act with the requisite intent, or that

"corruptly" requires "an intent to gain an advantage for oneself or another" or "dishonesty."

Rather, these arguments have been rejected in the cases where they have been advanced, and in

*Reffitt* Judge Friedrich rejected all of them.   Under § 1512(c)(2), a defendant need not have

corruptly influenced another person because the statute uses the word corruptly "in the intransitive,

such that the defendant's own behavior must be corrupt."   *Reffitt*, 2022 WL 1404247, at *6 (citing

*Caldwell*, 2021 WL 6062718, at *10).   This comports with the jury instruction given by the Court

in *Reffitt*, which the Court adopted here.   ECF No. 86 at 11. And, given that instruction, additional

requirements of "dishonesty" or "an intent to gain an advantage" also are not required.   As *Reffitt*

recognized, some courts have used those terms, where factually appropriate, to "guard against

16

potential overbreadth, vagueness, and First Amendment concerns." *Id.* at *7. Where, however, those terms are not factually applicable, and the Court's definition of "corruptly" separately guards against those concerns, those terms become unnecessary. *Id.* at *6-7. The jury instruction defining "corruptly" in both *Reffitt* and in this case—requiring either an unlawful purpose or an unlawful means, as well as consciousness of wrongdoing—does exactly this. *Id.*; Jury Instructions, ECF No. 86, at 12. Thus, these additional terms simply were not necessary to include in the jury instruction here.

## II.   Counts Three and Four:  Unlawful Conduct in a Restricted Building or Grounds While Carrying a Deadly or Dangerous Weapon

Counts Three and Four charge the defendant with two felonies for particular conduct in a restricted area of the U.S. Capitol Building or grounds while carrying a deadly or dangerous weapon—specifically, a large wooden stick.[6] Both of these crimes have lesser included offenses that are misdemeanors—engaging in the same prohibited conduct in the restricted area *without* carrying a deadly or dangerous weapon—which the defendant conceded at trial. Trial Tr. 4/8/22, at 1041 (conceding guilt on lesser included offenses in defense closing). The defendant now challenges his convictions on the felony counts, arguing there was insufficient evidence to support a jury finding that the defendant "used [the stick] in a deadly or dangerous way." Mot. for Judgment of Acquittal, at 6. This argument is meritless.

The statute at issue, 18 U.S.C. § 1752(b)(1)(A), enhances into a felony any violation of § 1752(a) in which the defendant "during and in relation to the offense, uses or carries a deadly or

---

[6] Specifically, Count Three charges the defendant with entering or remaining in a restricted building or grounds with a weapon, in violation of 18 U.S.C. § 1752(a)(1) & (b)(1)(A), and Count Four charges the defendant with disruptive or disorderly conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) & (b)(1)(A).

dangerous weapon." Counts Three and Four charged the defendant with carrying a dangerous weapon (the stick) but not with using it. Second Superseding Indictment, ECF 74, at 2. The Court instructed the jury that for these purposes, "[a]n object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant intends that it be used it in that manner." Final Jury Instructions, ECF 86, at 21. In response to a jury note concerning this definition, following briefing from the parties, the Court further instructed:

> In order for you to find that the stick is a deadly or dangerous weapon, you must find that (1) it is capable of causing serious bodily injury, and (2) the defendant carried it with the intent to use it in a manner capable of causing serious injury. The defendant need not have actually used the stick in that manner.

Court's Response to Jury Note, ECF 93; *see* ECF 88 (government argument in support of instruction similar to the one given by the Court).

