## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** : | | |
| | : | **Case No: 21-cr-34 (CRC)** |
| **v.** | : | |
| | : | |
| **THOMAS ROBERTSON,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' SENTENCING MEMORANDUM

Thomas Robertson, a police sergeant for the town of Rocky Mount, Virginia, joined the mob which attacked the U.S. Capitol to disrupt the peaceful transition of power on January 6, 2021, and used his law enforcement training to block Metropolitan Police Officers attempting to hold back the mob. For his efforts to impede law enforcement, overturn the election results, and destroy the evidence, this Court should sentence defendant Robertson to a United States Sentencing Guidelines sentence of 96 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

### I.       FACTUAL BACKGROUND

#### a.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, the defendant among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.

A joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. PSR ¶¶ 27.

2

**b. Injuries and Property Damage Caused by the January 6, 2021, Attack**

"[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy."
*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Rioters physically injured more
than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland
Security and Governmental Affairs and on Rules and Administration Report, Examining the
Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7,
2021), at 29, *available at*

https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol
Attack.pdf (describing officer injuries). The rioters also inflicted significant emotional injuries on
law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also*
Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives
Committee on House Administration (May 19, 2021), *available at*
https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-
19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6,
2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.
Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included
wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and
photography equipment, broken furniture, damaged artwork, including statues and murals, historic
lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol
Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott,
Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,
2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### c. The Defendant's Role in the January 6, 2021, Attack on the U.S. Capitol

The evidence at trial showed that defendant, a sworn police sergeant with the Rocky Mount, Virginia, Police Department (RMPD) and an Army veteran, believed the 2020 presidential election was fraudulent and became determined to overturn the results.  In the weeks and months leading up to January 6, 2021, the defendant advocated on social media for the use of violence to overturn the election results, including by starting a "counter-insurgency" and through "open armed rebellion."  *See, e.g.,* Gov. Ex. 100A, 100B, 100H, 100J (defendant's Facebook posts); Trial Tr. 4/7/22, at 688-91 (Fracker test.) (explaining that the defendant believed "[t]hat the election was rigged," that this bothered the defendant "very much," and that the defendant discussed these views).

On January 6, 2021, the defendant traveled from the Rocky Mount, Virginia area to Washington, D.C. with co-defendant Jacob Fracker and his neighbor.[1]  He anticipated violence on January 6 before even leaving home to travel to D.C.:  he packed a gas mask for himself, Fracker (who later became a cooperating government witness and testified at trial), and his neighbor, as well as military food rations, water, and a large wooden stick.  Trial Tr. 4/6/22, at 693 (Fracker test.).  The defendant had training on how to use that stick as a weapon; in connection with his work as a police sergeant in Rocky Mount, Virginia, the defendant had been trained and certified to use police batons.   Trial Tr. 4/5/22, at 459 (Ervin test.); Gov. Ex. 304B (personnel file records).

---

[1] The neighbor has not been charged in connection with his participation in the attack.

He also had combat experience in the U.S. military and many years of experience and training in law enforcement.  Trial Tr. 4/5/22, at 457-60 (Ervin test.); Gov. Ex. 304B.

After attending the "Stop the Steal" rally on the National Mall, the three men walked to the West Front of the Capitol, joining the growing crowd of rioters gathering there. As Fracker testified, when he and the defendant first arrived at the Capitol plaza the scene was chaotic, and any trained police officer would recognize the situation to be volatile and dangerous.  Trial Tr. 4/6/22, at 699-702 (Fracker test.). An angry crowd was growing, while a small group of vastly outnumbered law enforcement officers were struggling to hold the mob back from encroaching on the Capitol.  *Id.*  Pepper spray was in the air and flash bang devices were being deployed.  *Id.*  Rather than leaving the area or providing help to these officers, the defendant put on his gas mask and increased the ranks of the angry crowd.  *Id.* at 702-703, 713.

