## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No: 21-cr-34 (CRC)** |
| **v.** | : | |
| | : | |
| **THOMAS ROBERTSON,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>UNITED STATES' MEMORANDUM IN SUPPORT OF RESENTENCING</u>

Thomas Robertson ("Robertson"), a police sergeant for the town of Rocky Mount, Virginia, joined the violent mob which attacked the United States Capitol in an effort to disrupt the peaceful transition of power on January 6, 2021, using his law enforcement training to block Metropolitan Police Department ("MPD") Officers attempting to hold back the mob. For his efforts to impede law enforcement, overturn the election results, and destroy evidence of his crimes, this Court sentenced defendant Robertson to serve 87 months' incarceration. As this Court found at the sentencing hearing, this defendant's conduct was of the utmost seriousness and the 87-month sentence imposed was sufficient, but not greater than necessary, to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a). The same is true today. *See United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up) ("*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021, in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct."). Accordingly, for the reasons set forth herein, the United States requests that this Court depart or vary upwards to sentence Robertson to 87 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100 per felony and $10 per Class B misdemeanor.

## I.     FACTUAL BACKGOUND

### a. Defendant Robertson's Role in the Capitol Attack

Defendant Robertson's role in the Capitol attack has been well documented. The Government need not recount it at length here and refers the Court to the Government's 2022 Sentencing Memo for a full discussion of Robertson's criminal conduct. *See* ECF No. 124 ("Government's 2022 Sentencing Memo").  Suffice it to say, Robertson, a sworn law enforcement officer, came to the U.S. Capitol with the intent of disrupting the certification of the 2020 presidential election and used his specialized training to impede MPD officers attempting to hold back the mob – striking at least two officers with the large wooden stick he carried. Robertson's preparations before arriving at the Capitol, everything he did at the West Front, starting with his confrontation of the officers at the base of the scaffolding and afterward (with his coconspirators directly behind him in support), served his and the mob's goal of stopping the proceeding inside. Robertson put himself in midst of the first group of rioters who pushed up the stairs, overcame the officers' defenses on the West Front, and breached the Capitol building for the first time. Inside, he joined a crowd that pushed the police line further back through the Crypt, located at the very center of the building.  The chaos this first wave of rioters kicked off inside the building led to the evacuation of the House and Senate chambers only minutes later, suspending their proceedings.

Robertson traveled from the Rocky Mount, Virginia area to Washington, D.C. with co-defendant Jacob Fracker and his neighbor, both of whom he recruited to his efforts.  At the time, Fracker was also a police officer at the Rocky Mount Police Department, and Robertson was his commanding sergeant.  Robertson made the travel arrangements, supplied gas masks, water, and military food rations for all three men, drove Fracker and the third man up to D.C., and purchased

and provided them all with Metrorail cards for the day.  Robertson and Fracker were side by side for nearly the entire day and ascended the stairs on the West Front together.  They were briefly separated at the top of the stairs, and therefore entered the Capitol building several minutes apart, but as noted above, they reunited inside the Crypt and joined the crowd that swept officers further back into the Capitol building.  Despite both being police officers themselves, they did not assist other officers in any way while inside, and they only left when a group of officers confronted them in the then- nearly empty Crypt and ordered them to do so.

In the days following the riot, Robertson bragged about his conduct on social media. For example, after a selfie showing Robertson in the Crypt (taken shortly after the crowd overwhelmed police in that room) circulated online, Robertson posted to Facebook, "Here's the picture in question and I am fucking PROUD of it. It shows 2 men willing to actually put skin in the game and stand up for their rights. If you are too much of a coward to risk arrest, being fired, and actual gunfire to secure your rights, you have no words to speak I value. Enjoy your feel good protests and fame. I'll simply accept a 'Thank you' for the very blanket of freedom that you live and sleep under." Gov. Ex. 100D.  Describing the events of January 6, he wrote that the next American revolution had begun on January 6, 2021, and that people should just "buckle up or stay home." Trial Tr. 4/7/22 at 875.  Both before and after January 6, he used social media to confirm that overturning the election results and disrupting the proceeding was the intended consequence of his actions on January 6.  *See, e.g.,* Gov. Ex. 100A, 100B, 100H, 100J (Robertson's Facebook posts before January 6); Trial Tr. 4/7/22, at 688-91 (Fracker test.) (explaining that Robertson believed "[t]hat the election was rigged," that this bothered Robertson "very much," and that Robertson discussed these views); Gov. Ex. 100C, 100D, 100E, 100F, 100G, 100S (Facebook posts after January 6).

3

On January 13, 2021, Robertson was notified by the FBI that a warrant had issued for his arrest.  He agreed to self-surrender later that day, but before doing so, he collected his and Fracker's cell phones—the phones they had been using on January 6, 2021—and destroyed them. In text messages to a friend several days later, he admitted that "everything problematic has been destroyed, including my old phone." Gov. Ex. 314A.  That phone, Robertson wrote, "took a lake swim" and "had a tragic boating accident."  *Id*.  And, as Fracker testified, Robertson understood from his law enforcement training that his phone would likely be seized incident to arrest. Trial Tr. 4/6/22 at 746-747.

### b. Defendant Robertson's Post-Arrest Misconduct

On January 12, 2021, a Magistrate Judge in the District of Columbia issued an arrest warrant for Robertson for violations of 18 U.S.C. § 1752 and 50 U.S.C. § 5104.  Robertson was taken into custody on January 13, 2021, in the Western District of Virginia, and released subject to certain conditions, consistent with 18 U.S.C. § 3142, including that he not violate any federal, state, or local law while on release, and that he refrain from possessing a firearm, destructive device, or other dangerous weapon.  Robertson was also ordered to relocate any firearms in his home by January 15, 2021.  Nevertheless, four days later, while executing a search warrant at Robertson's property in connection with the Capitol riots charges, law enforcement discovered and seized eight firearms from Robertson's home, and large amounts of ammunition, as well as what appeared to be equipment used for re-loading ammunition, in an out-building on Robertson's property.

On January 19, 2021, Robertson appeared before a District of Columbia magistrate judge and was again ordered not to possess a firearm, destructive device, or other weapon, and not to commit any new violation of federal, state, or local law as conditions of his pre-trial release.  On

January 29, 2021, a grand jury in the District of Columbia charged Robertson with violations of 18 U.S.C. §§ 1512, 2 (Obstruction of an Official Proceeding, and Aiding and Abetting), 1752(a)(1) (Entering and Remaining in a Restricted Building), 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building), and 40 U.S.C. § 5104 (Violent Entry and Disorderly Conduct in a Capitol Building or Grounds). Prior to this time, the pending charges against Robertson were misdemeanors; however, the Indictment added a felony violation of 18 U.S.C. § 1512 against Robertson.

On February 2, 2021, Robertson appeared before a magistrate judge in the District of Columbia for a hearing on ascertainment of counsel and arraignment. He appeared at the hearing with his current counsel and entered a plea of not guilty. On February 25, 2021, Robertson was arraigned for a second time on the charges in the Indictment before the Court. Robertson acknowledged having read the Indictment, as well as having reviewed it with his attorney, before pleading not guilty to the charges.

On June 30, 2021, the United States asked the Court to revoke Robertson's pretrial release order because the day prior, following a lawfully authorized search of Robertson's residence, law enforcement discovered that Robertson had again violated his release conditions by possessing a loaded M4 rifle and a partially-assembled pipe bomb at his home, and by purchasing an arsenal of 34 firearms online and transporting them in interstate commerce while under felony indictment, in violation of 18 U.S.C. § 922(n). On July 28, 2021, following extensive briefing, the Court detained Robertson pending trial. In doing so, the Court found that Robertson had failed to rebut the presumption that he could not be safely released into the community. ECF No. 77 at 1.