Sufficient evidence supported the defendant's conviction for carrying the stick as a deadly or dangerous weapon. For one thing, there can be no serious dispute—and the defendant does not argue otherwise—that the large wooden stick was capable of inflicting serious bodily injury. Additionally, evidence allowed the jury to conclude, as it did, that the defendant formed the intent at some point during the events on the afternoon of January 6 to use it to inflict such injury. As discussed in part I.A. above, the defendant had years of military and law enforcement training, including specific training on using batons. *See also* Trial Tr. 4/15/22, at 459 (Ervin test.). Body worn camera (BWC) footage showed him raising the stick off up off the ground into a "port arms" position as CDU-42 officers approached him. Trial Tr. 4/6/22, at 523 (Hackerman test.) ("It looks like he's brought the stick up and is pretty much at port arms."). The defendant then stood directly in front of the officers, blocking their path, as he held the stick in this position. Testimony from

multiple witnesses established that the "port arms" position allows the user to employ a weapon (like the stick) to push anyone who approaches, and the CDU-42 officers' BWC footage showed the stick striking two officers as they moved past the defendant.  Gov. Ex. 200, 201, and 202. Testimony from law enforcement officers present at the Capitol also established that the members of the crowd were wielding all manner of everyday objects as weapons, including sticks and flagpoles, and that these items created serious safety concerns for the officers.  Trial Tr. 4/5/22, at 392-93 (Ortega test.); Trial Tr. 4/6/22, at 582 (Duckett test.)  Government exhibits, including CCTV footage, exhibit number 901, and related screenshots, showed that the defendant kept the stick on his person throughout the time that he joined the crowd inside the scaffolding, stormed up the stairs to the Upper West Terrace, and into the Capitol building itself.  This evidence was sufficient to establish that in the defendant's trained hands, the stick constituted a dangerous weapon, and that he carried the stick at the Capitol with that intent.

The defendant's claim (Mot. at 6) that no evidence demonstrated that the defendant "used" the stick "in a deadly or dangerous way" is beside the point.  Section 1752 provides for an enhanced ten-year statutory maximum where a defendant "uses or *carries* a deadly or dangerous weapon." 18 U.S.C. § 1752(b)(1)(A) (emphasis added).  The defendant cites *United States v. Arrington*, 309 F.3d 40 (D.C. Cir. 2002), but *Arrington* interpreted the "deadly or dangerous weapon" element in 18 U.S.C. § 111, which requires that a defendant "use[]" the object in question as a weapon.  *See* 390 F.3d at 45; 18 U.S.C. § 111(b) (making it crime for whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a federal officer and "uses a deadly or dangerous weapon").  Here, the indictment charged the defendant only with carrying, not using, the wooden stick as a dangerous or deadly weapon.  It follows that the jury was not required to find that he

used it in manner capable of causing serious bodily injury.

Evidence also supported the jury's decision to reject the defendant's contention that the stick was merely a walking stick.  For example, several witnesses who knew the defendant, including the former Rocky Mount town supervisor and a local FBI agent who had worked with the defendant, testified that the defendant did not have any physical impairments and did not use a walking stick.  Trial Tr. 4/5/22, at 452 (Ervin test.) (Q: "Have you ever known the defendant to use a walking stick or cane." A: "No, ma'am."); Trial Tr. 4/6/22, at 551 (Witt test.) (Q. "Have you ever seen him use a walking stick?" A: "I have not.").  In rebuttal, the government also introduced a text message the defendant wrote a short time after January 6, in which he asserted that he was in peak physical condition, could run two miles in 16 minutes while carrying a weighted pack, and that "I'm as dangerous as I'll ever be."  Trial Tr. 4/17/22, at 951-52; Gov. Ex. 3000.  This evidence, with all inferences favoring the government, further supports the jury's verdict.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the defendant's Motion for Judgment of Acquittal on Counts One, Three, and Four should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: _/s/ Risa Berkower_____
Elizabeth Aloi
Assistant United States Attorney
NY Bar No. 4457651
Risa Berkower
Assistant United States Attorney
NY Bar No. 4536538
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Phone: 202-695-0610 (Aloi)
          202-803-1576 (Berkower)
Email: elizabeth.aloi@usdoj.gov
          risa.berkower@usdoj.gov