From that point on, the defendant's conduct served only to advance the mob's progress toward the building.  While the defendant stood in the crowd near the base of the inaugural scaffolding on the Capitol's West Front, he was directly in front of MPD's Civil Disturbance Unit 42 (CDU-42) as it struggled to move through the crowd to the West Plaza, where the unit planned to reinforce the Capitol Police line.  With the defendant standing right in front of them, the crowd assaulted the CDU-42 officers, threw a smoke grenade at them, and tried to block their path forward.  Trial Tr. 4/6/22, at 592-97 (Duckett test.).  When the officers finally regrouped, resumed marching forward, and reached the defendant, he stood firmly in front of them, blocked their path, and raised up his wooden stick in "port arms," a tactical position used by the military and law enforcement to push others away.  Trial Tr. 4/6/22, at 523 (Hackerman test.) ("It looks like he's brought the stick up and is pretty much at port arms."); *id.* at 534 ("I observe the man with the gas mask and the blue backpack with the stick holding at what exactly appears to be port arms directly

in front of my officer."); *id*. (Hackerman test.) (Q: "Is he blocking your path?" A: "Yes."   Q: "Is he blocking that officer's path?"   A: "Yes."); *id*. at 602 (Duckett test.) ("It's port arms, similar to how we hold ours."); *id*. at 590 (Duckett test.) ("So when we're coming in contact with a crowd that we know is going to be hostile, the way we're taught is to hold it in front and use it as a means of force to push them back."); *id*. at 705 (Fracker test.) (Q: "How is he holding his stick?" A: "I refer to it as port arms."   Q: "What's port arms mean to you?" A: "Essentially you're holding— for the military it would be your rifle, or if you're doing baton stuff, you would hold it out in front of you as to kind of act as a blocking tool initially.").   The officers had to physically move the defendant out of their way to get through.   Trial Tr. 4/6/22, at 600-01 (Duckett test.).   His stick struck two separate CDU-42 officers as they tried to move past him.   Trial Tr. 4/6/22, at 599 (Duckett test.).   The defendant's port arms posture, shortly before making conduct with the officers can be seen here in Government's Exhibit 201D:



As this menacing crowd blocked CDU-42's path to the West Plaza, the vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were

locked or otherwise secured, but not for long. While the defendant engaged with the CDU-42 officers at the base of the scaffolding, rioters inside the scaffolding clashed with the line of Capitol police officers holding back the crowd from advancing up toward the Capitol building itself.  Tr. Test. 4/7/22, at 892 (Camiliere test.) (discussing Gov. Ex. 901).  Within minutes, the crowd overwhelmed this police line and surged up the stairs toward the Upper West Terrace.  *Id*.  The defendant joined them in climbing up the stairs, putting himself amid the first wave of rioters to advance to the Upper West Terrace.  *Id*. at 892-93; Gov. Ex. 801 (comparing screenshots of different camera angles from this time frame).  Fracker, who was with the defendant as they climbed these stairs, advancing toward the Capitol building, testified that it was clear from being there that the crowd was united in trying to stop the proceedings inside.  Trial Tr. 4/7/22, at 800 (Fracker test.) (Q: "Was there some type of informal agreement that you all talked about?" A: "I think of it metaphorically . . .  So you're stopped at a red light in your souped-up race car, and somebody pulls up next to you, and he revs his engine.  You rev your engine.   Kind of like—just you understand, like, once this light turns green we're going to race.").  Indeed, this is the group that committed the first breach of the Capitol building that day, by breaking the windows next to the Senate Wing Door at 2:13 p.m.—a time at which the defendant stood nearby on the terrace outside, as rioters scaled the walls directly next to him.  Gov. Ex. 801 (comparing screenshots from different camera footage).

Despite having become separated from Fracker as they mounted the final set of stairs to the Upper West Terrace, the defendant entered the building with this first wave at 2:16 pm, while alarms blared around him, the windows around him were busted out, and broken glass and overturned furniture were visible on the floor.  *Id*.; Gov. Ex. 102 (CCTV footage); Gov. Ex. 102A

(screenshots); Gov. Ex. 101C (Fracker cell phone video of area inside Senate wing door); Gov.

Ex. 901 (video footage of Senate wing door with audio).

Once inside, the defendant traveled with other rioters into the Capitol's Crypt, which is

directly underneath the Rotunda at the center of the building.  There he reunited with Fracker,

from whom he had gotten separated minutes before near the top of the northwest stairs.  The

two men then joined a crowd that overcame yet another police line that had formed in the Crypt,

in an attempt to prevent rioters from penetrating further into the building.   Trial Tr. 4/6/22, at

730-32 (Fracker test.); Gov. Ex. 406, Gov. Ex. 407.  As rioters chanted, the defendant showed

his support by banging his stick in time on the ground, while Fracker clapped along.  Trial Tr.