## II.      Relevant Procedural History

### a.  Conviction and Original Sentence

On April 11, 2022, a jury found Robertson guilty on all six counts with which he was charged for his conduct on January 6, 2021, and the aftermath – Count One, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Count Two, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Three, Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Count Four, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Count Five, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Six, Obstruction of Justice through Destruction of Evidence, in violation of 18 U.S.C. § 1512(c)(1).  On August 17, 2022, this Court sentenced the defendant to 87 months of incarceration for Counts One, Three, Four, and Six; 60 months of incarceration for Count Two; and six months of incarceration for Count Five, with all terms to be served concurrently; 36 months of supervised release, $2,000 restitution, and $510 in special assessment fees. *See* ECF 140.[1]

## III.      Defendant Robertson's First Sentencing Hearing

During Robertson's initial sentencing in 2022, the then-applicable United States Sentencing Guidelines (U.S.S.G. or "Guidelines") took into account not only the seriousness of his four felony (and one misdemeanor) convictions, but also the totality of his conduct and the relevant surrounding circumstances – Robertson trespassing on Capitol grounds with a dangerous

---

[1] On January 18, 2024, this Court issued an amended judgment (ECF 160) for Robertson correcting a small clerical error in the original written judgment (ECF 140), which mistakenly listed one of the charges of conviction as "18 USC 175<u>1</u>(a)(1) and (b)(1)(A)" instead of "18 USC 175<u>2</u>(a)(1) and (b)(1)(A)."

weapon, engaging in disorderly and disruptive conduct on Capitol grounds in possession of a weapon,  and obstructing officers (striking at least two) during a civil disorder (while using and threatening use of a dangerous weapon) – all with the intent to obstruct the certification and stop the peaceful transfer of presidential power for the first time in the history of American democracy.

### a.   The Guidelines Calculation at the Original Sentencing

At sentencing, the applicable sentencing guidelines range was driven by Count One; the Court grouped Counts Three, Four, and Six with Count One and the final Presentence Investigation Report (ECF 122 ("2022 Final PSR")) did not contain a separate calculation of the applicable guidelines for Counts Three, Four, or Six.  A summary of the Court's guidelines analysis, in agreement with Probation's analysis, is as follows:

Grouping:

- Group 1: Counts One, Three, Four, and Six
  - pursuant to U.S.S.G. § 3D1.2(a): Counts One, Three, and Four and
  - pursuant to U.S.S.G. § 3D1.2(c): Count Six embodies conduct treated as a specific offense characteristic (§ 3C1.1) to one of the other counts
- Group 2: Count Two

*Count One* (18 U.S.C. § 1512(c)(2)) *drove the Group 1 calculations*:

| | | |
|---|---|---|
| Base Offense Level | (U.S.S.G. §2J1.2(a)) | +14 |
| Specific Offense Characteristic | (§2J1.2(b)(1)(B)-Threatening) | +8 |
| Specific Offense Characteristic | (§2J1.2(b)(2)-Substantial Interference) | +3 |
| Adjustment | (§3B1.1 – Aggravating Role) | +2 |
| Adjustment | (§3C1.1 – Obstruction of Justice | +2 |
| **Total** | | **29** |

*Count Two* (18 U.S.C. § 231(a)(3)):

| | | |
|---|---|---|
| Base Offense Level | (U.S.S.G. §2A2.4(a)) | +10 |
| Specific Offense Characteristic | (§2A2.4(b)(1)(B)-Dangerous Weapon) | +3 |

**Total**                                                                    **13**[2]

*See* ECF No. 149 ("8/11/22 Sent. Tr.") at 4-6, 26; *see also* 2022 Final PSR at ¶¶ 53-77.

| Group/Count | Adjusted Offense | § 3D1.4 Units |
|---|---|---|
| Group 1 | 29 | 1.0 |
| Group 2 | 15 | 0.0 |
| Total Number of Units: | | 1.0 |

**Combined Adjusted Offense Level (OL): 29** (Highest OL (29) + 0 under 3D1.4)

*See* 2022 Final PSR at ¶ 71. The U.S. Probation Office calculated Robertson's criminal history as Category I, based on a criminal history score of zero. *Id.* at ¶ 80. With a total offense level of 29, pre-*Brock* (discussed below), the Court calculated Robertson's Guidelines imprisonment range during the original sentencing as 87-108 months. *Id*. at ¶74; *see also* 8/11/22 Sent. Tr. at 6, 57-58. The Government asked the Court to impose a sentence of 96 months' incarceration.

As the above charts reflects, in sum, with regard to Count One, the base offense level was 14, consistent with U.S.S.G § 2J1.2(a). The Court added three levels to Count One of the defendant's guidelines calculation under United States Sentencing Guidelines (U.S.S.G. or Guidelines) § 2J1.2(b)(2) finding that his actions had substantial interference with the administration of justice, given "both the delay that the riot caused in the certification proceeding, which is the proceeding at issue, and the expenditure of substantial resources that was necessary to fix the damage that was done to the Capitol." 8/11/22 Sent. Tr. at 19. The Court also added eight-levels under § 2J1.2(b)(1)(B) because the defendant's offense involved causing or

---

[2] Originally, Probation had included an additional adjustment for obstruction of justice for Count Two under § 3C1.1. *See* 2022 Final PSR at ¶ 69. However, during the sentencing hearing the Court noted that Probation had changed its position and believed that adjustment did not apply to Count Two. *See* 8/11/22 Sent. Tr. at 5-6. The Government objected. *Id*. at 25. The Court clarified that applying the adjustment would not "affect the overall adjusted offense level," given the overall offense level was driven by Count 1. *Id.* at 6, 26 The matter does not appear to have been further addressed.

threatening to cause physical injury to a person in order to obstruct the administration of justice. Specifically, the Court found that the defendant a carried a large wooden stick in a manner capable of causing serious injury, in other words, in threatening manner. *Id*. at 15.  An additional two points was added for his role in the offense under § 3B1.1(c), and two points were added for obstruction under § 3C1.1, cmt., n.4(D) for a total of Offense Level of 29.  With no criminal history the applicable guidelines range for Count One as originally calculated was 87 to 108 months. With regard to Count Two, the Court adopted a base offense level consistent of 10 consistent with obstructing or impeding law enforcement officers under U.S.S.G. § 2A2.4.   Adding three points for possessing and threatening the use of a dangerous weapon under § 2A2.4(b)(1)(B), the adjusted offense level was 13.

### b.  The Court's Findings at the Original Sentencing Hearing

At sentencing the Court described defendant's post-arrest conduct– a consideration which is unaffected by either *Fischer v. United States*, No. 23-5572 (U.S.) or *United States v. Brock*, 94 F.4th 39, 51 (D.C. Cir. 2024) (both discussed below) – as an "aggravating factor," and questioned whether he could have any confidence that the defendant would not reoffend, suggesting that this was "maybe the primary consideration" to take into account.  8/11/22 Sent. Tr. at 49, 54.  As the Court stated to the defendant at sentencing:

> You know, I read [the defendant's post-offense statements], and it really seems like you think of partisan politics as war, you know, and that's just not the right way to think about it, and that you continue to believe these conspiracy theories about the election being stolen despite any evidence of that whatsoever. And I sincerely believe that you would likely answer a call to duty if you were called to go do something like this again, and that's the biggest consideration that this Court has to consider.

8/11/22 Sent. Tr. at 63.  Nothing in the defendant's motion for release suggests he is any less likely to offend today than he was on January 6, 2021.