4/6/22, at 736 (Fracker test.); Gov. Ex. 406.  After the crowd advanced further into the building,

the defendant and Fracker remained in the Crypt taking selfie photographs.  Trial Tr. 4/6/22, at

732-35 (Fracker test.).  Fracker testified that at this point, after the crowd swept past the police

officers in the Crypt, it did not seem that they needed to do anything more themselves to achieve

their goal of stopping the Congressional proceeding.  Trial Tr. 4/7/22, at 830-31 (Fracker test.).

The defendant and Fracker agreed to leave the building only after a group of U.S. Capitol police

officers confronted them and ordered them to leave. Trial Tr. 4/6/22, at 736-42 (Fracker test.);

Gov. Ex. 408; Gov. Ex. 403A.  Outnumbered by officers for the first time that day, the defendant

and Fracker followed the directive and left.  They left Washington, D.C. to return home a short

time later.

In the days following the riot, the defendant bragged about his conduct on social media.

For example, after the selfie picture from the Crypt (taken shortly after the crowd overwhelmed

police in that room) circulated online, he posted to Facebook, "Here's the picture in question

and I am fucking PROUD of it. It shows 2 men willing to actually put skin in the game and stand

up for their rights. If you are too much of a coward to risk arrest, being fired, and actual gunfire to secure your rights, you have no words to speak I value. Enjoy your feel good protests and fame. I'll simply accept a 'Thank you' for the very blanket of freedom that you live and sleep under." Gov. Ex. 100D.  Describing the events of January 6, he wrote that the next American revolution had begun on January 6, 2021, and that people should just "buckle up or stay home." Trial Tr. 4/7/22 at 875   And after January 6, he again used social media to confirm that disrupting the proceeding was the intended consequence of his actions on January 6.  Gov. Ex. 100C, 100D, 100E, 100F, 100G, 100S (Facebook posts).

On January 11, 2021, however, he was notified by the FBI that a warrant had issued for his arrest.  He agreed to self-surrender later that day.  Before he did so, he collected his and Fracker's cell phones—the phones they had been using on January 6, 2021—and destroyed them.  In text messages to a friend several days later, he admitted that "everything problematic has been destroyed, including my old phone." Gov. Ex. 314A.  That phone, the defendant wrote, "took a lake swim" and "had a tragic boating accident."  *Id.*

Relevant to sentencing, the defendant recruited Fracker to join him and a third man, his neighbor, on the trip to DC.  At the time, Fracker was also a police officer at RMPD, and the defendant was his commanding sergeant.  They were professionally and personally close; Fracker, who is nearly 20 years younger than the defendant, routinely called the defendant "dad." For January 6, the defendant invited Fracker to join him, made the travel arrangements, supplied gas masks, water, and military food rations for all three men, drove Fracker and the third man up to D.C., and purchased and provided them all with Metrorail cards for the day.  The defendant and Fracker were side by side for nearly the entire day and ascended the stairs on the West Front together.  They were briefly separated at the top of the stairs, and therefore entered the Capitol

9

building several minutes apart, but as noted above they reunited inside the Crypt and joined the crowd that swept officers further back into the Capitol building.  Despite both being police officers themselves, they did not assist other officers in any way while inside, and they only left when a group of officers confronted them in the then- nearly empty Crypt and ordered them to do so.

The defendant's preparations before arriving at the Capitol, everything he did at the West Front, starting with his confrontation of the CDU-42 officers at the base of the scaffolding and afterward, served his and the mob's goal of stopping the proceeding inside.  The defendant put himself in midst of the first group of rioters who pushed up the stairs, overcame the Capitol Police officers' defenses on the West Front, and breached the Capitol building for the first time on January 6, 2021.  Inside, he joined a crowd that pushed the police line further back through the Crypt, located at the very center of the building.  The chaos this first wave of rioters kicked off inside the building led to the evacuation of the House and Senate chambers only minutes later, suspending their proceedings.

### d. The Defendant's Additional Firearms Offenses

Not only did the defendant participate in the January 6, 2021, insurrection and subsequently cover-up his criminal conduct by destroying evidence, but after he was arrested, he trafficked in firearms in direct violation of this Court's orders. As detailed at length in the briefing on the Government's motion to revoke the defendant's conditions of release, ECF Nos. 30, 32 and 34, on June 29, 2021, following a lawfully authorized search of the defendant's residence, law enforcement discovered that the defendant violated his release conditions by possessing a loaded M4 rifle and a partially-assembled pipe bomb at his home, and by purchasing an arsenal of 34

firearms online and transporting them in interstate commerce while under felony indictment, in violation of 18 U.S.C. § 922(n).