9

The Court also made significant findings about the nature and circumstances of the offense, another factor which must be considered at resentencing. The Court reflected in great detail on the seriousness of the charged and uncharged conduct in the sentencing hearing, telling the defendant:

> You advocated for an armed rebellion and a counter insurgency to overturn the result. So when you invited Mr. Fracker and others to come to D.C. on January 6th, it was not just to listen to a speech or to protest. I believe that the jury was correct in finding that at least one of your motivations was to interfere with what was going on in Congress that day. And when you got into your truck, you were at least expecting some form of violence …

> You were one of the first ones up the West Terrace stairs, which was one of the most chaotic and violent scenes of that day, and we watched those videos many times, and they're very jarring and disturbing…You are also one of the first -- you were among the first wave of people in the Capitol…

> [Y]ou were not some bystander who just got swept up in the crowd and in the emotion, but you were an active and willing participant, and that you were there for the purpose of disrupting the count, which Mr. Fracker testified to and which the jury found…

> Even after having time to reflect on the effect of January 6th, you continued to advocate for violence in response to the purportedly stolen election… In June, a full six months after January 6th, you posted on a gun forum, 'I have learned very well that if you dip your toe into the rubicon, cross it. Cross it hard and violent and play for all the marbles.' And even more troubling coming from a former law enforcement officer after four officers were killed on January 6th and four more took their lives by their own hand later, you advocated more violence against law enforcement. You told Mr. Deacon, 'I can kill every agent they send for me for at least 2 weeks.' We've talked about whether that was hyperbole, whether that was just boasting, whether that was just something you were saying on Facebook, or Instagram, or wherever it was, but it wasn't just your words. It was also your actions. You destroyed evidence. You continued to possess weapons, including an M4 and an explosive device, in repeated violations of your release conditions, and last summer you ordered -- and we can call it an arsenal, we can call it a cache, we can call it whatever we want – numerous automatic weapons while you were under federal indictment in violation of not only this Court's orders but likely a federal law. And while you gave your neighbor your guns in response to a court order, you maintained ready access to them. And except for the destruction of the cell phones, *none of that is incorporated in the guidelines analysis.*

8/11/22 Sent. Tr. at 60-62 (emphasis added).

## IV.    Defendant Robertson's Appeal

On appeal, the defendant challenged his conviction under 18 U.S.C. § 1512, as reflected in Count One, which prohibits "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." The jury was instructed that, in order to convict defendant Robertson of violating § 1512(c)(2), it had to find beyond a reasonable doubt that he (1) "attempted [to] or did obstruct or impede an official proceeding"; (2) "acted with the intent to obstruct or impede the official proceeding"; (3) "acted knowingly with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding"; and (4) "acted corruptly." Trial Tr. 980:14-20, 981:6-8, ECF No. 111. The defendant took issue with only the "corruptly" element. He did not challenge any of the other elements or dispute that they were met.

On May 28, 2024, the D.C. Circuit affirmed the defendant's convictions, but vacated his sentence and remanded him for resentencing under the D.C. Circuit's decision in *United States v. Brock*. In *United States v. Brock*, 94 F.4th 39, 51 (D.C. Cir. 2024), the D.C. Circuit held that, for purposes of U.S.S.G. § 2J1.2, the phrase "administration of justice" does not apply to Congress' certification of electoral college votes. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice" does not apply where a defendant interfered solely with the certification of electoral college votes. *Id.* at 59. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

11

The D.C. Circuit also ordered that, "on remand the district court may consider in the first instance any effect of the Supreme Court's" then-forthcoming "decision in *Fischer v. United States*, No. 23-5572 (U.S.), on [Robertson's] conviction under 18 U.S.C. § 1512(c)(2)." *United States v. Robertson*, 103 F.4th 1, 27 (D.C. Cir. 2023).

## V.    The Impact of Fischer

On June 28, 2024, after the D.C. Circuit remanded this case, the Supreme Court issued an opinion in *Fischer v. United States*, 144 S. Ct. 2176 (2024).  *Fischer* held that Section 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding."   The Court explained that, to prove a violation of Section 1512(c)(2), the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in the proceeding – such as witness testimony or intangible information – or attempted to do so.  *Id.* at 9, 16.

Here, there is ample evidence of Robertson's intent to impair the integrity of the election certification proceedings –and specifically, impair the ability of the legislators to carry out their constitutional duties that day. For example, Fracker testified that he understood that Mike Pence had to do a "certain thing" and that the election results would get overturned – and that this what they wanted to happen that day. 4/6/22 PM, Trial Tr. (Fracker Testimony).  Nevertheless, given the significant aggravating factors present in this case, the interests of justice in resolving a serious case, and in order to clarify and simplify the issues to be resolved at the defendant's resentencing hearing, the Government is not asking the Court to move to sentencing on Count One at this time, and expects to orally ask the Court to dismiss Count One at the sentencing hearing.

## VI.    The Revised Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 45 (2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."). [T]he Guidelines remain the foundation of federal sentencing decisions." *Hughes v. United States*, 584 U.S. 675, 685 (2018).  "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

### a.    Probation's Guidelines Recalculation without Count One

The Probation Office filed a July 25, 2024, letter with *post*-Brock and post-*Fischer* alternate Guidelines for defendant, which includes the following Guidelines calculations without consideration of the Section 1512(c)(2) conviction.  As noted below, the Government submits that this calculation omits certain information and includes an error in the grouping:

*Count Two* (18 U.S.C. § 231(a)(3))/*Count Four* (18 U.S.C. § 1752(a)(2) and (b)(1)(A):

| | | |
|---|---|---|
| Base Offense Level | (U.S.S.G. §2A2.4(a)) | +10 |
| Specific Offense Characteristic | (§2A2.4(b)(1)(B)-Dangerous Weapon) | +3 |
| Adjustment | (§ 3B1.1 – Aggravating Role) | +2 |
| **Total** | | **15** |

*Count Six* (18 U.S.C. § 1512(c)(1)) *drives the Group 2 calculations*:

| | | |
|---|---|---|
| Base Offense Level | (U.S.S.G. §2J1.2(a)) | +14 |
| **Total** | | **14** |

*See* ECF No. 167 ("2024 Guideline Calculation Letter") at ¶¶ 72-74.

Grouping:

> Group 1: Counts Two and Four, pursuant to U.S.S.G. § 3D1.2(c)
> Group 2: Count Three and Six, pursuant to U.S.S.G. § 3D1.2(b)[3]

| Group/Count | Adjusted Offense | 3D1.4(a) Units |
|---|---|---|
| Group 1 | 15 | 1.0 |
| Group 2 | 14 | 1.0 |
| Total Number of Units: | | 2.0 |

**Combined Adjusted Offense Level (OL): 17** (Highest OL (15) +2 under 3D1.4)

*See* 2024 Guideline Calculation Letter at ¶ 73.  The U.S. Probation Office calculated defendant's criminal history as Category I, based on a criminal history score of zero.  *See* 2022 Final PSR at ¶ 80; *see also* 2024 Guideline Calculation Letter at ¶ 38. With a total offense level of 17, Robertson's corresponding Guidelines imprisonment range without the Section 1512(c)(2) conviction, as calculated by Probation, but before considering the information discussed below, is 24-30 months. *Id*. at ¶ 74; *see also* U.S.S.G. Ch. 5, Pt. A, Sentencing Table.