Review of additional records further corroborates the defendant's participation in these firearms offenses. *See* Sentencing Ex. A with attachments A-1 to A-3 (FBI FD-302 discussing the defendant's sentencing submissions).   For example, in a recorded conversation between the defendant and Dennis Deacon on September 13, 2021, the defendant makes clear the control he exercised over his firearms during his pretrial release by stating, "[w]e've got a key to go in and get them anytime we want to. [Pat's] got a basement apartment and stuff and Pat doesn't give a rat's ass." *See* Sentencing Ex. A at 4-5. The Pat to whom the defendant refers is his neighbor who accompanied him to the Capitol, and who confirmed to law enforcement that he was holding firearms on the defendant's behalf.  Deacon, incidentally, is the same individual who, submitted a letter to the Court noting that he never had any doubt as to the defendant's integrity. ECF No. 121-5.  Additional messages between the defendant and his neighbor suggest the defendant may have retrieved some of his weapons. Sentencing Ex. A-1 (Texts with Pat).

### e.  The Defendant's False Statements about his Military Record

The defendant has a track record of lying about his military service to his employer, his friends, and to the news media. In evidence at trial were representations that the defendant made to the city of Rocky Mount, Virginia in support of his application for employment with the police department. Gov. Ex. 304; Trial Tr. 4/5/21 at 460 (Ervin test). The defendant identified himself on his resume to be a U.S. Army Ranger school graduate. Gov. Ex. 304. Through written filings by counsel, he made similar representations to this Court.  ECF No. 31 ("Mr. Robertson served in the United States Army…he became a Ranger and a Sniper school graduate"). A review of the defendant's official military records, however, confirms that he is neither an Army Ranger nor a

11

graduate of the U.S. Army Ranger School. *See* Sentencing Ex. B with attachments B-1 to B-5 (FBI FD-302 discussing the defendant's Army Service); and specifically, B-1 (April 5, 2022, Ranger School Memorandum).

On January 11, 2021, just a few days after the attack, in an effort to publicly assert that his own role in the insurrection was peaceful, law-abiding, and patriotic, the defendant also bragged to a reporter that he achieved the rank of Sergeant First Class (E-7) and sent a photo that he claimed to be of himself, adorned with a Purple Heart. Sentencing Exhibits. B-2 (Communications with Reporter) and B-3 (Related News Articles).  This too is false; the defendant was discharged from the Army at the rank of Specialist (E-4) on August 27, 2009, and never was awarded a Purple Heart.  Sentencing Ex. B at 4 and Sentencing Ex. B-4. Notably, the defendant lied to codefendant Fracker—a former U.S. Marine, and the defendant's subordinate officer at RMPD—about his military service, using the lies to envelope himself in a cloak of credibility and imbue himself with leadership authority, all of which influenced Fracker's friendship with his former mentor, and ultimately Fracker's decision to join the defendant at the Capitol on January 6, 2021. These lies to Fracker continued even after the defendant's arrest. Sentencing Ex. B-5 (Fracker Texts) ("Recognizing that I volunteered as a Ranger…").

## II.      THE CHARGES AND VERDICT

On April 11, 2022, a jury found the defendant guilty on all six counts with which he was charged for his conduct on January 6, 2021, and the aftermath – Count One, Obstruction of an Official Proceeding, in violation of  18 U.S.C. § 1512(c)(2); Count Two, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Three, Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Count Four, Disorderly or Disruptive Conduct in a Restricted

Building or Grounds with a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Five, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and   Count Six, Obstruction of Justice through Destruction of Evidence, in violation of 18 U.S.C. § 1512(c)(1).

### III.     STATUTORY PENALTIES

The defendant now faces sentencing on all six counts.  As noted by the U.S Probation Office, the statutory maximum term of imprisonment is 20 years each for Counts One and Six (Obstruction of Justice); 5 years for Count Two (Civil Disorder, Obstructing Officers); 10 years each for Counts Three and Four (Entering or Remaining in a Restrict Building with Dangerous Weapon and Disorderly Conduct with a Dangerous Weapon); and six months for Count 5 (Disorderly Conduct in a Capitol Building). PSR pages 1-2.

### IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The revised PSR contains an error in so far as it fails to conduct the offense level computation for each count prior to the grouping analysis. The Guidelines set out the specific "order" of the analysis:  first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. §

13

1B1.1(a)(1)-(3).  Then, repeat each step for each count.  U.S.S.G. § 1B1.1(a)(4).  Finally, perform the grouping analysis in Part D of Chapter 3.  *Id*. This specified procedure did not occur in the PSR.   Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 47-54. Sequencing the analysis as the Government suggests and as the Guidelines require, and as done in the PSR, however, leads to the same total offense level of 29.