Although the Government agrees with the two sentencing enhancements/adjustments applied above (specifically, application of the aggravating role adjustment pursuant to U.S.S.G. § 3B1.1 and the dangerous weapon enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(B)), the Government submits that:

- the aggravating role adjustment, pursuant to § 3B1.1, should be applied to all counts including Count Six, because Robertson's organizer/leadership role continued as he not

---

[3] The grouping provisions cited for this guidelines analysis appear to be a scrivener's error. Based on Probation's guidelines analysis with the 1512(c)(2) count, it should be the following:
- Group 1: Counts Two and Four, pursuant to U.S.S.G. § 3D1.2(**b**)
- Group 2: Count Three and Six, pursuant to U.S.S.G. § 3D1.2(**c**)

*See* 2024 Guideline Calculation Letter at ¶¶ 8-9.

only worked to delete incriminating evidence from January 6 from his phone, but he solicited, collected, and destroyed Fracker's phone as well;

- a two-level increase for obstruction of justice, pursuant to § 3C1.1, is appropriate for Counts Two, Three, and Four, as the evidence from his and Fracker's phones that Robertson destroyed was relevant to all of the crimes defendant committed on January 6;

- a three-level enhancement for "substantial interference with the administration of justice," pursuant to U.S.S.G. § 2J1.2(b)(2), should apply to Count Six, since defendant used his police training to foil collection not just of the evidence in his possession but also Fracker's photo and video evidence, and this missing evidence had a meaningful effect on the investigation and prosecution of Robertson's and Fracker's criminal conduct and, perhaps most significantly, impeded the government's ability to collect evidence relevant to the investigation of Robertson and Fracker's third suspected coconspirator, Robertson's neighbor, in so far that communications between Robertson and his neighbor were never recovered, and were likely to exist on the destroyed phones.

- a two-level enhancement for "selection of any essential or especially probative record, document, or tangible object, to destroy or alter," pursuant to U.S.S.G. § 2J1.2(b)(3)(B), should apply to Count Six, because evidence at trial indicated that Robertson's and Fracker's phones contained both photos and videos from January 6 while Robertson and Fracker were on restricted Capitol grounds and inside the Capitol building, evidence of which goes to the heart of Robertson's trespassing with a weapon, disorderly conduct with a weapon, and obstructing officers during a civil disorder; and also likely contained the aforementioned communications with the third coconspirator.

- all counts should group, as detailed further below.

Additionally, the 2024 Guideline Calculation Letter does not include a full Guidelines analysis for all counts of conviction. *See id.* at ¶¶ 72-74.[4]  The full Guidelines analysis for Counts Two through Six is as follows:

### b.  Analysis for each count

**Count Two: 18 U.S.C. § 231(a)(3)—Obstructing Police During a Civil Disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, the Court should use "the most analogous guideline."  U.S.S.G. §2X5.1.  As originally calculated, the Government requested, and the Court agreed, to use U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a)[5] |
|---|---|---|
| Specific Offense characteristic (Dangerous Weapon)[6] | +3 | U.S.S.G. §2A2.4(b)(1)(B): "If… a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." Photos and videos, as well as trial testimony, established that the defendant brought a large wooden stick with him to the Capitol, and the jury's guilty verdict on Counts Three and Four establishes an express finding that the large stick, in this defendant's hands, constituted a dangerous weapon.  Trial evidence also established that, as part of his |

---

[4] Guidelines Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The 2024 Guideline Calculation Letter does not follow these steps in full.

[5] Alternatively, Section 2A2.2 (Aggravated Assault) with a base offense level of 14 has been applied to the conduct of January 6 defendants who assaulted law enforcement. Thus, at a base offense level of 10, Section 2A2.4 does not capture the full scope of Robertson's relevant conduct.

[6] Although the record establishes that Robertson's stick made contact with the officers, the Government did not alternatively seek a physical contact enhancement pursuant to U.S.S.G. § 2A2.4(b)(1)(A) either in our first sentencing memo or at the original sentencing hearing. At the time it would have made no difference to the calculation. If applied by the Court, it would be applicable to Courts 2, 3 and 4.

| | | |
|---|---|---|
| | | police training, the defendant had been trained and certified to carry a police baton as a weapon. <br><br> Robertson also used the large stick in a "port arms" position, a tactical position used by the military and law enforcement to push others away. Specifically, BWC at trial showed that the defendant confronted MPD CDU officers by blocking their path with his body and with the raised, large wooden stick, which Robertson was holding in a "port arms" position that officers use as a ready position when wielding a police baton. Testimony established that from that position, a trained officer could use the stick to block and push others.  Video footage shows that the large wooden stick made contact with at least two officers. |
| Adjustment (Aggravating Role) | +2 | U.S.S.G. § 3B1.1(c): "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." <br><br> Robertson was an organizer and leader: he recruited two individuals to participate in the criminal conduct, one of whom was Robertson's direct subordinate in the police department, nearly 20 years Robertson's junior, and routinely called Robertson "dad."  Robertson also outfitted his two recruits with supplies (including gas masks, water, and military food rations), and provided transportation.  Robertson also brought the large wooden stick with him to D.C.  The items that Robertson packed (including the gas masks and big stick) and their manner of use make clear that Robertson was organizing for trespass, disorderly and disruptive conduct, forceful resistance to police, and obstructive conduct (both to obstruct police during a civil disorder and to obstruct the certification): Robertson put on his gas mask once he and Fracker reached an area with pepper spray in the air and flash bangs being deployed (by officers trying to hold back and disperse the crowd)  (*see* Trial Tr. 4/6/22, at 699-702 (Fracker test.)) and he used the large wooden stick in a "port arms" tactical position to physically block/obstruct officers and their attempts to hold rioters back. |
| Adjustment (Obstruction of Justice) | +2 | U.S.S.G. §3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."  The commentary for § 3C1.1 clarifies that "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" constitutes a violation of § 3C1.1. U.S.S.G. §3C1.1, cmt. n.4(D). <br><br> On January 11, 2021, after learning that a warrant had issued for his and Fracker's arrest for their conduct on January 6, Robertson collected Fracker's cell phone prior to the arrest, and then destroyed that phone and his own phone to prevent law enforcement from accessing any information on the phones. The information destroyed included photos and videos |

| | | which Robertson knew would be incriminating as they documented his conduct on January 6 and his communications with both coconspirators. |
|---|---|---|
| Total | 17 | |

## Count Three: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)—Entering And Remaining In A Restricted Area While In Possession Of A Dangerous Weapon

The Statutory Index lists two guidelines for this offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2 n.1. Here, since 18 U.S.C. § 1752(a)(1) is essentially a trespass statute, the most applicable guideline is U.S.S.G. § 2B2.3 (Trespass).

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic (Restricted Building or Grounds) | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Specific Offense Characteristic (Dangerous Weapon Possessed) | +2 | U.S.S.G. § 2B2.3(b)(2): "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels."<br><br>The jury's verdict established that the defendant carried a dangerous weapon, in this case, a large wooden stick. |
| *Cross reference* | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Robertson entered and remained in the restricted area of the Capitol grounds and building, armed with a dangerous weapon (the large wooden stick, found by the jury to be a dangerous weapon), not only for the purpose of obstructing the certification but also to obstruct and impede officers, in violation of U.S.S.G. § 231(a)(3). Accordingly, the substantive offense is Count Two (obstructing |

| | | police during a civil disorder, in violation of U.S.S.G. § 231(a)(3)), and the guideline for Count Two (U.S.S.G. § 2A2.4) would be applied). |
|---|---|---|
| Base Offense Level (adjusted): | 10 | U.S.S.G. §2A2.4(a) |
| Specific offense characteristic (Dangerous Weapon) | +3 | U.S.S.G. §2A2.4(b)(1)(B): "If… a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." *See* discussion for Count Two above. |
| Adjustment (Aggravating Role) | +2 | U.S.S.G. § 3B1.1(c): "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." *See* discussion for Count Two above. |
| Adjustment (Obstruction of Justice) | +2 | U.S.S.G. §3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." The commentary for § 3C1.1 clarifies that "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" constitutes a violation of § 3C1.1. U.S.S.G. §3C1.1, cmt. n.4(D). *See* discussion for Count Two above. |
| Total | 17 | |

### Count Four: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)—Disorderly and Disruptive Conduct In A Restricted Area While In Possession Of A Dangerous Weapon

The Statutory Index references two guidelines for 18 U.S.C. § 1752(a)(2), U.S.S.G. § 2B2.3 (Trespass) and U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers).  The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* Appendix A, Introduction; *see also* U.S.S.G. § 1B1.2 n.1.  Here, since 18 U.S.C. § 1752(a)(2) includes behavior beyond mere trespass, the most applicable guideline is U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers).  *See United States v. Nassif,* 97 F.4th 968, 983 (D.C. Cir. 2024) ("But section 2B2.3 is a mismatch for the section 1752(a)(2) violation charged in Count Two…Section 2A2.4 is a more natural fit.").