### a.  Guidelines Analysis for Each Count

The appropriate offense level computations for Counts One, Two, Three, Four, Five and Six prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count One: 18 U.S.C. §§ 1512(c)(2) and 2—obstruction of an official proceeding before Congress, and aiding and abetting**

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Special offense characteristic | +8 | U.S.S.G. § 2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special offense characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Adjustment | +2 | U.S.S.G. § 3C1.1, cmt. n.4(D) (obstructing administration of justice): "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." |
| Adjustment | +2 | U.S.S.G. § 3B1.1 (aggravating role). |
| Total | 29 | |

**Count Two: 18 U.S.C. § 231(a)(3)—obstructing police during a civil disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."  U.S.S.G. § 2X5.1.  Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|

| Special offense characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(b): "a dangerous weapon (including a firearm) was possessed and its use was threatened." |
| Adjustment | +2 | U.S.S.G. § 3C1.1, cmt. n.4(D) (obstructing administration of justice): "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" |
| Adjustment | +2 | U.S.S.G. § 3B1.1 (aggravating role). |
| Total | 17 | |

**Count Three: 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A)—entering and remaining in a restricted area while in possession of a dangerous weapon**

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): "a dangerous weapon (including a firearm) was possessed." |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 25 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Adjustment | +2 | U.S.S.G. § 3C1.1, cmt. n.4(D) (obstructing administration of justice): "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." |
| Adjustment | +2 | U.S.S.G. § 3B1.1 (aggravating role). |
| Total | 29 | |

**Count Four: 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)—disorderly and disruptive conduct in a restricted area while in possession of a dangerous weapon**

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
| Special offense characteristic | +3 | § 2A2.4(b)(1)(b), "a dangerous weapon (including a firearm) was possessed and its use was threatened." |
| Adjustment | +2 | U.S.S.G. § 3C1.1, cmt. n.4(D) (obstructing administration of justice): "directing or procuring another person to |

| | | destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" |
|---|---|---|
| Adjustment | +2 | U.S.S.G. § 3B1.1 (aggravating role). |
| Total | 17 | |

**Count Five: 40 U.S.C. § 5104(e)(2)(D)—disorderly or disruptive conduct in the Capitol building or grounds**

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

**Count Six: 18 U.S.C. § 1512(c)(1)—obstruction of justice by altering, destroying, mutilating, or concealing a record, document, or other object**

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Special offense characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Special offense characteristic | +2 | U.S.S.G. § 2J1.2(b)(3)(B): the offense "involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter." |
| Base Offense Level (adjusted) | 21 (from Count One) | U.S.S.G. § 2X3.1(a)(1): "6 levels lower than the offense level for the underlying offense." |
| Total | 21 | |

The guidelines calculations identified above include the specific offense characteristics found in U.S.S.G. §§ 2J1.2(b)(1)(B), 2J1.2(b)(2), and 2J1.2(b)(3)(B) to account for the severity and complexity of the defendant's behavior.

United States Sentencing Guideline § 2J1.2(b)(1)(B) applies when an offense involves "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). It applies to the defendant's conduct for several reasons. First, where a defendant directly caused injury, threatened injury, or damaged property, this enhancement applies based upon the defendant's own

acts under § 1B1.3(a)(1)(A). Here, the defendant's carrying and wearing of a gas mask, a large wooden stick consistent with the type of police baton he had been trained to use as a weapon, and military food rations, as well as his statements on social media calling for "open armed rebellion" to overturn the election, threatens injury and indicates his anticipation of and preparation for violence. The evidence at trial established that the defendant both possessed a dangerous weapon and threatened its use. Second, U.S.S.G. § 1B1.3(a)(1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. By blocking and interfering with the MPD officers who were trying to move through the crowd on the West Front of the building, the defendant aided and abetted those rioters immediately around him who were threatening and assaulting these officers. Third, the defendant is responsible for "all acts … of others involved in jointly undertaken criminal activity" with the defendant if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy; its plain terms apply to persons who acted in unison to achieve a common goal. The defendant is responsible for the "jointly undertaken criminal activity" of the crowd of rioters he joined, who charged up through the scaffolding, overcame two police lines, and then breached the building at the Senate Wing Door by breaking the windows and doors, in furtherance of the goal to disrupt, delay, and prevent the certification vote, all of which was reasonably foreseeable in connection with that joint criminal activity.