19

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific Offense characteristic (Dangerous Weapon) | +3 | U.S.S.G. §2A2.4(b)(1)(B): "If… a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." *See* discussion for Count Two above. |
| Adjustment (Aggravating Role) | +2 | U.S.S.G. § 3B1.1(c): "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." *See* discussion for Count Two above. |
| Adjustment (Obstruction of Justice) | +2 | U.S.S.G. §3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."  The commentary for § 3C1.1 clarifies that "directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so" constitutes a violation of § 3C1.1.  U.S.S.G. §3C1.1, cmt. n.4(D). *See* discussion for Count Two above. |
| Total | 17 | |

## Count Five: 40 U.S.C. § 5104(e)(2)(D)—Disorderly or Disruptive Conduct in The Capitol Building Or Grounds

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply to it.  *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9; 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9. |
|---|---|---|

## Count Six: 18 U.S.C. § 1512(c)(1)—Obstruction of Justice By Altering, Destroying, Mutilating, Or Concealing A Record, Document, Or Other Object

The Statutory Index references only one guideline for 18 U.S.C. § 1512(c) offenses:

U.S.S.G. § 2J1.2 (Obstruction of Justice).

| Base Offense Level | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "If the offense resulted in substantial interference with the administration of justice, increase by 3 levels." |

| | | |
|---|---|---|
| (Substantial Interference) | | Trial testimony established that immediately after Robertson learned that there was a warrant out for his arrest and Fracker's arrest, Robertson met Fracker and collected both of their cell phones before they self-surrendered on the warrant.  This prevented law enforcement officials from collecting the phones in a search incident to arrest, which Robertson knew would occur given his work in law enforcement.  Then, after Robertson was processed, arraigned on the charges and released, Robertson destroyed both phones by throwing them into a lake.  Several days later, in a text message to a friend, Robertson admitted to doing this because his phone was "problematic" in connection with the pending case.

Robertson destroyed both his cell phone and Fracker's cell phone, which both men used while inside the Capitol and on the Capitol grounds during the riot.  We know that Fracker took photos and videos, and Robertson took photos.  This destruction of evidence was not brought to light until Fracker agreed to plead guilty and cooperate with the government, and the evidence on the phones was never recovered by law enforcement.  Based on this, the crime substantially interfered with the administration of justice—specifically, the criminal charges against Robertson and Fracker. Perhaps most importantly, the phones were believed to have contained Robertson and Fracker's communications with their neighbor coconspirator, which have never been recovered.

Additionally, the "official proceeding" for Count Six (obstructing justice by corruptly destroying records or objects to impair their availability for use in an official proceeding), as specified in the Second Superseding Indictment, is the investigation into the attack on the Capitol on January 6, and the prosecution of Robertson's crimes, not the certification.  *See* ECF 74 at p. 4.  Accordingly, the "administration of justice" interfered with here is a criminal investigation and prosecution,  not the certification, and U.S.S.G. § 2J1.2 enhancements referring to the "administration of justice" rightfully apply to such judicial proceedings and related criminal investigations.  *See Brock*, 94 F.4th at 51 ("Section 2J1.2's text, context, and commentary show that 'administration of justice' refers to judicial, quasi-judicial, and adjunct investigative proceedings, but does not extend to the unique congressional function of certifying electoral college votes.") |

| Specific Offense Characteristic (Especially Probative) | +2 | U.S.S.G. §2J1.2(b)(3)(B): "If the offense… involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter… increase by 2 levels." Robertson destroyed his cell phone and Fracker's cell phone, which both men had used while on restricted Capitol grounds and inside the Capitol building on January 6, 2021.  Based on trial testimony and exhibits, the government proved that both phones contained incriminating photographs from the Capitol, and Fracker's phone contained at least three incriminating videos as well. Such photo and video evidence go to the heart of Robertson's trespassing with a dangerous weapon, disorderly conduct with a dangerous weapon, and obstructing officers during a civil disorder (which using a dangerous weapon).  They also were believed to have included probative evidence against their third coconspirator, whose communications were never recovered. |
| Adjustment (Aggravating Role) | +2 | U.S.S.G. § 3B1.1(c): "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." After January 6, Robertson organized the collection and destruction of both Fracker's and his own phone after learning of the FBI investigation. |
| Total | 21 | |

### c.  Grouping Analysis

Under U.S.S.G. § 3D1.2(a)-(c), "closely related counts" group.  Count Three (Entering and Remaining in a Restricted Building or Grounds While Using or Carrying a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A)), and Count Four (Disorderly and Disruptive Conduct in a Restricted Building or Grounds While Using or Carrying a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A)), group because they have the same victim – Congress.  *See* U.S.S.G. § 3D1.2(a) and (b).  Furthermore, Count Two (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)) groups with Counts Three and Four, pursuant to U.S.S.G. § 3D1.2(c) – because Count Two embodies conduct (Robertson's use of the large wooden stick to obstruct officers) that is treated as a specific offense characteristic in the

guideline applicable to Counts Three and Four (specifically, the possession and threatened use of a dangerous weapon, pursuant to U.S.S.G. § 2A2.4(b)(1)(B)).

Finally, Count Six (Obstruction of Justice by Destroying or Concealing a Record, Document, or Other Object, in violation of 18 U.S.C. § 1512(c)(1)) groups with Count Two because it must group with at least one of the counts with a § 3C1.1 adjustment, pursuant to U.S.S.G. § 3D1.2(c). *See* U.S.S.G. § 3C1.1, cmt., n.8 ("the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2"); *see also* U.S.S.G. § 3D1.2, cmt., n.5 ("If... [a] bribe was given for the purpose of hampering a criminal investigation into the offense [of fraud], it would constitute obstruction and under § 3C1.1 would result in a 2-level enhancement to the offense level for the fraud. Under the[se] circumstances, the counts would be grouped together."). Accordingly, Counts Two, Three, Four, and Six all group together. The offense level for that Group is "the highest offense level of the counts in the Group," pursuant to § 3D1.3(a). *See* U.S.S.G. § 3D1.3(a); *see also* U.S.S.G. § 3D1.4, comment. n. 1 (noting that when the analysis in §§ 3D1.2 and 3D1.3 results in a single group, the combined offense level for that group is simply the offense level for that group as determined under § 3D1.3); U.S.S.G. § 3C1.1, cmt., n.8 ("The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater."). Here, the highest offense level in the Group is the offense level (21) for the obstruction offense, Count Six. **Hence, the offense level for the Group is 21**.