Second, the Specific Offense Characteristic in U.S.S.G. §2J1.2(b)(2) applies to Count One because the defendant's conduct "resulted in substantial interference with the administration of justice." This enhancement has been applied to all January 6 defendants convicted of violations of

Section 1512(c)(2).  The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety.  This is substantial interference.

Third, U.S.S.G. § 2J1.2(b)(3)(B), applies to Count Six because, by destroying the cell phones that he and Fracker used on January 6 – phones which held videos and photos documenting their criminal conduct – the defendant destroyed especially probative records or documents. *See* U.S.S.G. § 2J1.2(b)(3)(B) ("If the offense . . . involved the selection of any essential or especially probative record, document, or tangible object . . .  increase by 2 levels.").

Finally, the above analysis also includes an aggravating role adjustment under U.S.S.G. §3B1.1. Relevant factors to consider when applying this enhancement include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 cmt. n.4.  A manager or supervisor must "exercise some control over others," *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998), which in turn connotes "some sort of hierarchal relationship, in the sense that an employer is hierarchically superior to his employee," *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004)). Here, a two-level adjustment for aggravating role is appropriate because the defendant was an organizer, and leader – he recruited two individuals, one of whom was a subordinate, to participate in the criminal conduct, outfitted them with supplies, and provided transportation.  By all accounts, Fracker participated in the events of January 6,  at the behest of his mentor and higher-

ranking police supervisor. Trial Tr. 4/6/22 at 691 (Fracker test.) ("A: T.J. invited me to go with him…Q: Would you have gone to D.C. if Mr. Robertson had not invited you? A: No.").

The five counts of conviction for which the Guidelines apply should be placed into one group under U.S.S.G. §3D1.2(a) and (c). Counts One, Three, and Four involve the same victim (Congress).   U.S.S.G. §3D1.2(a). Count Six is included in this grouping under the principle embodied in U.S.S.G. §3C1.1 cmt. n.8, which provides that if a defendant is convicted of both an obstruction offense and an underlying offense, the "the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts)."  Count Two is included because the interaction with the MPD officers is a specific offense characteristic of the Count One offense.[2] The highest offense level is 29 (for Counts One and Three).[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR ¶ 80.  Accordingly, if the total offense level is, as the Government submits, 29, the Guidelines range is 87 months to 108 months of incarceration.

## V.    SENTENCING FACTORS UNDER 18 U.S.S.C. § 3553(a)

Once the Court calculates the defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. In its evaluation, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the

---

[2] In the final Presentence Investigation Report, probation declined to group Count Two with the others. PSR ¶ 55.  Either calculation leads to the same adjusted offense level.

[3] There is an additional special adjustment for convictions for obstruction of justice, which the Government is not seeking at this time.  *See* U.S.S.G. §3C1.1, cmt. n.8; *see also* §3D1.2(c), cmt. n.5.

rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, id.; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). As described below, the Section 3553(a) factors weigh in favor of a term of incarceration of 96 months, at the midpoint of the range proscribed by the Guidelines.

### a. The Nature of Circumstances of the Offense

First, the nature and circumstances of the offense support a significant sentence. The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar.

10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.  This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  This was not a victimless crime.  Some of the rioters, including the defendant, wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers.  *See id*. at 27-30.

The defendant suggests in his letter to the Court that he was motivated to act on January 6, 2021, by "cumulative stress" that began on November 20, 2020, when a friend suffered a fall in his home. ECF No. 121-1 at 1-2.  This is patently false. The defendant's social media posts, discussed at length during trial, called for violence in the aftermath of the 2020 election as early as November 7, 2020, 13 days prior to the purported injury.  Sentencing Ex. A at 7 (discussing Facebook posts); *see also, e.g.,* Gov. Ex. 101A. He also blames his criminal behavior on alcohol abuse. This too warrant scrutiny, as some of the posts appear to have been made while he was on duty as a police officer. *Id.*

### b.  The History and Characteristics of the Defendant

The second factor that the Court must consider in fashioning an appropriate sentence is the history and characteristics of the defendant. This defendant has made clear that he has no respect for the rule of law, or this Court. The defendant, as a police sergeant, was entrusted with the power to enforce the criminal laws. PSR ¶¶ 103, 110 (discussing the defendant's police employment). Instead of using his training and power to promote the public good, he attempted to overthrow the government. And, when he thought he had gotten caught, he destroyed key evidence – and directed others to do so as well. And, after he was caught and ordered by this Court not to possess any firearms, destructive devices, or commit any new federal offenses, he nonetheless maintained an M4 in his bedroom, a destructive device on his property, and purchased and 34 additional firearms. Despite having held himself out as a public servant and a patriot, the defendant has demonstrated again and again that he believes himself to be fully above the law.