### d.   Acceptance of Responsibility

Robertson did not accept responsibility.  Instead, he contested factual guilt and went to trial on all six charges against him, all of which resulted in guilty verdicts.  Accordingly, he is not entitled to the minus-two adjustment under U.S.S.G. § 3E1.1(a).  *See* 2024 Guideline Calculation Letter ¶ 45; *see also* U.S.S.G. § 3E1.1, comment. n. 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, [and] is convicted"); *United States v. Dozier*, 162 F.3d 120, 126–27 (D.C. Cir. 1998) (finding that the defendant was ineligible for the 3E1.1(a) two-level downward adjustment for acceptance of responsibility where he went to trial and was acquitted of three drug charges but convicted of two firearms offenses).  Additionally, because Robertson is ineligible for the § 3E1.1(a) adjustment, he is also ineligible for the § 3E1.1(b) adjustment. *See* U.S.S.G. § 3E1.1(b).

### e.   Inapplicability of U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders)

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case, because Robertson used "violence or credible threats of violence in connection with the offense[s]," in contravention of U.S.S.G. § 4C1.1(a)(3); Robertson possessed a dangerous weapon (a large wooden stick) in connection with the offenses, in contravention of U.S.S.G. § 4C1.1(a)(7) (*see* 2024 Guideline Calculation Letter at ¶ 31)**;** and Robertson "receive[d] an adjustment under § 3B1.1 (Aggravating Role)," in contravention of U.S.S.G. § 4C1.1(a)(10).

24

As discussed above, Robertson was wearing a gas mask while he blocked the path of MPD

CDU officers with his body and with a large wooden stick raised in a "port arms" position, which

officers use as a ready position when wielding a police baton.  And as officers tried to move past

Robertson the stick made contact with them.  As this Court acknowledged at Robertson's original

sentencing, while discussing the application of the U.S.S.G. § 2J1.2(b)(1)(B) enhancement for

"threatening to cause physical injury," Robertson's behavior was threatening:

> While perhaps not aggressively threatening, as I said, *if I were an officer, I would
> have felt physically threatened if I saw the defendant standing in front of me with a
> backpack and a gas mask holding a stick at port arms standing right in front of me
> and not moving out of the way* and making contact with it as I tried to organize a
> line to fight off a violent mob. I would consider that threatening or menacing
> conduct.
>
> In addition, the Webster's definition of 'threat' is an expression of intention to
> inflict injury. That is very close to the instruction that I gave the jury on carrying a
> dangerous weapon, namely that they had to find that the defendant, quote, carried
> the stick with the intent to use it in a manner capable of causing serious injury. *In
> my view, carrying a weapon with the intent to use it to inflict injury is tantamount
> to expressing an intention to inflict injury, which is the dictionary definition of
> "threat."* So I believe the enhancement applies.

8/11/22 Sent. Tr. at 15 (emphasis added).  The analysis used above is also consistent with the

analysis that at least one other court has used in considering the inapplicability of § 4C1.1 because

the defendant engaged in a "credible threat of violence."  *See United States v. Bauer,* No.

121CR003862TNM, 2024 WL 324234, at *3 (D.D.C. Jan. 29, 2024) ("a 'credible threat of

violence' is a believable expression of an intention to use physical force to inflict harm.").

Furthermore, the context in which defendant acted—with officers being confronted,

attacked, and assaulted by other rioters at same time—made defendant's conduct even more

threatening.  *See United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 ("In

evaluating whether credible threats of violence were posed by the defendant's offense conduct, to

my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

Additionally, defendant Robertson possessed a dangerous weapon.  As defined in the Guidelines, a dangerous weapon is "an instrument capable of inflicting … serious bodily injury." U.S.S.G. § 1B1.1 cmt., n.1 (E)(i).  As discussed above, Robertson, who had been trained by police and military forces, carried a large wooden stick which he used in a port arms tactical position to block officers who were already being attacked and assaulted by the mob.  In those circumstances, the large wooden stick was capable of inflicting serious bodily injury and hence was a dangerous weapon. Finally, the Court applied the aggravating role adjustment pursuant to U.S.S.G. § 3B1.1 at Robertson's original sentencing as previously recommended by Probation (*see* 8/11/22 Sent, Tr. at pp. 5, 26).   Recently, Probation again recommended application of the aggravating role adjustment pursuant to § 3B1.1 in their 2024 Guideline Calculation Letter (at ¶15); and as discussed above, the Government believes that the aggravating role adjustment applies to all of Robertson's counts of conviction subject to the Guidelines.

### f.  Criminal History and Guidelines Range

The U.S. Probation Office calculated defendant's criminal history as Category I, based on a criminal history score of zero.  *See* 2022 Final PSR at ¶ 80; *see also* 2024 Guideline Calculation Letter at ¶ 38. With a total offense level of 21, Robertson's corresponding Guidelines imprisonment range, as calculated by the Government, is **37-46 months**.  *See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table.   This represents a significant drop from the original Guidelines range calculated by the Court and Probation (87-108 months' imprisonment), but of course, there was no change in the egregious nature of the underlying conduct.

### VII.   The Government's Resentencing Request

### a.  An Upward Departure is Warranted

After determining the defendant's Guidelines range, a court then considers any departures or variances.  *See* U.S.S.G. § 1B1.1(a)-(c); U.S.S.G. § 1B1.1, cmt., background ("If, after step (c), the court imposes a sentence that is outside the guidelines framework, such a sentence is considered a 'variance.'").  Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the Government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range to 87 months' incarceration.

Defendant Robertson was an avid and willing participant in an unprecedented crime.  He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.  His offenses targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Robertson "endanger[ed] our democratic

27

processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in Robertson's Guidelines calculation reflects these facts. Robertson would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[7] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate

---

[7] The D.C. Circuit's holding in *Brock*, 94 F.4th 39, finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176, 2195 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

punishment for the offense. U.S.S.G. § 5K2.7.[8] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. "January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition of power, which is one of the bedrocks of our democracy." *United States v. Perkins*, 21-CR-147-CJN, Sent. Tr. at 53; *see also United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86. ("The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy.")  There can be no doubt that it caused a significant disruption to a vital governmental

---

[8] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

function.  *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Because the seriousness of Robertson's crime is not adequately captured by the applicable Guideline, an upward departure under § 5K2.7 is appropriate.  Indeed, judges of this Court have already applied § 5K2.7 in January 6 cases. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

### b.  Analysis of the 18 U.S.C. § 3553(a) Factors Remains the Same

After calculating the Guidelines, the Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49, 50.  This two-prong "sentencing framework applies both at a defendant's initial sentencing and at any subsequent resentencing after a sentence has been set aside on appeal." *Pepper v. United States*, 562 U.S. 476, 490, 131 S. Ct. 1229, 1241, 179 L. Ed. 2d 196 (2011) (citing 18 U.S.C. § 3742(g) ("A district court to which a case is remanded ... shall resentence a defendant in accordance with section 3553") and *Dillon v. United*

*States*, 560 U.S. 817, 828, 827, 130 S.Ct. 2683, 2692, 177 L.Ed.2d 271 (2010)).  Although "the Supreme Court's decision in *Fischer* may ultimately change the Guidelines recommendation for [a defendant], Fischer does not dictate the Court's application of the 18 U.S.C. § 3553(a) factors to [that defendant's] remaining convictions[, and t]he Court may still consider [the defendant's] serious conduct on January 6th, 2021 in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512." *Hostetter*, 1:21-CR-392-1-RCL, ECF 507 (July 18, 2024 Order Denying Motion for Release from Custody Pending Appeal) at 4.  Section 3553(a) provides that the Court consider the following:  (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id*.; (C) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Guidelines is just one of many factors under § 3553(a).