The defendant also has repeatedly shown flagrant disrespect for the law by playing fast and loose with the facts. He continues to misstate the nature and scope of his public service. *See* Sentencing Ex. A at 9 (discussing the defendant's letter to the Court). In addition to widely propagating falsehoods about his military record, he lied outright to law enforcement during the investigation of this matter. For example, during an FBI search of the defendant's house, agents found the large wooden stick still in the trunk of the defendant's vehicle. The defendant voluntarily told the agents that it was a flagpole. Trial Tr. 4/6/21, at 520-571 (Witt test.). In the extensive footage of the defendant however, from January 6, 2021, there is no image in which the wooden stick has a flag of any kind attached to it.

These characteristics of the defendant – the abuse of his law enforcement authority, his propagation of dangerous lies, and his disrespect for the law, support a lengthy term of incarceration.

### c. The Need for the Defendant's Sentence to Reflect the Seriousness of the Offense and Promote the Rule of Law

The defendant's sentence must also reflect the seriousness of the offense to promote the rule of law, to provide just punishment, and to provide adequate deterrence, as well as to protect the public from future crimes of the defendant. The defendant has expressed no remorse for his crimes and has shown an utter disregard for the rule of law, as evidenced by his violations while on pretrial release. As with the nature and circumstances of the offense, and the history and characteristics of the defendant, this factor supports a lengthy sentence of incarceration.

Law enforcement officers are a central part of promoting and maintaining the rule of law in this country. The defendant's crimes do significant damage to the credibility of law enforcement in carrying out this essential role. The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law itself.  When the defendant, himself a law enforcement officer, recruited his fellow officer, entered the Capitol grounds, and blocked the MPD officers attempting to maintain order, it was abundantly clear—especially to someone with the defendant's extensive military and law enforcement training and experience—that lawmakers, and the law enforcement officers who tried to protect them, were under siege.

Not only did the defendant abuse the public trust when he participated in the January 6, 2021, insurrection, and subsequent cover-up, but after he was arrested, he trafficked in firearms in direct violation of this Court's orders. Nothing in his behavior would suggest a future willingness to abide by this Court's orders, or those of our civil society, absent serious punishment.

### d. The Need for Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. ' 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id*. at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id*. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, the defendant has never expressed remorse or contrition, and his social media and text messages after January 6 are those of a man girding for another battle.  *See, e.g,* Sentencing Ex. A at 3-4 and Sentencing Ex. A-2 (Text messages with Ed B. dated April 5, 2021) (I'm being conditioned to cross the Rubicon and not look back. Next time its all the way.").

The defendant also continues to make excuses for his conduct.  For example, in his letter to the Court filed with his sentencing materials, he puts squarely before the Court loneliness during his wife's absence as a contributing factor to his conduct.  ECF 121-1 at 1. He fails to mention, however, both that his wife moved to New York in the summer of 2021, long after the offense, and that contemporaneous with her departure, he had an extramarital affair.  Sentencing Ex. A at 8.

The defendant also accepts no responsibility for the conduct for which he was convicted in Count Six, blaming codefendant Fracker for destroying his phone, despite the jury's verdict to the contrary.  ECF No. 121-1 at 3-4.  Additional review of the evidence gathered by law enforcement continues to corroborate the defendant's role in the obstruction. *See* Sentencing Ex. A at 10 and Sentencing Ex. A-3 (Texts with Mark W.).

And, as noted above, the defendant's flagrantly unlawful conduct while on pre-trial release, as well as the other instances in which the defendant has telegraphed his belief that the rules that

apply to everyone else do not apply to him, further warrant a significant sentence to deter future criminal conduct.

### e.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." Id. at 101. As the Third Circuit has stressed:

> "The Sentencing Guidelines are based on the United States Sentencing Commission's in depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored."