As discussed above and below, the Guidelines range in the instant case is not an accurate reflection of the harm or gravity unique to the defendant's attempts to obstruction the certification of the 2020 presidential election, an attempt to undermine American democracy itself. Furthermore, as discussed above and below, this defendant in particular has characteristics (such as being a police officer who inexcusably used his training against other officers) and post-arrest misconduct (weapons hoarding) that the new guidelines do not adequately take into account in his conduct, his history, and the severity and harm of what happened.

### i. Nature and Circumstances of the Offense Support an 87-month sentence

As discussed above, Robertson's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Robertson used violent political rhetoric on social media in the weeks and month leading up to January 6, for instance discussing "counter-insurgency" and "open armed rebellion" (*see* Government's 2022 Sentencing Memo, p. 4), and recruited Fracker (Robertson's then-subordinate at RMPD who was nearly 20 years Robertson's junior) and a third man to join him on the trip to D.C., and made the travel arrangements, supplied gas masks, water, and military food rations for all three men, drove Fracker and the third man up to D.C., and purchased and provided them all with Metrorail cards for the day.  Robertson also packed a large wooden stick, and had been trained and certified to use similar weaponry, i.e., police batons, as a police sergeant. He witnessed the crowd assaulting MPD-CDU officers, and instead of helping his fellow officers, Robertson stood firmly in front of them, blocked their path, and raised up his wooden stick in the "port arms" tactical position, and while in that position his large wooden stick made contact with other officers.  Robertson was also part of the first wave of rioters to breach the Capitol building on January 6;  he joined a mob that overcame yet another police line that had formed in the Crypt, and, as rioters chanted, Robertson showed his support by banging his stick in time on the ground, while Fracker clapped along; and he then remained in the Crypt with Fracker to take selfies.  He then bragged about his involvement in January 6 on social media after the fact; after hearing about a warrant, he collected phones with possible incriminating evidence to be destroyed; and after arrest, he proceeded to violate several orders put in place by the courts while he was on supervision. And all of this was done in the shadow of the fact that Robertson had intended and actually attempted to stop the certification of the 2020 presidential election.  As previously asserted, the

nature and circumstances of Robertson's offenses remain of the utmost seriousness, and continue to fully support the Government's recommended sentence of 87 months' imprisonment.

Not only did the defendant participate in the January 6, 2021, insurrection and subsequently cover-up his criminal conduct by destroying evidence, but after he was arrested, he trafficked in firearms in direct violation of this Court's orders. As detailed at length in the briefing on the Government's motion to revoke the defendant's conditions of release, ECF Nos. 30, 32 and 34, on June 29, 2021, following a lawfully authorized search of the defendant's residence, law enforcement discovered that the defendant violated his release conditions by possessing a loaded M4 rifle and a partially-assembled pipe bomb at his home, and by purchasing an arsenal of 34 firearms online and transporting them in interstate commerce while under felony indictment, in violation of 18 U.S.C. § 922(n).

Review of additional records further corroborates the defendant's participation in these firearms offenses. *See* Sentencing Ex. A with attachments A-1 to A-3 (FBI FD-302 discussing the defendant's sentencing submissions).  For example, in a recorded conversation between the defendant and Dennis Deacon on September 13, 2021, the defendant makes clear the control he exercised over his firearms during his pretrial release by stating, "[w]e've got a key to go in and get them anytime we want to. [Pat's] got a basement apartment and stuff and Pat doesn't give a rat's ass."  *See* Sentencing Ex. A at 4-5. The Pat to whom the defendant refers is his neighbor who accompanied him to the Capitol, and who confirmed to law enforcement that he was holding firearms on the defendant's behalf – and whose communications Robertson likely destroyed. Deacon, incidentally, is the same individual who, submitted a letter to the Court noting that he never had any doubt as to the defendant's integrity. ECF No. 121-5.  Additional messages

between the defendant and his neighbor suggest the defendant may have retrieved some of his weapons. Sentencing Ex. A-1 (Texts with Pat).

### ii.   History and Characteristics of the Defendant

First, although the defendant has no criminal history prior to January 6, 2021, his post-arrest weapons and ammunition hoarding in direct contravention of court orders shows a clear pattern of disrespect for the law and the courts, and reflects the danger he poses, as discussed further below.   Second, the defendant has a police and military background, and used his law enforcement training against other police officers attempting to defend the Capitol.   And third, Robertson has a track record of lying about his military service to his employer, his friends, and to the news media. In evidence at trial were representations that the defendant made to the city of Rocky Mount, Virginia in support of his application for employment with the police department. Gov. Ex. 304; Trial Tr. 4/5/21 at 460 (Ervin test). The defendant identified himself on his resume to be a U.S. Army Ranger school graduate. Gov. Ex. 304. Through written filings by counsel, he made similar representations to this Court.   ECF No. 31 ("Mr. Robertson served in the United States Army…he became a Ranger and a Sniper school graduate"). A review of the defendant's official military records, however, confirms that he is neither an Army Ranger nor a graduate of the U.S. Army Ranger School. *See* Sentencing Ex. B with attachments B-1 to B-5 (FBI FD-302 discussing the defendant's Army Service); and specifically, B-1 (April 5, 2022, Ranger School Memorandum).

On January 11, 2021, just a few days after the attack, in an effort to publicly assert that his own role in the insurrection was peaceful, law-abiding, and patriotic, the defendant also bragged to a reporter that he achieved the rank of Sergeant First Class (E-7) and sent a photo that he claimed to be of himself, adorned with a Purple Heart. Sentencing Exhibits. B-2 (Communications with

Reporter) and B-3 (Related News Articles).  This too is false; the defendant was discharged from the Army at the rank of Specialist (E-4) on August 27, 2009, and never was awarded a Purple Heart.  Sentencing Ex. B at 4 and Sentencing Ex. B-4.  Notably, the defendant lied to codefendant Fracker—a former U.S. Marine, and the defendant's subordinate officer at RMPD—about his military service, using the lies to envelop himself in a cloak of credibility and imbue himself with leadership authority, all of which influenced Fracker's friendship with his former mentor, and ultimately Fracker's decision to join the defendant at the Capitol on January 6, 2021. These lies to Fracker continued even after the defendant's arrest. Sentencing Ex. B-5 (Fracker Texts) ("Recognizing that I volunteered as a Ranger…").

The defendant has amply demonstrated his approval of violence to disrupt the peaceful transfer of power.  And now, the country approaches the final months of what is likely to be another fiercely contested presidential election. If the defendant is released, the Court would be releasing him into the same volatile political climate and unrest that led him to commit his crimes in the first place. This presents an unacceptable risk to the safety of the community given the history and characteristics of this defendant.

### iii. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Robertson's criminal conduct on January 6 was the epitome of disrespect for the law and an attack on democracy, as detailed in the departure and variance sections.  *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our

democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### iv.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.  Not only did the defendant participate in the January 6, 2021, insurrection and subsequently cover-up his criminal conduct by destroying evidence, but after he was arrested, he trafficked in firearms in direct violation of this Court's orders. As detailed at length in the briefing on the Government's motion to revoke the defendant's conditions of release, ECF Nos. 30, 32 and 34, on June 29, 2021, Robertson has had multiple post-arrest weapons violations, including in January 2021, for possessing eight unapproved firearms in his home and large amounts of ammunition and equipment seemingly used for reloading ammunition on his property; and in June 2021, for possessing a loaded M4 rifle and a partially-assembled pipe bomb at his home, and purchasing an arsenal of 34 firearms

---

[9] *See* 18 U.S.C. § 23]31(5) (defining "domestic terrorism").

online and transporting them in interstate commerce while under felony indictment, in violation of 18 U.S.C. § 922(n).