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that significantly increases the likelihood that the sentence is a reasonable one. *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### f.   Unwarranted Sentencing Disparities

As of the date of this sentencing memorandum, by the Government's count, only seven Capitol Riot defendants have been sentenced for convictions under § 1512.   None abused the public trust the way that the defendant did, and only one, Guy Reffitt, was convicted after trial. The other defendants, unlike Robertson, expressed at least some acceptance of responsibility.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here (and the Government submits that there are in fact no mitigating factors), the Court may consider the sentences imposed on Scott Fairlamb, Duke Wilson, and Greg Rubenacker for reference.   Fairlamb pled guilty to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was sentenced to 41 months incarceration (facing a Guidelines range of 41 to 51 months).   Fairlamb entered through the Senate Wing Door, brandishing a police baton, about a minute after the initial breach.   He assaulted a law enforcement officer while inside the Capitol

27

and made statements after the riot suggesting he was proud of his actions.  Notably, several mitigating factors are present in Fairlamb's case that are not present here: he showed sincere remorse for his actions and he was also one of the earliest felony pleas in a Capitol riot case. *Fairlamb*, Sent. Tr. at 37.

Wilson pled guilty to 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was sentenced to 51 months incarceration (facing a 41- 51 months Guidelines range).  Like the defendant, he participated in the attack on law enforcement at the Capitol's lower west terrace, arguably the most violent area of the Capitol riot on January 6, and struck officers with a PVC pipe and threw the pipe at officers.

Rubenacker pled guilty (without a plea agreement) to all ten counts in a superseding indictment, including felony counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and was sentenced to 41 months of incarceration (facing a 41-51 months Guidelines range).  Like the defendant, Rubenacker was one of the first people to breach the Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building.  Inside, he and other rioters chased United States Capitol Police Officer Eugene Goodman through part of the Capitol.

While these defendants all participated in the Capitol attack, many salient differences help explain the differing recommendations and sentences.  These differences include whether the defendant had a confrontation with law enforcement officers, as Robertson did, and if so, when and where in relation to the overall riot; whether the defendant acted as a leader or motivator of others, as Robertson did; whether the defendant was armed, as Robertson was, with a large wooden stick; whether the defendant took additional obstructive acts, like destroying evidence or

threatening others, which Robertson did; and whether the defendant accepted responsibility for his actions, which Robertson has not.  And as these factors illustrate, avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States* v. *Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).  These factors, too, support a lengthier sentence for Robertson than the other defendants who have been sentenced for a § 1512 felony conviction.

## II.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[4]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b). Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).  The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.  *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[5]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States*

---

[4] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA.  *United States v. Emor*, 850 F. Supp. 176, 204 n.9 (D.D.C. 2012).

[5] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

*v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Applies these principles in this case leads to the conclusion that the defendant should be required to pay $2,000 in restitution.  One of the offenses for which he was convicted, 18 U.S.C. §§ 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol.  See 18 U.S.C. § 3663A(c)(1)(A)(ii).

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

The defendant's additional convictions under Title 18 fall within the VWPA. The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars. As the evidence at trial showed, the defendant's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees.

A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which the defendant should be responsible is $2,000.  That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.  And that is the same amount that Chief Judge Howell ordered Rubenacker to pay absent any plea agreement.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.  18 U.S.C. § 3664(h).

The defendant's crimes on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer

of the United States House of Representatives, and the Office of the Secretary of the United States Senate.  Attached as Sentencing Exhibits C-1 through C-3 are letters from each of these three entities, attesting to the pecuniary damages each suffered as a result of the attack on the Capitol on January 6: $1,253,354.01, $547,411.27, and $32,075.00, respectively.  That is a total amount of $1,832,840.28, which does not even account for the damages suffered by the Capitol Police, Metropolitan Police Department, or myriad other law enforcement entities.[7]

Here, the defendant should be directed to pay $2,000 as an approximate estimate of the losses for which he is responsible.  The defendant's restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

### III.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of imprisonment of 96 months for each of Counts One (Obstruction of an Official Proceeding), Three (Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon) and Four (Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon); five years for Count Two (Civil Disorder); and six months for Count Five (Disorderly Conduct in a Capitol Building), and Six (Obstruction of Justice—Destruction of Evidence); all to run concurrently with one another.  The government further recommends that the Court impose a term of supervised release of 3 years, restitution of $2,000, and the mandatory $100 special assessment for each of the counts of conviction.

---

[7] The Government estimates that, as of April 5, 2022, the approximate total losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ *Elizabeth Aloi*
        Elizabeth Aloi
        Risa Berkower
        Assistant United States Attorneys
        601 D Street, N.W.,
        Washington, D.C. 20530
        (202) 252-7212 (Aloi)
        Elizabeth.Aloi@usdoj.gov
        Risa.Berkower@usdoj.gov