Accordingly, although the defendant has a criminal history category of I, his post-arrest conduct shows a clear pattern of disrespect for the law and an inability to forgo weapons even under court order.  This behavior not only suggests that Robertson is a risk of danger to the community, but it demonstrates that Robertson's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of violent political rhetoric.  Additionally, Robertson's post-January 6 social media messages confirm that he has not only a lack of remorse for his conduct but is proud of his behavior on January 6 ("I am fucking PROUD of it…"), and would engage in such behavior again unless sufficiently deterred.

### v.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants [1] with similar records [2] who have been found guilty of similar *conduct*." (emphasis added).   Although different charges are a legitimate consideration when determining if there are warranted disparities between two sentences, the focus of the judicial inquiry should be on the real underlying conduct.  *See United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020) ("A difference in types of charges is a legitimate consideration when determining whether there should be a justifiable difference, or disparity, between the sentences of  two defendants"); *United States v. Booker*, 543 U.S. 220, 223, 125 S. Ct. 738, 743, 160 L. Ed. 2d 621 (2005) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct underlying the crime of conviction.").  Courts have recognized that "[n]o limitation shall

be placed on the information concerning the background, character, and *conduct* of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Rhodes*, 145 F.3d 1375, 1381 (D.C. Cir. 1998) (citing 18 U.S.C. § 3661) (emphasis added). District Courts thus "may still consider [the defendant's] serious conduct on January 6th, 2021, in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512." *Hostetter*, 1:21-CR-392-1-RCL, ECF 507 at 4.

Additionally, pre-*Fischer* 1512(c)(2) cases remain reliable comparators because a review of sentences given by district judges in pre-*Fischer* Capitol Siege cases involving 1512(c)(2) convictions confirms that district judges were already appropriately considering and weighing the 18 U.S.C. § 3553(a) factors in their decision-making, instead of being beholden to the Guidelines. In a majority of pre-*Fischer* Capitol Siege cases involving 1512(c)(2) convictions, judges sentenced outside of the then-applicable Guidelines range and gave variances based on the § 3553(a) factors. At least 19 of the district judges who have sentenced Capitol Siege cases have varied in at least one of their cases involving a 1512(c)(2) conviction. And when varying, judges considered the importance of the context and the attempts to obstruct the certification. *See, e.g., United States v. Lucas Denney*, 22-cr-70 (RDM), Sent. Tr. at 83 ("I will say that under other circumstances, I might have varied further downward. But I had to temper any basis for varying further downward by the fact that the attacks occurred in the context of an assault on our democracy, an assault on the Capitol, an assault on one of the most sacred events in our nation, and that resulted in injuries, not just to the psychic well being of the officers who were -- endured that assault, but to the nation as a whole."); *United States v. Hunter Seefried*, 21-cr-287 (TNM), Sent. Tr. at 54 ("I have no doubt that the Commission would have intended for this to be applied

to a substantial interference with an official proceeding, which is itself more significant than almost any proceeding. And you and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources. Therefore, I intend to vary upwards from the guideline range I've calculated to reflect the substantial interference you and others caused."); *United States v. Gilbert Fonticoba*, 21-cr-638 (TJK), Sent. Tr. at 66-67 ("I'm varying downward given the posture we're in. But I would vary upward significantly to get to 48 months if I only had Count 2, because I think there, again, given the evidence here of the intent the defendant's conceded, the intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence and all the rest and in terms of the specific fact pattern here that that would be my sentence.").

At the original sentencing in the instant case, the Court used the defendant in *United States v. Reffitt*, 21-cr- 32 (DLF) as a comparator.  *See* 8/11/22 Sent. Tr. at 64-66 ("[O]n balance, I think the two cases are roughly notionally the same").  The Court noted that Reffitt was also one of the first January 6 cases to go to trial; that neither defendant had criminal history;  they had the exact same offense level and 87-to-108-month guideline range; both defendants "had disturbing text messages before January 6th advocating rebellion against the government based on the election, "although Mr. Reffitt's may have been a little more specific"; both carried a dangerous weapon (Reffitt a firearm); neither assaulted police officers; both encouraged others to destroy evidence; and although "Mr. Reffitt made clear and direct threats against Speaker Pelosi and Minority Leader McConnell while also attempting to obstruct the certification… [Robertson] entered the Capitol, and Mr. Reffitt did not." *Id.* at 64-66.  Reffitt also received a sentence of 87 months' incarceration.

In the *Reffitt* matter, which is currently on appeal, Judge Friedrich, the sentencing judge, noted after *Brock* that a sentence of 87 months' imprisonment could be driven by the Section 3553 factors, even without applying 2J1.2(b)(1)(B) and § 2J1.2(b)(2). *United States v. Reffitt*, No. 21-CR-32 (DLF), 2024 WL 1577941, at *5 (D.D.C. Apr. 10, 2024) ("The Court could arrive at the same sentence of 87 months' imprisonment by applying the § 3553(a) factors. Upon a resentencing occasioned by a remand, unless the court of appeals expressly directs otherwise, the district court may consider ... such new arguments or new facts as are made newly relevant by the court of appeals," including the application of an "upward variance.") (internal citations and quotations omitted).   This suggests that *Reffitt* remains a reliable comparator based on the 3553(a) factors.

### c. An Upward Variance is Warranted

If the Court declines to depart, an upward variance to 87 months' incarceration is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, it does not  require this Court to take a drastically different view of the defendant's conduct.  *Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5.

In past sentencings, this court has made clear its view that attempts to obstruct the certification on January 6 were "serious, not only for the delay that it caused and its effect on the police officers that the government referenced, but more importantly the stain that it left on our democracy." *United States v. Cooper John Herbert Strand*, 1:21-cr-85 (CRC), 6/1/2023 Sent. Tr., at 76.   Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

40

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided." *United States v. Cleveland*, 21-CR-159-ABJ, Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

Other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See Reffitt*, 2024 WL 1577941, at *5 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").

Additionally, as discussed above, in the Guideline recalculations here, all counts group, and Count Six, Robertson's 1512(c)(1) conviction for concealing and destroying records on his and Fracker's phones, determines the offense level for that single group.  Because the offense level for the 1512(c)(1) is singularly determinative of the total offense level, the conduct underlying Robertson's other convictions does not meaningfully enter into the determination of the applicable guidelines range at all – the total offense level would be the same regardless of Robertson's trespass with a dangerous weapon, disorderly and disruptive conduct with a dangerous weapon, obstruction of officers during a civil disorder, and attempts to interfere with the certification. Because Robertson's three other felony crimes do not meaningfully enter into the determination of defendant's guideline this Court should impose an upward variance to account for the full scope of Robertson's crimes.

The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the Government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal

conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting United States v. *Brown*, 808 F.3d 865, 867, 872 (D.C. Cir. 2015)).

### VIII.   Conclusion

For the reasons set forth above, and as fully supported by the facts and the law, the United States asks the Court to resentence defendant Robertson to a sentence of 87 months' incarceration for each of Counts Three (Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon), Four (Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon), and Six (Obstruction of Justice—Destruction of Evidence); 60 months' incarceration for Count Two (Civil Disorder); and six months' incarceration for Count Five (Disorderly Conduct in a Capitol Building), all to run concurrently with one another. The United States further asks the Court to reinstate the previously imposed 3-year term of supervised release, restitution of $2,000, and the mandatory special assessment for each of the counts of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/*Elizabeth Aloi*
Elizabeth Aloi
Assistant United States Attorney
601 D Street, N.W.,
Washington, D.C. 20530
(202) 252-7212
Elizabeth.Aloi@usdoj.gov